UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF TENNESSEE

NASHVILLE DIVISION

| | |
|---|---|
| DAVID BROWN CAUDLE, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>AAC HOLDINGS, INC., MICHAEL T. CARTWRIGHT, KIRK R. MANZ and ANDREW W. MCWILLIAMS,<br><br>Defendants. | Civil Action No. 3:19-cv-00407<br><br><u>CLASS ACTION</u><br><br>Judge Eli J. Richardson<br>Magistrate Judge Alistair E. Newbern<br><br>CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934<br><br>JURY DEMAND |

## TABLE OF CONTENTS

**Page**


I. INTRODUCTION ....................................................................................................1

II. JURISDICTION AND VENUE ...............................................................................4

III. PARTIES ...............................................................................................................4

IV. DEFENDANTS' FRAUDULENT SCHEME AND WRONGFUL COURSE OF BUSINESS ................................................................................................................7

A. Defendants' Unethical and Deceptive Marketing Tactics ......................................8

B. Defendants Artificially Inflated AAC's Financial Results by Failing to Write Off Uncollectible Accounts Receivable ......................................................16

V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ..........................................................................................................23

A. False and Misleading Statements Regarding AAC's Marketing Practices............23

B. False and Misleading Statements About AAC's Financial Results and Accounting Practices ..............................................................................................34

VI. LOSS CAUSATION................................................................................................51

VII. ADDITIONAL SCIENTER ALLEGATIONS...........................................................56

A. Defendants Disregarded Current Factual Information Before Issuing AAC's Financial Results, and Their External Statements Contradicted AAC's Internal Reports .........................................................................................56

B. Defendants Concealed a SEC Subpoena Regarding AAC's Accounts Receivable.................................................................................................................58

C. Defendants Falsely Attested to the Adequacy of AAC's Internal Controls ..........59

D. Numerous AAC Executives and a Majority of the Board of Directors Have Resigned....................................................................................................................60

E. Sales and Marketing Were Critical to AAC's Core Operations ............................61

F. Cartwright Misled the United States Congress Under Oath Regarding AAC's Operations...........................................................................................................61

VIII. APPLICABILITY OF PRESUMPTION OF RELIANCE ...............................................62

IX. CLASS ACTION ALLEGATIONS .........................................................................64

**Page**


COUNT I ....................................................................................................................66

COUNT II ...................................................................................................................67

PRAYER FOR RELIEF .............................................................................................68

## I. INTRODUCTION

1. This is a securities fraud class action brought on behalf of those who purchased AAC Holdings, Inc. ("AAC" or the "Company") common stock between March 8, 2017 and April 15, 2019, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "1934 Act") and SEC Rule 10b-5 promulgated thereunder.

2. AAC is a for-profit healthcare company which operates addiction treatment centers, transitional "sober living" services, and drug testing services. AAC's inpatient and sober living beds are located around the country and operated primarily through its subsidiary, American Addiction Centers, Inc.

3. The human and financial toll of the opioid epidemic afflicting this nation is without precedent. AAC positioned itself as one of the few public companies committed to helping those suffering from opioid addiction and substance abuse disorders. The truth about AAC, however, was far darker. AAC, its CEO, and two successive CFOs falsified the Company's reported financial results while simultaneously overseeing a deceptive sales and marketing scheme which was designed to and did inflate AAC's operating performance, balance sheets and income statements as publicly reported throughout the Class Period.

4. As an integral part of defendants' efforts to fill beds and drive AAC's reported revenue growth, the Company operated over 100 deceptive websites that were designed to appear to provide unbiased and reliable addiction advice and directories of treatment facilities but were, in fact, thinly veiled lead-generation mechanisms. When people seeking help with drug and alcohol addiction called the toll-free number listed on AAC's websites, they were not connected with counselors or treatment specialists but rather with commission-compensated AAC salespersons located in AAC's Brentwood, Tennessee call center, who were paid bonuses when they induced callers to be admitted to AAC facilities. While defendants publicly asserted that AAC's marketing

practices provided it with a competitive advantage, AAC's untoward practice of recruiting patients through deception ultimately caused AAC to be barred from advertising on Google, denied renewed membership in a prominent addiction treatment professional society, and forced AAC to attempt to defend its conduct in front of a congressional committee hearing on improper marketing practices in the substance abuse treatment industry.

5. As a part of defendants' scheme and wrongful course of business, AAC also fraudulently inflated its accounts receivable, overstating its reported net income and/or understating the net losses it reported to investors during the Class Period. Ignoring its own historical collections experience and instead relying on "industry and other data," (which Cartwright, Manz, and McWilliams knew was not representative of AAC's actual experience), AAC failed to timely write off tens of millions in impaired receivables.

6. Each of the individual defendants was directly involved in the misconduct complained of herein. Cartwright directly oversaw the Company's sales and marketing programs, publicly acknowledging that he was "hyperfocus[ed] on the sales and marketing side of things." Cartwright, Manz, and McWilliams repeatedly discussed the purported strengths of AAC's marketing program throughout the Class Period, while failing to disclose: (a) that the "success" of ACC's marketing efforts was being driven by the deceptive lead generation websites and misleading marketing practices; and (b) that, as a result of media, industry, and congressional pressure, AAC was being forced to discontinue its deceptive and misleading practices and had been denied renewed membership in a leading addiction treatment industry association. Cartwright, Manz, and McWilliams also oversaw the preparation and dissemination of AAC's fraudulent financial statements. Among other things, Cartwright, Manz, and McWilliams received monthly reports showing the Company's poor collections record and the aging of receivables while repeatedly assuring the market that collections were a "top priority" of senior management. Even when the

SEC specifically questioned AAC in March 2018 about how it accounted for its receivables, Cartwright and McWilliams did not come clean, but instead concealed the SEC subpoena from investors for more than seven months.

7. Toward the end of 2018, when defendants could no longer sustain their scheme and wrongful course of business, the true state of affairs at AAC began to be revealed. On November 6, 2018, defendants released AAC's 3Q18 financial results, disclosing that the Company had failed to meet its revenue, earnings per share, and EBITDA targets, and reduced the fiscal year 2018 ("FY18") guidance Cartwright had previously reassured investors AAC was on track to meet. AAC's disastrous results were the direct result of AAC's inability to continue its deceptive marketing practices and financial manipulations.

8. On April 15, 2019, AAC filed with the SEC its annual report on Form 10-K for FY18 ("2018 Form 10-K"), which disclosed that the Company had been forced to restate its historical financial results. During a conference call the next day, McWilliams euphemistically noted that "adjustments" had to be made "to certain of our previously issued annual and interim financial statements." Also April 16, 2019, defendants issued a release and convened a conference call regarding AAC's 4Q18 financial results, reporting revenue, earnings per share, and EBITDA that were well below AAC's guidance as a result of the Company's inability to continue the scheme and wrongful course of business complained of herein.

9. As defendants' misconduct reached the market, AAC's stock price collapsed, declining more than ***86%*** from its Class Period high of $12.87 on March 16, 2018 to just $1.74 on April 16, 2019. The decline in the price of AAC common stock caused tens of millions of dollars in losses to AAC investors, who suffered economic harm as the truth about AAC, its operations, and its prospects began to be revealed. This action seeks to recover these losses suffered by Lead Plaintiff and the Class.

## II. JURISDICTION AND VENUE

10. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the 1934 Act (15 U.S.C. §§78j(b) and 78t(a)), and U.S. Securities and Exchange Commission ("SEC") Rule 10b-5 (17 C.F.R. §240.10b-5) promulgated thereunder. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act (15 U.S.C. §78aa).

11. Venue is proper in this District pursuant to 28 U.S.C. §1391(b). A substantial amount of the acts and omissions giving rise to the claims at issue occurred in this District. AAC's corporate headquarters are located in this District and defendants are subject to personal jurisdiction in this District.

12. In connection with the acts and omissions alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the New York Stock Exchange ("NYSE").

## III. PARTIES

13. Lead Plaintiff Indiana Public Retirement System ("INPRS") includes the two largest public retirement plans in Indiana. The Indiana State Teachers' Retirement Fund ("TRF") was created in 1921. The Indiana Public Employees' Retirement Fund ("PERF") was created in 1945. In 2011, the Indiana General Assembly integrated the management of the two systems under INPRS. INPRS oversees a total of nine separate retirement funds, representing more than 222,000 active members. INPRS manages more than $30 billion in assets and serves the needs of members and retirees, representing more than 1,200 employers, including public universities, school corporations, municipalities, and state agencies, and is among the largest 100 pension funds in the United States. As set forth in its Private Securities Litigation Reform Act certification, INPRS acquired AAC

common stock at artificially inflated prices during the Class Period and was damaged thereby. ECF No. 27-3.

14. Defendant AAC is a Nevada corporation with its principal executive offices located at 200 Powell Place, Brentwood, Tennessee 37027. AAC is a provider of inpatient and outpatient addiction treatment services, as well as an internet marketing company. As of June 30, 2019, AAC had over 25.2 million shares of common stock outstanding. During the Class Period, AAC's common stock traded in an efficient market on the NYSE, under the ticker symbol "AAC."

15. Defendant Michael T. Cartwright ("Cartwright") has served as AAC's Chief Executive Officer ("CEO") at all relevant times, since June 2013. Defendant Cartwright has served as the Chairman of AAC's Board of Directors (including that of Forterus, Inc., the predecessor to AAC's operating subsidiary American Addiction Centers, Inc.) since 2011. Cartwright continued to own approximately 26.3% of AAC's shares following the October 2014 initial public offering of AAC common stock, making him the Company's largest shareholder. As of April 24, 2019, Cartwright was AAC's largest shareholder, with about 19% of the outstanding shares.

16. Defendant Kirk R. Manz ("Manz") served as AAC's Chief Financial Officer ("CFO") from January 2011 until his resignation in December 2017. From 2008 through 2010, Manz served as CEO of GMD Holdings, Inc., a digital media company. From 2006 through 2008, Manz served as managing member of Private Capital Securities, LLC, an investment banking firm. From 2004 through 2006, Mr. Manz served as Vice President of Investments for Piper Jaffray & Co. Previously, Mr. Manz worked as a fixed income specialist for Stephens Inc. from 2002 through 2004.

17. Defendant Andrew W. McWilliams ("McWilliams") has served as AAC's CFO since January 1, 2018 and served as its Chief Accounting Officer between August 2014 and January 1, 2018. From October 1998 through August 2014, McWilliams worked as an auditor with Ernst &

Young LLP. While at Ernst & Young LLP, Mr. McWilliams worked with multiple healthcare clients, and worked on public offerings of securities as well as mergers and acquisitions.

18. The defendants referenced above in ¶¶15-17 are collectively referred to herein as the "Individual Defendants" and are liable under §§10(b) and 20(a) of the 1934 Act.

19. During the Class Period, AAC's Chairman and CEO, Cartwright, and CFOs, Manz (until December 2017) and McWilliams, were privy to confidential, proprietary information concerning AAC, its finances, operations, financial condition, and present and future business prospects. The Individual Defendants also had access to material adverse non-public information concerning AAC, as discussed in detail below. Because of their positions with the Company, the Individual Defendants had access to non-public information about its finances, business, markets, products, and present and future business prospects through internal corporate documents, conversations, and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof, and through reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

20. The Individual Defendants are liable as direct participants in the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers (and with respect to Cartwright, also as a director) were "controlling persons" within the meaning of §20(a) of the 1934 Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of AAC's business.

21. The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases, and presentations

to securities analysts and, through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and releases alleged herein to be misleading, before or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

22. As senior executive officers and/or a director and as controlling persons of a publicly traded company whose stock was, throughout the Class Period, registered with the NYSE and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to AAC's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of AAC common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

23. The Individual Defendants are liable as participants in a scheme and wrongful course of conduct that operated as a fraud or deceit on purchasers of AAC common stock. The scheme: (a) deceived the investing public regarding AAC's business, operations and management, and the intrinsic value of AAC common stock; and (b) caused plaintiff and members of the Class (defined below) to purchase AAC common stock at artificially inflated prices.

## IV. DEFENDANTS' FRAUDULENT SCHEME AND WRONGFUL COURSE OF BUSINESS

24. AAC is headquartered in Brentwood, Tennessee, and provides inpatient and outpatient substance abuse treatment services for individuals with drug addiction, alcohol addiction and co-occurring mental/behavioral health issues. As of March 31, 2019, AAC operated nine

inpatient substance abuse treatment facilities located throughout the United States, fifteen standalone outpatient centers and four sober living facilities comprising a total of 1,443 inpatient and sober living beds. The Company operates websites from which it derives advertising income and generates leads for its treatment facilities. The Company also performs drug testing and diagnostic laboratory services for its clients and third parties from its laboratory in Brentwood.

25. For fiscal year 2017 ("FY17"), 97% of AAC's revenue was derived from "client related revenue," that is, primarily service charges related to providing addiction treatment and related services, including clinical diagnostic laboratory services. The remaining 3% of AAC's revenue was derived from "non-client related revenue," consisting of service charges from the delivery of targeted leads to behavioral and mental health service businesses and diagnostic laboratory services provided to clients of third-party addiction treatment providers. During FY17, 80% of AAC's "client related revenue" was generated by residential treatment facility services. Thus, filling beds, or, as AAC dubbed it, increasing "census," was critical to AAC's ability to drive its reported revenue growth.

**A. Defendants' Unethical and Deceptive Marketing Tactics**

26. AAC relied heavily on its sales and marketing efforts to grow revenue. With over 300 of its employees being specifically dedicated to generating or answering phone calls from potential patients, AAC was as much a consumer marketing company as a healthcare company.

27. While generating new clients was the core driver of AAC's operating performance, attracting new customers was very expensive. Before the Class Period, AAC spent approximately $5,500 per client on customer acquisition costs. To reduce these expenses and drive future growth, AAC sought to build what Manz described as a "dominant sales and marketing force in this space."

28. AAC's purportedly "best-in-class sales and marketing engine" consisted of what it characterized as its "air game" and its "ground game." The "ground game" included dozens of

business development representatives, who promoted AAC's services and facilities to hospitals, therapists, doctors, employers, DUI attorneys, unions, first responders and veterans, among other groups. Each of these business development representatives was expected to generate approximately 6-8 admissions per month, and produced 47% of AAC's admissions.

29. The "air game" was comprised of AAC's corporate and facility websites and lead generation websites, as well as television, radio, billboard and print advertising. This "air game" resulted in over 30,000 monthly calls and web chats, which were routed to over 100 salespeople in AAC's Brentwood call center, and collectively produced 53% of AAC's admissions.

30. AAC's "air game" was driven in large part by its July 2015 acquisition of Referral Solutions Group, LLC ("RSG") for $35 million in cash and $25 million in stock. RSG's primary business involved operating over 100 websites, with URLs like rehabs.com and recovery.org, which appeared to provide informational resources about drug abuse and drug treatment, as well as directories of treatment facilities in different parts of the country. In reality, RSG's websites were thinly veiled lead generation mechanisms designed to produce millions of dollars in income by using carefully crafted search engine optimization ("SEO") techniques to increase the websites' visibility, and charging rehab providers to advertise on their sites, or when visitors would call or click-through to facility websites.

31. Following its purchase of RSG, AAC relied on these lead generation websites to generate a substantial portion of its patients and revenues. While still appearing to provide disinterested information about addiction and treatment, as well as information about addiction treatment centers across the country, these websites included a toll-free phone number on almost every page. When people seeking help called the toll-free phone number displayed on the websites, they were connected with an AAC sales representative who was paid on a commission basis, and subject to minimum admissions goals, to enroll patients in AAC's facilities.

32. By the start of the Class Period, AAC was aware that RSG had been inflating its call volumes through so-called "black hat" SEO techniques. These techniques included "scraping," which involves copying content from one website and using it on another. The purpose of this strategy is to attract search traffic to the scraped content, and then profit through visitors clicking on pay-per-click ads. Another involved "keyword stuffing," or "thin content," when websites produce low-quality content but repeatedly stuff keywords into such content in an order to increase the site's ranking by search engines. Nevertheless, by the start of the Class Period AAC continued to operate these deceptive and misleading websites.

33. By 2017, the proliferation of predatory and deceptive drug treatment marketing began attracting significant media and oversight attention. For example, a September 7, 2017, article in *The Verge*, entitled "Searching For Help," examined how rehab lead generators and call centers used Google Ads to attract clients through misleading marketing practices, including operating hotlines that seemed like unbiased referral services, but in reality referred patients to treatment centers they owned. The article discussed how rehab operators frequently overbilled insurance companies by tens of thousands of dollars, how call center reps were paid bonuses for "performance," and how recent legislative changes could impact the industry.

34. Industry trade associations began taking steps to address unethical and illegal marketing practices. Founded in 1978, the National Association of Addiction Treatment Providers ("NAATP") is a not-for-profit professional membership association which functions as a trade association for addiction treatment providers. NAATP is comprised of approximately 850 member-facilities that provide varying addiction treatment services. NAATP's mission is to provide leadership, advocacy, training, and member support services to ensure the availability and highest quality of addiction treatment.

35. In response to unethical marketing tactics employed by addiction treatment providers, and because such behavior caused serious harm to the consumer patient, the patient's family, insurer, and the addiction treatment industry at large, the NAATP adopted a Quality Assurance Initiative in 2017 designed to deter misleading marketing practices, among other things, and articulate standards for marketing ethics amongst its members. NAATP's Quality Assurance Initiative included an Ethics Code which specifically prohibited the types of marketing employed by AAC, including deceptive internet marketing.

36. Congress also took notice. On December 12, 2017, the United States House of Representatives Committee on Energy and Commerce, Subcommittee on Oversight and Investigations, held a hearing entitled, "Examining Concerns of Patient Brokering and Addiction Treatment Fraud." The hearing included testimony from Pete Nielsen, Executive Director of the California Consortium of Addiction Programs and Professionals. CCAPP is California's largest statewide consortium of community-based for profit and nonprofit substance use disorder treatment agencies, and addiction focused professionals, providing services to over 100,000 California residents annually in residential, outpatient, and private practice settings.

37. Nielsen testified that focus on patient centered care is critical and that patients should not be treated as a commodity, which he observed was taking place at the time. Nielsen specifically called out the type of high pressure boiler room call centers operated by AAC:

> At some call centers, workers are paid bonuses for "performance," based on how many admissions they sign up, and many use high-pressure sales tactics on very desperate callers. Once a potential client is on the phone, it's up to the call center employee to convince them that they should travel to the treatment center the call center is representing, whether or not going away from home was the person's intention, and whether or not the treatment center provides the right therapies and environment that best suits the consumer.

38. The hearing also included testimony from Douglas Tieman, President and CEO of Caron Treatment Centers, a leading, non-profit provider of addiction treatment services. Tieman testified about "unethical and illegal practices," which included practices employed by AAC:

> ***Predatory Web Practices*** **–** Manipulation of websites or online search results designed to deceive prospective patients and families, or to obscure the source of treatment advice provided. This can take the form of hijacking Google search results for specific treatment provider names or by utilizing complex corporate ownership trails to obscure relationships between online treatment referral sources and the providers owned by the same parent company. This may be done by changing, disguising, or hiding the phone number associated with a specific provider to that of a competing provider or call aggregator with the intent of redirecting prospective patients.
>
> * * *
>
> ***Paid Call Center/Directory/Call Aggregation*** **–** A potentially predatory web practice where a highly efficient search engine optimization (SEO) website is established by an organization owned by the parent company of multiple treatment centers. These sites often advertise "free consultations" that can help place a prospective patient at a treatment facility with available beds. In reality, prospective patients or families may end up reaching call centers that only search the facilities owned by the parent company, and cannot guarantee a good geographic or clinical fit for the patient. Additionally, the free consultations offered may be conducted by call center staff who are not clinically trained to assess a potential patient's appropriate treatment level of care.

39. On July 25, 2018, the House of Representatives Committee on Energy and Commerce, Subcommittee on Oversight and Investigations, held another hearing, entitled "Examining Advertising and Marketing Practices within the Substance Use Treatment Industry." The Pre Hearing Memo described some of the concerns which prompted the Subcommittee's action, again including practices utilized by AAC:

> The increased demand for treatment has brought with it new concerns about treatment facilities' marketing practices as well as the quality of care patients receive. Patients in need of treatment resources often look for help on the internet, where some providers have used aggressive, and, at times, allegedly deceptive advertising tactics. Many treatment-focused websites advertise phone hotlines that lead potential clients to call centers or call aggregators. These call centers may appear to be unaffiliated third-party referral services, but, in some cases, they are wholly operated by treatment facilities or are paid by facilities to refer calls. While some centers disclose their relationship with treatment facilities, others do not, and

> may engage in deceptive marketing tactics to hide the relationship. Reports indicate that call aggregators may refer patients to facilities that do not meet their needs, and once patients enter treatment, they may be vulnerable to exploitation by unscrupulous business owners.
>
> * * *
>
> Some treatment facilities utilize call centers or call aggregators to engage with potential customers. One type of call center functions as an unaffiliated third-party referral service, which routes calls to treatment facilities for a per-call fee. In some instances, these call centers do not speak with potential patients to determine their needs before routing them to the treatment facilities paying for calls. The price per call varies, but the Committee's investigation has found that some call aggregators charge between $20 to $40 per call. Other call centers are operated by businesses that also own treatment facilities, and the call centers are used to advertise their own facilities and services. In these cases, the Committee found that some call centers pay bonuses to employees for each successful enrollment of a patient in their treatment facility. While some call centers and websites disclose that they are owned and operated by treatment facilities, others do not clearly list or otherwise disclose their ownership or affiliations. In some instances, the contact information included in online listings for treatment facilities has been altered so that anyone who calls seeking treatment would be funneled to a call center or another treatment facility rather than the facility listed. Those answering the calls could then either encourage a prospective patient to enroll in their treatment programs or collect the person's contact information and sell it to other interested treatment centers.
>
> In addition, some facilities or companies own and operate multiple websites, domains, or URLs to advertise treatment. Like call centers, the level of disclosure offered by treatment facilities about their ownership of treatment-related websites varies widely. Some companies advertise solely through branded websites that disclose their treatment facilities and ownership structure. Others develop unbranded websites that may appear to be unaffiliated third-party sites meant to offer resources and helplines. To reach the greatest number of potential clients, some businesses have developed dozens of treatment-related websites. At least one business told the Committee that they developed unbranded websites in order to reach additional potential clients. The Committee has also found multiple examples of treatment industry business URLs that closely mirror other well-established treatment facilities or highly trafficked websites in an effort to capitalize on similar terms or misspellings. Businesses have also indicated they occasionally use television advertisements to promote 1-800 hotlines for treatment facilities.

40. Opening statements from members of the Subcommittee, including Representative Greg Walden, Representative Frank Pallone, Jr., and Subcommittee Chairman Gregg Harper, expressed similar concerns, describing a "Pandora's box of online advertisements" and websites engaged in deceptive marketing tactics to obscure their affiliation with treatment operators.

41. Cartwright was called to testify at the July 25, 2018 hearing and was questioned directly about AAC's practices, including whether AAC clearly identified its websites as being affiliated with AAC, as well as its use of incentive compensation and quotas in its call center.

42. Google also began to scrutinize addiction treatment advertising. Google Ads (formerly Google AdWords) is an online advertising solution that businesses use to promote their products and services on Google Search, YouTube, and other sites across the web. Google Ads works by displaying a company's ad when people search online for keywords tied to the specific products and services that are the subject of the ad. Rehab and addiction and recovery organizations routinely used Google Ads to target new customers, paying upwards of $100.00 for every instance in which a web user clicked on one of their ads, and spending an estimated $100 million on Google Ads as of 2017. AAC was a leading user of the Google Ad platform, and one of Google Ads' largest drug rehab-related customers.

43. In September 2017, shortly after publication of *The Verge* article and six months into the Class Period, Google stopped selling ads for addiction treatment-related search terms in the US, stating that "[w]e found a number of misleading experiences among rehabilitation treatment centers that led to our decision." In January 2018, Google extended the ban and applied it globally, stating:

> Substance abuse is a growing crisis and even as we've helped healthcare providers connect with people who need help, unfortunately there's also been a rise in deceptive practices from bad actors taking advantage of those in need. This is a complex issue with varying degrees of regulation in different countries, which is why we've decided to suspend ads in the entire addiction treatment center category globally while we consult with experts to find a better way to connect people with the treatment they need.

44. In January 2018, the NAATP declined to renew AAC's membership in the organization. During the July 24, 2018, Congressional hearing, Cartwright misleadingly suggested (under oath) to Vice Chairman Griffith that AAC was not a member of NAATP because the Company felt that another organization, the National Association of Behavioral Healthcare, was

"meeting our needs more appropriately." In fact, AAC's web marketing practices were found to violate NAATP's Code of Ethics, making AAC ineligible for membership renewal, and AAC spent months, before and after the hearing, seeking to rejoin the NAATP and participate in its events, including by sending a threatening cease and desist letter.

45. On April 16, 2018, LegitScript, a company which monitors and certifies health and other high-risk websites on behalf of search engines, payment providers, and e-commerce platforms, issued a release entitled, "LegitScript and Google Partner on New Certification Program for Addiction Treatment Providers." Google had decided to again allow Google Ads advertising by addiction treatment entities, and in the release, LegitScript announced that, "[s]tarting in July, advertisers of drug and alcohol treatment services in the United States, including providers of in-person addiction treatment, mutual support groups, and crisis hotlines, will need to be certified by LegitScript before they can advertise through Google AdWords."

46. AAC immediately sought to inject itself into LegitScript's certification process, reaching out to LegitScript and its CEO in an attempt to install itself as a LegitScript advisor. But its efforts were rebuffed. Beginning in May 2018 (and continuing until at least May 2019) AAC also sought to obtain certification from LegitScript so that it could resume Google Ads marketing. Its efforts were unsuccessful, however, as LegitScript's certification standards preclude "lead generators" from certification.

47. On August 1, 2018, Google released a broad core algorithm update, as it does on a periodic basis. Such updates can impact where a given website appears in the hierarchy of Google's search results. This update became known by some in the SEO community as the "YMYL" (Your Money or Your Life) update. YMYL content is the type of information that, if presented inaccurately, untruthfully or deceptively, could directly impact the reader's happiness, health, safety or financial stability. Google applies a high level of scrutiny to such content, which must

demonstrate expertise, authoritativeness and trustworthiness (known as "E-A-T"), in order to be highly ranked. The YMYL update was in part an attempt by Google to better rank websites based on E-A-T. Disreputable websites with a poor or non-existent reputation that do not demonstrate the E-A-T of their content, such as many of AAC's websites, would be ranked lower, whereas websites written by knowledgeable people which are positively externally reviewed or linked would be ranked higher. As Google explained with regard to medical-related websites:

> High E-A-T medical advice should be written or produced by people or organizations with appropriate medical expertise or accreditation. High E-A-T medical advice or information should be written or produced in a professional style and should be edited, reviewed, and updated on a regular basis.

48. The YMYL update resulted in many of AAC's lead generation websites declining significantly in Google's search rankings.

49. These efforts to curtail predatory and unscrupulous operators from taking advantage of individuals seeking treatment took a profound toll on AAC, which relied heavily on deceptive methods to fuel its growth, and saw its revenues decline by tens of millions of dollars when it was no longer able to employ such tactics.

### B. Defendants Artificially Inflated AAC's Financial Results by Failing to Write Off Uncollectible Accounts Receivable

50. At the same time defendants began to reveal the impact of their inability to continue their deceptive marketing practices, they also revealed that AAC had falsified its Class Period financial results. The same release that disclosed AAC's 4Q18 financial results also described the Company's earnings restatement, stating that AAC, its audit committee, management, and auditors had "determined that adjustments to certain of its previously issued annual and interim financial statements were necessary, and that those annual and interim financial statements could no longer be relied upon." AAC further explained that the "adjustments related to estimates of accounts

receivable, provision for doubtful accounts and revenue" for the periods reported in the annual and quarterly reports during the Class Period.

51. As AAC's restated financial statements revealed, by failing to timely write off revenue that defendants were aware AAC was never going to receive, Defendants caused AAC to report its financial condition and operating performance as being much stronger than it actually was. AAC ultimately overstated its earnings and understated its losses by tens of millions of dollars and was compelled to restate its financial statement as a result thereof.

52. As a provider of inpatient and outpatient addiction treatment services, the vast majority of AAC's services (90% or more) are paid for by third-party payors, including commercial health insurance providers and managed care organizations. AAC was "generally an 'out-of-network' provider" and thus "receive[d] the majority of payments from commercial payors at out-of-network rates." Some of those payments were not paid directly by the third party to AAC but rather to the client (*i.e.*, a recovering addict who may have been out of work for an extended period and be behind on other financial commitments), who would then be responsible for remitting it to AAC. For accounting purposes, AAC treated those payments the same as any other accounts receivable ostensibly due from a commercial payor. This payment structure made it especially important for investors to understand the extent to which AAC was actually able to collect the amounts it billed for its services. This aspect of AAC's business was reflected on its financial statements through its accounting for revenue, accounts receivable, and "doubtful accounts" or "bad debt."

53. Throughout the Class Period, AAC represented that its financial statements were prepared in accordance with generally accepted accounting principles ("GAAP").[1] Under GAAP, the

[1] GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. SEC Regulation S-X, Rule 4-01 (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite

collectability of accounts receivable is an example of a "loss contingency." GAAP requires that an estimated loss from a loss contingency be accrued (recorded) by a charge to income if both of the following conditions are met:

> (a) information available before the financial statements are issued or are available to be issued indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements; and
>
> (b) the amount of loss can be reasonably estimated.

*See* Accounting Standards Codification ("ASC") 450-20-25-2. Similarly, GAAP requires "[a]n expense or loss [to be] recognized if it becomes evident that previously recognized future economic benefits of an asset have been reduced or eliminated." *See* Statement of Financial Accounting Concepts ("SFAC") No. 5, *Recognition and Measurement in Financial Statements of Business Enterprises*, ¶87.

54. Consistent with GAAP, AAC represented in its Annual Report on Form 10-K, for the fiscal year ended December 31, 2016, filed with the SEC on March 7, 2017 (the "2016 Form 10-K"), that "[r]evenues are recognized when services are performed at the estimated net realizable value amount from clients, third-party payors and others for services provided," *i.e.*, "based on [AAC's] estimate of the amount that payors will pay [it] for the services performed." Revenues for client services were "recorded at established billing rates less adjustments to estimate net realizable value," which adjustments were supposed to reflect "the amount expected to be collected for the service provided based on historic adjustments for out-of-network services not under contract." AAC said those adjustments were made "on a per facility basis, to reflect a ***historical analysis of reimbursement data by facility*** in addition to considering the type of services provided, the payors and the gross client charge rates by facility." These statements were repeated in AAC's Annual

---

footnote or other disclosure. Regulation S-X requires that interim financial statements must also comply with GAAP. 17 C.F.R. §210.10-01(a).

Report on Form 10-K for the fiscal years ended December 31, 2017, filed with the SEC on February 23, 2018 (the "2017 Form 10-K").

55. Before January 1, 2018, AAC's financial statements reflected a provision for doubtful accounts, which represented the expense associated with "management's best estimate of accounts receivable that could become uncollectible in the future." That provision was purportedly based on "a number of factors, including historical experience, the age of the accounts and current economic trends." The provision was "determined on a quarterly basis and adjusted monthly thereafter based on actual collections," meaning that if "actual future collections are less favorable than those projected by management, additional allowances for uncollectible accounts may be required."

56. Effective January 1, 2018, AAC adopted ASC Topic 606, Revenue from Contracts with Customers, which changed the way AAC accounted for doubtful accounts. As a result of the adoption of Topic 606, substantially all of AAC's adjustments related to collectability were considered implicit variable price concessions to be recorded as a direct reduction to revenue. As such, bad debt was recorded as a reduction of revenue rather than as a provision for doubtful accounts expense. The only activity still recorded in operating expenses post-adoption was bad debt related to specific customers that experience significant adverse changes in creditworthiness, such as bankruptcies. Despite the change from accounting for doubtful accounts as an expense to accounting for them as a direct reduction to revenue, AAC still purported to be conducting an analysis of collectability that took "into account the type of services provided and the historical collections received from commercial payors, on a per facility basis, compared to gross client charges billed."

57. Unbeknownst to investors, however, throughout the Class Period AAC estimated the collectability of its revenues and calculated its net accounts receivable ***not*** on the basis of its own historical collection experience but "primarily based on industry and other data." As a result, AAC treated a large portion of its revenues as collectible and thus included it in its accounts receivable

without deducting it as a "doubtful account," even though defendants were in possession of historical data that indicated that AAC was unlikely ever to receive payment. Indeed, by the start of the Class Period, AAC had accounts receivable – predominantly related to laboratory testing – that had not been written off for two to three years after the services were rendered. This contradicted AAC's representations to investors that "substantially all of accounts receivable aged greater than 360 days were fully reserved in [AAC's] consolidated financial statements." It was, however, the result of a "challenge" that defendants had been aware of since at least 2016, when, as Manz stated in an April 2017 investor conference, there had begun to be "a lot of . . . scrutiny within the lab business, and rightly so." By 1Q17, defendants were aware that "the lab side of our business" was causing a slowdown in collections. As Manz put it, "fraud and abuse from a few providers in the lab space" had caused "the major payers" to refuse to pay bills unless and until they received additional "clinical documentation." Nonetheless, defendants simply allowed those receivables to remain on AAC's books instead of timely writing them off.

58. Because AAC was ignoring its own historical collection experience and failing to properly reserve for or write off accounts receivable that had aged well beyond 360 days, it significantly overstated its accounts receivable during the Class Period. In March 2018, AAC received an SEC subpoena seeking information about accounts receivable where AAC had received partial payment from an insurance company but continued to pursue collections for remaining amounts AAC claimed it was owed. Cartwright and McWilliams concealed AAC's receipt of that subpoena from the market until November 6, 2018. In the third quarter of 2018, the audit committee conducted a review of AAC's accounting for those specific receivables and stated that a "change in estimate of the collectability" of those accounts receivable was necessary. As disclosed on November 6, 2018, that change in estimate resulted in a $6 million revenue reduction and an increase in AAC's net loss of about $5.7 million for the three and nine months, respectively, ended

September 30, 2018. Defendants Cartwright and McWilliams, however, continued to conceal that this was just the tip of the iceberg.

59. On March 19, 2019, AAC filed with the SEC a Form 12b-25 revealing that it would not file its annual report on Form 10-K in a timely manner. On March 29, 2019, AAC filed a current report on Form 8-K that revealed AAC "expect[ed] to report a material weakness in the Company's internal controls over financial reporting, and, therefore, conclude that internal controls over financial reporting as of December 31, 2018 [were] not effective" and that, as a result, the financial information contained in financial statements for the years ended December 31, 2016 and 2017, and each quarter in 2017 and 2018, "should not be relied upon." The Company further revealed that, in preparing the annual report for FY18, management and AAC's auditors had "analyze[d] cash collection trends for historical and prospective periods relating to its accounts receivable (including client-related diagnostic testing accounts receivable), provision for doubtful accounts and revenue," and determined that AAC's financial statements contained "error[s]" such that they required "restatements with regard to the relevant historical periods." Defendants indicated that the adjustments did "not relate to the change in estimate that the Company made during the three months ended September 30, 2018" yet failed to disclose whether or how they related to the SEC's ongoing investigation. By specifically highlighting "client-related diagnostic testing accounts receivable," AAC confirmed that the restatement at least partly related to the lab testing receivables that AAC had secretly allowed to remain on its books for years, contrary to its representations, and that defendants knew had been the subject of increased scrutiny from major payors.

60. On April 15, 2019, AAC issued its annual report on Form 10-K for the year ended December 31, 2018 (the "2018 Form 10-K"). The 2018 Form 10-K disclosed AAC's restated financial results for 2017, and the first three quarters of 2018. On April 16, 2019, McWilliams also discussed the Company's restatement on a conference call, stating that AAC "determined [in]

consultation with our auditors that adjustments to certain of our previously issued annual and interim financial statements were necessary. These adjustments related to estimates of accounts receivable, provision for doubtful accounts and revenue . . . ."

61. The fact that AAC restated its previous financial statements is an admission that (i) AAC's Class Period financial results and public statements regarding those results were materially false and misleading when made; and (ii) the financial statements reported during the Class Period were incorrect based on information available to defendants at the time the results were originally reported. As noted by the SEC, "GAAP only allows a restatement of prior financial statements based upon information 'that existed at the time the financial statements were prepared'"; and "restatements should not be used to make any adjustments to take into account subsequent information that did not and could not have existed at the time the original financial statements were prepared." The Financial Accounting Standards Board ("FASB"), the governing body that promulgated the accounting rules regarding restatements of prior financial statements, has defined "restatement" as "the process of revising previously issued financial statements to reflect the correction of an error in those financial statements." *See* ASC 250-10-20, *Accounting Changes and Error Corrections*. The FASB has also defined the "errors" that may be corrected through a restatement: "an error in recognition, measurement, presentation, or disclosure in financial statements resulting from mathematical mistakes, mistakes in the application of generally accepted accounting principles (GAAP), or oversight or misuse ***of facts that existed at the time the financial statements were prepared***." *Id.* (emphasis added).

62. If there were any doubt about whether the information that led to the restatement was available to defendants at the time of their initial statements, the restatement itself cleared that up, stating that the Company had failed to timely write off accounts receivable based on "historical cash collection trends by customer ***that existed at the time of the issuance of the historical financial***

***statements***." Similarly, defendants cannot dispute that the errors were material because they admitted in the restatement that their evaluation of the accounting errors "includ[ed] discussion as to the size of the adjustments" and that it was on the basis of those discussions that they decided to issue the restatement. In sum, AAC's restatement was due to material accounting errors as a result of misuse of facts that were known at the time relating to uncollectible revenue and receivables (*i.e.*, bad debt).

## V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

### A. False and Misleading Statements Regarding AAC's Marketing Practices

63. Throughout the Class Period, defendants repeatedly chose to speak to investors about the strength of the Company's sales and marketing platforms, extolling them as industry leading and providing AAC with a competitive advantage that other treatment providers could not replicate without considerable expense. In fact, defendants caused AAC to use deceptive tactics to drive leads to its call center and convert leads into paying patients, while concealing from investors the risks posed by such practices.

64. On May 23, 2017, Cartwright and Manz presented at the UBS Global Healthcare Conference in New York. The presentation included a slide deck, which was also attached to a Form 8-K filed with the SEC and available on the Investor Relations section of the Company's website. The slide deck described AAC's "best-in-class sales and marketing engine," including that AAC received "2+ million AAC site visits per month," "30,000+ phone calls per month," and "1,000+ admissions per month" and that AAC received "[r]evenue from delivering targeted leads to third-parties." The slide deck also stated that "AAC's marketing knowledge and infrastructure cannot be replicated without substantial capital and time" and provided the Company with a "significant

competitive advantage." During the conference, Cartwright described AAC's digital marketing strategy, stating:

> One of the things that we've also built while we're at this in terms of building a great product is a great sales and marketing engine, right? There's no great brand out there. Nike, whatever you consider a great brand out there today that doesn't have a great sales and marketing platform. So we've done that as well. We have 65 outside sales reps, they talk to emergency rooms, they talk to physicians, they talk to private therapists, DUI attorneys, large employers in different cities throughout the United States. And then we also have a multimedia platform, where we have over 100 websites, that if you type in heroin addiction or methamphetamine addiction, and you look up a different keyword, you're probably going to come across one of our websites. We generate about 30,000 calls per month coming into our call center in Nashville, where we have a 100 sales reps [sic] answering the phone every day.

65. The statements in ¶64, above, were materially false and misleading when made. The true facts, which were then known to or recklessly disregarded by defendants AAC, Cartwright and Manz were that AAC's sales and marketing operations were not "best-in-class," and did not provide AAC with a "significant competitive advantage," but rather that the majority of the admissions AAC reported were derived from an "air game" centered around unethical and deceptive websites that drove phone calls and web chats to AAC's Brentwood call center, where salespeople were subject to quotas and paid bonus payments if they admitted patients to AAC's facilities (Section IV(A)).

66. On February 22, 2018, Cartwright and McWilliams hosted a conference call to discuss AAC's financial results. During the call, Cartwright was asked what he had learned by carefully assessing the Company's marketing efforts for the last several months and whether the Company's efforts would in the future be more focused on its call center or business development representatives. Cartwright responded that there would be growth in digital marketing in AAC's call center and that the Company's efforts would drive business in the states in which it operated:

> No, I think it's both. I mean, I think the team that we have focused on digital marketing is incredible. The talent that we have there is really exceptional. And I think the ideas that they come up with on a quarterly basis amaze me. Some of the partnerships that we're doing now with universities, we just started a unique partnership with Ole Miss, University of Mississippi, partnering with Oxford Centre and working with some of their new incoming freshmen. It started all on the digital

> front, but now is really more of a community relations front. So I think one of the things that we're going to see is how can our digital work hand-in-hand with community marketing in the field. For example, in New Jersey, we just had a great community program up there that hand-in-glove the community program worked with the digital side that bring people together. So I think you'll see more community working in states like Nevada. They're working more as a team. So I think you're going to see growth both on the digital. You're going to see it in the call center. But you're also going to see it local, where you're going to see a lot more local business being driven out of the states that we operate facilities. So I think there is a long way to go there on both sides. I think we're just getting started.

67. On February 23, 2018, AAC filed its Form 10-K for FY17 with the SEC. The Form 10-K was signed by defendants Cartwright and McWilliams. In the Form 10-K, defendants stated that "[w]e believe our national sales and marketing program provides us with a competitive advantage compared to treatment facilities that primarily target local geographic areas and use fewer marketing channels to attract clients."

68. On September 5, 2018, the Company issued a release entitled "American Addiction Centers Names Stephen Ebbett Chief Digital & Marketing Officer." In the release, AAC and Cartwright announced that Ebbett would oversee the Company's lead generation websites and falsely claimed that AAC was seeking to "elevate[] the addiction treatment industry as a whole":

> Ebbett will lead American Addiction Centers' outreach to those seeking recovery from alcoholism, addiction and co-occurring mental health disorders. As part of his duties, Ebbett will oversee operation of AAC's Recovery Brands websites that provide news, information and discussion forums for the recovery community.
>
> * * *
>
> "Searching for help with addiction requires courage, and finding help should be as seamless as possible, especially in a digital landscape that is always evolving and can be confusing for individuals," Cartwright said. "Under Stephen's leadership, we'll continue to explore ways to help those who are seeking freedom from addiction and to honor their willingness to change. And we'll do this in a way that, hopefully, elevates the addiction treatment industry as a whole."

69. The statements in ¶¶66-68, above, were materially false and misleading when made. The true facts, which were then known to or recklessly disregarded by defendants AAC, Cartwright, Manz, and McWilliams were:

(a) That AAC's sales and marketing operations had not provided AAC with a "significant competitive advantage;"

(b) That the majority of AAC's admissions were derived from an "air game" centered around unethical and deceptive websites that drove phone calls and web chats to AAC's Brentwood call center, where commission-based salespeople were subject to quotas and paid bonuses if they successfully induced patients to be admitted to AAC's facilities (¶¶29-32);

(c) That scrutiny of AAC's improper practices, including from industry trade associations and Congress, had reduced AAC's ability to continue generating revenue through its established practices (¶¶33-49);

(d) That Google's ban on addiction treatment advertising, shortly after publication of *The Verge* article in September 2017, had already made an immediate negative impact on AAC, which relied on such advertising to generate calls to its call center and convert those calls into revenue-generating patients (¶¶42-48);

(e) That AAC's refusal to conform its practices to NAATP's standards of conduct had caused substantial reputational harm to AAC, as did its removal from NAATP's online directory of members (which had previously generated revenue for AAC) which resulted in further damages, as AAC's misconduct led some NAATP members to stop advertising on AAC's directory websites, causing AAC to lose millions of dollars in revenue (¶¶44-49);

(f) Far from providing a competitive advantage, AAC's websites lacked E-A-T, and were designed to deceive and obfuscate regarding the ownership and affiliation of the websites, making them uniquely vulnerable to changes in Google's search algorithms (¶¶29-32, 47-48);

(g) Far from providing AAC a competitive advantage, defendants were aware that due to Congressional and industry scrutiny, AAC could not continue its existing marketing practices; and

(h) That Defendants knew that AAC's FY18 revenues and prospects, which had historically been driven by the practices detailed in Section IV(A) above, would be substantially impaired.

70. AAC's 2017 Form 10-K, filed with the SEC on February 23, 2018, acknowledged that if the Company's marketing programs were disrupted, AAC's census and operations could be negatively impacted:

> We believe our national sales and marketing program provides us with a competitive advantage compared to treatment facilities that primarily target local geographic areas and use fewer marketing channels to attract clients. If any disruption occurs in our national sales and marketing program for any reason, or if we are unable to effectively attract and enroll new clients to our network of facilities, our ability to maintain census could be adversely affected, which would have a material adverse effect on our business, financial condition and results of operations.

71. The statements in ¶70, above, was materially false and misleading when made. The true facts, which were then known to or recklessly disregarded by defendants AAC, Cartwright, and McWilliams, were that AAC's marketing programs, census and operations had already been disrupted and adversely impacted by (i) Google Ads' suspension of addiction treatment advertising; (ii) the December 12, 2017 Subcommittee on Oversight and Investigations hearing; and (iii) AAC's inability or unwillingness to confirm its sales and marketing practices to NAATP's Code of Ethics, as detailed in Section IV(A) above.

72. On November 6, 2018, the Company filed its 3Q18 Form 10-Q with the SEC for the quarter ended September 30, 2018 (the "3Q18 Form 10-Q"). The 3Q18 Form 10-Q again suggested that changes to Google's search rankings had the potential to impact AAC's sales and marketing efforts, emphasizing that AAC could not "predict" the impact of "[u]nexpected changes":

> Internet search engines play an increasingly important role in addiction treatment marketing. Google and other search engines use complex algorithms to rank websites. The algorithms take into account many factors, including the domain name itself, website content and user-friendly factors such as the speed at which the website pages may be clicked through and viewed. We cannot predict or control changes in algorithms and website rankings, which may result in lower rankings for

> our websites. Additionally, Google and other online platforms have instituted review processes required to advertise on their websites. Some of these processes are time-consuming, complex and continuously evolving. We cannot predict how these private processes, rules and restrictions will evolve or be applied to individual advertising applicants. Unexpected changes in these areas may result in a decrease in calls to our admissions center, a decrease in interactions with potential clients and a lowering of our census, which could have [a] material adverse effects on our business, financial condition and results of operations.

73. The statement in ¶72, above, was materially false and misleading when made. The true facts, which were then known to or recklessly disregarded by defendants AAC, Cartwright, and McWilliams, were:

(a) In addition to the facts set forth in ¶71, above, by the time defendants issued the 3Q18 Form 10-Q, Google had already altered its algorithms and already instituted additional review processes, which prevented AAC from advertising through Google (¶¶43, 47-48);

(b) Defendants' statement that the "algorithms take into account many factors, including the domain name itself, website content and user-friendly factors such as the speed at which the website pages may be clicked through and viewed" was misleading as the primary reason AAC's websites had fallen in Google's ranking was because they lacked E-A-T, and were designed expressly to deceive or obfuscate regarding the ownership and affiliation of the websites (¶¶29-32, 47-48);

(c) Defendants' statement that they "cannot predict" how Google's process of approving advertisers "will evolve or be applied to individual advertising applicants" and "cannot predict or control changes in algorithms and website rankings," was misleading because defendants were aware that (i) LegitScript had rejected AAC's attempts to obtain certification specifically because LegitScript precluded lead generators such as AAC from certification; and (ii) Google's attempts to better rank its search results based on E-A-T (which was expressly part of Google's Search Quality Evaluator Guidelines publicly released in 2015), was already adversely impacting AAC's websites because its websites were lacking in E-A-T and were designed expressly to deceive

or obfuscate regarding the ownership and affiliation of the websites, causing the websites to fall precipitously in Google's search results, resulting in fewer calls to AAC's call center, decreased enrollment, and lower revenues; and

(d) Defendants' statement that these changes "could have [a] material adverse effects on our business, financial condition and results of operations" was false and misleading because the changes were already having a materially adverse impact by 3Q18, including contributing to the Company's total census decline of just under 10% between July and September 2018.

74. On May 3, 2018, Cartwright and McWilliams hosted a conference call to discuss AAC's 1Q18 financial results. When asked whether census improvements would be driven by investments in online marketing and SEO or by the Company's sales representatives, Cartwright responded that AAC was focused on working with its digital assets to improve conversion rates in its call center and that the benefits of those efforts would be realized in AAC's operating performance for the second half of 2018:

> It's really all the above. And then also, just in our call center working on conversion rates. Now that we have multiple offerings, it sometimes can be more complex when you have outpatient, residential, in-network, out-of-network, 10 different states. So I think it's a matter of continuing to build out the sales and marketing team, continue to work with our digital assets and continue to put emphasis training and education on our call center to improve conversion rates, is really what we're focused on in 2018. And like I've stated, since back half of last year, and early part of this year, that I thought the first 6 months of 2018 would be pretty consistent with the back half of 2017. And we would really see the results starting to trend up, starting around August, September. Back half of the year is when I think that some of these things are going to come to well together. We're starting to see them. We're starting to see some of the changes that we're making – is making improvements. But I think it's going to be more in the back half of the year.

75. During the call, Cartwright also stated that he would be "hyerpfocus[ed] on the sales and marketing side of things" and that he was "very confident" census would improve starting in August:

***John Wilson Ransom** – Raymond James & Associates, Inc., Research Division – MD, Equity Research and Director of Healthcare Research*

Okay. And then my last question is, you've had your hands in the marketing engine for several months now. And I get the sense, as you know, more about what the issues are than you've said. So I'm not trying to tease you out and giveaway all the goods. But just at a very high level. Do you think that you can get to your 88% with your existing call volume? And do you think that part of the trick is converting more that call volume? And then, do you also think that it is a simple matter of adding more local BD reps? I'm just kind of curious to what your diagnosis is? Are you through the diagnosis phase? Are you in the execution phase? And just at a high level, what are some of the steps you're taking to improve the conversions?

***Michael T. Cartwright** – AAC Holdings, Inc. – Chairman & CEO*

Absolutely. All very good questions. I definitely feel like I'm through the analysis stage of what I was doing. My goal in January – in February was to get Dr. Nanko on board. I've been just extremely impressed with his skill set, his ability to jump in with both the understand the business, take charge of the operation, and really free me up now to hyperfocus on the sales and marketing side of things. One thing I'm most impressed about is the people we have in sales and marketing. We have the right people. So it's not really a people issue because we have extremely talented people in our call center as well as on the outside BD team as well as in the digital marketing space. You hit it on the head when you said is it a conversion issue. It is a conversion issue. We have the call volume, we have the right people. There are some tweaks that we're doing on technology front on how we answer phone calls. There's tweaks that we're doing on scripting. There's tweaks that we're doing on education and training of staff on different products that we offer. So I definitely think that's going to take another 3 to 6 months to really fully bake. And that's why I feel very confident on starting August, September, back half of the year that we should be more in that 88% range.

76. On August 1, 2018, the Company issued a release including its 2Q18 financial results, as well as comments by Cartwright, who stated:

"We are pleased with the progress we have made this year as we continue to execute to plan and make strides in transforming our sales and marketing team, including opening a new admissions center and bringing on new senior leadership . . . . Operations during the quarter remained very strong with the integration of AdCare going well and the continued improvements in cash collections. We remain focused on our sales and marketing efforts and feel confident we will meet our annual guidance with continued momentum entering into 2019."

77. On August 2, 2018, Cartwright and McWilliams hosted a conference call to discuss AAC's 2Q18 financial results. During the call, Cartwright again stated that AAC was focused on sales and marketing and that he was confident the Company would meet its annual financial goals:

> We continue to remain focused on our sales and marketing initiatives and begun to make substantial changes in the leadership, processes and technology. . . .
>
> As we said at the beginning of the year, our sales and marketing initiatives that we have been working on for the last 6 months will begin to have positive impact in the second half of 2018. I'm pleased to report that we are starting off the third quarter with stronger admissions than we were when we began the second quarter. Looking ahead, I'm confident we will meet our annual financial goals as we continue to support our patients with the best clinical care. Our balance sheet is strong, our senior management team is extremely focused and I continue to spend my time working with the sales and marketing team.

78. The statements in ¶¶74-78 above, were materially false and misleading when made. The true facts, which were then known to or recklessly disregarded by defendants Cartwright and McWilliams were:

(a) That defendants' statements of their confidence in AAC's ability to meet AAC's FY18 guidance did not align with the information in their possession at the time of their statements, as AAC's ability to continue to drive revenue through its lead generation websites and call center had been severely undermined by unprecedented media attention, congressional inquiries, exclusion from a professional organization, and Google's attempts to reduce deceptive advertising (¶¶29-49);

(b) By the time Cartwright and McWilliams hosted AAC's May 3, 2018 conference call to discuss its 1Q18 financial results, AAC had already been (i) prohibited from advertising on Google Ads and was yet unable to achieve certification from LegitScript, which would be required in order for AAC to advertise using Google Ads in the future (¶¶42-46); and (ii) denied continued membership and participation in the NAATP as a result of its unwillingness to

conform to NAATP's ethical standards, resulting in reputational harm and the loss of business from other NAATP members (¶44);

(c) By the time Cartwright and McWilliams hosted AAC's August 2, 2018 conference call to discuss its 2Q18 financial results, AAC had also: (i) been denied the opportunity to attend the NAATP annual conference in May 2018 in spite of a threatening yet meritless cease and desist sent to NAATP by AAC and copied to Cartwright on May 15, 2018 (¶44); (ii) remained unable to achieve LegitScript certification despite the fact that LegitScript was now certifying other treatment providers that did not employ misleading marketing tactics to restart advertising on Google (¶45); and (iii) been forced to change its web content and call center incentive compensation practices as a result of congressional attention and pressure (¶¶36-41, 154); and

(d) As a result of (a) – (c) above, Cartwright and McWilliams had no reasonable basis to believe, and did not actually believe, that AAC would meet the FY18 operating and financial performance estimates disseminated by AAC.

79. On November 6, 2018, the Company issued a release incorporating AAC's 3Q18 results. In the release, Cartwright claimed that the Company's disastrous 3Q18 results were "unanticipated" and that "'[w]e believe that we have the right marketing leadership to navigate these headwinds.'" Specifically, the release stated:

> "Our third quarter results were not what we expected. Although we started off the third quarter with a very strong July, we hit unanticipated headwinds in August that caused a significant decline in call volume and led to lower census," said Michael Cartwright, Chairman and Chief Executive Officer of AAC Holdings, Inc. "We believe that we have the right marketing leadership to navigate these headwinds. Our marketing strategy is broad and diverse, focused on various paid and earned media online and in other traditional media. We strive to be as accessible and as informative as possible to those searching for addiction treatment."

80. On November 6, 2018, Cartwright and McWilliams hosted a conference call to discuss AAC's 3Q18 financial results. During the call, Cartwright stated that the Company had faced "unanticipated headwinds in 3Q18," that "none of us expected what happened in August," and

that he had "no doubt we will improve census, deliver higher margins, maintain financial discipline and continue to provide best-in-class clinical care." Cartwright also stated:

> This was a difficult quarter, and we're not pleased with the results. We faced some very difficult unanticipated headwinds that sharply impacted call volume. We're navigating these headwinds with process changes in our call center, better training of our employees in the center and a series of employee transitions, including a strengthened executive team leading our marketing department.
>
> We experienced an excellent start to the third quarter with a very strong July; however, in early August, Google launched changes to its algorithm that impacted the search engine optimization of our health care and medical-related websites. These types of broad changes to Google's algorithm happen from time-to-time and are unannounced. This particular change in health care and wellness-related websites is so hard that SEO analysts are referring to the update as the Medic change.
>
> On a net basis, across all of our websites, this resulted in a sharp downturn in calls to our call center. Overall, calls dropped over 30% when you compare July call totals to September call totals. This led to a total census decline of just under 10% for the July to September period.

81. McWilliams also claimed that AAC "got hit by a little bit of a meteorite" but was "working through it" and "making the progress we need to make":

> ***Joseph Yanchunis***
>
> Okay. So I know you talked about changes in your call center, but can you speak to how the conversion ratio trended in the third quarter?
>
> ***Andrew W. McWilliams** – AAC Holdings, Inc. – CFO & CAO*
>
> Yes. I mean, I think that all the things that we're doing in the call center – I mean, look, in the third quarter, we changed out compensation plans, we changed out leadership, we changed out technology. And then right in the middle of that, we got hit by a little bit of a meteorite in terms of the Medic algorithm change. And so a lot of – there's been just a lot of noise in there for the last month to 1.5 months. So we're starting to see a lift in conversions. We definitely feel like the changes that we're making are working. But in the midst of that, you get such a large volume drop, it's a little too early to tell. But we're certainly are working through it, and we certainly are keenly aware of it, and everybody is full all hands on deck, and we're – I feel like that we're making the progress that we need to make.

82. The statements in ¶¶79-81, above, were materially false and misleading when made. The true facts, which were then known to or recklessly disregarded by defendants Cartwright and McWilliams, were that AAC's disastrous 3Q18 results were caused by its inability to continue its

deceptive and unethical marketing practices. By 3Q18, AAC had: (i) been prohibited from advertising on Google Ads because LegitScript refused to certify AAC in light of its lead generation websites (¶¶45-46); (ii) been denied renewed membership and participation in the NAATP as a result of its unwillingness to confirm to NAATP's ethical standards, resulting in reputational harm, as well as the loss of business from other NAATP members (¶44); (iii) been forced to change its web content and call center incentive compensation practices as a result of congressional attention and pressure (¶¶36-41, 154); and (iv) seen its lead generation websites decline vastly in Google's search rankings because they lacked E-A-T and were designed to deceive potential patients (¶¶47-49).

83. AAC's inability to continue its misleading sales and marketing practices and its inability to comply with the NAATP's ethical standards had taken a profound toll on AAC, which had relied on deceptive methods to fuel its growth. AAC's revenues declined by tens of millions of dollars when it was no longer to employ such tactics, causing disastrous 3Q18 and 4Q18 results.

### B. False and Misleading Statements About AAC's Financial Results and Accounting Practices

84. AAC's 2016 Form 10-K was filed on March 7, 2017, and was signed by defendants Cartwright, Manz, and McWilliams. The 2016 Form 10-K was certified pursuant to the Sarbanes-Oxley Act of 2002 by defendants Cartwright and Manz, each of whom certified that the financial information contained in the 2016 Form 10-K was accurate and disclosed all material changes to the Company's internal control over financial reporting.

85. The 2016 Form 10-K stated that AAC's financial results as reported therein had been prepared in compliance with GAAP and that the Company's "internal control over financial reporting was effective as of December 31, 2016."

86. The 2016 Form 10-K reported a net loss attributable to stockholders of $589,000, or negative $0.03 diluted earnings per share ("EPS") for FY16. AAC also reported accounts

receivable, net of allowances, of more than $87.3 million and stockholders' equity of $165.106 million as of December 31, 2016, as well as a $21.485 million provision for doubtful accounts.

87. The 2016 Form 10-K also incorporated AAC's financial results for the fiscal year ended December 31, 2015 including net income attributable to stockholders of $10.493 million, or $0.48 diluted EPS, accounts receivable (net of allowances) of $60.934 million and stockholders' equity of $141.654 million as of December 31, 2015, as well as a $18.113 million provision for doubtful accounts.

88. The statements in ¶¶84-87, above, were materially false and misleading when made. The true facts which were then known to or recklessly disregarded by defendants Cartwright, Manz, and McWilliams were as defendants have now admitted:

(a) That AAC's 2016 financial results were not prepared in compliance with GAAP, and the Company's internal control over financial reporting was not effective as of December 31, 2016;

(b) That AAC's financial statements were misstated because they reported false FY16 net income/loss, accounts receivable, provisions for doubtful accounts, and stockholders' equity. AAC's actual net loss attributable to stockholders was $21.218 million, or negative $0.93 diluted EPS, not $589,000 or negative $0.03 diluted EPS as reported – a net loss that was 30 times larger than reported. AAC's actual accounts receivable for fiscal 2016 was $46.002 million, not $87.334 million as reported. AAC's actual provision for doubtful accounts was $38.549 million, not $21.485 million as reported. AAC's actual stockholders' equity as of December 31, 2016 was less than $120.7 million, not the more than $165 million previously reported; and

(c) That AAC's financial statements were also misstated because they reported false FY15 net income/loss, accounts receivable, provisions for doubtful accounts, and stockholders' equity. AAC actually suffered a net loss of $13.294 million, or negative $0.62 diluted EPS, rather

than earning net income of $10.493 million or $0.48 diluted EPS, as reported. Further, AAC's actual accounts receivable for fiscal 2015 was $36.666 million, not $60.934 million as reported. AAC's actual provision for doubtful accounts was $42.381 million, not $18.113 million as reported. And AAC's actual stockholders' equity as of December 31, 2015 was $117.867 million, not $141.654 million as reported.

89. The 2016 Form 10-K reported how the Company accounted for its accounts receivable, assuring investors multiple times that AAC used historical data to account for the valuation of accounts receivable.

(a) For example, the Form 10-K stated:

> Accounts receivable primarily consist of amounts due from third-party commercial payors and clients and we record accounts receivable net of contractual discounts. Our ability to collect outstanding receivables is critical to our results of operations and cash flows. ***Accounts receivable are reported net of an allowance for doubtful accounts, which is management's best estimate of accounts receivable that could become uncollectible in the future***. Accordingly, the accounts receivable reported in our consolidated financial statements are recorded at the net amount expected to be received. Our primary collection risks are (i) the risk of overestimating our net revenues at the time of billing that may result in us receiving less than the recorded receivable, (ii) the risk of non-payment as a result of commercial insurance companies denying claims, (iii) the risk that clients will fail to remit insurance payments to us when the commercial insurance company pays out-of-network claims directly to the client, (iv) resource and capacity constraints that may prevent us from handling the volume of billing and collection issues in a timely manner and (v) the risk of non-payment from uninsured clients. ***In evaluating the collectability of accounts receivable and evaluating the adequacy of our allowance for doubtful accounts, management considers a number of factors, including historical experience***, the age of the accounts and current economic trends. ***We continually monitor our accounts receivable balances and utilize retrospective reviews and cash collection data to support our estimates of the allowance for doubtful accounts***. Estimates of our allowance for doubtful accounts are determined on a quarterly basis and adjusted monthly thereafter based on actual collections.

(b) The 2016 Form 10-K further stated "[t]here can be no guarantee that we will continue to experience the ***same collection rates that we have experienced in the past***," underscoring that the "historical experience" and "retrospective reviews" used to calculate accounts receivable were based on AAC's own historical collections experience.

(c) The 2016 Form 10-K further stated that while "management also takes into consideration the age of accounts, creditworthiness and current economic trends when evaluating the adequacy of the allowance for doubtful accounts," "***[t]he Company's allowance for doubtful accounts is based on historical experience***."

90. Statements substantively identical to those in ¶89 were repeated in AAC's FY17 Form 10-K filed with the SEC on February 23, 2018 (the "2017 Form 10-K"). The 2017 Form 10-K was signed and certified pursuant to the Sarbanes-Oxley Act of 2002 by defendants Cartwright and McWilliams, each of whom certified that the financial information contained therein was accurate and disclosed all material changes to the Company's internal control over financial reporting.

91. The statements in ¶¶89-90, above, were each materially false and misleading when made. The true facts which were then known to or recklessly disregarded by defendants Cartwright and McWilliams were that AAC management had not evaluated the collectability of its accounts receivable and the adequacy of its allowance for doubtful accounts using AAC's actual historical experience, but rather had opted to ignore AAC's actual historical collections experience in favor of an estimate that was "primarily based on industry and other data."

92. On April 4, 2017, Defendant Manz presented on behalf of AAC at the 16th Annual Needham Healthcare Conference. Addressing AAC's leverage, Manz represented that "we have approximately – a little under $200 million of total debt. We have about $150 million worth of collateral in terms of our property that we own, ***plus we have a little over $80 million of net receivables***, so we have substantial coverage on our total debt."

93. The statement in ¶92 above was materially false and misleading, as AAC's actual accounts receivable for fiscal 2016 were $46.002 million, not "a little over $80 million" as Manz stated, or $87.334 million as reported in AAC's 2016 Form 10-K.

94. On May 4, 2017, AAC filed with the SEC its quarterly report on Form 10-Q for 1Q17 (the "1Q17 Form 10-Q"). The 1Q17 Form 10-Q was signed by defendants Cartwright, Manz, and McWilliams. The 1Q17 10-Q was also certified pursuant to the Sarbanes-Oxley Act of 2002 by defendants Cartwright and Manz, each of whom certified that the financial information contained in the 1Q17 10-Q was accurate and disclosed all material changes to the Company's internal control over financial reporting.

95. Like AAC's 2016 Form 10-K, its 1Q17 Form 10-Q assured investors that AAC utilized historical data to value AAC's accounts receivable, stating:

> We recognize client related revenues from commercial payors at the time services are provided based on our estimate of the amount that payors will pay us for the services performed. We estimate the net realizable value of revenue by adjusting gross client charges using our expected realization and applying this discount to gross client charges. ***Our expected realization is determined by management after taking into account*** the type of services provided and ***the historical collections received from the commercial payors***, on a per facility basis, compared to the gross client charges billed.
>
> Our accounts receivable primarily consists of amounts due from commercial payors. . . . Included in the aging of accounts receivable are amounts for which the commercial insurance company paid out-of-network claims directly to the client and for which the client has yet to remit the insurance payment to us (which we refer to as "paid to client"). Such amounts paid to clients continue to be reflected in our accounts receivable aging as amounts due from commercial payors. Accordingly, our accounts receivable aging does not provide for the distinct identification of paid to client receivables. Also included in the aging of accounts receivable are amounts where we have received a partial payment from the commercial insurance company and are continuing to pursue additional collections for the estimated remaining balance outstanding.

96. The statements in ¶95 were repeated in AAC's quarterly reports on Form 10-Q filed with the SEC on August 3, 2017 (the "2Q17 Form 10-Q"); November 6, 2017 (the "3Q17 Form 10-Q"); May 9, 2018 (the "1Q18 Form 10-Q"); August 3, 2018 (the "2Q18 Form 10-Q"); and November 6, 2018 (the "3Q18 Form 10-Q"). The 2Q17 and 3Q17 Forms 10-Q were signed by defendants Cartwright, Manz, and McWilliams. The 2Q17 and 3Q17 Forms 10-Q were certified pursuant to the Sarbanes-Oxley Act of 2002 by defendants Cartwright and Manz, each of whom

certified that the financial information contained therein was accurate and disclosed all material changes to the Company's internal control over financial reporting. The 1Q18, 2Q18, and 3Q18 Forms 10-Q were signed and certified pursuant to the Sarbanes-Oxley Act of 2002 by defendants Cartwright and McWilliams, each of whom certified that the financial information contained in the 1Q18, 2Q18, and 3Q18 Forms 10-Q was accurate and disclosed all material changes to the Company's internal control over financial reporting.

97. As to the provision for doubtful accounts, the 1Q17 Form 10-Q represented as follows:

> [T]he provision for doubtful accounts represents the expense associated with management's best estimate of accounts receivable that could become uncollectible in the future. We establish our provision for doubtful accounts based on the aging of the receivables, historical collection experience by facility, services provided, payor source and historical reimbursement rate, current economic trends and percentages applied to the accounts receivable. As of March 31, 2017, substantially all accounts receivable aged greater than 360 days were fully reserved in our consolidated financial statements. In assessing the adequacy of the allowance for doubtful accounts, we rely on the results of detailed reviews of historical write-offs and recoveries on a rolling twelve-month basis (the hindsight analysis) as a primary source of information to utilize in estimating the collectability of our accounts receivable. We supplement this hindsight analysis with other analytical tools, including, without limitation, historical trends in cash collections compared to net revenues less bad debt and days sales outstanding.

98. The statements in ¶97 were repeated in AAC's 2Q17 and 3Q17 Forms 10-Q.[2]

99. On June 6, 2017, AAC filed with the SEC a current report on Form 8-K, attaching "an investor presentation . . . containing financial and operational highlights and certain other information that the Company also plan[ned] to present to potential lenders" in connection with its efforts to obtain a new term loan facility and revolving credit facility. The Form 8-K was signed by Defendant Cartwright, and it explicitly "incorporated . . . by reference" the investor presentation.

---

[2] The only difference in the text of these quotes was that dates were changed to correspond to the periods reported in each Form 10-Q.

The presentation itself listed defendants Cartwright, Manz, and McWilliams as "presenters." The presentation included a slide entitled "BAD DEBT POLICY," which represented as follows:

> • The provision for doubtful accounts represents the expense associated with management's best estimate of accounts receivable that could become uncollectible in the future. . . .
>
> • We establish our provision for doubtful accounts based on the aging of the receivables, historical collection experience by facility, services provided, payor source and historical reimbursement rate, current economic trends and percentages applied to the accounts receivable aging categories. As of December 31, 2016, substantially all of accounts receivable aged greater than 360 days were fully reserved in our consolidated financial statements.
>
> • In assessing the adequacy of the allowance for doubtful accounts, we rely on the results of detailed reviews of historical write-offs and recoveries on a twelve-month basis (the hindsight analysis) as a primary source of information to utilize in estimating the collectability of our accounts receivable.
>
> • We supplement this hindsight analysis with other analytical tools, including, but not limited to, historical trends in cash collections compared to net revenues less bad debt and days sales outstanding.

100. The statements in ¶¶94-99, above, were materially false and misleading when made. The true facts which were then known to or recklessly disregarded by defendants Cartwright, Manz, and McWilliams, included that AAC had not evaluated the collectability of its accounts receivable and the adequacy of its allowance for doubtful accounts using AAC's actual historical experience. Instead, as explained above, AAC had opted to ignore AAC's actual historical collections experience in favor of an estimate that was "primarily based on industry and other data."

101. On July 3, 2017, AAC filed with the SEC a current report on Form 8-K, reporting that it had entered into a credit agreement with Credit Suisse AG as administrative agent and collateral agent and with certain lenders, providing for a new term loan facility and a new revolving line of credit. The Form 8-K attached the credit agreement as an exhibit and "incorporated [it] by reference." Defendant Cartwright signed the Form 8-K and the credit agreement. In the credit agreement, AAC represented as follows:

> [AAC] has heretofore furnished to the Lenders its consolidated balance sheets and related statements of income, stockholder's equity and cash flows (i) as of and for the fiscal year ended December 31, 2014, audited by and accompanied by the opinion of BDO USA, LLP; December 31, 2015, audited by and accompanied by the opinion of BDO USA, LLP; and December 31, 2016, audited by and accompanied by the opinion of BDO USA, LLP and (ii) as of and for the fiscal quarter and the portion of the fiscal year ended March 31, 2017, certified by its chief financial officer [*i.e.*, the financial statements publicly filed with the 2016 Form 10-K and the 1Q17 Form 10-Q, as well as AAC's 2014 and 2015 annual reports]. ***Such financial statements present fairly in all material respects the financial condition and results of operations and cash flows of [AAC]*** and its consolidated Subsidiaries as of such dates and for such periods. … ***Such financial statements were prepared in accordance with GAAP applied on a consistent basis***, in all material respects, subject, in the case of unaudited financial statements, to year-end audit adjustments and the absence of footnotes.

102. On March 2, 2018, AAC filed with the SEC a current report on Form 8-K that attached and incorporated by reference an amended version of the credit agreement, which contained the same representation. Defendant Cartwright signed the Form 8-K.

103. On September 13, 2017, AAC filed with the SEC a current report on Form 8-K, reporting that it had agreed to acquire AdCare, Inc., and attaching as an exhibit and "incorporat[ing] . . . by reference" the Securities Purchase Agreement for that acquisition. The Form 8-K and the Securities Purchase Agreement were both signed by Defendant Cartwright. In the Securities Purchase Agreement, AAC represented as follows:

> (a) Within the twelve (12) months prior to the date hereof, [AAC] has filed on a timely basis all forms, reports and documents required to be filed by it with the SEC under the Exchange Act (the "*Reports*"). The Reports, as of the dates they were filed with the SEC, did not contain a misstatement or omission of a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading. . . .
>
> (b) The financial statements of [AAC] as included in the Reports (the "***Holdings Financial Statements***") present fairly in all material respects the financial condition, cash flows and results of operations of [AAC] as of the times and for the periods referred to therein in accordance with GAAP, consistently applied (subject in the case of the unaudited financial statements to (i) the absence of footnote disclosures and other presentation items, that, if presented, would not differ materially from those included in the audited Holdings Financial Statements; and (ii) changes resulting from year-end adjustments, the effect of which would not

reasonably be expected, individually or in the aggregate, to be material) and are consistent with the books and records of [AAC].

> (c) [AAC] has established and maintains disclosure controls and procedures (as defined in Rule 13a-15 under the Exchange Act), and such disclosure controls and procedures are effective.
>
> (d) [AAC] has also implemented and maintains a system of internal control over financial reporting (as defined in Rule 13a-15 under the Exchange Act) sufficient to provide reasonable assurance regarding the reliability of [AAC's] financial reporting and the preparation of financial statements for external purposes in accordance with GAAP. [AAC] has disclosed, based on its most recent evaluation of internal controls prior to the date hereof, to its auditors and audit committee (i) any significant deficiencies and material weaknesses in the design or operation of internal controls which are reasonably likely to materially adversely affect [AAC's] ability to record, process, summarize and report financial information; and (ii) any fraud, whether or not material, that involves management or other employees who have a significant role in internal control over financing reporting.

104. The statements in ¶¶101-103, above, were materially false and misleading when made. The true facts which were then known to or recklessly disregarded by defendant Cartwright were that, as defendants have now admitted, AAC's 2016 financial results were not prepared in compliance with GAAP, the Company's internal control over financial reporting was not effective as of December 31, 2016, and AAC's financial statements did not present fairly in all material respects AAC's financial condition, cash flows and results of operations.

105. On August 3, 2017, defendants Cartwright, Manz, and McWilliams convened a nationwide conference call with analysts to discuss AAC's 2Q17 financial results. In response to a question from an analyst about AAC's "aging policies," Defendant McWilliams expressly assured investors that:

> [W]e do have an aging policy that we apply against the receivables. We – that's based on a hindsight analysis that we perform based on historical collections and those percentages. Gets updated from time to time. And they do vary by facility and et cetera. As the agings get older, obviously we're applying more and more conservative reserves, all the way up to by the time it reaches a year old it's 100% reserved and there's step ups.

106. The statements in ¶105 were materially false and misleading when made. The true facts which were then known to or recklessly disregarded by defendants Cartwright and McWilliams were that management had not conducted hindsight analysis based on AAC's historical collections in evaluating the collectability of its accounts receivable and the adequacy of its allowance for doubtful accounts. Instead, AAC had opted to ignore AAC's actual historical collections experience in favor of an estimate that was "primarily based on industry and other data."

107. On February 21, 2018, after the market closed, AAC issued a release announcing the Company's financial results for the quarter and fiscal year ended December 31, 2017. For fiscal 2017, the Company reported net loss attributable to common stockholders of $20.579 million, or negative $0.88 diluted EPS. AAC reported accounts receivable, net of allowances, of $94.096 million and stockholders' equity of $150.994 million as of December 31, 2017. The release quoted defendant Cartwright as describing the financial results as a "'strong fourth quarter'" that "'capped off a year of solid performance, providing excellent momentum as we head into the new year.'"

108. On February 23, 2018, AAC filed with the SEC its 2017 Form 10-K. The 2017 Form 10-K provided the same 2017 financial results, accounts receivables net of allowances and shareholder equity reported on February 21, 2018. It said those results had been prepared in compliance with GAAP and that the Company's "internal control over financial reporting was effective as of December 31, 2017."

109. The statements in ¶¶107-108, above, were materially false and misleading when made. The true facts which were then known to or recklessly disregarded by defendants Cartwright and McWilliams were, as defendants have now admitted:

(a) That AAC's 2017 financial results were not prepared in compliance with GAAP, and the Company's internal control over financial reporting was not effective as of December 31, 2017; and

(b) That AAC's financial statements were misstated because they reported false net income/loss, accounts receivable, provisions for doubtful accounts, and stockholders' equity. AAC's actual net loss attributable to stockholders was $12.873 million, or negative $0.55 diluted EPS, not $20.579 million or negative $0.88 diluted EPS as reported. AAC's actual accounts receivable for fiscal 2017 was $63.746 million, not $94.096 million as reported. AAC's actual provision for doubtful accounts was $25.932 million, not $36.914 million as reported. AAC's actual stockholders' equity as of December 31, 2016 was $114.284 million, not $150.994 million as reported.

110. On May 2, 2018, AAC issued a release announcing the Company's first quarter 2018 ("1Q18") financial results for the interim period ended March 31, 2018. AAC reported a net loss attributable to stockholders of $202,000, or negative $0.01 diluted EPS, and revenue of $78.473 million. AAC reported accounts receivable, net of allowances of $99.581 million and stockholders' equity of $157.202 million as of March 31, 2018. The release quoted Defendant Cartwright, who in discussing the Company's days of sales outstanding described the financial results as off to "'a solid start in 2018.'"

111. On May 9, 2018, AAC filed with the SEC its 1Q18 Form 10-Q. The 1Q18 Form 10-Q was signed and certified pursuant to the Sarbanes-Oxley Act of 2002 by defendants Cartwright and McWilliams, each of whom certified that the financial information contained in the 1Q18 Form 10-Q was accurate and disclosed all material changes to the Company's internal control over financial reporting.

112. The 1Q18 Form 10-Q provided the same financial results, accounts receivable net of allowances, and stockholders' equity reported by AAC provided on May 2, 2018. The 1Q18 Form 10-Q said those results had been prepared in compliance with GAAP and that the Company's "internal control over financial reporting was effective as of March 31, 2018." Concerning the

Company's accounting for accounts receivable, the 1Q18 Form 10-Q stated in pertinent part that "[a]pproximately $14.3 million and $14.6 million of the accounts receivable, net of the allowance for doubtful accounts, at March 31, 2018 and December 31, 2017, respectively, include[d] accounts where we ha[d] received a partial payment from a commercial insurance company, and we [were] continuing to pursue additional collections for the balance that we estimate remains outstanding."

113. The statements in ¶¶110-112, above, were materially false and misleading when made. The true facts which were then known to or recklessly disregarded by defendants Cartwright and McWilliams were, as defendants have now admitted:

(a) That AAC's financial results were not prepared in compliance with GAAP, and the Company's internal control over financial reporting was not effective as of March 31, 2018;

(b) That AAC's financial statements were misstated because they reported false net income/loss, accounts receivable, provisions for doubtful accounts, and stockholders' equity. AAC's actual net income attributable to stockholders for 1Q18 was $1.056 million or $0.04 diluted EPS, not a net loss of $202,000 or negative $0.01 diluted EPS as reported. AAC's actual accounts receivable for 1Q18 was $71.944 million, not $99.581 million as reported. AAC's actual net revenue for 1Q18 was $81.187 million, not $78.473 million as reported. And AAC's actual stockholders' equity as of March 31, 2018 was $122.222 million, not $157.202 million as reported; and

(c) That despite making these and the other statements described below, the 1Q18 Form 10-Q concealed that AAC had received a subpoena from the SEC concerning its accounting for accounts receivable during the quarter.

114. The 1Q18 Form 10-Q again assured investors that AAC was relying on its historical data to provide for doubtful accounts, stating in pertinent part:

> Prior to the adoption of Topic 606, the provision for doubtful accounts represented the expense associated with ***management's best estimate of accounts receivable that***

> ***could become uncollectible in the future***. ***We established our provision for doubtful accounts based on*** the aging of the receivables, ***historical collection experience*** by facility, services provided, payor source ***and historical reimbursement rate***, current economic trends and percentages applied to the accounts receivable aging categories.
>
> As of March 31, 2018, substantially all accounts receivable aged greater than 360 days were fully reserved in our consolidated financial statements. In assessing the adequacy of the allowance for doubtful accounts, ***we rely on the results of detailed reviews of historical write-offs and recoveries on a rolling twelve-month basis (the hindsight analysis) as a primary source of information*** to utilize in estimating the collectability of our accounts receivable. We supplement this hindsight analysis with other analytical tools, including, without limitation, ***historical trends in cash collections*** compared to net revenues less bad debt and days sales outstanding.

115. Statements that were substantively identical to those in ¶114 were likewise repeated in AAC's 2Q18 and 3Q18 Forms 10-Q.[3]

116. The statements in ¶¶114-115, above, were materially false and misleading when made. The true fact which was then known to or recklessly disregarded by defendants Cartwright and McWilliams was that contrary to defendants' statements, AAC had not evaluated the collectability of its accounts receivable and the adequacy of its allowance for doubtful accounts using AAC's actual historical experience. Instead, as explained above, AAC had opted to ignore AAC's actual historical collections experience in favor of an estimate that was "primarily based on industry and other data."

117. On June 8, 2018, AAC filed a registration statement with the SEC on form S-3 (File No. 333-225536), using the "shelf registration statement" process under which the Company would be able to issue and sell up to $150 million of its securities at a later date, at as of yet undetermined

[3] The only differences in the text of these quotes were that dates were changed to correspond to the periods reported in each Form 10-Q, and the 2Q18 and 3Q18 Forms 10-Q added a statement that "[a]s a result of the adoption of Topic 606 as of January 1, 2018, substantially all of our adjustments related to bad debt will now be recorded as a direct reduction to revenue as opposed to the provision for doubtful accounts included within operating expenses. The only activity that will be recorded in operating expenses from 2018 forward will be bad debt related to specific customers that experience significant adverse changes in creditworthiness, such as bankruptcies."

prices. The registration statement expressly "incorporated by reference" AAC's 2017 Form 10-K, and its 1Q18 and 2Q18 Forms 10-Q, and was materially false and misleading for the same reasons as those reports (¶¶109, 113, 116, 121). Despite AAC having just recently received and responded to a subpoena from the SEC concerning its accounting for accounts receivable in March 2018, AAC concealed this information and the SEC declared the shelf registration statement effective on June 22, 2018.

118. On August 1, 2018, AAC issued a release announcing the Company's second quarter 2018 ("2Q18") financial results for the quarter ended June 30, 2018. AAC reported a net loss attributable to common stockholders of $3.013 million, or a loss of $0.12 per share, and revenue of $86.761 million. AAC reported accounts receivable, net of allowances of $97.362 million and stockholders' equity of $155.506 million as of June 30, 2018. The release quoted Defendant Cartwright, who stated that AAC's "[o]perations during the quarter remained very strong with the integration of AdCare going well and the continued improvements in cash collections."

119. On August 3, 2018, AAC filed with the SEC its 2Q18 Form 10-Q. The 2Q18 Form 10-Q was signed and certified pursuant to the Sarbanes-Oxley Act of 2002 by defendants Cartwright and McWilliams, each of whom certified that the financial information contained in the 2Q18 Form 10-Q was accurate and disclosed all material changes to the Company's internal control over financial reporting during 2Q18.

120. The 2Q18 Form 10-Q incorporated the same financial results, accounts receivables net of allowances and stockholders' equity provided by defendants to the market on August 1, 2018. The 2Q18 Form 10-Q stated those results had been prepared in compliance with GAAP and that the Company's internal controls over financial reporting were effective as of June 30, 2018. Concealing that AAC had received – and responded to – a subpoena from the SEC addressing its improper accounting treatment for accounts receivable during 1Q18, the 2Q18 Form 10-Q stated that

"[a]pproximately $12.3 million and $14.6 million of accounts receivable, net of the allowance for doubtful accounts, at June 30, 2018 and December 31, 2017, respectively, include[d] accounts where the Company ha[d] received a partial payment from a commercial insurance company and the Company [was] continuing to pursue additional collections for the remaining balance."

121. The statements in ¶¶118-120, above, were materially false and misleading when made. The true facts which were then known to or recklessly disregarded by defendants Cartwright and McWilliams were as defendants have now admitted:

(a) That AAC's financial results were not prepared in compliance with GAAP, and the Company's internal control over financial reporting was not effective as of June 30, 2018; and

(b) That AAC's financial statements were misstated because they reported false net income/loss, accounts receivable, provisions for doubtful accounts, and stockholders' equity. AAC's actual net loss attributable to stockholders for 2Q18 was $1.602 million (or a loss of $0.07 diluted EPS), not $3.013 million (or a loss of $0.12 diluted EPS) as reported. AAC's actual accounts receivable for 2Q18 was $71.057 million, not $97.362 million as reported. AAC's actual net revenue for 2Q18 was $88.094 million, not $86.761 million as reported. And AAC's actual stockholders' equity as of June 30, 2018 was $121.478 million, not $155.506 million as reported.

122. On November 6, 2018, before the market opened, AAC issued a release announcing its third quarter 2018 ("3Q18") financial results for the interim period ended September 30, 2018. The Company reported a net loss of $11.493 million, or negative $0.47 diluted EPS, and revenue of $77.473 million. AAC reported accounts receivable, net of allowances of $94.583 million and stockholders' equity of $145.066 million as of September 30, 2018. Later that same day, defendants Cartwright and McWilliams convened a conference call with analysts to discuss AAC's 3Q18

financial results, on which McWilliams confirmed that "[f]or the third quarter of 2018, total revenue less the provision for doubtful accounts was up 10% to $77.5 million."

123. On November 28, 2018, AAC filed with the SEC its 3Q18 Form 10-Q. The 3Q18 Form 10-Q incorporated the financial results, accounts receivables net of allowances, and stockholders' equity provided to the market by defendants on November 6, 2018. Defendants Cartwright and McWilliams confirmed therein that AAC's 3Q18 financial results had been prepared in compliance with GAAP and that the Company's internal controls over financial reporting were effective as of September 30, 2018. The 3Q18 10-Q was signed and certified pursuant to the Sarbanes-Oxley Act of 2002 by defendants Cartwright and McWilliams, each of whom certified that the financial information contained in the 3Q18 10-Q was accurate and disclosed all material changes to the Company's internal control over financial reporting during 3Q18.

124. The statements in ¶¶122-123, above, were materially false and misleading when made. the true facts, which were then known to or recklessly disregarded by defendants Cartwright and McWilliams, were as defendants have now admitted:

(a) That AAC's financial results were not prepared in compliance with GAAP, and the Company's internal control over financial reporting was not effective as of September 30, 2018; and

(b) That AAC's financial statements were misstated because they reported false net income/loss, accounts receivable, provisions for doubtful accounts, and stockholders' equity. AAC's actual net loss attributable to stockholders for 3Q18 was $22.181 million or negative $0.92 diluted EPS, not $11.493 million or negative $0.47 diluted EPS as reported. AAC's actual accounts receivable for 3Q18 was $59.839 million, not $94.583 million as reported. AAC's actual net revenue for 3Q18 was $69.034 million, not $77.473 million as reported. And AAC's actual stockholders' equity as of June 30, 2018 was $100.204 million, not $145.066 million as reported.

125. The November 6, 2018 release and the 3Q18 Form 10-Q also confirmed that:

(a) changes had been made to the reported value of the Company's partial payment accounts receivable, net of allowance, representing that those changes had reduced revenues by $6 million and increased losses by $4.8 million in the quarter, stating in pertinent part as follows:

> ***Change in Accounting Estimate***
>
> During the three months ended September 30, 2018 and effective as of July 1, 2018, we made a change to our accounting estimate of the collectability of accounts receivable, specifically relating to accounts where we have received a partial payment from a commercial insurance company and we are continuing to pursue additional collections for the balance that we estimate remains outstanding ("partial payment accounts receivable"). Based on the limited number of claims that were closed through our historical appeals process, information with respect to the ultimate resolution of the appeals of these partial payment accounts receivable has been limited. As a result, initial assumptions of the ultimate collectability rates for partial payment accounts receivable were primarily based on industry and other data. During 2018, to enhance our own collection processes, we began using a third-party vendor to pursue collections on these partial payment accounts receivable. As of September 30, 2018, we are using this vendor exclusively for collection of the partial payment accounts receivable. As a result of utilizing the third-party vendor, the number of partial payment claims closed through the appeals process has increased allowing us to rely on our own collection history and additional information obtained from the third party vendor to estimate ultimate collectability. This recent information indicated that our current assumptions were different from our historical assumptions. We used this additional information to further refine our procedures to more precisely estimate the collectability of partial payment accounts receivable. This change in estimate resulted in a reduction in revenue of approximately $6.0 million, an increase in net loss of approximately $4.8 million, or $0.20 loss per basic and diluted share for the three and nine months ended September 30, 2018. We determined this change in assumptions and estimation procedures of the collectability of partial payment accounts receivable is a change in accounting estimate in accordance with Accounting Standards Codification ("ASC") 250-10 "Accounting Changes and Error Corrections."

(b) Unbeknownst to investors, the Company's accounting for receivables had been the subject of an SEC investigation since at least March 2018, stating:

> *SEC Matter*
>
> The Company provided general accounting, finance and governance documentation in response to a subpoena received from the SEC in March 2018.

> Following this initial document request, the Commission requested additional information pertaining to the Company's accounting for partial payments from insurance companies, where the Company is continuing to pursue additional collections for the estimated balance. Beginning in the third quarter of 2018, the Company's Audit Committee initiated a review of the Company's accounting for these partial payments. The Audit Committee has substantially completed this review. In connection with this review, the Audit Committee determined that the Company's change in estimate of the collectability of accounts receivable relating to partial payments during the quarter was appropriate. *See* "*Note 2. Basis of Presentation and Recently Issued Accounting Pronouncements – Change in Accounting Estimate*." The Commission's investigation is ongoing, and the Company is continuing to fully cooperate on this matter. The Commission's investigation is neither an allegation of wrongdoing nor a finding that any violation of law has occurred. At this time, the Company is unable to predict the final outcome of this matter or what impact it might have on the Company's consolidated financial position, results of operations or cash flows.

126. Despite this turn of events, however, defendants AAC, Cartwright and McWilliams caused the 3Q18 Form 10-Q to continue to falsely state that AAC's accounting for accounts receivable was based on a detailed historical review. It thus indicated to investors that the change in accounting estimate had been the result of a modest improvement in the historical data on which AAC based its analysis of doubtful accounts, specifically with respect to partial payment accounts receivable, and did not disclose the falsity of the remainder of its prior financial statements. The 3Q18 Form 10-Q falsely stated that AAC's financial statements complied with GAAP, stated that AAC was operating with effective internal controls, and incorporated current and historical financial statements that were materially misstated.

127. The statements in ¶¶125-126, above, were materially false and misleading when made. The true facts then known to or recklessly disregarded by defendants Cartwright and McWilliams were as detailed in Section IV(B) above.

## VI. LOSS CAUSATION

128. As detailed herein, defendants made false and misleading statements and/or omitted material information during the Class Period concerning AAC's business fundamentals and financial prospects. Defendants' fraudulent scheme and wrongful course of business was designed to and did

artificially inflate, maintain, and manipulate the price of AAC common stock and deceived plaintiff and the Class (defined below), causing purchasers of AAC common stock to suffer economic harm as the truth reached the market. When the circumstances concealed by defendants' prior misrepresentations and omissions began to come out, it caused the price of AAC common stock to fall as the prior artificial inflation came out of the stock price. As a result of their purchases of AAC common stock during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

129. On November 6, 2018, AAC issued a release which reported 3Q18 revenues of $77.5 million, an adjusted loss per share of $0.08 and adjusted EBITDA of $10.7 million, all well below Wall Street analyst expectations. In addition, AAC reduced its full year FY18 revenue, EBITDA and EPS guidance, which Cartwright had previously reassured investors it was on track to meet when he announced the Company's 2Q18 results on August 2, 2018. In the November 6, 2018, release, Cartwright blamed the substantial miss and guidance reduction on "'a significant decline in call volume,'" and "'lower census.'"

130. On November 6, 2018, Cartwright and McWilliams also hosted a conference call to discuss AAC's 3Q18 financial results. During the call, Cartwright asserted that changes in Google's algorithms

> impacted the search engine optimization of our health care and medical-related websites. . . . On a net basis, across all of our websites, this resulted in a sharp downturn in calls to our call center. Overall, calls dropped over 30% when you compare July call totals to September call totals. This led to a total census decline of just under 10% for the July to September period.

131. On this news, the price of AAC common stock declined by more than 44%, from a close of $5.31 on November 5, 2018, to a close of $2.96 on November 6, 2018.

132. On April 15, 2019, AAC filed with the SEC its 2018 Form 10-K, which disclosed that the Company had restated its historical financial results:

**Overview and Background of Restatement**

On March 29, 2019, the Company, the Audit Committee of the Company's Board of Directors and executive management, in consultation with the Company's independent registered public accounting firm, BDO USA, LLP ("BDO"), determined that adjustments to certain of its previously issued annual and interim financial statements were necessary and that those annual and interim financial statements could no longer be relied upon. The adjustments relate to estimates of accounts receivable, provision for doubtful accounts and revenue for the relevant periods described below, as well as the related income tax effects. Certain other immaterial reclassifications to the presentation of the financial statements are also reflected in the adjustments.

Subsequent to the year ended December 31, 2018 and as part of the preparation of the Company's year-end financial statements, using recently developed financial database analytical tools, the Company became aware of historical cash collection trends by customer that existed at the time of the issuance of the historical financial statements. As a result of this review and after consultation and deliberation with regard to the appropriate accounting treatment, including discussion as to the size of the adjustments, the Company concluded that this oversight by the Company of the historical collection trends by customer led to the adjustments being considered corrections of an error under accounting principles generally accepted in the United States of America.

The adjustments resulted in an estimated increase to net income of approximately $7.7 million for the year ended December 31, 2017. The adjustments also resulted in an estimated decrease of net income of approximately $20.6 million for the year ended December 31, 2016. Periods prior to 2016 were also impacted as a result of the adjustments, resulting in an estimated cumulative effect adjustment of approximately $23.8 million, recorded as a reduction to stockholders' equity on the balance sheet as of January 1, 2016. The adjustments did not affect the previously reported cash flows from operating activities.

The Company's previously issued annual financial statements audited by BDO and included in the Company's Annual Report on Form 10-K for the years ended December 31, 2017 and 2016 and the unaudited financial statements reviewed by BDO and included in the Company's quarterly reports on Form 10-Q for the quarters ended September 30, 2018 and 2017, June 30, 2018 and 2017, and March 31, 2018 and 2017, are being restated in this Annual Report on Form 10-K to properly reflect these corrections.

133. The 2018 Form 10-K also disclosed that the Company had a material weakness in its internal controls, resulting in misstatements in its financial results:

Under the supervision of and with the participation of management, including the Chief Executive Officer and Chief Financial Officer, the Company conducted an evaluation of the effectiveness of its internal control over financial reporting based

> on the criteria in Internal Control – Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework). A material weakness is a control deficiency, or combination of control deficiencies, such that there is a reasonable possibility that a material misstatement to the annual or interim financial statements will not be prevented or detected on a timely basis. Based upon that evaluation, management identified the following material weakness as of December 31, 2018 in the Company's internal control over financial reporting, principally related to the Company's estimation of revenue and accounts receivable processes. The Company did not have effective controls to ensure the accuracy of its estimation of provision for doubtful accounts, revenue and accounts receivable.
>
> This material weakness resulted in the misstatement and audit adjustments of financial statement line items and related financial disclosures . . . .
>
> As a result of the material weakness in internal control over financial reporting described above, management concluded that the Company's internal control over financial reporting was not effective as of December 31, 2018 based on the criteria in Internal Control — Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (2013 framework).

134. On April 16, 2019, AAC issued a release reporting AAC's 4Q18 revenues of $57.4 million, an adjusted loss per share of $0.85 and adjusted EBITDA of negative $12.4 million, all well below the estimates defendants Cartwright and McWilliams had led the market to expect. In addition, AAC provided FY19 revenue and EPS estimates well below those defendants Cartwright and McWilliams had led the market to expect. In the release, Cartwright attributed the miss to the continuing fallout from the reduced call volume and lower census which had impacted the Company's 3Q18 results: "'The last several months of 2018 saw a census decline that was more significant than we originally anticipated, with an initial 30% drop in call volume resulting in a sharp decrease in admissions in the second half of 2018 which resulted in a corresponding decrease in revenue.'"

135. The release further detailed the Company's earnings restatement, stating in pertinent part as follows:

> On March 29, 2019, the Company, the Audit Committee of the Company's Board of Directors and executive management, in consultation with the Company's independent registered public accounting firm, BDO USA, LLP ("BDO"), determined that adjustments to certain of its previously issued annual and interim

> financial statements were necessary, and that those annual and interim financial statements could no longer be relied upon. The adjustments related to estimates of accounts receivable, provision for doubtful accounts and revenue for the relevant periods described below, as well as the related income tax effects. Certain other immaterial reclassifications within the financial statements are also reflected in the adjustments. The restatements do not implicate misconduct with respect to the Company, its management or its employees.
>
> The Company's previously issued annual financial statements are included in the Company's Annual Report on Form 10-K for the years ended December 31, 2017 and 2016 and the unaudited financial statements and included in the Company's quarterly reports on Form 10-Q for the quarters ended September 30, 2018 and 2017, June 30, 2018 and 2017, and March 31, 2018 and 2017, have been restated in the Company's 2018 Annual Report on Form 10-K for the year ended December 31, 2018 to properly reflect these corrections.

136. On April 16, 2019, Cartwright and McWilliams hosted a conference call to discuss AAC's 4Q18 financial results and restatement. During the call, Cartwright asserted that the Company's 4Q18 admissions, census, and revenue declines were caused by continuing fallout from Google's algorithms update, which was also responsible for the Company's 3Q18 miss: "we faced a series of headwinds starting in August that impacted our results for the back half of 2018 and caused declines in admission and census, which impacted revenue. . . . Google did an algorithm update and really just disrupted the entire system." McWilliams also discussed the Company's restatement, stating:

> [A]s noted in our annual report, in the Form 10-K filed on Monday and in this morning's earnings release, we determined [in] consultation with our auditors that adjustments to certain of our previously issued annual and interim financial statements were necessary. These adjustments related to estimates of accounts receivable, provision for doubtful accounts and revenue as well as the related income tax effects. Our previously issued annual financial statements for 2017 and 2016 and the unaudited financial statements for the quarters ended September 30, 2018 and '17, June 30, 2018 and '17, and March 31, 2018 and '17, were restated in our 2018 annual report to properly recollect these corrections. These adjustments had no impact on net operating cash flows.

137. On this news, the price of AAC common stock price declined over 18% on very high trading volume, to close at $1.74 per share on April 16, 2019.

138. The decline in the price of AAC common stock after the corrective disclosures came to light was a direct result of the revelation of the nature and extent of defendants' scheme and fraudulent misrepresentations and omissions to investors and the market. The timing and magnitude of the price declines in AAC common stock compared to the market and its peers negate any inference that the loss suffered by plaintiffs and the other Class members was caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by plaintiffs and the other Class members was a direct result of defendants' fraudulent scheme to artificially inflate and maintain the price of AAC common stock and the subsequent significant decline in the value of AAC common stock when defendants' prior misrepresentations and other fraudulent conduct were revealed.

## VII. ADDITIONAL SCIENTER ALLEGATIONS

### A. Defendants Disregarded Current Factual Information Before Issuing AAC's Financial Results, and Their External Statements Contradicted AAC's Internal Reports

139. As set forth in Section IV(B) above, defendants have admitted that AAC's financial statements misstated AAC's financial results and condition based on information "that existed at the time of the issuance of the historical financial statements." As also explained in Section IV(B), at least part of the restatement had to do with accounts receivable for "client-related diagnostic testing," the same type of receivable that AAC had retained on its balance sheet for two or three years before writing off. Notably, AAC's periodic reports until the third quarter of 2016 represented that "[a]s of [the end of the relevant period], all accounts receivable aged greater than 360 days were fully reserved in our consolidated financial statements." Beginning in the third quarter of 2016, AAC changed its language to state only that "***substantially*** all accounts receivable aged greater than 360 days were fully reserved," confirming that defendants Cartwright, Manz, and McWilliams (together

with the other AAC representatives who assisted them in preparing its periodic reports), were aware that AAC was allowing material portions of its accounts receivable to age for significantly more than 360 days.

140. Defendants' own statements showed they were aware that major payors were increasingly scrutinizing lab testing. For example, Defendant Manz, in an April 4, 2017 presentation, said that a slowdown in collections had "come[] from the lab side of our business" where "the major payers" had begun conducting "a lot of . . . scrutiny within the lab business" seeking "to eliminate fraud and abuse." Likewise, Defendant Manz, on conference calls with analysts (also attended by Cartwright and McWilliams) on May 4 and August 3, 2017, confirmed that most of the increase in uncollected receivables was "related to Lab collections" and it was "being primarily driven by payers requiring extensive documentation on laboratory claims."

141. Not only did defendants allow lab testing receivables to remain on AAC's balance sheet for years without being written off during the Class Period, defendants Cartwright, Manz, and McWilliams regularly received monthly spreadsheets detailing billing information, including the monthly amounts written off as "bad debt." Those spreadsheets were prepared for distribution to several AAC executives, including defendants Cartwright, McWilliams and Manz (before his December 2017 departure). Defendant Cartwright personally worked closely with the "Pay to Patient" department responsible for collecting from clients who had directly received payments from insurance companies that were due to AAC. As a result, he was well aware of the difficulties AAC faced in collecting those payments. Nonetheless, AAC's "accounts receivable aging d[id] not provide for the distinct identification of paid to client receivables." Defendants ultimately disregarded this information in preparing AAC's financial statements, enabling them to drastically overstate AAC's earnings (or understate its losses).

142. Days sales outstanding, or DSO, is a common measure of the age and quality of accounts receivable. DSO represents the average number of days it takes a company to collect its receivables. It is a measure of collectability and serves as a useful measure of cash flow efficiency and revenue quality. For example, a DSO of 30 means it takes a company 30 days on average to convert a credit sale (*i.e.*, an account receivable) into cash. An abnormally high DSO, in comparison to a relevant benchmark, is a sign that receivables are at risk and may indicate problems with the company's collection process. The significance of this measure has been noted by the SEC: "A growing DSO figure is often a telltale sign that a company's receivables are impaired . . . ."[4]

143. Defendants were aware that AAC's DSOs were abnormally high. During the Class Period, defendants said AAC's DSOs were "the top priority of [AAC] management," and "DSOs[] have been a major focus for us."[5] Thus, AAC's DSOs alerted defendants to AAC's significant collection problems.

### B. Defendants Concealed a SEC Subpoena Regarding AAC's Accounts Receivable

144. In addition to the internal reports they received and reviewed, defendants Cartwright and McWilliams were on notice from external sources by at least March 2018 that AAC's

---

4 *SEC v. Korkuc*, No. 2:03-cv-3017, Complaint, ¶28 (E.D.N.Y., June 19, 2003); *see also SEC v. Cappel*, AAER Release No. 1673A, 2002 WL 31654548 (Nov. 25, 2002).

5 On May 4, 2017, Cartwright, Manz, and McWilliams participated in a conference call with analysts to discuss AAC's 1Q17 financial results. Manz responded to a question about DSOs by representing that DSOs were "the top priority of management." On an August 3, 2017, Cartwright, Manz, and McWilliams participated in a conference call with analysts to report AAC's 2Q17 financial results. Manz volunteered that "Days sales outstanding, DSOs, have been a major focus for us." On November 2, 2017, Cartwright, Manz, and McWilliams participated in a conference call with analysts to report AAC's 3Q17 financial results. Cartwright introduced the quarterly results by briefly alluding to "substantial gains and profitability" before saying "[m]ost importantly, we materially improved collections in Q3." On February 22, 2018, Cartwright, Manz, and McWilliams participated in a conference call with analysts to report AAC's fiscal year 2017 financial results. McWilliams said that "[f]ocusing on DSOs continues to be a priority for us as part of our strategy to accelerate operational efficiency and discipline."

accounting for accounts receivable was inaccurate. In March 2018, the SEC subpoenaed the Company for records regarding its accounting for accounts receivable. The subpoena specifically related to those accounts receivable where the Company had received partial payment from an insurance company but continued to pursue the balance from the patient.

145. Despite receiving an SEC subpoena which underscored AAC's improper treatment of its accounts receivable, however, defendants concealed the SEC investigation for over seven months.

### C. Defendants Falsely Attested to the Adequacy of AAC's Internal Controls

146. Before the issuance of AAC's Forms 10-K and Forms 10-Q during the Class Period, management conducted an evaluation, with the participation of the CEO (Cartwright) and CFO (Manz, and then McWilliams as of 4Q17), of the effectiveness of the company's disclosure controls and procedures as of the end of the quarter preceding the issuance of the report. Based on these evaluations, Cartwright, Manz (through the 3Q17 Form 10-Q), and McWilliams (beginning with the 2017 Form 10-K) claimed to have concluded that AAC's disclosure controls and procedures were effective to ensure that information required to be disclosed was recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms and that such information was accumulated and communicated to management, including the CEO and CFO, as appropriate to allow timely decisions regarding required disclosure. Further, each of AAC's 2016 and 2017 Forms 10-K stated that management had assessed the effectiveness of internal control over financial reporting and concluded that it was effective each period.[6]

[6] Defendants' assessments and conclusions regarding internal control over financial reporting were especially important because management did not engage the independent auditor to attest to management's conclusions. The SEC permits "emerging growth companies," like AAC, to provide only a report by management, which is what AAC opted to do. Investors had to rely solely on management's conclusions since the independent auditor did not audit/attest to management's assessment or issue an attestation report.

147. Each of the Forms 10-K and 10-Q during the Class Period also stated that there had been no changes in internal control over financial reporting during the reporting period that had materially affected or were reasonably likely to materially affect internal control over financial reporting. In addition, defendant Cartwright (for all relevant periods), Manz (through the 3Q17 Form 10-Q) and McWilliams (beginning with the 2017 Form 10-K) signed SOX certifications accompanying AAC's periodic reports. These certified, among other things, that these defendants had reviewed each report and that the certifying officers had designed disclosure controls and procedures "to ensure that material information relating to the registrant . . . is made known to us" and had, within the past quarter, "[e]valuated the effectiveness of the registrant's disclosure controls and procedures." As a result of these regular evaluations of AAC's disclosure controls, and of the controls and procedures that were purportedly in place to ensure that material information was made known to them, defendants either learned or were reckless in not learning of AAC's fraudulent accounting for accounts receivable.

### D. Numerous AAC Executives and a Majority of the Board of Directors Have Resigned

148. During and following the Class Period, an unprecedented number of senior AAC executives and directors resigned. On November 9, 2017, AAC announced that Manz would be resigning as CFO. On March 12, 2019, AAC announced that Thomas W. Doub, Ph.D, the Company's Chief Compliance Officer and Chief Clinical Officer, would be resigning. On May 31, 2019, David C. Kloeppel resigned from AAC's board of directors immediately and without notice. On June 14, 2019, Michael Nanko, AAC's President and Chief Operating Officer, who had joined AAC just sixteen months earlier, resigned. On October 1, 2019, the majority of AAC's board of directors – Darrell S. Freeman, Sr., Michael J. Blackburn, W. Larry Cash, and David W. Hillis – resigned immediately and without notice. AAC failed to disclose their resignations until October 7, 2019, when the NYSE notified the Company that, in light of the resignations of Cash and Freeman,

who (following Kloeppel's resignation) were the only members of the Company's Audit Committee, the Company was not in compliance with §303A.07 of the NYSE Listed Company Manual, which states that audit committees of listed companies must have a minimum of three members.

### E. Sales and Marketing Were Critical to AAC's Core Operations

149. Marketing was a core function at AAC. As Manz publicly acknowledged on April 4, 2017 at the 16th Annual Needham Healthcare Conference:

> [W]e are also a consumer marketing company. . . . [s]o we are marketing geeks. We look at cost per channel, cost per call, conversation rates, whether or not an ad on the Fox network outperforms an ad on CNN, all those kinds of things that we do to try to drill down to continually push our customer acquisition costs to the lowest it possibly can be.

150. Cartwright was actively involved in AAC's sales and marketing and had actual knowledge of the Company's deceptive practices detailed herein, as well as the false and misleading statements and omissions he authored or approved during the Class Period. Indeed, on the February 22, 2018, conference call, Cartwright stated that he was going to "spend a lot more of my focus and energy" on sales and marketing. Later, on the May 3, 2018 conference call, Cartwright stated that hiring a COO had allowed Cartwright to not just focus on but "hyperfocus on the sales and marketing side of things" and that it would just take some "tweaks" over the next "3 to 6 months" to reach AAC's goals of improving conversion rates and census. Cartwright was also personally involved in AAC's dispute with the NAATP, reaching out to Ventrell, NAATP's President, as part of AAC's attempts to reverse the NAATP's January 2018 decision not to renew AAC's membership.

### F. Cartwright Misled the United States Congress Under Oath Regarding AAC's Operations

151. Cartwright misled the United States Congress, while under oath, about the nature of AAC's marketing practices. For example, Cartwright testified that "[w]e make sure that our website visitors know who they are contacting," that "[w]e make clear that users know which treatment centers are going to answer the numbers they call," and that "[w]e make clear that AAC's toll-free

numbers go to AAC's call center." These statements were misleading. In fact, at best AAC's websites included a small radio button that users would have to click on in order to learn who answered the toll-free numbers on the Company's lead generation websites, some of which were added between May and September 2017.

152. Cartwright was also asked by Committee Chairman Harper during the July 24, 2018, hearing whether the websites AAC operated "contain information that discloses which company or which facilities the websites are affiliated with." Cartwright misleadingly testified that they did, stating that when AAC bought Recovery Brands they vetted the websites, found they were "the most ethical, straightforward websites that we saw as related to third-party websites," and that "[w]hen we bought that organization and since we've operated, it has absolutely been 100 transparent websites." This was false. In fact, AAC's websites intentionally sought to appear to be neutral informational websites that would increase their ranking in search engine results and cause individuals seeking treatment to call AAC's call center. To the extent the websites disclosed their affiliation with AAC, they did so only with fine-print-type disclosures. Even when AAC did begrudgingly alter certain of its websites following the July 24, 2018, hearing, including recovery.org and rehabs.com, it still only added words such as "An American Addiction Centers Resource," in tiny type beneath the websites' logos, while misleadingly characterizing such changes as "rebranding and content enhancements," and "website upgrades."

## VIII. APPLICABILITY OF PRESUMPTION OF RELIANCE

153. In light of defendants' pervasive Class Period omissions, a class-wide presumption of reliance is appropriate pursuant to *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972).

154. Plaintiff's claims for securities fraud are also asserted under the fraud-on-the market theory of reliance. The market price of AAC common stock, including common stock regularly traded on the NYSE, was artificially inflated by the false and misleading statements and omissions

complained of herein. Defendants' false statements and omissions inflated the price of, and maintained the artificially inflated price of, AAC common stock both before and during the Class Period.

155. The Class Period inflation in the price of AAC common stock was eliminated when the financial conditions, business risks and other information concealed by defendants' fraud was revealed to the market. The information did not reach the market all at once but leaked out through several partial disclosures, each of which partially corrected the market price of AAC common stock.

156. During the Class Period, the market for AAC common stock was an efficient market for the following reasons, among others:

(a) AAC common stock met the requirements for listing, and was listed and actively traded, on the NYSE, a highly efficient and automated market;

(b) During the Class Period, a high volume of AAC common stock traded on the NYSE;

(c) As a regulated issuer, AAC filed periodic public reports with the SEC and NYSE;

(d) AAC regularly communicated with investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services, publications on its website and other Internet sites, and other wide-ranging public disclosures, such as conference calls, communications with the financial press and other similar reporting services;

(e) During the Class Period, AAC was followed by securities analysts employed by major brokerage firms. Analysts employed by these and other firms regularly wrote reports based

on the publicly available information disseminated by defendants about AAC. These reports were distributed to the sales force and certain customers of their respective brokerage firms; and

(f) AAC had substantial institutional ownership during the Class Period.

157. Through the foregoing mechanisms, the information publicly disseminated by defendants about AAC and its operations, and the import thereof, became widely available to and was acted upon by investors in the marketplace, such that, as a result of their transactions in AAC stock, the information disseminated by defendants, including the false and misleading statements described above, became incorporated into and were reflected by the market price of AAC publicly traded securities.

158. Under these circumstances, all purchasers of AAC common stock during the Class Period suffered similar injury through their purchase of AAC common stock at artificially inflated prices and their subsequent decline in value, and a presumption of reliance applies.

## IX. CLASS ACTION ALLEGATIONS

159. Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons who purchased AAC common stock during the Class Period and were damaged thereby (the "Class"). Excluded from the Class are defendants and their immediate families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which defendants have or had a controlling interest.

160. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, AAC shares were actively traded on the NYSE. While the exact number of Class members is unknown to plaintiff at this time, plaintiff believes that there are hundreds, if not thousands, of members in the proposed Class, if not more. Record owners and other members of the Class may be identified from records maintained by AAC, its transfer agent or

securities' brokers, and may be notified of the pendency of this action electronically or by mail, using the form of notice similar to that customarily used in securities class actions.

161. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law complained of herein.

162. Plaintiff will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class action and securities litigation.

163. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by defendants' acts as alleged herein;

(b) whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business and operations of AAC;

(c) whether the price of AAC common stock was artificially inflated during the Class Period; and

(d) to what extent the members of the Class have sustained damages and the proper measure of damages.

164. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5 (Against All Defendants)

165. Plaintiff incorporates ¶¶1-164 by reference.

166. During the Class Period, defendants disseminated or approved the statements as specified above in Section V, which they knew or recklessly disregarded contained material misrepresentations and/or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

167. Defendants violated §10(b) of the 1934 Act and SEC Rule 10b-5 in that they:

(a) employed devices, schemes and artifices to defraud;

(b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with its purchases of AAC common stock during the Class Period.

168. Defendants, individually and together, directly and indirectly, by the use of the means and instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal the truth and/or adverse material information about AAC's business, operations and financial condition as specified herein.

169. Defendants had actual knowledge of the misrepresentations and omissions of material fact set forth herein, or recklessly disregarded the true facts that were available to them.

170. As a result of the dissemination of the materially false or misleading information and/or failure to disclose material facts, as set forth above, the market price of AAC common stock was artificially inflated during the Class Period. In ignorance of the fact that the market price of

AAC common stock was artificially inflated, and relying directly or indirectly on the false and misleading statements, or upon the integrity of the market in which AAC common stock traded, and/or on the absence of material adverse information that was known to or recklessly disregarded by defendants (but not disclosed in defendants' public statements during the Class Period), plaintiff and the other Class members purchased AAC common stock during the Class Period at artificially high prices and were damaged thereby.

171. Plaintiff and the Class, in reliance on the integrity of the market, paid artificially inflated prices for AAC common stock, and suffered losses when the relevant truth was revealed. Plaintiff and the Class would not have purchased AAC common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by these defendants' misleading statements.

172. As a direct and proximate result of these defendants' wrongful conduct, plaintiff and the other Class members suffered damages in connection with their Class Period transactions in AAC common stock.

173. By reason of the foregoing, defendants named in this Count have violated §10(b) of the 1934 Act and SEC Rule 10b-5.

**COUNT II**

**For Violation of §20(a) of the 1934 Act**
**(Against All Defendants)**

174. Plaintiff incorporates ¶¶1-173 by reference.

175. Defendants were controlling persons of AAC within the meaning of §20(a) of the 1934 Act. By virtue of their high-level positions as officers and/or a director of AAC, their ownership and contractual rights, participation in and awareness of the Company's operations, and intimate knowledge of the statements filed by the Company with the SEC and/or disseminated to the investing public, these defendants had the power to influence and control and did influence and

control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the allegedly false and misleading statements.

176. In particular, each of these defendants had direct or supervisory responsibility over the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions and business practices giving rise to the securities violations as alleged in Count I, and exercised that power.

177. As a direct and proximate result of these defendants' wrongful conduct, plaintiff and other members of the Class suffered damages in connection with their purchases of AAC common stock during the Class Period when the relevant truth was revealed.

178. By reason of the foregoing, the defendants named in this Count violated §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment as follows:

A. Determining that this action is a proper class action and certifying Lead Plaintiff as Class Representative under Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiff's counsel as Class Counsel;

B. Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Awarding such other and further relief, including equitable and/or injunctive relief, as the Court may deem just and proper.

DATED: November 4, 2019

ROBBINS GELLER RUDMAN
& DOWD LLP
CHRISTOPHER M. WOOD, #032977
CHRISTOPHER H. LYONS, #034853

s/ CHRISTOPHER M. WOOD
CHRISTOPHER M. WOOD

414 Union Street, Suite 900
Nashville, TN 37219
Telephone: 615/244-2203
615/252-3798 (fax)
cwood@rgrdlaw.com
clyons@rgrdlaw.com

ROBBINS GELLER RUDMAN
& DOWD LLP
DARREN J. ROBBINS
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
darrenr@rgrdlaw.com

Lead Counsel for Lead Plaintiff Indiana Public Retirement System and the members of the Putative Class

BARRETT JOHNSTON MARTIN
& GARRISON, LLC
JERRY E. MARTIN, #20193
Bank of America Plaza
414 Union Street, Suite 900
Nashville, TN 37219
Telephone: 615/244-2202
615/252-3798 (fax)
jmartin@barrettjohnston.com

Local Counsel for Lead Plaintiff Indiana Public Retirement System and the members of the Putative Class

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on November 4, 2019, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ CHRISTOPHER M. WOOD

CHRISTOPHER M. WOOD

ROBBINS GELLER RUDMAN
& DOWD LLP
414 Union Street, Suite 900
Nashville, TN 37219
Telephone: 615/244-2203
615/252-3798 (fax)

E-mail: cwood@rgrdlaw.com

# Mailing Information for a Case 3:19-cv-00407 Caudle v. AAC Holdings, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Paul Kent Bramlett**
  pknashlaw@aol.com
- **Robert P. Bramlett**
  robert@bramlettlawoffices.com
- **Lisa R. Bugni**
  lbugni@kslaw.com
- **Jessica Perry Corley**
  jpcorley@kslaw.com
- **Patrick V. Dahlstrom**
  pdahlstrom@pomlaw.com
- **Michael T. Harmon**
  michael.harmon@wallerlaw.com,TAPDocketingClerk-Nash@wallerlaw.com,shelli.dimarco@wallerlaw.com
- **Logan R. Hobson**
  lhobson@kslaw.com
- **J. Alexander Hood , II**
  ahood@pomlaw.com
- **Jeremy A. Lieberman**
  jalieberman@pomlaw.com,disaacson@pomlaw.com,lpvega@pomlaw.com
- **Jonathan Lindenfeld**
  jlindenfeld@pomlaw.com
- **Christopher Hamp Lyons**
  clyons@rgrdlaw.com,crosini@rgrdlaw.com,e_file_sd@rgrdlaw.com
- **Jerry E. Martin**
  jmartin@barrettjohnston.com,eseaborn@barrettjohnston.com,nchanin@barrettjohnston.com,jmartin@rgrdlaw.com,ggilbert@barrettjohnston.com
- **W. Travis Parham**
  travis.parham@wallerlaw.com,TAPDocketingClerk-Nash@wallerlaw.com,shelli.dimarco@wallerlaw.com
- **Christopher M. Wood**
  cwood@rgrdlaw.com,cbarrett@rgrdlaw.com,CWood@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)