## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

INDIANA PUBLIC RETIREMENT
SYSTEM, Individually and on Behalf of All
Others Similarly Situated,

      Plaintiff,

v.

AAC HOLDINGS, INC., MICHAEL T.
CARTWRIGHT, KIRK R. MANZ, and
ANDREW W. MCWILLIAMS,

      Defendants.

Civil Action No. 3:19-cv-00407
Judge Eli J. Richardson
Magistrate Judge Alistair E. Newbern

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
## MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

STATEMENT OF FACTS ................................................................................. 3

    A. The Parties ......................................................................................... 3

    B. The Restatement ................................................................................. 3

    C. The Marketing Claim ......................................................................... 6

    D. Procedural History ............................................................................. 7

APPLICABLE STANDARDS .......................................................................... 7

ARGUMENT ...................................................................................................... 9

I.  THE RESTATEMENT CLAIM SHOULD BE DISMISSED BECAUSE THE COMPLAINT FAILS TO ALLEGE A STRONG INFERENCE OF SCIENTER ........................................... 9

    A. Scrutiny of Lab Diagnostic Testing ................................................. 11

    B. AAC's DSO Metrics ......................................................................... 11

    C. The SEC's Subpoena ......................................................................... 12

    D. The Signed SOX Certifications ........................................................ 13

    E. The Executive Resignations ............................................................. 14

    F. Considered in Totality, the Competing Inference of Non-Fraudulent Intent Is More Compelling ................................................................................... 14

II.  THE MARKETING CLAIM SHOULD BE DISMISSED ........................ 16

    A. The Complaint Fails to Allege Loss Causation ............................... 16

    B. The Complaint Fails to Allege An Actionable Misstatement .......... 18

        1. Protected Forward-Looking Statements ..................................... 18

        2. Inactionable Statements of Opinion ........................................... 20

        3. Inactionable Statements of Corporate Optimism ....................... 21

    C. The Complaint Fails to Allege a Strong Inference of Scienter ........ 22

        1. Third-party Criticisms ................................................................ 22

        2. The Core Operations Doctrine ................................................... 23

        3. Mr. Cartwright's Congressional Testimony .............................. 24

        4. The Innocent Inference Is More Compelling ............................. 25

III. THE CONTROL PERSON LIABILITY CLAIMS SHOULD BE DISMISSED ................. 25

CONCLUSION.................................................................................................. 25

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Aceto Corp. Sec. Litig.*,
   No. 2:18-CV-2425-ERK-AYS, 2019 WL 3606745 (E.D.N.Y. Aug. 6, 2019)........................23

*In re Almost Family, Inc. Sec. Litig.*,
   Case No. 3:10-cv-00520, 2012 WL 443461 (W.D. Ky. Feb. 10, 2012)..................................17

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)............................................................................................................7

*In re Barrick Gold Corp. Sec. Litig.*,
   341 F. Supp. 3d 358 (S.D.N.Y. 2018)...................................................................................20

*Beaver County Retirement Board v. LCA-Vision Inc.*,
   No. 1:07CV750, 2009 WL 806714 (S.D. Ohio Mar. 25, 2009) .............................................14

*In re BofI Holding, Inc. Sec. Litig.*,
   302 F. Supp. 3d 1128 (S.D. Cal. 2018)..................................................................................13

*Bondali v. Yum! Brands, Inc.*,
   620 F. App'x 483 (6th Cir. 2015) ............................................................................................8

*Boynton Beach Firefighters' Pension Fund v. HCP, Inc.*,
   No. 3:16-CV-1106, 2019 WL 6251435 (N.D. Ohio Nov. 22, 2019)......................................14

*In re Comshare, Inc. Sec. Litig.*,
   183 F.3d 542 (6th Cir. 1999) ..............................................................................................1, 2

*In re Corrpro Sec. Litig.*,
   Case No. 1:02CV1198, 2003 WL 23138459 (N.D. Ohio May 27, 2003) ....................4, 13, 14

*Courie v. Alcoa Wheel & Forged Prods.*,
   577 F.3d 625 (6th Cir. 2009) ..................................................................................................7

*D.E. & J. Ltd. Pshp. v. Conaway*,
   133 F. App'x 994 (6th Cir. 2005) ..........................................................................................16

*Fire & Pension Ass'n of Colo. v. Simon*,
   778 F.3d 228 (1st Cir. 2015)............................................................................................11, 12

*In re Ford Motor Co. Sec. Litig.*,
   381 F.3d 563 (6th Cir. 2004) ................................................................................................21

Case 3:19-cv-00407   Document 53   Filed 02/12/20   Page 3 of 33 PageID #: 501

*Grossman v. Novell, Inc.*,
120 F.3d 1112 (10th Cir. 1997) ......................................................................................21

*Helwig v. Vencor, Inc.*,
251 F.3d 540 (6th Cir. 2001) ......................................................................................8, 19

*Hess v. Am. Physicans Capital, Inc.*,
No. 5:04-CV-31, 2005 WL 459638 (W.D. Mich. Jan. 11, 2005)....................................19, 22

*Holbrook v. Trivago N.V.*,
No. 17 CIV. 8348 (NRB), 2019 WL 948809 (S.D.N.Y. Feb. 26, 2019) .................................24

*In re Humana, Inc. Sec. Litig.*,
No. CIVA 308CV-00162-JHM, 2009 WL 1767193 (W.D. Ky. June 23, 2009).....................19

*IBEW Local No. 58 Annuity Fund v. EveryWare Glob., Inc.*,
849 F.3d 325 (6th Cir. 2017) ......................................................................................25

*Ind. State. Dist. Council v. Omnicare, Inc.*,
583 F.3d 935 (6th Cir. 2009) ......................................................................................16, 20

*Konkol v. Diebold, Inc.*,
590 F.3d 390 (6th Cir. 2009) ....................................................................... *passim*

*Ley v. Visteon Corp.*,
Case No. 05-CV-70737, 2006 WL 2559795 (E.D. Mich. Aug. 31, 2006),
aff'd, 543 F.3d 801 (6th Cir. 2008)................................................................... *passim*

*In re Lions Gate Entm't Corp. Sec. Litig.*,
165 F. Supp. 3d 1 (S.D.N.Y. 2016) ....................................................................13

*Lubbers v. Flagstar Bancorp. Inc.*,
162 F. Supp. 3d 571 (E.D. Mich. 2016)..................................................................8

*Miller v. Champion Enterprises, Inc.*,
346 F.3d 660 (6th Cir. 2003) ......................................................................................18

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
575 U.S. 175 (2015)..................................................................................20, 21

*Owens v. Jastrow*,
789 F.3d 529 (5th Cir. 2015) ......................................................................................11, 12

*Plumbers, Pipefitters & MES Local Union v. Fairfax Financial Holdings Ltd.*,
886 F. Supp. 2d 328 (S.D.N.Y. 2012)..................................................................17

*PR Diamonds, Inc. v. Chandler*,
364 F.3d 671 (6th Cir. 2004) ....................................................................2, 10, 12, 15

iii

*Ricker v. Zoo Entm't, Inc.*,
534 F. App'x 495 (6th Cir. 2013) ..................................................................................2, 10

*Shaw v. Digital Equip. Corp.*,
82 F.3d 1194 (1st Cir. 1996) ...............................................................................................21

*Smith v. Circuit City Stores, Inc.*,
286 F. Supp. 2d 707 (E.D. Va. 2003) ...................................................................................8

*Stambaugh v. Corrpro Cos., Inc.*,
116 F. App'x 592 (6th Cir. 2004) ...................................................................................2, 14

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007).............................................................................................. *passim*

*In re The Goodyear Tire & Rubber Co. Sec. Litig.*,
436 F. Supp. 2d 873 (N.D. Ohio 2006)..................................................................................9

*In re Travel Agent Comm'n Antitrust Litig.*,
583 F.3d 896 (6th Cir. 2009) ................................................................................................7

*In re Velti PLC Sec. Litig.*,
No. 13-CV-03889-WHO, 2015 WL 5736589 (N.D. Cal. Oct. 1, 2015)..................................12

*Zwick Partners, LP v. Quorum Health Corp.*,
No. 3:16-CV-2475, 2019 WL 1450546 (M.D. Tenn. Mar. 29, 2019) ....................................20

**Statutes**

15 U.S.C. § 15u-4, *et seq*. .....................................................................................................8

15 U.S.C. § 78u-4(b)(1)(2) .....................................................................................................9

15 U.S.C. § 78u-4(b)(2) .........................................................................................................22

15 U.S.C. § 78u-4(b)(3)(A).......................................................................................................9

15 U.S.C. § 78u-5(i)(1)............................................................................................................18

15 U.S.C. § 78u-5(c)(1)(A)(i)....................................................................................................18

**Other Authorities**

Fed. R. Civ. P. 8......................................................................................................................8

Fed. R. Civ. P. 9......................................................................................................................8

Fed. R. Civ. P. 12....................................................................................................................7

S. Rep. No. 104-98 (1995) .................................................................................................................8

v

## INTRODUCTION

On April 15, 2019, AAC Holdings, Inc. ("AAC" or the "Company") announced that it would be restating its financial results for fiscal years 2016 and 2017 and the first three quarters of 2018 (the "Restatement"). The Restatement was not entirely negative – it resulted in *increases* to net income for fiscal year 2017 and the first two quarters of 2018. The fact that the Restatement resulted in increases to net income for certain periods demonstrates that there was no fraud here. No executive would intentionally understate net income. Nevertheless, Plaintiff filed this lawsuit a month after the Restatement was announced claiming fraud based on nothing more than Defendants' announced correction to previously issued financial statements. *See* Dkt. No. 1.

But just because Defendants admitted in the Restatement that prior financial statements needed to be corrected does not mean that Plaintiff has stated a claim for securities fraud. To survive a motion to dismiss, the Complaint must include specific allegations of scienter, that is "specific allegations showing that the Defendants either knew of or recklessly disregarded the falsity of their own statements at the time the statements were made." *Konkol v. Diebold, Inc.*, 590 F.3d 390, 403 (6th Cir. 2009). "[T]he fact that their statements later turned out to be false is irrelevant." *Id.* And, to be clear, the Restatement alone is not sufficient to allege scienter because the "Sixth Circuit has repeatedly rejected the proposition that restatements or accounting errors, standing alone, show scienter." *Ley v. Visteon Corp.*, Case No. 05-CV-70737, 2006 WL 2559795 (E.D. Mich. Aug. 31, 2006), *aff'd*, 543 F.3d 801 (6th Cir. 2008).

Rather, the Complaint must allege "facts to show that Defendants knew or could have known of the errors, or that their regular procedures should have alerted them to the errors sooner than they actually did." *In re Comshare, Inc. Sec. Litig.*, 183 F.3d 542, 553 (6th Cir. 1999). Defendants specifically disclosed that they did not become aware of the issue until after December

1

2018 based on the development of new analytical tools. And the Complaint nowhere challenges the veracity of this statement. The Complaint also otherwise does not allege any facts to meet the requisite standard of knowledge and for that reason it should join the legions of other Sixth Circuit restatement cases that have been dismissed for failure to allege a strong inference of scienter. *See, e.g., Ricker v. Zoo Entm't, Inc.*, 534 F. App'x 495 (6th Cir. 2013) (dismissing restatement case for failure to allege a strong inference of scienter); *Konkol*, 590 F.3d 390 (same); *Ley*, 540 F.3d 379 (same); *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671 (6th Cir. 2004) (same); *Stambaugh v. Corrpro Cos., Inc.*, 116 F. App'x 592 (6th Cir. 2004) (same); *Comshare*, 183 F.3d 542 (same).

Perhaps recognizing that its Restatement claim had no legs, Plaintiff added a new theory of fraud in its Amended Complaint filed on November 4, 2019 (the "Complaint" or Compl."). Dkt. No. 45. That theory, however, is equally as faulty as the Restatement claim. The new theory asserts that Defendants misled investors with respect to the sustainability of the Company's "deceptive sales and marketing scheme" (the "Marketing Claim"). Compl. ¶ 3. But the alleged corrective disclosure that purportedly revealed the "truth" of the alleged misstatements was that the Company was being impacted by changes Google made to its search algorithms. Compl. ¶¶ 130, 136. The alleged misstatements have nothing to do with Google's algorithms, and, therefore, Plaintiff fails to plead the requisite element of loss causation on the Marketing Claim. Even if the Court were to consider the alleged misstatements, which it need not do given the failure to allege loss causation, the claim should still be dismissed because the alleged misstatements are inactionable as a matter of law and the Complaint fails to plead any facts giving rise to a strong inference of scienter on the Marketing Claim.

For each of these reasons, and as discussed in more detail below, Defendants request that the Court dismiss the Complaint in its entirety and with prejudice.

<u>**STATEMENT OF FACTS**</u>

**A.     The Parties**

Defendant AAC is a provider of inpatient and outpatient substance abuse services for individuals plagued by addiction and co-occurring behavioral issues. Compl. ¶ 14.  Defendants Michael T. Cartwright, Kirk R. Manz, and Andrew W. McWilliams (together, the "Individual Defendants") occupied various executive positions at the Company. *Id.* ¶¶ 15, 16, 17.

Mr. Cartwright was the Company's Chairman and Chief Executive Officer ("CEO") during the alleged Class Period, and, notably, as alleged in the Complaint, was AAC's largest shareholder, owning approximately 19% of the outstanding shares.  *Id.* ¶ 15.  Mr. Cartwright, as a significant stock holder, had no incentive whatsoever to engage in a fraudulent scheme that would ultimately cause his 19% holdings to decline in value.

Mr. Manz was AAC's Chief Financial Officer ("CFO") from January 2011 until resigning in December 2017. *Id.* ¶ 16.  The Complaint does not allege any facts even remotely suggesting Mr. Manz's resignation was the result of anything other than his decision to take a new position after seven years with AAC.  Moreover, the Complaint does not allege that Mr. Manz sold any of his AAC stock during the alleged Class Period or otherwise had a motive to commit fraud.

Mr. McWilliams is the Company's current CEO.  Prior to that, he was the Company's CFO effective January 1, 2018 and had previously served as the Company's Chief Accounting Officer since August 2014. *Id.* ¶ 17.  The Complaint does not allege that Mr. McWilliams sold any of his AAC stock during the alleged Class Period or otherwise had a motive to commit fraud.

**B.     The Restatement**

Because most of AAC's facilities are not enrolled in Medicare or Medicaid, the majority of the Company's revenue derives from commercial payors, i.e., insurance companies, at out-of-

3

network rates, with the remaining revenue coming directly from patients. *See* Ex. G, 2018 AAC Form 10-K, at 40.[1] AAC recognizes revenue from commercial payors at the time services are rendered to the insured based on an estimate of the eventual amount the commercial payors will pay the Company. *Id.* These estimates are calculated by management upon consideration of a number of factors, including the types of services provided, the gross bill, and the historical collections received from commercial payors on a per facility basis. *Id.* at 41.

AAC also maintains accounts receivable, which prior to January 1, 2018, were calculated net of a provision for doubtful accounts. *Id.* The doubtful accounts expense entry reflected management's best estimate for amounts that could become uncollectible in the future. *Id.* It was calculated using the age of the receivables, historical collection experience by facility, the nature of the services provided, payor source and historical reimbursement rate, current economic trends, and percentages applied to the accounts receivable aging categories. *Id.* AAC calculated its provision for doubtful accounts on a quarterly basis and adjusted it based on actual collections. *Id.*

AAC adopted the Topic 606 accounting standard on January 1, 2018, using the modified retrospective approach. *Id.* Jointly issued by the Financial Accounting Standards Board ("FASB") and the International Accounting Standards Board ("IASB"), Topic 606 provides guiding principles on revenue recognition. It aims to provide companies flexibility when recognizing revenue for contracts involving many layers of goods and services conferred to a single client.

The adoption of Topic 606 required AAC to amend its method for recording the risk of nonpayment. Whereas before AAC could record revenue with a separate consideration of the

---

[1] "The court can consider the full text of SEC filings, prospectus, analysts' reports and statements essential to the complaint, even if not attached, without converting the motion into one for summary judgment." *In re Corrpro Sec. Litig.*, Case No. 1:02CV1198, 2003 WL 23138459, at *1 (N.D. Ohio May 27, 2003).

4

collectability of the associated receivable balance, the Company would now be required to record bad debt as a *direct* reduction to revenue. The financial statements included in AAC's 10-Q for the first quarter of 2018 and thereafter reflected this change. *See* Ex. C, AAC Form 10-Q for 1Q 2018, at 8.

AAC explained that the Restatement came about as follows:

> Subsequent to the year ended December 31, 2018 and as part of the preparation of the Company's year-end financial statements, using recently developed financial database analytical tools, the Company became aware of historical cash collection trends by customer that existed at the time of the issuance of the historical financial statements. As a result of this review and after consultation and deliberation with regard to the appropriate accounting treatment, including discussion as to the size of the adjustments, the Company concluded that this oversight by the Company of the historical collection trends by customer led to the adjustments being considered corrections of an error under accounting principles generally accepted in the United States of America. The adjustments relate to estimates of accounts receivable, provision for doubtful accounts and revenue for the relevant periods described below and reclassifications, as well as the related income tax effects.

*See* Ex. G, at F-9.

The Restatement resulted in the following ***increases*** to net income: $7.7 million in fiscal year 2017; $1.3 million in the first quarter of 2018; and $1.4 million in the second quarter of 2018. *Id.* at 4, F-38, F-39. The Restatement also resulted in the following decreases to net income: $20.6 million in fiscal year 2016; $23.8 million in fiscal year 2015; and $10.7 million in the third quarter of 2018. *Id.* at 4, F-37

The Restatement ***did not*** affect the Company's previously reported cash flows from operating activities. *Id.* at 3. The Restatement also ***did not*** relate at all to a change in estimate the Company made during the three months ended September 30, 2018 for "partial payments accounts receivable." *Id.* Notably, the Securities and Exchange Commission ("SEC") subpoena alleged in the Complaint related to the partial payments accounts receivable, not the errors that were corrected in the Restatement. *See* Ex. F, AAC Form 10-Q for 3Q 2018, at 20.

## C.     The Marketing Claim

Like all healthcare companies, AAC has an interest in potential patients choosing its facilities and services over those of its competitors. To that end, AAC employs a variety of sales and marketing strategies.  Ex. G, at 8-9.

The Complaint alleges that the so-called fraud related to the Marketing Claim was purportedly revealed on November 6, 2018 and April 16, 2019, when AAC discussed the impacts to its business of changes and updates by Google in Google's search algorithms.  Compl. ¶¶ 130, 136.  AAC, however, never made any statements about being impervious to Google's search algorithms.  In fact, when AAC faced the issue, it warned investors of the risk of disruptions to its sales and marketing practices and, when AAC found out about Google's algorithm changes, it specifically warned investors of that risk.  The risk disclosures are as follows:

- "We rely on our multi-faceted sales and marketing program to continuously attract and enroll clients in our network of facilities. Any disruption in our national sales and marketing program would have a material adverse effect on our business, financial condition and results of operations."  Ex. A, AAC 2016 Form 10-K, at 15.

- "We believe our national sales and marketing program provides us with a competitive advantage compared to treatment facilities that primarily target local geographic areas and use fewer marketing channels to attract clients. If any disruption occurs in our national sales and marketing program for any reason or if we are unable to effectively attract and enroll new clients to our network of facilities, our ability to maintain census could be adversely affected, which would have a material adverse effect on our business, financial condition and results of operations." *Id.*

- "In addition, our ability to grow or even to maintain our existing level of business depends significantly on our ability to establish and maintain close working and referral relationships with hospitals, other treatment facilities, employers, alumni, employee assistance programs and other referral sources. We have no binding commitments with any of these referral sources. We may not be able to maintain our existing referral relationships or develop and maintain new relationships in existing or new markets. If we lose existing relationships with our referral sources, the number of people to whom we provide services may decline, which may adversely affect our revenues. Also, if we fail to develop new referral relationships, our growth may be restrained." *Id.*

- "Internet search engines play an increasingly important role in addiction treatment

6

marketing. **Google and other search engines use complex algorithms to rank websites**. The algorithms take into account many factors, including the domain name itself, website content and user-friendly factors such as the speed at which the website pages may be clicked through and viewed. We cannot predict or control changes in algorithms and website rankings, which may result in lower rankings for our websites. Additionally, Google and other online platforms have instituted review processes required to advertise on their websites. Some of these processes are time consuming, complex and continuously evolving. We cannot predict how these private processes, rules and restrictions will evolve or be applied to individual advertising applicants. Unexpected changes in these areas may result in a decrease in calls to our admissions center, a decrease in interactions with potential clients and a lowering of our census, which could have and material adverse effects on our business, financial condition and results of operations." Ex. F, at 42 (emphasis added).

### D.     Procedural History

On May 16, 2019, one month after the Restatement was announced, Plaintiff filed its initial complaint that alleged securities fraud related to the Restatement only.  Dkt. No. 1.  On November 4, 2019, the Complaint was filed, which added the Marketing Claim (Dkt. No. 45), and on January 13 and February 5, 2020, Plaintiff supplemented the Complaint.  Dkt. Nos. 48, 51.

### APPLICABLE STANDARDS

A motion to dismiss a complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure tests the legal sufficiency of the claims asserted.  When such a motion is filed, a complaint can survive dismissal only if it "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Courie v. Alcoa Wheel & Forged Prods.*, 577 F.3d 625, 629 (6th Cir. 2009) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  In ruling on a motion to dismiss, the Court "need not accept as true legal conclusions or unwarranted factual inferences . . . and conclusory allegations or legal conclusions masquerading as factual allegations will not suffice." *In re Travel Agent Comm'n Antitrust Litig.*, 583 F.3d 896, 903 (6th Cir. 2009) (internal quotation and citations omitted).

Here, the Complaint attempts to allege a claim under § 10(b) of the Exchange Act and Rule

7

10b-5. "[T]o state a viable claim under Section 10(b) of the [Exchange Act], or under SEC Rule 10b–5, a plaintiff must allege: (1) a misrepresentation or omission; (2) of a material fact that the defendant had a duty to disclose; (3) made with scienter; (4) justifiably relied on by plaintiffs; and (5) proximately causing them injury." *Ley*, 543 F.3d at 806, *abrogated on other grounds, Doshi v. Gen. Cable Corp.*, 823 F.3d 1032 (6th Cir. 2016). The failure to plead any one of the elements of a § 10(b) claim is sufficient grounds for dismissal. *See Lubbers v. Flagstar Bancorp. Inc.*, 162 F. Supp. 3d 571, 584 (E.D. Mich. 2016) (dismissing complaint because "plaintiff cannot satisfy the first element of his § 10(b) and Rule 10b-5 claim").

Ordinarily, civil complaints need only satisfy the pleading standard set forth in Rule 8, but because the Complaint in this case alleges claims of securities fraud under §§ 10(b) and 20(a) of the Exchange Act, it is subject to the higher pleading burdens of Rule 9(b) and the Private Securities Litigation Reform Act (the "Reform Act"), 15 U.S.C. § 15u-4, *et seq*. *See Bondali v. Yum! Brands, Inc.*, 620 F. App'x 483, 488–89 (6th Cir. 2015). Securities litigation has for many years been especially prone to "strike suits" aimed at "jackpot discovery and predatory settlement." *Helwig v. Vencor, Inc.*, 251 F.3d 540, 547 (6th Cir. 2001). Such abusive lawsuits are often "based on nothing more than a company's announcement of bad news, not evidence of fraud." S. Rep. No. 104-98, at 4 (1995), as reprinted in 1995 U.S.C.C.A.N. 679, 683. Thus, in 1995, Congress enacted the Reform Act and designated district courts as gatekeepers to prevent actions that do not meet the heightened pleading requirements from proceeding to discovery and beyond. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 320 (2007); *Smith v. Circuit City Stores, Inc.*, 286 F. Supp. 2d 707, 713 (E.D. Va. 2003).

Under the Reform Act, the Complaint must "(1) . . . specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading . . . and (2) . . . state

8

with particularity facts giving rise to a ***strong inference*** that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(1)(2) (emphasis added). If either of these requirements is not met, the court "***shall***, on the motion of any defendant, dismiss the complaint." 15 U.S.C. § 78u-4(b)(3)(A) (emphasis added).

Here, the Complaint should be dismissed because (a) the Restatement Claim fails to allege a strong inference of scienter, *see infra* at § I, and (b) the Marketing Claim fails to plead loss causation, *see infra* at § II(A), an actionable misstatement or omission, *see infra* at § II(B), or a strong inference of scienter, *see infra* at § II(C).

## ARGUMENT

## I. THE RESTATEMENT CLAIM SHOULD BE DISMISSED BECAUSE THE COMPLAINT FAILS TO ALLEGE A STRONG INFERENCE OF SCIENTER

"The purpose of a restatement is to correct an error in a previously-issued financial statement. By definition … a restatement says that the prior financial statement was false." *In re The Goodyear Tire & Rubber Co. Sec. Litig.*, 436 F. Supp. 2d 873, 894 (N.D. Ohio 2006). "The need for a restatement, while it may demonstrate the falsity of a prior statement, does not automatically result in a finding of scienter." *Id.* The issue for the Court on the Restatement Claim is, therefore, whether the Complaint adequately alleges scienter.

As noted, the Reform Act requires the Complaint to plead particularized facts that give rise to a strong inference of scienter. "To qualify as strong, … an inference of scienter must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. As the Sixth Circuit has held, negligence alone cannot support a finding of scienter; rather, the complaint must allege at least recklessness, which is defined as "highly unreasonable conduct which is an extreme departure from the standards of ordinary care." *Konkol*, 590 F.3d at 396.

9

"A complaint alleging accounting irregularities fails to raise a strong inference of scienter if it alleges no facts to show that Defendants knew or could have known of the errors, or that their regular procedures should have alerted them to the errors sooner than they actually did." *PR Diamonds*, 364 F.3d at 684. A court may infer recklessness where the accounting violations were "so simple, basic, and pervasive in nature, and so great in magnitude, that they should have been obvious to a defendant." *Id.* Where, however, the alleged accounting violations are "not 'in your face facts" that 'cry out' scienter," the Complaint is appropriately dismissed. *Id.* at 686. Indeed, [b]efore finding that a defendant acted recklessly, [the Sixth Circuit] typically looks for multiple, obvious red flags." *Ricker*, 534 F. App'x at 499. "That is, warning signs that would have revealed the accounting errors prior to their inclusion in public statements." *Id.*

The Sixth Circuit "employs a totality of the circumstances analysis whereby the facts argued collectively must give rise to a strong inference of at least recklessness." *PR Diamonds*, 364 F.3d at 683. To conduct that analysis, the Sixth Circuit has "sift[ed] Plaintiffs' allegations individually and then aggregate[d] the nuggets of inference they generate," to reach its conclusion as to whether a strong inference arises on the whole. *Id.* at 684. The individual allegations on which the Complaint relies here are (i) commercial payors' increased scrutiny of diagnostic lab testing services, (ii) AAC's days sales outstanding, or "DSOs," (iii) the SEC's request for documents in March 2018, (iv) SOX certifications signed by the Individual Defendants, and (v) the resignations of certain executives and Board members. *See* Compl. ¶¶ 139, 142, 144, 146, 147, 148. As explained below, none of the inferences individually raises an inference of scienter and, in totality, the innocent inference is the more compelling one here. The Restatement Claim should be dismissed.

### A.      Scrutiny of Lab Diagnostic Testing

The Complaint alleges a strong inference of scienter may be inferred because AAC was experiencing a delay in collections for out-of-network lab diagnostic testing. *See id.* ¶ 140.  This allegation fails to give rise to a strong inference of scienter for at least two reasons.

*First*, AAC disclosed that fact at the very beginning of the alleged Class Period.  In the Form 10-K for fiscal year 2016, AAC disclosed that "[t]he aging of our accounts receivable continue to be negatively impacted by increased documentation requests from commercial payors prior to payment and slower collections related to laboratory services."  Ex. A, at 39.   This transparency cuts heavily against a finding of scienter. *See Owens v. Jastrow*, 789 F.3d 529, 540-41 (5th Cir. 2015) ("the red flags were disclosed to the public, which negates the inference that defendants acted with scienter"); *Fire & Pension Ass'n of Colo. v. Simon*, 778 F.3d 228, 244 (1st Cir. 2015) (holding that a company's disclosures of red flags "undercut any inference of scienter").

*Second*, the Complaint completely fails to explain how increased scrutiny of lab diagnostic testing would have made it obvious to Defendants that the Restatement was needed.  "The standard from *Tellabs* requires specific facts that [the alleged reports] were known to Defendants and reflected the revenue-recognition scheme in such a way that it would have been obvious that [the Company] was improperly inflating its revenue." *Konkol*, 590 F.3d at 398.  The Complaint alleges none of these facts, and, if the scrutiny of lab testing had made the Restatement so obvious, then any investor or analyst could have figured it out at the beginning of the alleged Class Period by reviewing AAC's disclosure of that scrutiny.

### B.      AAC's DSO Metrics

Days sales outstanding, or DSO, measures the average number of days it takes to collect on a bill once a sale is recorded, or in this instance, when addiction treatment services are rendered to

11

a patient. The Complaint alleges that AAC's increasing DSOs somehow gives rise to a strong inference of scienter. *See* Compl. ¶¶ 142-43. Again, this theory fails for at least two reasons.

**First**, AAC disclosed its increasing DSOs at the very beginning of the alleged Class Period. In the Form 10-K for fiscal year 2016, AAC disclosed that "[o]ur days sales outstanding was 111 days as of and for the quarter ended December 31, 2016 compared with 96 days as of and for the quarter ended December 31, 2015." Ex. A, at 39. Disclosure of alleged red flags negates an inference of scienter. *Owens*, 789 F.3d at 540-41; *Fire & Pension Ass'n of Colo.,* 778 F.3d at 244.

**Second**, once again, the Complaint fails to allege any explanation as to how the publicly disclosed information of increasing DSOs would inform Defendants that the Restatement was needed. As the Sixth Circuit held, "[t]he only connection between these [DSO] reports and the Defendants, however, is that the Defendants allegedly 'monitored' the high DSO. But this general allegation is not sufficient to support a strong inference of scienter." *Konkol*, 590 F.3d at 398; *see also In re Velti PLC Sec. Litig.*, No. 13-CV-03889-WHO, 2015 WL 5736589, at *36 (N.D. Cal. Oct. 1, 2015) ("[T]he increase in receivables and DSOs, standing alone, does not indicate that [auditor] knew or should have known at any time before its final audit of [client's] financial statements that [client's] reserves were insufficient."). An increase in DSO levels simply does not make it "obvious" that the Restatement was needed. *PR Diamonds*, 364 F.3d at 686.[2]

### C. The SEC's Subpoena

The Complaint alleges that Defendants' purported concealment of a subpoena from the SEC between March 2018 when the subpoena was received and October 2018 when AAC publicly disclosed the subpoena gives rise to a strong inference of scienter. Plaintiff is incorrect for at least

---

[2] Defendants note that the DSO levels were actually decreasing. As AAC disclosed in the Form 10-K for fiscal year 2017, its DSOs had decreased 10 days. Ex. B, AAC 2017 Form 10-K, at 42.

three reasons.

**First**, companies have no duty to disclose SEC subpoenas. *See In re BofI Holding, Inc. Sec. Litig.*, 302 F. Supp. 3d 1128, 1147 (S.D. Cal. 2018) ("Lead Plaintiff has not identified any duty held by Defendants to disclose the existence of an SEC investigation into BofI."); *In re Lions Gate Entm't Corp. Sec. Litig.*, 165 F. Supp. 3d 1, 12 (S.D.N.Y. 2016) ("[T]he defendants did not have a duty to disclose the SEC investigation and Wells Notices because the securities laws do not impose an obligation on a company to predict the outcome of investigations.").

**Second**, the SEC subpoena had no relation to the Restatement. As AAC disclosed in its Form 10-Q for the 3Q 2018, the SEC subpoena related to partial payment accounts receivable. The Restatement, however, specifically did not relate to that issue, as AAC disclosed when it stated that the Restatement adjustments did not relate to partial payment accounts receivable. Ex. G, at 3. An unrelated SEC subpoena is not indicative of scienter. *In re Corrpro Sec. Litig.*, No. 1:02CV1198, 2003 WL 23138459, *5 (N.D. Ohio May 27, 2003), *aff'd*, 116 F. App'x 592.

**Third**, the fact of an SEC subpoena (particularly one on an unrelated issue) "is not sufficient to meet the heightened *Tellabs* standard on its own." *Konkol*, 590 F.3d at 402. "Government investigations can result from any number of causes, and the investors have not pointed to any facts suggesting that the SEC investigation was the result of knowing or reckless behavior by the Defendants." *Id.* The SEC subpoena does not give rise to a strong inference of scienter.

###  D.  The Signed SOX Certifications

Plaintiff alleges that the Sarbanes-Oxley ("SOX") certifications signed by the Individual Defendants contribute to a strong inference of scienter. *See* Compl. ¶ 146. The Sixth Circuit, however, has held that SOX certifications are indicative of scienter only if "the person signing the certification was severely reckless in certifying the accuracy of the financial statements." *Ley*, 543

13

F.3d at 812. Where, as here, (a) the Complaint fails to allege facts to suggest that Defendants "had reason to know or should have suspected accounting irregularities or other 'red flags' at the time they signed the certifications"; and (b) the Complaint does not even "explain[] the link between the statements [in the SOX certification] and the actual accounting issues," the SOX signatures are simply "not probative of scienter." *Id.*; *see also Konkol*, 590 F.3d at 402-403 (holding SOX certifications not indicative of scienter in restatement case); *Beaver County Retirement Board v. LCA-Vision Inc.*, No. 1:07CV750, 2009 WL 806714, at *19 (S.D. Ohio Mar. 25, 2009) (same).

### E. The Executive Resignations

The Complaint alleges that the resignations of certain directors and executives at AAC contribute to an inference of scienter. *See* Compl. ¶ 148. This allegation fails for the simple reason that the Complaint is entirely devoid of "any connection between the job turnover and the problems" at the Company. *Corrpro*, 2003 WL 23138459, at *6. "Lead Plaintiffs identify no evidence of a connection between the departures and an inference of misconduct. Nor do they provide factual support for [the allegation] that the departure of [multiple] executives over two years … is unusual." *Boynton Beach Firefighters' Pension Fund v. HCP, Inc.*, No. 3:16-CV-1106, 2019 WL 6251435, at *7 (N.D. Ohio Nov. 22, 2019). The Complaint does not allege that any of the resignations came in the immediate aftermath of or were otherwise related to the Restatement. In fact, the bulk of resignations did not occur until October 1, 2019—approximately 7 months after the Restatement. Compl. ¶ 148. The resignations have no bearing on the issue of scienter.

### F. Considered in Totality, the Competing Inference of Non-Fraudulent Intent Is More Compelling

As set forth above, "the individual allegations do not create any inference of scienter at all; therefore, even in combination, they cannot make the inference of scienter 'strong.'" *Corrpro*, 116 F. App'x at 598 (dismissing complaint because scienter allegations similar to those alleged in

14

this case did not raise a strong inference of scienter).  Simply put, the Complaint is wholly lacking in "specific allegations showing that the Defendants either knew of or recklessly disregarded the falsity of their own statements at the time the statements were made." *Konkol*, 590 F.3d at 403.

The Complaint in essence relies on the Restatement alone, but an inference of recklessness from accounting violations alone is permitted only when the accounting violations are "so simple, basic, and pervasive in nature, and so great in magnitude, that they should have been obvious to a defendant." *PR Diamonds*, 364 F.3d at 684.  The Complaint here nowhere alleges the specific violation that occurred, so it cannot be "simple or basic."  In fact, the issue involves complicated judgments and assumptions of cash collection trends by customer and how that should factor into the provision of doubtful accounts.  The Complaint likewise does not allege that the Restatement was so great in magnitude as to be obvious to Defendants, nor could it because the Restatement involved both *increases* and decreases to net income.  Moreover, the Restatement announcement specifically disclosed that Defendants did not become aware of the issue until they started using recently developed financial database analytical tools after December 31, 2018.  Ex. G, at 3.

Not only are the factors relating to the Restatement itself supportive of the non-fraudulent inference that Defendants did not know about the accounting issue until after December 31, 2018, but the absence of motive and opportunity allegations likewise supports a finding that the non-fraudulent inference is the more compelling one.  Neither of the CFOs is alleged to have sold any AAC stock during the alleged Class Period.  As the Sixth Circuit recognizes, "courts have explained that the absence of inside sales dulls allegations of fraudulent motive." *PR Diamonds*, 364 F.3d at 691.  As to Mr. Cartwright, he was AAC's largest shareholder.  He stood only to lose significant dollars on announcement of any restatement.  If he were trying to capitalize on any purported fraud, he would have sold his shares during the alleged Class Period. But he remained

15

the largest shareholder after the Restatement was announced, and, thus, when AAC's stock price declined, he lost the most.

The Complaint does not allege an inference of scienter that is cogent and at least as compelling as any opposing inference of nonfraudulent intent, and it should therefore be dismissed. *See Tellabs*, 551 U.S. at 309.

## II.     THE MARKETING CLAIM SHOULD BE DISMISSED

Recognizing the infirmity of the Restatement Claim, Plaintiff added a new theory when it filed the Complaint.  That new theory is that Defendants made alleged misstatements about its sales and marketing practice.  As explained below, however, the Marketing Claim fails because the Complaint fails to plead loss causation and may be dismissed on that basis alone.  *See infra* § II(A).  If, however, the Court is inclined to consider the Marketing Claim further, it should still be dismissed because the Complaint fails to (a) plead an actionable misstatement or omission, *see infra* § II(B); and (b) plead facts giving rise to a strong inference of scienter, *see infra* § II(C).

### A.      The Complaint Fails to Allege Loss Causation

Plaintiff must "adequately allege and prove the traditional elements of causation and loss" to state a claim against Defendants.  *D.E. & J. Ltd. Pshp. v. Conaway*, 133 F. App'x 994, 999 (6th Cir. 2005) (affirming dismissal of complaint for failure to allege loss causation adequately).  "Price inflation alone is insufficient; rather, a plaintiff must show that an economic loss occurred after the truth behind the misrepresentation or omission became known to the market."  *Ind. State. Dist. Council v. Omnicare, Inc.*, 583 F.3d 935, 944 (6th Cir. 2009) (dismissing complaint in part for failure to allege loss causation adequately).  Specifically, to survive dismissal, the allegations in the Complaint must "explain how the statements were revealed to be false and thereby caused a drop in the stock price."  *Id.*  Where, as here, the Complaint relies on corrective disclosures to allege loss causation, those disclosures must correct prior statements that Defendants made to

16

allege loss causation adequately. *In re Almost Family, Inc. Sec. Litig.*, Case No. 3:10-cv-00520, 2012 WL 443461, at *10 (W.D. Ky. Feb. 10, 2012).

The Complaint attempts to meet this burden by citing to disclosures on November 6, 2018 and April 16, 2019. Compl. ¶¶ 130, 136. Those two disclosures, however, were about "changes in Google's algorithms" (¶ 130) and "Google [doing] an algorithm update [that] really just disrupted the entire system" (¶ 136). None of the alleged Marketing Claim misstatements, however, ensured that AAC was impervious to Google's changes or updates in its algorithms or otherwise stated that the marketing function had no faults. Compl. ¶¶ 63-83.[3]

The alleged corrective disclosures, therefore, do not "possess a sufficient nexus to a prior misstatement such that it reveals at least part of the falsity of that misstatement." *Plumbers, Pipefitters & MES Local Union v. Fairfax Financial Holdings Ltd.*, 886 F. Supp. 2d 328, 338 (S.D.N.Y. 2012). Because there is "no logical connection between the press releases and Plaintiff's vague allegations" on the Marketing Claim, the Marketing Claim should be dismissed for failure to allege loss causation. *Id.* (dismissing complaint for failure to allege loss causation where the corrective disclosures did not address plaintiff's alleged misstatements).

---

[3] In fact, AAC specifically disclosed at the outset of the alleged Class Period that "[a]ny disruption in our national sales and marketing program would have a material adverse effect on our business, financial condition and results of operations." Ex. A, at 15. And, as soon as the Company knew that Google's changes were having an impact it disclosed that "[i]nternet search engines play an increasingly important role in addiction treatment marketing. Google and other search engines use complex algorithms to rank websites. . . . We cannot predict or control changes in algorithms and website rankings, which may result in lower rankings for our websites. Additionally, Google and other online platforms have instituted review processes required to advertise on their websites. Some of these processes are time consuming, complex and continuously evolving. We cannot predict how these private processes, rules and restrictions will evolve or be applied to individual advertising applicants. Unexpected changes in these areas may result in a decrease in calls to our admissions center, a decrease in interactions with potential clients and a lowering of our census, which could have and material adverse effects on our business, financial condition and results of operations." Ex. F, at 42.

17

## B. The Complaint Fails to Allege An Actionable Misstatement

The Marketing Claim should be dismissed for the separate and independent reason that the Complaint fails to allege an actionable misstatement or omission. As explained below, the alleged misstatements should be dismissed because they are (1) protected forward-looking statements; (2) inactionable statements of opinion; or (3) inactionable statements of corporate puffery/optimism.

### 1. Protected Forward-Looking Statements

Under its terms, the Safe Harbor provides that "in any private action . . . that is based on an untrue statement of a material fact or omission of a material fact necessary to make the statement not misleading, [the defendant] ***shall not be liable*** with respect to ***any*** forward-looking statement . . . [that] is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A)(i) (emphasis added). Thus, "if the statement qualifies as 'forward-looking' and is accompanied by sufficient cautionary language, a defendant's statement is protected ***regardless of the [defendant's] actual state of mind***." *Miller v. Champion Enterprises, Inc.*, 346 F.3d 660, 672 (6th Cir. 2003) (emphasis added).

The safe harbor broadly defines a forward-looking statement to include, among other things, "(A) a statement containing a projection of revenues, . . . capital expenditures, . . . or other financial items"; "(B) a statement of the plans and objectives of management for future operations"; "(C) a statement of future economic performance"; and "(D) any statement of the assumptions underlying or relating to any statement described in subparagraph (A), (B), or (C)." 15 U.S.C. § 78u-5(i)(1). As the express language of the safe harbor makes clear, statements of a company's expected "future economic performance" and management's "plans and objectives" for future operations are forward-looking under the PSLRA. *See id.*; *see also In re Humana, Inc.*

18

*Sec. Litig.*, No. CIVA 308CV-00162-JHM, 2009 WL 1767193, at *11 (W.D. Ky. June 23, 2009) (statements of management's "objectives" are forward-looking); *Hess v. Am. Physicians Capital, Inc.*, No. 5:04-CV-31, 2005 WL 459638, at *6 (W.D. Mich. Jan. 11, 2005) (same for statement: "*I believe* we will continue to see a pattern of improving results").

Many of the challenged Marketing Claim statements are undoubtedly forward-looking under the safe harbor. *See* Compl. ¶¶ 66, 68, 74, 76, 77, 79. For example, an alleged misstatement in the Complaint is that: "So I think it's a matter of continuing to build out the sales and marketing team, continue to work with our digital assets and continue to put emphasis training and education on our call center to improve conversion rates, *is really what we're focused on in 2018. . . . Back half of the year is when I think that some of these things are going to come to well together. . . . But I think it's going to be more in the back half of the year*." Compl. ¶ 74 (emphasis added). The other cited paragraphs of the Complaint contain similarly forward-looking statements. *See* Compl. ¶¶ 66, 68, 76, 77, 79.

Not only are these statements forward-looking, but they are accompanied by meaningful cautionary language explaining the risks that could cause actual results to differ from those implied by the forward-looking statements. As discussed above, the risk disclosures in AAC's SEC filings adequately cautioned investors and warned of the precise risks about which Plaintiff now complains. *See supra* at 6-7. "'In short, when an investor has been warned of risks of a significance similar to that actually realized, she is sufficiently on notice of the danger of the investment to make an intelligent decision about it according to her own preferences for risk and reward.'" *Helwig v. Vencor, Inc.*, 251 F.3d 540, 559 (6th Cir. 2001).

Moreover, AAC updated these risk disclosures to reflect developments in scrutiny of internet advertising that the Company was experiencing. *See* Ex. F, at 42 (specifically disclosing

19

risk from Google's analyses).  Because the forward-looking statements were accompanied by meaningful cautionary language, they are inactionable as a matter of law under the Reform Act. *See Zwick Partners, LP v. Quorum Health Corp.*, No. 3:16-CV-2475, 2019 WL 1450546, at *7-8 (M.D. Tenn. Mar. 29, 2019) (dismissing claims under the safe harbor where forward-looking statements were accompanied by meaningful cautionary language).

### 2. Inactionable Statements of Opinion

Several of the alleged Marketing Claim statements are also statements of opinion that should be dismissed.  *See* Compl. ¶¶ 70, 79.

As the Supreme Court held, a complaint challenging an opinion statement must plead facts demonstrating (i) that the speaker did not actually hold the opinion professed or (ii) that the speaker lacked the reasonable basis an investor would expect the speaker to have for making the statement. *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 185-86 (2015).[4]  As *Omnicare* further holds, statements with the words "we believe" are statements of opinion. *Id.* at 185.  Here, the statements in paragraphs 70 and 79 of the Complaint begin with the "linguistic cue" of "we believe" that signals they are statements of opinion.  *In re Barrick Gold Corp. Sec. Litig.*, 341 F. Supp. 3d 358, 375 (S.D.N.Y. 2018) (noting that "use of linguistic cues like 'we expect' or 'we believe'" signal opinions of management).

The Complaint, however, comes nowhere near satisfying *Omnicare*'s standard for alleging an actionable opinion. The Complaint does not allege that any of the Defendants did not actually believe the expressed opinions at the time they were issued. *Omnicare*, 575 U.S. at 185-86. Nor does the Complaint allege facts demonstrating that the speakers lacked the reasonable basis for

---

[4] Although *Omnicare* involved a Section 11 claim, other courts have applied the same reasoning when evaluating whether an opinion is actionable under the Exchange Act.

offering these opinions that an investor would expect. *Id.* The opinion statements should be dismissed.

### 3. Inactionable Statements of Corporate Optimism

Several of the Marketing Claim statements are statements of corporate optimism that are inactionable in the Sixth Circuit. *See* Compl. ¶¶ 64, 68.

"All public companies praise their products and their objectives. Courts everywhere 'have demonstrated a willingness to find immaterial as a matter of law a certain kind of rosy affirmation commonly heard from corporate managers and numbingly familiar to the marketplace—loosely optimistic statements that are so vague, so lacking in specificity, or so clearly constituting the opinions of the speaker, that no reasonable investor could find them important to the total mix of information available.'" *In re Ford Motor Co. Sec. Litig.*, 381 F.3d 563, 570–71 (6th Cir. 2004) (quoting *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1217 (1st Cir. 1996)). Because statements reflecting "puffing" or "corporate optimism" are immaterial, they are not actionable as a matter of law. *Id.* The Sixth Circuit defines "Statements that are 'mere puffing' or 'corporate optimism' as those 'generalized statements of optimism that are not capable of objective verification.'" *Id.* (quoting *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir. 1997)).

Several of the Marketing Claim statements easily satisfy this standard. For example, paragraph 64 of the Complaint alleges that Defendants stated AAC had a "best-in-class sales and marketing engine" that provides it with a "significant competitive advantage." And paragraph 68 of the Complaint alleges that Defendants stated "we'll continue to explore ways to help those who are seeking freedom from addiction and to honor their willingness to change. And we'll do this in a way that, hopefully, elevates the addiction treatment industry as a whole."

These statements are the kind of quintessential vague and unverifiable opinions of general

corporate optimism that no reasonable investor would rely upon and should therefore be dismissed. *See Hess v. Am. Physicans Capital, Inc.*, No. 5:04-CV-31, 2005 WL 459638, at \*8 (W.D. Mich. Jan. 11, 2005) (holding that the phrases "[w]e continue to view the market . . . as very favorable," "[the] program reflects our continued confidence," and "I am encouraged by the improvements . . . and optimistic about the future" are each "generalized statements of corporate optimism").

### C. The Complaint Fails to Allege a Strong Inference of Scienter

The Marketing Claim statements should also be dismissed because the Complaint fails to allege particularized facts giving rise to a strong inference that any of the statements were made with scienter. *Tellabs*, 551 U.S. at 309; 15 U.S.C. § 78u-4(b)(2). As the Sixth Circuit has held, "[p]leadings that fail to meet this standard 'shall' be dismissed." *Doshi*, 823 F.3d at 1039. As explained below, none of the three factors cited in the Complaint give rise to a strong inference of scienter and the more compelling inference here is the non-fraudulent one.

### 1. Third-party Criticisms

Plaintiff cites to the following in an attempt to allege a strong inference of scienter: (a) an article published by *The Verge* that criticized the marketing tactics of the industry; (b) congressional hearings; and (c) Google's efforts to reduce deceptive advertising in the substance abuse treatment space. None suffices to meet the requisite standard.

***First***, the Complaint does not, and cannot, allege that *The Verge* article specifically criticized any of AAC's marketing practices. Thus, the article does not speak to the scienter of Defendants on the Marketing Claim.

***Second***, the fact that a congressional hearing was held to discuss advertising practices within the addiction treatment industry has little bearing on Defendants' scienter. The Complaint does not allege that Mr. Cartwright was called to Washington D.C. to answer for the alleged

22

wrongdoing of AAC or that Congress took any action against AAC for its marketing practices. Rather, the cited Congressional hearing testimony makes clear that Mr. Cartwright and several other industry executives were asked to provide color on the way treatment providers reached potential patients. The Congressional hearing has no bearing on scienter.

*Third*, Google's algorithm update and its effect on some of AAC's websites is not an indictment of the Company's sales and marketing practices. Google's algorithms are complex, especially those designed to process searches for medical or treatment information. And while the update may focus on peer reviewed medical advice, that does not mean that any of the alleged misstatements regarding AAC's marketing practices were made with an intent to defraud.

In sum, the third-party criticisms in the Complaint do not relate to AAC's specific sales and marketing practices and therefore do not and cannot give rise to a strong inference of scienter.

### 2. The Core Operations Doctrine

Invoking the core operations doctrine, the Complaint alleges that Defendants must have acted with scienter because AAC's marketing practices are important to the business. *See* Compl. ¶¶ 149-150. This theory fails for at least two reasons.

*First*, although the Sixth Circuit has not addressed the viability of the doctrine post-Reform Act, the courts that have done so suggest that the doctrine did not survive passage of the Reform Act. *See, e.g.*, *In re Aceto Corp. Sec. Litig.*, No. 2:18-CV-2425-ERK-AYS, 2019 WL 3606745, at *10 (E.D.N.Y. Aug. 6, 2019). The Court should likewise hold that the core operations doctrine is no longer viable because it is as odds with the Reform Act's particularized pleading requirement.

*Second*, even in those courts that still recognize the core operations doctrine, it does not provide an independent basis for pleading scienter. Rather, the consensus approach is to "consider the 'core operations' allegations to constitute supplementary, but not an independent, means to

23

plead scienter." *Holbrook v. Trivago N.V.*, No. 17 CIV. 8348 (NRB), 2019 WL 948809, at \*22 (S.D.N.Y. Feb. 26, 2019). As described herein, the rest of the Complaint's scienter allegations fail, and, standing by itself, the core operations doctrine cannot establish scienter. *See id.*

### 3. Mr. Cartwright's Congressional Testimony

The Complaint makes the unadorned allegation that scienter is present because Mr. Cartwright alleged lied to Congress in two statements. The Complaint is flat wrong.

***First***, the Complaint alleges that "Cartwright misleadingly suggested (under oath) to Vice Chairman Griffith that AAC was not a member of NAATP because the Company felt that another organization, the National Association of Behavioral Healthcare, was 'meeting [its] needs more appropriately.'" Compl. ¶ 44. In the ***actual*** transcript, however, Mr. Cartwright expressly admits that "you're right, Marv asked us not to be members based on [NAATP's] new marketing practices or ethical guidelines that he has." Ex. D, Excerpts from 7/24/18 Congressional Subcommittee Hearing, at 65.

***Second***, the Complaint alleges that it was misleading for Mr. Cartwright to state that AAC's "website visitors know who they are contacting." *See* Compl. ¶ 152. But in the written responses Mr. Cartwright submitted to Congress, AAC makes clear that not only did its online directories indicate that they are owned and operated by AAC, but, after the hearing, AAC upgraded its websites so that an icon appears next to the toll-free numbers to ensure potential patients are made aware that an AAC representative will be on the other end of the line. Ex. E, 10/11/2018 Cartwright Written Submission to Subcommittee, at 8-9 (citing to article discussing addition of icon to websites). The Complaint contains no particularized allegations demonstrating the falsity of these representations.

Because Mr. Cartwright's statements were completely truthful, they cannot be used to

establish that Mr. Cartwright or any other Defendant acted with a culpable state of mind.

### 4. The Innocent Inference Is More Compelling

In totality, the Complaint fails to identify a single particularized fact that demonstrates any Defendant made any of the Marketing Claim statements with an intent to deceive. The more compelling inference is that all of the statements AAC made regarding its marketing practices were truthful, and, in fact, Mr. Cartwright participated in Congress's investigation into industry practices as a whole in AAC's continued effort to "champion[] reform meant to flush out deceptive advertising about addiction treatment options." *Id.* at Cover Letter. Because the inference of scienter from the Marketing Claim allegations is neither cogent nor "as compelling as any opposing inference of nonfraudulent intent," the Marketing Claim should be dismissed. *See Tellabs*, 551 U.S. at 314.

## III. THE CONTROL PERSON LIABILITY CLAIMS SHOULD BE DISMISSED

Because Plaintiff has not stated any viable Section 10(b) claims, its claims for "control person" liability under Section 20(a) of the Exchange Act likewise fail. *See IBEW Local No. 58 Annuity Fund v. EveryWare Glob., Inc.*, 849 F.3d 325, 328 (6th Cir. 2017).

### CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court dismiss the Complaint with prejudice.

Respectfully submitted,

/s/ *W. Travis Parham*
W. Travis Parham (TN BPR #16846)
Michael T. Harmon (TN BPR # 27279)
Waller, Lansden, Dortch & Davis, LLP
Nashville City Center
511 Union Street
Suite 2700
Nashville, TN 37219
Tel: (615) 244-6380

25

travis.parham@wallerlaw.com
michael.harmon@wallerlaw.com

Jessica P. Corley (*pro hac vice*)
Lisa R. Bugni (*pro hac vice*)
Logan R. Hobson (*pro hac vice*)
KING & SPALDING LLP
1180 Peachtree Street, N.E.
Atlanta, GA 30309
Tel: (404) 572-4600
jpcorley@kslaw.com
lbugni@kslaw.com
lhobson@kslaw.com

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of February, 2020, I caused a true and correct copy of the foregoing to be filed with the Clerk of the Court using the CM/ECF system, which will automatically send notification of such filing and make available the same to the following attorneys of record:

Christopher M. Wood, #032977
Christopher H. Lyons, #034853
ROBBINS GELLER RUDMAN
& DOWD LLP
414 Union Street, Suite 900
Nashville, TN 37219
Tel: (615) 244-2203
cwood@rgrdlaw.com
lyons@rgrdlaw.com

Darren J. Robbins
ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
Tel: (619) 231-1058
darrenr@rgrdlaw.com

*Lead Counsel for Lead Plaintiff Indiana Public
Retirement System and the members of the Putative Class*

Jerry E. Martin, #20193
Bank of America Plaza
BARRETT JOHNSTON MARTIN
& GARRISON, LLC
414 Union Street, Suite 900
Nashville, TN 37219
Tel: (615) 244-2202

*Local Counsel for Lead Plaintiff Indiana Public
Retirement System and the members of the Putative Class*

*/s/ W. Travis Parham*
W. Travis Parham

27