# Exhibit D

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

RPTR KEAN

EDTR HUMKE

EXAMINING ADVERTISING AND MARKETING PRACTICES WITHIN THE SUBSTANCE USE

TREATMENT INDUSTRY

TUESDAY, JULY 24, 2018

House of Representatives,

Subcommittee on Oversight

and Investigations,

Committee on Energy and Commerce,

Washington, D.C.

The subcommittee met, pursuant to call, at 10:00 a.m., in Room 2123, Rayburn House Office Building, Hon. Gregg Harper [chairman of the subcommittee] presiding.

Present: Representatives Harper, Griffith, Burgess, Brooks, Collins, Walberg, Walters, Costello, Carter, Walden (ex officio), DeGette, Schakowsky, Castor, Tonko, Clarke, Ruiz, and Pallone (ex officio).

Also Present: Representative Bilirakis.

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

Staff Present:    Jennifer Barbla, Chief Counsel, Oversight and Investigations; Adam Fromm, Director of Outreach and Coalitions; Ali Fulling, Legislative Clerk, Oversight and Investigations, Digital Commerce and Consumer Protection; Brighton Haslett, Counsel, Oversight and Investigations; Brittany Havens, Professional Staff, Oversight and Investigations; Ed Kim, Policy Coordinator, Health; Andrea Noble, Fellow, Oversight and Investigations; Jennifer Sherman, Press Secretary; Austin Stonebraker, Press Assistant; Hamlin Wade, Special Advisor, External Affairs; Everett Winnick, Director of Information Technology; Julie Babayan, Minority Counsel; Jeff Carroll, Minority Staff Director; Waverly Gordon, Minority Health Counsel; Zach Kahan, Minority Outreach and Member Services Coordinator; Chris Knauer, Minority Oversight Staff Director; Jourdan Lewis, Minority Staff Assistant; Miles Lichtman, Minority Policy Analyst; Perry Lusk, Minority Government Accountability Office Detailee; Kevin McAloon, Minority Professional Staff Member; and C.J. Young, Minority Press Secretary.

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

Mr. Harper.     The subcommittee will come to order.

Today, the subcommittee holds a hearing entitled examining, advertising, and marketing practices within the substance abuse treatment industry.

This hearing builds on the subcommittee's extensive work over the past 4 years examining the causes and scope of the opioid epidemic including ways to effectively treat individuals with a substance use disorder.   The opioid epidemic continues to ravish our Nation.

According to the Centers for Disease Control approximately, 2.1 million Americans over the age of 12 suffer from an opioid use disorder.   Meanwhile, the number of Americans dying from opioid overdoses has increased in recent years to 115 deaths per day.

As the opioid epidemic continues to take its toll, the demand for treatment has dramatically increased.   According to the Substance Abuse and Mental Health Services Administration, the number of treatment facility admissions for opiate use increased 58 percent from 2005 through 2015.    With rising demand, the number of treatment facilities has also grown.

However, the increased demand for treatment and attendant proliferation of treatment facilities has raised a number of concerns about practices within the industry.

Our December hearing examined patient brokering.    The practice of recruiting individuals with a substance use disorder and luring them to treatment facilities and sober living homes, often in other States, in return for financial kickbacks.

We also heard testimony about the problems stemming from the dramatic surge and substance use disorder treatment facilities including practices employed by

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

businesses known generally as call aggregators. These practices incentivize profit over the recovery and well-being of the individual seeking treatment.

The information we learned at the hearing in December, along with additional reports and research that the committee conducted, led us to dig deeper into these marketing and advertising practices within the drug treatment industry.

If you compare how one seeks care for a substance use disorder to how one would seek care for any other illness or disease, the differences are staggering.

For example, if you aren't feeling well, most people would go to their primary care physician, or if it's an emergency, the ER, and that doctor is likely to refer you to another doctor or specialist, depending upon what's wrong.

Here, individual seeking treatment for themselves or loved one often turn to the Internet to find resources to guide them in choosing a treatment center.

One study found that 61 percent of people who went to rehab used the Internet to find treatment. Such online searches can prove overwhelming. Patients are often at the mercy of what they find online with little or no guidance from a medical professional.

Many treatment-focused websites advertise hotlines that purport to direct individuals to a trained professional that can help the individual assess what treatment facilities will best meet their needs. These call centers may appear to be unaffiliated third-party referral services, but they are often either owned and operated by treatment facilities or are paid by facilities to refer calls.

While some centers disclose their relationship with treatment facilities, others may engage in deceptive marketing tactics to hide them. Moreover, these call centers are often staffed by sales representatives rather than medical professionals.

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

In some cases, the individual staffing the company's call center receive a bonus each month based on the number of callers that are successfully admitted into one company's facilities.

In some of the worst cases, call aggregators, or call centers, may refer patients to facilities that don't meet their needs based on a financial arrangement. And once patients enter treatment, they may be vulnerable to exploitation by unscrupulous business owners.

Concerns raised about deceptive advertising and marketing practice have already led to action. For example, several States have passed legislation, the National Association For Addiction Treatment Providers updated its code of ethics, and Google placed a temporary restriction of online advertising by treatment providers due to misleading experiences among rehabilitation treatment centers.

As the opioid epidemic continues to claim lives, it is vital that we ensure individuals seeking treatment for themselves or loved ones are able to find treatment that best meets their needs without being misled by those who would prioritize financial gain over saving lives.

We thank our panel of witnesses for joining us this morning. I hope that today's hearing will shed light on how we can combat deceptive marketing practices while protecting legitimate treatment centers and the individuals desperately seeking their care.

We thank you for appearing before the subcommittee today, and we will look forward to hearing your testimony shortly.

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

At this time, the chair will recognizes the ranking member of this subcommittee Ms. DeGette for 5 minutes for the purposes of an opening statement.

[The prepared statement of Mr. Harper follows:]

\*\*\*\*\*\*\*\* COMMITTEE INSERT \*\*\*\*\*\*\*\*

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

Ms. DeGette.    Thank you very much, Mr. Chairman.

Mr. Chairman, throughout the several years that we have been holding a series of hearings in this subcommittee and other subcommittees of the Energy and Commerce Committee, one of the themes that has emerged is that families need good information about the types of treatments that are available.    And also we've heard from the medical experts that evidence-based treatment, including medication-assisted treatment is the most effective means for overcoming opioid use disorders.

But this is echoing what your concern is.    Not all facilities provide that treatment. Some facilities make only vague promises about the effectiveness of various treatment models they offer.    And in addition, when you're finding your facility online, most patients will have no idea if the facilities that they're identifying would have the types of treatment that would actually work in dealing with this opioid crisis.

You know, we've been seeing through this committee's investigation that we've got nefarious or unqualified actors out there who are taking advantage of those who are suffering in order to capitalize on this condition.

Last year, this subcommittee had a hearing where we heard about individuals known as patient brokers who profit from recruiting patients with opioid addiction and then send them to dubious treatment centers in other States.

We have heard that the operators of many of these centers sometimes have no training or expertise in drug treatment and once the patients arrive, they may receive substandard or no care at all.    And then in December, the subcommittee heard from law enforcement officials in States that were affected by these schemes.

They testified about the wide variation and the quality of care provided at some of

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

the facilities and how we lack sufficient national standards.

Now, today, we're looking at another feature of the opioid epidemic that shows the challenges patients with opioid use disorder currently face. And that is, how the treatment providers advertise market or locate perspective patients seeking treatment and guide them to appropriate treatment.

In other words, our patients prioritize when it comes to finding and directing those seeking care for opioid use disorders and for those patients who are the target of aggressive marketing practices, how should they evaluate a possible treatment facility for its effectiveness.

As you noted, Mr. Chairman, this committee has seen reports of call centers that sell customer referrals to treatment providers.

Some also hide the fact that they're making referrals for a fee or that the call centers actually owned by the same company that owns the treatment center.

We've also seen aggressive advertising and marketing strategies by treatment facilities such as websites and 1-800 numbers that do not clearly disclose who a patient is contacting or where they're being referred. And some facilities try to lure in patients with promises of luxurious treatment such as daily yoga sessions and free housing.

And I think that the experts who are here today will tell you that things like daily yoga sessions, while they might be great for a spa, are not going to cure opioid addiction.

So how pervasive are these problems in the industry, and how many of these practices, like having multiple websites or purchasing calls in bulk actually provide the treatment that helps people recover.

So for today's discussion, here is what I'm looking to hear from the witnesses:

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

What are good practices when it comes to marketing treatment services and what are dubious practices.

We need to hear whether there are certain quality indicators patients should look for when seeking a treatment and just as important, are there certain red flags that indicate questionable services.

In other words, Mr. Chairman, opioid use disorder and its treatment is complicated enough for any prospective patient to navigate.

We need to make sure that existing practices are not making it more difficult for people seeking treatment by obscuring what's really being provided and what they need to treat their addiction.

And so we need to find out how treatment providers find patients, educate them, and then guide them into appropriate treatment.

I look forward to hearing from all of the witnesses about these issues, and I yield back.

[The prepared statement of Ms. DeGette follows:]


******** COMMITTEE INSERT ********

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

Mr. Harper.    The gentlewoman yields back.

The chair will now recognize the chairman of the full committee, Greg Walden for the purposes of his opening statement.

The Chairman.    Thank you very much, Mr. Chairman.    I appreciate you holding this hearing.

I want to thank our witnesses for being here today to inform our work.

Today's hearing follows up on our year-long bipartisan investigation to patient brokering and the fraud and abuse within the substance use disorder treatment industry.

Beginning in 2014, April of 2014, this subcommittee commenced a comprehensive examination into the causes of the opioid epidemic, the impact it's had on Americans and explored possible solutions to enable greater access to effective evidence-based treatment for substance use disorders.

The House, as you know, recently passed H.R. 6.    This is the Support For Patients and Communities Act, which includes 70 provisions, largely from this committee, that seek to address a number of issues within the opioid epidemic.

But our work here is not done.    The committee continues to conduct its proper oversight, because our Nation is far from seeing the end of the opioid epidemic and its tragic and deadly effects.

In December, the subcommittee held a hearing examining the patient brokering and addiction treatment fraud where concerns were raised about deceptive and sometimes predatory advertising and marketing practices within the treatment industry.

In addition, we've read news reports, spoken to treatment facilities, doctors, associations and stakeholders within the industry, but most importantly, we've heard

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

from individuals, their loved ones, who have faced some of these aggressive and deceptive advertising practices.

In fact, in my own district out in Oregon, a father named Mike told me about the troubling experience he had when his son was seeking treatment for addiction.

The recovery center that his son went to was located in another State. And he said it seemed more interested in cashing the check than actually caring for his son.

As the committee dug deeper into the advertising and marketing practices within this industry, we found a Pandora's box of online advertisement, websites, phone numbers, lead generators, call centers, television commercials. In some cases an individual company or companies may own dozens and dozens of websites, and some of these websites contain different 1-800 numbers, despite all being owned by the same person were all leading to the same treatment company.

Some websites, television commercials used pretty forceful language, such as, "Call now, don't wait any longer," "Get the help you need," "Talk to someone who cares," "End your addiction now," or "For immediate treatment, help."

One individual the committee spoke with shared that the person on the other end of the phone went on to say, and I quote, "if you don't get your kid here now, your kid will die," end of quote.

Further, some of the websites and advertisements purport to offer the best, quote-unquote "treatment in the country" or claim high success rates to lure patients to their facilities.

This all sounds great. We don't know what those statements are based upon. For example, does that mean someone successfully enrolled in the treatment, completed

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

treatment, that they are still maintaining their sobriety once a year later has gone by? What does success mean, and how do you measure it?

These are the types of questions that individuals and their loved ones should be able to find answers when they search their treatment that best meets their needs.

These advertising practices lead to reputable and quality treatment. That's great. That's what we hope for. But deceptive practices can have consequences, whether it's online advertisements, websites, 1-800 numbers, or television commercials, individuals and their loved ones should be able to expect transparency, know who answers the phone or responds to an inquiry when they reach out for help.

Individuals who call treatment hotlines are often in times of crisis and they had need help fast and from someone that can be trusted.

They have a right to know what facilities they're calling and type of treatment that facility offers so they can decide whether it's the right treatment for them or their loved one.

So today's hearing will help bring much-needed attention to this issue, help us understand the scope of advertising and marketing practices within the treatment issue. Our hope is a thoughtful discussion will help us establish a baseline for best practices, help inform individuals or loved ones about how to seek treatment that best meets their needs.

And I would yield the balance of the time to the chairman of the Subcommittee of Health, Dr. Burgess.

[The prepared statement of The Chairman follows:]

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

\*\*\*\*\*\*\*\* COMMITTEE INSERT \*\*\*\*\*\*\*\*

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

Mr. Burgess.    I thank the chairman for yielding.    And the chairman makes an important point.    H.R. 6 did pass through this committee and, indeed, on the floor of the House.    And we do call on the Senate, the other body, to take that up.

This is not the first hearing we've had on this subject.    Last December, we did have a hearing, and we heard from the assistant attorney general from the Massachusetts attorney general's office, Eric Gold, was his name.    And he provided for us three recommendations on the evaluation and solution for the problems that are existing at sober homes.

He said we need additional resources for Federal, State and local law enforcement.    Okay, that's covered in H.R. 6.

Second, patients need transparency into the quality of addiction treatment of the providers nationwide.    I agree with that.    I'm not sure we're there.

And the third thing:    We need to ensure that patients with substance use disorder have access to the treatment they need and we do not unintentionally limit access.    And that is an important point as well.

Additionally, we heard from a panel of family members who had been affected by family members who had problems with opioid addiction.    And one of the statements of one of the witnesses really stands out.

She said, "the intent, of course, was not to kill Jaime, but to keep him in the system and continue to abuse his insurance."

Those are pretty apocryphal words, and I hope we get to explore some more of that.    Mr. Chairman, thank you for the indulgence, and I yield back Mr. Walden's time.

[The prepared statement of Mr. Burgess follows:]

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

\*\*\*\*\*\*\*\* COMMITTEE INSERT \*\*\*\*\*\*\*\*

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

Mr. Harper.    The gentleman yields back.    The chair will now recognize the ranking member of the full committee, Mr. Pallone, for 5 minutes.

Mr. Pallone.    Thank you, Mr. Chairman.

The opioid epidemic continues to devastate families and communities around the Nation.    We still have a long way to go to climb out of this crisis.

Opiates killed more than 115 Americans a day in 2016, and millions more continue to suffer.    That's bad enough.    But to see people taking advantage of this crisis by preying on victims to make money is unconscionable.

The Affordable Care Act expanded access to substance abuse treatment for millions of Americans.    It also required insurance companies to cover this treatment just as they would cover any other chronic disease.

Thanks to the ACA and Medicaid expansion, Americans who could not get access to this treatment before, now can.    Unfortunately, people with substance use disorder still face barriers to accessing treatment.

According to SAMHSA, of the 19 million adults who had a substance use disorder in 2016, 17 million did not receive treatment.    And we need to do everything we can to help more Americans access this treatment.

Unfortunately, there are companies preying on individuals in desperate need of treatment services.    Some of the companies this committee has been examining claim they are merely filling a market need, but anyone advertising treatment services must put the needs of the patient first, and they must employ well qualified staff that can provide quality treat or ensure that they are only referring patients to quality treatment providers.

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

This committee's investigation into patient brokering revealed shocking examples of companies that claim to offer treatment and special perks to individuals suffering from opioid addiction.   Families that were desperate to help their loved ones put their trust and hope in many of these treatment facilities.    But as our investigation has found, many of those entities are a scam, and do not offer actual treatment.

In some instances, these facilities are actually putting people's lives at risk.   And now the committee has broadened its focus to look at treatment call centers and marketing tactics.    And unfortunately, we've discovered that some companies have looked at this devastating epidemic as an opportunity solely to make money.

For instances, reports indicate that some of these call centers or call aggregators advertise opioid treatment to get people to call looking for help, and then sell those calls to various facilities.    And it is unclear how this helps the patient.

Other companies actually appear to offer treatment for opioid use disorder, but they also engage in aggressive marketing tactics.

For example, some facilities operate multiple websites with different names and phone numbers with the goal of maximizing the number of beds filled.

And this raises questions about how transparent these companies are about the services they offer and how they help patients find the treatment that's right for them.

It also raises questions about how a prospective patient is suppose to navigate the countless number of treatment offerings and find quality care against the backdrop of the array of services being advertised.

So I'm hopeful our witnesses can shed some light on the types of marketing and treatment practices that are best designed to put the patient first and help them find

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

quality care.

And unless someone else wants my time, I yield back, Mr. Chairman.

[The prepared statement of Mr. Pallone follows:]


\*\*\*\*\*\*\*\* COMMITTEE INSERT \*\*\*\*\*\*\*\*

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

Mr. <u>Harper.</u>    The gentleman yields back.

I ask unanimous consent that the members' written opening statements be made a part of the record.

Without objection, so ordered.

Additionally, I ask unanimous consent that Energy and Commerce members not on the subcommittee on Oversight and Investigations be permitted to participate in today's hearing.

Without objection, so ordered.

I would now like to introduce our witnesses for today's hearing.

Today, we have Dr. Marvin Ventrell, who is the executive director of the National Association of Addiction Treatment Providers.

Next, is Mr. Mark Mishek, president and CEO of the Hazelden Betty Ford Foundation.

Third, is Mr. Michael Cartwright, who is the chairman and CEO of American Addiction Centers.

Mr. Robert Niznik, who is the CEO of Addiction Recovery Now and Niznik Behavorial Health.

Then we have Mr. Jason Brian, founder of Redwood Recovery Solutions and TreatmentCalls.com.

And finally, Dr. Kenneth Stoller, who serves as the Director of John Hopkins Hospital Broadway Center For Addiction.

We welcome each of you here.

You are all aware that the committee is holding an investigative hearing.    And

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

when doing so, we have had the practice of taking testimony under oath.

Do any of you have any objection to testifying under oath?

Every witness has replied no.

The chairman then advises you that under the rules of the House and the rules of the committee, you are entitled to be accompanied by counsel.

Do you desire to be accompanied by counsel during your testimony today?

Let the record reflect that all the witnesses have replied no.

In that case, if you would please rise and raise your right hand, I will swear you in.

[Witnesses Sworn.]

You may be seated.

All the witnesses responded affirmatively. And you are now under oath and subject to the penalties set forth in Title 18 Section 1001 of United States Code. And you may now give a 5-minute summary of your written statement.

There should be a light system that will tell you when that time is come, so you'll have 5 minutes. It should go yellow at 1 minute, at red when your time is up.

And I will now start with Mr. Ventrell. You may begin. Make sure your mike is up close and you turn your button on when you testify.

**TESTIMONY OF MARVIN VENTRELL, EXECUTIVE DIRECTOR, NATIONAL ASSOCIATION OF ADDICTION TREATMENT PROVIDERS; MARK MISHEK, PRESIDENT AND CEO, HAZELDEN BETTY FORD FOUNDATION; MICHAEL CARTWRIGHT, CHAIRMAN AND CEO, AMERICAN ADDICTION CENTERS; ROBERT NIZNIK, CEO, ADDICTION RECOVERY NOW AND NIZNIK BEHAVIORAL HEALTH; JASON BRIAN, FOUNDER, REDWOOD RECOVERY SOLUTIONS AND**

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

**TREATMENTCALLS.COM; AND DR. KENNETH STOLLER, DIRECTOR, JOHNS HOPKINS**

**HOSPITAL BROADWAY CENTER FOR ADDICTION**

**TESTIMONY OF MARVIN VENTRELL**

Mr. <u>Ventrell.</u>   Thank you, Chairman Harper.   Thank you, Ranking Member DeGette.   I also recognize the comments of Ranking Member Pallone and the comments made by the committee at large chair, Mr. Walden.

Thank you for the opportunity to be here today to present this testimony.

I represent the National Association of Addiction Treatment Providers.   I am the executive director of the National Association, also known from time to time as NAATP. Our folks will say NAATP.   That all refers to us.

It is an honor to be here.   I'm excited to give this testimony because our association is fully supportive of the work of this subcommittee.

This has in fact been the focus of the National Association for the past several years.

We are horrified by the behaviors that have occurred in this field.   They are not us.   It is not unusual for a trade association such as ours to perhaps object or resist certain regulation.   We do not do so in this instance.

In fact, we have been at the forefront of asking for this sort of regulation for some time.   That is why, among other things, we developed our new code of ethics and are in the process of writing a resource guidebook for the ethical and proper operation of addiction treatment centers.

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

So thank you again for this opportunity. We wholeheartedly support what you are doing. We want to be part of that. We want to provide as much information as we possibly can for you. And I look forward to giving this testimony today and answering your questions.

Ranking Member DeGette specifically asked in her opening comments for recommendations for choosing treatment centers and for red flags in understanding what is not an appropriate center.

We have worked diligently on these very things. Much of that resource is attached to my written testimony as a supplement, and it should be ultimately in the record. And I look forward, again, to articulating any of those principles.

Our association is grateful for this opportunity. On behalf of our members and the thousands of patients that they serve, and we support this committee's efforts to clean up the practices that are harming us all.

This matter, ethical operation, professional operation, and legal operation of addiction treatment is at the forefront of our work. What has happened in our industry is among the greatest threats to the success of our work as an addiction treatment field that we have ever seen.

Historically, the practice of addiction treatment has been marginalized. It has been stigmatized. And we have functioned on the outskirts of healthcare.

We are poised to make a change in this regard now. We are poised with all of the developments that have occurred in terms of science, social science, and opportunity for funding and treatment. We are poised to do the best work we have ever been able to do. That is what we wish to do, and we are being delayed, and we are being impeded

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

from that by bad actors.

These bad actors that are the source of comments that the committee made are a minority. They are a small minority, but they are an effective and very damaging minority. They are not our members. I wish to say that the -- they are not we.

The National Association of Addiction Treatment Providers is comprised of approximately 850 treatment campuses around the country. These are good centers doing good work. The source of the problem is not the national association. It is not common, as I indicated, for a trade association to resist regulation. Once again, we do not, in fact, we are promulgating much of that within our practices now.

The primary issues have been accurately identified. I applaud the subcommittee's staff memorandum. It is accurate, and I adopt all of it. The problems we are facing are primarily these.

Patient brokering, billing and insurance abuses, credential misrepresentation, predatory web practices and foremost, in predatory web practices is the matter of deceptive, unbranded or inadequately branded websites.

While a trade association is not typically in the business of policing, we have undertaken that role as it concerns our members, and we have adopted an initiative called of the quality assurance initiative, which has 11 components.

I would like to explain all of them to you. Of course, I don't have time do that, but hopefully, you will ask me questions about those.

In each of these 11 initiatives, many of which are focused specifically on deceptive advertising matters are addressed in the quality assurance initiative which will be fully articulated in the guidebook that will be published later this year.

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

I see that my time is up, and I thank you for the opportunity.

[The prepared statement of Mr. Ventrell follows:]


\*\*\*\*\*\*\*\* COMMITTEE INSERT \*\*\*\*\*\*\*\*

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

Mr. Harper.    Thank you, Mr. Ventrell.

The chair will now recognize Mr. Mishek for 5 minutes for the purposes of his opening statement.

**TESTIMONY OF MARK MISHEK**

Mr. Mishek.    Thank you, Chairman Harper, Ranking Member DeGette, and members of the subcommittee for inviting me.   It is an honor.

I am grateful for your leadership in addressing the opioid crisis and addiction, and for the opportunity to testify today about business practices and quality standards in the addiction treatment industry.

My name is Mark Mishek, and I am the president and CEO of the Hazelden Betty Ford Foundation, a non-profit addiction treatment provider with 17 sites in 9 States.

We treat over 21,000 people annually and are also engaged in prevention, education, publishing, research and advocacy related to the disease of addiction.

On behalf of the millions of vulnerable people and families suffering from substance use disorders, thank you again, for your bipartisan look into patient brokering and related issues.

Growing market demand for addiction treatment, driven by the opioid crisis and expanded insurance coverage has attracted unprecedented investment and an influx of new providers all operating in a field that is under-regulated and lacks consistent quality standards.

It is in this environment that our industry has seen the rise of unprofessional,

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

unethical, and sometimes illegal, practices such as deceptive marketing and patient brokering.    Not to mention, excessive consumer billing and insurance fraud.    In too many cases, people who need help are instead being harmed.

Most in our field do great work, but to ensure ethical quality care for all who seek help for addiction, we believe it is time to establish quality standards and a consistent enforceable regulatory framework for the addiction treatment industry.   The stakes: Patient safety and public confidence in addiction treatment are high.

Now, patient referrals, of course, are not bad, per se.   The problem is when referrals are made with little or no regard to what is clinically appropriate for the patient when there is a lack of transparency in the process and especially when financial kickbacks are involved.    That's when referrals become patient brokering.   Many brokering schemes begin with deceptive marketing.

Now, at Hazelden Betty Ford, all of our treatment marketing leads to one website, one consumer website, HazeldenBettyFord.org.    That is not the case for others who use multiple sites and multiple brands to acquire patients.

Often, it is not clear who is behind ads for addiction treatment or who consumers will get when they reach out for help.

Some providers obscure their affiliations to other organizations or misrepresent the services they provide, the conditions they treat, the credentials of their staff, or the insurance that they actually accept.

And some use online bait-and-switch techniques to get calls from people intending to call a different treatment center.    Something, unfortunately, we see frequently with our name.

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

All of this can lead to bad treatment for consumers.    The lack of transparency on top of minimal quality standards in the industry puts patients at risk.    These kinds of practices certainly would not be tolerated in any other area of healthcare.    And in light of them and because of the life saving work that we do, it is more imperative than ever for the addiction treatment field to hold itself to the highest ethical, legal, and quality standards.

Ultimately, we think reforms are needed to bolster State licensure requirements, accreditation standards, clinician education qualifications and access to comprehensive evidence-based care.

Beyond State initiatives, Federal oversight through the Federal Trade Commission, for example, is essential.    Fraudulent advertising and patient brokering obviously cross State lines.    Finally, we think a Federal law explicitly outlawing patient brokering is critical.

Without such accountability, our field will continue to evolve into a sector where success is predicated not on whether patients get well or families heal, but on the size of your advertising budget, your website analytics, your search engine optimization, and your call center tactics.

Now is the time to restore faith and accountability in the addiction treatment field, and it's time to establish quality standards in that enforceable regulatory framework.

Thank you for the opportunity to share my testimony.    And I look forward to answering your questions.

[The prepared statement of Mr. Mishek follows:]

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

******** COMMITTEE INSERT ********

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

Mr. Harper. Thank you, Mr. Mishek. The chair will now recognize Mr. Cartwright for 5 minutes for the purposes of his opening statement.

TESTIMONY OF MICHAEL CARTWRIGHT

Mr. Cartwright. Thank you, Chairman Harper and Ranking Member DeGette. Thank you for having me here.

My name is Michael Cartwright I'm the chairman and CEO of American Addiction Centers.

Mr. Harper. Check your mike.

Mr. Cartwright. Excuse me. Thank you very much.

Thank you Chairman Harper and Ranking Member DeGette. Thank you for having me here.

My name is Michael Cartwright I'm the chairman and CEO of American Addiction Centers. We operate in 9 States. We offer 39 treatment centers.

I've been a treatment counselor and executive for 23 years. For 12 of those years, I operated a not-for-profit organization.

I've also run both publicly traded, as well as privately funded drug and alcohol treatment centers. I have actually advised the U.S. Senate Health Subcommittee on Substance Abuse and Mental Health Services back in the early 2000s when we were looking at co-occurring disorders in this country and how we could better implement that.

I also serve on the board of directors of the National Association for Behavorial

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

Healthcare, which for 85 years has advocated nationally for mental healthcare and substance abuse.   Its members include American Addiction Centers and other publicly traded healthcare companies like HCA and Acadia UHS, among others.

I've been in recovery for 26 years.   As a young man, I struggled with addiction.   I know the pain of untreated addiction.

AACs mission is to help with those who are struggling like I did, find the right treatment for psychiatric and community support.

I'm glad that Congress is looking into treatment marketing practices.    Treatment providers and government officials should work together not just to keep bad actors out, but to let potential patients and their loved ones know who they can trust.

I'm glad that Congress is continuing to look at marketing practices and treatment providers and government officials.    AAC's recovery brands business operates online treatment directories, including Recovery.org and Rehabs.com.    These directories provide information about treatment centers across the country.

Centers that are also approved and listed by the Federal Government Substance Abuse and Mental Health Services Administration on SAMHSA.gov.

In fact, about 300 treatment providers, who are members of the National Association of Addiction Treatment Providers or NAATP, Marvin's association, either list or advertise on our websites.

A lot of treatment centers don't have large online presences in their own right. Addicts who need help reach these treatment centers through our website.

We don't engage in unethical market practicing like hijacking phone numbers.   We are not a call center aggregator.    We don't take calls for other treatment

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

centers, just for our own.    We don't sell information gathered on calls, AAC opposes this kind of lead generation.   We make sure that our website visitors know who they are contacting.

Under our transparency guidelines, we work with treatment centers across the country to make sure their listings are up-to-date and accurate.

We make clear that users know which treatment centers are going to answer the numbers they call.

We make clear that AAC's toll-free numbers go to AAC's call center.    And when they pick up, AAC's call center reps identify themselves as an AAC employee.

Not all treatment centers market honestly, but they should.    AAC supports legislation that criminalizes fraudulent advertising, outlaws tactics like hijacking of treatment center phone numbers, requires disclosures about who owns and operates call centers, and bans kickbacks and bribes.   AAC has supported this kind of legislation in its home State of Tennessee and elsewhere.

I have the following recommendations.   Congress should ask the National Association of Insurance Commissioners or the National Alliance For Model Drug Laws to draft a model law banning deceptive marketing.

Number two, existing or proposed laws in Tennessee, Florida, and California should be considered as models for reform.

Number three, SAMHSA should update its treatment center locator regularly, and should include sober homes in its listings.

SAMHSA should prioritize sober homes that are members of the National Association of Recovery Residences.

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

Number four, existing FTC Truth in Advertising Guidelines should be used to stop misleading addiction treatment marketing.

While there is rightfully a lot of attention being paid to bad marketing practices, I hope we don't lose sight of all the great work that treatment centers do.

Treatment does work.    I've been clean and sober now for 26 years.    And throughout this country we have great treatment centers, just like Hazelden Betty Ford.

We need help.    We have tens of thousands, almost 100,000 people a year dying from this disease.

We definitely need to look into this as a matter of a marketing practice, but we also need to be looking at what are some of the solutions to solve this epidemic.

Thank you very much for having me here today.

[The prepared statement of Mr. Cartwright follows:]


******** COMMITTEE INSERT ********

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

Mr. <u>Harper.</u>    Thank you, Mr. Cartwright.

The chair will now recognize Mr. Niznik for 5 minutes for his opening statement.

**TESTIMONY OF ROBERT NIZNIK**

Mr. <u>Niznik.</u>    Chairman Harper, Ranking Member DeGette, and members of the subcommittee.

Thank you for the opportunity to share my perspective as you continue your important investigation into various aspects of the opioid crisis confronting our country.

Our focus at Niznik Behavorial Health is in offering quality treatment to those seeking help at a time when such services are most in demand and when there's a shortage of available providers.

We help kids, mothers, fathers, individuals from a variety of walks of life as they seek to take control of their lives, overcome their battles with addiction, and return to their families.

We've helped thousands of individuals through our inpatient and outpatient services at facilities we operate in Texas, Florida, and in California, several of which fill a need in underserved markets.

In Texas, for example, our inpatient facilities in our rural county is served by only one other provider.   We will soon be opening an additional facility in New Jersey which will also help individuals in an underserved market.

At the outset, I want to emphasize that neither NBH nor ARN has ever operated as a patient broker, nor have we made any payments to any intermediary or third parties for

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

referrals.

We have not engaged in any of the activities that would appear to be of concern to your and your colleagues as expressed in the committee's May 29th letter. NBH is in the business of treating patients. All of our NBH programs are licensed, in good standing, and are accredited by the Joint Commission.

Our staff include board-certified psychiatrists, licensed masters and doctorate-level clinicians as well as a comprehensive nursing team. We offer a variety of specialized programs. Including an adolescent program.

I am very proud of what we have accomplished in only 5 years. We started with one facility in Miami, and upon being licensed by the State of Florida, that facility began answering calls from individuals seeking its services.

As we added other facilities, the customer service function relating to all facilities was assumed by NBH. We now employ over 500 individuals and support hundreds of additional jobs. In fact, I'm proud to say that we've given jobs to people in recovery.

Based on our experience, I would be pleased to share with you how we market and advertise our services with full transparency. Like you, we want to make sure that prospective patients and their families are as well-equipped as possible when they're seeking treatment for a loved one or for themselves.

Choosing a healthcare provider is an important decision. We believe it is essential that prospective patients know who a provider is and that it described with full transparency what services it offers, where it makes them available so that prospective patients can make an informed decision.

When one of our customer service representatives receives a call, the individual

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

answering the call immediately identifies himself or herself as an NBH employee. That way, all callers know at all times that they are speaking directly with NBH.

If a caller seeks admission to an NBH facility, trained and licensed medical and clinical personnel determine the medical necessity and the clinical appropriateness of the services to offer that individual.

The work of an NBH customer service representative is akin to a receptionist in a doctor's office. A person who answers a call, provides information regarding the service that the doctor offers, and then schedules an appointment for the doctor if a patient requests help.

We believe there are several factors that a patient should consider when looking to identify a quality provider such as whether they are accredited. They also want to know what programs, therapies, and specialty that provider offers. They will then be in a position to determine whether a provider can help them or a loved one.

We're in the business of helping people and are only able to succeed as a company when we provide quality and effective care. Our patients consistently report that they are overwhelmingly pleased with the quality of care and the services they have received.

We have helped thousands of individuals get control of their lives. And as part of our goal of helping people in need, we have provided 296 full scholarships. With a full scholarship, the patient's entire stay through all levels of care and services is free.

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

In closing, I want to emphasize that we appreciate this opportunity to put in perspective how we operate our business, how our license and medical and clinical personnel help people in need and how we believe individuals seeking treatment can identify a quality provider.

Thank you again for the opportunity to make this opening statement.    I will be glad to answer your questions.

[The prepared statement of Mr. Niznik follows:]

******** COMMITTEE INSERT ********

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

Mr. <u>Harper.</u>     Thank you, Mr. Niznik.

The chair will now recognize Mr. Brian for 5 minutes for his opening.

**TESTIMONY OF JASON BRIAN**

Mr. <u>Brian.</u>    Thank you.    My name is Jason Brian, and I founded Redwood Recovery Solutions, the organization that owns TreatmentCalls.com.

It is my pleasure to be here today to share with this committee my perspective on marketing and treatment.

My background prior to this industry is in insurance and automotive marketing.

Although we were successful in those areas, my team and I shared the vision of wanting to make a difference.    And so Redwood started by quoting projects where this was a strong purpose motivator not just a profit motivator.

Redwood's model was at its core simply an advertising and marketing firm that worked closely with many different types of media companies that operated in TV, radio, search engine advertising, and other marketing channels to generate inbound phone calls from persons seeking substance abuse help and then get them connected with a licensed treatment center.

Redwood did not own these sources or the agencies that ultimately built or controlled the distribution of the media companies' advertisements.   Due to this, Redwood developed a strict set of marketing standards and requirements for these agencies to follow in order to work with us as an affiliate.

These rules forbid the use of any sort of incentive to the caller for making the

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

call.   The use of any treatment centers intellectual property, any attempt at intentionally deceiving the caller, or any provision of any clinical guidance, just to name a few.

These affiliates were compensated a flat pre-negotiated rate per call to Redwood. And at no time was their fee structure contingent on the outcome of any call or the placement of any patient.

After receiving a call from an affiliate, Redwood would then route this inbound phone call directly to a licensed treatment provider within its network.

Redwood did not answer any of these inbound phone calls, but rather, the licensed treatment providers were responsible to answer the calls.

It was in the sole discretion and professional judgment of the licensed treatment program answering the inbound call along with the caller themselves, to make any decision about the appropriateness or lack thereof, of a program best suited for the caller or their loved one.

If a referral was needed to another facility or level of care, it would have been done solely by the licensed treatment provider as Redwood made no referrals whatsoever.

I need to add clarity surrounding my past tense use of Redwood, and share my brief opinion on the unfortunate reality of painting with broad strokes.

In January of this year, collectively with my team, Redwood decided it was time to move on from this industry.   Far too often this industry and those watching it from the sidelines, want to typecast marketing companies as bad and unethical because of the abuse of a few immoral, disgusting individuals.

I would liken this to saying that all treatment centers are bad simply because a few

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

have given the industry a black eye.   That would be wrong and misleading and unfortunate to those that they could have ultimately served.

Inevitably, when I discussed this topic within the industry, people want to use a crisis moment and vulnerability as a supporting argument for why companies like mine are bad or unethical.

This past week, a good friend of mine lost her husband to an overdose.   He went to the best treatment money could buy, she said.    We all prayed this day would not happen, but his family and I knew that this day might come.    And indeed, our worst nightmare came true.

The reality is that people seeking treatment do so for some time.    They search for months and even years in some instances for a solution.   This disease often get worse over years or even decades.

I am in no way downplaying the seriousness of, or the importance of, making the phone call, but to suggest that the calls received are random impromptu decisions caught in a moment of vulnerability is simply inaccurate.

The second point that always comes up pertains to the appropriateness of a facility that the call is routed to.

If you find yourself asking how do you know if a generic help line call was a good fit for a specific center, consider this.

If you search for treatment online and called any treatment center that came up directly, would you finding them online qualify that center to be the best fit for you or your loved one?

If you used a phone book and called one listed there, would that be a perfect fit?

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

If a center placed an advertisement on television directly, might that do the trick in finding the right one?

Of course, none of these things independently change anything about the quality of care or experience one might receive at any given center.

Don't lose sight that these treatment providers are licensed to do the work that they are doing. And outside of gross negligence, these centers who share the same licensure, even internally, still disagree largely on what type of treatment is best for the same client. And ultimately, that subjectivity is largely part of the disparagement on where a call would be best suited.

We've never entered that conversation and have always taken the stance that their licensure was good enough for us to work with them.

Placing a scarlet letter on marketing companies like so many have doesn't change how treatment centers will handle the phone call. And in fact, at least in our case, actually chases away good people and good corporations that want to do good work helping people.

Over 519,000 individuals place calls that were routed through my company to facilities licensed to provide them with help. Regardless of anything anyone may claim, lives have been changed and saved because Redwood cared enough to do something that made a difference. And I'm proud of that.

I would strongly urge anyone in this industry and those who are tasked with creating legislation in it, to reconsider how they look at marketing companies.

Quickly summarized, without them less money will be spent connecting people with the help that they desperately need, and even if all the marketing companies were

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

gone, there wouldn't be any fewer people in need of help and the bad centers would still exist.

I'm happy to be part of this conversation and continue any dialogue that helps accomplish the initial goal Redwood set out on of helping people.

[The prepared statement of Mr. Brian follows:]


\*\*\*\*\*\*\*\* COMMITTEE INSERT \*\*\*\*\*\*\*\*

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

Mr. Harper.    Thank you, Mr. Brian.    The chair will now recognize Dr. Stoller for his testimony.

**TESTIMONY OF DR. KENNETH STOLLER**

Dr. Stoller.    Chairman Harper, Ranking Member DeGette, and members of the subcommittee, thank you for giving me the opportunity to speak with you today.

With 64,000 overdose fatalities in 2016, we are fortunate to have at our disposal effective evidence-based approaches to treating substance use disorders.

In my experience, the impact of treatment is optimized when three sequential actions are taken.

Number one, using opportunistic times and settings to engage potential patients. Number two, completing a comprehensive initial assessment to determine the best setting and type of treatment for each individual.    And number three, offering treatments that are evidence-based, high quality, and dynamically adjusted.

Regarding action number one, I focus on referrals from locations where people are most in need of treatment.    Accepting patients who have already been engaged in the healthcare system prevents lost opportunities for lifesaving treatment.

Hospital emergency rooms and inpatient units have patients who survived overdoses, are being treated for medical problems, resulting from injection drug use, or are contemplating suicide.

Other referrals come from medical offices, other treatment programs, and, of course, community walk-ins.

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

By focusing on these sources of referral, we serve patients who are most in need and who otherwise would incur tremendous costs to the healthcare system as high utilizers of costly services.

Regarding action number two, a comprehensive assessment is done by my clinical staff as each patient is unique in terms of their disorder, as well as their personal strength, liabilities, and resources.

Past treatment experiences can also inform what to try next. For example, for those who have repeatedly failed limited time episodes without medications, I may recommend a medication trial in a setting of long-term outpatient counseling and those who have severe mental health and social problems might best succeed in a comprehensive program with resources to effectively address all of those problems.

Regarding action number three, the actual treatment, I consider there to be five critical approaches that providers of high quality treatment aspire to offer.

Number one, they use medications as clinically appropriate, including the three FDA approved medications for opioid use disorder and three for alcohol use disorder. They should be started, stopped, and switched over time according to ongoing response.

Number two, they combine it with psychosocial treatments, including counseling delivered by skilled professionals.

Number three, they use behavorial therapies that motivate positive change and increase treatment adherence.

Number four, they use adaptive step care models. This means they use ongoing measurement of outcomes to continually adjust the intensity and types of treatment and

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

to motivate engagement.

And number five, they incorporate wraparound services provided within the program or through linkages with outside agencies to support a holistic approach to recovery.

This can include, medical, mental health, housing, vocational, 12-step, and certified peer support services.

Solid linkages to aftercare must be facilitated at the time of discharge to ensure continuation of the recovery process.

As an illustration of some of these points, Mr. A was a 55-year old man referred after a hospital detox admission to us for alcohol and heroin use. He had HIV, hepatitis, and a multitude of other medical problems. We began him on buprenorphine and later switched him to methadone. We provided him with counseling and housing when needed, and coordinated with his local medical providers.

One day I received an inquiry from his managed care organization after they determined that over the prior 17 months, he had 81 ER visits incurring tremendous cost.

On further examination, I discovered that only 4 of the 81 visits were during his time with us. The reduction in cost for ER visits was ten-fold from a monthly average of over $3,000 to $325 when he was with us, illustrating that fiscal gains can result from comprehensive addiction treatment.

In conclusion, we are fortunate to have the ability to meet these challenges head on with effective treatments for the opioid epidemic. Comprehensive opioid treatment programs are well-positioned to be hubs of expertise and coordination and can be scaled up nationally to narrow the gap between treatment, need, and availability.

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

I applaud your recent work in Congress to both increase access and quality of substance use disorder treatment.

Thank you.

[The prepared statement of Dr. Stoller follows:]

******** COMMITTEE INSERT ********

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

Mr. Harper.    Thank you, Dr. Stoller.

It is now time for the members to each ask questions of you as witnesses.   And I'll begin by recognizing myself for 5 minutes.

As part of its investigation, the committee has learned about a variety of advertising and marketing business models within the treatment industry, including the use of websites and phone numbers.    There is a wide variation within the industry.    For example, Hazelden Betty Ford Foundation has three websites that advertise its hotline.

Niznik Behavorial Health has ten websites.    American Addiction Centers has 13 facility-specific websites, and in addition, has a subsidiary Recovery brands who operates a portfolio of websites.

And Jason Brian of Redwood Recovery, TreatmentCalls.com has 84 domains, most of which appear to be related to substance use disorder treatment.

So my question is, and I'll start with you, Mr. Mishek, but also Mr. Cartwright, Niznik, and Brian, do each of your websites contain information that discloses which company or which facilities the websites are affiliated with?

Mr. Mishek.    Our main website, HazeldenBettyFord.org, most of our web hits come to that website.    The other two that you referenced are prior to our merger with the Betty Ford Center.

The Hazelden.org is about our publishing, and the other website relates to philanthropy.    So for consumers seeking treatment, they go to one website, HazeldenBettyFord.org.

Mr. Harper.    And have those disclosures always been on your website.

Mr. Mishek.    Absolutely.

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

Mr. Harper. Okay. Mr. Cartwright.

Mr. Cartwright. Thank you, Mr. Chairman.

Yes, we have a variety of websites that specifically to American Addiction Centers or our drug and alcohol treatment centers in the different States, Dessert Hope, Green House and Texas, we have a treatment center. And then we have Recovery Brands, which is the portfolio that you are concerned about.

Mr. Harper. Okay. My question is, to be sure that I'm clear here, do those disclose which company or which facilities those websites are affiliated with at that point?

Mr. Cartwright. Yes, sir, they do.

Mr. Harper. Okay. And have those disclosures always been on those websites? And if not, when were they added?

Mr. Cartwright. They were not. We had bought Recovery Brands. It was a company that was out of the State of California. And when we bought that company, one of the things that we do as a publicly traded company, we have a group of lawyers that vetted those sites, went through them, looked at those websites, looked at where we should be, make sure we're in compliance. And we've done that over about a 2-year period.

Mr. Harper. Were they --

Mr. Cartwright. Go ahead.

Mr. Harper. Were they operational while they were being reviewed and looked at by your team?

Mr. Cartwright. They were. They were owned by another company. We had

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

a group of attorneys that reviewed them, looked over the websites, and we found that they were the most ethical, straightforward websites that we saw as related to third-party websites that we could find out there.

We asked them to do some changes, which they did, and before we bought that organization. When we bought that organization and since we've operated, it has absolutely been 100 transparent websites.

Mr. Harper. Mr. Niznik.

Mr. Niznik. Of the websites you mentioned, the majority of them are facility websites. And when you go on the website you know that it is the facility you're calling, or the NBH websites, so you know who you're reaching. And then of the other two websites we operate that are now branded as our programs, they do disclose who owns them, who answers the calls, and then when someone does call, the employee answering the call identifies themselves as an employee of the company.

Mr. Harper. Has those disclosures always been on those websites?

Mr. Niznik. They have.

Mr. Harper. From the beginning?

Mr. Niznik. They have.

Mr. Harper. Okay. Then Mr. Brian?

Mr. Brian. Thank you. You referenced that we own 84 websites.

The question that was directed to me prior to this in the phone call that I had was to provide a list of any domains that I owned. Those 84 domains, I own. The company owns.

None of which are geared towards addiction treatment outside of

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

TreatmentCalls.com and Redwood Recovery Solutions.

Mr. Harper.    Okay.

Mr. Brian.    And so those two sites are business-to-business sites.    So we don't have any sites.    We've never owned sites that induced a call from a treatment-seeking individual to a treatment center.    That wouldn't be our model.

Mr. Harper.    Okay.    So those other 82 domains?

Mr. Brian.    Yes, sir.

Mr. Harper.    Are not related to addiction or recovery?

Mr. Brian.    They were domains that were purchased.    They probably, most of which don't even have any content on them.    They were just websites that were listed that we purchased from an online domain buying service.

Mr. Harper.    Are they operational today?

Mr. Brian.    No, sir.

Mr. Harper.    Not operational?

Mr. Brian.    I would imagine that less than a dozen of those are operational, which are business-to-business like TreatmentCalls.com is.

Mr. Harper.    All right.    And those dozen or so, they are set up to, if you contact them, where does it go?

Mr. Brian.    It would ring directly into TreatmentCalls, to Redwood Recovery Solution, to our organization.    There's no business-to-consumer or consumer-facing sites designed to have somebody call in for addiction help.

Mr. Harper.    Does that domain, does it show on its face that it's affiliated with Redwood?

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

Mr. Brian.   Yes, sir.

Mr. Harper.   All of those?

Mr. Brian.   To other businesses, to treatment centers seeking our service?   Yes, it would say that.

Mr. Harper.   All right.   And my time is expired.   So I will now recognize the ranking member of the subcommittee, Ms. DeGette for 5 minutes.

Ms. DeGette.   Thank you very much, Mr. Chairman.   Mr. Chairman, I have here in my hand a list of Mr. Brian's websites that you were referring to.   I would ask unanimous consent to put it in the record.

Mr. Harper.   Without objection.

[The information follows:]


******** COMMITTEE INSERT ********

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

Ms. DeGette.    So Mr. Brian, I'm looking at all this list of websites.    I'm trying to figure out exactly how your business worked.

Mr. Brian.    Yes, ma'am.

Ms. DeGette.    So what would happen is somebody -- like here's one, TreatmentCalls.com.    Somebody might go on to that website and see a phone number and call, and that would go into your call center.    And then you would, your business would refer that off to a certified treatment center, is that correct?

Mr. Brian.    No, ma'am.    And I can --

Ms. DeGette.    Okay.    Tell me what happen, please, briefly.

Mr. Brian.    Yes, ma'am.    So TreatmentCalls.com is a site that offers treatment call services to treatment centers.    It's not a site designed for consumers who might be looking for help.

Ms. DeGette.    I see.    So the way your business works though --

Mr. Brian.    Yes, ma'am.

Ms. DeGette.    -- is treatment centers would pay you to refer calls to them.    So there would be, there would be advertising, people would call in --

Mr. Brian.    Yes, ma'am.

Ms. DeGette.    -- to your phone numbers, and then they would be referred out, right?

So there was no judgment on the part of your business about which centers would be appropriate to send the calls to.    The calls would be referred to the centers based on who, which centers paid you money to refer the calls to them, right?

Mr. Brian.    If I can just correct one portion of it.

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

Ms. DeGette.    Please.

Mr. Brian.    We did not own the phone numbers or the websites.    We worked with third-party affiliates that we --

Ms. DeGette.    Okay.

Mr. Brian.    -- made a per call fee.

Ms. DeGette.    Right.

Mr. Brian.    We paid them.

Ms. DeGette.    Right.

Mr. Brian.    And the treatment centers ultimately paid us a per call fee for sending them calls.

Ms. DeGette.    So people called the phone number.

Mr. Brian.    Yes, ma'am.

Ms. DeGette.    And then that went somewhere else.

Now, Dr. Stoller, has your organization ever used a system like this to get patients for your facility?

Dr. Stoller.    Well, fortunately --

Ms. DeGette.    You can turn on your mike.    Thanks.

Dr. Stoller.    Fortunately or unfortunately, you know, the prevalence of substance use disorders --

Ms. DeGette.    You know, yes or no will work.

Dr. Stoller.    No.

Ms. DeGette.    Have you ever used a substance like this, and why not?

Dr. Stoller.    No, we haven't.

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

Ms. DeGette.     Why not.

Dr. Stoller.     We don't need to do that sort of outreach for patients.

Ms. DeGette.     Do you think that's an effective way for patients to get matched with an appropriate treatment facility?

Dr. Stoller.     We prefer to link with other providers who have already engaged with patients.

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

<u>RPTR ZAMORA</u>

<u>EDTR ZAMORA</u>

[11:01 a.m.]

Ms. <u>DeGette.</u>    So, in other words, you think the best practice, as you testified in your testimony, is when a doctor or somebody else sees a patient or an emergency room refers them to you.    Is that right?

Dr. <u>Stoller.</u>    I do.

Ms. <u>DeGette.</u>    Now, Dr. Mishek, let me ask you that same question.    Does your organization use call centers like this where people come in and are referred to you?

Mr. <u>Mishek.</u>    Absolutely not.

Ms. <u>DeGette.</u>    And why not?

Mr. <u>Mishek.</u>    Well, we don't need to.    Number one, we're overwhelmed with calls directly into our call center.    And number two, we need to take the people who come to us and assess them.    We don't need a third party to be funneling someone to us who may have an eating disorder and shouldn't be coming to us in the first place.

Ms. <u>DeGette.</u>    Well, you know, this is an interesting question to me because the two of you gentlemen are here representing two of the premier centers in this country, but there are thousands of people who need services, addiction services who might be going to other centers.    So do you think there's some kind of inherent problem with using these call -- these call aggregators like we heard about from Mr. Brian?

Mr. <u>Mishek.</u>    I certainly do.    Only 1 out of 10 people who need help get help, so there are plenty of patients out there who need help.    It's not like there's a scarcity of

55

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

patients and we're all fighting over the next patient.

Ms. DeGette.    Right.

Mr. Mishek.    It's not that way at all.

Ms. DeGette.    Right.

Mr. Mishek.    So, you know, treatment centers that are accredited, have good, licensed staff, and are doing great work generally don't have any trouble acquiring and attracting patients, both through professional referrals, through word of mouth, and through community reputation.

Ms. DeGette.    Mr. Ventrell, you look like you want to add.

Mr. Ventrell.    Well, I was nodding along, Congresswoman.    The issue becomes whether a clinical assessment is being made or --

Ms. DeGette.    Right.

Mr. Ventrell.    -- a sales assessment is being made --

Ms. DeGette.    Right.

Mr. Ventrell.    -- and that's essentially the distinction that's drawn here today by Dr. Stoller and Mr. Mishek.    People are looking for healthcare.

Ms. DeGette.    Right.

Mr. Ventrell.    The word "rehab" itself has caused us to sort of go down the wrong path, but people are looking at healthcare and you look for healthcare at the hospital.    You look for healthcare at the facility that provides that healthcare.    To have a website that does not identify primarily as its owner, the clinical provider is fundamentally deceptive, in our view.

Let me just also say quickly that the little "I" isn't good enough.    The little "I" isn't

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

good enough.    So one of the questions that the chairman asked is, does your site identify or disclose your identity?

Ms. DeGette.    Yes.

Mr. Ventrell.    I don't -- and that's a very thoughtful question, but I don't think it should even have -- that question shouldn't even have to be asked.

Ms. DeGette.    Right.    They should know who they're calling.

Mr. Ventrell.    It should simply be the site of the individual.

Ms. DeGette.    Right.

Mr. Ventrell.    The little "I" -- I don't go to the little "I," and consumers in crisis certainly don't know how to do that.    And the fact that it ultimately identifies it is, frankly, wholly inadequate.

Ms. DeGette.    Thank you very much.    Thank you, gentlemen.

Mr. Harper.    Ranking Member DeGette yields back.

The chair will now recognize the chairman of the full committee, Chairman Walden, for 5 minutes.

The Chairman.    Thank you very much, Mr. Chairman.

Again, thanks to everybody on the panel as we try and dig into this issue and figure out how things are working, how they're not working, and where there needs to be improvement.

So I guess one of the questions I'd have off the top is, the business model for one of today's witnesses, Mr. Brian of Redwood Recovery, appears to be entirely based on the sale of prospective patient calls to treatment facilities.    And my question is, have your companies, your facilities, or your subsidiaries ever paid or sold for leads?    And I would

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

address that to Mr. Niznik, Mr. Cartwright, and Mr. Mishek.

Mr. Niznik.    So we advertise in a lot of mediums online, on television, on the radio.    So the only sorts of advertising we do is that sort, the traditional advertising where someone sees an ad or comes across our website and calls us.

The Chairman.    Okay.    So the question is, have your facilities or your subsidiaries ever paid for or sold leads?

Mr. Niznik.    No, we haven't.

The Chairman.    Okay.    Next, Mr. Cartwright.

Mr. Cartwright.    With Recovery Brands' websites, it's a business model very similar to YP.com, yellowpages.com, or WebMD.    We have advertisers on those websites.    Three hundred advertisers are NAATP members.    Actually, Betty Ford Center used to be a pretty large advertiser of ours as well.    So we have advertisers on our websites, recoverybrands.com.

So thank you very much.

The Chairman.    All right.

Mr. Mishek.    No, we never have.

The Chairman.    Not -- never paid or -- for or sold leads?

Mr. Mishek.    No, we never have.

The Chairman.    Okay.    Mr. Ventrell, the National Association of Addiction Treatment Providers recently updated its code of ethics, with particular focus in the advertising and marketing space, to fight back against practices of patient brokering, including this kind of lead generation.    Can you explain and perhaps write a few examples for what practices the Association was seeing in the substance

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

abuse -- substance use disorder treatment industry that led it to revise its code of ethics? What did you see?

Mr. Ventrell. Yes, Mr. Chairman. Thank you. National Association had a code of ethics for some time. In spirit, it prohibited all the kinds of practices that have been discussed here today. However, it wasn't thought necessary, prior to last year, that we specifically articulate exactly what right and wrong is. Our good providers didn't need to be told right and wrong. They were just doing right. But we came to understand that that's not true across the board, and so -- and we approved our new ethics code 2.0 on December 31, 2017, and it became effective on January 1. It specifically defines and prohibits the kinds of conduct we're talking about today.

The first and foremost of these would be patient brokering. Under no circumstances may an NAATP member or under any circumstances should any treatment provider, in our view, buy leads or sell leads. And so if there's a connection with doing that, it is prohibited by our code and you may not be an NAATP member.

A second area that came up frequently was licensing and accreditation misrepresentation. It is difficult enough for the consumer to understand what they need. When the provider misrepresents or does not adequately display precisely what they are licensed or accredited for, the consumer can't know what they are getting, and that lack of regulation is extremely dangerous.

The third and most prevalent reason why we removed certain members from our rolls, Mr. Chairman, is what we call unbranded or inadequately branded sites. You received information from your staff that indicates, among other things, that we have sacrificed approximately $100,000 in dues revenue and removed 24 parent companies

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

from our membership rolls primarily for this reason.

There are multiple reasons, but the primary reason why members were not renewed, or as incoming applications occur and are denied, is because we find that there is inadequate branding on the site for the same reason that I just discussed with Ranking Member DeGette:    The ability to somehow investigate and determine ultimately that the site is connected to a provider is simply not adequate.    It should be branded as, for example, the Hazelden Betty Ford site is.

So for the most part, where we have removed members or not invited members or declined an application it has been because of the deceptive websites.

The <u>Chairman.</u>    All right.

Mr. <u>Ventrell.</u>    It's just a question of transparency, Mr. Chairman.

The <u>Chairman.</u>    Thank you.    Thank you.

I want to go back, because I maybe didn't hear this right, to Mr. Cartwright.    I was looking at my notes here.    Just a -- the yes or no, have your companies, your facilities, or your subsidiaries ever paid for or sold leads?

Mr. <u>Cartwright.</u>    No, we don't pay for or sell leads.    Recovery Brands has an advertising model very similar to WebMD or yellowpages.com, and I'm assuming that Hazelden Betty Ford and NAATP must like that model, because about 300 of the NAATP members are advertisers of ours.    About half of our advertising revenue comes from NAATP members, so we hold ourselves up as a solid organization of the way you can do and should do advertising on the internet.

The <u>Chairman.</u>    I'm just sensing, Mr. Chairman, with your indulgence, maybe a disagreement on the other end of the panel.    Is that accurate?    Mr. Cartwright --

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

Mr. Ventrell.    Mr. Chairman, are you recognizing me?

The Chairman.    Yeah.

Mr. Ventrell.    Thank you.    I -- Mr. Cartwright's written testimony, which I saw for the first time yesterday, indicated this 300 number, that there are 300 NAATP members which advertise on the site.    I am unfamiliar with this.    I'm surprised to hear this information, but I am entirely open to finding out exactly what it is.

I would ask for the opportunity to determine whether that's true by being provided a list of those 300 members, and then also ask ourselves what do we mean by advertising, right.    There is a common practice generally among the problems on the website to bring in good providers, put them on the site.

I'm not saying this is the case here.    I don't know that.    But there is a common practice to grab a Hazelden Betty Ford or a Caron or a Harmony Foundation and put their information on the site as if it were part of when, in fact, there is not a motive to produce that --

The Chairman.    Right, okay.    Mr. Cartwright, are you okay sharing that information with them so we can get to the bottom of this?

Mr. Cartwright.    I would be happy to share it.    And the easiest way to look at it is, we generate about $8 million a year of our $400 million annual budget through advertising.    And about one-half of that $4 million a year is coming from NAATP members.

The Chairman.    Thank you for your indulgence, Mr. Chairman.

Mr. Harper.    Chairman Walden yields back.

So if you'll make sure, Mr. Cartwright, you get us that list, that would be very

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

helpful.

The chair will now recognize the gentlewoman from Florida, Ms. Castor, for 5 minutes.

Ms. Castor.    Thank you, Mr. Chairman and Ms. DeGette, for calling this hearing.

There are all sorts of press reports out there about unscrupulous actors that engage in deceptive marketing practices and who take advantage of patients, and I've heard directly from many families back home in Florida.    And I'd like to discuss some of the problems and what we can do to solve it.

Mr. Ventrell, you've gone into some detail here with -- could you further expand on what you see as major problems with deceptive sales in the addiction treatment industry and how they prevent patients from getting the care that they need?

Mr. Ventrell.    Thank you, Congresswoman.    If one begins by assuming that we need a transparent clinical assessment, much of the problem goes away.    The fundamental problem is that most of the problematic areas do not promote a clinical assessment where the patient or the consumer understands who is performing that assessment.    It's compounded by the fact that folks don't know what clinical assessment that they need.

The primary areas continue to be licensing and accreditation confusion and misrepresentation, unbranded or inadequately branded sites.    And toward those goals, we have been very clear in two ways:    One, you must have that clearly branded site, and now our association has, as of this month, adopted a new requirement that all NAATP members must be accredited.

There needs to be a system whereby quality and safety are adequately regulated

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

and business operations are adequately regulated. The accrediting, certifying, licensing bodies traditionally and appropriately handle quality and safety. There has been very little regulatory oversight as it concerns business operations, and that is why we are producing the guidebook for operations, which I will hopefully commend to the committee for study.

Ms. Castor. It's when -- first of all, you have a family or an individual that is searching for information on how to get substance use treatment, you're not shopping for clothing or something else.

And, Dr. Stoller, you highlights this problem too. Is it appropriate to go shopping on the internet for your -- how you're going to be treated for addiction?

Dr. Stoller. I would recommend somebody looking for treatment on the internet to go to particular sites, such as the SAMHSA treatment locater. The National Institute on Alcoholism and Alcohol Abuse has recently created a website that helps consumers to look at those sorts of things.

The other thing is that jurisdictional entities, such as county health departments, are really good sources for information about substance use disorders and also where they -- that people might be able to go to achieve the best match for the person's needs with the treatment program that can provide them with those services.

Ms. Castor. Rather than shop in general on the internet and see what comes up in the ranking on that page and then hit the first one and --

Dr. Stoller. That's correct.

Ms. Castor. So, Mr. Ventrell, you said your organization has removed members for failing to adhere to the code of ethics. You went into some detail on that, on patient

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

brokering and buying and selling leads.    Is it possible that conduct by one of your former member organizations that violated the code of ethics also violated the law?

Mr. Ventrell.    It's possible, Congresswoman, but I don't know specifically of an instance of that.    Certainly, it is possible.

Ms. Castor.    Does that need to be clarified?    What do you understand the law to say?

Mr. Ventrell.    Relative to what precisely?

Ms. Castor.    To patient brokering.

Mr. Ventrell.    Well, patient brokering -- the law of patient brokering has been very confusing and, to some extent, nonexistent and State-by-State based.    It needs to be clarified, and I would support Mr. Mishek's recommendation that there be a Federal law in this regard.

So we've all heard of the horrors that occurred in south Florida.    Certainly, there was similar activity in Arizona and also southern California, and it's probably not isolated to those States.    If patient brokering, body brokering, paying for the delivery of a body for care was made, one would have to determine what the State regulation was and that would be a legal determination.

I will say, however, that if Federal moneys were being involved in the treatment of that individual, Medicare, Medicaid, that I believe I would be correct in saying that that would have been a legal violation, irrespective of State law.

Ms. Castor.    Thank you very much.    I yield back.

Mr. Harper.    The gentlewoman yields back.

The chair will now recognize the vice chairman of the subcommittee, Mr. Griffith,

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

for 5 minutes.

Mr. Griffith. Thank you very much, Mr. Chairman.

I'm going to build on some of the prior testimony and questions about NAATP's updated code of ethics.

Mr. Cartwright, as you've indicated to Chairman Walden, there are about 300 treatment providers that are members of NAATP who advertise on your website. So my question is, if I go to your website later today, am I just going to find your traditional straight advertising, treatment center A, treatment center B, treatment center C, and it just rotates based on, you know, who's up next like the line of cabs? Is that how your system works?

Mr. Cartwright. No, sir, it doesn't. It operates very similar to YP.com, yellowpages.com. If you go into a particular area in the State of Colorado and you went into Denver, it would only list operators within that State, and then there would -- I'm sorry.

Mr. Griffith. No, that's fine. I got it.

And so the question is, it -- so it just -- it helps focus where you're going, is what you're saying. But my question is, is it just advertising? Was that -- are you telling us that you don't get paid anything for a straight referral or for a head count?

Mr. Cartwright. That is correct. It's straight advertising.

Mr. Griffith. And that's never been the case?

Mr. Cartwright. That's never been the case.

Mr. Griffith. And so when your people do -- when these ads are up there, your folks don't actually talk to the people, and it just focuses them in and -- the next question

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

is, what sort of vetting, if any, do you -- does AAC do before letting another treatment provider advertise on your website?

Mr. Cartwright.    They would need to be on the samhsa.gov.    We really take that website very seriously, that we're assuming the Substance Abuse and Mental Health Administration is -- in their listing is vetting folks.    They have to be licensed, joint commission accredited or CARF accredited.

Mr. Griffith.    Okay.    Is AAC itself a member of the NAATP?

Mr. Cartwright.    We're a member of a different organization, National Association of Behavioral Healthcare.    It's been around for about 85 years.    A lot of the larger companies join that.    You've got to remember, most of NAATP is smaller, not-for-profit organizations.    We feel like that with HCA and Acadia and UHS, some of the larger organizations, that's meeting our needs more appropriately.

Mr. Griffith.    Prior to the new ethics standards that we've talked about today, weren't you all a member of the NAATP?

Mr. Cartwright.    I go back two decades being a member of NAATP, back to when I was on their board of directors.    So, again, back when I was a not-for-profit agency, I thought that was a very effective organization.    I could go back and look at the exact date that we're no longer members, but you're right, Marv asked us not to be members based on their new marketing practices or ethical guidelines that he has.

I really don't think he fully understood, though, our websites.    I think he got confused with some other websites that are absolutely websites that are nontransparent. And we're supportive of new marketing standards.    In the State of Tennessee we just passed the toughest law on marketing standards, and we would recommend, just like

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

Mr. Mishek did, let's take that national. Let's do that on a national basis and take a law like Tennessee or take a law like Florida -- they've been working very, very hard in the State of Florida to get this right. We would support that. We actually were extreme supporters of that measure that passed in the State of Florida, California, and Tennessee. If you want to talk to some of the legislators in those States about our activity, I'm happy to put you in touch with them.

Mr. Griffith. Mr. Ventrell, you want to make any comment on that?

Mr. Ventrell. I must be demonstrative in my demeanor that suggests to the members of the committee to call on me when I haven't raised my hand, but thank you.

Mr. Griffith. Was there merely a misunderstanding? That's what I'm trying to find out. Did you not understand what he's doing?

Mr. Ventrell. You know, Mr. Cartwright just suggested that I might not fully have understood what the -- what American Addiction Centers was doing. What happened was at the expiration of American Addiction Centers term, which was December 31 of 2017, we reviewed its practices and determined that it wasn't in sufficient compliance with our ethical rules. The primary reason for that was the website issue, the inadequately branded or unbranded website, so we did not invite them back.

Mr. Griffith. Okay.

Mr. Ventrell. It's as simple as that.

Mr. Griffith. So the primary issue was that you couldn't tell -- if you just went there, you couldn't tell whether it was one of theirs or somebody else's or what treatment center was being referred and who was telling folks to do that. Is that accurate?

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

Mr. Ventrell.    Yes.    We believed it was inadequately transparent.

Mr. Griffith.    All right.    I've got to move on to some other questions.

Mr. Cartwright, I'm going to switch gears on you.    AAC operates several websites that might appear to consumers -- and it gets to the same vein -- but it might appear to consumers to be unaffiliated third-party resources, such as drugabuse.com, rehabs.com, projectknow.com.

Mr. Niznik, your company does the same thing through its operation of addictionrecoverynow.net and findingtreatmentnow.com.    Unless consumers click on the information buttons next to the 1-800 numbers advertised on the website, isn't it true they may not realize who is behind the websites or answering their calls?

First, Mr. Cartwright, yes or no.    And then, Mr. Niznik, isn't it true they may not realize who's behind the websites or answering their calls?

Mr. Cartwright.    I think it's very clear on our websites that they know who they're calling.

Mr. Griffith.    Mr. Niznik?

Mr. Niznik.    I also believe it's pretty transparent on our sites who they're calling, and then, more importantly, when they do call, they immediately know who they're talking to.    So even if they've read a blog or content online, before they -- as soon as they speak to someone, they know who they're dealing with.

Mr. Griffith.    And I see I'm over my time.    But Mr. Ventrell earlier said pushing on the "I" doesn't work.    I can't -- I'm out of time.    I apologize.

I yield back.

Mr. Harper.    The chair will now recognize Mr. Tonko for 5 minutes.

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

Mr. Tonko.    Thank you, Mr. Chair.    Thank you to our witnesses.

When opioid addiction patients are seeking help, what matters most is that they get the quality care that they need.    The problem is many families don't know what to look for in an addiction treatment provider.    And the promises that some facilities make, such as expensive housing and various forms of therapy, sound enticing, but families need to know what will actually help their loved ones in their treatment.

So, Dr. Stoller, you run the addiction center at Johns Hopkins, which has an excellent reputation for high-quality treatment.    And I understand you also provide all of the medication-assisted treatment options such as buprenorphine and methadone with that MAT concept.    How do you determine whether a patient should receive MAT and which MAT therapy is appropriate?

Dr. Stoller.    Thank you.    We do a comprehensive evaluation upon consideration of admission of any patient.    At the end of that comprehensive evaluation, we might recommend that the person go someplace else.    Maybe they need an inpatient admission for alcohol detoxification or something else.

The most important thing is that the patient has particular needs that we feel like we can match.    The way that we match that, let's just look at medication-assisted treatment, is that we look at, number one, patient preference.    So some people come with a particular preference.    Number two, we look at their past history of treatment, both their successes and their failures.    Both are important in determining what the person might need right now.    We also look at other medications that they might be on, their particular symptoms of disorder, how long they've been using, and the severity of their use.

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

Mr. Tonko.    Thank you.

And as we know, millions of Americans are affected by this crisis, and not every family can afford the higher-end facilities.    Dr. Stoller, what treatment options are there for people with limited means, and do you have to spend a lot of money to get quality care?

Dr. Stoller.    So I'll go back to my written and oral presentation.    I think that there are particular requirements of a treatment program in terms of delivering care that is comprehensive.    The use of medication-assisted treatments for people with opioid use disorder is very important, and if the particular program doesn't deliver it themselves, for whatever reason, then connections and very strong linkages with programs and physicians who do is very important.

We have a hub-and-spoke model where we use our opioid treatment program as a hub, and we work very closely with area primary care providers and psychiatrists who might be providing that medication-assisted treatment.

Mr. Tonko.    Thank you.    And what are some reliable metrics to use to demonstrate a success rate for opioid addiction treatment?

Dr. Stoller.    One of the most important ones is retention within the system of care at a level of care that matches the person's need.    So when somebody leaves treatment with us, despite the fact that they need ongoing treatment and they're leaving the treatment system, that's not an indication of success.    That said, if the person is leaving with a very positive sense of hope of what a treatment program can offer them and they come back to us, that could be good.    We also --

Mr. Tonko.    Okay.    I've got a few questions here to go, so I want to get to

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

everyone.

Mr. Mishek, Hazelden Betty Ford is another gold standard in this industry. Your written testimony speaks to quality standards you've identified for addiction treatment providers. Briefly, how do you determine what a successful treatment is, and how do you measure outcome for your patients?

Mr. Mishek. We measure outcomes by checking back with our patients at 1 month, 3 months, 6 months, 9 months, and 1 year after they leave our care, at whatever point they leave our care, whether it's after an extensive long-term treatment or after, let's say, 3 weeks of residential care. We measure three things: continuous abstinence during that period of time; second of all, we measure percent days abstinent. That is, they may have relapsed during that period of time, but if they got right back into the program with hope and move forward, that's great, and we would consider that a success. And then finally, we have a series of quality-of-life measures that we measure over that period of time. So those are the metrics that we have in place that we've had for a number of years.

Mr. Tonko. Thank you.

And, Mr. Cartwright, turning to you, I'll ask you about how your facility ensures high-quality care. And first of all, in your response to the committee's letter, you provided your client outcome study that found, and I quote, 63 percent of AAC patients maintain abstinence 1 year after treatment. How many patient responses is that 63 percent success rate based upon, and just how many patients enter the doors of AAC treatment centers each year?

Mr. Cartwright. Thank you very much. I'm proud -- most proud of the outcome

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

studies. We partnered with an organization in Nashville, Centerstone Research Institute, to do a 3-year longitudinal study. Many times you'll see SAMHSA do these studies or NAADAC do these studies. We had 4,000 patients that went through this study with Centerstone Research Institute. They're the ones that conducted the followup calls, very similar to Mr. Mishek. They did that on the intake process, 2 months, 6 months, and 1-year posttreatment. And we have an entire study. We can get all the members of the committee that study. Be happy to dig in and get you in touch with Centerstone Research Institute that actually conducted the study.

Mr. Tonko. And how many are you saying completed that 1 year?

Mr. Cartwright. Four thousand. Four thousand people went through the study, and I can get you the details on the entire study. That would be -- Centerstone Research Institute is the one that did the study. We didn't do that ourselves. We didn't have our staff members calling the patients back. We actually -- it was a research institute that did that for us.

Mr. Tonko. So I'm clear on the response, so you said you sent -- you had -- approached how many people to respond?

Mr. Cartwright. Four thousand.

Mr. Tonko. And how many responded that said 63 percent -- had that 63 percent success rate? How many of those 4,000 responded?

Mr. Cartwright. Again, I can get you the exact numbers from Centerstone Research Institute. They're the ones that conducted the study. My staff didn't conduct the study, but I can get you the details on that study if you'd like it.

Mr. Tonko. Thank you very much, Mr. Chair. I yield back.

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

Mr. Harper.    The gentleman yields back.

Before I recognize the next member for questions, I just want to be clear, Mr. Ventrell, you had stated earlier that the little "I" isn't good enough.    And I assume by that you're referring to the little circle, the information button on a website that you have to click on?

Mr. Ventrell.    That's correct.

Mr. Harper.    Okay.    With that, the chair will now recognize Dr. Burgess for 5 minutes.

Mr. Burgess.    Well, thank you, Mr. Chairman.

And, Dr. Stoller, thank you for your testimony, and thank you for your honesty when you address the fact that it's complicated.    In the treatment of these patients, the disease itself is complicated.    The people who are affected by the disease themselves can be sometimes very complex individuals with very complex histories and, oftentimes, there are confounding comorbidities that have to be taken into consideration.    And as a consequence -- well, let me just back up a little bit.

Your expertise that you bring to this, you are a board certified psychiatrist?    Is that correct?

Dr. Stoller.    Yes, I am, and with additional qualifications in addiction medicine.

Mr. Burgess.    So would that -- the committee had the ability to refer everyone with this problem to you or someone of similar qualifications, but unfortunately, that's not always the case.    And we are left with trying to provide as much care as possible to protect the greatest number of people, but recognize that it's an imperfect process.

But at some point I would love to visit with you and get your perspectives on how

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

much is okay, how much is too much.    And I suspect you have some pretty keen insights into this, and I really would welcome the opportunity to follow up with you on your experience in treating, again, this very complex type of patient.

Dr. Stoller.    My pleasure.

Mr. Burgess.    Mr. Ventrell, let me ask you a question.

And thank you for that answer.

Your organization, the National Association of Addiction Treatment Providers, so you had some people that you did not renew their -- because they did not meet your standards.    Is that correct?

Mr. Ventrell.    That's correct.

Mr. Burgess.    And tell me again how many different centers you did not renew?

Mr. Ventrell.    Yes.    First of all, let me explain that sometimes we will hear a number that represents campuses, other times you will hear a number that represents the parent corporation.

The answer to your question is 24 parent corporations, 99 facilities.    And that is the number, sir, as of last week, Friday.

And so what has happened is the majority of NAATP members -- NAATP membership functions on a calendar year.    The majority of members expire on December 31 of the calendar year.    So that is why the vast majority of those who are no longer part of our rolls were deleted at that time.    But this continues to go on throughout the year, and as we receive applications or see other issues, we may remove based on that.

So that -- the number has increased since December 31, which was the number

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

that the -- that your committee staff gave you.

Mr. Burgess.    So you're in the rehabilitation business or you represent companies that are.    Are there some of those people who fell through that -- some of those organizations or those facilities that were just one or two clicks off of being okay where you could work with them and bring them back into the fold, or was it once you're done, you're done?

Mr. Ventrell.    Thank you for that question, because our goal is not to remove members.    Our goal is to create a society, a professional society of treatment providers that are aligned in terms of values-based care and ethics.    And so what we want to do when we receive a complaint or become aware of an act is to contact that treatment provider and say, this is a problem.    Can you fix it.

Mr. Burgess.    Let me ask you about that, that becoming aware of something. And I'm purposely not asking our other witnesses about any history of lawsuit activity or pending litigation.    I don't want to get into that.    But is that something that you consider through NAATP, if there has been a -- if there has been a settlement, if there has been an action or an allegation, is that something that you evaluate?

Mr. Ventrell.    As it concerns potential liability to our organization, is that your question?

Mr. Burgess.    No.    The liability experience of one of the providers.    Is that something that would be a red flag?

The reason I bring that up is I cited the testimony that we had last December from Eric Gold, who was an assistant attorney in the Massachusetts Attorney General's Office. And I asked him the question, I said, look, I'm a doctor.    I practiced for years.    If things

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

are not going well, you worry about liability lawsuits, and where are those liability lawsuits for the types of organizations that he brought before our committee that morning. And he said, well, it just doesn't happen. And that was a little bit astounding to me. I've got to believe that sometimes litigation does result.

Do you evaluate that litigation when it's -- I mean, that's all public knowledge, correct?

Mr. <u>Ventrell.</u> Certainly. We want to know what all of our centers are doing in terms of clinical and business operation, and if we become aware of that, that would certainly be a red flag that concerns us.

Mr. <u>Burgess.</u> And so has that happened?

Mr. <u>Ventrell.</u> Not specifically to my knowledge, no.

Mr. <u>Burgess.</u> Has not. And, again, I find that surprising.

I just have one last observation, and I want to ask our treatment centers predominantly to get back to me with this information. One of the family members that was interviewed in our roundtable last -- earlier this year talked about her son. She said it was continued on her medical insurance up to age 26, was -- eventually died of an overdose, but not before he had been resuscitated seven times with Narcan in emergency rooms.

And her question to us was, how can he still be on my insurance and I not be informed of this type of activity, and what was preventing someone from telling me that my son was in an emergency room seven times requiring Narcan? So, again, I'm going to submit that question for the record, but I would be interested in your responses to that.

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

And I yield back, Mr. Chairman.

Mr. <u>Harper.</u>    The gentleman yields back.

The chair will now recognize the gentlewoman from Indiana, Chairman of our Ethics Committee, Mrs. Brooks, for 5 minutes.

Mrs. <u>Brooks.</u>    Thank you, Mr. Chairman.

And I would like to talk a little bit about the call center employees and concerned about the types of incentives that might happen relative to call centers and connecting. Although I certainly appreciate that, as we've talked and heard, those with addictions that I've talked to or their families, I appreciate that it is incredibly difficult work that treatment centers provide.    And success rates are very difficult.    Relapses are common. Dropping out of centers is common.    This is an incredibly difficult group of people to work with.

Unfortunately, it's large and growing, and we've got to make sure, in our oversight role, that we are providing and making sure that these folks are not being taken advantage of.

And addicts that I have talked to, by the time they get to the point where they're ready for treatment, they are that desperate or their families are that desperate and have usually tried many centers.    The last center I visited, one young man said it was about his third or fourth center he had been in.

And so I think that this is a really difficult problem we're trying to work on, and that's why we want to make sure, whether they go to the internet, whether they're going to a phone book -- I don't even know that anybody is using that anymore -- but whatever they're doing, we want to connect them with the best treatment possible.

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

And with all due respect, no one knows what SAMHSA is. An addict doesn't. I would say, we as government and providers do, but we have got to get this figured out. And there also aren't nearly enough psychiatrists coming out of our med school classes and addiction specialists. And so we've got to keep focused on this problem because we are losing far too many people.

I'd like to know, maybe Mr. Cartwright, Mr. Mishek, and Mr. Niznik, how are your call center employees paid, and are they given bonuses?

Mr. Cartwright?

Mr. Cartwright. Yeah. Thank you very much. And I appreciate your comments. You're so right in terms of the devastation of this disease in keeping it on treatment and quality of care. And I think one of the things it -- I'm in a unique position because I --

Mrs. Brooks. And I'm sorry, I have several questions. So I need -- and I appreciate that, comments on my comments. But how are your call center employees paid and what fact -- and are they given bonuses and how -- what determines whether or not they receive a bonus?

First, are they -- how are they paid, Mr. Cartwright?

Mr. Cartwright. Today they're paid a salary.

Mrs. Brooks. Okay. A salary. No bonuses?

Mr. Cartwright. Today it's a salary. Prior to July 1 -- and again, I go back to the Tennessee State law that was passed. I think it's the most aggressive law in the State related to these bad practices that we all want rid of. They were paid on a commission basis.

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

Mrs. Brooks.    And you've changed that?

Mr. Cartwright.    Yes, ma'am.

Mrs. Brooks.    Mr. Niznik, how about you, how are your call center employees paid?

Mr. Niznik.    So our call center employees are all salaried employees who also do receive a discretionary bonus.    It's based on many factors that you'd expect someone who answers calls to measure, so courtesy, returning calls, not missing calls.

But I think what's important is that no one that answers these calls has any impact on the sort of care someone receives.    So when a patient comes to us, the doctors, the nurses, the therapists, they make that determination.    So the -- really just being measured how good of a job they do in explaining the services that we offer and performing just the typical job duties of answering calls.

Mrs. Brooks.    But how would one call center employee get a bonus versus another call center employee?    How does that information come to you or whoever their supervisor is as to whether or not they receive a bonus?    And is it monthly?    Is it -- how is it determined?

Mr. Niznik.    The bonus is monthly.    And, again, it is discretionary.    It's based on maybe 7, 8, 10 -- it's based on a list of factors that I provided in my written testimony. But you measure things like do they answer the call?    Have they missed calls?    Are they helpful?    When the managers walk around and hear a call, are they being polite?    Are they knowledgeable in the program?    So all these factors are relevant in determining is the person answering the call doing a good job.

Mrs. Brooks.    Okay.    Mr. Mishek, are your call center people paid?

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

Mr. Mishek.    Our call center employees have always been salaried?

Mrs. Brooks.    Without bonuses?

Mr. Mishek.    Correct.

Mrs. Brooks.    Are there any minimum admissions goals for any employees, kind of like sales quotas?

Mr. Mishek.    No.

Mrs. Brooks.    Mr. Cartwright?

Mr. Cartwright.    Today, no.

Mrs. Brooks.    Okay.    There have been in the past, but there are not any longer?

Mr. Cartwright.    Yes, ma'am.    Again, I go back to the State law in Tennessee, and we'd love to see that nationwide.

Mrs. Brooks.    Okay.    Thank you.

Mr. Niznik, are there any imposed minimum admission goals?

Mr. Niznik.    There's no minimum admission goals per person, but collectively as a group, we want to make sure that people answering the calls are doing a good job.    And like I said in my oral testimony, that like a receptionist in a doctor's office, you want to make sure the person answering the call, answering your questions is being polite and doing a good job.

Mrs. Brooks.    I'm sorry.    My time is up, and I may submit a couple of more written questions.    Thank you.    Thanks for your work.

Mr. Harper.    The gentlewoman yields back.

The chair will now recognize the gentleman from New York, Mr. Collins, for 5 minutes.

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

Mr. Collins.    Thank you, Mr. Chairman.

And the witnesses, you've -- it's an intriguing hearing because this problem is almost insidious in its nature and it's almost hard to begin.    Let's start with the Federal regulations versus Tennessee.

Mr. Mishek, you pretty much were calling on Congress to do something and to call on the FTC to regulate.

Mr. Mishek.    That's correct.

Mr. Collins.    Maybe quickly, if I could ask the other witnesses, do you agree that this situation we need -- in this case, Mr. Cartwright, you talked about Federal law versus State law, which is popping up here or there, you believe this is a place the Federal Government should step in and broadly regulate what's going on, especially in the advertising area?

Mr. Cartwright.    I do.    I think there are existing FTC laws that get to this, that need to be enforced.    But I also think your attention to this is much welcomed.

Mr. Collins.    Yeah.

Mr. Niznik.    I think it's important that, just broadly, all providers are transparent in the service they offer, that when someone receives a call, they identify themselves. So I think, even though we practice that in all of our facilities, even the States where there isn't necessarily regulation, I think it would be helpful.    And I think equally as important would be regulation that would look at standardizing care so that, you know, providers --

Mr. Collins.    But you're talking about in Federal -- but you're saying some States aren't doing anything, others, Tennessee, may be doing a lot --

Mr. Niznik.    Right.

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

Mr. Collins.   -- in which case you're saying the Federal Government, in this case, should step in.   We're always somewhat cautious about, you know, Federal versus States' rights and so forth, but it's sounding like, in this instance, you're calling for the Federal Government to step in?

Mr. Niznik.   Right.   I mean, because, for example, the standard of care, I mean, there isn't a national one that's consistent from provider to provider.   So even as a facility, you know, we defer to the professional judgment of our doctors and clinicians, but I think it would be better if they knew exactly what was, at least at a minimum level, expected from them.

Mr. Collins.   Mr. Cartwright.

Mr. Cartwright.   I do think we need Federal intervention and not just in marketing practices.   We have a similar issue related to licensure.   Licensure standards in the State of Minnesota or the State of Tennessee or the State of California can be completely different where, for example, out in California, in six-bed houses, you could be doing detox services.   We both, Mishek and myself, through our organizations have CDRHs.   They're hospitals for detoxification services.   So we should have some standardizations across the country.

One of the difficulties is we have 19,000 different treatment centers across the United States with an annual budget of about $5 million.   We've never really caught the attention of the Federal Government or even the healthcare system.   And today we do, right.   We have people dying in the streets all over this country, and we really do need to do something about this.

And I'm very impressed with Congress in respect to what all you all have done

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

over the last 2 years on this issue. But now I think we're starting to get to the things that Mr. Ventrell, Mishek, myself want to see, and that's consistency around advertising and marketing, but also consistency around quality of care and licensure standards.

Thank you.

Mr. Collins. Mr. Brian.

Mr. Brian. From the advertisement perspective, I couldn't agree more. We want nothing more, wanted nothing more than to work with great centers that were licensed to do what they were tasked to do. And I think that the ultimate underlying message that I would like to leave is that people will search however they choose to search, not how we think might be most appropriate for them to search. So if they decide to go online, they're going to go online. That's what they're going to do.

And so if we are holding our treatment programs to a higher standard and ultimately the licensure required for them, I think we'll be in much better shape regardless of who's on the other end of the phone call.

Mr. Collins. Dr. Stoller.

Dr. Stoller. I'm afraid my work doesn't overlap advertising enough to render a very informed opinion, but what I would say is that access is very important. And I really appreciate the work that the Congress has done to increase access, for example, through Medicare reimbursement for opioid treatment programs and anything else that could be done to make sure that treatment is accessible and that parity is enforced.

Mr. Collins. So, Mr. Ventrell, finishing with you, you know, NAATP is the, you know, the organization that is certifying and riding herd on these. Is that organization well known like almost we think of the, you know, Good Housekeeping Seal or something

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

as in the vernacular?    Somebody searching would know, I've got to start with do I see NAATP stamp of approval?

Mr. Ventrell.    Well, I would hope so.    And that certainly would be --

Mr. Collins.    Or is there work to be done there?

Mr. Ventrell.    There is work to be done, Congressman, as is demonstrated by the fact that we removed certain members so that we could have a moral high ground in order to say, look, if you want to be a member of the society, you have to follow these rules.

So NAATP has been in existence for 40 years, so certainly we're the longstanding trade association.    I think that what you will find as this process develops and we continue to articulate best practices, that that is, in fact, the case, that you need to be part of this national association and that demonstrates a meaningful --

Mr. Collins.    That would certainly be one way to weed out the very bad actors because they're not part of the NAATP.    So we'd encourage you to continue to promote your brand.

Mr. Ventrell.    Thank you.

Mr. Collins.    With that, Mr. Chairman, I yield back.

Mr. Harper.    The gentleman yields back.

The chair will now recognize the gentleman from Pennsylvania, Mr. Costello, for 5 minutes.

Mr. Costello.    Thank you, Mr. Chairman.

Mr. Brian, information your company provided committee staff as well as your testimony indicates you routed more than 519,000 calls to treatment providers from

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

December 2014 to the present.    Can you describe how those calls were generated?

Mr. Brian.    Yes, sir, of course.    We work with third-party media agencies that operate in television, radio, search engine advertising, amongst other avenues, and they generate -- in advertisement, typically it would be in the form of a help-line related call that clearly indicates that their call will be routed to a treatment center who pays to receive that phone call.    That call is then routed directly to the treatment center through our platform, never stopping with us.

Mr. Costello.    Contractually, do you have any approval over the type of language that they utilize in their advertising in order to generate that call?

Mr. Brian.    Yes, sir.    Indirectly, we have what we call our marketing standards and practices attestation form, which allows and provides them a very clear guideline of what we allow and what we don't allow, most of which is congruent and consistent with the same dialogue that we've had today.

Mr. Costello.    Do you pre-approve that?

Mr. Brian.    Not in all instances, but in most instances, yes.

Mr. Costello.    Have you ever had occasion to tell them to remove a particular type of advertisement that did not accord with your -- those guidelines that you just referenced?

Mr. Brian.    Yes, sir.

Mr. Costello.    How much did you pay per call?

Mr. Brian.    It would vary depending on the type of call.    It would range anywhere from $10, $15, $20 dollars on up to $60 or $70, depending on how the call was originated.

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

Mr. Costello.    How did treatment facilities find Redwood?

Mr. Brian.    We participated in numerous trade shows, conferences.    I've spoken at several of these -- at these conferences, and ultimately the organizations would find us typically through that.    We also had a strong web presence where we would advertise directly to the treatment programs through our website, which was treatmentcalls.com.

Mr. Costello.    So did Redwood find the facilities online?

Mr. Brian.    In some instances, yes, sir.    Not in all instances.

Mr. Costello.    Okay.    Let me shift gears.    This is for everyone but Mr. Ventrell. I want to talk about success rates, because in a lot of these advertisements you hear talk of there being, you know, a successful treatment.    We don't necessarily know what success means.

So for each of you, what is your facility's success rate, and how do you define success?    Is it admission to your facility?    Completion of the program?    Maintaining sobriety for a month?    Six months?    One year?    Five years?    Starting with Mr. Mishek.

Mr. Mishek.    Thank you, Congressman.    First of all, we don't use that word, "success."    It's outcomes.    This is a chronic disease.    It's -- you're going to have it for your lifetime.    Hopefully, you are in recovery and are happy, joyous, and free, as they say in the big book.

We measure, as I said earlier, outcomes after 1 year of being with us, whatever point you leave us, and --

Mr. Costello.    Do you list that in your advertisement at all, what's your outcome --

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

Mr. Mishek.    We don't advertise it.

Mr. Costello.    Okay.    And I want to hone in on the advertisement and the use of the word "success" or anything related thereto.    Mr. Cartwright.

Mr. Cartwright.    We don't use success rate on our advertising.    We conducted an outcome study that we've published and put out there just recently over the last several months where 4,000 patients went through that, that I'm very, very pleased and proud of.    But that doesn't encompass all of our folks that are going through treatment annually.

Mr. Costello.    Mr. Niznik.

Mr. Niznik.    We don't advertise what our success rate is or define it in any of our ads.

Mr. Brian.    We don't have treatment centers at all --

Mr. Costello.    Right.

Mr. Brian.    -- so we don't have success rates.

Mr. Costello.    Dr. Stoller.

Dr. Stoller.    Our position is similar to Mr. Mishek's.    We measure outcome over a continual time period.

Mr. Costello.    Mr. Mishek, share with me some of the other challenges in tracking success within the substance abuse industry.

Mr. Mishek.    Well, again, success for us is lifetime recovery.    It's a chronic disease.    One of the unfortunate features of it being a chronic disease is people relapse. People come back to treatment often many times.    It's important never to give up hope, to bring them back, get them back in the continuum.

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

So success for us are things like, yes, completion of a particular episode of care is really important; participating in recovery management is really important; making it to 12-step meetings, if that's the route you're going, is really, really important.    Those are the things that we really focus on and those are the things we look to for success.    I hope that answers your question.

Mr. Costello.    It does.    Thank you.

I yield back.

Mr. Harper.    The gentleman yields back.

The chair will now recognize the gentleman from Georgia, Mr. Carter, for 5 minutes.

Mr. Carter.    Thank you all for being here.    Very important subject.    I've always described the opioid epidemic as being two types of problems:    One is, how do we control that what I consider to be the tangible part, how do we control the number of pills out there, the number of prescriptions; and two, the intangible, and that is, how do we -- what do we do with those 2.5 million people who are currently addicted?    How do we help them?    That's why you're here today because we need answers to that.    That's very difficult.

I'll start with you, Mr. Brian, and ask you this:    Are you familiar with the Addiction Network?

Mr. Brian.    Yes, sir.

Mr. Carter.    You are familiar with that?    As I understand that, that's -- features a gentleman, a bearded gentleman in blue scrubs saying call this number and you can get help.    And is that your company doing that or what?

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

Mr. Brian.    It's not our company doing that, sir.    We --

Mr. Carter.    It's not your company doing it?

Mr. Brian.    No, sir.

Mr. Carter.    Okay.    I want to ask you about -- so you have a list of companies that you refer people to,

Mr. Brian.    Yes.

Mr. Carter.    Is that correct?

Mr. Brian.    Yes, sir.

Mr. Carter.    Okay.    What are the qualifications for a company to be on that list?

Mr. Brian.    Licensed in the State that they are --

Mr. Carter.    Just licensed.

Mr. Brian.    Yes.

Mr. Carter.    Anything else?

Mr. Brian.    Not with us, no.

Mr. Carter.    Not with you.

What about you, Mr. Cartwright?    You do the same thing, the same business model.    Is that correct?

Mr. Cartwright.    A little bit different business model, sir.

Mr. Carter.    Okay.    Very quickly, how different?

Mr. Cartwright.    It's an advertising model.

Mr. Carter.    It's an advertising model.

Mr. Cartwright.    They don't call into our call center, and then we don't refer them out.

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

Mr. Carter.    Okay.    Do you have any requirements for them to be on there?

Mr. Cartwright.    We do.    They have to be part of SAMHSA's website --

Mr. Carter.    Okay.    You mentioned that earlier.

Mr. Cartwright.    -- which I'm assuming is vetted.    They have to be a licensed organization with CARF or JCAHO accreditation.

Mr. Carter.    Do you take into consideration, as my colleague just asked, outcomes?    Do you take that into consideration?    Do you ask those companies before you put them on your list, tell me about your outcomes?

Mr. Cartwright.    We do not.

Mr. Carter.    You do not.

Mr. Brian, do you?

Mr. Brian.    No, sir.

Mr. Carter.    You do not?

Mr. Brian.    No, sir.

Mr. Carter.    So the outcomes has nothing to do with it.    They're just on the list.

When you refer, Mr. Cartwright, one -- a patient to one of these clinics, if you will, do you -- do they reimburse you for that?

Mr. Cartwright.    No, sir, we don't refer people to clinics.

Mr. Carter.    Okay.    When you refer people --

Mr. Cartwright.    Correct.

Mr. Carter.    -- the company that you refer them to?

Mr. Cartwright.    If a call comes into our call center and we refer it out to another facility, we would never -- no, we would never take money from them.

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

Mr. Carter.   Does that facility reimburse you in any way at all?

Mr. Cartwright.   No, sir.

Mr. Carter.   How do you make money then?

Mr. Cartwright.   We don't make money from that at all.

Mr. Carter.   You don't make -- where do you make your money?

Mr. Cartwright.   We are a treatment organization.   We have 39 treatment centers in 9 States, and that's where we make the bulk of our revenue, just like Hazelden Betty Ford Center.

Mr. Carter.   Do you refer patients to other facilities besides yours?

Mr. Cartwright.   If somebody calls into our call center and they're in a local area and we don't have a treatment center in that area, absolutely, we'd refer them to the SAMHSA website.   We may even walk through that SAMHSA website with them and let them know about local facilities in that area, but we would never take money from them.

Mr. Carter.   Okay.   What about you, Mr. Brian, do you -- do you get any kind of referral -- when you give a referral to another clinic, do you get reimbursed?

Mr. Brian.   We don't make any referrals.   So we don't have a call center that accepts phone calls.

Mr. Carter.   You don't have a call center.   So when you route them --

Mr. Brian.   Yes, sir.

Mr. Carter.   -- to that clinic --

Mr. Brian.   Yes, sir.

Mr. Carter.   -- do they reimburse you any at all for that referral, if you will?

Mr. Brian.   For the phone call, we receive compensation for it, yes, sir.

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

Mr. Carter.    Do you receive it from the clinic?

Mr. Brian.    For the phone call itself, yes.

Mr. Carter.    Okay.    So, again, you don't take into consideration -- I mean, there's -- you don't -- there's no prerequisites for that company, for that clinic to be on your list.    You just simply go in and list them.

Let me ask you something.    When you make these kind of referrals, if you will, do you interview the patient?    Do you sit there and say, okay, tell me what your problem is, tell me what your pay type is, tell me, you know, what you're looking for?    Do you do anything like that or you just say, hey, this is in your area, this is who we recommend?

Mr. Brian.    We don't recommend.    We don't talk to the client ever in that engagement at all.    We don't have any interaction at all with the prospective --

Mr. Carter.    Then how do you know who to refer them to?

Mr. Brian.    We refer them to a licensed facility, sir.    The prerequisite to work with us, if it was good enough for the State to issue licensure for them, that's our prerequisite in order to do business with us.

Mr. Carter.    Okay.    Do you think that serves the best interest of the patient?

Mr. Brian.    I believe it serves the law in the State of Florida that I live and work in. If we could -- and I would welcome this conversation.    I believe that a lot more can be done to be routed -- to route these calls to the appropriate facility.

Mr. Carter.    I would think so.

Mr. Brian.    I agree.

Mr. Carter.    I would think if I called that, you know, I'd want to have some information before I said, okay, this is where you need to go.

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

Mr. Cartwright, you've referred to State laws that have been passed. Have they addressed any of that?

Mr. Cartwright. They don't address what -- I think what you're getting at is the quality of the facility that you're referring someone to.

Mr. Carter. The quality and the type of facility. I mean, if I say, you know, I've got an addiction and I'm looking for something that's faith based and I need your recommendation, do you take into consideration anything like that?

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

Mr. Cartwright.    Again, if Congress would support something like that through SAMHSA, I think that would be excellent.    I do think that this is where it needs to land is in Congress' lap, because each of the States are so different in terms of how they license --

Mr. Carter.    Okay.    I'm out of time.    But, you know, listen, we're very responsible people up here, and we want to do and we're going to do what's right.    But we also look to you to have a certain level of responsibility as well.    So don't always look to Congress as being the ultimate answer here, okay.

Thank you very much, Mr. Chairman.    I yield back.

94

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

<u>RPTR KEAN</u>

<u>EDTR ZAMORA</u>

[11:56 a.m.]

Mr. <u>Harper.</u>    The gentleman yields back.

The chair will now recognize the gentleman from Florida, Mr. Bilirakis, for 5 minutes.

Mr. <u>Bilirakis.</u>    Thank you very much.

Thank you for your testimony as well.   And thank you, Mr. Chairman, for holding this very important hearing.

If there's one thing that's been made clear in today's hearing is that there is a lack of clarity on how individuals can ensure they are seeking care that will best meet their needs.   I want to better understand how we can serve our constituents by creating a clear path forward here.

Mr. Ventrell, does the Association have a definition of what quality care is?    And then, what resources exist for the consumers to seek out quality care?

Mr. <u>Ventrell.</u>    Thank you, Congressman.   Yes.    As part of the quality assurance initiative, NAATP developed a research called the NAATP Guide to Treatment Program Selection.    It's a comprehensive consumer tool, also useful for the field, that provides red flags and positive references.

It is premised on four principles.    Addiction treatment is healthcare and should be chosen as such.    There are knowable indicia of quality of care.    It's not a mystery. We know what produces quality care.    Third, there needs to be transparency in the marketing process.    And fourth, the institution that you go to should adhere to a

Case 3:19-cv-00407    Document 53-4    Filed 02/12/20    Page 95 of 104 PageID #: 864

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

recognized code of ethics.

Mr. Bilirakis.    Let me ask you a question, and maybe this is for the panel as well. Would a star rating system be very helpful?    Because that kind of simplifies it in certain areas rating the particular facility.    I think that that might be simpler.    I mean, people -- again, these are their loved ones and they want to make the right decision for them.

So if anybody wants to chime in on that, I'd appreciate an answer.

Yes, sir.

Mr. Ventrell.    May I, sir?    It's an attractive solution, but I think it's a dangerous one.    Things are more complicated than ranking by star.    I don't think that that's achievable in a reliable way.

Mr. Bilirakis.    Well, we do it for nursing homes.    I distinguish that, you know, a nursing home as opposed to a substance use disorder facility or mental health facility.

Mr. Ventrell.    Yes.    Thank you.    The floor needs to be clearly established in order for a process like that to work.    In other words, nursing homes must exist, I believe, at a certain level of quality before you can start to talk about that.

What I propose, or what we propose or suggest instead is that the floor, the basic operational requirements should be regulated sufficiently such that if you read, if they are, and then you read the services offered, the consumer can rely on that, and a star system wouldn't be necessary.

Mr. Bilirakis.    Okay.    I just want to make it clear and less complicated for the consumer.    And I want them to know where to turn to, where to find this information out.    I want it to be easily accessible.

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

Let's see, a big concern that this committee has is ensuring that when an individual or their loved one is seeking substance use disorder treatment, they know what things to look for.    And you mentioned the flags.   What things to avoid, again, to best protect themselves from falling prey to any deceptive marketing schemes that may be out there, and there are plenty out there.

Could you identify a few red flags that individual should be on the lookout for when seeking care, as well as a few green flags that might indicate that a treatment center provides quality care?

For example, some reports suggest paying attention to whether or not the facility lists a staff page or asking the person who answers the phone whether or not they are actually at the treatment center.

So, Mr. Ventrell, you can start, if you like.

Mr. <u>Ventrell.</u>    Sure.    As part of the same document which I have referenced, we've listed red flags and questions to ask.   Red flags generally that we believe should be observed are generic websites, call directories, or websites offering treatment placement.   Many of these make referrals based on business relationships.   That's the problem.

Questions to ask include licensing, accreditation.    It's all based on transparency. We would like them obviously to be members of our national association.    How long has the facility been in operation?    Who are the staff?    What levels of care are provided? What are the placement criteria?    What is your procedure for the continuum of care as the chronic disease exists one's entire life?    The list goes on, and I'm happy to provide that.    In fact, it is part of the record.

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

Mr. <u>Bilirakis.</u>    Okay.    Let me ask one more question.    I do have several here, but with regard to payment, you know, because it's difficult for a person to -- obviously, you want to make the right decision, okay, but also, how many treatment centers take insurance, private insurance?    What's a percentage?

I can ask -- whoever wants to answer that question, would be fine with me, or you can even just talk about your particular treatment center, whether that center accepts private insurance.

Mr. <u>Cartwright.</u>    Congressman, thank you very much, and going back to your previous question as well.    I do think that the addiction treatment industry is very similar to the nursing home industry.    It's a maturing industry that could benefit from a star system like you were referring to.    I think it's very, very similar to the nursing home space where Federal regulation needs to be tighter across the board.    That would be my personal opinion.    So I really appreciate you bringing that up.

Mr. <u>Bilirakis.</u>    Oh, absolutely.    Thank you.    Thank you for your opinion.

Mr. <u>Mishek.</u>    If I could talk about insurance.

Mr. <u>Bilirakis.</u>    I guess I probably have to yield back.

Thank you very much.    If maybe you can have some time, Mr. Chairman, for him to answer the question.    But I'll yield back.

Mr. <u>Harper.</u>    The gentleman yields back, and we will -- I've got a couple of followup things, but I'll recognize Ranking Member DeGette for purposes of entering a document.

Ms. <u>DeGette.</u>    Mr. Chairman, thank you.

We just received a letter from the Federal Trade Commission regarding this issue.

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

And what Commissioner Chopra talks about in this letter is the for-profit treatment centers and what that can do in terms of driving up costs for insurance and for Medicare and Medicaid programs, as well as cost for patients out of their pockets.

The letter also cautions about the deceptive trade practices in trying to match individuals to centers and the advertising.    And it finally urges this committee to take a close look at the advertising and marketing practices in the industry to make sure that incentive compensation practices for employees and operators of treatment centers, as well as financial conflicts of interests with other firms, are addressed.

And so I'd like unanimous consent to enter this into the record so that we can continue to look at these issues as we continue our investigation.

Mr. Harper.    Without objection, so entered.

[The information follows:]


\*\*\*\*\*\*\*\* COMMITTEE INSERT \*\*\*\*\*\*\*\*

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

Mr. Harper.  Any other comments, Ms. DeGette?

Ms. DeGette.  No.

Mr. Harper.  I had a couple of followup items I just wanted to touch on.

Mr. Cartwright, how do companies and their phone numbers end up on their website?

And I ask that because we understand that there's at least one phone number that doesn't call the named facility that it is listed with.  So how do companies and those phone numbers end up on your websites?

Mr. Cartwright.  We utilize the SAMHSA website in terms of the listings on there. And so if it's not been updated through SAMHSA, maybe we didn't update that.  I'd love to know the phone number that didn't go through correctly.  We would certainly like to look at that.

Mr. Harper.  Sure.  We will make sure you have that info to clear that up.

Also, Mr. Cartwright, I know that you do operate, you know, a portfolio of websites under your Recovery Brands business line.  Are you able to tell us how many websites are operated under Recovery Brands and give us that information today?

Mr. Cartwright.  I can get you the exact websites themselves.  I think we've been asked by staff to provide that, and we can certainly do that.

Mr. Harper.  That would be very helpful.

You know, one issue that this committee has explored, obviously, is abuse of billing practices, especially with urine drug testing.  For example, the reports of clinics and labs charging more than $4,000 for a single urine test and for treatment facilities to test individuals two or three times a week.

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

So for Mr. Mishek, Mr. Niznik, and Mr. Cartwright, can you explain how often your facilities test patients and what the average cost is? And answer, if you can, as quickly as you can.

Mr. Mishek. Sure. We do a urine drug screen upon admission for any level of care: Residential, day treatment, intensive outpatient. During the course, the patient may get two or three additional tests, depending on whether they came up on the randomized thing we do or whether it was for cause.

We don't charge. We have no revenue from drug testing. The cost that we incur is about $20 a test roughly. It's very, very low cost.

Mr. Harper. Are those tests performed at your facility or sent out to a lab?

Mr. Mishek. They are sent out to a national lab.

Mr. Harper. Okay. Mr. Cartwright.

Mr. Cartwright. Very similar. We use the same guidelines just like Hazelden Betty Ford Center, very similar in terms of intake. We generate about $50 for a urine sample, but we also own and operate our own laboratories. Two of them, one in Tennessee and one in the State of Louisiana.

Mr. Harper. So those are sent out to those facilities for testing?

Mr. Cartwright. Correct.

Mr. Harper. Okay. Mr. Niznik.

Mr. Niznik. We also test upon admission. And then on average, it's about 1-1/2 times per week, but it's generally in the discretion of the medical doctor that's overseeing the care of the patient to order whatever test they think is medically necessary. We send it out to the lab that we operate in Florida.

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

Mr. Harper.    Is your mike on?

Mr. Niznik.    Yeah.

Mr. Harper.    How many labs and what do you charge, that you own.

Mr. Niznik.    We own one lab.    We operate one lab.    It services all of our facilities.    And our average, I think, reimbursement is somewhere around $200 to $300.

Mr. Harper.    Okay.    I'll yield to Ms. DeGette for a followup.

Ms. DeGette.    So you say that you test on the average of 1-1/2 times per week. You send it out to your lab.    Are you then billing the insurance the $200 to $300?

Mr. Niznik.    Yes, that's the reimbursement we receive from the -- no, that's the reimbursement we receive from the insurance company.

Ms. DeGette.    Right.    So you're billing the insurance $200 to $300 per 1-1/2 times a week, whereas these other labs -- or these other facilities aren't charging their people anything.

Thank you, Mr. Chairman.

Mr. Harper.    Final question, and Mr. Cartwright, I pulled up drugabuse.com, which is yours.    And going through the website it has, you know, lots of information.    It talks about the opioid crisis.    It has an 800 number.    You know, "it's not too late to turn your life around," you know, "overcoming your addiction."

While we don't measure success or outcome, it certainly might imply to one, that I will get that outcome if I go there.    But you have to go to the small "I" that I asked Mr. Ventrell about earlier to find out that your visit will be answered by American Addiction Centers, AAC, or a paid sponsor.

Why wouldn't you just list that information at the top of your web page?    You

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

have to go hunt for that, either under the number or other things. Why wouldn't you do that?

Mr. Cartwright. Again, our business model is very similar to WebMD. If you'd like us to change it and put it at the very top, I'm happy to do --

Mr. Harper. I'm not asking you -- I'm not asking about WebMD. I'm asking you, if we're talking about transparency and what we're looking at here so that it's nothing is viewed to be deceptive, wouldn't it be easy just at the beginning of your web page to say that information?

Mr. Cartwright. Yes, sir, we can do that.

Mr. Harper. Who are the paid sponsors?

Mr. Cartwright. It's the advertisers that we were referring to earlier in the conversation.

Mr. Harper. Who determines on that call whether or not it goes to AAC or to a paid sponsor?

Mr. Cartwright. All of the phone calls that are coming in through the 1-800 number that is like that, they all come to American Addiction Centers.

Mr. Harper. Okay.

Mr. Cartwright. The paid sponsors is referring to if they have an ad, and it's very clear who that company is.

Mr. Harper. Do you send anything to an unpaid sponsor? Or is there such a thing as unpaid sponsor?

Mr. Cartwright. Yes, there is.

Mr. Harper. Okay. And how do you rotate -- a call comes in, how do you

**This is a preliminary, unedited transcript. The statements within may be inaccurate, incomplete, or misattributed to the speaker. A link to the final, official transcript will be posted on the Committee's website as soon as it is available.**

determine who it goes to?

Mr. <u>Cartwright.</u>   It's not a call that comes in.   If they're looking on the website, and if you go down through the website and you look in Colorado, look in Denver, Colorado, it would have all the local providers in that area.   They wouldn't have to pay for that listing.   It would have all of them listed there.   All the not-for-profit agencies, all the hospitals, treatment centers.

Mr. <u>Harper.</u>   But if I call that 800 number, or 877 number, whatever it is, if I were to call that, it would go to a facility or go to the hotline?

Mr. <u>Cartwright.</u>   That would only come to American Addiction Centers.

Mr. <u>Harper.</u>   Okay.   All right.   I got it.

I want to thank everyone for their testimony.   This is an issue that we're obviously concerned, but I thank you for your time, your patience, for your responses.

I would remind members that they have 10 business days to submit questions for the record.   And I would ask the witnesses that you respond as promptly as possible when you get such questions.

With that, the subcommittee is adjourned.

[Whereupon, at 12:10 p.m., the subcommittee was adjourned.]