# Exhibit E

![American Addiction Centers logo — People Who Care. An Approach That Works.]

200 Powell Place
Brentwood, TN 37027
AmericanAddictionCenters.org

**Michael T. Cartwright**
Chairman and Chief Executive Officer
(615) 732-1613
michael@contactaac.com

**VIA HAND DELIVERY AND EMAIL**

October 11, 2018

The Honorable Gregg Harper, Chairman
Subcommittee on Oversight and Investigations
Committee on Energy and Commerce
United States House of Representatives
2125 Rayburn House Office Building
Washington, D.C. 20515-6115

**Re: Addiction Treatment Industry Marketing Practices; NAATP; Lead Generation and Online Directories**

Dear Chairman Harper:

On behalf of American Addiction Centers, Inc. (together with its affiliates, "AAC"), thank you for allowing me to testify before the Subcommittee on Oversight and Investigations ("Subcommittee") at the July 24, 2018 hearing entitled "Examining Advertising and Marketing Practices within the Substance Use Treatment Industry." I was honored to speak with the Subcommittee about AAC and the addiction treatment industry. On August 31, 2018, AAC submitted written responses to the Subcommittee in connection with certain information requested at the hearing, and I appreciate the opportunity to provide the enclosed information in response to the Subcommittee's additional questions for the record (see attached Exhibit A).

While AAC has championed reform meant to flush out deceptive advertising about addiction treatment options, it does not want to help put limits on patient access to legitimate treatment providers in any way. Terms like "leads" and "lead generation" have been used pejoratively in the discussion over marketing reform. In our enclosed supplement to the hearing record, we offer

some observations that we hope make the conversation around marketing more enlightening, by identifying legitimate forms of advertising and clarifying some marketing-related terminology. We also appreciate the opportunity to supplement the hearing record by addressing certain statements made to the Subcommittee by certain treatment providers, as well as information provided to the Subcommittee, some of which significantly mischaracterizes AAC's marketing and operational practices.

We note that some of the Subcommittee's follow-up questions do not concern marketing, which was the topic of the hearing, but rather address clinical and healthcare delivery matters. We are happy to answer such questions, as well as marketing-related ones. We respectfully request that the Subcommittee also direct the same questions to Hazelden Betty Ford Foundation ("Hazelden Betty Ford") and Caron Treatment Centers ("Caron"), that it has asked of AAC, since each has also testified before Congress as part of the Subcommittee's examination of the addiction treatment industry. The Subcommittee should obtain the same information from Hazelden Betty Ford, Caron, and as wide a group of treatment providers as possible, so that any such assessments related to patient care, quality of service, and ethical marketing is well-informed and representative.

While Hazelden Betty Ford, Caron and NAATP have made laudable contributions to addiction treatment, AAC is concerned that some not-for-profit peer companies are pursuing anti-competitive agendas. Many at AAC, including myself, have worked for both not-for-profits and for-profits. "Not-for-profit" and "for-profit" are tax classifications, not indicators of quality of care or ethics. Unnecessary feuding by treatment industry leaders ultimately hurts those brave enough to seek treatment. Our shared focus should be on individuals recovering from a substance use disorder. Alleviating their suffering, should be our goal. Those individuals should have access to as much accurate information about treatment options as possible, online and elsewhere.

Appropriately, there was unanimity among panelists at the July 24, 2018 hearing that misleading marketing practices must be curtailed. However, the July hearing showed that even some leading industry organizations that testified are either confused or misinformed about credible, legitimate marketing mediums, such as AAC's recovery resource websites. NAATP expressed surprise at the hearing that hundreds of its treatment center members collaborate with AAC to promote their treatment centers. Industry leaders like AAC and NAATP should meet to iron out such confusion.

Addiction treatment industry leaders should be standing shoulder to shoulder in reform efforts. AAC has offered to meet with each of Hazelden Betty Ford, Caron and NAATP in hopes of collaborating to elevate treatment industry standards, as well as resolving any misunderstandings. AAC is hopeful that these peer companies and NAATP will be willing to work together to foster industry unity and best practices. AAC awaits replies to its invitations.

Thank you for the attention being paid to addiction treatment. We hope that this federal interest and support continues.

Sincerely,

Michael T. Cartwright
Chairman & Chief Executive Officer
American Addiction Centers

cc:     The Honorable Diana DeGette, Ranking Member
         Subcommittee on Oversight and Investigations

Enclosures

EXHIBIT A

**AMERICAN ADDICTION CENTER'S RESPONSE TO SUBCOMMITTEE'S
ADDITIONAL QUESTIONS FOR THE RECORD**

**DATED SEPTEMBER 26, 2018**

**<u>The Honorable Gregg Harper</u>**

1. **According to information provided to the Committee, AAC said it receives more than 40,000 calls each month. How many of those calls result in an admission to one of your facilities?**

   AAC previously provided this information to Committee staff. Please refer to the information previously submitted.

   The vast majority of calls do not result in an admission to an AAC facility. Many callers cannot be treated by AAC because screening indicates that they have medical or psychiatric conditions of a nature that AAC does not specialize in or treat. Many callers explore treatment options for themselves or loved ones but decide that treatment is not necessary or that another treatment organization would be a better fit. Other callers desire to receive treatment in geographic locations where AAC does not have treatment operations.

   While the vast majority of callers will not seek to be admitted to an AAC facility, AAC call center employees try to be as helpful and engaging as possible in answering questions about treatment options. They know that it takes courage to consider getting help and understand that the disease of addiction involves denial. As first responders to an addict's call for help, AAC expects each caller to be treated with empathy and urgency.

   AAC endorses the Shatterproof National Principles of Care. In particular, AAC endorses Shatterproof's principles advocating fast access to treatment, which can be found at https://www.shatterproof.org/shatterproof-national-principles-care.With respect to this, Shatterproof states:
   - **Fast access to treatment:** Addiction alters brain chemistry. So when an individual is able to seek treatment, that moment must be seized.
   - **Rapid access to appropriate substance use disorder care – What that means:** Ability to rapidly engage individuals in the type and intensity of services that promptly meets their needs.
   - **Why it matters:** Brain circuits associated with motivation, inhibition, and stress tolerance are often severely affected among individuals with an SUD. Thus, periods of motivational readiness rarely sustain and rapid access to appropriate care is critical.

- 1 -

**a. How are the majority of calls that your company receives generated (a specific website, an advertisement, etc.)?**

AAC receives calls from numerous channels. Calls are generated by word-of-mouth, television, print or radio advertising, referrals from alumni, suggestions made by healthcare providers to their patients, visits to AAC's facility websites and Recovery Brands website directories, as well as the directory of treatment providers operated by the Substance Abuse and Mental Health Services Administration at https://findtreatment.samhsa.gov.

**2. Are AAC's call center employees sales representatives or do they have any clinical background?**

**a. Do they disclose that status to callers?**

Yes. AAC call center employees identify themselves as such. For additional information, please see our responses to Question 3.

**3. The decision to seek treatment for yourself or a loved one is a big decision, and one that many individuals make without a good understanding of the treatment options that are available or that would best meet their needs. It's a big responsibility for whomever is on the other end of the line. How are the employees that are answering the phones trained?**

AAC trains its call center employees to empathize with helpline callers and engage with them. Many seeking help for addiction complain that they get stuck in a system with providers who don't address their needs with sufficient urgency. Additionally, AAC has provided the Subcommittee with information as to AAC's and its CEO's leadership in treatment of "dual diagnosis" patients who suffer co-occurring psychiatric disorders, in addition to addiction. Though the addiction treatment industry has made significant strides in treating dual diagnosis patients, it is often still challenging for them to find comprehensive care. A discussion of the access to care issues facing dual diagnosis patients and their families is contained in *Clean: Overcoming Addiction and Ending America's Greatest Tragedy*, including the book's discussion "Treating Dual Diagnosis."[1]

As we stated in our prior submission to Subcommittee staff, call center employees, upon being hired by AAC, must complete comprehensive training before taking any calls from potential patients. This month-long training includes classroom programs

---

[1] Sheff, David. *Clean: Overcoming Addiction and Ending America's Greatest Tragedy*, Part VI, Chapter 15, "Treating Dual Diagnosis pp 237-250. New York: Houghton Mifflin. 2015. Mr. Sheff is also the author of the memoir, *Beautiful Boy: A Father's Journey Through His Son's Addiction*; New York: Houghton Mifflin. 2008.

on understanding the disease of addiction; understanding the callers' motivation for treatment; sales ethics and trust; compliance and security; communications skills meant to ensure call center employees listen with empathy and build rapport with callers; and fundamentals of health insurance coverage.

### a. Do those answering the calls perform any sort of assessment of a caller's medical or treatment needs over the phone to ensure the caller can be properly treated at an AAC facility?

For the purposes of this discussion, it is important to differentiate between a *screening* and a clinical *assessment*. AAC's call center employees perform highly structured *screenings* that elicit basic information necessary to know whether it may be appropriate and beneficial for the caller to receive our services. The clinical *assessment* is conducted face-to-face with the patient by a credentialed clinical or medical professional before admission to any facility. This is typical of most healthcare environments and is consistent with the requirements of most major healthcare insurance companies. *A patient may only be admitted following a licensed physician's medical review. Further, please understand that a physician may not admit a patient for treatment unless treatment is, in that physician's judgment, medically necessary. Moreover, health insurance companies and other payors will not pay for care they determine to be medically unnecessary.* If these questions are intended to explore whether treatment centers are providing unnecessary addiction treatment, these many checks and safeguards in AAC's processes, as well as the healthcare system generally, should be noted.

We do not believe it is best practice, or feasible, for physicians or other licensed clinicians, to conduct comprehensive medical assessments via phone. Nor would this be acceptable to payors. Our multi-tiered process ensures that admitted patients receive clinically and medically appropriate care.

### b. Do they have any formal education, certifications, or accreditation to be doing a clinical assessment and recommending or referring individuals to a treatment facility that is right for that patient?

As explained in our answer to Question 3, AAC call center employees do not conduct clinical *assessments*; rather they conduct *screenings*.

AAC's call center employees have diverse backgrounds, including many people in personal recovery from addiction, with varying levels of education and job history. They receive the comprehensive job training discussed above. As described in AAC's prior submission to the Subcommittee, screenings are conducted under guidelines that have been established by leading addiction treatment industry clinicians.

Call center employees are trained to ask about:

- 3 -

1) Current and past substance use
2) Previous treatment history
3) Presence of comorbid psychiatric issues
4) Risk of harm to self or others
5) Presence of comorbid medical issues
6) Family/environment support
7) Special needs or preferences
8) Legal/employment problems

**c. If the employees that are answering these calls have no medical training, and in some cases no formal educational training at all, do you believe that they are qualified to be making recommendations to individuals seeking clinical treatment?**

AAC call center employees do not conduct clinical *assessments*; rather they conduct *screenings*, as described in Question 3a. above.

Typically, if an individual is identified through the screening process as a candidate to receive care from a company facility, the patient is scheduled for a clinical assessment at that particular facility. In a substantial number of cases, there is an intermediate step between the screening and clinical assessment. In such cases, the screening may identify a possible medical or psychiatric issue that requires further consideration before a clinical assessment is scheduled. In such cases, screening results may be sent to a multidisciplinary admissions team at the particular facility. This team typically includes the facility Medical Director, Director of Nursing, Clinical Director, and chief operating officer or chief executive officer, who may confer and make a decision regarding whether the patient appears to be appropriate for the facility's services. When more information may be needed, the facility team may review previous medical records or speak to the patient or their family to gather additional context.

At the facility, potential patients receive a comprehensive clinical assessment, conducted by appropriately credentialed and licensed medical professionals, including the following:

- Nursing assessment (Including substance use history and nursing review)
- Physician assessment (Complete History and Physical and Psychiatric Evaluation)
- Clinical assessment (Addiction Severity Index assessment and/or biopsychosocial inventory)
- Aftercare assessment (Discharge planning)

This information is subsequently reviewed and integrated into a clinical summary that forms the basis of a patient's initial treatment plan.

- 4 -

4. **If a caller agrees to enroll at an AAC facility, does the caller speak with anyone with medical or treatment expertise before his or her arrival at an AAC facility?**

Yes, in cases where the screening process has identified a potential complex medical or psychiatric issue, clinicians from the multidisciplinary team described above may speak to the potential patient and sometimes his or her family.

5. **Do AAC staff conduct a medical assessment of patients once they arrive at a facility?**

Yes, consistent with AAC policy. Please see our responses to Questions 3 and 4.

    a. **Under what circumstances would an AAC facility turn someone away or take them to another hospital or facility?**

    If the comprehensive clinical assessment identifies psychiatric, medical or other needs that were not previously identified, the AAC facility typically works with local hospitals, physicians and healthcare providers to assist the inquiring patient and/or family in identifying an appropriate care provider. For example, medical stabilization may be required for an issue previously unknown to the patient and identified during the clinical assessment.

    b. **How frequently do AAC facilities decline to enroll patients because they have medical or psychiatric conditions AAC is not able provide adequate care for?**

    Please see our responses to Questions 1, 3 and 4.

6. **How many deaths have occurred at AAC facilities? Please provide details regarding the date and facility at which these deaths occurred**.

The disease of addiction claims tens of thousands of lives every year nationwide. Every single one of those deaths is a tragedy, whether it happens in a hospital, a treatment facility, at home or on the streets. Giving and receiving addiction treatment is hard work, and while sometimes tragic and heartbreaking, there is much joy in helping others recover from addiction and reclaim their lives. AAC is proud of its safety record relative to the industry as a whole. We have treated tens of thousands of patients across our 39 facilities and patient safety is our top priority.

The Substance Abuse and Mental Health Services Administration ("SAMHSA"), a branch of the U.S. Department of Health and Human Services, examined 3.44 million client discharges from substance abuse treatment nationwide during 2010 and 2011. It found that 8,143 clients died while in treatment, a rate of one death for every 422

client discharges.[2]  AAC's Compliance Department found that, for the most recent full five-year period, such sentinel events at the company's facilities are 10 times less frequent than the industry average shown in the SAMHSA study – a rate of one sentinel event for every 4,274 discharges, as opposed to one event for every 422 client discharges in the industry as a whole.

AAC respectfully requests that the Subcommittee obtain data regarding the frequency of sentinel events asked of AAC from other treatment organizations, including Caron and Hazelden Betty Ford, as well as any available data that NAATP has with respect to frequency of sentinel events at its member organizations. Any patient-specific information must be provided in a manner that is compliant with federal and state patient privacy laws, including 42 CFR Part 2 –  Confidentiality Of Substance Use Disorder Patient Records and the Health Insurance Portability and Accountability Act of 1996.

AAC believes that the issue of patient safety in the addiction treatment industry is of significant public interest. However, it is AAC's opinion that media reports about patient deaths at addiction treatment centers are often sensationalized and frequently present only the view of plaintiff's lawyers or other interested parties. The public would benefit from up-to-date, data-driven analyses of safety in the addiction treatment industry, using broad data sets rather than anecdotal incidents at some treatment centers.

Moreover, media reports about safety incidents in the addiction treatment industry rarely, if ever, are reviewed in the context of data-driven studies that show addiction treatment centers play a key role in reducing alcohol and drug related deaths and benefiting American society as whole. For an example of such academic research, please see https://econofact.org/access-to-substance-abuse-treatment-drug-overdose-deaths-and-crime. The researchers conclude:

> *"Our work shows that having more treatment facilities reduces drug-induced mortality and reduces crime. This evidence provides strong backing for policies to expand access to treatment not just in terms of its effectiveness, but also because it gives some indication that doing so would be cost-effective. The average cost of operating one facility is $1.1 million annually. Our estimates indicate that an additional facility saves one life lost through drug-induced mortality every two years on average. Our results also indicate that they reduce costs associated with crime by $1.2 million to $2.9 million annually. As such, there is good reason to encourage access to treatment facilities in our communities, even for individuals whose lives are unlikely to be directly affected by drug abuse. For those who value the life-saving benefits of such facilities, the case is even clearer."*

---

[2] See: https://www.samhsa.gov/data/sites/default/files/2010_Treatment_Episode_Data_Set_Discharge_Tables/TEDS2010D_Web.pdf; See also https://wwwdasis.samhsa.gov/dasis2/teds_pubs/2011_teds_rpt_d.pdf.

AAC believes that leaders in the addiction treatment industry need to collaborate on further studies examining the benefits of addiction treatment.  In his remarks to the Subcommittee at the July 24, 2018 hearing, AAC CEO Michael Cartwright stated: *"While there is rightfully a lot of attention being paid to bad marketing practices, I hope we don't lose sight of all the great work most treatment centers do. Treatment works."*  AAC has provided the Subcommittee with its Client Outcomes study illustrating the benefits of treatment based on a study in which more than 4,000 of AAC's clients voluntarily participated. The study is available at https://americanaddictioncenters.org/outcomes-study/.

AAC would like to meet with NAATP and Hazelden Betty Ford to discuss how industry leaders can support more such research. Increased research on clinical outcomes, in AAC's opinion, will help elevate the quality of addiction treatment and the public's understanding of it.

**a. What is AAC's after-action policy for a death at one of its facilities? Is any evaluation or review of the facility required after a death? If so, were these conducted for each incident?**

AAC facilities have rigorous sentinel-event procedures.  AAC facilities are licensed by each respective healthcare governmental authority and accredited by either The Joint Commission or the Commission on the Accreditation of Rehabilitation Facilities ("CARF").  In the event of a patient death or other sentinel event, each AAC facility follows policies consistent with requirements of the applicable States and accreditation bodies. At a high level, this includes the following: (1) preventive reporting; (2) documentation; (3) root cause analysis and corrective action, if necessary; and (4) timely debriefing conducted following critical incidents.

**7. AAC told Committee staff that it closed the facility A Better Tomorrow in 2017. Why was the facility closed?**

AAC previously informed Committee staff that its remaining Murrieta, California operations closed in 2017 as part of a strategic consolidation of operations in Southern California.

**8. According to your testimony, AAC sends urine tests out to its own labs for testing and the company will "generate about $50 for a urine sample." Please clarify whether this is the amount AAC bills per test, the amount reimbursed by insurance per test, or whether this figure refers to something else.**

$50 is the approximate amount, per test performed, that was paid by insurers in the second calendar quarter of 2018.

9. **According to your testimony, 300 treatment providers who are members of the National Association of Addiction Treatment Providers either list or advertise on AAC-run websites. Can AAC provide a list of those NAATP members?**

   a. **Do treatment providers have to affirmatively request their facility be listed on an AAC-run website to be included in the listings or would AAC choose to include treatment providers without their express consent?**

   b. **Have any facilities or providers asked to be removed from AAC's listings? If so, have they been removed?**

The list has been previously provided to the Subcommittee and NAATP. Please note that eleven NAATP board members represent organizations that currently use Recovery Brands marketing services. AAC and Recovery Brands are proud to serve these peer companies. For additional information, please refer to AAC's prior submission to the Subcommittee, as well as our response to Question 12.

Further, as noted in the presentation accompanying AAC's written July 24 hearing testimony, more than 1.8 million website visits to Recovery Brands online directories have resulted in directory users finding treatment information for non-AAC facilities.

AAC respectfully requests that NAATP provide the Subcommittee with a list of addiction treatment providers NAATP removed for alleged ethical violations, as well as the justification for such removal. AAC also asks that NAATP indicate whether the members removed were not-for-profit or for-profit entities.

10. **Do treatment providers have to pay to be included in AAC's listing directory?**

No. Please see our response to Question 12.

   a. **How much does AAC charge treatment providers to be paid advertising sponsors on its websites?**

   Please see our response to Question 12.

11. **Can AAC provide a list of websites that it currently operates under its Recovery Brands portfolio?**

Please refer to the list previously provided to the Subcommittee.

   a. **Do all of these websites disclose ownership or affiliation with AAC?**

Yes.  In response to requests by you and NAATP at the hearing, we have enhanced existing disclosures.  Please see "American Addiction Centers Upgrades Recovery Community Websites," August 22, 2018, at https://www.thefix.com/american-addiction-centers-upgrades-recovery-community-websites and Exhibit B.

**12. Is there anything else that you'd like to add, clarify, or correct for the record?**

Yes. Thank you for the opportunity to provide additional information to the Subcommittee.  AAC would like to clarify and comment on statements made by Hazelden Betty Ford CEO Mark Mishek and AAC Chief Executive Center Michael T. Cartwright, at the July 24, 2018 hearing entitled "Examining Advertising and Marketing Practices within the Substance Use Treatment Industry."

**Discussion of "Leads" at July 24 Subcommittee Hearing; Need for further Treatment Industry Discussion and Collaboration About Marketing Practices**

Much emotion surrounds  addiction, addiction treatment and the current opioid epidemic. Unfortunately, the outrage about some addiction treatment providers' alleged deceptive marketing practices is so hyperbolic, however, that some useful marketing practices, used throughout the industry by good healthcare providers, are being conflated with the unethical practices of some bad actors.

For instance, the terms "leads" and "lead generation" have become pejoratives in the addiction treatment industry. In fact, NAATP's Code of Ethics expressly prohibits the "buying and selling of patient leads."[3]

---

[3] See https://www.naatp.org/resources/ethics/code-ethics , Section IV.3.  AAC has asked NAATP to meet to address this issue regarding "leads" and "lead generation" further. As stated to the Subcommittee, AAC is not a "call center aggregator."  AAC would appreciate the opportunity to meet with NAATP's personnel to discuss NAATP's Code of Ethics, as well as how NAATP applies this code to for-profit operators as compared to not-for-profit companies that engage in lead generation.

With respect to lead generation, we note that NAATP serves as an advisor to LegitScript, LLC ("LegitScript"), which certifies addiction treatment center providers for the Google Ads online marketing platform. See https://www.legitscript.com/blog/2018/04/legitscripts-new-certification-program-for-addiction-treatment-providers-will-help-those-most-vulnerable/.

We would like to discuss with NAATP how it reconciles its ban on buying or selling of leads with LegitScript's addiction treatment advertising certification standards. More specifically, we would like to discuss how NAATP, on the one hand, bars the buying or selling of leads in its code of ethics, but on the other hand, advocates for its members to advertise on the Google Ads platform.  The Google Ads lead generation process involves competitive bidding among companies for prominent placement of their advertisements with search engine results for relevant keywords. See https://support.google.com/google-ads/answer/1722135?hl=en. In the addiction treatment industry, these include terms such as "drug abuse treatment" and "treatment for alcoholism." The Google Ads process is perhaps the largest form of lead generation in the addiction treatment industry. Examples of NAATP members' recent use of Google Ads is attached as Exhibit C.

- 9 -

However, all treatment centers – indeed, all businesses, generally – participate in "lead generation." A "sales lead," according to BusinessDictionary.com is an "[i]nquiry, referral, or other information, obtained through advertisements or other means, that identifies a potential customer (prospect)." In other words, the term "lead" refers to all forms of outreach to and identification of potential clients, whether through advertising, business referrals, promotion or other forms of marketing, publicity or communication.

All treatment centers seek to identify potential clients. Most, if not all, engage in paid advertising. As written, NAATP's Code of Ethics regarding the buying or selling of leads would require NAATP to remove most, if not all, of its members.

A more nuanced and informed discussion of "lead generation" in the addiction treatment industry would not ask only the question, "Does your organization buy or sell leads?," implying that any sort of advertising or promotion is inappropriate and unethical. Rather, a more productive inquiry would ask questions such as:

- Does your organization generate leads by advertising or marketing in a way that is deceptive of harmful to a prospective patient?
- Does your organization generate leads by engaging in patient brokering, or paying bribes, kickbacks or other such payments in order to induce patient referrals?
- Does your organization operate a call center that generates leads by gathering information about potential patients and then selling that individual patient's information to third parties?

---

AAC supports LegitScript's efforts to weed out bad actors in the addiction treatment industry. LegitScript, in AAC's opinion, has drafted what is generally a thoughtful definition of "lead generator" that allows addiction treatment companies with ancillary lead generation businesses to advertise on Google Ads. See https://www.legitscript.com/service/certification/addiction-treatment/:

*An applicant is a **lead generator** if:*

- *Your website is not owned, operated or commonly controlled by the entity that owns or operates the addiction treatment provider to which it refers internet users, and*

- *You refer potential clients to third party addiction treatment providers, irrespective of whether those addiction treatment providers independently meet LegitScript certification criteria.*

*This is not intended to prohibit bona fide addiction treatment applicants that, as an ancillary part of their business, refer patients to other addiction treatment centers. It is intended to prohibit applicants for whom the primary business strategy is compensated, for-profit referrals and that otherwise meet the definition of these bullet.* (Emphasis added. AAC does not believe that any ethics certification process should favor not-for-profits over for-profits, as tax classification is not an indicator of quality or integrity).

AAC notes that its Recovery Brands website business constitutes only approximately 2% to 3% of its consolidated revenue and that AAC's primary business is its operation of addiction treatment facilities.

- 10 -

- Does your organization generate leads through websites that don't disclose publicly who owns or operates them?
- Does your organization generate leads by engaging in ethically questionable sales and marketing activities, such as providing payments, gifts or benefits to third party interventionists in order to induce patient referrals?
- Does your organization generate leads by engaging in ethically questionable loan programs, under which potential patients and their families are encouraged or offered the ability to mortgage their homes in order to access funds to pay for treatment?

This confusion about "leads" in the treatment context was evident at the Subcommittee's July 24, 2018 hearing. At the hearing, the Subcommittee asked each participating treatment provider multiple times, whether their companies had "paid for or sold leads." Mr. Cartwright responded, in part, as follows:

> *"No, we don't pay for or sell leads, Recovery Brands has an advertising model very similar to WebMD or yellowpages.com and I'm assuming that Hazelden Betty Ford and NAATP must like that model, because about 300 of the NAATP members are advertisers, about half of our advertising revenue comes from NAATP members, so we hold ourselves up as a solid organization, of the way you can and should do advertising on the Internet."*

Mr. Cartwright's testimony conveyed that not all "lead generation" or other forms of advertising are inherently unethical. Asking whether an addiction treatment "buys or sells leads" with a pejorative connotation is in effect asking the loaded question: "Do you engage in deceptive marketing?" To that question, AAC's answer was and is, "No."

Hazelden Betty Ford's CEO Mark Mishek and other panelists were also asked if they "buy or sell leads". Each answered that they had never done so.

Mr. Mishek, in fact, specifically denied Mr. Cartwright's statement that Hazelden Betty Ford had ever used Recovery Brands to advertise its treatment centers. "No, we never have," Mr. Mishek said.

In fact, Hazelden Betty Ford has and continues to actively promote its facilities on Recovery Brands websites. Enclosed as Exhibit D are the following documents: (i) email correspondence from Hazelden Betty Ford marketing personnel approving a Recovery Brands marketing partnership intended to increase website visits and phone calls to Hazelden Betty Ford, as well as related correspondence; (ii) correspondence from Hazelden Betty Ford marketing personnel to Recovery Brands dated July 16, 2018 (the week before the Subcommittee's July 24, 2018 hearing), in which Hazelden Betty Ford personnel ask for Recovery Brands' assistance in responding to online reviews written by treatment center alumni; (iii) screenshots of Hazelden Betty Ford profiles on AAC's rehabs.com site that Recovery Brands that were prepared in collaboration with Hazelden Betty Ford marketing personnel; and (iv) related documentation regarding Hazelden Betty Ford's and Recovery Brands' marketing collaboration.

- 11 -

Hazelden Betty Ford, by collaborating with rehabs.com and other Recovery Brands sites to generate visits to their websites and calls to its call centers, has done nothing unethical or inappropriate. Indeed, it has increased its connectivity to those seeking treatment for addiction.  These collaborative listings benefit the treatment centers who reach out to Recovery Brands to prepare their listings. Most importantly, these collaborative listings benefit those seeking help for addiction who visit rehabs.com, who conveniently find information about high quality treatment centers in the website's directory.  AAC and Recovery Brands seek to promote this access to information and care.  It is pleased to work with Hazelden Betty Ford and 300 NAATP member treatment centers.  This kind of collaboration is decidedly <u>not</u> unethical or illegal "lead generation."

We believe that NAATP, AAC and other industry leaders should have an honest discussion about Recovery Brands' services and online marketing in general.  As the Subcommittee's hearing demonstrated, even industry trade organizations and leading treatment providers have trouble distinguishing between what does and does not constitute deceptive marketing. We have asked NAATP and other treatment centers that have provided information and testimony to the Subcommittee to meet so that we can have a more balanced conversation about addiction treatment marketing practices.  If industry organizations and elected officials wish to ban or regulate online directories, it would be helpful to openly and transparently debate the issue.

### **Mischaracterization of AAC Marketing Practices**

The Subcommittee has been provided information that mischaracterizes AAC's marketing and operational practices.

An example of this mischaracterization occurred in the written testimony that Douglas E. Tieman, Caron President and CEO, submitted to the Subcommittee at the hearing on December 12, 2017 entitled, "Examining Concerns of Patient Brokering and Addiction Treatment Fraud."  At this hearing, Mr. Tieman testified about alleged "predatory web practices" and misleadingly identified recovery.org as an example.  Mr. Tieman's written testimony included a discussion of "unethical marketers that have taken advantage of Caron [Treatment Centers]."[4]  In testimony regarding examples of alleged piracy of Caron Treatment Centers website and telephone listings, Mr. Tieman followed his other allegations by identifying  recovery.org for "prominently including phone numbers that do not connect callers to Caron … [and] that the recovery.org website is owned by a treatment center not affiliated with Caron." After learning of Mr. Tieman's testimony to the Subcommittee, Recovery Brands called all of the phone numbers listed as numbers for Caron's centers and determined that some phone numbers were no longer in service

---

[4] Mr. Tieman's testimony is available at https://docs.house.gov/meetings/IF/IF02/20171212/106716/HHRG-115-IF02-Wstate-TiemanD-20171212.pdf.

while others reached the appropriate Caron facility.  But none of the listed phone numbers were "hijacked" by another addiction treatment center or call center.[5]

In fact, Caron and Recovery Brands have interacted with respect to Recovery Brands websites for some time.  As part of this collaboration, Recovery Brands has provided Caron with information on how to access its directory listings on Recovery Brands websites and to correct any out-of-date contact information.

Mr. Tieman's testimony failed to mention or disclose that Caron has engaged for its own benefit with AAC's Recovery Brands by responding **one hundred twenty-five (125)** times to user reviews of its facilities on the Recovery Brands' website rehabs.com. Nor did he mention that Caron previously approved its facility listing on a Recovery Brands website.  Caron's active and direct engagement with these online user reviews is demonstrated in the documents attached as Exhibit E.  Exhibit E also contains email correspondence from 2015 illustrating Caron's approval of listing its written profiles on Recovery Brands, as well as an email sent to Recovery Brands approximately one month before the Subcommittee's December 12, 2017 hearing (at which Mr. Tieman testified) requesting profile update information.

Mr. Tieman's testimony suggests that certain not-for-profit treatment centers may be attempting to take advantage of  the Subcommittee's investigative process for anti-competitive purposes.  Additionally and respectfully, AAC asks the Subcommittee to ask each of the same questions – or similarly tailored ones – of other testifying treatment organizations that are being asked of AAC.  This will provide more information to the Subcommittee and allow a more balanced view of treatment industry practices.

Please note that AAC has asked Caron to meet to discuss concerns it has over any AAC websites.

**Previous Unsuccessful NAATP Member Litigation Against Recovery Brands**

Caron was not the first not-for-profit peer of AAC, with a prominent position in NAATP, to publicly mischaracterize Recovery Brands' websites and marketing operations. Since its establishment in 2011, a number of not-for-profit treatment centers have alleged that operation of addiction treatment center directories for profit is inappropriate, or even illegal.

For example, in 2014, Seabrook House, a not-for-profit treatment center located in New Jersey, which is represented on the NAATP board of directors, sued Recovery Brands in federal court, alleging that inclusion of Seabrook House in the www.rehabs.com online directory constituted trademark infringement and unfair competition. Seabrook House later voluntary dismissed the suit with prejudice, receiving no settlement payment. Alcoholism & Drug Abuse Weekly reported on the lawsuit in its November 3, 2014

---

[5] The Hazelden Betty Ford Foundation recently filed a lawsuit against what it alleges are predatory marketers of the nature described in Mr. Tieman's testimony.  The lawsuit's defendants include Addiction Campuses and Addiction Enders, which are not affiliated with and should not be confused with American Addiction Centers' operations.

- 13 -

edition. A news report discussing dismissal of the case can be found at https://www.behavioral.net/news-item/seabrook-house-drops-marketing-lawsuit.

AAC believes that certain not-for-profit NAATP members are trying to re-litigate issues about Recovery Brands' directories that have already been dismissed in federal court, by providing inaccurate information to governmental authorities about Recovery Brands' marketing practices.

At the heart of the conflict between certain members to NAATP, on the one hand, and Recovery Brands, on the other, is certain not-for-profit organizations' distrust of, and struggles to compete with, for-profit treatment operators. As the American healthcare industry has matured, many not-for-profit and for-profit subsectors of the industry have seen this kind of struggle. It occurred decades ago among acute care hospitals. It is now occurring in the addiction treatment subsector.

In this context, attacks by some not-for-profit entities against for-profit-entities are common. For example, at the July 24, 2018 Subcommittee hearing, Federal Trade Commissioner Rohit Chopra submitted a letter critical of for-profit treatment centers' business practices.[6] The letter may not necessarily reflect the views of the FTC, nor those of the current President of the United States of America, and AAC respectfully disagrees with its general assertions about for-profit treatment center operators. Further, AAC disagrees with the view that the FTC does not have jurisdiction over deceptive advertising by not-for-profit treatment operators. It is well established that the FTC has jurisdiction over the anti-competitive activities of not-for-profit healthcare operators.[7] Anti-competitive activity by certain peer not-for-profits harms AAC and Recovery Brands. And it consumes the valuable time of governmental employees and elected representatives. But more troubling, this kind of anti-competitive activity – particularly attacks on legitimate online directories and the business practices of high-quality for-profit treatment providers such as AAC – threatens to erode confidence in the addiction treatment industry. It could result in alcoholics and addicts finding it harder to access ethical, effective treatment centers, because of the stigmatization of credible, convenient informational sources such as AAC's Recovery Brands websites.

---

[6] See https://www.ftc.gov/public-statements/2018/07/letter-commissioner-chopra-congress-deceptive-marketing-practices-opioid.

[7] As a general matter, bona fide non-profit organizations are exempt from the FTC's authority for consumer protection matters (e.g., advertising) under the FTC Act. Specifically, the authority to enforce the FTC Act applies only to corporations that are "organized to carry on business for [their] own profit or that of [their] members." (see §44). That said, where a profit motive exists in relation to the non-profits' members, the FTC has jurisdiction. For example, in *FTC v. California Dental Association*, 526 U.S. 756, 765 (1999), the Supreme Court held that the FTC Act extends the FTC's jurisdiction to any corporation, company, or association "organized to carry on business for its own profit or that of its members . . . . whether the entity is organized as a non-profit; the matter in which it uses and distributes realized profit; its provision of charitable purposes as a primary or secondary goal; and its use of non-profit status as an instrumentality of individuals or others' seeking monetary gains." In other words, a not-for-profit entity that paid lavish executive salaries, whose executives have misappropriated funds or that did not provide sufficient charity care, would fall squarely within the FTC's jurisdiction.

- 14 -

Sixty percent (60%) of treatment centers are for-profit, according to information cited in Commissioner Chopra's letter. By contrast, individuals who represent not-for-profit organizations comprise 72% of NAATP's board members, according to AAC's best estimate.[8] Of course, this is not to say that NAATP has <u>no</u> meaningful for-profit representation in its membership. It certainly does. AAC has been a member in the past. AAC's Chairman and CEO, Michael Cartwright, who has both not-for-profit and for-profit executive experience, has previously served in NAATP's leadership.[9] In AAC's opinion, many outstanding treatment industry leaders sit on NAATP's board of directors. They come from both not-for-profits and for-profits. But based on information submitted to the Subcommittee by Mr. Tieman, the addiction treatment industry consists of 60% for profits. By contrast, it appears that only about 28% of NAATP's leadership represent for-profit entities.[10]

It is AAC's belief that only a certain number of influential not-for-profits in NAATP's membership are behaving in an anti-competitive manner. As a whole, AAC respects and admires all organizations that participate in NAATP, not-for-profit and for-profit alike. AAC believes that the conversation about addiction treatment marketing reform should include as many voices as possible.

It is unfortunate that in the midst of a nationwide addiction and mental health crisis, a number of addiction treatment industry leaders are making these baseless allegations. AAC has reached out to NAATP, Hazelden Betty Ford and Caron to end this unproductive feuding. Anticompetitive attacks are destructive to the mission of helping people recover from addiction. AAC appeals to the principles of Steps 8 and 9 of Alcoholics Anonymous, which are meant to foster reconciliation and improved relations.

> "*First, we take a look backward and discover where we have been at fault; next we make a vigorous attempt to repair the damage we have done; and third, having thus cleaned away the debris of the past, we consider how, with the newfound knowledge of ourselves, we may develop the best possible relations with every human being we know.*"[11]

### Need for Reliable Treatment Industry Online Directories

Seeking help for addiction treatment can be difficult. The unfortunate stigma around addiction, as well as time and confusion about options, is often a barrier to accessing

---

[8] Based on the best available information to AAC, 18 of NAATP's 25 board members represent organizations that are not-for-profit – i.e., 72% of the total board membership.

[9] Mr. Cartwright, AAC's CEO, currently serves on the Board of Trustees of the National Association for Behavioral Healthcare. https://www.nabh.org/about-nabh/board-of-trustees-staff/.

[10] See https://www.naatp.org/about-us/board.

[11] *Twelve Steps and Twelve Traditions*, p. 77. New York: Alcoholics Anonymous World Services, Inc., Twelfth Printing, 2005.

treatment. Because of the anonymity and privacy it affords, many people seeking treatment turn to the Internet.

Having a directory that lists treatment facilities by geographic location helps consumers to efficiently learn about available treatment options. AAC directories provide factual business information (such as name, address, website, and phone number) obtained from publicly available sources, along with an invaluable collection of user-generated alumni reviews to help people looking for treatment and their families make informed decisions about their care.

AAC's online directories provide those seeking help in determining what facilities are available in their areas without the need for multiple searches across various platforms, much like a phone book does. Our directory websites are similar to other listings and review websites, which are common on the Internet and useful to consumers. In general, we try to list all treatment facilities, just as www.google.com and www.yelp.com endeavor to include all available options, and www.yellowpages.com endeavors to include all businesses. User reviews on directory websites are a standard and widespread feature on Internet websites.

Directories in the addiction treatment industry include http://www.treatmentplacementspecialists.com/, which is operated by Acadia Healthcare (Notably, one of Acadia's healthcare facilities, Sierra Tucson, has a representative on NAATP's board of directors). A list of other examples of online directories in healthcare and other industries are included as Exhibit F.

To be clear, AAC as a company receives much benefit from operating these website directories – these are AAC websites, and the AAC helpline number is listed prominently on the website, resulting in calls to AAC from potential patients. However, and most importantly, patients benefit from our websites, which provide information regarding hundreds of treatment options across the country. A recent testimonial from someone who found treatment and entered recovery through our website directories is attached as Exhibit F. Furthermore, the treatment centers listed in our directories, including about 300 NAATP members, benefit from our directories as well. Many treatment centers that list on Recovery Brands thank us for providing them with a cost-effective online marketing channel. See Exhibit G for such a testimonial. As noted in the presentation accompanying AAC's written July 24 hearing testimony, more than 1.8 million website visits to Recovery Brands online directories have resulted in directory users finding treatment information for non-AAC facilities.

We encourage all facility operators to claim their listing free-of-charge in order to supply additional content or update contact information displayed in their listings.[12] We would

---

[12] We know of no well-regarded directory, whether the Yellow Pages or others that we have cited for you, that creates a listing only upon "express consent" of any listed business. We do believe, however, that any responsible directory will remedy any inaccuracies in any listing. Recovery Brands staff will discuss any such concerns brought to it by a listed treatment provider, such as reporting changes of address or phone numbers to us. Obtaining express consent of a listed business is certainly not a requirement to operate any directory; the listings that appear on our

- 16 -

also note that Recovery Brands works with facility operators to ensure that any claimed listings comport with SAMHSA's listing requirements.[13]  Furthermore, in order to be considered for a "Verification" designation, operators must submit additional documentation under Recovery Brands' verification guidelines, which involves a rigorous review of additional qualifications (including those regarding clinical licensure), beyond those required by SAMHSA.[14]

As discussed above and elsewhere in these responses, we work on a daily basis with providers across the industry to help them build out their facility profiles, so that potential patients are provided with good information.  For paid advertisers, Recovery Brands offers a customary pay-per-click and  pay-per-call model, which is used elsewhere in the healthcare industry and commonly in all forms of marketing.  The correspondence between Hazelden Betty Ford and Recovery Brands attached to Exhibit D reflect this model.  This is the model used by Hazelden Betty Ford in their paid engagement while it was in effect, and which Recovery Brands and many other NAATP members still use. Under this business model, paid sponsors pay Recovery Brands based on the number of times Recovery Brands' visitors click to that treatment centers website' or call the phone number that the treatment provider lists on the website. Neither AAC nor Recovery Brands acts as a "call center aggregator", take calls on behalf of non-AAC treatment centers or otherwise acts as a phone intermediary in this relationship. All calls go directly to the treatment centers who choose to advertise. All advertisements are listed as paid-for content.   None of this is illegal or unethical.  Please see Exhibit F, which illustrates that such kinds of marketing arrangements and online consumer directories are common.

The goal of addiction treatment marketing reform should be to weed out all bad actors. We applaud NAATP's efforts in this area.  At the same time, reform efforts should not limit patients from finding useful information, about credible treatment options, provided in a transparent manner.  AAC suggests, respectfully, that the Subcommittee ask all who have testified before it at its December 12, 2017 hearing and July 24, 2018, hearing the same questions it has asked of AAC, as well as (i) the organization's general view on the need for credible online directories, and whether they participate in or operate any such online directories or plan to do so (ii) how each organization defines the terms "leads" and "lead generation," (iii) whether the organization engages in forms of suspect or unregulated marketing, such as the use of third party interventionists who are paid on a commission-like basis.  As Mr Cartwright stated in his hearing testimony, AAC has championed marketing reform in Tennessee and other states.[15]

---

sites are undoubtedly speech protected by the First Amendment. See, e.g., *Lorillard Tobacco Co. V. Reilly*, 533 U.S. 525, 553 (2001) ("For over 25 years, the Court has recognized that commercial speech does not fall outside the purview of the First Amendment.").

[13] See https://findtreatment.samhsa.gov/locator/link-AppIns#.W75R-HtKhaQ.

[14] See https://www.rehabs.com/faq/.

[15]  See https://docs.house.gov/meetings/IF/IF02/20180724/108592/HHRG-115-IF02-Wstate-CartwrightM-20180724.pdf ; as well as https://thehill.com/opinion/healthcare/407755-effective-regulation-of-the-addiction-treatment-industry-will-take.

People suffering from addiction, who are brave enough to seek treatment, should be encouraged and supported to get help. They should have access to as many credible treatment options as possible, whether through websites, call centers or other forms of advertising and outreach.  Reform efforts should not seek to ban or stigmatize advertising,  marketing, or online directories, or otherwise suggest that online directories or call centers require unnecessary oversight; rather, reform should ensure that advertising, marketing and interaction with those seeking treatment is conducted in a useful, honest and transparent manner.

**The Honorable Gus Bilirakis**

**What entity is responsible for auditing your facilities? Since opening your doors, how many times have you been audited, and is your experience unique or common in the industry?**

Our facilities are licensed and/or audited by state health authorities in the states where they operate and accredited by either the Joint Commission or CARF. Frequency of state health department audits vary, but generally occur on an annual basis. Joint Commission and CARF visits are scheduled as dictated by the accreditation agency surveyor.

*     *     *

In responding to the Subcommittee's supplemental questions for the record, AAC has used its best efforts to be as accurate and responsive as possible based on its understanding of the terms used in your letter.  The representations herein are based on reasonably available information and are not intended to, and do not, capture every event related to your questions, nor are they an exhaustive description of the events discussed. In providing these responses, AAC does not waive, nor does it intend to waive, any of its rights or privileges with respect to this inquiry, including any applicable attorney-client, work product, or other evidentiary privilege, or any objection to assertions or requests in your letter.  Please note that AAC has redacted certain information in the enclosed exhibits due to privacy interests, but would be willing to provide unredacted versions at the Subcommittee's request.

- 18 -