UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF TENNESSEE

NASHVILLE DIVISION

| | | |
|---|---|---|
| DAVID BROWN CAUDLE, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | Civil Action No. 3:19-cv-00407 |
| Plaintiff, | ) ) | CLASS ACTION |
| vs. | ) ) ) | Judge Eli J. Richardson<br>Magistrate Judge Alistair E. Newbern |
| AAC HOLDINGS, INC., et al., | ) ) ) | LEAD PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS |
| Defendants. | ) ) ) | PLAINTIFF'S AMENDED COMPLAINT |
| | ) | JURY DEMAND |

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ...................................................................................................1

II. ARGUMENT.........................................................................................................3

    A.  Plaintiff's Scheme Liability Claims Are Unchallenged............................4

    B.  Plaintiff Alleges Actionable Misstatements and Omissions.....................4

        1.  Defendants Made False Statements About AAC's Financial Statements and Its Accounting for Receivables.............................5

        2.  Defendants' Statements Regarding Sales and Marketing Were Materially False and Misleading.................................................5

            a.  Defendants' Cautionary Language Was Misleading ......................7

            b.  Defendants' Misstatements Were Not Inactionable Opinion ..........9

            c.  Defendants' Misstatements Were Not Puffery ..............................10

        3.  The Complaint Pleads a Strong Inference of Scienter ...............11

            a.  Defendants Had Actual Knowledge of AAC's Deceptive Marketing Practices ........................................................12

            b.  The Restatement Demonstrates Scienter ......................................13

             c.  Defendants Disregarded Current Factual Information Before Making Statements and Their External Statements Contradicted AAC's Internal Reports.............................................14

            d.  Defendants' Refusal to Respond to an SEC Letter Questioning Their Restatement Supports Scienter ........................15

            e.  The Mass Resignations of AAC's Executives and Directors Support a Strong Inference of Scienter.........................................16

            f.  Defendants Concealed an SEC Subpoena Regarding AAC's Accounts Receivable..................................................................17

            g.  Defendants Falsely Attested the Adequacy of AAC's Internal Controls ............................................................18

            h.  Cartwright Misled Congress ........................................................20

- i -

i.     There Are No Innocent Inferences ........................................................21

4.     The Complaint Alleges Loss Causation ........................................................23

C.     Leave to Amend Should Be Freely Granted ........................................................25

III.     CONCLUSION ........................................................25

Cases\4846-9145-2345.v1-4/10/20

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Beaver Cty. Ret. Bd. v. LCA-Vision Inc.*,
2009 WL 806714 (S.D. Ohio. Mar. 25, 2009)................................................................19

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007).........................................................................................................3

*Boynton Beach Firefighters' Pension Fund v. HCP, Inc.*,
2019 WL 6251435 (N.D. Ohio Nov. 22, 2019)..............................................................17

*Chamberlain v. Reddy Ice Holdings, Inc.*,
757 F. Supp. 2d 683 (E.D. Mich. 2010)........................................................................16

*City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*,
399 F.3d 651 (6th Cir. 2005) ...............................................................................5, 10, 11

*Cosby v. KPMG, LLP*,
2018 WL 3723712 (E.D. Tenn. Aug. 2, 2018) ........................................................15, 17

*D.E.&J. Ltd. P'ship v. Conaway*,
133 F. App'x 994 (6th Cir. 2005) ..................................................................................24

*Dura Pharm., Inc. v. Broudo*,
544 U.S. 336 (2005)..........................................................................................................4

*Frank v. Dana Corp.*,
547 F.3d 564 (6th Cir. 2008) .........................................................................................21

*Frank v. Dana Corp.*,
646 F.3d 954 (6th Cir. 2011) ...................................................................11, 12, 14, 16

*Gelfer v. Pegasystems, Inc.*,
96 F. Supp. 2d 10 (D. Mass. 2000) ...............................................................................18

*Gov't of Guam Ret. Fund v. Invacare Corp.*,
2014 WL 6982233 (N.D. Ohio Dec. 9, 2014) ..................................................................9

*Grae v. Corr. Corp. of Am.*,
2017 WL 6442145 (M.D. Tenn. Dec. 18, 2017)....................................................... *passim*

*Helwig v. Vencor, Inc.*,
251 F.3d 540 (6th Cir. 2001) .....................................................................................5, 11

Cases\4846-9145-2345.v1-4/10/20

*In re Aceto Corp. Sec. Litig.*,
2019 WL 3606745 (E.D.N.Y. Aug. 6, 2019)..........................................................................13

*In re Am. Int'l Grp., Inc.*,
965 A.2d 763 (Del. Ch. 2009)............................................................................................23

*In re Am. Serv. Grp., Inc.*,
2009 WL 1348163 (M.D. Tenn. Mar. 31, 2009) ............................................................ *passim*

*In re Barrick Gold Corp. Sec. Litig.*,
341 F. Supp. 3d 358 (S.D.N.Y. 2018).................................................................................9

*In re Cardinal Health, Inc. Sec. Litig.*,
426 F. Supp. 2d 688 (S.D. Ohio 2006) .........................................................................11, 23

*In re Compuware Sec. Litig.*,
301 F. Supp. 2d 672 (E.D. Mich. 2004).............................................................................7

*In re Comshare, Inc. Sec. Litig.*,
183 F.3d 542 (6th Cir. 1999) ............................................................................................11

*In re Corrpro Sec. Litig.*,
2003 WL 23138459 (N.D. Ohio May 27, 2003),
*aff'd*, 116 F. App'x 592 (2004).....................................................................................17, 18

*In re Envision Healthcare Corp. Sec. Litig.*,
2019 WL 6168254 (M.D. Tenn. Nov. 19, 2019).......................................................9, 10, 12, 25

*In re Envoy Corp. Sec. Litig.*,
133 F. Supp. 2d 647 (M.D. Tenn. 2001) ...........................................................................21

*In re FirstEnergy Corp. Sec. Litig.*,
316 F. Supp. 2d 581 (N.D. Ohio 2004).............................................................................5, 7

*In re The Goodyear Tire & Rubber Co. Sec. Litig.*,
436 F. Supp. 2d 873 (N.D. Ohio 2006).............................................................................13

*In re Health Mgmt., Inc. Sec. Litig.*,
970 F. Supp. 192 (E.D.N.Y. 1997) ...................................................................................17

*In re Phycor Corp. Sec. Litig.*,
No. 3:98-0834, slip op. (M.D. Tenn. Feb. 17, 2000) ...........................................................7

Cases\4846-9145-2345.v1-4/10/20

*In re ProQuest Sec. Litig.*,
527 F. Supp. 2d 728 (E.D. Mich. 2007) ..................................................................20

*In re Sirrom Capital Corp. Sec. Litig.*,
84 F. Supp. 2d 933 (M.D. Tenn. 1999) ...................................................................11

*Konkol v. Diebold, Inc.*,
590 F.3d 390 (6th Cir. 2009) ............................................................................18, 19

*Kuhn v. Washtenaw Cty.*,
709 F.3d 612 (6th Cir. 2013) ..............................................................................4, 16

*Kyrstek v. Ruby Tuesday*,
2016 U.S. Dist. LEXIS 43523
(M.D. Tenn. Mar. 31, 2016).....................................................................................11

*La. Sch. Emps' Ret. Sys. v. Ernst & Young, LLP*,
622 F.3d 471 (6th Cir. 2010) ...................................................................................12

*Ley v. Visteon Corp.*,
543 F.3d 801 (6th Cir. 2008) ...................................................................................19

*Local 295/Local 851 IBT Emp. Grp. Pension Tr. & Welfare Fund v.*
*Fifth Third Bancorp.*,
731 F. Supp. 2d 689 (S.D. Ohio 2010) ....................................................................19

*Lorenzo v. SEC*,
_U.S._, 139 S. Ct. 1094 (2019)..................................................................................4

*Matrixx Initiatives, Inc. v. Siracusano*,
_U.S._, 131 S. Ct. 1309 (2011)................................................................................12

*Morse v. McWhorter*,
290 F.3d 795 (6th Cir. 2002) ...................................................................................25

*N. Port Firefighters' Pension-Local Option Plan v.*
*Fushi Copperweld, Inc.*,
929 F. Supp. 2d 740 (M.D. Tenn. 2013)........................................................ *passim*

*Norfolk Cty Ret. Sys. v. Cmty Health Sys., Inc.*,
2016 WL 4098584 (M.D. Tenn. June 16, 2016)........................................................6

*Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*,
830 F.3d 376 (6th Cir. 2016) ........................................................................3, 23, 24

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
575 U.S. 175 (2015)...................................................................................................10

*Plumbers, Pipefitters & MES Local Union No. 392 Pension Fund v.
Fairfax Fin. Holdings Ltd.*,
886 F. Supp. 2d 328 (S.D.N.Y. 2012).....................................................................24

*PR Diamonds, Inc. v. Chandler*,
364 F.3d 671 (6th Cir. 2004) ........................................................................... *passim*

*Ret. Sys. v. Psychiatric Sols., Inc.*,
2012 WL 1071281 (M.D. Tenn. Mar. 29, 2012) .....................................................13

*Ret. Sys. v. Psychiatric Sols., Inc.*,
2011 WL 1335803 (M.D. Tenn. Mar. 31, 2011) ...............................................4, 18

*Ricker v. Zoo Entm't, Inc.*,
534 F. App'x 495 (6th Cir. 2013) ............................................................................13

*SEC v. SeeThruEquity, LLC*,
2019 WL 1998027 (S.D.N.Y. Apr. 26, 2019)............................................................4

*Shane v. Bunzl Distrib. USA, Inc.*,
200 Fed. App'x. 397 (6th Cir. 2006) .......................................................................25

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)........................................................................................3, 12, 23

*Weiner v. Tivity Health, Inc.*,
365 F. Supp. 3d 900 (M.D. Tenn. 2019)..............................................................9, 13

*Williams v. Duke Energy Int'l, Inc.*,
681 F.3d 788 (6th Cir. 2012) .....................................................................................4

*Willis v. Big Lots, Inc.*,
2017 WL 2608690 (S.D. Ohio 2017)........................................................................16

*Winslow v. BancorpSouth, Inc.*,
2011 WL 7090820 (M.D. Tenn. Apr. 26, 2011)....................................................7, 24

*Zwick Partners, LP v. Quorum Health Corp.*,
2018 WL 2933406 (M.D. Tenn. Apr. 19, 2018)......................................................13

Cases\4846-9145-2345.v1-4/10/20

Case 3:19-cv-00407   Document 56   Filed 04/10/20   Page 7 of 36 PageID #: 1130

*Zwick Partners, LP v. Quorum Health Corp.*,
    2019 WL 1450546 (M.D. Tenn. Mar. 29, 2019) ....................................................................13

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
    §78u-4 ...................................................................................................................3, 4
    §78u-4(b)(1).............................................................................................................4
    §78u-4(b)(2)(A) ......................................................................................................4

Federal Rules of Civil Procedure
    Rule 9(b) ...............................................................................................................3, 4
    Rule 12(b)(6)...........................................................................................................3

Cases\4846-9145-2345.v1-4/10/20

Case 3:19-cv-00407   Document 56   Filed 04/10/20   Page 8 of 36 PageID #: 1131

# I. INTRODUCTION

This securities fraud class action is brought on behalf of purchasers of AAC Holdings, Inc. ("AAC" or the "Company") common stock between March 8, 2017 and April 15, 2019 (the "Class Period"). AAC operates addiction treatment centers and linked services, mostly through a subsidiary, American Addiction Centers, Inc. ¶¶2, 24.[1] Amid the national tragedy of the opioid epidemic, AAC represented itself to be a company devoted to aiding those suffering from substance abuse disorders. ¶3. In truth, AAC, its CEO, and two successive CFOs falsified AAC's financial results while overseeing a deceptive marketing scheme that deliberately inflated AAC's financial results. ¶¶24-62.

Fundamental to AAC's patient recruitment was the use of more than 100 deceptive websites, which were designed to seem to give unbiased, reliable addiction advice and directories of treatment facilities, but which were, in fact, thinly veiled lead-generation mechanisms. ¶¶4, 28-32. When people seeking help with addiction called the toll-free number on the websites, they were connected not with counselors or treatment specialists but rather with commission-paid salespeople in AAC's Brentwood, Tennessee call center. *Id.* While defendants touted AAC's "best-in-class sales and marketing engine" and marketing knowledge and infrastructure" giving it a "significant competitive advantage," AAC's deceptive patient recruiting scheme ultimately decimated its business, causing AAC to be barred from advertising on Google, denied renewed membership in a prominent addiction treatment professional society, and forced to defend its conduct before a congressional committee hearing on improper marketing practices in the substance abuse treatment industry. ¶¶33-49, 63-83.

AAC also fraudulently inflated its financial results. ¶¶5, 50-62. Defendants told investors AAC accounted for doubtful accounts based on its "historical experience," but in truth AAC ignored

---

[1] All "¶__" or "¶¶__" references are to the Consolidated Complaint for Violations of the Securities Exchange Act of 1934 (ECF No. 45) (the "Complaint"), as supplemented with respect to ¶145 (ECF No. 48), and ¶¶15, 17, & 148 (ECF No. 51). "Mot." refers to the Memorandum of Law in Support of Defendants' Motion to Dismiss Plaintiff's Amended Complaint (ECF No. 53). Citations are omitted and emphasis is added unless indicated otherwise.

- 1 -

its own experience in favor of unrepresentative "industry and other data." ¶¶50-62, 84-127. As a result, AAC failed to timely reserve for or write-off impaired receivables, and overstated net income and understated net losses by tens of millions of dollars – its true net losses from fiscal 2015 ("FY15") through the third quarter of 2018 ("3Q18") were nearly triple what AAC had reported. *Id.*

Each individual defendant was directly involved in the wrongdoing. ¶6; *infra* §II(B)(3). Cartwright oversaw AAC's sales and marketing programs, emphasizing that he was "hyperfocus[ed] on the sales and marketing side of things." ¶¶149-150. Called to testify, Cartwright misled Congress rather than admit AAC's deceptive practices. ¶¶44, 151-152. The individual defendants were also in charge of preparing AAC's fraudulent financial statements and assured investors that at AAC collections were a "top priority" – all while receiving monthly reports showing AAC's poor collections record and the aging of receivables, but excluding those reports from AAC's accounts receivable analysis. ¶¶6, 139-143. Cartwright personally worked with the "Pay to Patient" department that was intimately involved with the dubious receivables. ¶141. Even when the SEC questioned AAC in March 2018 about how it accounted for receivables, Cartwright and McWilliams concealed the SEC subpoena from investors for more than seven months while refusing, despite that warning, to clean up AAC's accounting until more than a year later. ¶¶6, 58-59, 125-126.

The truth began to be revealed on November 6, 2018, when defendants disclosed that AAC had missed its revenue and earnings targets and lowered guidance for the rest of fiscal 2018. ¶¶7, 79-81, 129-131. The woeful results were due to AAC's inability to continue its marketing and accounting schemes. Then, on April 15, 2019, AAC filed its annual report on Form 10-K for fiscal 2018, revealing AAC was restating its historical financial statements and had missed its already-lowered 4Q18 guidance. ¶¶8, 132-137.

All told, AAC's stock price collapsed more than 86% from its Class Period high, causing

- 2 -

investors tens of millions of dollars in losses, amid an exodus of senior executives and directors, including a majority of AAC's board of directors, every member of its audit committee, the Chief Compliance Officer, the Chief Operating Officer and the Chief Executive Officer. Meanwhile, chary of revealing more details of their fraud, defendants inexplicably refused to respond to questions from the SEC about AAC's vague and contradictory disclosures regarding the restatement. ¶145.

Defendants declined to address lead plaintiff's well-pled scheme claims. *Infra* §II(A). They admit their accounting-related statements were materially false and caused investors' loss. *Infra* §II(B)(1). They also concede that their marketing-related statements were false, yet claim their false statements are inactionable. However, the cautionary language defendants seek to hide behind was itself misleading – stating AAC could not "predict" the impact of "[u]nexpected changes" in Google's algorithms, when in fact those changes ***had already happened***. *Infra* §II(B)(2)(a). And the misstatements were not opinion or puffery – courts in this District routinely find similar statements actionable. *Infra* §II(B)(2)(b)-(c). Further, plaintiff more than plausibly alleges the link between the statements and investors' losses. *Infra* §II(B)(4).[2] The motion to dismiss should be denied.

## II.   ARGUMENT

Federal Rule of Civil Procedure 12(b)(6) requires a court to "consider the complaint in its entirety," "accept all factual allegations . . . as true" and construe them in the light most favorable to the plaintiff. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007). A complaint "does not need detailed factual allegations" but only "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007).

A securities fraud complaint is subject to Rule 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"). *See Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.*,

---

[2]   Defendants' only argument for dismissal of the §20(a) claim is that the underlying §10(b) claim fails. Mot. at 25. Because the §10(b) claim is well pled, the §20(a) claim should be upheld as well.

Cases\4846-9145-2345.v1-4/10/20

830 F.3d 376, 383 (6th Cir. 2016). Rule 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud or mistake." "'Rule 9(b) does not require omniscience; rather the Rule requires that the circumstances of the fraud be pled with enough specificity to put defendants on notice as to the nature of the claim.'" *Williams v. Duke Energy Int'l, Inc*., 681 F.3d 788, 803 (6th Cir. 2012). The PSLRA requires a plaintiff to specify the alleged false statements, identify the "reasons why the statement is misleading" and "state with particularity facts giving rise to a strong inference that the defendant acted with" scienter. 15 U.S.C. §78u-4(b)(1), (2)(A).

"'Where a complaint alleges "a complex and far-reaching fraudulent scheme,"'" the scheme must be pled with particularity and the complaint must ""'"provide examples of specific" fraudulent conduct that are "representative samples" of the scheme.'" *Grae v. Corr. Corp. of Am.*, 2017 WL 6442145, at \*12 (M.D. Tenn. Dec. 18, 2017) ("*CCA*").

### A.    Plaintiff's Scheme Liability Claims Are Unchallenged

Plaintiff alleges defendants engaged in a course of conduct which operated as a fraud on investors, known as "scheme liability." ¶¶24-62, 167(a) & (c); *Lorenzo v. SEC*, _U.S._, 139 S. Ct. 1094, 1101 (2019); *Garden City Emps.' Ret. Sys. v. Psychiatric Sols., Inc*., 2011 WL 1335803, at \*45 (M.D. Tenn. Mar. 31, 2011) ("The securities laws reach misleading conduct as well as misleading statements . . . ."). Plaintiff "alleges that the defendants' entire business model, beyond any misstatements or omissions, [wa]s deceptive." *SEC v. SeeThruEquity, LLC*, 2019 WL 1998027, at \*5 (S.D.N.Y. Apr. 26, 2019). Defendants do not seek dismissal of the scheme claims, so they have "waived" any challenge to those claims. *Kuhn v. Washtenaw Cty*., 709 F.3d 612, 624 (6th Cir. 2013).

### B.    Plaintiff Alleges Actionable Misstatements and Omissions

The Exchange Act prohibits "the making of any 'untrue statement of a material fact' or the omission of any material fact 'necessary in order to make the statements made . . . not misleading.'" *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341 (2005). Corporate actors must "'provide complete

Cases\4846-9145-2345.v1-4/10/20

and non-misleading information with respect to the subjects on which [they] undertake[] to speak.'" *Helwig v. Vencor, Inc.*, 251 F.3d 540, 560-61 (6th Cir. 2001). "[A] company may choose silence or speech elaborated by the factual basis as then known – but it may not choose half-truths." *Id.* Assessing falsity requires an analysis of the alleged false statements ***and*** the context in which they were made. *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 672 (6th Cir. 2005).

### 1. Defendants Made False Statements About AAC's Financial Statements and Its Accounting for Receivables

Defendants concede that by inflating AAC's results and representing they evaluated doubtful accounts receivable "based on historical experience," when they actually ignored that experience in favor of "industry and other data," they materially misled investors. *Compare* ¶¶5, 55-58, 84-127, *with* Mot. at 9. Rightly so. *In re FirstEnergy Corp. Sec. Litig.*, 316 F. Supp. 2d 581, 595 (N.D. Ohio 2004) ("By definition . . . a restatement says that the prior financial statement was false.").

### 2. Defendants' Statements Regarding Sales and Marketing Were Materially False and Misleading

Defendants repeatedly chose to speak about AAC's sales and marketing efforts. ¶¶63-83. In fact, they touted AAC's marketing programs, calling them a "best-in-class sales and marketing engine." ¶64. They bragged to investors that such programs differentiated AAC from its competitors because "AAC's marketing knowledge and infrastructure cannot be replicated with substantial capital and time," giving AAC a "significant competitive advantage." ¶64. By 2018, Cartwright said he was personally focused on sales and marketing and there would be growth in digital marketing in AAC's call center, driving business. ¶66. Cartwright claimed AAC's marketing initiatives were designed to "elevate[] the addiction treatment industry as a whole," including AAC's many websites, which purportedly provided "news, information and discussion forums for the recovery community." ¶68. Cartwright and McWilliams stated that AAC's marketing team was working to "improve conversion rates," and the benefits would be realized in the second half of 2018. ¶74. In August

- 5 -

2018, Cartwright said that AAC was "transforming our sales and marketing team, including opening a new admissions center and bringing on new senior leadership," and that changes in its marketing initiatives would allow AAC to meet its annual financial goals. ¶¶76-77.

Having chosen to speak repeatedly about its sales and marketing programs, and their purported quality and competitive strengths, Defendants had a "'duty to speak fully and truthfully on the [subject].'" *CCA*, 2017 WL 6442145, at *13. As Judge Sharp noted, "once [defendants] 'put the topic of the cause of [their] financial success at issue,' they were 'obligated to disclose information concerning the source of the success.'" *Norfolk Cty Ret. Sys. v. Cmty Health Sys., Inc.*, 2016 WL 4098584, at *12 (M.D. Tenn. June 16, 2016). Instead, defendants here dissembled.

While touting the purported success and unique competitive strengths of AAC's marketing programs, defendants knew AAC's practices were unsustainable and of ever-diminishing value. *See* ¶¶26-49. Notably, defendants do not dispute that (i) AAC operated deceptive websites that used "black hat" SEO techniques to improperly increase their visibility on search engines (¶¶30-32); (ii) AAC was engaged in the same type of misleading marketing practices, like operating hotlines that seemed like unbiased referral services but in reality referred patients to AAC's treatment centers, that were coming under increasing public scrutiny (¶33); (iii) industry trade groups, including the National Association of Addiction Treatment Professionals ("NAATP"), were developing ethical codes to prohibit the types of marketing AAC used, including deceptive internet marketing, and NAATP declined to renew AAC's membership, costing it millions of dollars (¶¶34-35); (iv) congressional hearings were being held to investigate "unethical and illegal practices" in the addiction treatment industry and specifically criticized the type of marketing programs employed by AAC (¶¶36-40); (v) Google Ads had banned addiction treatment advertising except subject to institutional review procedures, which AAC failed because of its deceptive practices (¶¶43-46); and

- 6 -

(vi) Google had updated its search algorithms to rank websites based on expertise, authoritativeness and trustworthiness, which AAC's sites lacked (¶¶47-49).

As described in detail in the Complaint, these efforts to curtail predatory and unscrupulous operators from taking advantage of individuals seeking treatment took a profound toll on AAC, which relied heavily on deceptive methods to fuel its growth, and saw its revenues decline by tens of millions of dollars when it was no longer able to employ such tactics. ¶¶26-49. Yet defendants never disclosed these conditions, or how they would impact AAC's future prospects, to investors.

Defendants do not dispute that these statements are adequately alleged to be false, instead contending they are inactionable because they are: (i) forward-looking statements; (ii) statements of opinion; or (iii) puffery.[3] None of these contentions has merit.

### a. Defendants' Cautionary Language Was Misleading

Courts have long held that risk disclosures are "***meaningless***" where they "portend[] the future, but d[o] not alert investors about the conditions that then exist[]." *Winslow v. BancorpSouth, Inc.*, 2011 WL 7090820, at *16 (M.D. Tenn. Apr. 26, 2011).[4] As Judge Todd Campbell recognized long ago, safe harbor contentions, like those made here, "raise questions of fact which cannot be decided on a motion to dismiss." *In re Phycor Corp. Sec. Litig.*, No. 3:98-0834, slip op. at 6 (M.D. Tenn. Feb. 17, 2000) (ECF No. 90).

Here, the very risk warnings defendants contend alerted investors to potential "disruptions" in AAC's marketing programs were themselves misleading. AAC's FY17 Form 10-K warned that ***if*** AAC's marketing programs were disrupted, AAC ***could*** be negatively impacted:

> ***If*** any disruption occurs in our national sales and marketing program for any reason, or if we are unable to effectively attract and enroll new clients to our network of facilities, our ability to maintain census ***could*** be adversely affected, which would

---

[3] Defendants offer no challenge whatsoever to the statements alleged at ¶¶67, 72, 75, 80-81.
[4] *Accord In re Compuware Sec. Litig.*, 301 F. Supp. 2d 672, 685-86 (E.D. Mich. 2004); *FirstEnergy*, 316 F. Supp. 2d at 596.

have a material adverse effect on our business, financial condition and results of operations.

¶70. This "risk warning" was misleading because by the time Cartwright and McWilliams signed and certified AAC's FY17 Form 10-K on February 23, 2018, disruptions were *already* occurring, including: (i) Google Ads' suspension of addiction treatment advertising, of which AAC was a leading user, due to unethical practices such as those employed by AAC (¶42); and (ii) AAC's exclusion from the NAATP due to its inability to conform to the NAATP Code of Ethics (¶¶44-49).

Similarly, AAC's 3Q18 Form 10-Q suggested that changes to Google's search rankings had the *potential* to impact AAC's sales and marketing efforts, emphasizing that AAC could not "predict" the impact of "[u]nexpected changes":

> Internet search engines play an increasingly important role in addiction treatment marketing. Google and other search engines use complex algorithms to rank websites. The algorithms take into account many factors, including the domain name itself, website content and user-friendly factors such as the speed at which the website pages may be clicked through and viewed. We cannot predict or control changes in algorithms and website rankings, which may result in lower rankings for our websites. Additionally, Google and other online platforms have instituted review processes required to advertise on their websites. Some of these processes are time consuming, complex and continuously evolving. We cannot predict how these private processes, rules and restrictions will evolve or be applied to individual advertising applicants. Unexpected changes in these areas may result in a decrease in calls to our admissions center, a decrease in interactions with potential clients and a lowering of our census, which could have [a] material adverse effects on our business, financial condition and results of operations.

¶72. This "risk warning" was misleading because by the time Cartwright and McWilliams signed and certified AAC's 3Q18 Form 10-Q on November 6, 2018, the changes defendants warned of had *already* occurred and were *already* materially adversely impacting AAC. ¶73. Specifically:

- Google had already altered its algorithms and already instituted additional review processes, which prevented AAC from advertising through Google (¶¶43, 47-48);

- Defendants' statement that the "algorithms take into account many factors, including the domain name itself, website content and user-friendly factors such as the speed at which the website pages may be clicked through and viewed" was misleading as the primary reason AAC's websites had fallen in Google's ranking was because they

- 8 -

were designed expressly to be deceptive (¶¶29-32, 47-48);

- Defendants' statement that they "cannot predict" how Google's process of approving advertisers "will evolve or be applied to individual advertising applicants" and "cannot predict or control changes in algorithms and website rankings" was misleading because (a) LegitScript had rejected AAC's attempts to obtain certification because it precluded lead generators from certification; and (b) Google's attempts to better rank its search results was already adversely impacting AAC's websites because its websites were designed to be deceptive, causing the websites to fall precipitously in Google's search results, resulting in fewer calls to AAC's call center, decreased enrollment and lower revenues (¶¶72-73); and

- Defendants' statement that these changes "could have [a] material adverse effects on our business, financial condition and results of operations" was misleading because the changes were already having a materially adverse impact by 3Q18. ¶73.

Because the very warnings defendants contend immunize their false statements were themselves misleading, the safe harbor is inapplicable. Indeed, it is axiomatic that "[i]f a company were to warn of the potential deterioration of one line of business, when in fact it was established that that line of business had already deteriorated, then . . . its cautionary language would be inadequate to meet the safe harbor standard." *Weiner v. Tivity Health, Inc.*, 365 F. Supp. 3d 900, 911 (M.D. Tenn. 2019).

### b. Defendants' Misstatements Were Not Inactionable Opinion

Defendants contend that the statements alleged in ¶¶70 and 79 contain non-actionable statements of opinion.[5] Mot. at 20-21. First, these statements are fragments of broader statements that clearly do not contain opinions and are independently false.[6] Second, "merely appending 'we believe' or 'we think' does not automatically render statements non-actionable." *In re Envision Healthcare Corp. Sec. Litig.*, 2019 WL 6168254, at *11 (M.D. Tenn. Nov. 19, 2019); *see also Gov't of Guam Ret. Fund v. Invacare Corp.*, 2014 WL 6982233, at *4 (N.D. Ohio Dec. 9, 2014)

---

[5]   The discussion in *In re Barrick Gold Corp. Sec. Litig.*, 341 F. Supp. 3d 358, 375 (S.D.N.Y. 2018), of "linguistic cues" (*see* Mot. at 20) is irrelevant – the court was discussing how to identify forward-looking statements, not statements of opinion.

[6]   For instance, the statement "we hit unanticipated headwinds in August that caused a significant decline in call volume and led to lower census" (¶79) is false for the reasons set forth in ¶82. The remainder of the statements alleged in ¶70 is false for the reasons discussed above in §II(b)(2)(a).

- 9 -

(disregarding "'throat-clearing language'" in which defendants "couch[ed] some of their statements . . . like 'our belief' or 'we believe' or 'our highest priority' or 'in my opinion'") (emphasis omitted). "A statement couched as an opinion can still be misleading if it omits material facts about the basis for the opinion." *Envision*, 2019 WL 6168254, at \*11; *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 189 (2015) (an opinion is misleading if omitted facts would "conflict with what a reasonable investor would take from the statement itself").

Judge Campbell's decision in *Envision* is on point. 2019 WL 6168254. *Envision* involved allegations that the defendant "artificially inflated its earnings through out-of-network billing . . . and failed to disclose to investors that these business practices were substantially responsible for [its] revenue growth," which subsequently declined when the practices came under scrutiny. *Id.* at \*3. Rejecting defendants' contention that the alleged misstatements were inactionable, Judge Campbell held that statements about drivers of Envision's success were "misleading for omitting information regarding out-of-network-billing as a factor driving revenue." *Id.* at \*12. The same is true here. Claiming a belief that AAC's sales and marketing programs gave AAC a competitive advantage and that its strategies were broad, diverse and informative, did not come close to "fairly align[ing] with the information in [defendants'] possession at the time," including that AAC's sales and marketing programs were being decimated by widespread rejection of its deceptive and misleading practices. *Omnicare*, 575 U.S. at 189; *infra* §II(B)(3)(a).

### c. Defendants' Misstatements Were Not Puffery

Defendants assert that the alleged misstatements in ¶¶64 and 66 are inactionable puffery. In so arguing, defendants raise fact-based contentions not susceptible to resolution on the pleadings. *CCA*, 2017 WL 6442145, at \*14 (rejecting defendants' puffery contentions and finding materiality to be a question for the jury); *see Bridgestone*, 399 F.3d at 672 ("'[A] company's statements that it is "premier," "dominant"' or "leading" must not be assessed in a vacuum (*i.e.*, by plucking the

- 10 -

statements out of their context to determine whether the words, taken *per se*, are sufficiently "vague" so as to constitute puffery.'")).

Defendants' statements about the source of AAC's competitive strengths, and hard data about the engagement resulting from its deceptive web marketing, were hardly "loosely optimistic statements insufficiently specific for a reasonable investor to 'find them important to the total mix of information available.'" *Bridgestone*, 399 F.3d at 671. And it was misleading to tell investors that AAC had a "best-in-class sales and marketing engine" that "cannot be replicated without substantial capital and time" when the truth was that AAC's deceptive marketing program was unsustainable and causing it to suffer substantial losses. ¶¶26-49. Because the statements at issue here offer "facts about the current state of Defendant's affairs and go beyond vaguely optimistic statements about the future," they are not puffery. *In re Sirrom Capital Corp. Sec. Litig.*, 84 F. Supp. 2d 933, 943 (M.D. Tenn. 1999); *see also Kyrstek v. Ruby Tuesday*, 2016 U.S. Dist. LEXIS 43523, at *23 (M.D. Tenn. Mar. 31, 2016) (statements about "'excitement'" over "'growth potential'" of restaurant division were puffery, but were actionable due to omissions of restaurant's financial performance).

### 3. The Complaint Pleads a Strong Inference of Scienter

Scienter may be alleged two ways: "'[1] knowing and deliberate intent to manipulate, deceive, or defraud, and [2] recklessness.'" *Frank v. Dana Corp.*, 646 F.3d 954, 958-59 (6th Cir. 2011). Recklessness is "'highly unreasonable conduct which is an extreme departure from the standards of ordinary care.'" *In re Comshare, Inc. Sec. Litig.*, 183 F.3d 542, 549-50 (6th Cir. 1999).

The Sixth Circuit has identified nine factors that courts have considered in determining whether a strong inference of scienter has been pled. *Dana*, 646 F.3d at 958 n.2 (citing *Helwig*, 251 F.3d at 552). Not all are needed. *E.g.*, *Bridgestone*, 399 F.3d at 685. The list is non-exhaustive and only meant to "point to fixed constellations of facts that courts have found probative of securities fraud." *Helwig*, 251 F.3d at 552; *see also In re Cardinal Health, Inc. Sec. Litig.*, 426 F. Supp. 2d

- 11 -

688, 718 n.43 (S.D. Ohio 2006) (plaintiffs "should draw upon these factors where applicable").

Inexplicably, defendants ask the Court to analyze scienter under *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 683 (6th Cir. 2004), despite that the Sixth Circuit overruled the "sorting through each allegation individually" approach almost ten years ago. *Frank v. Dana Corp.*, 646 F.3d 954, 961 (6th Cir. 2011) (overruling *PR Diamonds* in light of *Matrixx Initiatives, Inc. v. Siracusano*, _U.S._, 131 S. Ct. 1309 (2011)). In fact, courts analyze scienter "holistically." *Id.* Separating each allegation "risks losing the forest for the trees." *Id.* A complaint survives "if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324.

### a. Defendants Had Actual Knowledge of AAC's Deceptive Marketing Practices

One way to plead scienter is "by pleading with particularity facts that give rise to a strong inference that the defendant acted with knowledge . . . of the fraud being committed." *La. Sch. Emps' Ret. Sys. v. Ernst & Young, LLP*, 622 F.3d 471, 479 (6th Cir. 2010). In addition, "'[c]ourts may presume that high-level executives are aware of matter related to their business's operations where the misrepresentations and omissions pertain to "central, day-to-day operational matters."'" *Envision*, 2019 WL 6168254, at *22; *CCA*, 2017 WL 6442145, at *21 (same).

Cartwright, Manz and McWilliams do not dispute that while touting the purported success and unique competitive strengths of AAC's marketing programs, they had actual knowledge of all the negative information that caused these statements to be false. ¶¶65, 69, 71, 73, 78, 82. Defendants' actual knowledge of these circumstances demonstrates scienter.

Defendants also do not dispute that sales and marketing were central to AAC's operations.[7]

"***[W]e are also a consumer marketing company*** . . . . [s]o we are marketing geeks." ¶149. Instead,

---

[7]    Nor do they dispute that they were intimately involved in such efforts. ¶150 (Cartwright said he would "spend a lot more of my focus and energy," and "hyperfocus" on, sales and marketing).

- 12 -

they ask this Court to overrule well settled law in this Circuit and beyond to hold that the core operations doctrine is irrelevant or insufficient to plead scienter. Mot. at 22-23.

In fact, the Sixth Circuit **has** addressed and endorsed the core operations doctrine. *PR Diamonds*, 364 F.3d at 688 ("high-level executives can be presumed to be aware of matters central to their business's operation"). Decades after the PSLRA's passage, courts in this District and beyond have continued to apply the core operations doctrine.[8] *Supra* at 12. Even the authority defendants cite does not suggest that the doctrine is defunct.[9]

### b. The Restatement Demonstrates Scienter

"'GAAP violations . . . along with other circumstances, can create a strong inference of scienter.'" *N. Port Firefighters' Pension-Local Option Plan v. Fushi Copperweld, Inc.*, 929 F. Supp. 2d 740, 784 (M.D. Tenn. 2013).[10] Accounting errors show scienter if "'Defendants knew or could have known of the errors or . . . regular procedures should have alerted them to the errors sooner than they did,'" and "accounting errors can be 'viewed in combination with other allegations.'" *In re Am. Serv. Grp., Inc.*, 2009 WL 1348163, at \*55 (M.D. Tenn. Mar. 31, 2009) ("*ASG*").

In *ASG*, "Plaintiffs' allegations of systemic accounting violations add[ed] to the strong inference of the Defendants' scienter." *Id.* at \*56. In *Fushi Copperweld*, the fact that "Fushi's restatements . . . precluded timely compliance with an SEC report" gave "rise to a strong inference

---

8 Tellingly, despite the well-developed body of law resolving motions to dismiss in securities actions in this District, Defendants cite to only **one**, *Zwick Partners, LP v. Quorum Health Corp.*, 2019 WL 1450546 (M.D. Tenn. Mar. 29, 2019), a case in which Judge Crenshaw **denied** the majority of defendants' motions to dismiss. *Zwick Partners, LP v. Quorum Health Corp.*, 2018 WL 2933406 (M.D. Tenn. Apr. 19, 2018). This is particularly puzzling in light of defense counsel's involvement with numerous other cases here. *E.g.*, *Weiner*, 365 F. Supp. 3d at 904; *Garden City Emps.' Ret. Sys. v. Psychiatric Sols., Inc.*, 2012 WL 1071281, at \*1 (M.D. Tenn. Mar. 29, 2012).
9 *In re Aceto Corp. Sec. Litig.*, 2019 WL 3606745, at \*10 (E.D.N.Y. Aug. 6, 2019), "assum[ed] the doctrine applies," while noting that the Second Circuit has not "'expressly addressed" the issue.
10 Defendants' cases address the strawman argument that a restatement **alone** shows scienter. *See In re The Goodyear Tire & Rubber Co. Sec. Litig.*, 436 F. Supp. 2d 873, 894 (N.D. Ohio 2006); *PR Diamonds*, 364 F.3d at 684; *Ricker v. Zoo Entm't, Inc.*, 534 F. App'x 495, 500 (6th Cir. 2013).

- 13 -

about the serious magnitude of the Defendants' accounting mistreatment of these transactions," and the "'magnitude of [the] false statements [was] relevant to the scienter element.'" 929 F. Supp. 2d at 786. Here too, AAC failed to file a timely annual report due to its restatement. ¶59. Moreover, the restatement revealed that net losses attributable to AAC stockholders were understated by about $45 million. ¶¶88(b)-(c), 109(b), 113(b), 121(b), 124(b); Mot., Ex. G at 34, F-10, F-37-F-39. The restated cumulative net loss from FY15 to 3Q18 – $70 million – almost tripled the $25 million cumulative net loss initially reported for that period. *Id.* Thus, the inflation of AAC's results was "so great in magnitude, that [it] should have been obvious to a defendant." *PR Diamonds*, 364 F.3d at 684.

> ### c. Defendants Disregarded Current Factual Information Before Making Statements and Their External Statements Contradicted AAC's Internal Reports

AAC failed to timely reserve for and write-off uncollectable accounts receivable based on "historical cash collection trends by customer ***that existed at the time of the issuance of the historical financial statements***." ¶¶62, 132-133. Despite getting "internal reports" about AAC's problematic cash-collection trends, defendants disregarded the "most current factual information" and made statements that conflicted with that reporting. *Cf. Dana*, 646 F.3d at 958 n.2.

The parties agree "warning signs that would have revealed the accounting errors ***prior*** to their inclusion in public statements" support scienter. Mot. at 10. Plaintiff pleads such signs.

AAC was retaining accounts receivable for "client-related diagnostic testing" (*i.e.*, laboratory testing) for two to three years before writing them off. ¶57. This was the (undisclosed) result of a "challenge" defendants knew of by 2016, when there began to be "a lot of . . . scrutiny within the lab business, and rightly so." *Id.* As Manz put it, "fraud and abuse from a few providers in the lab space" caused "the major payers" to refuse to pay bills pending additional "clinical documentation." *Id.* By 1Q17, defendants knew that "the lab side of our business" was causing a slowdown in collections; and in May and August 2017, they knew that AAC's increase in uncollected receivables was "being

- 14 -

primarily driven by payers requiring extensive documentation on laboratory claims." ¶¶57, 140.

As these receivables lingered on AAC's balance sheet, the individual defendants received monthly spreadsheets with billing data, including the monthly amounts written off as "bad debt." ¶141. Cartwright worked closely with the "Pay to Patient" department responsible for collecting from clients who received insurance payments that were due to AAC. *Id.* As a result, he knew well the difficulties AAC faced in collecting those payments. *Id.*

Defendants also knew AAC's days sales outstanding ("DSOs") were abnormally high. ¶143. They called DSOs a "top priority" and "a major focus." *Id.* As the SEC has explained, "[a] growing DSO figure is often a telltale sign that a company's receivables are impaired . . . ." ¶142. Thus, this red flag's presence shows "'Defendants knew or could have known of the errors or that regular procedures should have alerted them to the errors sooner than they actually did.'" *Fushi Copperweld*, 929 F. Supp. 2d at 784; *see also Cosby v. KPMG, LLP*, 2018 WL 3723712, at *5 (E.D. Tenn. Aug. 2, 2018) (same).[11] That is, while the high DSOs did not mean a restatement was inevitable (*cf.* Mot. at 11), they uncontestably warranted closer analysis of AAC's provision for doubtful accounts.

### d. Defendants' Refusal to Respond to an SEC Letter Questioning Their Restatement Supports Scienter

In *ASG*, the restatement "deliberately failed to provide" complete information "in order to confuse investors about the impact [and details] of their fraud and to support their . . . argument[s] in this action." *ASG*, 2009 WL 1348163, at *51. This supported a strong inference of scienter.

The same happened here. On August 29, 2019, Cartwright and AAC received a letter from the SEC's Division of Corporation Finance questioning AAC's disclosures about its restatement, revenue recognition practices and allowance for doubtful accounts. ¶145. The SEC questioned how AAC failed to determine the collectability of accounts receivable during the Class Period, describing

---

[11] That the DSOs were public is irrelevant. *Cf.* Mot. at 11-12. In *Cosby*, for example, the "red flags" that supported an inference of scienter included "public inquiries." 2018 WL 3723712, at *5.

AAC's disclosures on these issues as "unclear" and needing to be "expand[ed]." ¶145(a). The SEC highlighted inconsistencies in AAC's statements and underscored Cartwright's involvement with the "Pay to Patient" department. ¶145(b)-(e). Rather than elucidate the ambiguities and inconsistencies in their disclosures, defendants stalled and then refused to provide a substantive response to the SEC. ¶145(f). Defendants do not even try to proffer an innocent inference from their refusal to respond. They have now waived their opportunity to do so. *Kuhn*, 709 F.3d at 624.

### e. The Mass Resignations of AAC's Executives and Directors Support a Strong Inference of Scienter

"[H]igh-ranking executives' departures from [the issuer] are relevant to scienter." *Willis v. Big Lots, Inc.*, 2017 WL 2608690, at *3 (S.D. Ohio 2017). "'[H]ouse-cleaning and reforms do not follow innocent mistakes.'" *ASG*, 2009 WL 1348163, at *58. "'Rather, they customarily, even if not invariably, follow systemic and fraudulent abuse of internal financial controls.'" *Id.*; *Dana*, 646 F.3d at 960; *Chamberlain v. Reddy Ice Holdings, Inc.*, 757 F. Supp. 2d 683, 712 (E.D. Mich. 2010).

Plaintiff alleges an "unprecedented" series of resignations. ¶148. Manz resigned during the Class Period. *Id.* On March 12, 2019, a week before AAC revealed that it would not timely file its Form 10-K (¶59), AAC announced its CCO was resigning. ¶148. On May 31, 2019, six weeks after the restatement (¶132), a member of AAC's audit committee resigned immediately and without notice. ¶148. Two weeks after that, the President and COO resigned, having worked at AAC just 16 months. *Id.* The majority of AAC's board – including all remaining members of the audit committee – resigned on October 1, 2019, five and one-half months after the restatement, leaving AAC in breach of the NYSE's listing requirements. *Id.* Finally, on January 8, 2020, Cartwright resigned as CEO, effective January 24, 2020. Defendants do not even try to explain away this exodus.

Defendants cite no case where the CFO resigned during the Class Period, followed by the CEO, COO, CCO, a majority of the board and the entire audit committee, much less one where such

- 16 -

a pattern was found ***not*** to support scienter. *See* Mot. at 14.[12] The only plausible conclusion is that this striking series of departures supports an inference of scienter.

### f. Defendants Concealed an SEC Subpoena Regarding AAC's Accounts Receivable

Scienter can be pled based on "red flags," like a defendant's "apparent failure to exercise heightened scrutiny in response to [an] analyst letter and [an] SEC inquiry regarding [the issuer's] accounts receivable." *In re Health Mgmt., Inc. Sec. Litig.*, 970 F. Supp. 192, 203 (E.D.N.Y. 1997); *see also, e.g.*, *Cosby*, 2018 WL 3723712, at *5 (plaintiffs "sufficiently pled scienter" where they "alleged numerous red flags including . . . SEC investigations and public inquiries into [the issuer]" that "should have put defendant on notice of possible violations"). The same happened here.

In March 2018, AAC received an SEC subpoena seeking information about accounts receivable. ¶58. Cartwright and McWilliams concealed that subpoena for more than seven months. *Id.* On November 6, 2018, AAC disclosed both the subpoena and the fact that AAC's audit committee had conducted a review of AAC's accounting for partial-payment receivables and determined that a "change in estimate of the collectability" of those receivables was necessary, resulting in about a $6 million reduction in revenues and corresponding increase in net loss. ¶125. Even after that – and for a full year after receiving the SEC subpoena – defendants continued to report inflated accounts receivable and to state, falsely, that AAC's accounting for accounts receivable was based on a detailed historical review, that its financial statements complied with GAAP and that AAC operated with effective internal controls. ¶¶110-126.

---

[12]  In *In re Corrpro Sec. Litig.*, 2003 WL 23138459, at *5-*6 (N.D. Ohio May 27, 2003), *aff'd*, 116 F. App'x 592 (2004), it was alleged only that the company "had six CFO's during the class period" and did "not establish any connection between the job turnover and the problems at [the relevant subsidiary]." In *Boynton Beach Firefighters' Pension Fund v. HCP, Inc.*, 2019 WL 6251435, at *7 (N.D. Ohio Nov. 22, 2019), there was "no evidence of a connection between the departures and an inference of misconduct" and no "factual support for their argument that the departure of five executives over two years from a large, publicly-traded corporation is unusual, much less 'striking.'"

Given the link between the investigation and the restatement, *Corrpro* is inapt. 2003 WL 23138459, at *5 (rejecting allegation that SEC censure for conduct involving different individuals and occurring five to six years before allegations at issue supported scienter). As defendants' own authorities explain, "a government investigation is not altogether irrelevant to the scienter analysis." *Konkol v. Diebold, Inc.*, 590 F.3d 390, 402 (6th Cir. 2009). "Plaintiffs need not prove that the accounting practices at issue here were identical to those in [the investigation] in order to create a strong inference of scienter." *Gelfer v. Pegasystems, Inc.*, 96 F. Supp. 2d 10, 15 (D. Mass. 2000) (cited in *Corrpro*, 2003 WL 23138459, at *5). "It is enough . . . that Plaintiffs show that the questioned accounting practices in this case were sufficiently similar to those questioned in [the related investigation] that Defendant knew or should have known about them." *Id*. at 15.

### g. Defendants Falsely Attested the Adequacy of AAC's Internal Controls

"Sarbanes-Oxley certifications signed by [defendants can] establish[] their awareness" of financial trends and thereby "create the 'red flags' that support a strong inference of scienter." *Psychiatric Sols.*, 2011 WL 1335803, at *56. "[T]he Court must . . . consider these certifications in light of the other circumstances alleged by the Plaintiffs" to assess whether plaintiff adequately alleges scienter. *ASG*, 2009 WL 1348163, at *52-*53. "[T]he Sox certifications expressly reflect the signatories' assurances to investors of adequate internal controls of [the company's] finances, including accounting and GAAP compliance." *Fushi Copperweld*, 929 F. Supp. 2d at 779.

Each individual defendant attested that they reviewed the relevant periodic reports, designed disclosure controls and procedures "to ensure that material information relating to the registrant . . . is made known to us" and "[e]valuated the effectiveness of the registrant's disclosure controls and procedures." ¶¶146-147. Those certifications and the underlying evaluation of controls were especially important here because, as an "emerging growth compan[y]," AAC opted not to engage

- 18 -

its independent auditor to attest to management's conclusions. ¶146 n.6.

The individual defendants' evaluation and certification of controls is relevant for two reasons. First, AAC was ignoring its historical collections experience (which it said it used), instead relying on "industry and other data" (which defendants knew was not representative) to assess its accounts receivable. ¶¶5, 50-62. This is precisely the type of issue management assesses when it evaluates reporting controls. Second, defendants attested they had "[e]valuated the effectiveness of the registrant's disclosure controls and procedures." ¶147. In the restatement, AAC admitted that its "internal control over financial reporting was not effective." ¶133. In short, the fraud alleged directly implicates AAC's internal controls such that the individual defendants' assessment of those controls made them aware, or reckless in remaining unaware, of the accounting issues. ¶147.

Under *Ley v. Visteon Corp.*, 543 F.3d 801, 812 (6th Cir. 2008) (cited in Mot. at 13-14), a plaintiff must "allege facts to suggest that [defendants] had reason to know or should have suspected accounting irregularities or other 'red flags' at the time they signed the certifications." Applying *Ley*, "clear accounting violations give rise to a plausible inference of the lack of internal review of these transaction[s] as well as the lack of any accounting controls." *Fushi Copperweld*, 929 F. Supp. 2d at 780; *cf. Local 295/Local 851 IBT Emp. Grp. Pension Tr. & Welfare Fund v. Fifth Third Bancorp.*, 731 F. Supp. 2d 689, 725 (S.D. Ohio 2010) ("[T]he fact that Fifth Third was not required to restate . . . indicates that their Sarbanes-Oxley certifications are not probative of scienter.").[13] Here, either the certifications were false and management did not review the controls, or they were true and management reviewed them and knew AAC was not accounting for doubtful accounts receivable in

---

[13]  The certifications in *Ley* did not support scienter because plaintiffs "fail[ed] to allege facts to suggest that [defendants] had reason to know or should have suspected accounting irregularities or other 'red flags' at the time they signed the certifications" and had "not explained the link between these statements [in the certifications] and the actual accounting issues." 543 F.3d at 812; *accord Konkol*, 590 F.3d at 402-03 (similar); *Beaver Cty. Ret. Bd. v. LCA-Vision Inc.*, 2009 WL 806714, at *19 (S.D. Ohio. Mar. 25, 2009) (similar).

- 19 -

accordance with its disclosures. *Cf. In re ProQuest Sec. Litig.*, 527 F. Supp. 2d 728, 743 (E.D. Mich. 2007) ("The SOX certifications give rise to an inference of [defendant's] scienter because they provide evidence either that he knew about the improper accounting practices or, alternatively, knew that the controls he attested to were inadequate.").

### h. Cartwright Misled Congress

Cartwright misled Congress, under oath, about AAC's marketing practices. Defendants do not dispute that misleading Congress supports an inference of scienter. Mot. at 24-25. They just try to rewrite the record as to Cartwright's testimony.

Cartwright testified that "[w]e make sure that our website visitors know who they are contacting," "[w]e make clear that users know which treatment centers are going to answer the numbers they call" and "[w]e make clear that AAC's toll-free numbers go to AAC's call center." ¶151. These statements were misleading. *Id.* At best, AAC's websites included a tiny radio button, some added between May and September 2017, that users would have to click on in order to learn who answered the listed toll-free numbers. *Id.* The websites intentionally sought to appear to be neutral informational websites that would increase their ranking in search engine results and cause individuals seeking treatment to call, unaware they were being connected to AAC. ¶152. Defendants' attempt at disproving plaintiff's allegations does the opposite: their contention is that "*after the hearing*, AAC upgraded its websites so that an icon appears next to the toll-free numbers to ensure potential patients are made aware that an AAC representative will be on the other end of the line." Mot. at 24. *At the time of the hearing*, Cartwright's testimony was misleading.

Cartwright also testified that the reason AAC was not a member of NAATP was that another organization was "meeting our needs more appropriately." ¶44. The fact that, when pressed, Cartwright "admit[ted]" (Mot. at 24) that "Marv asked us not to be members based on their new marketing practices or ethical guidelines that he has" (Mot., Ex. D at 65) does not change the fact

- 20 -

that his initial answer sought to mislead Congress. And Cartwright never mentioned AAC's attempts to threaten its way back into the NAATP. *Compare* ¶44 *with* Mot., Ex. D at 65.

### i. There Are No Innocent Inferences

In assessing scienter, the Court is to "conduct a 'comparative inquiry' and assess the possible competing inferences that could be drawn from the allegations, including 'plausible nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff.'" *Frank v. Dana Corp.*, 547 F.3d 564, 571 (6th Cir. 2008).

Defendants' proposed inferences all fail. First, defendants say plaintiff does not allege "the specific violation that occurred, so it cannot be 'simple or basic'" but instead "involves complicated judgments and assumptions." Mot. at 15. In fact, plaintiff alleges the restatement arose not from debatable but flawed judgments, but rather from AAC "[i]gnoring its own historical collections experience and instead relying on 'industry and other data'" to account for doubtful accounts receivable, contrary to its statements that its accounting was based on its "historical experience." ¶¶5, 54-58, 89-91, 95-100, 105-106, 114-116. In AAC's own words, the restatement reflected "the historical collection trends by customer," which trends "existed at the time of the issuance of the historical financial statements." ¶132. Excluding from the receivables analysis a type of data that defendants explicitly told investors they were using is exactly the type of "simple" and "basic" violation that supports an inference of scienter. *PR Diamonds*, 364 F.3d at 684.

Second, defendants argue they must not have acted with scienter because the "Restatement involved both *increases* and decreases to net income." Mot. at 1, 15. Suffice it to say this is not the first time securities fraud defendants have argued that an upward restatement in certain periods somehow undermines the inference of scienter. *See, e.g.*, *In re Envoy Corp. Sec. Litig.*, 133 F. Supp. 2d 647, 662 (M.D. Tenn. 2001) (Haynes, J.) (rejecting argument that "allegations of improper accounting 'to boost the Company's operating results' are illogical because . . . Defendants'

- 21 -

restatements resulted in a reduction in losses" in certain periods). This argument misrepresents the restatement. When financial statements are restated, expenses that were delayed (like provisions for bad debt that should have been recorded earlier) must be recorded in prior periods instead. Here, the FY17 net loss decreased because the provision for doubtful accounts that had been belatedly recorded in 2017 was restated to earlier periods – before and during FY16.[14] Defendants conveniently ignore that the single fiscal year increase in net income ($7.7 million in FY17), which they argue militates against scienter, pales next to the $44.4 million of net income improperly recognized the prior two fiscal years – more than 500% of the FY17 increase in net income. ¶88(b)-(c). Likewise, the understatements of net income for 1Q18 ($1.3 million) and 2Q18 ($1.4 million) are dwarfed by more than 400% by the $10.7 million overstatement of net income for 3Q18. ¶¶113(b), 121(b), 124(b). Far from supporting an innocent inference, the restatement's effect – nearly *tripling* the $25 million net loss AAC had reported from FY15 to 3Q18 – was "so great in magnitude, that [it] should have been obvious to a defendant." *PR Diamonds*, 364 F.3d at 684.

Third, defendants ask the Court to credit their self-serving claim that they "did not become aware of the issue until they started using recently developed financial database analytical tools after December 31, 2018." Mot. at 15. But again, defendants admitted the restatement reflected "the historical collection trends by customer" that "existed at the time of the issuance of the historical financial statements." ¶132. As noted by the SEC, "GAAP only allows a restatement . . . based upon information 'that existed at the time the financial statements were prepared'"; and "restatements should not be used to make any adjustments to take into account subsequent information that did not and could not have existed at the time the original financial statements were prepared." ¶61. Both defendants' contemporaneous statements and their decision to restate showed that the data they

---

[14] Defendants' argument that "[n]o executive would intentionally understate net income" (Mot. at 1) is also false. *See, e.g.*, *ASG*, 2009 WL 1348163, at *53 (explaining "'cookie jar' accounting").

- 22 -

excluded from their analysis – which they told investors they considered – both "existed" and was "available" to them at the time of the original financial statements. Defendants' vague, self-serving claim that they did not know at the time that they had misstated AAC's financial statements, based on unidentified "financial database analytical tools" that were "developed" at some unidentified "recent[]" time, does not support a nonculpable inference – and certainly not one that outweighs the inference of scienter.[15] *Tellabs*, 551 U.S. at 310.

Finally, defendants argue "the absence of motive and opportunity allegations" makes the innocent inference "more compelling." Mot. at 15-16. In fact, the individual defendants as senior executive officers did have the "opportunity" to commit fraud. *In re Cardinal Health Inc. Sec. Litig.*, 426 F. Supp. 2d 688, 726 (S.D. Ohio 2006) ("there can be little doubt that [senior management] could have, had they wanted to, committed such acts"). As to stock sales, "[t]here are any number of reasons why they might have chosen to keep their insider trading to a limit, not least of which is that they wanted to avoid getting caught." *In re Am. Int'l Grp., Inc.*, 965 A.2d 763, 801 (Del. Ch. 2009). Motive and opportunity do not support an opposing inference.[16]

### 4. The Complaint Alleges Loss Causation

"'Loss causation is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff.'" *Ohio Pub. Emps' Ret. Sys.*, 830 F.3d at 384. Alleging loss causation "is 'not meant to impose a great burden upon a plaintiff,' but to 'provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind.'" *Id.* No heightened pleading standards apply. *Id.* Plaintiff need only plead a "plausible" theory and may do

---

[15] As to the marketing statements, defendants argue their statements were truthful, and Cartwright participated in Congress's investigation in good faith. Mot. at 25. As explained above, their statements were not truthful, and Cartwright purposely misled Congress. *Supra* §II(B)(2), (3)(h).
[16] The extent of defendants' stock sales is beyond the scope of the Complaint. But it would be inaccurate to suggest (*see* Mot. at 15) that Cartwright did not pocket millions of dollars from the sale of AAC stock during the Class Period and prior to the alleged corrective disclosures.

- 23 -

so by alleging "'that negative investor inferences,' drawn from a particular event or disclosure, 'caused the loss and were a foreseeable materialization of the risk concealed by the fraudulent statement.'" *Id.* at 384-85; *see also Winslow*, 2011 WL 7090820, at \*9-\*13.[17]

AAC's stock price declined by more than 44% on November 6, 2018 on the disclosure that AAC had missed its 3Q18 revenue and earnings estimates, and was reducing FY18 guidance, as a result of "'a substantial decline in call volume'" and "'lower census,'" which it attributed to Google's algorithm changes. ¶¶129-131. That AAC's admissions and revenues would decline precipitously when defendants were unable to continue their deceptive marketing practices is precisely the type of foreseeable materialization of risk that was concealed by defendants' false and misleading statements and omissions.[18] *Ohio Pub. Emps. Ret. Sys.*, 830 F.3d at 384-85.

Defendants ignore the Sixth Circuit's endorsement of the "materialization of the risk" theory of loss causation in contending that the alleged disclosures must "correct prior statements . . . to allege loss causation adequately." *Compare* Mot. at 16-17, *with Ohio Pub. Emps' Ret. Sys.*, 830 F.3d at 384. Moreover, defendants did not need to state that "AAC was impervious to Google's changes or updates"[19] (Mot. at 17) in order for their admission and revenue losses to be "within the zone of risk concealed by the misrepresentations and omissions alleged." *Ohio Pub. Emps' Ret. Sys.*, 830

---

[17]    *D.E.&J. Ltd. P'ship v. Conaway*, 133 F. App'x 994, 999 (6th Cir. 2005) does not require plaintiff to "'***prove***'" loss causation to "state a claim against Defendants." *Cf.* Mot. at 16. *Conaway* confirms plaintiffs need only "'a short and plain statement of the claim showing that the pleader is entitled to relief'" and need "prove" loss causation to win on, not plead, their claims. 133 F. App'x at 999.

[18]    Defendants' contention that there is no logical connection between the statements and later disclosures is thus baseless. Mot. at 17. *Plumbers, Pipefitters & MES Local Union No. 392 Pension Fund v. Fairfax Fin. Holdings Ltd.*, 886 F. Supp. 2d 328 (S.D.N.Y. 2012) is inapposite. There, the Court found plaintiffs failed to plead loss causation because the disclosures at issue related only to misstatements that the Court had found to be immaterial. *Id.* at 338.

[19]    Defendants' purported risk warnings (Mot. at 17 n.3) relate, if at all, to materiality, not loss causation. *Supra* §II(B)(2)(a). Further, the November 6, 2018 warning (Mot., Ex. F) (a) came too late, simultaneously with the corrective disclosure, ¶¶129-131; and (b) was itself materially misleading since the risks it warned of had already come to pass. ¶¶72-73; *supra* §II(B)(2)(a).

- 24 -

F.3d at 384. *CCA*, 2017 WL 6442145, is on point. There, plaintiff alleged that CoreCivic represented that its "'strong record of operational excellence'" had "'earned [it] the confidence of [its] government partners,'" while concealing that the U.S. Bureau of Prisons had identified numerous deficiencies with CoreCivic's operations, ultimately announcing that it would end the use of private prisons altogether because of quality concerns. *Id.* at *14. Judge Trauger rejected defendants' loss causation contentions with reasoning that applies equally here:

> While it may be true that the [Google change] would have had some negative effect on the value of [AAC's] stock no matter what, the scope of that loss was determined by the degree to which the market was able to evaluate the [impact] of such a shift and therefore price that risk into its valuation of [AAC]. [Plaintiff's] Complaint amply alleges that [AAC] gave a misleadingly incomplete picture of the issues that ultimately resulted in [Google's change], and [AAC] concedes that it was that shift that caused the loss in value of its stock. [AAC's] argument, if accepted, would effectively immunize any company that concealed or misleadingly minimized a known risk from the damage done when that risk came to fruition.

*Id.* at *18; *accord Envision*, 2019 WL 6168254, at *25 (allegation that [defendant's business practices] were unsustainable and that [the company] saw decreased revenue when this risk was realized and [it] began to transition [its practices]" was "sufficient . . . to plausibly allege causation"). Loss causation is adequately pled.[20]

### C.     Leave to Amend Should Be Freely Granted

"[L]eave to amend [is] to be 'freely given when justice so requires.'" *Shane v. Bunzl Distrib. USA, Inc.,* 200 Fed. App'x. 397, 406 (6th Cir. 2006). "In the securities litigation context, leave to amend is particularly appropriate[.]" *Morse v. McWhorter*, 290 F.3d 795, 800 (6th Cir. 2002). If any part of the motion is granted, plaintiff respectfully asks permission to file an amended complaint, which it has not yet done (*see* ECF No. 1 (different plaintiff)), or a motion for leave to amend.

### III.     CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motions to dismiss.

---

[20]   Defendants do not dispute loss causation as to the restatement. *See also* ¶¶132-138.

- 25 -

DATED: April 10, 2020

Respectfully submitted,

ROBBINS GELLER RUDMAN
  & DOWD LLP
CHRISTOPHER M. WOOD, #032977
CHRISTOPHER H. LYONS, #034853


        s/ Christopher M. Wood
       CHRISTOPHER M. WOOD

414 Union Street, Suite 900
Nashville, TN 37219
Telephone: 615/244-2203
615/252-3798 (fax)
cwood@rgrdlaw.com
clyons@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
DARREN J. ROBBINS
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
darrenr@rgrdlaw.com

Lead Counsel for Indiana Public Retirement
System

BARRETT JOHNSTON MARTIN
  & GARRISON, LLC
JERRY E. MARTIN, #20193
Bank of America Plaza
414 Union Street, Suite 900
Nashville, TN 37219
Telephone: 615/244-2202
615/252-3798 (fax)
jmartin@barrettjohnston.com

Local Counsel

- 26 -

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on April 10, 2020, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

<div style="margin-left:50%">

s/ Christopher M. Wood
CHRISTOPHER M. WOOD

ROBBINS GELLER RUDMAN
    & DOWD LLP
414 Union Street, Suite 900
Nashville, TN 37219
Telephone: 800/449-4900
615/252-3798 (fax)

E-mail: cwood@rgrdlaw.com

</div>

# Mailing Information for a Case 3:19-cv-00407 Caudle v. AAC Holdings, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Paul Kent Bramlett**
  pknashlaw@aol.com

- **Robert P. Bramlett**
  robert@bramlettlawoffices.com

- **Lisa R. Bugni**
  lbugni@kslaw.com

- **Jessica Perry Corley**
  jpcorley@kslaw.com

- **Patrick V. Dahlstrom**
  pdahlstrom@pomlaw.com

- **Michael T. Harmon**
  michael.harmon@wallerlaw.com,TAPDocketingClerk-Nash@wallerlaw.com,shelli.dimarco@wallerlaw.com

- **Logan R. Hobson**
  lhobson@kslaw.com

- **J. Alexander Hood , II**
  ahood@pomlaw.com

- **Jeremy A. Lieberman**
  jalieberman@pomlaw.com,disaacson@pomlaw.com,lpvega@pomlaw.com

- **Jonathan Lindenfeld**
  jlindenfeld@pomlaw.com

- **Christopher Hamp Lyons**
  clyons@rgrdlaw.com,crosini@rgrdlaw.com,e_file_sd@rgrdlaw.com

- **Jerry E. Martin**
  jmartin@barrettjohnston.com,eseaborn@barrettjohnston.com,nchanin@barrettjohnston.com,jmartin@rgrdlaw.com,ggilbert@barrettjohnston.com

- **W. Travis Parham**
  travis.parham@wallerlaw.com,TAPDocketingClerk-Nash@wallerlaw.com,shelli.dimarco@wallerlaw.com

- **Christopher M. Wood**
  cwood@rgrdlaw.com,cbarrett@rgrdlaw.com,CWood@ecf.courtdrive.com,e_file_sd@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)