IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

INDIANA PUBLIC RETIREMENT
SYSTEM,[1] et al.

     Plaintiffs,

v.

AAC HOLDINGS, INC., et al.

     Defendants.

)
)
)
)
)
)
)
)
)
)
)

NO. 3:19-cv-00407
JUDGE RICHARDSON

## MEMORANDUM OPINION

Pending before the Court is Defendants' Motion to Dismiss the Amended Complaint (Doc.

No. 52, "Motion"). Lead Plaintiff has filed a response in opposition to the Motion (Doc. No. 56,

"Response"), and Defendants have filed a reply (Doc. No. 59, "Reply").

## BACKGROUND[2]

This securities fraud action alleges violations of Section 10(b) of the Securities Exchange

Act of 1934 ("the Act") and Securities and Exchange Commission ("SEC") Rule 10b-5

promulgated thereunder (together, "Section 10(b) claims") and also alleges violations of Section

20(a) of the Act ("Section 20(a) claims") on behalf of persons or entities that purchased common

stock of Defendant AAC Holdings, Inc. ("AAC") between March 8, 2017 and April 15, 2019,

---

[1] Indiana Public Retirement System was appointed Lead Plaintiff in this action by Order of the
Magistrate Judge dated August 13, 2019. (Doc. No. 37).

[2] Unless otherwise noted, the background facts are taken from Plaintiffs' Amended Complaint
(Doc. No. 45) and, for purposes of this motion to dismiss, are accepted as true. Even with the
heightened pleading standards applicable to a securities fraud case under Section 10(b), the
allegations in the Amended Complaint are accepted as true, and all reasonable inferences are drawn
in Plaintiff's favor. *Weiner v. Tivity Health, Inc.*, 365 F. Supp. 3d 900, 908 (M.D. Tenn. 2019).

inclusive ("the Class Period"). Plaintiffs allege that Defendants engaged in an unethical and deceptive sales and marketing scheme and also fraudulently inflated AAC's accounts receivable, overstating AAC's reported net income and/or understating net losses it reported to investors during the Class Period. Once news of Defendants' misconduct reached the market, AAC's stock price collapsed, declining more than 86% and resulting in millions of dollars of losses to AAC investors. This action seeks to recover those losses suffered by Lead Plaintiff[3] and the proposed class.

AAC Holdings, Inc. ("AAC") is a provider of inpatient and outpatient addiction treatment services and also an Internet marking company. AAC has filed a Suggestion of Bankruptcy in this action (Doc. No. 60), so the Court will proceed with the Motion only as to the individual Defendants. 11 U.S.C. § 362(a). Defendant Michael Cartwright served as AAC's Chief Executive Officer ("CEO") and Chairman of AAC's Board of Directors at all relevant times and was AAC's largest stockholder. Defendant Kirk Manz served as AAC's Chief Financial Officer ("CFO") from January 2011 until his resignation in December 2017. Defendant Andrew McWilliams served as AAC's Chief Accounting Officer from August 2014 until January 1, 2018, when he became AAC's CFO.

The 178-paragraph Amended Complaint sets forth allegations concerning Defendants' fraudulent scheme and their materially false and misleading statements and omissions. In their Section 10(b) claims, Plaintiffs' "Restatement Claim" asserts that Defendants made false and misleading statements about AAC's accounts receivable, leading to false financial statements that were ultimately revealed to investors through AAC's Restatement of its financial results for fiscal years 2016 and 2017 and the first three quarters 2018. Plaintiffs' "Marketing Claim" alleges that

---

[3] Lead Plaintiff oversees a total of nine separate retirement funds for public employees in Indiana.

2

Defendants engaged in a fraudulent and deceptive sales and marketing scheme and made false and misleading statements related to AAC's sales and marketing practices that were revealed to investors as the industry and Congress began to investigate and cast light upon such deceptive practices.[4] In their Section 20(a) claims, Plaintiffs contend that the individual Defendants, as "controlling persons" of AAC, violated Section 20(a).

Via the Motion, Defendants argue that Plaintiff's Section 10(b) claims should be dismissed because Plaintiffs have failed to allege a strong inference of scienter, failed to allege loss causation, and failed to allege actionable misstatements. Defendants also argue that, because Plaintiffs have failed to state underlying Section 10(b) claims, their Section 20(a) claims should also be dismissed.

## MOTIONS TO DISMISS

For purposes of a motion to dismiss, the Court must take all the factual allegations in the complaint as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Id*. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id*. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id*. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to

---

[4] Among other allegations, Plaintiffs describe Defendants' deceptive sales and marketing scheme as follows: "As an integral part of defendants' continued efforts to fill beds and drive AAC's reported revenue growth, the Company operated over 100 deceptive websites that were designed to appear to provide unbiased and reliable addiction advice and directories of treatment facilities but were, in fact, thinly veiled lead-generation mechanisms. When people seeking help with drug and alcohol addiction called the toll-free number listed on AAC's websites, they were not connected with counselors or treatment specialists but rather with commission compensated AAC salespersons located in AAC's Brentwood, Tennessee call center, who were paid bonuses when they induced callers to be admitted to AAC facilities." (Doc. No. 145 at ¶ 4).

relief. *Id.* at 1950. A legal conclusion, including one couched as a factual allegation, need not be accepted as true on a motion to dismiss, nor are mere recitations of the elements of a cause of action sufficient. *Id.*; *Fritz v. Charter Township of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010), *cited in Abriq v. Hall*, 295 F. Supp. 3d 874, 877 (M.D. Tenn. 2018). Moreover, factual allegations that are merely *consistent* with the defendant's liability do not satisfy the claimant's burden, as mere consistency does not establish *plausibility* of entitlement to relief even if it supports the *possibility* of relief. *Iqbal*, 556 U.S. at 678.

In determining whether a complaint is sufficient under the standards of *Iqbal* and its predecessor and complementary case, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), it may be appropriate to "begin [the] analysis by identifying the allegations in the complaint that are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 680. This can be crucial, as no such allegations count toward the plaintiff's goal of reaching plausibility of relief. To reiterate, such allegations include "bare assertions," formulaic recitation of the elements, and "conclusory" or "bald" allegations. *Id.* at 681. The question is whether the remaining allegations – factual allegations, *i.e.*, allegations of factual matter – plausibly suggest an entitlement to relief. *Id.* If not, the pleading fails to meet the standard of Fed. R. Civ. P. 8 and thus must be dismissed pursuant to Rule 12(b)(6). *Id.* at 683.[5]

As a general rule, matters outside the pleadings may not be considered in ruling on a motion to dismiss under Fed. R. Civ. P. 12(b)(6) unless the motion is converted to one for summary judgment under Rule 56. Fed. R. Civ. P. 12(d). When a document is referred to in the pleadings and is integral to the claims, it may be considered without converting a motion to dismiss into one

---

[5] The Court notes the heightened pleading standard requirement for securities fraud cases, as set forth below.

for summary judgment. *Doe v. Ohio State Univ.,* 219 F. Supp. 3d 645, 652-53 (S.D. Ohio 2016); *Blanch v. Trans Union, LLC*, 333 F. Supp. 3d 789, 791-92 (M.D. Tenn. 2018).

To support a Rule 12(b)(6) motion to dismiss, "[t]he moving party has the burden of proving that no claim exists." *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross and Blue Shield,* 552 F.3d 430, 433 (6th Cir. 2008). That is not to say that the movant has some *evidentiary* burden; as should be clear from the discussion above, evidence (as opposed to *allegations* as construed in light of any allowable matters outside the pleadings) is not involved on a Rule 12(b)(6) motion. The movant's burden, rather, is a burden of *explanation*; since the movant is the one seeking dismissal, it is the one that bears the burden of explaining—with whatever degree of thoroughness is required under the circumstances—why dismissal is appropriate for failure to state a claim.

## SECURITIES FRAUD

Section 10(b) of the Act and Rule 10b-5 promulgated thereunder prohibit fraudulent, material misstatements or omissions in connection with the sale or purchase of a security. *Grae v. Corrections Corp. of Am.*, No. 3:16-cv-2267, 2017 WL 6442145, at * 13 (M.D. Tenn. Dec. 18, 2017). Liability under Rule 10b-5 is implicated when an individual, in connection with the purchase or sale of any security, either directly or indirectly, (a) employs any device, scheme, or artifice to defraud, (b) makes any untrue or misleading statement of a material fact, or (c) engages in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person. 17 C.F.R. § 240.10b-5.[6]

---

[6] In full, Rule 10b-5 provides as follows:

To state a claim under Section 10(b) and Rule 10b–5(b), a plaintiff must allege: "(1) a material misrepresentation or omission by the defendant;[7] (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Jackson Cty. Employees' Ret. Sys. v. Ghosn*, --- F. Supp. 3d ---, 2020 WL 7711378, at *13 (M.D. Tenn. Dec. 29, 2020) (citing *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 469 (6th Cir. 2014) [hereinafter, *Omnicare*]). Stated another way, "a plaintiff must allege, in connection with the purchase or sale of securities, the misstatement or omission of a material fact, made with scienter, upon which the plaintiff justifiably relied and which proximately caused the plaintiff's injury." *Id.*

Plaintiffs' securities fraud claims implicate the heightened pleading standards of Federal Rule of Civil Procedure 9(b), *Jackson Cty*, 2020 WL 7711378, at *5, which requires that a party "must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Accordingly, the Amended Complaint must "(1) specify the statements that Plaintiffs contend

---

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
(a) To employ any device, scheme, or artifice to defraud,
(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

[7] "Successfully pleading an actionable material misrepresentation or omission requires a plaintiff to allege facts demonstrating two things: (1) that a defendant made a statement or omission that was false or misleading; and (2) that this statement or omission concerned a material fact." *Jackson Cty.*, 2020 WL 7711378 at *14 (citing *Omnicare,* 769 F.3d at 470).

6

were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Jackson Cty.,* 2020 WL 7711378, at *5 (citing *Dougherty v. Esperion Therapeutics, Inc.,* 905 F.3d 971, 978 (6th Cir. 2018)). The Private Securities Litigation Reform Act ("PSLRA")—in particular, 15 U.S.C. § 78u–4(b)(1) & (2), respectively—requires that a plaintiff's complaint (1) specify each statement alleged to have been misleading along with the reason(s) why the statement is misleading and (2) state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind. *Id.*

Historically, the first two of the six elements have been notoriously difficult to articulate. As the Sixth Circuit noted a half-dozen years ago:

> Our court has covered the standards for pleading these elements many times, and yet for all of our efforts and many pronouncements, the precise requirements for sufficiently pleading them, at least in this circuit, remain somewhat hazy and muddled. Therefore, before analyzing KBC's actual allegations, we will attempt to state the doctrine simply and in a straightforward manner in the hope of clearing away any confusion.

*Omnicare*, 769 F.3d at 469. The Court herein will attempt to do likewise, relying on *Omnicare* (and whatever clarity it provided) and other extant cases.

## SCOPE OF THE MOTION TO DISMISS

As noted above, it is Rule 10b-5(a) that prohibits employment of "any device, scheme, or artifice to defraud," and it is Rule 10b-5(b) that prohibits making "any untrue statement of a material fact" or omitting "a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading[.]" A defendant who violates Rule 10b-5(a) is subject to what is known generally as "scheme liability." As Plaintiffs note in their Response, (Doc. No. 56 at 12), in the Amended Complaint they did allege scheme liability, accusing Defendants (at several places in the Amended Complaint) of perpetrating a scheme, then accusing the Defendants of violating Section 10(b) and Rule 10b-5 specifically by,

7

among other things, "employing devices, schemes and artifices to defraud[.]" (Doc. No. 45 at ¶ 167). As Plaintiffs further note, scheme liability is premised on conduct that goes beyond just false statements or omissions of material fact.

In the Motion or memorandum in support thereof, Defendants did not specifically challenge Plaintiffs' claims of scheme liability under Rule 10b-5(a). In their Response, Plaintiffs asserted that Defendant did not challenge Plaintiffs' scheme liability claims (unlike their claims under Rule 10b-5(b)), and that therefore any such challenge was waived. (Doc. No. 56). In their Reply, Defendants argued that Plaintiffs had failed adequately to plead reliance upon any purported scheme. (Doc. No. 59). The Court finds that Defendants did not move to dismiss Plaintiffs' scheme liability claims and, therefore, it will not address Defendants' belated argument related thereto, which are deemed waived for purposes of the Motion. *Estakhrian v. Obenstine*, 320 F.R.D. 63, 91 (C.D. Cal. 2017) (noting that a party waives any argument raised for the first time in its reply rather than its opening brief); *Mackey v. Brunsman*, No. 3:09cv255, 2011 WL 13130640, at *4 (S.D. Ohio Feb. 11, 2011) (holding that where the plaintiff-movant first raised a particular argument in his reply and "failed to raise that argument in his motion, he has waived that argument"), *aff'd sub nom. Mackey v. Warden, Lebanon Corr. Inst.*, 525 F. App'x 357 (6th Cir. 2013).

The Court is thus constrained to construe the Motion as one seeking dismissal of Plaintiffs' claims only to the extent that they are based on alleged violations of Rule 10b-5(b). The Court's discussion will proceed accordingly.

## RESTATEMENT CLAIM

On April 15, 2019, AAC released its annual SEC Form 10-K for Fiscal Year 2018. (Doc. No. 45 at ¶ 50). The same release that disclosed AAC's 4Q18 financial results also included the

8

company's earnings restatement. (*Id.*; Doc. No. 53-7, referred to in the Amended Complaint as "the Restatement"). Specifically, the Restatement included an "Explanatory Note" that stated, in part, that AAC had determined that adjustments to certain of its previously issued annual and interim financial statements were necessary and that those annual and interim financial statements could no longer be relied upon. (Doc. No. 53-7 at 5). The Explanatory Note represented that the adjustments related to estimates of accounts receivable, provision for doubtful accounts, and revenue for the relevant periods, as well as related income tax effects. (*Id.*).

The Explanatory Note further stated that when AAC had begun using recently developed financial database analytical tools, it "became aware of historical cash collection trends by customer that existed at the time of the issuance of the historical financial statements." (*Id.*). As a result, the Explanatory Note continued, AAC concluded that "this oversight by the Company of the historical collection trends by customer led to the adjustments being considered corrections of an error" under generally accepted accounting principles in the United States ("GAAP"). (*Id.*). The Restatement included restated financial results for 2016, 2017 and the first three quarters of 2018. (Doc. No. 45 at ¶ 132; Doc. No. 53-7 at 5).

Plaintiffs have asserted that the Restatement led to the collapse of AAC's stock price and losses to its investors. In support of the Restatement claim, Plaintiffs rely upon alleged false and misleading statements in the Restatement regarding accounts receivables that resulted in net losses being understated by about $70 million from FY15 to 3Q18, which almost tripled the cumulative net loss previously reported for that period. (Doc. No. 45 at ¶¶ 88, 109(b), 113(b), 121(b), and 124(b); Doc. No. 56 at 22).

9

Defendants argue that Plaintiffs' Restatement claim should be dismissed for failure to allege a strong inference of scienter.[8] "Scienter" has been defined as a mental state embracing intent to deceive, manipulate, or defraud. *Jackson Cty.,* 2020 WL 7711378, at *18 (citing *Matrixx Initiatives, Inc. v. Siracusano,* 563 U.S. 27, 48 (2011)). "In the securities fraud context, scienter includes a knowing and deliberate intent to manipulate, deceive, or defraud, and recklessness."[9] *Id.* (citing *Doshi v. Gen. Cable Corp.,* 823 F.3d 1032, 1039 (6th Cir. 2016)); *see also Dougherty v. Esperion Therapeutics, Inc.,* 905 F. 3d 971, 979 (6th Cir. 2018). Whether someone made a statement with the knowledge that it was false is, at bottom, a question of someone's state of mind, which is the general subject of a scienter inquiry. *Omnicare,* 769 F.3d at 471.

The Supreme Court has set forth a framework for analyzing the scienter element as follows:

> We establish the following prescriptions: *First,* faced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true. . . .
>
> *Second,* courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice. The inquiry, as several Courts of Appeals have recognized, is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.
>
> *Third,* in determining whether the pleaded facts give rise to a "strong" inference of scienter, the court must take into account plausible opposing inferences. . . .
>
> The strength of an inference cannot be decided in a vacuum. The inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts? To determine whether the plaintiff has alleged facts that give rise to the requisite "strong inference" of scienter, a court must

---

[8] As noted above, the PSLRA requires that a plaintiff's complaint must specify each statement alleged to have been misleading along with the reason or reasons why the statement is misleading and state with particularity facts giving rise to a strong inference of scienter. *Id.*

[9] Under the general PSLRA standard, a complaint may allege scienter based on "either knowing falsity or recklessness." *Moshell v. Sasol Ltd.*, 481 F. Supp. 3d 280, 289 (S.D.N.Y. 2020).

consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff. The inference that the defendant acted with scienter need not be irrefutable, *i.e.,* of the "smoking-gun" genre, or even the "most plausible of competing inferences." . . . Yet the inference of scienter must be more than merely "reasonable" or "permissible"—it must be cogent and compelling, thus strong in light of other explanations. A complaint will survive, we hold, only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322–24 (2007) (citations omitted).

In *Matrixx,* the Court provided a post-*Tellabs* example of how to consider scienter pleadings "holistically" in Section 10(b) cases. *See Frank v. Dana Corp*., 646 F.3d 954, 961 (6th Cir. 2011) (citing *Matrixx*, 563 U.S. at 48). "Writing for the Court, Justice Sotomayor expertly addressed the allegations collectively, did so quickly, and, importantly, did not parse out the allegations for individual analysis." *Id. "*This is the only appropriate approach following *Tellabs's* mandate to review scienter pleadings based on the collective view of the facts, not the facts individually." *Id.*[10] (citing *Tellabs,* 551 U.S. at 322–23 ("The inquiry ... is whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.")).[11]

---

[10] The former method of reviewing each allegation individually before reviewing them holistically risks losing the forest for the trees. *Frank,* 646 F.3d at 961. Furthermore, after *Tellabs,* conducting an individual review of a myriad allegations is an unnecessary inefficiency. *Id.*

[11] Prior to *Matrixx,* the Sixth Circuit provided a list of nine non-exhaustive factors to consider: (1) insider trading at a suspicious time or in an unusual amount; (2) divergence between internal reports and external statements on the same subject; (3) closeness in time of an allegedly fraudulently statement or omission and the later disclosure of inconsistent information; (4) evidence of bribery by a top company official; (5) existence of ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit; (6) disregard of the most current factual information before making statements; (7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication; (8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and (9) the self-interested motivation of defendants in the form of saving their salaries or jobs. *See St. Clair Cty. Emps.' Ret. Sys. v. Acadia Healthcare Co., Inc.*, No.

Thus, the Court will address Plaintiffs' claims holistically, as required by *Tellabs*, but it also will address the specific arguments in Defendants' Motion. Plaintiffs allege that AAC represented to investors, contemporaneously with its (original, not restated) financial statements, that it had accounted for doubtful accounts receivable based on its historical experience; when in fact it had *not* based its accounting on its historical experience. Thus, as alleged by Plaintiffs, those representations about accounts receivable were false. Plaintiffs also allege that Defendants *knew* their representations were false (*i.e.*, acted with scienter) because of various, obvious, warning signs. The parties agree that "warning signs" that would have revealed accounting errors, obvious "red flags," can be indicators of scienter. (Doc. No. 53 at 16; Doc. No. 56 at 22); *see Ricker v. Zoo Entm't., Inc.,* 534 F. App'x 495, 499 (6th Cir. 2013). Defendants challenge the following alleged "red flags" related to the Restatement claim.

a) <u>Scrutiny of Lab Diagnostic Testing</u>

Defendants maintain that Plaintiffs have failed adequately to allege that AAC's experience of a delay in collections for out-of-network lab diagnostic testing implies scienter—that is, that such delays show Defendants' knowledge of any falsity related to AAC's accounts receivable. Defendants also argue that AAC *disclosed* these delays at the beginning of the Class Period by stating that "the aging of our accounts receivable continue to be negatively impacted by increased documentation requests from commercial payors prior to payment and slower collections related to laboratory services." (Doc. No. 53 at 17). Typically, the Court realizes, disclosures by securities-fraud defendants (if truthful) tend to aid defendants by suggesting that the defendants were not

---

3:18-cv-00988, 2021 WL 195370, at *7 n.4 (M.D. Tenn. Jan. 20, 2021) (citing *Frank*, 646 F.3d at 958). Because *Frank* was decided before *Matrixx*, the Court need not examine the nine factors separately.

12

concealing anything or deceiving anyone.[12] But here, Defendants' argument about disclosure does not advance their position as to scienter. Defendants' disclosure was fine as far as it went, but it does not serve to show that Defendants concealed nothing material about accounts receivable in their original financial statements. Rather, Defendants' disclosure serves to show that Defendants knew something material; that is, the disclosure shows that Defendants *knew* about this "red flag" of delays in collections and still did not account for those receivables truthfully.

Moreover, the Amended Complaint alleges[13] that AAC did not disclose how it was actually accounting for doubtful accounts, AAC was ignoring its own historical collection experience, and AAC was failing to properly reserve for or write off accounts receivable that had aged well beyond 360 days. Therefore, Plaintiffs contend, AAC significantly overstated its accounts receivable during the Class Period. (Doc. No. 45 at ¶ 58). "Because AAC was ignoring its own historical collection experience and failing to properly reserve for or write off accounts receivable that had aged well beyond 360 days, it significantly overstated its accounts receivable during the Class Period." (*Id.*). Plaintiffs assert that the presence of these delays in lab business collections is an

---

[12] But there can be a downside for defendants to having made truthful disclosures: the disclosures serve to make clear that the defendants were aware of the facts truthfully disclosed, and such awareness in some cases can undermine the defendants' position.

[13] Citing comments allegedly made by Defendant Manz in April, May and August 2017, the Amended Complaint asserts that Defendants knew, by the start of the Class Period, of the increased scrutiny within the lab business and the refusal to pay bills pending additional clinical documentation and yet, they failed to write off accounts receivable related to such bills for two to three years. (Doc. No. 45 at ¶ 57 and ¶¶ 140-41). Plaintiffs allege that Defendants Cartwright, Manz, and McWilliams knew that this "lab side of the business" was causing a slowdown in collections and why it was, yet they simply allowed those receivables to remain on AAC's books instead of timely writing them off. (*Id.* at ¶ 141).

13

indicator of scienter—of what Defendants knew and intentionally or recklessly disregarded or concealed in relation to AAC's accounts receivable.

The Court finds that Plaintiffs have sufficiently alleged that Defendants' continued knowledge of these delays is an indicator that can be considered with the entirety of the Amended Complaint as to whether Defendants knew they were failing properly to account for receivables.

b) AAC's DSO Metrics

Plaintiffs allege that Defendants were aware that AAC's day sales outstanding ("DSOs")[14] were abnormally high and, therefore, were alerted to a significant collections problem. (*Id.* at ¶ 143). Plaintiffs aver that a growing DSO figure is often a telltale sign that a company's receivables are impaired, and Defendants knew of these problems.

Defendants maintain that AAC disclosed its increasing DSOs during the alleged Class Period by stating "our days sales outstanding was 111 days as of and for the quarter ended December 31, 2016 compared with 96 days as of and for the quarter ended December 31, 2015." (Doc. No. 53 at 18). Again, Defendants' reliance upon their disclosures does not help their position on scienter; rather, the disclosure admits Defendants' awareness of the problem.

Plaintiffs respond that Defendants knew or should have known through these "red flags" that AAC's receivables were impaired and, at a minimum, warranted closer analysis. (Doc. No. 56 at 15). Again, the Amended Complaint alleges that AAC was ignoring its own historical collection experience and failing to properly reserve for or write off accounts receivable that had aged well beyond 360 days and therefore, it significantly overstated its accounts receivable during the Class Period. (Doc. No. 45 at ¶ 58). As before, the disclosure on which Defendants rely here does not

---

[14] The Amended Complaint alleges that DSOs measure the average number of days it takes a company to collect on its receivables and are a common and useful measure of collectability, cash flow efficiency, and revenue quality. (Doc. No. 45 at ¶ 142).

ultimately help Defendants. Rather than precluding the possibility that Defendants were hiding something in their original financial statements, Defendants' disclosure of rising DSOs is a further indicator that Defendants knew that their accounting for (and statements concerning) accounts receivable were overly rosy, *i.e.*, false and misleading. This fact can be considered along with the other indicators as evidence of scienter.

c) SEC Subpoena

The Amended Complaint alleges that in March 2018, AAC received a subpoena from the SEC, seeking information about certain accounts receivable. (Doc. No. 45 at ¶¶ 7, 58). Plaintiffs assert that Defendants concealed this subpoena from the market for more than seven months, until November 2018, when Defendants changed the company's estimate of the collectability of the specific receivables referenced in the SEC subpoena. (*Id.*). Plaintiffs allege this change in estimate resulted in a significant revenue reduction and net loss increase for the company as of September 30, 2018, and the SEC Subpoena reflects Defendants' knowledge of or scienter with regard to this problem since at least March 2018. (*Id.*).

Defendants contend that AAC had no duty to disclose this subpoena and that the subpoena, which related to partial payment accounts receivable, had nothing to do with the Restatement. (Doc. No. 53 at 19). Once again, however, Defendants have placed unwarranted reliance on a disclosure-related point while ignoring the salient point about knowledge. Plaintiffs have not asserted that Defendants had a duty to *disclose* the subpoena. Rather, they have asserted that receipt of the subpoena is further evidence of *scienter*, *i.e.*, that Defendants knew of red flags with their accounts receivable and recklessly issued financial statements containing false information about their accounts receivable. Defendants also maintain that the fact of an SEC subpoena is insufficient

15

on its own to meet the *Tellabs* standard.[15] (*Id.*). Plaintiffs' allegations, however, are that Defendants were *aware* of overall significant overstatements of accounts receivable, of which these partial payment accounts receivable flagged by the SEC were a part (partial payment or otherwise), and that the SEC subpoena was further proof of Defendants' *knowledg*e.

Plaintiffs have sufficiently alleged that the SEC subpoena relates to Defendants' knowledge of problems with its accounting for accounts receivable. The Court will consider this subpoena in the holistic *Tellabs* analysis of scienter.

d) Signed Sarbanes-Oxley ("SOX") Certifications

The Amended Complaint alleges that the individual Defendants signed SOX certifications (accompanying AAC's periodic reports) during the Class Period that certified Defendants had reviewed each report, had designed disclosure controls and procedures to ensure that material information relating to AAC was made known to them, and had, within the past quarter, evaluated the effectiveness of AAC's disclosure controls and procedures that were purportedly in place to ensure that material information was made known to them. (Doc. No. 45 at ¶ 147). Plaintiffs assert that if these statements by the individual Defendants were true, then Defendants either knew or were reckless in not learning of AAC's fraudulent accounting for accounts receivable, an allegation that sufficiently indicates scienter. (*Id.*).

Defendants argue that signed SOX certificates are indicative of scienter only if the person signing the certification was severely reckless in certifying the accuracy of the financial

---

[15] Defendants cite to *Perrin v. Sw. Water Co.*, No. 2:08-cv-7844, 2011 WL 10756419, at *11 (C.D. Cal. June 30, 2011), which states that an allegation that the SEC questioned an accounting is not sufficient to show that a defendant had the requisite intent to defraud or acted with deliberate recklessness as to its financial reports; but, the *Perrin* court actually said that an allegation that the SEC questioned an accounting "*without more*" falls short. *Id.* Here, the allegation concerning the SEC subpoena is simply one indicator of scienter that Plaintiffs allege.

statements, and Defendants have a point.[16] But Defendants miss the mark when they argue that Plaintiffs have failed to allege any such recklessness. (Doc. No. 53 at 19-20). Defendants contend that the Amended Complaint fails to allege facts to suggest that the individual Defendants had reason to know or should have suspected accounting irregularities at the time they signed the SOX certificates and that Plaintiffs have failed to show any connection between the SOX certificates and any accounting issues. (*Id.* at 20). Therefore, Defendants maintain, these SOX certificates are not indicative of scienter.

The fraud alleged in the Amended Complaint, however, directly implicates AAC's internal controls and accounting practices. Plaintiffs allege that Defendants were, in violation of GAAP, artificially inflating AAC's financial results by failing timely to write off accounts receivable they knew were uncollectible and, thereby, Defendants were reporting AAC's financial condition and operating performance as being much stronger than they actually were. (Doc. No. 45 at ¶¶ 50-58). Thus, Plaintiffs contend, if Defendants truthfully reported that they reviewed AAC's internal controls, then Defendants knew or recklessly disregarded that the company was not accounting for doubtful accounts receivable in accordance with its disclosures. If Defendants did *not* review AAC's internal controls, then Defendants falsely represented in their certifications that they did undertake such a review, which could also contribute to a finding of scienter under the applicable holistic analysis. (Doc. No. 56 at ¶¶ 27-28). These allegations are sufficient for the Court to consider the specific SOX certifications in its scienter analysis.

---

[16] The Sixth Circuit has stated that a Sarbanes–Oxley certification is probative of scienter only if the person signing the certification was severely reckless in certifying the accuracy of the financial statements. *Ley v. Visteon Corp.*, 543 F.3d 801, 812 (6th Cir. 2008), *abrogated on other grounds as recognized in Doshi v. Gen. Cable Corp.,* 823 F.3d 1032, 1039 (6th Cir. 2016). Here, however, unlike *Ley*, Plaintiffs have alleged facts to suggest that Defendants had reason to know or should have suspected accounting irregularities or other "red flags" at the time they signed the certificates.

e) <u>Executive Resignations</u>

The Amended Complaint asserts that during and following the Class Period, numerous senior AAC executives and directors resigned. (Doc. No. 45 at ¶ 148). Specifically, Plaintiffs have alleged that during the Class Period, Defendant Manz resigned and AAC's Chief Compliance Officer and Chief Clinical Officer resigned. After the Class Period, AAC's President and Chief Operating Officer resigned and the majority of AAC's board of directors resigned. (*Id.*). Defendants argue that Plaintiffs have failed to show any connection whatsoever between the job turnover and the Restatement or any inference of misconduct; but evidence of these resignations is offered here as an indicator of scienter, not to show misconduct.

In some situations, courts have found that resignations and related remedial, internal changes were "unusual" and, combined with other evidence, possibly indicative of fraud. *In re Sipex Corp. Sec. Litig.,* No. C 05-00392 WHA, 2005 WL 3096178, at *1 (N.D. Cal. Nov. 17, 2005) ("These circumstances, combined with the announcement of the impending restatement, establish a strong inference that the company itself believes that fraud led to materially misleading financials for the period in question"), *cited in In re Am. Serv. Grp., Inc.,* No. 3:06-0323, 2009 WL 1348163, at *58 (M.D. Tenn. Mar. 31, 2009). As with the other alleged indicators of scienter, the Court will consider this factor—not alone, but in combination with other factors—in connection with the holistic *Tellabs* standard. The Court will give this factor little weight, however, in light of the fact that (1) of those executives who resigned, only Manz is accused of securities violations, and he resigned before the end of the Class Period; and (2) Defendant Cartwright, a major stockholder, and the CEO and Board Chairman, did not resign.

18

f) Restatement Itself

Plaintiffs have also alleged that the issuance of the Restatement itself demonstrates scienter. This assertion implies that there was fraud merely because there was a restatement. This is simply not the case. *In re The Goodyear Tire & Rubber Co. Sec. Litig.*, 436 F. Supp. 2d 873, 894 (N.D. Ohio 2006). By definition, a restatement says that the prior financial statement was false. *In re FirstEnergy Corp. Sec. Litig.*, 316 F. Supp. 2d 581, 595 (N.D. Ohio 2004). Such an assumption is logical since the purpose of a restatement is to correct an error in a previously issued financial statement. *Id.* While the need for a restatement may demonstrate the falsity of a prior statement, it does not automatically result in a finding of scienter. *Goodyear Tire & Rubber*, 436 F. Supp. 2d at 894.[17] There is no disputing that AAC issued false statements; instead, the issue this Court is called on to decide is whether Plaintiffs have adequately alleged scienter as to those statements on the part of Defendants. *See id.* The issuance of the Restatement itself is not directly probative of that issue.

g) Conclusion

Plaintiffs have alleged that Defendants knew (or were reckless[18] in not knowing) that AAC was failing properly to reserve and account for doubtful accounts receivable and would never

---

[17] An allegation of failure to follow GAAP is, by itself, insufficient to state a securities fraud claim. *Am. Serv. Grp.,* 2009 WL 1348163, at *55. To give rise to an inference of scienter, violations of GAAP must be of a type and scope to be obvious or to show the magnitude, pervasiveness, and repetitiveness of the company's violations of simple accounting principles amounting to a night-and-day difference. *Id.* Plaintiffs must also allege facts showing that the defendants knew or could have known of the violations (and resulting errors) or that regular procedures should have alerted them to the errors sooner than they actually did. *Id.* Yet, accounting errors in the preparation of the original financial statements can be viewed in combination with other allegations when assessing scienter. *Id.*

[18] Scienter includes recklessness. *Forman v. Meridian Bioscience, Inc.*, 387 F. Supp. 3d 791, 794 (S.D. Ohio 2019). "Recklessness" is defined in this context as highly unreasonable conduct which

collect on many of these accounts. (Doc. No. 45 at ¶¶ 51, 57, 58). Plaintiffs also contend that Defendants misrepresented their reliance upon AAC's historical collection experience in accounting for these doubtful accounts receivable. (*Id.* at ¶¶ 55, 57). Plaintiffs maintain that, despite Defendants' representations, AAC failed to timely reserve for and write off uncollectable accounts receivable "based on historical cash collection trends by customer that existed at the time of the issuance of the historical financial statements." (*Id.* at ¶¶ 62, 132-33). Plaintiffs have sufficiently alleged facts to show a strong inference of scienter as to AAC's failure adequately and accurately to account for its accounts receivables.

The Court finds that, when the allegations are viewed holistically, Plaintiffs have sufficiently alleged facts giving rise to a strong inference of scienter to support the Restatement Claim. Defendants' Motion with regard to that claim will be denied.

## MARKETING CLAIM

Plaintiffs also allege that Defendants made false and misleading statements regarding AAC's marketing practices, touting AAC's "best-in-class sales and marketing engine" with its "competitive advantage" to investors. (Doc. No. 45 at ¶¶ 63-83). Plaintiffs contend that efforts by the industry and others to curtail such predatory and unscrupulous tactics took a profound financial toll on AAC, which relied heavily on deceptive methods to fuel its growth. These curtailing efforts began to reveal to the market AAC's deceptive practices and resulted in AAC revenue decline of tens of millions of dollars. (*Id.* at ¶ 83). Defendants argue that this Marketing Claim should be

---

is an extreme departure from the standards of ordinary care akin to conscious disregard. *Id.* Recklessness requires more than negligence or the mere notice and opportunity to commit fraud, but it is a lower standard than knowing misrepresentation or intent. *Id.*

dismissed for failure to plead loss causation, failure to plead an actionable statement or omission, and failure to plead facts giving rise to a strong inference of scienter. (Doc. No. 53).

    1. Loss Causation[19]

A party who brings a securities fraud claim bears the burden to prove "that the act or omission of the defendant alleged to violate this chapter caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u–4(b)(4). The Sixth Circuit has defined loss causation (somewhat tautologically) as "the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Ohio Pub. Emps. Ret. Sys. v. Fed. Home Loan Mortg. Corp.,* 830 F.3d 376, 384 (6th Cir. 2016)). The requirement to allege loss causation is subject only to the general pleading principle of Federal Rule of Civil Procedure 8(a)(2), which in this context entails that Plaintiffs need only set forth briefly and plainly the facts showing loss causation. Fed. R. Civ. P. 8(a)(2); *In re Envision Healthcare Corp. Sec. Litig.*, No. 3:17-cv-01112, 2019 WL 6168254, at *23 (M.D. Tenn. Nov. 19, 2019). The pleading requirement is not meant to impose a great burden upon a plaintiff, but to provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind. *Ohio Pub. Emps.,* 830 F.3d at 384. At the motion-to-dismiss stage, it is sufficient that the plaintiff's allegations be plausible; no final determination of amount of loss or its cause is required. *Id.*

The Sixth Circuit has recognized two methods by which a plaintiff can show loss causation: (1) through a corrective disclosure; and (2) through materialization of a concealed risk. *Envision Healthcare,* 2019 WL 6168254, at *24 (citing *Ohio Pub. Emps.*, 830 F.3d at 384-85)). "Under the

---

[19] The Amended Complaint's allegations concerning loss causation are found in paragraphs 128-138. (Doc. No. 45).

first method, a corrective disclosure reveals the fraud and the market reacts negatively to the disclosure of [what was concealed by] the fraud." *Id.*[20] Under the materialization of the risk theory, "a misstatement or omission is the 'proximate cause' of an investment loss if the risk that caused the loss was within the zone of risk concealed by the misrepresentations and omissions alleged by a disappointed investor." *Id.* (quoting *Ohio Pub. Emp.*, 830 F.3d at 384).[21]

Plaintiffs claim that Defendants' deceptive sales and marketing statements and omissions were designed to and did artificially inflate, maintain, and manipulate the price of AAC common stock. Plaintiffs aver that Defendants deceived AAC investors through false and misleading statements, resulting in economic harm as the truth reached the market. (Doc. No. 45 at ¶ 128). Plaintiffs cite disclosures on November 6, 2018, after AAC suffered what Cartwright called "a significant decline in call volume" and "lower census," where AAC reported revenues of well-below Wall Street analyst expectations and below Defendants' earlier reassurances. (*Id.* at ¶¶ 129-130). Defendants attributed the decline in sales calls to changes in Google's algorithms for its advertising. (*Id.* at ¶ 130). Plaintiffs allege that instead these declines actually were the result of AAC no longer being able to use its (alleged) deceptive marketing tactics. (*Id.* at ¶¶ 128-131).

---

[20] A plaintiff must show that an economic loss occurred after the truth behind the misrepresentation or omission became known to the market. *Envision Healthcare,* 2019 WL 6168254, at *24. This is the easiest loss causation to show because the stock price drops immediately following the revelation of the fraud to the public. *Id.*

[21] Loss causation is not exactly analogous to the common law tort concept of proximate causation, because the alleged misstatements do not generally cause a security to drop in value; rather, the underlying circumstance that is concealed or misstated does (once it is revealed). *Ohio Pub. Emp.*, 830 F.3d at 384. In the securities fraud context, then, a misstatement or omission is the proximate cause of an investment loss if the risk that caused the loss was within the zone of risk *concealed* by the misrepresentations and omissions alleged by a disappointed investor. *Id.*, *cited in In re TransDigm Grp., Inc. Sec. Litig.*, 440 F. Supp. 3d 740, 771 (N.D. Ohio 2020).

22

Defendants argue that the disclosures concerning declines in call volume and sales calls due to Google's changes were not contrary to any prior alleged misstatements by Defendants because Defendants never "ensured that AAC was impervious to Googles' changes or updates in its algorithms or otherwise stated that the marketing function had no faults." (Doc. No. 53 at 23). The prior statements, concerning the success and "competitive advantage" of AAC's marketing and sales strategies, however, still could have been false—despite the absence of such assurances—if Defendants failed to disclose the true reason for the declines. Plaintiffs also allege that Defendants *knew* the statements concerning these call declines were false.

The Amended Complaint as a whole alleges that Defendants knew, or were reckless in not knowing, that AAC's sales and marketing strategies were deceptive and fraudulent[22] and that Defendants certainly knew, by the time industry actors and others began to call those practices into question, that AAC would be forced to change those practices. Plaintiffs also assert that the disclosures of these concealed facts caused the price of AAC common stock to decline by more than 44 percent. (Doc. No. 145 at ¶ 131).

Whether Plaintiffs can ultimately prove their allegations and establish loss causation is a different question, but for purposes of surviving the Motion, the Amended Complaint adequately alleges loss causation. In other words, having considered the relationship between the risks allegedly concealed (AAC's deceptive marketing strategies) and the risks that subsequently materialized (AAC's declining sales calls and its inability to use its deceptive marketing

---

[22] As noted earlier, Plaintiffs allege that Defendants engaged in unethical and deceptive sales and marketing tactics by operating deceptive websites, designed to appear to provide unbiased and reliable addiction advice and directories of treatment facilities, that were, in fact, thinly veiled lead-generation mechanisms. When people seeking help with addiction called the toll-free number listed on AAC's websites, they were not connected with counselors or treatment specialists but rather with commission-compensated AAC salespersons who were paid bonuses when they induced callers to be admitted to AAC facilities. (Doc. No. 145 at ¶ 4).

23

strategies), and drawing all reasonable inferences in Plaintiffs' favor, the Court concludes Plaintiffs have plausibly alleged loss causation. *See Envision Healthcare*, 2019 WL 6168254, at *25.

### 2. Allegedly Inactionable Statements

Defendants also posit that Plaintiffs' Marketing Claim should be dismissed because the Amended Complaint fails to allege an actionable misstatement or omission related thereto. Defendants challenge specifically those alleged misstatements they identify as (1) forward-looking statements; (2) statements of opinion; or (3) statements of corporate puffery/optimism.

#### a) Forward-Looking Statements

The PSLRA contains a "safe-harbor provision" for a forward-looking statement, whereby a defendant is liable for such a statement only if it was material, if the defendant had actual knowledge that the statement was false or misleading, and if the defendant did not identify the statement as forward-looking or insulate it with meaningful cautionary language. *Weiner*, 365 F. Supp. 3d at 910. A company that chooses to speak, therefore, is protected against failed projections provided it identifies important factors that could cause actual results to differ materially from those in the forward-looking statements. *Id.* at 911. While a company need not list all factors, the cautionary statements must convey substantive information about factors that realistically could cause results to differ materially from those projected in the forward-looking statements. *Id.* (finding that the forward-looking statements at issue were provided in the context of cautionary statements that were boilerplate, not meaningful, and inconsistent with the historical facts).[23]

---

[23] General cautionary language does not render omission of specific adverse historical facts immaterial and, moreover, the disclaimer must be meaningful and tailored to the risks the business faces. *Winslow v. BancorpSouth, Inc.*, No. 3:10-00463, 2011 WL 7090820, at *16 (M.D. Tenn. Apr. 26, 2011).

Defendants contend that the statements mentioned in paragraphs 66, 68, 74, 76, 77 and 79 of the Amended Complaint (Doc. No. 45) are forward-looking.[24] The first two of these paragraphs include Cartwright's statement that he thinks investors will see growth in both AAC's digital marketing and the call center, Cartwright's statement "I think we're just getting started," and an announcement that claimed AAC was seeking to elevate the addiction treatment industry as a whole. Plaintiffs contend these statements were materially false and misleading when made because AAC's digital marketing and call center were unethical and deceptive and, rather than "just getting started," were actually losing their ability to generate revenue because of the increased scrutiny of the industry and the negative impact already occurring in AAC's internet advertising. (Doc. No. 45 at ¶ 69). Plaintiffs allege that Defendants knew, when these statements were made, that its fiscal year 2018 revenues would be substantially impaired. (*Id.*)

The alleged "forward-looking statements" also include: Cartwright's comments concerning continuing to work on AAC's digital assets to improve conversion rates in the call center and his statement that things would come together well in the second half of 2018 (*id.* at ¶ 74); a release of second quarter Fiscal Year 2018 financial results in which Cartwright stated that operations remained "very strong" during the quarter and that he felt "confident we will meet our annual guidance with continued momentum entering into 2019" (*id.* at ¶ 76); and an additional statement that Cartwright was confident AAC would meet its annual financial goals, that the sales and marketing initiatives "will begin to have positive impact in the second half of 2018, and that "our balance sheet is strong." (*id.* at ¶ 77). Plaintiffs allege that these statements were materially false and misleading when made because Defendants knew that their projected FY18 guidance did not align with the fact that they continued to drive revenue through seriously undermined practices

---

[24] Paragraph 79 is addressed below, in the discussion of opinion statements.

that were deceptive and unethical. In other words, at the time these statements were made, Defendants allegedly "had no reasonable basis to believe, and did not actually believe, that AAC would meet the FY18 operating and financial performance estimates disseminated by AAC." (*Id.* at ¶ 78).

Defendants argue that these statements were accompanied by meaningful cautionary language (including cautionary language in AAC's SEC filings) "explaining the risks that could cause actual results to differ from those implied by the forward-looking statements" and that AAC updated these risk disclosures to reflect developments in the scrutiny of Internet advertising that were affecting AAC. (Doc. No. 53 at 25). Plaintiffs respond by arguing that Defendants' cautionary language itself was misleading because it warned of *potential* disruptions that *could* negatively impact AAC, when in fact those disruptions were already occurring; Plaintiffs claim AAC was already materially adversely impacted, and that Defendants knew it. (*See, e.g.,* Doc. No. 45 at ¶¶ 70, 42-49; 72-73).

The Court finds that Plaintiffs have sufficiently alleged that these alleged "forward-looking" statements were *not* accompanied by warnings "consistent with the historical facts when the statements were made," *see Weiner*, 365 F. Supp. 3d at 912, because (allegedly) Defendants were aware, at the time the statements were made, that the facts stated were, at best deceptive and misleading. The trier of fact will have to determine whether these statements were, in context, false and misleading based upon what Defendants knew (or did not know) at the time.

b) <u>Statements of Opinion</u>

Defendants argue that the alleged misstatements at ¶¶ 70 and 79 of the Amended Complaint were merely statements of opinion and are, therefore, not actionable.

In *Omnicare, Inc. v. Laborers District Council Construction Industry Pension Fund*, 575 U.S. 175 (2015),[25] the Supreme Court, distinguished statements of fact (which express certainty about a thing) from statements of opinion (which do not express certainty) in a securities fraud case. 575 U.S. at 182; *see also Zwick Partners, LP v. Quorum Health Corp.*, No. 3:16-cv-2475, 2018 WL 2933406, at *5 (M.D. Tenn. Apr. 19, 2018). An opinion is actionable if the person stating the opinion does not actually hold the stated belief, or if the opinion contains a materially false embedded statement of fact, or if it is paired with a sufficiently material omission that makes the statement misleading. *Id.*; *see also USM Holding, Inc. v. Simon,* No. 15-14251, 2017 WL4005939, at *4 (E.D. Mich. Sept. 12, 2017).[26] Whether a statement is "misleading" depends on the perspective of a reasonable investor. *Zwick Partners,* 2018 WL 2933406, at *5 (citing *Omnicare*, 575 U.S. at 186). In *Omnicare*, the Court explained that a reasonable investor expects not just that the company believes the opinion, but that "it fairly aligns with the information in the company's possession at the time." *Id.* (citing *Omnicare,* 575 U.S. at 189).

At Paragraph 70, Plaintiffs allege that AAC represented in its 2017 Form 10-K, filed February 23, 2018, the following:

> We believe our national sales and marketing program provides us with a competitive advantage compared to treatment facilities that primarily target local geographic areas and use fewer marketing channels to attract clients. If any disruption occurs in our national sales and marketing program for any reason, or if we are unable to effectively attract and enroll new clients to our network of facilities, our ability to maintain

---

[25] Although *Omnicare* involved a registration statement that allegedly violated Section 11 of the Securities Act of 1933, other courts have found that the same standards for pleading falsity of opinion statements apply to Section 10(b) and Rule 10(b)-5. *See Zwick Partners,* 2018 WL 2933406, at * 5.

[26] If the speaker omits material facts about the inquiry into or knowledge concerning the statement of opinion, and if those facts conflict with what a reasonable investor would take from the statement itself, then that omission is actionable. *See USM Holdings,* 2017 WL 4005939, at *4.

census could be adversely affected, which would have a material adverse effect on our business, financial condition and results of operations.

(Doc. No. 45 at ¶ 70). At Paragraph 79, Plaintiffs allege that Defendants issued a release that stated:

> Our third quarter results were not what we expected. Although we started off the third quarter with a very strong July, we hit unanticipated headwinds in August that caused a significant decline in call volume and led to lower census," said Michael Cartwright, Chairman and Chief Executive Officer of AAC Holdings, Inc. "We believe that we have the right marketing leadership to navigate these headwinds. Our marketing strategy is broad and diverse, focused on various paid and earned media online and in other traditional media. We strive to be as accessible and as informative as possible to those searching for addiction treatment.

(*Id.* at ¶ 79). Defendants argue that Plaintiffs have failed to allege that any of the Defendants did not actually believe the expressed opinions at the time they were made and have failed to allege facts demonstrating that the speakers lacked a reasonable basis in fact for the opinions. (Doc. No. 53 at 26-27).

Here, the Amended Complaint alleges facts to support Plaintiffs' claims that Defendants had no reasonable basis for believing these statements and that material omissions made the statements misleading. (*See, e.g.,* Doc. No. 45 at ¶¶ 71 and 82). A statement couched as an opinion can still be misleading if it omits material facts about the basis for the opinion. *Envision Healthcare*, 2019 WL 6168254, at *11. A reasonable person could view these statements about the merits and potential success of AAC's marketing strategies as misleading for omitting information regarding the increased scrutiny of AAC's methods and the widespread rejection of its deceptive and misleading practices. *See id.* at *12. Plaintiffs have sufficiently alleged that Defendants *knew* (at the time of the making of the statements described in Paragraphs 70 and 79 of the Amended Complaint) about that scrutiny and rejection—*i.e.*, had scienter—and yet failed to include that information in their statements.

28

Plaintiffs also argue that the factual allegations in these statements are independently false. For example, they allege that the statement in Paragraph 70 was false when made because AAC's marketing operations had *already* been disrupted and there had *already* been an adverse impact on the business because of the investigations and changes in the addiction treatment industry advertising. (Doc. No. 45 at ¶ 71). The Court finds that, although Defendants' statements concerning what *could happen* were technically true, they implied that any such disruption or adverse impact on business had not yet occurred while omitting the fact that these things in fact were already occurring. Therefore, construing the alleged facts in Plaintiffs' favor as required, such omission made the statements false. *See* 17 C.F.R. § 240.10b-5(b) (omission of material fact necessary in order to make statements, in light of circumstances, not misleading).

Plaintiffs claim that the statement in Paragraph 79 that "[AAC] hit unanticipated headwinds in August that caused a significant decline in call volume and led to lower census" was false because it omitted the fact that "significant decline" was a result of AAC's own deceptive marketing practices. (*Id.* at ¶ 72).[27] Again, Plaintiffs have sufficiently alleged that the omission made this statement false and misleading.

The Court finds that Plaintiffs have sufficiently alleged that the statements in these "opinions" were false and misleading via both embedded false statements and omission of material facts. A reasonable juror could find that, in context, the cautionary language itself was misleading; conversely, a reasonable juror could also find that, in context, the cautionary language sufficiently cushioned the statements as opinion. But these determinations cannot be made on this motion to dismiss.

---

[27] Plaintiffs contend that these statements were misleading because they omitted material information about the ways Defendants' deceptive practices were being rejected in the industry.

c) <u>Statements of Corporate Optimism</u>

Defendants contend that the statements alleged in Paragraphs 64 and 68 of the Amended Complaint are inactionable statements of corporate optimism. "The Sixth Circuit has made clear that even superficially broad statements of corporate self-praise must be evaluated in context to determine whether they convey more than just a generalized optimism." *Grae*, 2017 WL 6442145, at \*14 (citing *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 671-72 (6th Cir. 2005))

Paragraph 64 of the Amended Complaint identifies statements made by Cartwright and Manz that describe AAC's "best-in-class sales and marketing engine" and a "marketing knowledge and infrastructure" that "cannot be replicated without substantial capital and time" and provides AAC with a "significant competitive advantage." (Doc. No. 45 at ¶ 64).

Paragraph 68 describes a release issued by AAC on September 5, 2018, entitled "American Addiction Centers Names Stephen Ebbett Chief Digital & Marketing Officer." Specifically, Plaintiffs cite the following:

> "Searching for help with addiction requires courage, and finding help should be as seamless as possible, especially in a digital landscape that is always evolving and can be confusing for individuals," Cartwright said. "Under Stephen's leadership, we'll continue to explore ways to help those who are seeking freedom from addiction and to honor their willingness to change. And we'll do this in a way that, hopefully, elevates the addiction treatment industry as a whole."

(*Id*. at ¶ 68).

The Amended Complaint adequately alleges that these statements and descriptions of AAC's digital marketing strategy were materially false and misleading when made because (allegedly) AAC's sales and marketing operations were *not* "best-in-class" and, rather than providing a "significant competitive advantage," were in fact a liability because they were based upon "unethical and deceptive websites that drove phone calls and web chats to AAC's Brentwood

30

call center, where salespeople were subject to quotas and paid bonus payments if they admitted patients to AAC's facilities." (*Id.* at ¶ 65). Plaintiffs allege that these statements were materially false and misleading when made because, among other things, Defendants (allegedly) *knew* that AAC's unethical and deceptive sales and marketing operations were coming under greater scrutiny, that AAC could not continue those marketing practices, and that AAC's FY18 revenues and prospects would be substantially impaired. (*Id.* at ¶ 69).

A company's general boasts of quality are typically insufficient to establish liability under Section 10(b). *See St. Clair Cty.,* 2021 WL 195370, at *6. The key is whether the statement at issue can be proven or disproven using standard tools of evidence. *See id.* Thus, vague statements not subject to verification by proof are generally deemed non-actionable puffery. But opinion or puffery, in particular contexts[28] when it is both factual and material, may be actionable. *See id.* Opinions are actionable under Section 10(b) if "the speaker does not believe the opinion and the opinion is not factually well-grounded." *Cosby v. KPMG, LLP*, No. 3:16-cv-121-TAV-DGP, 2018 WL 3723712, at *8 (E.D. Tenn. June 29, 2020)

Here, Plaintiffs have alleged that Defendants knew that AAC's deceptive marketing practices, rather than being "best-in-class" and giving AAC a competitive advantage, actually "decimated" AAC's business once the industry found out. (Doc. No. 45 at ¶¶ 33-49, 67-83). The Court finds that Plaintiffs have sufficiently alleged that Defendants knew, at the time they were

---

[28] The context of statements is often telling. *City of Monroe Employees Ret. Sys.*, 399 F.3d at 672 (citing *Casella v. Webb,* 883 F.2d 805, 808 (9th Cir. 1989) ("What might be innocuous 'puffery' or mere statement of opinion standing alone may be actionable as an integral part of a representation of material fact when used to emphasize and induce reliance upon such a representation.") and *Scritchfield v. Paolo,* 274 F. Supp. 2d 163, 175-76 (D.R.I. 2003) (stressing that "a company's statements that it is 'premier,' 'dominant,' or 'leading' must not be assessed in a vacuum (*i.e.*, by plucking the statements out of their context to determine whether the words, taken *per se,* are sufficiently 'vague' so as to constitute puffery")).

31

touting their best-in-class marketing, that their practices were deceptive, were not sustainable, and were being scrutinized and rejected by the industry. Therefore, Plaintiffs have sufficiently alleged the challenged misstatements and omissions in support of their Marketing Claim.

### 3. Scienter

Defendants next argue that the marketing claim statements also fail to allege particularized facts giving rise to a strong inference of scienter as required. They contend that the more compelling inference, with regard to the Marketing Claim, is that the alleged statements were truthful and made with non-fraudulent intent. As noted above, the Court must view the allegations of scienter holistically to determine whether the facts allege give rise to a strong inference of scienter. Defendants' specific arguments are as follows.

#### a) Third-Party Criticism

Defendants challenge Plaintiffs' reliance on three specific instances of alleged third-party criticism of AAC, claiming that such criticism fails to demonstrate scienter on the part of Defendants. The criticism arose in (or in connection with): (1) an article published by *The Verge* that criticized marketing tactics of the industry; (2) congressional hearings to discuss advertising practices in the industry; and (3) Google's efforts to reduce deceptive advertising in the substance-abuse industry. Defendants argue that these third-party criticisms do not relate to the sales and marketing practices of AAC in particular and therefore do not and cannot give rise to a strong inference of scienter. Plaintiffs allege, however, that Defendants had actual knowledge that AAC's specific sales and marketing practices were of the type being investigated, thus indicating that Defendants knew that those practices were being considered deceptive.

For example, the Amended Complaint alleges in detail (Doc. No. 45 at ¶¶ 26-49) how AAC sought to build a dominant sales and marketing force through an "air game"[29] and a "ground game,"[30] including operating more than 100 websites that appeared to offer information and resources about substance abuse, treatment, and treatment facilities but in reality were thinly veiled lead-generation mechanisms designed to produce revenue. (Doc. No. 45 at ¶ 30). Plaintiffs allege that AAC used these lead-generation websites to direct people seeking help to its own sales representatives who were paid on a commission to enroll patients in AAC facilities. (*Id.* at ¶ 31). Moreover, Plaintiffs assert that AAC was using other deceptive techniques to increase the reach of its deceptive and misleading websites. (*Id.* at ¶ 32).

Plaintiffs allege that by 2017, such predatory and deceptive marketing began attracting media and oversight attention, leading both the industry and Congress to begin trying to deter such practices. (*Id.* at ¶¶ 33-48). Plaintiffs contend that these efforts specifically included prohibition of the types of marketing employed by AAC, including deceptive Internet marketing. (*Id.* at ¶¶ 35, 37-39). The Amended Complaint asserts that Defendant Cartwright was called to testify before a congressional committee and was questioned there specifically about AAC's practices. (*Id.* at ¶ 41). In further steps, a national trade organization declined to renew AAC's membership in the organization because of its marketing practices, Google issued certification standards that precluded "lead generators" from certification to advertise on Google, and Google's higher level

---

[29] The "air game" was comprised of AAC's corporate and facility websites and lead-generation websites as well as advertising. (Doc. No. 45 at ¶ 29).

[30] The "ground game" included dozens of business development representatives who promoted AAC's services and facilities and were expected to generate a certain number of admissions to AAC facilities per month. (Doc. No. 45 at ¶ 28).

33

of scrutiny resulted in AAC's lead-generation websites declining significantly in Google's search rankings. (*Id.* at ¶¶ 44-48).

The above-cited third-party criticism was related to the increased scrutiny by the industry of sales and marketing practices, including AAC's. Plaintiffs have sufficiently alleged that this criticism was related to AAC's practices and that Defendants knew of the criticism, so the criticism can be considered in the Court's holistic view of whether scienter has been adequately pled.

b) <u>Core-Operations Doctrine</u>

The Amended Complaint alleges that the fact that sales and marketing were critical to AAC's core operations is another indication of Defendants' knowledge (scienter). (Doc. No. 45 at ¶¶ 149-150). Defendants argue that this "core-operations doctrine" is no longer viable and, even if it were, it does not provide an independent basis for pleading scienter.[31]

The "core-operations" theory allows courts to draw an inference of scienter where the misrepresentations and omissions allegedly made by defendants were about their core operations. *In re Aceto Corp. Sec. Litig.*, No. 2:18-cv-2425-ERK-AYS, 2019 WL 3606745, at *10 (E.D.N.Y. Aug. 6, 2019). Under this theory, if a plaintiff can plead that a defendant made false or misleading statements when contradictory facts of critical importance to the company either were apparent or should have been apparent, then an inference arises that high-level officers and directors had knowledge of those facts by virtue of their positions within the company. *Id.* Courts may presume that high-level executives are aware of matters related to their business's operations where the misrepresentations and omissions pertain to central, day-to-day operational matters, particularly for facts "critical to a business's core management." *Envision Healthcare*, 2019 WL 6168254, at

---

[31] The Court has already found that the issue of scienter must be considered holistically.

*22 (quoting *Garden City Employees' Ret. Sys. v. Psychiatric Sols., Inc.*, No. 3:09-00882, 2011 WL 1335803, at *57 (M.D. Tenn. Mar. 31, 2011)) (internal quotation marks omitted).

Defendants argue that, although the Sixth Circuit has not addressed the viability of the core-operations doctrine after the PLSRA, the courts that have done so suggest that the doctrine did not survive. *See Aceto Corp.*, 2019 WL 3606745, at *10. In *Stein v. U.S. Xpress Enterprises, Inc.*, No. 1:19-cv-98, 2020 WL 3584800 (E.D. Tenn. June 30, 2020), however, the court noted that a majority of district courts appear to have concluded that the doctrine survived, albeit only as a supplementary consideration that may bolster other well-pleaded facts. 2020 WL 3584800, at *39 (concluding that the core-operations theory, even assuming the doctrine survives, provided the plaintiff in that case no support). Although the "core-operations" inference generally will not establish a strong inference of scienter *by itself*, it can be one relevant part of a complaint supporting that inference. *In re Baxter Int'l Inc. Sec. Litig.*, No. 19 C 7786, 2021 WL 100457, at *13 (N.D. Ill. Jan. 12, 2021).

Thus, the Court considers the "core-operations" allegations, albeit not as an independent means to show scienter, but rather as one possible indicator of scienter under a holistic examination. Plaintiffs have sufficiently alleged that the individual Defendants, as officers of AAC, held out AAC's sales and marketing practices as "core operations" of the company. Plaintiffs have also sufficiently alleged that Defendants had actual knowledge about the deceptive nature of those practices and the industry's attempts to stop such practices.

c) Congressional Testimony

The Amended Complaint alleges that Defendant Cartwright made misleading statements to Congress in two ways: (1) by suggesting that the reason AAC was not a member of the National Association of Addiction Treatment Providers ("NAATP") was that the company felt that another

35

organization was meeting its needs more appropriately (Doc. No. 45 at ¶ 44), and (2) by stating that AAC's website visitors know who they are contacting (*id.* at ¶¶ 151-52). Defendants argue that these statements cannot be used to show scienter because the statements were completely truthful. The Court cannot, however, on a motion to dismiss, determine the truth or falsity of Plaintiff's allegations. Instead, where (as here) Plaintiffs have set forth non-conclusory factual allegations, they must be accepted as true. These statements can be considered in the Court's holistic inquiry into scienter.

### d) Inference To Be Drawn

Finally, Defendants contend that, rather than an inference of scienter, the more compelling inference in this case is that all of the statements AAC made regarding its marketing practices were truthful. But due to the countervailing cognizable (non-conclusory) factual allegations, the Court cannot make such a determination at this stage of the litigation. A strong inference of scienter[32] must be at least as compelling as any opposing inference of non-fraudulent intent. *Doshi*, 823 F.3d at 1039. Viewing the Amended Complaint's cognizable factual allegations related to scienter as to the Marketing Claim in the light most favorable to Plaintiffs, the Court—determining scienter *vel non* holistically as required—finds that Plaintiffs have sufficiently alleged facts plausibly supporting a strong inference of scienter, as required to survive a motion to dismiss.

## CONTROL PERSON LIABILITY

Count II of the Amended Complaint alleges that the individual Defendants, as controlling persons of AAC, violated Section 20(a) of the Securities Act of 1934. (Doc. No. 45 at ¶¶ 174-78). Section 20(a) provides that "[e]very person who ... controls any person liable under any provision

---

[32] Under the PSLRA, a plaintiff must state with particularity facts giving rise to a "strong inference" that the defendant acted with the required state of mind in violating the securities laws. *Doshi*, 823 F.3d at 1039 (citing 15 U.S.C. § 78u-4(b)(2)(A)).

36

of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person." 15 U.S.C. § 78t(a). The "controlling person" must be an actual participant and in control of the specific activity at issue. *Jackson Cty.*, 2020 WL 7711378, at *20.

Defendants argue simply that because Plaintiffs have not stated any viable Section 10(b) claims, their claims for Section 20(a) violations likewise fail. Defendants advance no other arguments for the dismissal of the control person liability claim. Thus, because the Court has found that Plaintiffs have stated viable Section 10(b) claims, Defendants' motion to dismiss the control person liability claim will be denied.

## CONCLUSION

For the reasons stated above, Defendants' Motion to Dismiss (Doc. No. 52) will be denied. An appropriate Order will be entered.

ELI RICHARDSON
UNITED STATES DISTRICT JUDGE