# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| INDIANA PUBLIC RETIREMENT SYSTEM,) Individually and on Behalf of All Others ) Similarly Situated, ) <br><br> Plaintiff, ) <br><br> vs. ) <br><br> MICHAEL T. CARTWRIGHT, KIRK R. ) MANZ and ANDREW W. McWILLIAMS, ) <br><br> Defendants. ) ) ) | Civil Action No. 3:19-cv-00407 <br><br> <u>CLASS ACTION</u> <br><br> HEARING REQUESTED <br><br> Judge Eli J. Richardson <br> Magistrate Judge Alistair E. Newbern |

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION

Dated: September 7, 2021

W. Travis Parham (TN BPR #16846)
Michael T. Harmon (TN BPR # 27279)
**Waller Lansden Dortch & Davis LLP**
Nashville City Center
511 Union Street, Suite 2700
Nashville, TN 37219
Tel: (615) 244-6380
travis.parham@wallerlaw.com
michael.harmon@wallerlaw.com

Jessica P. Corley (*pro hac vice*)
Lisa R. Bugni (*pro hac vice*)
Logan R. Hobson (*pro hac vice*)
**KING & SPALDING LLP**
1180 Peachtree Street, N.E.
Atlanta, GA 30309
Tel: (404) 572-4600
jpcorley@kslaw.com
lbugni@kslaw.com
lhobson@kslaw.com

*Counsel for Defendants*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................................... iii

INTRODUCTION .................................................................................................................... 1

BACKGROUND ...................................................................................................................... 3

LEGAL STANDARD............................................................................................................... 6

ARGUMENT............................................................................................................................ 7

I.      PLAINTIFF IS NOT ENTITLED TO THE *BASIC* PRESUMPTION FOR THE RESTATEMENT CLAIM BECAUSE DEFENDANTS HAVE SHOWN A LACK OF PRICE IMPACT. .................................................................................................... 7

II.     PLAINTIFF IS NOT ENTITLED TO THE *AFFILIATED UTE* PRESUMPTION. .......... 12

III.    PLAINTIFF'S MARKETING CLAIM PRESENTS INDIVIDUALIZED QUESTIONS REGARDING RISK TOLERANCE THAT DEFEAT PREDOMINANCE. ................... 13

IV.     PLAINTIFF CANNOT SATISFY RULE 23(B)(3)'S PREDOMINANCE REQUIREMENT FOR ITS ALLEGED "SCHEME" CLAIM. ....................................... 15

V.      PLAINTIFF'S DAMAGES THEORY IS INCAPABLE OF CLASS-WIDE DETERMINATION. ...................................................................................................... 17

   A.   Mr. Dalrymple Has Not Proposed A Methodology That Can Measure Inflation For Plaintiff's Marketing Claim.................................................................................. 18

   B.   Mr. Dalrymple Has Not Proposed A Methodology That Can Measure Inflation For Plaintiff's Restatement Claim. ................................................................................. 23

   C.   Mr. Dalrymple Has Not Proposed A Methodology That Can Measure Inflation For Plaintiff's "Scheme" Claim. ..................................................................................... 24

CONCLUSION........................................................................................................................ 25

**TABLE OF AUTHORITIES**

**Cases** Page(s)

*In re Allstate Corp. Sec. Litig.*,
966 F.3d 595 (7th Cir. 2020) ......................................................................................8

*Anschutz Corp. v. Merrill Lynch & Co. Inc.*,
785 F. Supp. 2d 799 (N.D. Cal. 2011) ......................................................................17

*In re BancorpSouth, Inc.*,
No. 16-0505, 2016 WL 5714755 (6th Cir. Sept. 6, 2016) ........................................7

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988)........................................................................................... *passim*

*In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*,
No. 17 CIV. 01580 (LGS), 2019 WL 5287980 (S.D.N.Y. Oct. 18, 2019) ...............8

*Comcast Corp. v. Behrend*,
569 U.S. 27 (2013)............................................................................................. *passim*

*Cox v. Collins*,
7 F.3d 394 (4th Cir. 1993) .........................................................................................2

*Desai v. Deutsche Bank Sec. Ltd.*,
573 F.3d 931 (9th Cir. 2009) ...............................................................................16, 17

*In re DVI Inc. Sec. Litig.*,
249 F.R.D. 196 (E.D. Pa. 2008)................................................................................16

*Erica P. John Fund, Inc. v. Halliburton Co.*,
309 F.R.D. 251 (N.D. Tex. 2015) ...........................................................................8, 11

*Goldman Sachs Grp., Inc. v. Ark. Teacher Ret. Sys.*,
141 S. Ct. 1951 (2021)...........................................................................................19, 20

*Halliburton Co. v. Erica P. John Fund, Inc.*,
573 U.S. 258 (2014)...................................................................................................8

*Hawaii Ironworkers Annuity Tr. Fund v. Cole*,
296 F.R.D. 549 (N.D. Ohio 2013) ...........................................................................16

*IBEW Local 98 Pension Fund v. Best Buy Co.*,
818 F.3d 775 (8th Cir. 2016) ....................................................................................12

*Joseph v. Wiles*,
223 F.3d 1155 (10th Cir. 2000) ...........................................................................13, 16

Case 3:19-cv-00407   Document 83   Filed 09/07/21   Page 3 of 31 PageID #: 1666

*In re Kosmos Energy Ltd. Sec. Litig.*,
299 F.R.D. 133 (N.D. Tex. 2014) ...............................................................................15

*Loritz v. Exide Techs.*,
No. 13-cv-02607, 2015 WL 6790247 (C.D. Cal. July 21, 2015)............................................12

*Ludlow v. BP, P.L.C.*,
800 F.3d 674 (5th Cir. 2015) .........................................................................13, 14, 21

*In re Moody's Corp. Sec. Litig.*,
274 F.R.D. 480 (S.D.N.Y. 2011) .......................................................................12

*In re N.J. Carpenters Health Fund v. Residential Capital*,
LLC, 272 F.R.D. 160 (S.D.N.Y. 2011)...................................................................14

*In re Omnicom Grp., Inc. Sec. Litig.*,
597 F.3d 501 (2d Cir. 2010)...............................................................................8

*Ret. Fund v. J.P. Morgan Chase & Co.*,
301 F.R.D. 116 (S.D.N.Y. 2014) .......................................................................17

*S.E.C. v. Kelly*,
817 F. Supp. 2d 340 (S.D.N.Y. 2011).....................................................................15

*S.E.C. v. Loomis*,
969 F. Supp. 2d 1226 (E.D. Cal. 2013)....................................................................15

*Schwab v. E\*TRADE Fin. Corp.*,
285 F. Supp. 3d 745 (S.D.N.Y. 2018), *aff'd* 752 F. Appx 56 (2d Cir. 2018) ...........................13

*Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*,
552 U.S. 148 (2008)...............................................................................15, 16

*Waggoner v. Barclays PLC*,
875 F.3d 79 (2d Cir. 2017)................................................................................12

*Wal–Mart Stores, Inc. v. Dukes*,
564 U.S. 338 (2011)..............................................................................6, 7

*Yadlosky v. Grant Thornton L.L.P.*,
197 F.R.D. 292 (E.D. Mich. 2000) ....................................................................14

*Young v. Nationwide Mut. Ins. Co.*,
693 F.3d 532 (6th Cir. 2012) ..........................................................................7

**Statutes**

Securities Exchange Act of 1934, Section 10(b) .............................................................2, 14, 15

iv

**Other Authorities**

Fed. R. Civ. P. 23 .................................................................................................... *passim*

Case 3:19-cv-00407   Document 83   Filed 09/07/21   Page 5 of 31 PageID #: 1668

Defendants Michael T. Cartwright, Kirk R. Manz, and Andrew McWilliams ("Defendants") respectfully submit this Memorandum of Law in Opposition to Lead Plaintiff Indiana Public Retirement System's ("Plaintiff") Motion for Class Certification.

## INTRODUCTION

Plaintiff seeks to certify a class of AAC investors based on two distinct claims: (1) the "Marketing Claim," which alleges that Defendants engaged in a fraudulent and deceptive sales scheme, and (2) the "Restatement Claim," which alleges that Defendant made misleading statements concerning AAC Holdings, Inc.'s ("AAC") accounts receivable. In doing so, Plaintiff treats class certification as an entitlement rather than the exception, resting on unavailable reliance presumptions and the flawed damages opinion of its expert, Scott Dalrymple. But for reasons explained below, Plaintiff's claims are undeserving of class treatment under Rule 23(b)(3).

***First***, Plaintiff cannot invoke *Basic*'s presumption of reliance for its Restatement Claim because Defendants have demonstrated a lack of price impact. The economic evidence submitted by Defendants' expert, Paul Zurek, Ph.D, demonstrates that: (1) AAC first revealed the financial restatement to the market on March 29, 2019, and AAC's stock reacted *positively* to the news; (2) the alleged corrective disclosure on April 15, 2019, when AAC revealed the full extent of the restatement in its Form 10-K with the Securities and Exchange Commission ("SEC") did not result in a statistically significant stock price reaction; and (3) the alleged corrective disclosures from April 16, 2019 did not reveal any additional information regarding the restatement, so any price movement that day cannot demonstrate price impact of the alleged misstatements on the Restatement Claim. *See* Declaration of Lisa R. Bugni ("Bugni Dec.") filed contemporaneously herewith, Exhibit A (Rebuttal Expert Report of Paul Zurek, Ph.D. "Zurek Rpt.") at ¶¶ 33-51.

***Second***, the *Affiliated Ute* reliance presumption is unavailable because Plaintiff's Amended Complaint is based principally on allegations of affirmative misrepresentations, not

1

omissions. *See Cox v. Collins*, 7 F.3d 394, 395-96 (4th Cir. 1993) ("The *Affiliated Ute* presumption of reliance is not warranted in a Rule 10b–5 case when the plaintiff alleges both nondisclosure and positive misrepresentation instead of only nondisclosure as in *Affiliated Ute*.").

*Third*, Plaintiff's Marketing Claim raises individualized issues sufficient to defeat the requisite showing of predominance under Rule 23(b)(3). To avoid dismissal of its Marketing Claim, Plaintiff stated in its response to Defendants' Motion to Dismiss that it was relying on a materialization of the risk theory of loss causation. *See* ECF 56 (Response to Motion to Dismiss) at 24-25; *see also* ECF 62 (Order on Motion to Dismiss) at 23-24. Although this unpled theory of loss causation may have helped Plaintiff escape dismissal, it presents insurmountable hurdles to class certification. Namely, issues of whether individual class members would have purchased AAC securities had they known the "true" level of risk regarding AAC's sales and marketing strategies require investor-specific inquiries that will overwhelm any common questions for the Marketing Claim. And, as explained later, Plaintiff's materialization theory also cannot be certified given the mismatch between the alleged representations and the alleged disclosures that purportedly revealed the truth.

*Fourth*, Plaintiff fails to satisfy Rule 23(b)(3)'s predominance requirement for its purported "scheme" liability claim. It is well-established that scheme claims brought under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") must hinge on the performance of a deceptive act distinct from the alleged misstatements. Here, Plaintiff's scheme claim is simply a recast of its Marketing and Restatement Claims and as such, fails on the same predominance grounds. And, even if Plaintiff's scheme claim was sufficiently distinct (it is not), certification would still fail because Plaintiff cannot establish class-wide reliance.

2

*Finally*, Plaintiff cannot satisfy the predominance requirement because Mr. Dalrymple wholly fails to provide a methodology as to how Plaintiff's alleged damages can be calculated on a class-wide basis consistent with Plaintiff's various liability theories. Mr. Dalrymple's analysis (or lack thereof) falls well short of the requirements set forth in *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013).

For the reasons set forth above and those explained in more detail below, Plaintiff's Motion for Class Certification should be denied in its entirety.

## BACKGROUND

AAC is a provider of inpatient and outpatient substance use services for individuals suffering from addiction and co-occurring behavioral issues. ECF 45 (Amended Complaint) at ¶ 14. Defendants Michael T. Cartwright, Kirk R. Manz, and Andrew W. McWilliams occupied various executive and board positions at AAC during the putative class period.[1] *Id.* at ¶¶ 15-17.

As to the Marketing Claim, Plaintiff alleges that the purported truth was first revealed on November 6, 2018. *Id.* at ¶¶ 129-131. On that day, AAC issued a press release reporting the Company's third quarter 2018 financial results. *Id.* at ¶ 79. The press release stated that AAC's third quarter results were lower than expected due to headwinds that caused declines in call volume and patient census. *Id.* During the investor conference call later that day, Mr. Cartwright explained that Google had launched an unexpected update to its Search Engine Optimization ("SEO") algorithm that impacted the search positions of AAC's healthcare and medical-related websites. *Id.* at ¶ 80.

As to the Restatement Claim, Plaintiff alleges AAC's stock price declined in response to news of the restatement contained in AAC's Form 10-K filed on April 15, 2019 and its press

---

[1] AAC was dismissed from the case on April 29, 2021. ECF 69.

release and earnings call on April 16, 2019. *Id.* at ¶¶ 132-37. The restatement was actually announced before the April 15, 2019 Form 10-K, and in any event, the Form 10-K did not result in a statistically significant price reaction in AAC's stock.

On Friday, March 29, 2019, after market hours, AAC filed a Form 8-K report with the SEC. *See* Bugni Dec., Exhibit B (March 29, 2019 Form 8-K). The Form 8-K announced that AAC had determined that a restatement to the Company's financial statements for fiscal years 2016, 2017, and the first three quarters of 2018 would be necessary. *Id.* The report explained the nature of the restatement and provided estimated adjustments. *Id.* Investors did not react negatively to the March 29 restatement news. Indeed, AAC's residual stock price return on April 1, the first trading day after the March 29, 2019 Form 8-K, was *positive* in a statistically significant amount. *See* Zurek Rpt. at ¶ 48.

Before the market opened on April 15, 2019, AAC publicly filed its 2018 Form 10-K. *See* Bugni Dec., Exhibit C (April 15, 2019 Form 10-K). On the very first page of the Form 10-K, AAC discussed the final impact of the financial restatement previously disclosed on March 29. *Id.* Those results included a decrease to net income of approximately $20.6 million for FY 2016, an increase of $7.7 million for FY 2017, and small increases to net income for the first two quarters of 2018. *Id.* Once again, investors did not react negatively to the news. *See* Zurek Rpt. at ¶ 50.

On April 16, 2019, AAC issued a press release and conducted an investor conference call, neither of which revealed additional or new information about the restatement. *See* Bugni Dec., Exhibit D (April 16, 2019 Press Release), Exhibit E (April 16, 2019 Conference Call); Zurek Rpt. at ¶¶ 45, 46. The April 16 press release quoted the restatement section from AAC's April 15, 2019 Form 10-K verbatim, except for two additional sentences that were included in the press release. The first sentence ("The restatements do not implicate misconduct with respect to the Company,

its management or its employees") was disclosed previously in AAC's March 29 restatement announcement. The second sentence ("All comparisons to prior period results contained in this release are presented on an as restated basis") does not include new value-relevant information. Mr. McWilliams mentioned the financial restatement during the April 16 conference call, but did not provide any information previously unknown to investors:

> Finally, as noted in our annual report, in the Form 10-K filed on Monday and in this morning's earnings release, we determined in consultation with our auditors that adjustments to certain of our previously issued annual and interim financial statements were necessary. These adjustments related to estimates of accounts receivable, provision for doubtful accounts and revenue as well as the related income tax effects. Our previously issued annual financial statements for 2017 and 2016 and the unaudited financial statements for the quarters ended September 30, 2018 and 2017, June 30, 2018 and 2017, and March 31, 2018 and 2017, were restated in our 2018 annual report to properly recollect these corrections. These adjustments had no impact on net operating cash flows.

*See* Exhibit E; Zurek Rpt. at ¶ 46. Nevertheless, AAC's stock price decreased on April 16, 2019, and this lawsuit followed.

Plaintiff filed its initial complaint on May 16, 2019 alleging securities fraud related only to the restatement. ECF 1. Plaintiff filed its Amended Complaint on November 4, 2019, which alleges the Marketing Claim, the Restatement Claim, and a scheme claim. ECF 45. Plaintiff's "Marketing Claim" alleges that Defendants engaged in a fraudulent and deceptive sales scheme; the truth of which was supposedly revealed to the market on November 6, 2018. ECF 45 at ¶¶ 1-9. Plaintiff's "Restatement Claim" charges Defendants with making misleading statements concerning AAC's accounts receivable. According to Plaintiff, the corrective disclosures on the Restatement Claim are AAC's Form 10-K filed before market open on April 15, 2019 and a press release and earnings call on April 16, 2019. *Id.* at ¶¶ 132-137. Plaintiff also purports to allege a "scheme" claim against Defendants based on the same alleged conduct underlying the Marketing and Restatement Claims. *Id.* at ¶¶ 5, 7.

5

At the dismissal stage, Plaintiff asserted that it was proceeding on a materialization of the risk loss causation theory for its Marketing Claim—despite not mentioning the theory in its Amended Complaint. *See* ECF 56 at 24 ("Defendants ignore the Sixth Circuit's endorsement of the 'materialization of the risk' theory . . . ."); *id.* ("That AAC's admissions and revenues would decline precipitously when defendants were unable to continue their deceptive marketing practices is precisely the type of foreseeable materialization of risk that was concealed by defendants' false and misleading statements and omissions."). This Court acknowledged Plaintiff's theory, describing the alleged corrective disclosures of the Marketing Claim as materialization of a risk. *See* ECF 62 at 23-24 ("[H]aving considered the relationship between the risks allegedly concealed . . . and the risks that subsequently ***materialized*** . . . , and drawing all reasonable inferences in Plaintiffs' favor, the Court concludes Plaintiffs have plausibly alleged loss causation.") (emphasis added).

Plaintiff now seeks to certify a class pursuant to Rule 23(b)(3). Plaintiff alleges that common questions predominate because: (1) it is entitled to a presumption of reliance under both *Basic* and *Affiliated Ute*; and (2) "damages in this case are capable of being measured on a class-wide basis, consistent with Plaintiffs' theory of the case." ECF 77 (Memorandum of Law in Support of Class Certification) at 12. Applying the required "rigorous analysis," Plaintiff cannot establish a class-wide presumption of reliance or that damages can be calculated on a class-wide basis. Certification should be denied accordingly.

## **LEGAL STANDARD**

The Supreme Court has made clear that class actions are "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only." *Wal–Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011) (internal quotation omitted). "[T]o justify a departure from that rule" and obtain class certification, Plaintiff bears the burden of satisfying all

6

the requirements of Rule 23(a) and at least one requirement of Rule 23(b). *Id.* And it cannot do so with mere allegations or conclusory assertions. *Id.* at 350. Plaintiff must, instead, "prove the Rule 23 certification requirements" are met with evidence. *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 537 (6th Cir. 2012).

The Court may grant class certification only if it finds, after conducting a "rigorous analysis" of the evidence submitted, that the Rule 23 requirements are satisfied. *In re BancorpSouth, Inc.*, No. 16-0505, 2016 WL 5714755, at *1 (6th Cir. Sept. 6, 2016). "A district judge may not duck hard questions by observing that each side has some support . . . . Tough questions must be faced and squarely decided, if necessary by holding evidentiary hearings and choosing between competing perspectives." *Id.* (internal quotation omitted). And when there are competing expert reports, as is the case here, the Court must carefully weigh the persuasiveness of that expert testimony and resolve conflicts between the experts when deciding whether to certify a class. *See Wal-Mart Stores, Inc.*, 564 U.S. at 353-56.[2]

## ARGUMENT

I. **PLAINTIFF IS NOT ENTITLED TO THE *BASIC* PRESUMPTION FOR THE RESTATEMENT CLAIM BECAUSE DEFENDANTS HAVE SHOWN A LACK OF PRICE IMPACT.**

Plaintiff seeks to invoke the *Basic* presumption rather than producing direct evidence that individual class members relied on Defendants' alleged misrepresentations. ECF 77 at 12-17. The *Basic* presumption relies on the "fraud-on-the-market" theory, which provides "that the market price of shares traded on well-developed markets reflects all publicly available information, and hence, any material misrepresentations." *Basic Inc. v. Levinson*, 485 U.S. 224, 246 (1988). Even

---

[2] Consistent with Rule 23's standards, Defendants are filing contemporaneously with this opposition a motion requesting the Court to conduct an evidentiary hearing to address the parties' competing evidence, including the competing expert testimony, on class certification issues.

if Plaintiff demonstrates an efficient market, however, Defendants can rebut the *Basic* presumption

"by showing, among other things, that the particular misrepresentation at issue did not affect the

stock's market price." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 279 (2014)

("*Halliburton II*").

Absence of price impact can be shown by demonstrating that (1) the alleged corrective

disclosure did not cause the stock price to drop, *i.e.*, lack of "back-end" impact, or (2) the alleged

corrective disclosure did not reveal any new information to the market. *See Erica P. John Fund,*

*Inc. v. Halliburton Co.*, 309 F.R.D. 251, 269-80 (N.D. Tex. 2015) (denying class certification for

five alleged corrective disclosures that did not cause statistically significant price drops at 95%

confidence level); *In re Chicago Bridge & Iron Co. N.V. Sec. Litig.*, No. 17 CIV. 01580 (LGS),

2019 WL 5287980, at \*22 (S.D.N.Y. Oct. 18, 2019) (holding that a "newness" analysis of the

alleged corrective disclosures is required at the class certification stage).[3] Both tests are satisfied

here for the Restatement Claim because the market did not react negatively to AAC's restatement

announcements on March 29 and April 15, 2019 and the alleged corrective disclosures on April

16 did not reveal any new information about the restatement to the market.

An event study is a common and scientifically accepted method for determining the

response of security prices to information. Zurek Rpt. at ¶ 30; *see also Halliburton II*, 573 U.S. at

280 (noting that parties commonly submit event studies to determine whether information had a

price impact); *In re Allstate Corp. Sec. Litig.*, 966 F.3d 595, 613 n.6 (7th Cir. 2020) ("[E]vent

---

[3] *See also In re Omnicom Grp., Inc. Sec. Litig.*, 597 F.3d 501, 511 (2d Cir. 2010) (holding that alleged corrective disclosure did not establish price impact because information disclosed "was the subject of continuing media reports" before alleged corrective disclosure date and thus did not "reveal some then-undisclosed fact with regard to the specific misrepresentations alleged in the complaint").

studies have come to be treated as the sine qua non for proving or disproving price impact and loss causation."). As Dr. Zurek describes, an event study involves the following:

> First, a researcher selects the event to be examined and the appropriate event window, for example, earnings announcements for a particular firm and the price reaction to these announcements as measured over one-day windows. Second, a statistical model is used to calculate the abnormal or residual return for each event, which is the portion of the observed return that is unexpected based on a model of expected returns—commonly the portion that cannot be attributed to market or industry price movements according to the statistical model employed. Third, a statistical hypothesis regarding the residual return is constructed and tested. For example, a researcher may test a hypothesis (a so-called "null hypothesis") that the residual return equals zero following the release of information—that is, that there is no security price reaction to the event. Hypothesis testing is a statistical technique that considers whether the null hypothesis (zero residual return in the example) can be rejected for a given significance threshold (typically 5%) based on the observed data. In an efficient market, rejection of the null hypothesis of zero residual return supports a finding that the bundle of information disclosed during the event window was value-relevant and affected the security's price. This is because such a finding is consistent with a statistically discernible movement in the security's price having occurred following the release of information during the event window.

Zurek Rpt. at ¶ 31.

Using these accepted principles, Dr. Zurek conducted an event study to review the impact, if any, of the alleged corrective disclosures regarding the restatement on AAC's stock during the relevant time period. Based on his analysis, which is fully described in his expert report, Dr. Zurek concludes that there is <u>no</u> price impact for the Restatement Claim. *Id.* at ¶¶ 47-51.

Plaintiff posits that the "truth" regarding AAC's restatement was first revealed to the market on April 15, 2019 and then on April 16, 2019. *See* ECF 45 at ¶¶ 132-137. That is simply false. Plaintiff's own Amended Complaint acknowledges that AAC first disclosed the restatement through a Form 8-K report filed on Friday March 29, 2019, after market hours. *Id.* at ¶ 59. The Form 8-K explained the nature and causes of the restatement. It also provided estimated adjustments to net income for FY 2016, FY 2017, and the first three quarters for 2018. The market,

however, did not react negatively to the restatement announcement. In fact, Dr. Zurek's event study confirms that the residual return for AAC's stock on the first day of trading after the announcement, April 1, 2019, was actually *positive* at a statistically significant level. Zurek Rpt. at ¶ 48. Considering this evidence, Dr. Zurek concludes that the March 29 disclosure "did not impact AAC's stock price negatively." *Id.*

Prior to market open on April 15, 2019, AAC filed its 2018 Form 10-K, which reported the final impact of the previously disclosed restatement. ECF 45 at ¶ 132. AAC reported a decrease to net income of approximately $20.6 million for FY 2016, an increase of $7.7 million for FY 2017, and small increases to net income for the first two quarters of 2018. *Id.* As to the April 15, 2019 Form 10-K, Dr. Zurek concludes that "AAC's residual return on April 15, 2019, was ***positive*** 1.3% and not statistically significant at the 5% level of significance. This is economic evidence that AAC's disclosure of the restatement did not impact its stock price." Zurek Rpt. at ¶ 50.

Perhaps recognizing that there is no price impact associated with the March 29 and April 15, 2019 restatement announcements, Plaintiff points to AAC's stock price movement on April 16, 2019, the day after AAC filed its 2018 Form 10-K. But AAC's stock price movement on April 16 still does not establish price impact for the Restatement Claim.

*First*, if the market for AAC stock was semi-strong efficient, as Mr. Dalrymple suggests, any market reaction would have started when AAC first announced the restatement on March 29, or at a minimum, when the final impact of the restatement was disclosed to the market on April 15. *See* Bugni Dec., Exhibit F (Deposition of Scott Dalrymple ("Dalrymple Dep.") at 36:15-21 ("I would have expected the reaction on the same day after the market opened, or at least the reaction to begin that day."). Plaintiff's suggested theory that the reaction occurred a day after AAC filed its Form 10-K requires a finding that AAC's stock did not in fact trade in an efficient market. In

an efficient market, as Plaintiff's own expert concedes, AAC's stock price would reflect "new, value-relevant public information." *See* ECF 78-2 (Expert Report of W. Scott Dalrymple, CFA ("Dalrymple Rpt."), at ¶ 28. The use of a two-day event window is contrary to Plaintiff's conclusion of market efficiency. It is also worth noting that Mr. Dalrymple used single-day windows for his own event study. *See id.* at Exhibit 1; Dalrymple Dep. at 35:2-36:21.

*Second*, Dr. Zurek's expert report confirms that AAC's April 16, 2019 press release and investor conference call did not disclose any new information to the market regarding AAC's restatement. Zurek Rpt. at ¶¶ 45-46, 51. The April 16 press release quoted the restatement section from the April 15 Form 10-K almost word for word. And as discussed above, *supra* at 4-5, the two additional sentences appearing in the press release did not reveal any new restatement information. Nor did AAC's April 16 investor conference call. *Id.* In short, the April 16 disclosures contained stale restatement information, making any AAC stock price movement on April 16 unattributable to such disclosures. *See* Zurek Rpt. at ¶ 51. As Dr. Zurek explains:

> [W]hile there was discussion of the restatement on April 16, 2019, none of it represented new value-relevant information to which the market would react if it were efficient. Therefore, while AAC's residual return on April 16, 2019, was -15.2% and statistically significant at the 1% level, this return is not evidence of a reaction to new information about the restatement in an efficient market. This is because, in an efficient market [], a stock's price only reacts to new information, and therefore AAC's stock price reaction on April 16, 2019 cannot be attributed to new information about the Restatement Claim because there was no such new information.

*Id.*

Because the relevant disclosures did not impact AAC's stock price, the *Basic* presumption does not apply to Plaintiff's Restatement Claim. *See, e.g.*, *Halliburton*, 309 F.R.D. at 270-80 (holding that defendant demonstrated lack of price impact from alleged corrective disclosures and consequently rebutted the *Basic* presumption as to misstatements purportedly revealed on those

11

dates); *IBEW Local 98 Pension Fund v. Best Buy Co.*, 818 F.3d 775, 782 (8th Cir. 2016) (finding that defendants sufficiently demonstrated lack of price impact where price movement resulted from the release of information that was not connected to the alleged fraudulent misstatements); *In re Moody's Corp. Sec. Litig.*, 274 F.R.D. 480, 492-93 (S.D.N.Y. 2011) (refusing to certify class due to lack of statistically significant price impact from alleged corrective disclosures). Certification of the Restatement Claim should be denied accordingly.

## II.     PLAINTIFF IS NOT ENTITLED TO THE *AFFILIATED UTE* PRESUMPTION.

The *Affiliated Ute* reliance presumption is only available when a plaintiff's claims are based "primarily" on omissions. *Waggoner v. Barclays PLC*, 875 F.3d 79, 95 (2d Cir. 2017). Because this case centers on allegations of affirmative misrepresentations, and Plaintiff is not forced to prove reliance on non-disclosures, the *Affiliated Ute* presumption of reliance is unavailable. *See id.* at 96 ("[T]he Plaintiffs' complaint alleges numerous affirmative misstatements by the Defendants. The Plaintiffs are therefore not in a situation in which it is impossible for them to point to affirmative misstatements."); *Loritz v. Exide Techs.*, No. 13-cv-02607, 2015 WL 6790247, at *21 (C.D. Cal. July 21, 2015) ("This is thus not a case where Plaintiffs must show that they relied on [the defendant's] silence."). Indeed, the Amended Complaint asserts dozens of allegedly misleading affirmative statements, ECF 45 at ¶¶ 63-127, and includes only a small number of alleged omissions to explain why the challenged affirmative statements were supposedly false or misleading. *Id.* at ¶¶ 69, 73. Plaintiff is not entitled to the *Affiliated Ute* presumption because such "presumption does not apply to . . . what has been described as 'half-truths,' nor does it apply to misstatements whose only omission is the truth that the statement misrepresents." *Waggoner*, 875 F.3d at 96.

Courts consistently reject efforts to dress up affirmative misstatements in omissions garb, warning that allowing such a practice would effectively eliminate the reliance requirement. *See,*

*e.g.*, *Joseph v. Wiles*, 223 F.3d 1155, 1162 (10th Cir. 2000) ("We cannot allow the mere fact of this concealment to transform the alleged malfeasance into an omission rather than an affirmative act. To do otherwise would permit the *Affiliated Ute* presumption to swallow the reliance requirement almost completely."); *Schwab v. E\*TRADE Fin. Corp.*, 285 F. Supp. 3d 745, 753 (S.D.N.Y. 2018), *aff'd* 752 F. Appx 56 (2d Cir. 2018) ("The failure to disclose the alleged falsity of a representation does not transform a misrepresentation case into an omission case and allow a plaintiff to seek refuge in the *Affiliated Ute* presumption."). This Court should do the same and reject Plaintiff's attempt here.

## III. PLAINTIFF'S MARKETING CLAIM PRESENTS INDIVIDUALIZED QUESTIONS REGARDING RISK TOLERANCE THAT DEFEAT PREDOMINANCE.

Plaintiff's Amended Complaint alleges that loss causation for the Marketing Claim relies on a corrective disclosure theory. *See* ECF 45 ¶¶ 128-138. But when Defendants exposed the lack of any corrective disclosure for the Marketing Claim, Plaintiff pivoted to a materialization of the risk theory of loss causation. *See* ECF 56 at 24-25; *see also* ECF 62 at 23-24. On these facts, Plaintiff's about face presents predominance problems too great to support class treatment.

Under a materialization of the risk theory of loss causation, a plaintiff may establish loss causation by showing that the defendant's conduct concealed or caused the plaintiff to misapprehend a risk that later materialized, causing a decline in the value of the security in question. A materialization of the risk theory, however, also requires losses to be calculated in different ways for different types of investors, depending on their individual level of risk tolerance. The Fifth Circuit perfectly distilled the issue in *Ludlow*:

> Consider the following scenario: The true risk of a major spill was 2%, but BP's statements had improperly represented the risk as 0.5%. Further imagine two different plaintiff-investors. The first is a low-risk pension fund, whose investment policy forbids investing in companies for whom the risk of a catastrophic event is greater than 1%. The second is a high-risk fund whose risk threshold is higher than

> 2%. Both plaintiffs invested in BP based on BP's statements representing the risk as 0.5%. In this hypothetical, BP's misstatements caused the low risk pension fund to make an investment forbidden under its policy. It would not have bought BP stock at all had it known the true risk of a catastrophe. This is the type of plaintiff the materialization-of-the-risk theory is designed to compensate. By contrast, the high-risk fund still might have purchased the stock, even had it known the "true" risk, though presumably at a lower price that accounted for the increased risk. For the second type of plaintiff, full materialization-of-the-risk damages would prove a windfall.

*Ludlow v. BP, P.L.C.*, 800 F.3d 674, 690 (5th Cir. 2015).

When *Ludlow* is applied here, only those AAC investors with a low risk tolerance would suffer losses representing the full AAC stock price decline because such investors would not have purchased any AAC stock had they known the true risk posed by AAC's marketing practices. *See id.* at 690-92. Investors with a higher risk tolerance, on the other hand, would have purchased AAC stock regardless of knowledge of the true risk. *See id.* Any damages suffered by such investors would only reflect the price between the amount paid and the different amount, if any, they would have paid had they known the true risk. *See* Zurek Rpt. at ¶¶ 66-68.

Plaintiff's Marketing Claim therefore requires individualized inquiries into each individual class member's risk tolerance and whether each individual investor would have purchased AAC securities during the putative class period had they known the true risk, and if so, at what quantity and price. *See Ludlow*, 800 F.3d at 690-92. Such issues would undoubtedly overwhelm any common questions concerning Plaintiff's Marketing Claim. And where a proposed securities fraud class action does not meet the stringent predominance requirements of Rule 23, courts do not hesitate to deny class certification. *See Yadlosky v. Grant Thornton L.L.P.*, 197 F.R.D. 292, 298-301 (E.D. Mich. 2000) (denying class certification in Section 10(b) case on predominance grounds where need to demonstrate individual proof of reliance would predominate over issues common to the class); *In re N.J. Carpenters Health Fund v. Residential Capital*, LLC, 272 F.R.D. 160, 168-

70 (S.D.N.Y. 2011) (denying class certification in federal securities case because questions of investors' knowledge predominated over common issues); *In re Kosmos Energy Ltd. Sec. Litig.*, 299 F.R.D. 133, 150 (N.D. Tex. 2014) (denying class certification where lead plaintiffs failed to submit sufficient evidence to satisfy predominance). The Marketing Claim should not be certified for class treatment because it does not meet Rule 23(b)(3)'s predominance requirement.

## IV. PLAINTIFF CANNOT SATISFY RULE 23(B)(3)'S PREDOMINANCE REQUIREMENT FOR ITS ALLEGED "SCHEME" CLAIM.

The Court should also refuse to certify a class for Plaintiff's scheme claim because Plaintiff cannot satisfy the predominance requirement. To allege a claim for scheme liability under Section 10(b), a plaintiff must allege a "device, scheme, or artifice to defraud," or an "act, practice, or course of business which would operate as a fraud," in addition to the standard elements of a Section 10(b) violation. *See Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 158 (2008); *S.E.C. v. Loomis*, 969 F. Supp. 2d 1226, 1237 (E.D. Cal. 2013) (noting that scheme liability is available only where "defendants undertook a deceptive scheme or course of conduct that went beyond the misrepresentations") (quoting *In re Alstom SA*, 406 F. Supp. 2d 433, 475 (S.D.N.Y. 2005)). Put differently, scheme liability "hinges on the performance of an inherently deceptive act that is distinct from an alleged misstatement." *S.E.C. v. Kelly*, 817 F. Supp. 2d 340, 344 (S.D.N.Y. 2011).

Although generally alleging that Defendants engaged in a "scheme to artificially inflate and maintain the price of AAC common stock," ECF 45 at ¶ 138, Plaintiff fails to assert a single distinct act in furtherance of that scheme. Instead, Plaintiff's scheme claim appears to be a recast of its Marketing and Restatement Claims. Because of this overlap, all the reasons the Marketing and Restatement Claims cannot be certified would also preclude certification of Plaintiff's scheme claim.

But even if Plaintiff's scheme claim was sufficiently distinct (it is not), certification would still be inappropriate for at least two reasons.

*First*, the *Basic* presumption is unavailable because Plaintiff does not allege that Defendants' scheme was ever disclosed to the market. As the Supreme Court held in *Stoneridge*, a plaintiff cannot invoke *Basic*'s fraud-on-the-market presumption for an alleged scheme where that scheme was never "communicated to the public," and, consequently, "[n]o member of the investing public had knowledge, either actual or presumed, of [defendants'] deceptive acts during the relevant times." 552 U.S. at 159. Following *Stoneridge*, courts have refused to apply the *Basic* presumption of reliance to scheme claims where the plaintiff did not allege that the scheme itself was publicly revealed. *See, e.g.*, *Hawaii Ironworkers Annuity Tr. Fund v. Cole*, 296 F.R.D. 549, 556-59 (N.D. Ohio 2013) (refusing to invoke the *Basic* presumption as to scheme claims because the deceptive conduct was never "communicated to the public"); *Desai v. Deutsche Bank Sec. Ltd.*, 573 F.3d 931, 940 (9th Cir. 2009) (refusing to certify a class as to scheme claims and rejecting plaintiffs' theory that they relied on the "integrity" of the market); *In re DVI Inc. Sec. Litig.*, 249 F.R.D. 196, 218 (E.D. Pa. 2008) (declining to apply *Basic* because "none of this alleged conduct was public[ly] disclosed such that it affected the market for [defendant's] securities"). The *Basic* presumption does not apply here for the same reason.

*Second*, the *Affiliated Ute* presumption also does not apply to Plaintiff's scheme claim. As mentioned above, *supra* § II, the presumption does not apply to cases like this one, where Plaintiff challenges numerous affirmative statements and generically alleges a "scheme" to defraud related to those same affirmative statements. *See Joseph*, 223 F.3d at 1163 (refusing to apply *Affiliated Ute* to alleged scheme where the plaintiff "struggle[d] valiantly to bring the alleged conduct within the definition of 'omission'" and in reality challenged "the affirmative misrepresentations

16

allegedly made by defendants"); *Desai*, 573 F.3d at 941 (rejecting *Affiliated Ute* presumption for scheme claims and agreeing with the approach that "carefully maintained the well-established distinction, for purposes of the *Affiliated Ute* presumption, between omission claims, on the one hand, and misrepresentation and manipulation claims, on the other"); *Anschutz Corp. v. Merrill Lynch & Co. Inc.*, 785 F. Supp. 2d 799, 818 (N.D. Cal. 2011) (same where "all [challenged] conduct was part of the same alleged scheme to manipulate the market" and was not limited to omissions). Plaintiff's scheme claim should not be certified for class treatment.

## V. PLAINTIFF'S DAMAGES THEORY IS INCAPABLE OF CLASS-WIDE DETERMINATION.

Plaintiff cannot satisfy predominance for the independent reason that it fails to articulate a method for calculating damages on a class-wide basis. *Comcast* requires a plaintiff to prove that its purported class-wide damages methodology is "consistent with its liability case," and "measure[s] only those damages." 569 U.S. at 35 (internal quotation omitted). Plaintiff cannot merely rely on "assurance[s]" that it intends to create such a model in the future—it must actually present that model at the class certification stage. *Id.* at 37; *see also Fort Worth Emps.' Ret. Fund v. J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 142 (S.D.N.Y. 2014) ("[W]ithout assurance beyond [an expert's] say-so, the Court cannot conclude that there is a damages model that will permit the calculation of damages on a classwide basis.").

Plaintiff patently fails to do so. As Dr. Zurek opines, "Mr. Dalrymple's discussion of damages in his report is, as an economic matter, ***not a methodology***, and he therefore has not demonstrated that damages attributable to Lead Plaintiff's theory of liability can in fact be calculated." Zurek Rpt. at ¶ 60 (emphasis added). In Mr. Dalrymple's own words, "Well, I have not constructed a model that measures damages. I have not determined the extent to which these techniques would be applied in that model." Dalrymple Dep. at 50:14-17.

All Mr. Dalrymple's report does is assert in boilerplate fashion that damages can be determined based on a calculation of share price inflation, that such inflation "can be measured using widely accepted valuation and economic techniques," and that "standard financial analysis and valuation tools can be applied." Dalrymple Rpt. at ¶¶ 90-93. But, as Dr. Zurek opines:

> Mr. Dalrymple's mention of "financial analysis and valuation tools" is not a methodology or proof that damages or inflation can be computed. . . . [A] methodology consistent with Lead Plaintiff's theory of liability needs to consider the particular circumstances of this litigation, as economic theory provides no "off-the-shelf" methodology that can be used to compute inflation without regard to the particular circumstances of a given litigation.

Zurek Rpt. at ¶ 61. As explained further below, Mr. Dalrymple's assertions do not propose a damages methodology capable of measuring damages consistent with Plaintiff's theory of liability for the Marketing Claim, the Restatement Claim, or the scheme claim.

### A. Mr. Dalrymple Has Not Proposed A Methodology That Can Measure Inflation For Plaintiff's Marketing Claim.

*First*, Mr. Dalrymple fails to account for the mismatch between the contents of the alleged misrepresentations and the alleged corrective disclosures for Plaintiff's Marketing Claim. Zurek Rpt. at ¶¶ 63-65. Mr. Dalrymple's damages opinion is based on the notion that "[c]urative events . . . indicate the extent to which the share price had been inflated by alleged material misrepresentations or omissions and, as a result, may be used to estimate share price inflation in semi-strong form efficient markets." Dalrymple Rpt. at ¶ 90. But, as the Supreme Court recently held:

> Plaintiffs typically try to prove the amount of inflation indirectly: They point to a negative disclosure about a company and an associated drop in its stock price; allege that the disclosure corrected an earlier misrepresentation; and then claim that the price drop is equal to the amount of inflation maintained by the earlier misrepresentation.
>
> ***But that final inference – that the back-end price drop equals front-end inflation – starts to break down where there is a mismatch between the contents of the misrepresentation and the corrective disclosure***.

*Goldman Sachs Grp., Inc. v. Ark. Teacher Ret. Sys.*, 141 S. Ct. 1951, 1961 (2021) (internal citation omitted and emphasis added). Mr. Dalrymple's report does not account for the mismatch that exists here or how that would be addressed in any damages methodology that could be applied on a class-wide basis.

Plaintiff's Marketing Claim alleges that "Defendants engaged in a fraudulent and deceptive sales and marketing scheme and made false and misleading statements related to AAC's sales and marketing practices that were revealed to investors as the industry and Congress began to investigate and cast light upon such deceptive practices." ECF 62 at 2-3. But AAC did not disclose that it engaged in deceptive marketing practices on either of the alleged corrective disclosure dates. Nor has it ever done so. The disclosures on November 6, 2018 and April 16, 2019 instead revealed that changes to Google's SEO algorithm had adversely impacted, and continued to adversely impact, AAC's financial results. Dr. Zurek opines accordingly that "there is a mismatch between what was alleged (marketing practices and misrepresentations regarding these practices) and what was ultimately disclosed by the Company (financial performance below what the market expected and information that call volumes to the Company's call centers declined, apparently as a result of Google changing its search algorithm)." Zurek Rpt. at ¶ 64.

Plaintiff argues that despite the mismatch, the alleged corrective disclosures are still "within the zone of risk concealed by the misrepresentations and omissions alleged." ECF 56 at 24-25. But even if Plaintiff were correct, "it does not mean that the market's reaction to the alleged corrective disclosure is a reasonable approximation of the market's hypothetical reaction to an earlier truthful disclosure, which is a necessary condition for one to calculate inflation using the price decline following the alleged corrective disclosure." Zurek Rpt. at ¶ 65. As Dr. Zurek explains:

In fact, there are a number of reasons to conclude that the price reaction following the alleged corrective disclosures would not be the same as inflation earlier during the Proposed Class Period. These reasons include, among others, the fact that the change in Google's algorithm and the target of that change (i.e., the medical space []) may not have been known at the beginning of the Proposed Class Period and that the alleged corrective disclosures include realized financial results that again may not have been known at the beginning of the Proposed Class Period.

*Id.*

Yet Mr. Dalrymple's model does not account for any of them. In fact, Mr. Dalrymple admitted that he did not even do the analysis to determine whether the alleged corrective disclosures, in fact, corrected the alleged misrepresentations:

**Q**: In forming the opinions set forth in paragraphs 89 through 95, did you do an analysis to determine whether the alleged corrective disclosures, in fact, corrected the alleged misrepresentations?

**A**: Well, generally, I have not done an analysis of the corrective disclosures or what they corrected.

Dalrymple Dep. at 57:24-58:6.

*Second*, Mr. Dalrymple does not provide any way to distinguish damages relating to Plaintiff's materialization of the risk loss causation theory. Zurek Rpt. at ¶¶ 66-68. As Dr. Zurek explains:

[A]n earlier disclosure of a risk is not the same as a subsequent materialization, and the two would generally be associated with different price reactions. To understand why this is the case, consider the following example. A company knows that there is a 30% probability it will lose a major customer, yet conceals this risk (i.e., the market believes there is a 0% probability). The company loses the customer and its stock price declines. The stock price decline when the company loses the customer represents the reaction to the certainty (100% probability) of losing the customer, while the allegedly concealed risk is that there was a 30% probability of losing the customer. Since a stock price decline in response to a 100% probability of loss would be larger than in response to a 30% probability of that same loss, the stock price decline to the former (the "back-end price drop" as described in *Goldman*) is not a measure of "front-end inflation" due to the allegedly concealed risk. To illustrate this, suppose the "back-end price drop" were $10 million. Had the company revealed the 30% probability that it would lose a major customer before this risk had materialized with 100%

probability, the hypothetical price in the absence of the alleged concealed risk would have been lower than the actual price by $3 million, which is 30% of $10 million. Using the price drop of $10 million to measure inflation would overstate it by $7 million.

In this case specifically, the allegedly concealed risk associated with AAC relying on a deceptive marketing strategy is mismatched from the alleged corrective disclosure that this risk had materialized in "declining sales calls and [AAC's] inability to use its deceptive marketing strategies." Mr. Dalrymple does not therefore demonstrate that AAC's stock price reaction to the alleged materialization of this risk can be used to measure inflation earlier, before this risk had materialized.

*Id.* at ¶¶ 66-68.

Stated differently, Mr. Dalrymple assumes that each putative class member would not have bought AAC at all but for the alleged misrepresentations. But there are certain investors who would have purchased AAC stock, even assuming the true risk. Although that investor would be entitled to damages based on the inflated price paid, it cannot be compensated for the materialization of a risk it may have been willing to take. Mr. Dalrymple's model, like the one rejected in *Ludlow*, does not provide any mechanism for separating these two types of investors. *See* 800 F.3d at 690-92. And because it lacks the ability to do so, Mr. Dalrymple's methodology cannot provide an adequate measure of class-wide damages under *Comcast* for the Marketing Claim. *See id.*

*Third*, Mr. Dalrymple fails to provide "an economically valid damages methodology [that] control[s] for confounding information and measure[s] the impact of only information that is corrective of the alleged fraud." Zurek Rpt. at ¶ 74.

Mr. Dalrymple specifically "has not proposed a methodology that can be used to parse out the impact of the change in Google's search algorithm on AAC's financial results stemming from the Company's allegedly deceptive marketing." *Id.* at ¶ 71. The Google algorithm changes were specifically directed at the healthcare sector and "would likely have impacted AAC even if AAC's allegedly deceptive marketing practices had been disclosed prior to November 6, 2018." *Id.* at ¶

72. Mr. Dalrymple, however, readily admits that he did no analysis as to how the Google algorithm change could be parsed out from damages:

> **Q**: In forming your opinions, did you do an actual analysis to determine whether any of those techniques could be used to distinguish the impact of a Google algorithm change from information that revealed to the market the alleged marketing fraud?
>
> **A**: Well, I didn't do an analysis to determine that the tools can be used. The tools can be used because they are standard valuation and economic tools that are routinely used. But I think what you're suggesting is – I haven't actually done the analysis.

Dalrymple Dep. at 59:9-20. Plaintiff, thus, has not provided the requisite damages methodology as to how damages can be calculated on a class-wide basis for the Marketing Claim.

Mr. Dalrymple also fails to propose a methodology as to how to account for the myriad of factors incorporated into AAC's 2019 guidance. As Dr. Zurek explains:

> [O]n April 16, 2019, AAC also disclosed 2019 guidance for the first time. In an efficient market, AAC's stock price on April 16, 2019, would adjust to reflect this guidance. However, it is not clear how or to what extent the Marketing Claim impacted this guidance as opposed to other factors unrelated to the allegations. Mr. Dalrymple does not propose a methodology that can measure the impact, if any, of the guidance disclosure solely due to the Marketing Claim as opposed to other business developments. For example, analysts reported their estimates of the impact on AAC of the change in Google's algorithm as early as October 2018, prior to the first alleged corrective disclosure. Therefore, Mr. Dalrymple would need some methodology to distinguish the impact of the alleged fraud on 2019 guidance that was able to be disclosed earlier, as opposed to other new business developments.
>
> In sum, an economically valid damages methodology would need to control for confounding information and measure the impact of only information that is corrective of the alleged fraud, and Mr. Dalrymple has not put forth such a methodology in light of the particular complications discussed above.

Zurek Rpt. at ¶¶ 73-74. Again, Mr. Dalrymple admits he did no such analysis:

> **Q**: In forming the opinions set forth in paragraphs 89 through 95 of your report, did you do an analysis to determine whether the techniques you mentioned could be used to disaggregate the confounding information in the April 16, 2019 press release?

**A:** Is that the same question you just asked but –

**Q:** But as applied to the April 16, 2019 press release.

**A:** Okay. And I think my answer is similar. These are standard economic and valuation tools that can be applied in any context, including with respect to the allegations related to that date.

**Q:** Have you done the actual analysis?

**A:** I have not done the actual analysis.

Dalrymple Dep. at 60:15-61:7.

Mr. Dalrymple's failure to provide an economically valid damages methodology runs afoul of the requirements of *Comcast* and renders class certification of the Marketing Claim untenable. *See Comcast*, 569 U.S. at 35.

**B.  Mr. Dalrymple Has Not Proposed A Methodology That Can Measure Inflation For Plaintiff's Restatement Claim.**

Price impact is wholly lacking on Plaintiff's Restatement Claim. The market did not react negatively to the AAC's restatement announcements on March 29 and April 15, 2019 and the alleged corrective disclosures on April 16 did not reveal any additional information regarding the restatement. Mr. Dalrymple would not know that, however, because his review of the Restatement Claim is inadequate. He did not even review the March 29, 2019 Form 8-K or the April 15, 2019 Form 10-K:

**Q:** So you did not review AAC Holdings Form 8K dated March 29, 2019, correct?

**A:** Yeah, I don't – I don't believe I did. It's not listed here.

**Q:** You did not review AAC Holdings Form 10K dated April 15, 2019, correct?

**A:** Yeah, not – not in forming my opinions here, no.

Dalrymple Dep. at 24:1-8. He was not aware of any disclosures other than the November 6, 2018 and April 16, 2019 disclosures that purportedly corrected the alleged misrepresentations. *Id.* at 14:9-16 ("Q: But sitting here today, you are not aware of any disclosures other than the November 6, 2018 disclosures and the April 16, 2019 disclosures that allegedly corrected defendants' alleged misrepresentations. A: Yeah, sitting here today, I'm not aware of any – anything else that allegedly corrected the misstatements."). And he did not conduct a price impact analysis. *Id.* at 64:25-65:2 ("Q: Have you performed any analysis of price impacts in this case? A: Not at this time, no.").

If Mr. Dalrymple had conducted such an analysis or even reviewed all the disclosures on the restatement, he would know that AAC's stock price did not decline in response to the release of new information on the restatement. "Given that AAC's stock price did not decline in response to the release of information about the alleged truth behind the Restatement Claim, Mr. Dalrymple has not shown that his proposed damages 'methodology' can measure inflation associated with the Restatement Claim based on the price movements on the days on which information about the Restatement Claim was released." Zurek Rpt. at ¶ 75. Accordingly, class certification on the Restatement Claim should be denied for the additional reason that Plaintiff has not proposed a viable damages methodology.

C.     **Mr. Dalrymple Has Not Proposed A Methodology That Can Measure Inflation For Plaintiff's "Scheme" Claim.**

Plaintiff does not allege that the truth regarding Defendants' scheme was ever revealed to the market. And without a "curative" disclosure for the alleged scheme to calculate damages, Mr. Dalrymple's proposed model does not apply. Mr. Dalrymple confirmed that he has not proposed any methodology to isolate damages for the alleged scheme theory of liability. As Mr. Dalrymple himself testified:

**Q**: In coming up with your opinions that are in paragraphs 89 through 95 of your report, did you do any separate analysis as to plaintiff's scheme allegations?

**A**: I have an understanding that there are allegations of a scheme in this case. As I testified earlier, I have not analyzed the impact of the allegations on the share price at this stage with respect to the scheme or any of the allegations.

Dalrymple Dep. at 61:8-18

Plaintiff, thus, fails to present a viable damages model for its scheme claim. Class certification of the scheme claim should be denied.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court deny Plaintiff's Motion for Class Certification in its entirety.

Dated: September 7, 2021

Respectfully submitted by:

*/s/ W. Travis Parham*
W. Travis Parham (TN BPR #16846)
Michael T. Harmon (TN BPR # 27279)
**Waller Lansden Dortch & Davis LLP**
Nashville City Center
511 Union Street, Suite 2700
Nashville, TN 37219
Tel: (615) 244-6380
travis.parham@wallerlaw.com
michael.harmon@wallerlaw.com

Jessica P. Corley (*pro hac vice*)
Lisa R. Bugni (*pro hac vice*)
Logan R. Hobson (*pro hac vice*)
**KING & SPALDING LLP**
1180 Peachtree Street, N.E.
Atlanta, GA 30309
Tel: (404) 572-4600
jpcorley@kslaw.com
lbugni@kslaw.com
lhobson@kslaw.com

*Counsel for Defendants*

25

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on this 7th day of September, 2021, I caused a true and correct copy of the foregoing to be filed with the Clerk of the Court using the CM/ECF system, which will automatically send notification of such filing and make available the same to the following attorneys of record:

Christopher M. Wood
Christopher H. Lyons
ROBBINS GELLER RUDMAN
& DOWD LLP
414 Union Street, Suite 900
Nashville, TN 37219
Tel: (615) 244-2203
cwood@rgrdlaw.com
lyons@rgrdlaw.com

Francisco J. Mejia
ROBBINS GELLER RUDMAN
& DOWD LLP
655 West Broadway, Suite 1900
San Diego, CA 92101
Tel: (619) 231-1058
fmejia@rgrdlaw.com

Jerry E. Martin
Bank of America Plaza
BARRETT JOHNSTON MARTIN
& GARRISON, LLC
414 Union Street, Suite 900
Nashville, TN 37219
Tel: (615) 244-2202
jmartin@barrettjohnston.com

J. Alexander Hood, II
Jeremy A. Lieberman
Jonathan Lindenfeld
Pomerantz LLP
600 Third Avenue
20th Floor
New York, NY 10016
Tel: (212) 661-1100
ahood@pomlaw.com
jalieberman@pomlaw.com
jlindenfeld@pomlaw.com

Patrick V. Dahlstrom
Pomerantz LLP
10 S LaSalle Street
Suite 3505
Chicago, IL 60603
Tel: (312) 377-1181
pdahlstrom@pomlaw.com

Paul Kent Bramlett
Robert P. Bramlett
Bramlett Law Offices
40 Burton Hills Blvd.
Suite 200
Nashville, TN 37215
Tel: (615) 248-2828
pknashlaw@aol.com
robert@bramlettlawoffices.com

*/s/ W. Travis Parham*

26