# Exhibit A

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

INDIANA PUBLIC RETIREMENT SYSTEM,
Individually and on Behalf of All Others
Similarly Situated,

Plaintiff,

v.

MICHAEL T. CARTWRIGHT, KIRK R. MANZ,
and ANDREW W. MCWILLIAMS,

Defendants.

Civil Action No. 3:19-cv-00407

REBUTTAL REPORT OF PAUL ZUREK, PH.D.
September 7, 2021

# Table of Contents

I. Qualifications ........................................................................................... 1

II. Assignment ............................................................................................. 1

III. Summary of Opinions ............................................................................ 2

IV. Background ............................................................................................. 5

    A. Lead Plaintiff's Allegations ............................................................5

    B. Alleged Corrective Disclosures .......................................................6

V. Market Efficiency and Event Studies .......................................................8

    A. Market Efficiency ...........................................................................8

    B. Event Study Analysis ....................................................................11

VI. From an Economic Standpoint, the Restatement Claim Did Not Have Price Impact on AAC's Stock Price During the Proposed Class Period.................................................. 12

    A. Price Impact Analysis ....................................................................13

    B. Timeline of Information Disclosed Regarding the Restatement Claim...........15

    C. There Was No Price Impact When the Restatement Was Disclosed and Therefore No Price Impact Due to the Restatement Claim. .........................................19

VII. Mr. Dalrymple Has Not Provided a Damages Methodology that Can Measure Damages Consistent with Lead Plaintiff's Theory of Liability. ..................................20

    A. Economics of Damages in Securities Litigation and Out-of-Pocket Damages 21

    B. Mr. Dalrymple's Damages "Methodology" Does Not Address Specific Circumstances Here nor Lead Plaintiff's Theory of Liability. ..................................24

        1. Mr. Dalrymple Has Not Proposed a Methodology that Can Measure Inflation for the Alleged Marketing Claim. .....................................26

        2. Mr. Dalrymple Has Not Shown that His "Methodology" Can Measure Inflation Due to the Restatement Claim.........................................31

## I.    Qualifications

1.    I am a Vice President at Cornerstone Research, a financial and economic consulting firm. I hold Ph.D. and M.A. degrees in finance and a B.S. degree in economics from the Wharton School at the University of Pennsylvania. My research and work experience span a number of areas in financial economics, with a focus on asset pricing, valuation, and statistical analysis, including event studies. A copy of my curriculum vitae is attached as **Appendix A**.

2.    My academic research has focused on asset pricing and valuation, and on econometric analysis of financial market data. I have authored textbook chapters on issues in finance and financial economics. I was involved in teaching economics, valuation, corporate finance, risk management, and asset pricing to undergraduate and graduate students, and in executive education programs at the Wharton School at the University of Pennsylvania.

3.    I have more than a decade of experience conducting economic analyses on complex matters at all stages of litigation. At Cornerstone Research, I have consulted on a large number of litigation matters, including many securities lawsuits brought by shareholders. My work has involved issues of market efficiency, price impact, loss causation, and valuation, as well as the calculation of damages. I have also previously testified as an expert in litigation, including on issues related to class certification, and presented findings of my analyses to regulators. I have spoken publicly on various matters related to securities litigation. A list of my prior testimony is included as part of **Appendix A**.

## II.    Assignment

4.    I have been retained by counsel for Defendants to evaluate economic evidence regarding whether the fraud alleged by Lead Plaintiff in its Restatement Claim, as defined herein, impacted AAC Holdings, Inc.'s ("AAC's" or the "Company's") stock price,[1] under

---

[1] I understand that the Supreme Court explained in *Halliburton II* that a defendant may rebut the *Basic* presumption of reliance, which is based on the notion that "the price of stock traded in an efficient market reflects all public, material information," by "showing that the alleged misrepresentation did not actually affect the stock price—that is, that it had no 'price impact.'" *Halliburton Co. v. Erica P. John Fund Inc.*, 573 U.S. 258 (2014) ("*Halliburton II*"). As explained in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988) ("*Basic*"), "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance." Further, I understand that the Supreme Court explained in *Goldman*: "[P]rice impact is the amount of price

Case 3:19-cv-00407    Document 84-1    Filed 09/07/21    Page 4 of 67 PageID #: 1701

the assumption that Lead Plaintiff prevails in establishing market efficiency. I have also been asked to review and respond to certain opinions expressed in the Expert Report of W. Scott Dalrymple, CFA, dated July 6, 2021, in particular Mr. Dalrymple's opinion regarding the calculation of damages in this matter "for every member of the proposed class using a common technique that is grounded in Plaintiff's theory of liability."[2]

5.     I understand that Lead Plaintiff is seeking to certify a class of "[a]ll persons who purchased or otherwise acquired the common stock of [AAC] between March 8, 2017 and November 5, 2018, inclusive," (the "Proposed Class Period") excluding AAC, the Defendants, members of Defendants' immediate families, and entities controlled by Defendants.[3] In evaluating price impact and the existence of a methodology to calculate damages, I have assumed that Lead Plaintiff will be able to prove the allegations of securities fraud in this matter.

6.     Cornerstone Research staff, working under my direction, have assisted me in the preparation of this report. Cornerstone Research is being compensated for my work as an expert in this matter at an hourly rate of $750. The compensation is not contingent on the opinions that I reach or the outcome of this litigation. My opinions are based on information available to me as of the date of this report, and I reserve the right to revise or supplement my opinions should additional information or facts become available or to respond to any additional opinions offered by Mr. Dalrymple. A list of materials that I have considered in forming my opinions is included in **Appendix B**.

## III.    Summary of Opinions

7.     I understand that Lead Plaintiff's allegations fall into two categories, which were characterized by the Court as allegations regarding (1) AAC's allegedly deceptive marketing scheme and the Company's statements about its marketing practices ("Marketing Claim") and (2) allegations regarding AAC's financial statement restatement in April 2019 for FY

---

inflation maintained by an alleged misrepresentation—in other words, the amount that the stock's price would have fallen 'without the false statement.'" *Goldman Sachs Group, Inc., et al., Petitioners v. Arkansas Teacher Retirement System, et al.*, 141 S.Ct. 1951 (2021) ("*Goldman*").

[2] Expert Report of W. Scott Dalrymple, CFA, dated July 6, 2021, ¶ 11 ("Dalrymple Report").

[3] Memorandum of Law in Support of Lead Plaintiff's Motion for Class Certification, *Indiana Public Retirement System, Individually and on Behalf of All Others Similarly Situated vs. Michael T. Cartwright, Kirk R. Manz, and Andrew W. McWilliams*, filed July 6, 2021, p. 1.

2016 and FY 2017 and the first three quarters of FY 2018 that affected the Company's reported provision for doubtful accounts and accounts receivable ("Restatement Claim").[4] I understand that Lead Plaintiff is alleging that corrective disclosures concerning the Marketing Claim occurred on November 6, 2018, (the day immediately following the last day of the Proposed Class Period), and on April 16, 2019, and corrective disclosures concerning the Restatement Claim occurred several months after the end of the Proposed Class Period, on April 15, 2019, and on April 16, 2019.[5]

8.     My opinions, the bases for which are detailed in the report, are as follows.

9.     *First*, from an economic standpoint, the Restatement Claim did not have price impact on AAC's stock price during the Proposed Class Period.  The existence of price impact with respect to the Restatement Claim can be assessed using an event study and the observed residual stock price reaction when information about the restatement was disclosed to the market.  Based on my review of publicly available information regarding the Company, this first occurred on March 29, 2019, after market hours, when the Company announced that it would restate its financials and provided preliminary estimates of the impact.[6]  AAC's residual stock price return on April 1, 2019, (the first trading day after the information was released) was ***positive*** 13.2%, which is statistically significant at the 1% level.  In other words, AAC's stock price did not decline when AAC first disclosed corrective information regarding the Restatement Claim, as would be expected had the alleged fraud impacted AAC's stock price during the Proposed Class Period.

10.     In addition to the disclosures on March 29, 2019, AAC publicly filed its Form 10-K for FY 2018 prior to market hours on April 15, 2019.  This filing included the final impact of the restatement on AAC's financials.[7]  AAC's residual stock price return was ***positive*** 1.3% on that day, which is not statistically significant at conventional levels of significance. Hence, AAC's stock price did not decline upon the disclosure of AAC's final restatement

---

[4] In its Memorandum Opinion regarding Defendants' Motion to Dismiss the Amended Complaint, the Court used these categories to describe Lead Plaintiff's allegations.  Memorandum Opinion, *Indiana Public Retirement System, et al. v. AAC Holdings, Inc., et al.*, filed April 8, 2021 ("MTD Opinion"), pp. 2–3, 8–9. Periods prior to 2016 were also impacted.  AAC Form 8-K, filed March 29, 2019.

[5] Consolidated Complaint for Violations of the Securities Exchange Act of 1934, *David Brown Caudle, Individually and on Behalf of All Others Similarly Situated v. AAC Holdings, Inc., Michael T. Cartwright, Kirk R. Manz and Andrew W. McWilliams,* filed November 4, 2019 ("Amended Complaint"), ¶¶ 128–138.

[6] AAC, SEC Form 8-K, filed March 29, 2019.

[7] AAC, SEC Form 10-K, filed April 15, 2019, pp. 3–4.

results either, as would be expected had the alleged fraud impacted AAC's stock price during the Proposed Class Period.

11. While AAC issued a press release discussing, among other topics, its financial results and held a conference call on April 16, 2019, which Lead Plaintiff alleges to be a corrective disclosure date, my review of this information shows that no new information regarding the restatement was disclosed on April 16, 2019.[8] Therefore, AAC's stock price reaction on April 16, 2019 cannot be attributed to the Restatement Claim if the market for AAC stock was efficient,[9] as Mr. Dalrymple claims and as I understand Lead Plaintiff is seeking to demonstrate.[10] The price reaction on that day does not, therefore, demonstrate the existence of price impact associated with the Restatement Claim. In summary, the lack of evidence of declines on the dates on which new information about AAC's restatement was released (positive residual returns on the first two dates and no new information regarding the restatement on the third date discussed above) is economic evidence that there was no price impact associated with the Restatement Claim.

12. *Second*, Mr. Dalrymple does not propose a damages methodology capable of measuring damages consistently with Lead Plaintiff's theory of liability. His report simply claims that damages can be determined based on a calculation of share price inflation and asserts that such inflation "can be measured using widely accepted valuation and economic techniques" and based on "analyzing the impact of the curative events."[11] However, Mr. Dalrymple does not discuss any specific methodology or technique that would be applicable in this matter to calculate inflation given the nature of Lead Plaintiff's allegations and the nature of the alleged corrective disclosures. In particular, Mr. Dalrymple does not address (beyond mere generalities regarding "widely accepted valuation and economic techniques") how he would account for (1) the mismatch between the contents of the alleged misrepresentations and the alleged corrective disclosures for the Marketing Claim, which means that price declines associated with the latter cannot be assumed to be a measure of inflation during the Proposed Class Period as Mr. Dalrymple is effectively assuming; (2) confounding information on November 6, 2018 (for the Marketing Claim), and on April 15 and 16, 2019, (for the Marketing and Restatement Claims); and (3) the lack of statistical

---

[8] AAC, SEC Form 8-K, filed April 16, 2019; Amended Complaint ¶¶ 134–138.
[9] As mentioned in **Section II**, I have been asked to assume that Lead Plaintiff prevails in establishing market efficiency.
[10] Dalrymple Report, ¶ 88.
[11] Dalrymple Report, ¶ 90.

significance of AAC's residual stock price return on April 15, 2019, and the fact that information regarding the Restatement Claim was already disclosed previously in March 2019.

13.     *In sum*, economic analysis shows that there was no price impact associated with the Restatement Claim.  In addition, Mr. Dalrymple has failed to show that damages can be calculated on a class-wide basis in this litigation in a manner consistent with Lead Plaintiff's theory of liability for both the Marketing and Restatement Claims.

## IV.     Background

### A.     Lead Plaintiff's Allegations

14.     Lead Plaintiff alleges that "AAC, its CEO, and two successive CFOs falsified the Company's reported financial results while simultaneously overseeing a deceptive sales and marketing scheme which was designed to and did inflate AAC's operating performance, balance sheets and income statements as publicly reported throughout the Class Period."[12]  In the Amended Complaint, Lead Plaintiff separates these allegations into two categories: "Defendants' Unethical and Deceptive Marketing Tactics" and "Defendants Artificially Inflated AAC's Financial Results by Failing to Write Off Uncollectible Accounts Receivable."[13]  The Court referred to these allegations as the "Marketing Claim" and the "Restatement Claim"[14] (terminology which I adopt here) and described them as follows:

> a.  "Restatement Claim":  "Defendants made false and misleading statements about AAC's accounts receivable, leading to false financial statements that were ultimately revealed to investors through AAC's Restatement of its financial results for fiscal years 2016 and 2017 and the first three quarters [of] 2018."[15]  As described in **Section VI.B**, my review of public information finds that the restatement was first announced on March 29, 2019, and fully disclosed on April 15, 2019.

---

[12] Amended Complaint, ¶ 3.
[13] Amended Complaint, ¶¶ 26–62.
[14] See, e.g., MTD Opinion, pp. 2–3.
[15] MTD Opinion, p. 2.

b. "Marketing Claim": "Defendants engaged in a fraudulent and deceptive sales and marketing scheme and made false and misleading statements related to AAC's sales and marketing practices that were revealed to investors as the industry and Congress began to investigate and cast light upon such deceptive practices."[16] As described below, I understand that Lead Plaintiff alleges that corrective information regarding this claim was revealed on November 6, 2018, and on April 16, 2019.

## B. Alleged Corrective Disclosures

15. I understand that Lead Plaintiff alleges that the fraudulent scheme and misrepresentations were revealed to the market in three corrective disclosures occurring on November 6, 2018, April 15, 2019, and April 16, 2019.

16. With respect to the November 6, 2018, alleged corrective disclosure, Lead Plaintiff claims that:

> On November 6, 2018, AAC issued a release which reported 3Q18 revenues of $77.5 million, an adjusted loss per share of $0.08 and adjusted EBITDA of $10.7 million, all well below Wall Street analyst expectations. In addition, AAC reduced its full year FY18 revenue, EBITDA and EPS guidance, which Cartwright had previously reassured investors it was on track to meet when he announced the Company's 2Q18 results on August 2, 2018. In the November 6, 2018, release, Cartwright blamed the substantial miss and guidance reduction on "'a significant decline in call volume,'" and "'lower census.'"

> On November 6, 2018, Cartwright and McWilliams also hosted a conference call to discuss AAC's 3Q18 financial results. During the call, Cartwright asserted that changes in Google's algorithms

>> impacted the search engine optimization of our health care and medical-related websites…. On a net basis, across all of our websites, this resulted in a sharp downturn in calls to our call center. Overall, calls dropped over 30% when you compare July call totals to September call totals. This led to a total census decline of just under 10% for the July to September period.

---

[16] MTD Opinion, pp. 2–3.

On this news, the price of AAC common stock declined by more than 44%, from a close of $5.31 on November 5, 2018, to a close of $2.96 on November 6, 2018.[17]

Lead Plaintiff's description of the alleged corrective disclosure in its discussion of loss causation (quoted above) only mentions information that Lead Plaintiff appears to associate in its Amended Complaint with being corrective of the Marketing Claim. It contains no mention of provision for doubtful accounts, accounts receivable, or of the subsequent restatement.[18]

17. With respect to the April 15, 2019, alleged corrective disclosure, Lead Plaintiff claims:

On April 15, 2019, AAC filed with the SEC its 2018 Form 10-K, which disclosed that the Company had restated its historical financial results [and] [t]he 2018 Form 10-K also disclosed that the Company had a material weakness in its internal controls, resulting in misstatements in its financial results."[19]

Lead Plaintiff's description of this alleged corrective disclosure (quoted above) only mentions information regarding the Restatement Claim. I note that Mr. Dalrymple does not mention in his report this date as an alleged corrective disclosure regarding either of the two claims by Lead Plaintiff although he appears to acknowledge that the 2018 Form 10-K was made public on this day.[20]

18. With respect to the April 16, 2019, alleged corrective disclosure, Lead Plaintiff claims:

On April 16, 2019, AAC issued a release reporting AAC's 4Q18 revenues of $57.4 million, an adjusted loss per share of $0.85 and adjusted EBITDA of

---

[17] Amended Complaint, ¶¶ 129–131.

[18] While the Amended Complaint elsewhere (in ¶ 125 in Section V, outside of the Loss Causation section which is Section VI) mentions an SEC investigation and AAC's change in estimate regarding the collectability of accounts receivable disclosed on this date, I understand that these disclosures are separate from the information revealed in the restatement that was disclosed on April 15, 2019. Further, the Company stated that this restatement did not relate to the "change in estimate that the Company made during the three months ended September 30, 2018 and effective as of July 1, 2018, regarding our estimate of the collectability of accounts receivable…" first announced in November 2018 (see, e.g., AAC, SEC Form 8-K, filed March 29, 2019), and the Court defined Lead Plaintiff's Restatement Claim as concerning "AAC's Restatement of its financial results for fiscal years 2016 and 2017 and the first three quarters [of] 2018," which was not revealed until March 29 and April 15, 2019. MTD Opinion, p. 2.

[19] Amended Complaint, ¶¶ 132–133.

[20] Dalrymple Report, ¶ 22.

negative $12.4 million, all well below the estimates defendants Cartwright and McWilliams had led the market to expect. In addition, AAC provided FY19 revenue and EPS estimates well below those defendants Cartwright and McWilliams had led the market to expect. In the release, Cartwright attributed the miss to the continuing fallout from the reduced call volume and lower census which had impacted the Company's 3Q18 results: "'The last several months of 2018 saw a census decline that was more significant than we originally anticipated, with an initial 30% drop in call volume resulting in a sharp decrease in admissions in the second half of 2018 which resulted in a corresponding decrease in revenue.'"[21]

19. Lead Plaintiff also claims that "[t]he release further detailed the Company's earnings restatement."[22] Lead Plaintiff's description in the Amended Complaint of the alleged corrective disclosure on April 16, 2019, (quoted above), therefore, appears to allege corrective information regarding both the Marketing and the Restatement Claims.

20. Lead Plaintiff claims that following the April 16, 2019, disclosure, "[o]n this news, the price of AAC common stock price declined over 18% on very high trading volume, to close at $1.74 per share on April 16, 2019."[23]

21. For additional context, **Exhibit 1** shows the evolution of AAC's stock price during the Proposed Class Period.

## V. Market Efficiency and Event Studies

### A. Market Efficiency

22. Market efficiency is a fundamental concept in financial economics dating back to the seminal work of Nobel Prize-winning economist Professor Eugene Fama in the 1960s.[24] Professor Fama defined an efficient market for a security as one where the security's price reflects the value implications of available information:

> In general terms, the ideal is a market in which prices provide accurate signals for resource allocation: that is, a market in which firms can make production-investment decisions, and investors can choose among the securities that represent ownership of firms' activities under the assumption that security

---

[21] Amended Complaint, ¶ 134.
[22] Amended Complaint, ¶ 135.
[23] Amended Complaint, ¶ 137.
[24] Eugene F. Fama, "Efficient Capital Markets: A Review of Theory and Empirical Work," *Journal of Finance* 25, no. 2 (1970), pp. 383–417 ("Fama I").

prices at any time 'fully reflect' all available information. A market in which prices always 'fully reflect' available information is called 'efficient.' [25]

23. Empirical tests of market efficiency concern three different sets of information with respect to which efficiency is examined. Tests of so-called weak form market efficiency examine whether security prices incorporate information that can be obtained from historical prices and dividends. Tests of semi-strong form market efficiency examine whether security prices incorporate all publicly available information. [26] Finally, tests of strong form market efficiency consider whether security prices incorporate all information, including private information that is not publicly available. [27]

24. I understand that the form of market efficiency that is most relevant in the present context is semi-strong form market efficiency. [28, 29] In other words, the relevant question is whether security prices (1) rapidly (such that information is "always" and "at any time" reflected, as in Professor Fama's definition) and (2) fully incorporate all publicly available information. [30]

25. Information is incorporated rapidly into a security's price in an efficient market, in many cases within minutes of the information becoming public. [31] An important feature of

---

[25] Fama I, p. 383.

[26] If markets are semi-strong efficient, they will also necessarily be weak form efficient, because all publicly available information includes information regarding historical prices and dividends.

[27] Fama I, p. 383. See also Richard A. Brealey, Stewart C. Myers, and Franklin Allen, *Principles of Corporate Finance*, 11th ed. (New York: McGraw-Hill/Irwin, 2014) ("Brealey, Myers, and Allen (2014)"), pp. 324–325.

[28] For example, the Supreme Court's decision in *Halliburton II*, citing its decision in *Basic*, states: "Specifically, the Court relied upon the 'semi-strong' version of that theory, which posits that the average investor cannot earn above-market returns (i.e., 'beat the market') in an efficient market by trading on the basis of publicly available information."

[29] Mr. Dalrymple tests for the semi-strong form market efficiency and appears to agree that that is the form that is most relevant in the present context: "A finding that shares trade in a semi-strong-form efficient market indicates that the prices of those shares incorporate new, value-relevant public information about the issuer. Consistent with this principle, I understand that courts have considered evidence that a security traded in a market characterized by the semi-strong form of the [efficient market hypothesis] as a basis to invoke the "fraud on the market" presumption with respect to that security in the context of securities litigation." Dalrymple Report, ¶ 28.

[30] Unless otherwise specified, any references to market efficiency and efficient markets in this report refer to the semi-strong form of market efficiency.

[31] See Eugene F. Fama, "Efficient Capital Markets: II," *Journal of Finance* 46, no. 5 (1991), pp. 1575–1617 ("Fama II") at pp. 1601–1602 ("The typical result in event studies on daily data is that, on average, stock prices seem to adjust within a day to event announcements. The result is so common that this work now devotes little space to market efficiency. The fact that quick adjustment is consistent with efficiency is noted, and then the studies move on to other issues."). An early article by Wolfson and Patell that studies news releases of earnings and dividend announcements found that, while some impact persists for longer than a few minutes, "returns earned by simple trading rules dissipate within five to ten minutes" of announcement. (James M. Patell and Mark A. Wolfson, "The Intraday Speed of Adjustment of Stock Prices to Earnings and Dividend Announcements," *Journal of Financial Economics* 13 (June 1984), pp. 223–252 at p. 223). Busse and Green find that "prices of stocks discussed positively [on financial networks] experience a statistically and

securities that are traded in efficient markets is that security prices equal the sum of discounted expected future cash flows based on the market's assessment of publicly available information.[32]

26.    As explained in finance textbooks, a market is semi-strong-form efficient when *all information* that is publicly available is reflected in prices:

> A market is semistrong-form efficient if prices reflect (incorporate) *all publicly available information*, including information such as published accounting statements for the firm as well as historical price information.[33]

> [Market efficiency] implies that securities will be fairly priced, based on their future cash flows, *given all information that is available to investors….* Information that is available to all investors includes information in news reports, financial statements, corporate press releases, or *other public data sources*.[34]

27.    According to Professor Fama, "prices reflect information to the point where the marginal benefits of acting on information (the profits to be made) do not exceed the marginal costs."[35]  Given that the marginal cost of obtaining and acting on public information is relatively low, the marginal benefit of acting on public information is essentially zero if the market is efficient—i.e., the value-relevant content of public information is incorporated fully into a security's price.  Notably, the existence of an efficient market does not require all investors to access, analyze, and trade on publicly available information.  It is sufficient for

---

economically significant increase beginning seconds after the stock is initially mentioned and lasting approximately one minute.  The response to negative reports is larger but more gradual.  Prices continue falling for 15 minutes after airing…."  (Jeffrey A. Busse and T. Clifton Green, "Market Efficiency in Real Time," *Journal of Financial Economics* 65 (2002), pp. 415–437 at p. 435).  Chordia, Roll, and Subrahmanyam find that "pattern[s] of intra-day serial dependence [reveal] that it takes more than five minutes but less than sixty minutes" for sophisticated investors to react to order imbalances.  (Tarun Chordia, Richard Roll, and Avanidhar Subrahmanyam, "Evidence on the speed of convergence to market efficiency," *Journal of Financial Economics* 76 (2005), pp. 271–292 at p. 271).  Finally, Greene and Watts find that "[o]n the NASDAQ, the price adjustment to [nontrading- and] trading-hours earnings announcements is concentrated in the first post-announcement trade with only slight adjustment in the next several transactions."  (Jason T. Greene and Susan G. Watts, "Price Discovery on the NYSE and the NASDAQ: The Case of Overnight and Daytime News Releases," *Financial Management*, 25, no. 1 (1996), pp. 19–42 at p. 41).

[32] Brealey, Myers, and Allen (2014), p. 328 ("[I]n an efficient market it is not possible to find expected returns greater (or less) than the risk-adjusted opportunity cost of capital. This implies that every security trades at its fundamental value, based on future cash flows…and the opportunity cost of capital.").

[33] Stephen A., Ross, Randolph W. Westerfield, and Jeffrey Jaffe, *Corporate Finance*, 7th ed. (New York: McGraw-Hill/Irwin, 2005), p. 356 (emphasis added).

[34] Jonathan Berk, Peter DeMarzo, and Jarrad Harford, *Fundamentals of Corporate Finance*, Global Edition, 4th ed. (London: Pearson Education, 2018), p. 348 (emphasis added).

[35] Fama II, p. 1575.

some (potentially the most sophisticated) investors to identify and trade on new information such that it is rapidly incorporated in market prices. For example, short-selling shares is one way through which negative information is incorporated into prices, while an investor optimistic about the prospects of a company may bid up the market price by purchasing shares.[36]

28. A corollary of the efficient market hypothesis is that, because a semi-strong form market rapidly incorporates all publicly available information that affects future cash flows and risks as soon as that information first becomes public, the market will not react to the repetition of previously available information. The market would likewise not react to information that is not value-relevant, because only information that affects the assessment of future cash flows and risks (i.e., is value-relevant) is reflected in security prices in an efficient market.

29. I understand that in the context of litigation under Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5, establishing that a security traded in an efficient market affords a plaintiff the presumption of reliance on the alleged misstatements or misrepresentations.[37] Absent the presumption of reliance, each plaintiff would need to prove individually that he or she relied on the alleged misstatements or misrepresentations. I further understand that the presumption of reliance is rebuttable by defendants.[38]

### B. Event Study Analysis

30. Event studies examine the response of security prices to information,[39] and generally involve three steps.[40]

31. First, a researcher selects the event to be examined and the appropriate event window, for example, earnings announcements for a particular firm and the price reaction to these

---

[36] Short sellers are investors who borrow shares and sell them at the prevailing price, anticipating that the price declines in the future when the shares are re-purchased and returned to the lender. The act of selling borrowed shares can put downward pressure on the stock price, resulting in a lower market price. See, e.g., Paul Asquith, Parag A. Pathak, Jay R. Ritter, "Short interest, institutional ownership, and stock returns," *Journal of Financial Economics* 78 (2005), pp. 243–276, for a discussion of short-selling.

[37] *Basic* ("An investor who buys or sells stock at the price set by the market does so in reliance on the integrity of that price. Because most publicly available information is reflected in [the] market price, an investor's reliance on any public material misrepresentations, therefore, may be presumed for purposes of a Rule 10b-5 action.").

[38] *Basic*; *Halliburton II*.

[39] See A. Craig MacKinlay, "Event Studies in Economics and Finance," *Journal of Economic Literature* 35 (1997), pp. 13–39 ("MacKinlay (1997)"), for an overview of event studies in financial economics.

[40] MacKinlay (1997), pp. 14–16.

announcements as measured over one-day windows. Second, a statistical model is used to calculate the abnormal or residual return for each event, which is the portion of the observed return that is unexpected based on a model of expected returns—commonly the portion that cannot be attributed to market or industry price movements according to the statistical model employed.[41] Third, a statistical hypothesis regarding the residual return is constructed and tested. For example, a researcher may test a hypothesis (a so-called "null hypothesis") that the residual return equals zero following the release of information—that is, that there is no security price reaction to the event. Hypothesis testing is a statistical technique that considers whether the null hypothesis (zero residual return in the example) can be rejected for a given significance threshold (typically 5%) based on the observed data. In an efficient market, rejection of the null hypothesis of zero residual return supports a finding that the bundle of information disclosed during the event window was value-relevant and affected the security's price. This is because such a finding is consistent with a statistically discernible movement in the security's price having occurred following the release of information during the event window.

32. Both Mr. Dalrymple and I performed event studies although our exact specifications of the expected return models are not the same. My overall findings and opinions in this report would be the same regardless of whether the residual returns and corresponding determination of statistical significance based on my or Mr. Dalrymple's event study approach were to be used.[42]

## VI.   From an Economic Standpoint, the Restatement Claim Did Not Have Price Impact on AAC's Stock Price During the Proposed Class Period.

33. As described in **Section IV.B**, in describing the alleged corrective disclosures in the Amended Complaint, Lead Plaintiff alleges disclosures regarding the Restatement Claim occurred on April 15, 2019, and April 16, 2019. However, this was not the first time information about the restatement was made public. In fact, when the restatement was initially announced with preliminary estimates of the impact (on March 29, 2019, as discussed below), and also when the full extent of its impact was revealed on April 15, 2019, AAC's stock price did not react in a negative, statistically significant manner (the residual

---

[41] Note that event studies are a joint test of price response and of the model used to calculate abnormal or residual returns.

[42] See **Section VI.A** for information on our respective approaches.

returns were positive), which is economic evidence that there was no price impact associated with the alleged misrepresentations about the restatement.

### A. Price Impact Analysis

34. I understand that the Supreme Court explained in *Halliburton II* that a defendant may rebut the *Basic* presumption of reliance, which is based on the notion that "the price of stock traded in an efficient market reflects all public, material information," by "showing that the alleged misrepresentation did not actually affect the stock price—that is, that it had no 'price impact.'"[43] As explained in *Basic*, "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance."[44] Further, I understand that the Supreme Court explained in *Goldman* that "price impact is the amount of price inflation maintained by an alleged misrepresentation—in other words, the amount that the stock's price would have fallen 'without the false statement.'"[45]

35. The concept of price inflation is described in more detail in **Section VII.A** of this report. In short, inflation is the difference between a security's actual or observed market price and the hypothetical lower price that would have prevailed in the absence of the alleged securities fraud. Therefore, an economist can assess whether there was price impact by answering the question whether there was inflation introduced into the price as a result of the alleged fraud.

36. In the present case, the existence of inflation associated with the Restatement Claim (i.e., whether or not there was price impact) can best be analyzed by examining the observed price movement in AAC's stock price when information about the restatement was made available to the market, including the information Lead Plaintiff alleges was corrective.[46] This information, and when it was revealed to the market, is described in detail in the following section. As described in that section, the restatement resulted from a change in the

---

[43] *Halliburton II.*
[44] *Basic.*
[45] *Goldman.*
[46] It may not always be possible to determine price impact at an earlier time by looking at the price reaction when corrective information is revealed if there is a change in circumstances or a mismatch between the information revealed and a hypothetical earlier disclosure (See **Section VII.A** for more detailed discussion). However, based on my review of the circumstances in the present matter, there is no reason to conclude that this would apply here.

Company's estimates of accounts receivable and provision for doubtful accounts, which impacted reported revenue and net income.  The restatement was reportedly due to the Company "bec[oming] aware of historical cash collection trends" through the use of "recently developed financial database analytical tools."[47]  As discussed in **Section V.A**, in an efficient market, stock prices equal the sum of discounted expected future cash flows based on the market's assessment of publicly available information.  As also discussed in the following section, the restatement resulted in changes that decreased net income (relative to originally reported figures) in some periods but increased it in others; it had no effect on reported operating cash flows.[48]  Furthermore, to the extent that the restatement negatively affected accounts receivable, revenue, and net income in some periods, it positively affected cash collection metrics, such as days sales outstanding ("DSO").[49]  Therefore, given that reported operating cash flows were not affected, net income increased in some periods and decreased in others, and cash collection metrics were affected as well, the overall effect of the restatement on the market's assessment of expected future cash flows, which would affect AAC's stock price and therefore inflation, cannot be immediately determined based on the nature of the restatement itself.  However, the market's assessment of the effect can be determined by examining AAC's stock price movement when information about the restatement was disclosed.

37.     To examine AAC's stock price reaction to the disclosure of information about the restatement, one needs to determine AAC stock's residual returns on the relevant dates and assess the statistical significance of those returns (see **Section V.B**).  I have conducted an event study to calculate, and assess the statistical significance of, residual returns.  My model specification differs from Mr. Dalrymple's model in several respects (i.e., my model uses 252 trading days before the Proposed Class Period as the estimation window, the CRSP NYSE/AMEX/NASDAQ/ARCA Market Index as the market index, and S&P 500 Health Care Index—to which AAC benchmarked its stock price performance in its SEC filings—as

---

[47] AAC, SEC Form 10-K, filed April 15, 2019, p. 3.  See also, AAC, SEC Form 8-K, filed March 29, 2019.

[48] See **Exhibit 3**.  See also, AAC, SEC Form 10-K, filed April 15, 2019, p. 4.

[49] Analysts commented on AAC's DSO.  ("Days' sales outstanding (DSO) continue to be a focus on the company's balance sheet, in our view.")  "Solid Start to 2017; Full-Year Guidance Maintained," William Blair, May 3, 2017.  See also, e.g., "If Management Delivers, Valuation Attractive," Raymond James, March 1, 2017; "Upgrade to Outperform with $14 Price Target," Raymond James, November 3, 2017; "Marketing Engine to Earn Their Keep; Census Must Improve," Raymond James, November 8, 2018; "First Look at Solid Second-Quarter Results; Guidance Maintained," William Blair, August 2, 2017; "Solid End to the Year, Good 2018 Outlook; Research Study Shows Favorable Outcomes at AAC Facilities," William Blair, February 21, 2018.

the industry index).[50] However, the differences between my model and Mr. Dalrymple's model lead to the same conclusions regarding the statistical significance of residual returns on the dates relevant to my analysis. Therefore, in order to minimize areas of potential disagreement between us, I use Mr. Dalrymple's linear regression specification and methodology when discussing residual returns in my report after extending his model to cover the period through the last alleged corrective disclosure date (April 16, 2019).[51]

### B. Timeline of Information Disclosed Regarding the Restatement Claim

38. As part of my analysis, I reviewed information disclosed by AAC regarding the restatement that underlies Lead Plaintiff's Restatement Claim. In particular, I analyzed AAC's public disclosures, public press mentioning AAC obtained from Factiva (see **Exhibit 2** for a list of headlines), and equity analyst commentary about the Company that was available to me. Based on this review, information about the restatement first became public in March 2019. I discuss how AAC's stock price reacted to this information in the following section.

39. On March 19, 2019, the Company disclosed, in its Form N-T 10-K filed after market hours, that it was "conducting an analysis of its estimates of accounts receivable, including its client-related diagnostic services accounts receivable."[52] However, AAC did not disclose on this date that a restatement would take place.

40. The first public disclosure that AAC would restate its financial statements (and of the Company's expectation of reporting a material weakness in its internal controls) was on March 29, 2019, also after market hours.[53] The release stated:

> On March 29, 2019, AAC Holdings, Inc. (the "Company"), the Audit Committee (the "Audit Committee") of the Company's Board of Directors and executive management, in consultation with the Company's independent

---

[50] See, e.g., AAC, SEC Form 10-K, filed February 23, 2018, p. 30; Dalrymple Report, ¶¶ 63–65. I also use the standard error of the forecast to determine statistical significance whereas Mr. Dalrymple uses the root mean square error to determine statistical significance. In addition, I model arithmetic returns whereas Mr. Dalrymple models log (continuously compounded) returns.

[51] Mr. Dalrymple reported his regression results through the end of the Proposed Class Period; however, AAC's disclosures about its restatement occurred after the end of the Proposed Class Period. To estimate his model, Mr. Dalrymple uses indicator variables for dates on which AAC released press releases containing "quarterly/annual financial results or issued revised guidance" (Dalrymple Report, ¶¶ 57, 63). Using this approach, two additional indicator variables for November 6, 2018, and March 13, 2019, are added to his set of chosen indicator variables when estimating his model for the period after the end of the Proposed Class Period.

[52] AAC, SEC Form NT 10-K, filed March 19, 2019.

[53] AAC, SEC Form 8-K, filed March 29, 2019.

registered public accounting firm, BDO USA, LLP ("BDO"), determined that adjustments to certain of its previously issued financial statements audited by BDO and unaudited quarterly financial statements reviewed by BDO are necessary. The adjustments relate to estimates of accounts receivable, , [*sic*] provision for doubtful accounts and revenue for the relevant periods described below.

The release further stated: "the Company expects to report a material weakness in the Company's internal controls over financial reporting, and, therefore, conclude that internal controls over financial reporting as of December 31, 2018 are not effective. Although the assessment is not yet complete, management expects to recommend to the Audit Committee certain remedial actions."[54]

41. The release contained preliminary estimated adjustments to net income for FY 2016, FY 2017, and 1Q–3Q 2018 and stated that "[t]he adjustments [would] not affect the previously reported net operating cash flows."[55] **Exhibit 3** details the preliminary estimated adjustments disclosed in the release. As the exhibit shows, the restatement was preliminarily estimated to adjust net income *down* by $13.5 million for FY 2016, *up* by $14.3 million for FY 2017, and *up* by $11.8 million for 1Q–3Q 2018.

42. AAC also explicitly distinguished the restatement from the change in accounting estimate made as part of its 3Q 2018 reported results announced on November 6, 2018.

> The adjustments do not relate to the change in estimate that the Company made during the three months ended September 30, 2018 and effective as of July 1, 2018, regarding our estimate of the collectability of accounts receivable, specifically relating to accounts where the Company has received a partial payment from a commercial insurance company and we are continuing to pursue additional collections for the balance that we estimate remains outstanding or "partial payment accounts receivable."[56]

43. AAC ultimately reported the final impact of its restatement, as well as its 2018 financial results, in its 2018 Form 10-K filed prior to market hours on April 15, 2019.[57] The final restatement differed from the preliminary estimate, but the adjustments still had no

---

[54] AAC, SEC Form 8-K, filed March 29, 2019.
[55] AAC, SEC Form 8-K, filed March 29, 2019.
[56] AAC, SEC Form 8-K, filed March 29, 2019.
[57] AAC, SEC Form 10-K, filed April 15, 2019, p. 3. The SEC's EDGAR timestamp for AAC's Form 10-K is 6:10:59 AM on April 15, 2019.

effect on reported cash flows from operating activities.[58]  **Exhibit 3** also shows AAC's final restated figures in addition to the preliminary estimate.  The final restatement *reduced* net income for FY 2016 by $20.6 million, *increased* net income for FY 2017 by $7.7 million, and *reduced* net income for 1Q–3Q 2018 by $8.0 million.  Hence, even though, overall, the restatement decreased net income, it did not uniformly increase or decrease net income.  Instead, net income increased in some quarters and years, and decreased in others.[59]

44.     When describing the restatement, AAC stated:

> Subsequent to the year ended December 31, 2018 and as part of the preparation of the Company's year-end financial statements, using recently developed financial database analytical tools, the Company became aware of historical cash collection trends by customer that existed at the time of the issuance of the historical financial statements. As a result of this review and after consultation and deliberation with regard to the appropriate accounting treatment, including discussion as to the size of the adjustments, the Company concluded that this oversight by the Company of the historical collection trends by customer led to the adjustments being considered corrections of an error under accounting principles generally accepted in the United States of America.[60]

AAC further described the revenue recognition process that relied on its estimates of "net realizable value of revenue" as follows:

> We recognize revenue from commercial payors at the time services are provided based on our estimate of the amount that payors will pay us for the services performed. We estimate the net realizable value of revenue by adjusting gross client charges using our expected realization and applying this discount to gross client charges. Our methodology related to our net realizable value is designed to react to potential changes in reimbursements by facility, by type of service and by payor. Management adjusts the expected realization discount, on a per facility basis, to reflect a historical analysis of reimbursement data by facility in addition to considering the type of services

---

[58] AAC, SEC Form 8-K, filed March 29, 2019; AAC, SEC Form 10-K, filed April 15, 2019, p. 3.  ("The adjustments did not affect the previously reported cash flows from operating activities.")

[59] AAC adopted Accounting Standards Codification 606 on January 1, 2018.  For the periods ending before January 1, 2018, the restatement affected accounts receivable and provision for doubtful accounts; for the periods ending after January 1, 2018, the restatement affected accounts receivable and revenue.  See AAC, SEC Form 10-K, filed April 15, 2019, pp. 58, F-55.  ("[T]he company's previously issued financial statements [for fiscal years 2016 and 2017 and the first three quarters 2018] must be restated to properly reflect accounts receivable balances and revenue for periods in 2018 and for periods prior to 2018, the provision for doubtful accounts as well as the related income tax effects….As a result of the adoption of Topic 606 as of January 1, 2018, substantially all of our adjustments related to bad debt will now be recorded as a direct reduction to revenue as opposed to the provision for doubtful accounts included within operating expenses.")

[60] AAC, SEC Form 10-K, filed April 15, 2019, p. 3.

provided, the payors and the gross client charge rates by facility. Subsequent to the year ended December 31, 2018 and as part of the preparation of our year-end financial statements, we used recently developed financial database analytical tools, in order to analyze cash collection trends for historical and prospective periods relating to our accounts receivable and allowance for doubtful accounts which resulted in more precise estimates being utilized beginning with the fourth quarter of 2018.[61]

45.    Finally, on April 16, 2019, before market hours, AAC issued a press release that included mention of the restatement and also included its reported financial results for FY 2018.[62]  The pre-market press release on April 16, 2019, did not disclose new information about the restatement.[63]  It repeated the disclosure AAC made on April 15, 2019, essentially word-for-word with the exception of two additional sentences that were part of the press release.  The first sentence ("The restatements do not implicate misconduct with respect to the Company, its management or its employees") was previously included in the March 29, 2019, disclosure.[64]  The second sentence ("All comparisons to prior period results contained in this release are presented on an as restated basis") does not include new value-relevant information as an economic matter.[65]

46.    AAC also held a conference call on April 16, 2019, during which one reference to the restatement was made:

> Finally, as noted in our annual report, in the Form 10-K filed on Monday and in this morning's earnings release, we determined a consultation with our auditors that adjustments to certain of our previously issued annual and interim financial statements were necessary. These adjustments related to estimates of accounts receivable, provision for doubtful accounts and revenue as well as the related income tax effects. Our previously issued annual financial statements for 2017 and 2016 and the unaudited financial statements for the quarters ended September 30, 2018 and '17, June 30, 2018 and '17, and March 31, 2018 and '17, were restated in our 2018 annual report to properly recollect these corrections. These adjustments had no impact on net operating cash flows.[66]

This mention also did not contain new value-relevant information.

---

[61] AAC, SEC Form 10-K, filed April 15, 2019, p. 56.
[62] AAC, SEC Form 8-K, filed April 16, 2019, pp. 2, 4.
[63] AAC, SEC Form 10-K, filed April 15, 2019, p. 3; AAC, SEC Form 8-K, filed April 16, 2019, p. 2.
[64] AAC, SEC Form 8-K, filed March 29, 2019; AAC, SEC Form 8-K, filed April 16, 2019, p. 2.
[65] AAC, SEC Form 8-K, filed March 29, 2019; AAC, SEC Form 8-K, filed April 16, 2019, p. 2.
[66] AAC, 4Q 2018 Earnings Call Transcript, April 16, 2019, p. 5.

47.     As described above, there were three days on which information about the restatement was disclosed:  March 29, 2019, April 15, 2019, and April 16, 2019.[67]  Only two of these days, March 29, 2019, and April 15, 2019, contained new value-relevant information about the restatement, and, as shown in **Exhibit 4**, AAC's stock price did not decline in a statistically significant manner to either disclosure.  This demonstrates that AAC's disclosure of the restatement did not negatively impact its stock price.  Had there been price impact, as an economic matter I would expect the price to decline in a statistically significant manner.

48.     As described above, AAC's March 29, 2019, disclosure of the restatement and preliminary estimated impact occurred after market hours, meaning AAC's stock price would be expected to react to this disclosure on the following trading day, April 1, 2019.  AAC's residual return on April 1, 2019, was *positive* 13.2%, and statistically significant at the 1% level.[68]  Since I identified no confounding information (i.e., company-specific information that was not about the restatement) released after market hours on March 29, 2019, through end of market hours on April 1, 2019, I conclude that AAC's stock price did not decline in response to the disclosure of new information about the Restatement Claim.  In other words, the disclosure that revealed information about the alleged misrepresentations associated with the Restatement Claim did not impact AAC's stock price negatively.

49.     On April 15, 2019, additional information regarding the restatement was disclosed.  On this date, AAC disclosed for the first time the final impact of the restatement in its Form 10-K filing.  Because there was other, potentially confounding information disclosed on this day, the impact of that information must also be considered.  The potentially confounding information in AAC's Form 10-K filing included AAC's financial results, specifically, AAC's 4Q 2018 financial results and its FY 2018 financial results.[69]  I have reviewed analyst

---

[67] As mentioned above, on March 19, 2019, after market hours, AAC filed its Form NT 10-K that stated it was "conducting an analysis of its estimates of accounts receivable, including its client-related diagnostic services accounts receivable."  This information was not a disclosure of a restatement and AAC's residual return on March 20, 2019, was -1.4%, which is not statistically significant at the 5% level.  See **Exhibit 4**.  The residual return is calculated using Mr. Dalrymple's event study methodology.  Based on my event study, the residual return is also not statistically significant at the 5% level.

[68] The 13.2% residual return is calculated using Mr. Dalrymple's event study methodology.  Based on my event study, the residual return is also positive and statistically significant at the 1% level.

[69] AAC did disclose its 4Q 2018 operating results on March 13, 2019, but did not disclose certain other financial information until the Form 10-K filing on April 15, 2019.  See AAC, SEC Form 8-K, filed March 13, 2019.

commentary regarding the disclosure of these financial results, and concluded that the results were negative information in that AAC's reported financial results were below analyst expectations.[70] Therefore, this other information is not effectively confounding (i.e., it is not information that could lead me to erroneously conclude that information about the Restatement Claim did not cause AAC's stock price to decline). I can therefore conclude that the other information released on April 15, 2019, does not confound the impact of information about the restatement.

50.     AAC's residual return on April 15, 2019, was *positive* 1.3% and not statistically significant at the 5% level of significance.[71] This is economic evidence that AAC's disclosure of the restatement did not impact its stock price.

51.     Finally, as discussed above in the prior section, while there was discussion of the restatement on April 16, 2019, none of it represented new value-relevant information to which the market would react if it were efficient. Therefore, while AAC's residual return on April 16, 2019, was -15.2% and statistically significant at the 1% level,[72] this return is not evidence of a reaction to new information about the restatement in an efficient market. This is because, in an efficient market (see **Section V.A**), a stock's price only reacts to new information, and therefore AAC's stock price reaction on April 16, 2019 cannot be attributed to new information about the Restatement Claim because there was no such new information.

### VII.     Mr. Dalrymple Has Not Provided a Damages Methodology that Can Measure Damages Consistent with Lead Plaintiff's Theory of Liability.

52.     Mr. Dalrymple does not propose a damages methodology capable of measuring damages consistent with Lead Plaintiff's theory of liability. His report simply claims that damages can be determined based on a calculation of share price inflation and asserts that such inflation "can be measured using widely accepted valuation and economic techniques" and based on "analyzing the impact of the curative events."[73] However, Mr. Dalrymple does not discuss any specific methodology or technique that would be applicable in this matter to calculate inflation given the nature of Lead Plaintiff's allegations and the nature of the

---

[70] See, e.g., "2019 Guide Light, but AAC on the Path to Recovery," Raymond James, April 17, 2019.
[71] The 1.3% residual return is calculated using Mr. Dalrymple's event study methodology. Based on my event study, the residual return is also positive and not statistically significant at the 5% level.
[72] The -15.2% residual return is calculated using Mr. Dalrymple's event study methodology. Based on my event study, the residual return is also negative and statistically significant at the 1% level.
[73] Dalrymple Report, ¶ 90.

alleged corrective disclosures. In particular, Mr. Dalrymple does not address (beyond mere generalities regarding "widely accepted valuation and economic techniques") how he would account for (1) the mismatch between the contents of the alleged misrepresentations and the alleged corrective disclosures for the Marketing Claim, which means that price declines associated with the latter cannot be assumed to be a measure of inflation during the Proposed Class Period as Mr. Dalrymple is effectively assuming; (2) confounding information on November 6, 2018 (for the Marketing Claim), and on April 15 and 16, 2019, (for the Marketing and Restatement Claims); and (3) the lack of statistical significance of AAC's residual stock price return on April 15, 2019, and the fact that information regarding the Restatement Claim was already disclosed previously in March 2019.

### A. Economics of Damages in Securities Litigation and Out-of-Pocket Damages

53. I understand that the Supreme Court's decision in *Comcast* requires plaintiffs to advance a damages methodology that measures damages stemming from the defendant's actions that created the legal liability.[74] *Comcast* states that "a model purporting to serve as evidence of damages in [a] class action must measure only those damages attributable to [the plaintiffs' liability] theory."[75]

54. Furthermore, I understand that both a showing of loss causation and "out-of-pocket" losses are essential to establish damages in securities litigation such as this matter.[76] Inflation is the difference between a security's actual or observed market price and the hypothetical lower price that would have prevailed absent the alleged misrepresentations. The amount of inflation can change over time (e.g., due to partial disclosures of the alleged fraud or due to changing price impact of the allegedly omitted or misrepresented information).[77]

55. In order to show that "out-of-pocket" damages could be calculated on a class-wide basis and consistently with the above definition of inflation, one would need to identify a reliable methodology that is consistent with Lead Plaintiff's theory of liability to calculate inflation in the market price on every day securities were purchased or sold, typically on every trading day of the class period. From the perspective of a financial economist, "out-of-

---

[74] *Comcast Corp. et al. v. Behrend et al.,* 569 U.S. 27 (2013) ("*Comcast*").

[75] *Comcast*.

[76] I understand that a showing of loss causation is a separate requirement that requires plaintiffs to show a causal connection between the alleged misrepresentations and subsequent losses, in addition to proving that the price of the security was artificially inflated in order to be able to recover damages. I do not analyze loss causation in this report.

[77] Price impact here is defined as the impact on the value (price) of a security.

pocket" damages and inflation are just definitional concepts, i.e., they must ultimately be calculated as the output of some specific methodology. They do not, in and of themselves, constitute a methodology that can be used to perform the calculation of inflation. Therefore, it is important to develop a methodology consistent with the relevant theory of liability, assuming such a methodology exists. Economic theory provides no "off-the-shelf" methodology that can be used to compute inflation without regard to the particular circumstances of a given litigation. In fact, it is possible that, under certain circumstances, no reliable methodology exists to appropriately calculate inflation or damages in a manner that is consistent with the relevant theory of liability.

56. Because class-wide damages are based on market prices (the actual price and a hypothetical market price that would have prevailed in the absence of the alleged fraud), establishing the feasibility of calculating inflation-based "out-of-pocket" damages requires an analysis to determine: first, which information would have been available to the market absent the alleged misrepresentations; and second, whether a methodology exists to translate that information into its impact on the market price. The first step requires consideration of what is alleged to have been misrepresented and how those misrepresentations affected the information available to the market. The second step is an assessment of whether one can measure the price impact of the difference in the information available to the market with and without the presence of the alleged misrepresentations at a given point in time. That price impact is a measure of inflation at that point in time.

57. For example, suppose that a plaintiff alleged that a company made statements that falsely gave the impression that it could continue to collect certain revenues. Calculating inflation tied to this allegation would require establishing the price impact of the misrepresentations on the stock price under two scenarios: (1) the mix of information that was actually available to the market (the company's actual statements regarding its ability to collect revenues it was booking as well as other information available to the market) and (2) the information that would have been available absent the alleged misrepresentations (i.e., hypothetically assuming the company made truthful statements about its ability to collect revenues). This would involve assessing (explicitly or implicitly) the market's cash flow expectations based, among other parameters, on its assessment of the company's ability to

collect revenues over the long run and the market's discount rate applied to these expected cash flows under the two scenarios.[78]

58.      In some circumstances, the price impact of information can be measured using the observed increase in the stock price at the time an alleged misrepresentation is made, assuming one can isolate the price movement that is specific to the alleged misstatement (i.e., one can account for any confounding information). In other circumstances, a price decline upon the revelation of the alleged truth can represent the price impact of information, again assuming that one can isolate the price movement specific to that revelation. Measuring price impact in this manner (e.g., using an event study methodology to isolate company-specific price movements on alleged misrepresentation dates or alleged corrective disclosure dates) can therefore, under certain circumstances, yield a measure of inflation based on the observed changes in the security's price. However, calculations of inflation based on observed changes in the security's price due to alleged misrepresentations or revelation of truth may not be possible due to, for example, changes in the amount of inflation over time, or other factors such as dismissed allegations or confounding information in the market whose price impact cannot be separated. In particular, it may not be possible to measure damages using the observed change in the security's price on the days of alleged corrective disclosures if the information released on those days represents information that could not have been released earlier or is different in its content from the truth behind the alleged misrepresentations. Consistent with this economic reasoning, I understand that the Supreme Court noted in *Goldman*:

> Plaintiffs typically try to prove the amount of inflation indirectly: They point to a negative disclosure about a company and an associated drop in its stock price; allege that the disclosure corrected an earlier misrepresentation; and then claim that the price drop is equal to the amount of inflation maintained by the earlier misrepresentation…. But that final inference—that the back-end price drop equals front-end inflation—starts to break down when there is a mismatch between the contents of the misrepresentation and the corrective disclosure.[79]

---

[78] An important assumption underlying the efficient markets hypothesis is that security prices equal the sum of discounted expected future cash flows. Brealey, Myers, and Allen (2014) states (p. 328): "[I]n an efficient market it is not possible to find expected returns greater (or less) than the risk-adjusted opportunity cost of capital. This implies that every security trades at its fundamental value, based on future cash flows ($C_t$) and the opportunity cost of capital (r)." Cash flow expectations are the market's view of the expected value of possible future cash flows and the discount rate incorporates the market's assessment of relevant risk.

[79] *Goldman.*

59.     If one were to conclude that it is not reasonable to measure the price impact of information throughout a class period using observed price changes at the time the alleged misrepresentations occurred or at the time the truth about the alleged fraud was revealed, it would be necessary to ascertain whether other appropriate valuation techniques exist to calculate inflation and whether the data required to implement those techniques would be available.  In other words, a financial economist would need to carefully consider the allegations and their implications to determine whether "out-of-pocket" inflation-based damages that are consistent with the theory of liability in the case can reliably be calculated. It is possible that such a calculation would not be possible, either due to the lack of an appropriate methodology that measures inflation with an acceptable error rate or due to the lack of appropriate inputs that would yield results consistent with the market's expectations about cash flows and risks under the two relevant scenarios (actual and hypothetical, in the absence of the alleged misstatements).

### B.     Mr. Dalrymple's Damages "Methodology" Does Not Address Specific Circumstances Here nor Lead Plaintiff's Theory of Liability.

60.     I understand that Mr. Dalrymple was asked "to determine whether damages in this matter can be calculated using a common methodology for all Class members pursuant to their claims."[80]  As detailed in this section, Mr. Dalrymple's discussion of damages in his report is, as an economic matter, not a methodology, and he therefore has not demonstrated that damages attributable to Lead Plaintiff's theory of liability can in fact be calculated.

61.     Mr. Dalrymple proposes to measure damages based on AAC's stock price inflation.[81] First, he states that "[t]he inflation in AAC's common stock, if any, can be measured using widely accepted valuation and economic techniques."[82]  I agree that inflation is commonly used to measure damages, but proposing to use inflation and only saying that it "can be measured using widely accepted valuation and economic techniques" is not an economic methodology or proof that damages (or inflation) can in fact be computed.  Second, Mr. Dalrymple states "in a semi-strong form efficient market, the share price reactions to new, value-relevant information appropriately reflected the effects of such events on the share

---

[80] Dalrymple Report, ¶ 1.
[81] Dalrymple Report, ¶ 89.
[82] Dalrymple Report, ¶ 90.

price…[t]herefore, one can measure the impact of a curative event on AAC's share price using the abnormal returns, if any, following [alleged corrective] disclosure[s] using an event study approach."[83] This may be the case under some circumstances (including potentially for the Restatement Claim here), but this statement alone is not a methodology or proof that damages can be computed, as is particularly relevant for the Marketing Claim. Third, Mr. Dalrymple claims that "[t]o the extent that there are issues complicating the quantification of artificial inflation at the time of a curative event, standard financial analysis and valuation tools can be applied to measure inflation and damages in accordance with Plaintiff's theory of liability."[84] This is again a generic statement that does not address whether and which "tools" can measure inflation given the allegations in this case. In addition, Mr. Dalrymple's mention of "financial analysis and valuation tools" is not a methodology or proof that damages or inflation can be computed.[85] As discussed in the prior section, a methodology consistent with Lead Plaintiff's theory of liability needs to consider the particular circumstances of this litigation, as economic theory provides no "off-the-shelf" methodology that can be used to compute inflation without regard to the particular circumstances of a given litigation.

62.    In the sections that follow, I discuss specific circumstances in this matter that complicate the calculation of damages and may in fact make it impossible to compute inflation using the general framework that Mr. Dalrymple has described.

---

[83] Dalrymple Report, ¶ 91 ("Given that AAC's shares traded in a semi-strong form efficient market, the share price reactions to new, value-relevant information appropriately reflected the effects of such events on the share price. Therefore, one can measure the impact of a curative event on AAC's share price using the abnormal returns, if any, following such disclosure using an event study approach. In cases where the abnormal return following a curative event is statistically significant, it may be reasonable to conclude that the return was caused by the event in question provided the news became available to the market at the time of (or just prior to) the abnormal movement. If no other information was released at the same time as the event, then the abnormal return may be used as an estimate of the event's effect on the value of the company's shares").

[84] Dalrymple Report, ¶ 92.

[85] Mr. Dalrymple also describes a formulaic calculation of damages for each class member *once* inflation is calculated. However, this calculation cannot be implemented without *first* calculating inflation. Dalrymple Report, ¶ 94.

**1. Mr. Dalrymple Has Not Proposed a Methodology that Can Measure Inflation for the Alleged Marketing Claim.**

**a) Mr. Dalrymple's "Methodology" Does Not Account for the Mismatch in the Content of the Alleged Misrepresentations and the Alleged Corrective Disclosures.**

**(1) Corrective Disclosures vs. Alleged Misrepresentations**

63. In this case, there is a mismatch between the contents of the alleged misrepresentations regarding the Marketing Claim and the alleged corrective disclosures on November 6, 2018, and April 16, 2019. Mr. Dalrymple has presented no analysis to demonstrate that his "methodology" to purportedly calculate damages based on observed price movements following alleged corrective disclosures can be used to measure inflation given this mismatch. This problem is further discussed in more detail in **Section VII.A**. In short, as noted by the Supreme Court in the *Goldman* ruling and consistent with economic reasoning, the notion "that the back-end price drop equals front-end inflation—starts to break down when there is a mismatch between the contents of the misrepresentation and the corrective disclosure."[86] Such a breakdown exists with respect to the Marketing Claim.

64. Lead Plaintiff's Marketing Claim alleges that "Defendants engaged in a fraudulent and deceptive sales and marketing scheme and made false and misleading statements related to AAC's sales and marketing practices that were revealed to investors as the industry and Congress began to investigate and cast light upon such deceptive practices."[87] However, there is a mismatch between what was alleged (marketing practices and misrepresentations regarding these practices) and what was ultimately disclosed by the Company (financial performance below what the market expected and information that call volumes to the Company's call centers declined, apparently as a result of Google changing its search algorithm), even if the price declines following those disclosures were caused, at least in part, by the alleged fraud.

65. In fact, AAC did not disclose that it engaged in deceptive marketing on either alleged corrective disclosure date (or as far as I am aware, subsequently to the alleged corrective disclosures). Instead, on November 6, 2018, and April 16, 2019, AAC issued press releases

---

[86] *Goldman*.
[87] MTD Opinion, pp. 2–3.

that included its financial results (see **Section IV.B** for an overview of the alleged corrective disclosures). It attributed its results, in part, to lower call center volume arising from a change in Google's search algorithm, but did not disclose that the results or the algorithm change impacted it because it used "fraudulent and deceptive sales and marketing."[88] There is, therefore, no close correspondence between the contents of the information allegedly withheld from the market (existence of a fraudulent and deceptive marketing scheme and related false and misleading statements) and the information actually revealed even if the alleged fraud ultimately caused investor losses by being responsible for the allegedly disappointing financial results. While Lead Plaintiff appears to allege that the two are causally related,[89] even if that were true, it does not mean that the market's reaction to the alleged corrective disclosure is a reasonable approximation of the market's hypothetical reaction to an earlier truthful disclosure, which is a necessary condition for one to calculate inflation using the price decline following the alleged corrective disclosure. In fact, there are a number of reasons to conclude that the price reaction following the alleged corrective disclosures would not be the same as inflation earlier during the Proposed Class Period. These reasons include, among others, the fact that the change in Google's algorithm and the target of that change (i.e., the medical space, as discussed in **Section VII.B.1.b)**) may not have been known at the beginning of the Proposed Class Period and that the alleged corrective disclosures include realized financial results that again may not have been known at the beginning of the Proposed Class Period. Mr. Dalrymple does not demonstrate otherwise.

### (2) Materialization of Risk vs. Allegedly Concealed Risk

66.     As a further illustration of this mismatch, the Court described the alleged corrective disclosures of the Marketing Claim as materializations of a risk:

> [H]aving considered the relationship between the risks allegedly concealed
> (AAC's deceptive marketing strategies) and the risks that subsequently
> materialized (AAC's declining sales calls and its inability to use its deceptive

---

[88] See, e.g., 3Q 2018 Earnings Call Transcript, November 6, 2018, p. 4.
[89] See, e.g., Amended Complaint, ¶¶ 47–49.

> marketing strategies), and drawing all reasonable inferences in Plaintiffs' favor, the Court concludes Plaintiffs have plausibly alleged loss causation.[90]

The fact that the alleged corrective disclosure was a materialization of risk further shows the mismatch in the content of the alleged corrective disclosures and the alleged fraud. This is because an earlier disclosure of a risk is not the same as a subsequent materialization, and the two would generally be associated with different price reactions.

67. To understand why this is the case, consider the following example. A company knows that there is a 30% probability it will lose a major customer, yet conceals this risk (i.e., the market believes there is a 0% probability). The company loses the customer and its stock price declines. The stock price decline when the company loses the customer represents the reaction to the certainty (100% probability) of losing the customer, while the allegedly concealed risk is that there was a 30% probability of losing the customer. Since a stock price decline in response to a 100% probability of loss would be larger than in response to a 30% probability of that same loss, the stock price decline to the former (the "back-end price drop" as described in *Goldman*) is not a measure of "front-end inflation" due to the allegedly concealed risk. To illustrate this, suppose the "back-end price drop" were $10 million. Had the company revealed the 30% probability that it would lose a major customer before this risk had materialized with 100% probability, the hypothetical price in the absence of the alleged concealed risk would have been lower than the actual price by $3 million, which is 30% of $10 million. Using the price drop of $10 million to measure inflation would overstate it by $7 million.

68. In this case specifically, the allegedly concealed risk associated with AAC relying on a deceptive marketing strategy is mismatched from the alleged corrective disclosure that this risk had materialized in "declining sales calls and [AAC's] inability to use its deceptive marketing strategies." Mr. Dalrymple does not demonstrate that AAC's stock price reaction to the alleged materialization of this risk can be used to measure inflation earlier, before this risk had materialized.

---

[90] MTD Opinion, pp. 23–24.

69.     As the discussion above demonstrates, there is a mismatch between the alleged misrepresentations underlying the Marketing Claim and Lead Plaintiff's alleged corrective disclosures.  Relatedly, even if one were to ignore that mismatch and attempt to use the AAC stock price declines on November 6, 2018, and April 16, 2019, to measure inflation, Mr. Dalrymple has not provided a methodology that can be used to parse out or remove the impact of confounding information that I understand does not give rise to recoverable damages.  Mr. Dalrymple also has not proposed a methodology that can be used to disentangle the impact of information that could not have been disclosed earlier, even if this information is found to have caused losses due to the alleged fraud, from the impact of information that could have, which would be necessary to measure inflation as an economic matter.

70.     I understand that Google has made regular updates to its search engine algorithm that can have a significant impact on search engine results.[91]  In early 2018, for example, Google implemented updates that reduced traffic to sites whose content was determined by the algorithm to not be sufficiently relevant to specific search queries.[92]  Google made another update to its search engine algorithm on August 1, 2018.[93]  This algorithm update was described as focusing on the medical and healthcare space.[94]  Two analysts commented on the algorithm and the impact on AAC in October 2018.  On October 1, 2018, a Raymond James report stated:  "On August 1, Google made a substantial update to its search engine algorithm.  We looked at the **search engine optimization (SEO) visibility for four of**

---

[91] Danny Sullivan, "What site owners should know about Google's core updates," Google Search Central Blog, August 1, 2019, https://developers.google.com/search/blog/2019/08/core-updates, accessed on August 30, 2021. "History of Google Algorithm Updates," *Search Engine Journal*, https://www.searchenginejournal.com/google-algorithm-history/, accessed on August 30, 2021.

[92] Matt Southern, "Google Confirms March 7th Algorithm Update Was About Relevance, Not Quality," *Search Engine Journal*, April 11, 2018, https://www.searchenginejournal.com/google-confirms-march-7th-algorithm-update-relevance-not-quality/248707/, accessed on August 30, 2021.  Matt Southern, "Google Confirms Algorithm Update Released on April 16th," *Search Engine Journal*, April 20, 2018, https://www.searchenginejournal.com/google-confirms-algorithm-update-released-april-16th/250265/#close, accessed on August 30, 2021.

[93] "Although Difficult to Define, Google Algorithm Change May Affect Near-Term Admission Growth, EBITDA Performance," William Blair, October 16, 2018.

[94] See, e.g., "Although Difficult to Define, Google Algorithm Change May Affect Near-Term Admission Growth, EBITDA Performance," William Blair, October 16, 2018.

**AAC's domain names and found that in aggregate they have fallen 56% since April 1, 2018**."[95] An October 16, 2018 report by William Blair stated:

> [W]e analyzed two of the company's larger websites—the organization's rehabs.com website and its corporate site, americanaddictioncenters.org, as well as two facility-specific sites: deserthopetreatment.com and greenhousetreatment.com.
>
> Based on data from semrush.com, it appears that the company's rehabs.com website was steadily experiencing organic volume of roughly 500,000 hits per month throughout 2018; however, after the implementation of the August 1, 2018, algorithm change, organic hits dropped to only 262,000 (roughly 55% from July). Similarly, the americanaddiction.org site saw traffic plummet roughly 36% in August 2018.
>
> Conversely, the two facility-specific sites experienced a nice uptick in traffic, with growth between 44% and 64% following the change. In our view, this also provides some affirmation of the abovementioned trend of larger, national sites losing traction to smaller regional sites/operators in the healthcare space (see the following exhibit for details).
>
> …
>
> Still, for AAC, the increase in facility-specific sites likely was overwhelmed by the drop in larger sites. For example, if we simply add up hits across all four sites, we calculate that overall visits to the four sites dropped from nearly 2.2 million in July 2018 to around 1.4 million visits in August—off 36.2% (or 787,397 hits), in aggregate.[96]

71.     *First*, Mr. Dalrymple has not proposed a methodology that can be used to parse out the impact of the change in Google's search algorithm on AAC's financial results stemming from the Company's allegedly deceptive marketing specifically.  Lead Plaintiff alleges corrective disclosures on November 6, 2018, and on April 16, 2019, because AAC attributed its disappointing financial results to the change in the Google algorithm.  However, this does not imply that the entirety of the allegedly disappointing financial results, even if entirely due to the change in the Google algorithm, was due to the Company having allegedly engaged in deceptive marketing.

72.     In fact, the change in the Google algorithm would likely have impacted AAC even if AAC's allegedly deceptive marketing practices had been disclosed prior to November 6,

---

[95] "Is the Marketing Engine Struggling?  Mr. Market Thinks So," Raymond James, October 1, 2018 (emphasis in original).

[96] "Although Difficult to Define, Google Algorithm Change May Affect Near-Term Admission Growth, EBITDA Performance," William Blair, October 16, 2019.

2018, and Mr. Dalrymple does not demonstrate otherwise. I am not aware that the update was targeted specifically at AAC, or specifically at AAC because of the allegedly deceptive marketing practices. Even if AAC had disclosed allegedly deceptive marketing practices at the onset of the Proposed Class Period, Mr. Dalrymple does not provide any analysis that the effects of a future algorithm change in August 2018, and its specific implications for AAC, would have been known to the market as of the beginning of the Proposed Class Period. The portion of the impact on AAC that would not have been known upon a hypothetical earlier disclosure of allegedly deceptive market practices would not represent inflation removed from AAC's stock price on the dates of the alleged corrective disclosures.

73.     *Second*, in addition to disclosing its financial performance on November 6, 2018, on April 16, 2019, AAC also disclosed 2019 guidance for the first time.[97] In an efficient market, AAC's stock price on April 16, 2019, would adjust to reflect this guidance. However, it is not clear how or to what extent the Marketing Claim impacted this guidance as opposed to other factors unrelated to the allegations. Mr. Dalrymple does not propose a methodology that can measure the impact, if any, of the guidance disclosure solely due to the Marketing Claim as opposed to other business developments. For example, analysts reported their estimates of the impact on AAC of the change in Google's algorithm as early as October 2018, prior to the first alleged corrective disclosure.[98] Therefore, Mr. Dalrymple would need some methodology to distinguish the impact of the alleged fraud on 2019 guidance that was able to be disclosed earlier, as opposed to other new business developments.

74.     In sum, an economically valid damages methodology would need to control for confounding information and measure the impact of only information that is corrective of the alleged fraud, and Mr. Dalrymple has not put forth such a methodology in light of the particular complications discussed above.

### 2.     Mr. Dalrymple Has Not Shown that His "Methodology" Can Measure Inflation Due to the Restatement Claim.

75.     As described above, Mr. Dalrymple has not demonstrated that his "methodology" can be used to measure damages arising from allegations regarding Lead Plaintiff's Marketing

---

[97] AAC, SEC Form 8-K, filed April 16, 2019.

[98] "Is the Marketing Engine Struggling? Mr. Market Thinks So," Raymond James, October 1, 2018; "Although Difficult to Define, Google Algorithm Change May Affect Near-Term Admission Growth, EBITDA Performance," William Blair, October 16, 2019.

Claim. The same conclusion is true for the Restatement Claim. While, given the specific nature of the Restatement Claim and the alleged corrective disclosures related to the claim, Mr. Dalrymple's "methodology" of using price movements associated with the release of allegedly corrective information *could* in theory be used to measure inflation based on the price movement of AAC shares on days on which new information about the Restatement Claim was revealed to the market, this approach does not yield any damages. As I have demonstrated in **Section VI**, the Restatement Claim did not impact AAC's stock price and there were no statistically significant declines associated with the release of information about the Restatement Claim. Given that AAC's stock price did not decline in response to the release of information about the alleged truth behind the Restatement Claim, Mr. Dalrymple has not shown that his proposed damages "methodology" can measure inflation associated with the Restatement Claim based on the price movements on the days on which information about the Restatement Claim was released.

Executed this 7th of September, 2021.

_____

Paul Zurek

# PAUL ZUREK, Ph.D.
## Vice President

**Cornerstone Research**
Two Embarcadero Center, 20th Floor • San Francisco, CA 94111
415.229.8225 • mobile 917.434.7602
pzurek@cornerstone.com

## ACADEMIC BACKGROUND

| | | |
|---|---|---|
| 2002 – 2008 | **The Wharton School, University of Pennsylvania** | Philadelphia, Pennsylvania |

*Ph.D. and M.A. in Finance*

Research interests include valuation, asset pricing, financial econometrics and financial institutions risk management.

| | | |
|---|---|---|
| 1998 – 2002 | **The Wharton School, University of Pennsylvania** | Philadelphia, Pennsylvania |

*B.S. in Economics, Minor in Mathematics, Summa Cum Laude*

## PROFESSIONAL EXPERIENCE

| | | |
|---|---|---|
| 7/08 – Present | **Cornerstone Research, Inc.** | New York and San Francisco |

*Vice President*

Ten years of experience conducting financial and economic analysis for financial institution and other corporate and individual clients in complex litigation, including securities, valuation, appraisal, market structure, market manipulation, hedge funds, PE and investment management, international arbitration, financial fraud, risk management, and government investigations. Design and oversee development of quantitative analysis models. Provide testimony and presentation of findings to regulators and arbitration panels.

| | | |
|---|---|---|
| 6/10 – 03/11 | **United Poles Federal Credit Union** | Perth Amboy, New Jersey |

*Director and ALCO Committee Member*
Member of the Board of Directors. Advised on issues of strategy and risk.

| | | |
|---|---|---|
| 9/02 – 12/07 | **Kimberton International Associates – The Banking Group** | Kimberton, Pennsylvania |

*Senior Consultant*
Designed executive education programs for banking and financial services. Taught seminars on financial institutions risk management, macroeconomics, banking, and general business management. Worked with clients in the United States, Europe and Latin America.

| | | |
|---|---|---|
| 5/01 – 8/01 | **Credit Suisse First Boston** | San Francisco, California |

*Mergers & Acquisitions Summer Analyst*
Assisted in transactions during both preparatory and due-diligence stages. Performed financial statement, precedent transaction and comparable company analysis. Updated league tables and analyzed revenue, market share and headcount trends in the Technology M&A Group.

## TEACHING EXPERIENCE

| | |
|---|---|
| Wharton / Ping An Bank Executive Education Program<br>*Taught global economics and credit risk modeling in Beijing, China.* | 2015 |
| Wharton China Asset Management Company Executive Development Program<br>*Taught global financial markets and market microstructure.* | 2011 |
| Risk Management Association and Wharton Advanced Risk Management Program<br>*Instructor (2007–2009) and Academic Co-Director (2009)* | 2007 – 2009 |
| Wharton Hana Financial Hana Leaders Academy Global Course<br>*Instructor in Risk Management* | 2008 |
| Merrill Lynch Investment Banking Institute<br>*Teaching Assistant* | 2006, 2007 |
| Investment Management, Derivative Securities, International Banking,<br>Venture Capital, Corporate Finance, Macroeconomics, Microeconomics<br>*Teaching Assistant* | 2002 – 2008 |

## RESEARCH AND PUBLICATIONS

"Momentum and Long-Run Risks," Working Paper, *The Wharton School*, November 2007.

"Essays on Asset Pricing," Doctoral Dissertation, *The University of Pennsylvania*, 2008.

The Guide to Damages in International Arbitration. Chapter 16: Market Approach or Comparables (with José Alberro), 1st Edition, November 2016, 2nd Edition, December 2017, 3rd Edition, November 2018.

Commodities: Markets, Performance, Strategies. Chapter 14: Commodity Mutual Funds (with Gustavo Camilo and Janko Cizel), Oxford University Press 2018.

"Collateralized loan obligations in the age of COVID-19" (with Yan Cao and Manuel Vasconcelos), Thomson Reuters Westlaw Expert Analysis, June 22, 2020.

## HONORS AND AWARDS

| | |
|---|---|
| Outstanding Doctoral Student Paper Award at the Southern Finance Association<br>Annual Meeting, Western Finance Association Doctoral Student Travel Grant | 2008 |
| Weiss Center for International Financial Research Summer Fellowship | 2007 |
| Dean's Fellowship for Distinguished Merit | 2002 |
| Class of 1939 Fellowship | 2002 |

## INVITED AND CONFERENCE PRESENTATIONS, SPEAKING ENGAGEMENTS

| | |
|---|---|
| "Trends and Updates on Class Action Litigation: Hot Buttons During the COVID-19 Crisis," webcast, The Knowledge Group | 2020 |
| "Discussion: Loss Causation in a Bear Market: The Economists' Perspective," Chicago Bar Association Securities Law Committee | 2020 |
| "The Evolving Securities Litigation Landscape: Recent Trends and Updates You Need to Know," webcast, The Knowledge Group | 2020 |
| "Effective Use of Statistical Evidence in Class Action Litigation: Practical Guide in 2019," webcast, The Knowledge Group | 2019 |
| "Securities Litigation in 2019: Winning Tips and Strategies," webcast, The Knowledge Group | 2019 |
| "Proving and Determining Damages in International Arbitration: Methods, Trends and Best Practices," webcast, The Knowledge Group | 2019 |
| Cambridge Forums Forum on Securities Litigation, panel speaker. | 2019 |
| Western Finance Association Annual Meeting, Southern Finance Association Annual Meeting, Drexel University, Ohio State University, University of Iowa, University of Minnesota, University of Notre Dame, Virginia Polytechnic Institute and State University | 2008 |
| The Wharton School | 2007 |

## CONFERENCE PARTICIPATION

| | |
|---|---|
| Wharton Rodney L. White Center for Financial Research Conference on Financial Decisions and Asset Markets[*] | 2019 |
| American Finance Association Annual Meeting | 2008, 2009, 2011 – 2020 |
| Western Finance Association Annual Meeting[*] | 2008, 2016 – 2018 |
| NYU Five Star Conference in Finance | 2012 |
| Wharton FIC and Oliver Wyman's Risk Roundtable | 2003, 2011 |
| Southern Finance Association Annual Meeting[*], Mid-Atlantic Research Conference in Finance[*] | 2008 |
| Mid-Atlantic Research Conference in Finance[*], Wharton FIC and Oliver Wyman's Risk Roundtable | 2007 |
| NBER's Asset Pricing Program Meeting | 2006 |
| The Philadelphia Fed Policy Forum | 2003 |
| NSF/NBER Time Series Conference | 2002 |

\* Paper Discussant or Presenter

## OTHER ACTIVITIES

Refereed for the Journal of Economic Dynamics and Control and Finance Research Letters. Fellow at the Wharton Financial Institutions Center.

**TESTIMONY AND EXPERT REPORTS**

In the Matter of Deutsche Bank Securities, Inc. (SEC administrative proceeding 3-17730), presentation to the SEC and NY AG, June 2015.

Pattelli v. Lending Club Corporation, arbitration testimony, January 2016.

In Re: Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation (MDL No. 2672 CRB (JSC)), expert declaration, August 2016.

Confidential expert reports submitted to the SEC regarding execution quality in FX markets, September 2016 and October 2016.

B.K. et al v. Gregory McKay (2:15-cv-00185), expert report, December 2017.

MidCoast Council and Division CCMF Ltd. v. Fitch Ratings, Inc., Federal Court of Australia, New South Wales (NSD995 of 2014), expert reports, June 2018 and February 2019, expert conclave and joint expert report, June 2019.

In Re: RH Securities Litigation (4:17-cv-00554), expert report, August 2018, deposition, September 2018.

Public Employees' Retirement System of Mississippi v. Treehouse Foods, Inc. et al (1:16-cv-10632), expert report, October 2018, deposition, April 2019.

Aaron Booth and Cody Tucker on behalf of themselves and all others similarly situated v. Galveston County, Texas, et al. (3:18-cv-104), two expert declarations and deposition, January 2019.

Brian C. Schartz, On Behalf of Himself and All Others Similarly Situated and Derivatively on Behalf of Nominal Defendant The Female Health Company v. O.B. Parrish, et al. (2016CH14488 and 2016CH13815, Circuit Court of Cook Country, Illinois, County Department, Chancery Division), expert report, February 2019, deposition, March 2019.

In Re: Spectrum Pharmaceuticals, Inc. Securities Litigation (2:16-cv-02279), expert report, March 2019.

Trevor Mild, Individually and on Behalf of All Others Similarly Situated v. PPG Industries, Inc., Michael H. McGarry, Vincent J. Morales, and Mark C. Kelly (2:18-cv-04231), expert report and deposition, April 2019.

In Re:  Novo Nordisk Securities Litigation (3:17-cv-00209), expert report, June 2019, deposition July 2019.

Christakis Vrakas et al v. United States Steel Corporation et al (2:17-cv-00579), expert report and deposition, June 2019.

Margaret Tinsley, et al. v. Michael Faust, et al. (2:15-cv-00185), expert reports, October and November 2019, deposition, January 2020.

In re Health Insurance Innovations Securities Litigation (8:17-cv-02186), expert report, January 2020, deposition, February 2020.

Frederic Haghebaert, Individually and On Behalf of All Others Similarly Situated v. Tandy Leather Factory, Inc., Janet Carr, Tina L. Castillo, and Shannon L. Greene (4:19-cv-01000), expert declaration, February 2020.

Matt Karinski v. Stamps.com, Inc. et al. (2:19-cv-01828), expert report, August 2020, deposition, October 2020.

Matt Wolther, individually and on behalf of all others similarly situated v. Shubham Maheshwari et al. (18CV329690, Superior Court of the State of California, County of Santa Clara), expert report, February 2021.

Cambridge Retirement System, Individually and On Behalf of All Others Similarly Situated v. Amneal Pharmaceuticals, Inc. et al (SOM-L-1701-19, Superior Court of New Jersey, Law Division, Somerset County), expert report, March 2021.

# Documents Considered List

**Academic Articles**

- Asquith, Paul, Parag A. Pathak, and Jay R. Ritter, "Short Interest, Institutional Ownership, and Stock Returns," *Journal of Financial Economics* 78 (2005), pp. 243–276.

- Busse, Jeffrey A., and T. Clifton Green, "Market Efficiency in Real Time," *Journal of Financial Economics* 65 (2002), pp. 415–437.

- Chordia, Tarun, Richard Roll, and Avanidhar Subrahmanyam, "Evidence on the Speed of Convergence to Market Efficiency," *Journal of Financial Economics* 76 (2005), pp. 271–292.

- Fama, Eugene F., "Efficient Capital Markets: A Review of Theory and Empirical Work," *Journal of Finance* 25, no. 2 (1970), pp. 383–417.

- Fama, Eugene F., "Efficient Capital Markets: II," *Journal of Finance* 46, no. 5 (1991), pp. 1575–1617.

- Greene, Jason T., and Susan G. Watts, "Price Discovery on the NYSE and the NASDAQ: The Case of Overnight and Daytime News Releases," *Financial Management* 25, no. 1 (1996), pp. 19–42.

- MacKinlay, A. Craig, "Event Studies in Economics and Finance," *Journal of Economic Literature* 35 (1997), pp. 13–39.

- Patell, James M., and Mark A. Wolfson, "The Intraday Speed of Adjustment of Stock Prices to Earnings and Dividend Announcements," *Journal of Financial Economics* 13 (June 1984), pp. 223–252.

**Analyst Reports**

- "1Q18 Slight Upside, Raising Estimates; Diversifying Payor Mix; Reit. OW and $14 PT," Cantor Fitzgerald, May 3, 2018.

- "1Q18 Upside on Higher Volumes and Rates, Aided by Acquisition of AdCare," Cantor Fitzgerald, May 2, 2018.

- "2018-19 Outlook: Stronger Strategy, Management and Systems; Reiterate $14 PT, OW," Cantor Fitzgerald, May 13, 2018.

- "2019 Guide Light, but AAC on the Path to Recovery," Raymond James, April 17, 2019.

Case 3:19-cv-00407    Document 84-1    Filed 09/07/21    Page 41 of 67 PageID #: 1738

- "2H EBITDA Lift Looks Heavy on the Surface…but is it?," Raymond James, August 3, 2018.

- "2Q18 Looks a Little Light, but AAC Maintains Its Full-Year Guidance, Call in AM," Cantor Fitzgerald, August 1, 2018.

- "2Q18 Mixed, Guidance Unchanged, But Challenging; Reit. $14 PT, OW Rating," Cantor Fitzgerald, August 2, 2018.

- "3Q17 Upside, But No Change in Guidance; DSO Continue to Improve; Call Tomorrow," Cantor Fitzgerald, November 1, 2017.

- "4Q17 Review; AdCare Closing Soon; Revising 2018 Outlook; Reit. OW, $14 PT," Cantor Fitzgerald, February 22, 2018.

- "AAC Settling Shareholder Litigation; AdCare Proceeding, No Change in Outlook," Cantor Fitzgerald, January 5, 2018.

- "Acquiring A Leading New England Provider; Raising PT to $14; Reit. OW Rating," Cantor Fitzgerald, September 13, 2017.

- "AdCare's Effective Multiple a Full Turn Below Company; Dilutive to EPS," Raymond James, September 15, 2017.

- "Although Difficult to Define, Google Algorithm Change May Affect Near-Term Admission Growth, EBITDA Performance," William Blair, October 16, 2018.

- "Announces Acquisition of AdCare; Further Diversifies Payer Mix and Referral Streams," William Blair, September 13, 2017.

- "Another Very Good Quarter; Tweaking Estimates; Reiterating $14 PT, OW Rating," Cantor Fitzgerald, November 2, 2017.

- "Blame the Google - Lowering Estimates and Price Target on Lower Census Assumptions," Raymond James, October 16, 2018.

- "Cantor Daily Research Highlights," Cantor Fitzgerald, August 10, 2017.

- "Cantor Daily Research Highlights," Cantor Fitzgerald, October 3, 2017.

- "CFO Succession in the Works for Awhile," Cantor Fitzgerald, November 13, 2017.

- "Clear Progress - Setup Has Improved Assuming Consistent Execution," Raymond James, August 7, 2017.

- "Consumer-Centric Healthcare: 2019 Update," William Blair, January 5, 2019.

- "Cost Cuts and Improved Admissions to Drive 2019," Raymond James, March 14, 2019.

- "Cost Cutting Programs Lift EBITDA as Bank Covenant Looms," Raymond James, December 7, 2018.

- "Cutting Estimates on Soft Census, Reduced Outlook ;PT to $4, Rating to Neutral," Cantor Fitzgerald, November 6, 2018.

- "Decent Income Statement, but Those DSOs…," Raymond James, May 4, 2017.

- "Discontinuing Research Coverage of Healthcare Facilities & Services Companies," Cantor Fitzgerald, November 20, 2018.

- "Driving Growth: Boosting Census, Adding AdCare; Reiterating $14 PT, OW Rating," Cantor Fitzgerald, November 16, 2017.

- "DSOs Expected to Improve Following "One-Time" Mishaps," Raymond James, May 5, 2017.

- "Elevated DSOs Overshadow P&L Beat; Guidance Reiterated," Raymond James, August 3, 2017.

- "Final Model Adjustments Following the 10-Q Filing," William Blair, November 10, 2017.

- "Finalizing Estimates Following Strong Fourth-Quarter Results, In-Line 2018 Outlook," William Blair, February 23, 2018.

- "First Look at Solid Second-Quarter Results; Guidance Maintained," William Blair, August 2, 2017.

- "First Take on Fourth-Quarter Results; Continued Census Weakness Affects Quarterly Performance, Improvements in Early 2019," William Blair, April 16, 2019.

- "First Take on Third-Quarter Results; As Anticipated, Census Weakness Affects Quarterly Performance," William Blair, November 6, 2018.

- "Healthcare Facilities & Services 1Q18 Outlook; Favorite is AAC Next Week," Cantor Fitzgerald, April 24, 2018.

- "Healthcare Facilities & Services; Earnings This Week: ACHC, AAC, LPNT," Cantor Fitzgerald, February 2019, 2018.

- "Healthcare Services and HCIT: Highlights from William Blair's 38th Annual Growth Stock Conference," William Blair, June 14, 2018.

- "If Management Delivers, Valuation Attractive," Raymond James, March 1, 2017.

- "If You Build It They Will Come...And Pay a Lot Too!," Raymond James, February 23, 2018.

- "Increasing Estimates Following AdCare Acquisition," William Blair, March 6, 2018.

- "Initiating with an Overweight and $11 Price Target," Cantor Fitzgerald, August 9, 2017.

- "Is the Marketing Engine Struggling? Mr. Market Thinks So," *Raymond James*, October 1, 2018.

- "Lower Census Hits 3Q18, Reduces 2018 Outlook, Stock Down Before Open; 9AM Call," Cantor Fitzgerald, November 6, 2018.

- "Management Bags a Marlin (AdCare); Guidance Looks Conservative," Raymond James, March 2, 2018.

- "Marketing Engine to Earn Their Keep; Census Must Improve," Raymond James, November 8, 2018.

- "Mixed Quarter Highlighted by 27% Revenue Growth; Labor Cost Pressure Drives EPS Miss," William Blair, August 1, 2018.

- "No Financial Impact Expected From Sunrise Disruption," Raymond James, June 1, 2017.

- "Postpones Fourth Quarter 2018 Earnings Call; Provides Lower-Than-Expected Operating Metrics," William Blair, March 13, 2019.

- "Quick Takeaways From Our Healthcare Conference Presentation with AAC," Cantor Fitzgerald, September 27, 2017.

- "Ramping Marketing Engine to Drive Occupancy Higher," Raymond James, May 3, 2018.

- "Revenue Beat; EBITDA Miss; Guidance Reiterated; Details TBD," Raymond James, August 1, 2018.

- "Solid End to the Year, Good 2018 Outlook; Research Study Shows Favorable Outcomes at AAC Facilities," William Blair, February 21, 2018.

- "Solid Start to 2017; Full-Year Guidance Maintained," William Blair, May 3, 2017.

- "Strong 1Q Print; Guidance (Conservatively?) Reiterated," Raymond James, May 2, 2018.

- "Strong 3Q; 2017 Guidance Unchanged Implying Weak 4Q," Raymond James, November 2, 2017.

- "Strong Execution Drives Solid Start to the Year; AdCare Acquisition Further Diversifies Business, Lowers Risk Profile," William Blair, May 2, 2018.

- "Strong Third-Quarter Results Highlighted by Material Sales, EBITDA Upside; Guidance Maintained," William Blair, November 1, 2017.

- "Takeaways from the Cantor Healthcare Conference: Healthcare Facilities/Services," Cantor Fitzgerald, October 2, 2017.

- "The Good, The Bad and the AAC," Raymond James, November 6, 2018.

- "Turn! Turn! Turn Around!; 2018 EBITDA Guidance Well Above Street," Raymond James, February 22, 2018.

- "Upbeat 4Q17 on Higher Revenue, Census; First look at 2018; Call Thursday Morning," Cantor Fitzgerald, February 21, 2018.

- "Update on AAC D&O Insurance Saga," Raymond James, March 26, 2018.

- "Updating Model Following Debt Refinancing," William Blair, July 5, 2017.

- "Updating Model Following First-Quarter Results," William Blair, May 5, 2017.

- "Updating Model Following Second-Quarter Results," William Blair, August 4, 2017.

- "Upgrade to Outperform with $14 Price Target," Raymond James, November 3, 2017.

**Books**

- Berk, Jonathan, Peter DeMarzo, and Jarrad Harford, *Fundamentals of Corporate Finance*, Global Edition, 4th ed., London: Pearson Education, 2018.

- Brealey, Richard A., Stewart C. Myers, and Franklin Allen, *Principles of Corporate Finance*, 11th ed., New York: McGraw-Hill/Irwin, 2014.

- Ross, Stephen A., Randolph W. Westerfield, and Jeffrey Jaffe, *Corporate Finance*, 7th ed., New York: McGraw-Hill/Irwin, 2005.

**Depositions**

- Videotaped Oral Deposition of W. Scott Dalrymple, Thursday, September 2, 2021.

**Expert Reports**

- Expert Report of W. Scott Dalrymple, CFA, dated July 6, 2021 and Production Materials.

**Case Law**

- *Basic Inc. v. Levinson*, 485 U.S. 224 (1988).

- *Comcast Corp. et al. v. Behrend et al.*, 569 U.S. 27 (2013).

- *Goldman Sachs Group, Inc., et al., Petitioners v. Arkansas Teacher Retirement System, et al.*, 141 S.Ct. 1951 (2021).

- *Halliburton Co. v. Erica P. John Fund Inc.*, 573 U.S. 258 (2014).

**Pleadings and Filings**

- Consolidated Complaint for Violations of the Securities Exchange Act of 1934, *David Brown Caudle, Individually and on Behalf of All Others Similarly Situated v. AAC Holdings, Inc., Michael T. Cartwright, Kirk R. Manz and Andrew W. McWilliams*, filed November 4, 2019.

- Memorandum of Law in Support of Lead Plaintiff's Motion for Class Certification, *Indiana Public Retirement System, Individually and on Behalf of All Others Similarly Situated v. Michael T. Cartwright, Kirk R. Manz, and Andrew W. McWilliams*, filed July 6, 2021.

- Memorandum Opinion, *Indiana Public Retirement System, et al. v. AAC Holdings, Inc., et al.*, filed April 8, 2021.

**Public Press**

- Articles and headlines obtained from Factiva.

- "AAC Holdings, Inc. Reports Fourth Quarter and Full Year 2018 Results and Provides Guidance for 2019," *PR Newswire*, April 16, 2019.

- "History of Google Algorithm Updates," *Search Engine Journal*, accessed on August 30, 2021, https://www.searchenginejournal.com/google-algorithm-history/.

- Southern, Matt, "Google Confirms Algorithm Update Released on April 16th," *Search Engine Journal* (April 20, 2018), accessed on August 30, 2021, https://www.searchenginejournal.com/google-confirms-algorithm-update-released-april-16th/250265/#close.

- Southern, Matt, "Google Confirms March 7th Algorithm Update Was About Relevance, Not Quality," *Search Engine Journal* (April 11, 2018), accessed on August 30, 2021, https://www.searchenginejournal.com/google-confirms-march-7th-algorithm-update-relevance-not-quality/248707/.

- Sullivan, Danny, "What site owners should know about Google's core updates," *Google Search Central Blog* (August 1, 2019), accessed on August 30, 2021, https://developers.google.com/search/blog/2019/08/core-updates.

- "Webmaster Frequently Asked Questions," *U.S. Securities and Exchange Commission* (August 5, 2021), accessed on September 3, 2021, https://www.sec.gov/os/webmaster-faq.

**Company Filings**

AAC's public filings during the relevant period, including:

- AAC Holdings, Inc., SEC Form 8-K, filed February 22, 2018.

- AAC Holdings, Inc., SEC Form 8-K, filed March 13, 2019.

- AAC Holdings, Inc., SEC Form 8-K, filed March 29, 2019.

- AAC Holdings, Inc., SEC Form 8-K, filed April 9, 2019.

- AAC Holdings, Inc., SEC Form 8-K, filed April 16, 2019.

- AAC Holdings, Inc., SEC Form 10-K, filed February 23, 2018.

- AAC Holdings, Inc., SEC Form 10-K, filed April 15, 2019.

- AAC Holdings, Inc., SEC Form 10-Q, filed May 4, 2017.

- AAC Holdings, Inc., SEC Form 10-Q, filed August 3, 2017.

- AAC Holdings, Inc., SEC Form 10-Q, filed November 6, 2017.

- AAC Holdings, Inc., SEC Form 10-Q, filed May 9, 2018.

- AAC Holdings, Inc., SEC Form 10-Q, filed August 3, 2018.

- AAC Holdings, Inc., SEC Form 10-Q, filed November 6, 2018.

- AAC Holdings, Inc., SEC Form NT 10-K, filed March 19, 2019.

- AAC Holdings, Inc., 3Q 2018 Earnings Call Transcript, November 6, 2018.

- AAC Holdings, Inc., 4Q 2018 Earnings Call Transcript, April 16, 2019.

**Data Sources**

- Bloomberg

- CRSP

- Eikon

- Factiva

**EXHIBIT 1**



# AAC Holdings, Inc.
## Closing Stock Price and Volume
### 12/8/16 – 7/15/19

Source: *CRSP*; Expert Report of W. Scott Dalrymple, CFA, dated July 6, 2021 and Production Materials

EXHIBIT 2

# AAC Holdings, Inc.
## Factiva Headlines [1]
3/8/17 – 4/16/19

| Date | Time | Publisher | Headline |
|------|------|-----------|----------|
| 4/3/17 | 12:38 ET | PR Newswire | AAC Holdings to Present at 16th Annual Needham Healthcare Conference |
| 4/3/17 | 12:38 ET | Dow Jones Institutional News | Press Release: AAC Holdings to Present at 16th Annual Needham Healthcare Conference |
| 4/4/17 | | CQ FD Disclosure | AAC Holdings, Inc. Presents at 16th Annual Needham Healthcare Conference, Apr042017 03:40 PM - Final |
| 4/19/17 | 17:28 ET | PR Newswire | AAC Holdings Schedules First Quarter 2017 Earnings Release and Conference Call |
| 4/19/17 | 17:28 ET | Dow Jones Institutional News | Press Release: AAC Holdings Schedules First Quarter 2017 Earnings Release and Conference Call |
| 4/23/17 | 3:35 ET | Dow Jones Institutional News | DJ AAC Holdings Inc, Inst Holders, 1Q 2017 (AAC) |
| 5/3/17 | 16:15 ET | PR Newswire | AAC Holdings, Inc. Reports First Quarter 2017 Results |
| 5/3/17 | 16:15 ET | Dow Jones Institutional News | Press Release: AAC Holdings, Inc. Reports First Quarter 2017 Results |
| 5/3/17 | 18:14 ET | Reuters News | BRIEF-AAC Holdings Q1 loss per share $0.03 |
| 5/4/17 | 11:33 ET | Reuters News | BUZZ-AAC Holdings Inc: Rises on strong Q1 earnings |
| 5/4/17 | 19:09 ET | Dow Jones Institutional News | AAC Holdings' CEO Michael Cartwright on Q1 2017 Results -- Earnings Call Transcript >AAC |
| 5/4/17 | | CQ FD Disclosure | Q1 2017 AAC Holdings Inc Earnings Call - Final |
| 5/17/17 | 16:16 ET | Dow Jones Institutional News | AAC Holdings Files 8K - Changes Exec Mgmt >AAC |
| 5/22/17 | 6:08 ET | Dow Jones Institutional News | AAC Holdings Files 8K - Regulation FD >AAC |
| 5/22/17 | 6:30 ET | PR Newswire | AAC Holdings to Present at UBS Global Healthcare Conference |
| 5/23/17 | | Bloomberg Government Disclosure | AAC Holdings Inc at UBS Global Healthcare Conference - Final |
| 6/1/17 | 16:04 ET | Dow Jones Institutional News | Labor Dispute Shuts 110-Bed N.J. Addiction Center |
| 6/2/17 | | The Wall Street Journal | Drug Rehab Center Is Shut Amid Labor Dispute |

EXHIBIT 2

# AAC Holdings, Inc.
## Factiva Headlines [1]
## 3/8/17 – 4/16/19

| Date | Time | Publisher | Headline |
|---|---|---|---|
| 6/2/17 | 2:33 ET | Dow Jones Institutional News | Drug Rehab Center Is Shut Amid Labor Dispute -- WSJ |
| 6/5/17 | 6:30 ET | PR Newswire | AAC Holdings, Inc. Announces Intention to Seek New Term Loan Facility and New Revolving Credit Facility |
| 6/5/17 | 6:30 ET | Dow Jones Institutional News | Press Release: AAC Holdings, Inc. Announces Intention to Seek New Term Loan Facility and New Revolving Credit Facility |
| 6/5/17 | 6:42 ET | Reuters News | BRIEF-AAC Holdings announces intention to seek new term loan facility |
| 6/6/17 | 6:06 ET | Dow Jones Institutional News | AAC Holdings Files 8K - Regulation FD >AAC |
| 6/6/17 | 11:16 ET | Dow Jones Institutional News | Moody's Assigns B3 Cfr To Aac Holdings, Inc.; Stable Outlook |
| 6/6/17 | 17:59 ET | Dow Jones Institutional News | *S&PGR Assigns AAC Holdings Inc. 'B-' Rtg; Positive Outlk |
| 6/13/17 | 6:30 ET | PR Newswire | AAC Holdings, Inc. to Present at William Blair 2017 Growth Conference |
| 6/19/17 | 15:51 ET | Dow Jones Institutional News | NJ Treatment Center Resolves Conflict With Union |
| 6/19/17 | 17:00 ET | PR Newswire | AAC Holdings, Inc. Reaches Agreement with Unionized Workers at Sunrise House in New Jersey |
| 6/19/17 | 17:00 ET | Dow Jones Institutional News | *AAC Holdings: Reaches Agreement With Unionized Workers at Sunrise House in New Jersey |
| 6/19/17 | 17:59 ET | Dow Jones Institutional News | NJ Treatment Center Resolves Conflict With Union -- Update |
| 6/19/17 | 17:11 ET | Reuters News | BRIEF-AAC Holdings reaches agreement with unionized workers at sunrise house in New Jersey |
| 6/20/17 | | The Wall Street Journal | Greater New York Watch |
| 6/30/17 | 11:37 ET | PR Newswire | AAC Holdings Simplifies Capital Structure and Expands Borrowing Capacity |

EXHIBIT 2

# AAC Holdings, Inc.
# Factiva Headlines [1]
## 3/8/17 – 4/16/19

| Date | Time | Publisher | Headline |
|---|---|---|---|
| 6/30/17 | 11:37 ET | Dow Jones Institutional News | Press Release: AAC Holdings Simplifies Capital Structure and Expands Borrowing Capacity |
| 6/30/17 | 12:09 ET | Reuters News | BRIEF-AAC Holdings simplifies capital structure and expands borrowing capacity |
| 7/3/17 | 6:10 ET | Dow Jones Institutional News | AAC Holdings Files 8K - Entry Into Definitive Agreement >AAC |
| 7/3/17 | 6:10 ET | Dow Jones Institutional News | AAC Holdings Files 8K - Termination Of Definitive Agreement >AAC |
| 7/3/17 | 6:10 ET | Dow Jones Institutional News | AAC Holdings Files 8K - Regulation FD >AAC |
| 7/3/17 | 6:10 ET | Dow Jones Institutional News | AAC Holdings Files 8K - Direct Or Off-Balance Sheet Financial Obligation >AAC |
| 7/3/17 | 6:27 ET | Reuters News | BRIEF-AAC Holdings on June 30, co entered into that certain credit agreement with Credit Suisse AG - SEC Filing |
| 7/6/17 | 14:54 ET | PR Newswire | 50 and Counting: American Addiction Centers' Podcast Series Reaches Milestone |
| 7/20/17 | 8:00 ET | PR Newswire | American Addiction Centers Awards $10,000 in Academic Scholarships |
| 7/22/17 | 3:32 ET | Dow Jones Institutional News | DJ AAC Holdings Inc, Inst Holders, 2Q 2017 (AAC) |
| 7/25/17 | 6:30 ET | PR Newswire | AAC Holdings Schedules Second Quarter 2017 Earnings Release and Conference Call |
| 7/25/17 | 6:30 ET | Dow Jones Institutional News | Press Release: AAC Holdings Schedules Second Quarter 2017 Earnings Release and Conference Call |
| 8/2/17 | 16:15 ET | PR Newswire | AAC Holdings, Inc. Reports Second Quarter 2017 Results |
| 8/2/17 | 16:15 ET | Dow Jones Institutional News | Press Release: AAC Holdings, Inc. Reports Second Quarter 2017 Results |
| 8/2/17 | 17:04 ET | Reuters News | BRIEF-AAC Holdings Inc Q2 loss per share $0.08 |

EXHIBIT 2

# AAC Holdings, Inc.
# Factiva Headlines [1]
## 3/8/17 – 4/16/19

| Date | Time | Publisher | Headline |
|---|---|---|---|
| 8/3/17 | 13:20 ET | Dow Jones Institutional News | AAC Holdings' CEO Michael Cartwright on Q2 2017 Results -- Earnings Call Transcript >AAC |
| 8/3/17 | | CQ FD Disclosure | Q2 2017 AAC Holdings Inc Earnings Call - Final |
| 8/7/17 | 16:49 ET | GlobeNewswire | Capital Southwest Announces Financial Results for First Fiscal Quarter Ended June 30, 2017 |
| 8/7/17 | 16:49 ET | Dow Jones Institutional News | Press Release: Capital Southwest Announces Financial Results for First Fiscal Quarter Ended June 30, 2017 |
| 8/7/17 | 17:30 ET | PR Newswire | MedEquities Realty Trust Signs Definitive Agreement To Acquire Behavioral Facilities In Las Vegas And Dallas For $25 Million |
| 8/7/17 | 17:30 ET | PR Newswire | AAC Holdings Secures $25 Million of Capital with Agreement to Sell and Leaseback Outpatient and Sober Living Facilities |
| 8/7/17 | 17:30 ET | Dow Jones Institutional News | Press Release: MedEquities Realty Trust Signs Definitive Agreement To Acquire Behavioral Facilities In Las Vegas And Dallas For $25 Million |
| 8/7/17 | 17:30 ET | Dow Jones Institutional News | Press Release: AAC Holdings Secures $25 Million of Capital with Agreement to Sell and Leaseback Outpatient and Sober Living Facilities |
| 8/7/17 | 17:48 ET | Reuters News | BRIEF-AAC Holdings secures $25 million of capital with agreement to sell and leaseback outpatient and sober living facilities |
| 8/8/17 | 16:15 ET | PR Newswire | MedEquities Realty Trust Reports Second Quarter 2017 Results |
| 8/8/17 | 16:15 ET | Dow Jones Institutional News | Press Release: MedEquities Realty Trust Reports Second Quarter 2017 Results |

EXHIBIT 2

# AAC Holdings, Inc.
## Factiva Headlines [1]
3/8/17 – 4/16/19

| Date | Time | Publisher | Headline |
|------|------|-----------|----------|
| 8/9/17 | 16:15 ET | PR Newswire | MedEquities Realty Trust Completes Acquisition Of Behavioral Facilities In Las Vegas And Dallas For $25 Million |
| 8/9/17 | 16:15 ET | Dow Jones Institutional News | Press Release: MedEquities Realty Trust Completes Acquisition Of Behavioral Facilities In Las Vegas And Dallas For $25 Million |
| 8/10/17 | 6:03 ET | Dow Jones Institutional News | AAC Holdings Files 8K - Direct Or Off-Balance Sheet Financial Obligation >AAC |
| 8/10/17 | 6:03 ET | Dow Jones Institutional News | AAC Holdings Files 8K - Entry Into Definitive Agreement >AAC |
| 8/10/17 | 6:03 ET | Dow Jones Institutional News | AAC Holdings Files 8K - Asset Acquisition Or Disposition >AAC |
| 8/10/17 | 7:33 ET | Dow Jones Institutional News | AAC Holdings Initiated at Overweight by Cantor Fitzgerald |
| 8/14/17 | 10:13 ET | Business Wire | Global Residential Substance Abuse and Mental Health Facilities Market Report 2017 - Research and Markets |
| 8/15/17 | 8:20 ET | PR Newswire | Revived from an Opioid Overdose: Three Life-Saving Lessons From Survivors |
| 9/11/17 | 6:02 ET | Dow Jones Institutional News | AAC Holdings Files 8K - Changes Exec Mgmt >AAC |
| 9/13/17 | 16:31 ET | PR Newswire | AAC Holdings to Increase Payor and Geographic Diversification with Agreement to Acquire AdCare in New England |
| 9/13/17 | 16:31 ET | Dow Jones Institutional News | AAC Holdings Files 8K - Unregistered Equity Sales >AAC |
| 9/13/17 | 16:31 ET | Dow Jones Institutional News | AAC Holdings Files 8K - Direct Or Off-Balance Sheet Financial Obligation >AAC |
| 9/13/17 | 16:31 ET | Dow Jones Institutional News | AAC Holdings Files 8K - Regulation FD >AAC |
| 9/13/17 | 16:31 ET | Dow Jones Institutional News | AAC Holdings Files 8K - Entry Into Definitive Agreement >AAC |

EXHIBIT 2

# AAC Holdings, Inc.
# Factiva Headlines [1]
## 3/8/17 – 4/16/19

| Date | Time | Publisher | Headline |
|---|---|---|---|
| 9/13/17 | 16:31 ET | Dow Jones Institutional News | *AAC Holdings To Increase Payor And Geographic Diversification With Agreement To Acquire AdCare In New England >AAC |
| 9/13/17 | 16:43 ET | Reuters News | BRIEF-AAC HOLDINGS TO ACQUIRE ADCARE IN NEW ENGLAND FOR $85 MILLION |
| 9/13/17 | | CQ FD Disclosure | AAC Holdings, Inc., AdCare, Inc. M&A Call - Final |
| 9/14/17 | 10:39 ET | Dow Jones Institutional News | AAC Holdings Is Maintained at Overweight by Cantor Fitzgerald |
| 9/14/17 | 18:46 ET | Dow Jones Institutional News | Moody's Affirms B3 Cfr Of Aac Holdings; Outlook To Negative |
| 9/15/17 | 13:43 ET | Dow Jones Institutional News | *S&PGRBulletin: AAC Holdings Rtgs Unchanged On Acq Of AdCare |
| 9/15/17 | 17:06 ET | PR Newswire | Clinical Services of Rhode Island CEO Raising Awareness for National Recovery Month |
| 9/26/17 | 6:03 ET | Dow Jones Institutional News | AAC Holdings Files 8K - Direct Or Off-Balance Sheet Financial Obligation >AAC |
| 9/26/17 | 6:03 ET | Dow Jones Institutional News | AAC Holdings Files 8K - Entry Into Definitive Agreement >AAC |
| 9/26/17 | 6:21 ET | Reuters News | BRIEF-AAC Holdings entered into certain incremental loan assumption agreement on Sept 25 |
| 9/26/17 | 16:20 ET | PR Newswire | AAC Holdings to Present at Cantor Fitzgerald Global Healthcare Conference |
| 9/26/17 | 16:20 ET | Dow Jones Institutional News | Press Release: AAC Holdings to Present at Cantor Fitzgerald Global Healthcare Conference |
| 9/27/17 | 13:12 ET | PR Newswire | David Marlon Elected President of State of Nevada Association of Addiction Professionals |

EXHIBIT 2

# AAC Holdings, Inc.
# Factiva Headlines [1]
## 3/8/17 – 4/16/19

| Date | Time | Publisher | Headline |
|---|---|---|---|
| 9/29/17 | 6:30 ET | PR Newswire | AAC Holdings to Open New Detoxification Unit in New Orleans East Hospital |
| 9/29/17 | 6:30 ET | Dow Jones Institutional News | Press Release: AAC Holdings to Open New Detoxification Unit in New Orleans East Hospital |
| 9/29/17 | 6:48 ET | Reuters News | BRIEF-AAC HOLDINGS TO OPEN NEW DETOXIFICATION UNIT IN NEW ORLEANS EAST HOSPITAL |
| 10/4/17 | 8:03 ET | PR Newswire | Townsend Opens Treatment Facility at New Orleans East Hospital |
| 10/9/17 | 16:28 ET | Reuters News | BRIEF-AAC Holdings secures committed $65 mln acquisition financing for AdCare transaction |
| 10/9/17 | 16:20 ET | Dow Jones Institutional News | Press Release: AAC Holdings Secures Committed $65 million Acquisition Financing for AdCare Transaction and Increases Revolving Credit Facility |
| 10/9/17 | 16:20 ET | PR Newswire | AAC Holdings Secures Committed $65 million Acquisition Financing for AdCare Transaction and Increases Revolving Credit Facility |
| 10/19/17 | 6:30 ET | PR Newswire | AAC Holdings Schedules Third Quarter 2017 Earnings Release and Conference Call |
| 10/19/17 | 6:30 ET | Dow Jones Institutional News | Press Release: AAC Holdings Schedules Third Quarter 2017 Earnings Release and Conference Call |
| 10/22/17 | 3:16 ET | Dow Jones Institutional News | DJ AAC Holdings Inc, Inst Holders, 3Q 2017 (AAC) |
| 10/30/17 | 11:00 ET | PR Newswire | Kaplan Fox & Kilsheimer LLP and Kahn Swick & Foti LLC Announce a Summary Notice of Pendency of Class Action |
| 11/1/17 | 16:35 ET | PR Newswire | AAC Holdings, Inc. Reports Third Quarter 2017 Results |
| 11/1/17 | 16:36 ET | PR Newswire | AAC Holdings Names Larry Cash to Board of Directors |

EXHIBIT 2

# AAC Holdings, Inc.
# Factiva Headlines [1]
## 3/8/17 – 4/16/19

| Date | Time | Publisher | Headline |
|------|------|-----------|----------|
| 11/1/17 | 16:36 ET | Dow Jones Institutional News | Press Release: AAC Holdings Names Larry Cash to Board of Directors |
| 11/1/17 | 16:35 ET | Dow Jones Institutional News | Press Release: AAC Holdings, Inc. Reports Third Quarter 2017 Results |
| 11/1/17 | 17:28 ET | Dow Jones Institutional News | AAC Holdings Files 8K - Changes Exec Mgmt >AAC |
| 11/1/17 | 17:28 ET | Reuters News | BRIEF-AAC Holdings reports Q3 adjusted earnings per share $0.12 |
| 11/2/17 | | CQ FD Disclosure | Q3 2017 AAC Holdings Inc Earnings Call - Final |
| 11/4/17 | 3:16 ET | Dow Jones Institutional News | DJ AAC Holdings Inc, Inst Holders, 3Q 2017 (AAC) |
| 11/4/17 | 18:31 ET | Dow Jones Institutional News | AAC Holdings' CEO Michael Cartwright on Q3 2017 Results -- Earnings Call Transcript >AAC |
| 11/7/17 | 16:15 ET | PR Newswire | MedEquities Realty Trust Reports Third Quarter 2017 Results |
| 11/7/17 | 16:15 ET | Dow Jones Institutional News | Press Release: MedEquities Realty Trust Reports Third Quarter 2017 Results |
| 11/9/17 | 18:25 ET | PR Newswire | AAC Holdings Announces Kirk Manz to Depart in December 2017 and Andrew McWilliams to Succeed as Chief Financial Officer |
| 11/9/17 | 18:25 ET | Dow Jones Institutional News | *AAC Holdings Announces Kirk Manz To Depart In December 2017 And Andrew McWilliams To Succeed As Chief Financial Officer >AAC |
| 11/10/17 | 14:05 ET | PR Newswire | American Addiction Centers Offers Free Beds to Veterans Needing Treatment |
| 11/13/17 | 6:04 ET | Dow Jones Institutional News | AAC Holdings Files 8K - Changes Exec Mgmt >AAC |
| 11/13/17 | 16:15 ET | PR Newswire | AAC Holdings to Present at Stifel 2017 Healthcare Conference |

EXHIBIT 2

# AAC Holdings, Inc.
## Factiva Headlines [1]
## 3/8/17 – 4/16/19

| Date | Time | Publisher | Headline |
|---|---|---|---|
| 11/13/17 | 16:23 ET | Dow Jones Institutional News | Press Release: AAC Holdings to Present at Stifel 2017 Healthcare Conference |
| 12/7/17 | 6:30 ET | PR Newswire | AAC Holdings Names Michael Nanko as President and Chief Operating Officer |
| 12/7/17 | 6:30 ET | Dow Jones Institutional News | *AAC Holdings Names Michael Nanko As President And Chief Operating Officer >AAC |
| 12/8/17 | 6:02 ET | Dow Jones Institutional News | AAC Holdings Files 8K - Director, Officer or Compensation Filing >AAC |
| 1/11/18 | 11:00 ET | PR Newswire | American Addiction Centers Grows Las Vegas Market with Key Leadership |
| 1/22/18 | 3:16 ET | Dow Jones Institutional News | DJ AAC Holdings Inc, Inst Holders, 4Q 2017 (AAC) |
| 1/25/18 | 7:50 ET | GlobeNewswire | New Research: Key Drivers of Growth for Hub Group, Meridian, ICU Medical, First Merchants, AAC, and Covenant Transportation Group -- Factors of Influence, Major Initiatives and Sustained Production |
| 1/29/18 | 9:00 ET | PR Newswire | American Addiction Centers Announces Top List of Sober Eats & Drinks for the Big Game |
| 2/7/18 | 16:03 ET | Dow Jones Institutional News | Press Release: AAC Holdings Schedules Fourth Quarter 2017 Earnings Release and Conference Call |
| 2/7/18 | 16:03 ET | PR Newswire | AAC Holdings Schedules Fourth Quarter 2017 Earnings Release and Conference Call |
| 2/20/18 | 9:42 ET | PR Newswire | American Addiction Centers Releases Findings from its First Patient Outcome Studies |
| 2/21/18 | 1:58 ET | Dow Jones Institutional News | G7 Calendar of Corporate Events - Week Ahead |
| 2/21/18 | 18:04 ET | PR Newswire | AAC Holdings, Inc. Reports Fourth Quarter and Full Year 2017 Results |

EXHIBIT 2

# AAC Holdings, Inc.
## Factiva Headlines [1]
## 3/8/17 – 4/16/19

| Date | Time | Publisher | Headline |
|---|---|---|---|
| 2/21/18 | 18:04 ET | Dow Jones Institutional News | Press Release: AAC Holdings, Inc. Reports Fourth Quarter and Full Year 2017 Results |
| 2/21/18 | 18:09 ET | Reuters News | BRIEF-AAC Holdings Q4 Adjusted Earnings Per Share $0.10 |
| 2/22/18 | 15:07 ET | Dow Jones Institutional News | AAC Holdings' CEO Michael Cartwright on Q4 2017 Results -- Earnings Call Transcript >AAC |
| 2/22/18 | | CQ FD Disclosure | Q4 2017 AAC Holdings Inc Earnings Call - Final |
| 2/26/18 | 16:15 ET | PR Newswire | AAC Holdings Names Michael Blackburn to Board of Directors |
| 2/26/18 | 16:15 ET | Dow Jones Institutional News | Press Release: AAC Holdings Names Michael Blackburn to Board of Directors |
| 2/26/18 | 16:28 ET | Dow Jones Institutional News | AAC Holdings Files 8K - Director, Officer or Compensation Filing >AAC |
| 2/26/18 | 16:37 ET | Reuters News | BRIEF-AAC Holdings Names Michael Blackburn To Board Of Directors |
| 2/28/18 | 11:00 ET | PR Newswire | Solutions Recovery Partners with Touro University to Educate Medical Students on Addiction |
| 3/1/18 | 16:54 ET | PR Newswire | AAC Holdings Completes Acquisition of AdCare, Inc. |
| 3/1/18 | 16:54 ET | Dow Jones Institutional News | *AAC Holdings Completes Acquisition Of AdCare, Inc. >AAC |
| 3/2/18 | 17:10 ET | Dow Jones Institutional News | AAC Holdings Files 8K - Asset Acquisition Or Disposition >AAC |
| 3/26/18 | 8:00 ET | GlobeNewswire | Report: Exploring Fundamental Drivers Behind Fibria Celulose S.A., AAC, Harmony Gold Mining Company, Petroleo Brasileiro S.A.- Petrobras, USANA Health Sciences, and American States Water -- New Horizons, Emerging Trends, and Upcoming Developments |

EXHIBIT 2

# AAC Holdings, Inc.
# Factiva Headlines [1]
## 3/8/17 – 4/16/19

| Date | Time | Publisher | Headline |
|------|------|-----------|----------|
| 3/28/18 | 13:30 ET | PR Newswire | Sunrise House New Jersey Treatment Center Welcomes Stanley Frank as CEO |
| 3/29/18 | 14:00 ET | PR Newswire | Desert Hope Announces Medication-Assisted Treatment Program for Opioid Users |
| 3/29/18 | 14:01 ET | PR Newswire | Townsend Tees Up for the Community |
| 3/29/18 | 15:26 ET | PR Newswire | River Oaks Recognized for Providing Gold Standard of Care |
| 4/3/18 | 14:33 ET | Business Wire | Global Residential Substance Abuse and Mental Health Facilities Market Report 2018 - ResearchAndMarkets.com |
| 4/4/18 | 10:00 ET | PR Newswire | Kaplan Fox & Kilsheimer LLP and Kahn Swick & Foti, LLC Announce a Proposed Settlement of a Class Action Lawsuit Involving Purchasers of AAC Holdings, Inc. Securities |
| 4/6/18 | 18:56 ET | PR Newswire | Ribbon-Cutting Held to Highlight Resolutions Las Vegas and Its Commitment to the Addiction Recovery Community |
| 4/9/18 | | Investor's Business Daily | Tivity Health Clears Key Benchmark, Hitting 80-Plus RS Rating |
| 4/10/18 | 11:43 ET | PR Newswire | American Addiction Centers' Donation to MusiCares Provides Free Treatment to Musicians |
| 4/16/18 | 15:36 ET | PR Newswire | Las Vegas Music Therapist Receives First-Time Honor from ACMs |
| 4/19/18 | 17:09 ET | Dow Jones Institutional News | Press Release: AAC Holdings Schedules First Quarter 2018 Earnings Release and Conference Call |
| 4/19/18 | 17:09 ET | PR Newswire | AAC Holdings Schedules First Quarter 2018 Earnings Release and Conference Call |
| 4/22/18 | 3:39 ET | Dow Jones Institutional News | DJ AAC Holdings Inc, Inst Holders, 1Q 2018 (AAC) |

EXHIBIT 2

# AAC Holdings, Inc.
## Factiva Headlines [1]
## 3/8/17 – 4/16/19

| Date | Time | Publisher | Headline |
|---|---|---|---|
| 4/23/18 | 9:00 ET | PR Newswire | Townsend Treatment Centers Receives Joint Commission Accreditation |
| 5/2/18 | 16:07 ET | PR Newswire | AAC Holdings, Inc. Reports First Quarter 2018 Results |
| 5/2/18 | 16:07 ET | Dow Jones Institutional News | Press Release: AAC Holdings, Inc. Reports First Quarter 2018 Results |
| 5/2/18 | 16:20 ET | Reuters News | BRIEF-AAC Holdings Reports Q1 Loss Per Share $0.01 |
| 5/3/18 | | CQ FD Disclosure | Q1 2018 AAC Holdings Inc Earnings Call - Final |
| 5/6/18 | 3:16 ET | Dow Jones Institutional News | DJ AAC Holdings Inc, Inst Holders, 1Q 2018 (AAC) |
| 5/6/18 | 7:21 ET | Dow Jones Institutional News | AAC Holdings' CEO Michael Cartwright on Q1 2018 Results -- Earnings Call Transcript >AAC |
| 5/8/18 | 9:00 ET | PR Newswire | American Addiction Centers 1st to Implement AI Technology to Improve Patient Safety During Detox |
| 5/21/18 | 8:30 ET | GlobeNewswire | Factors of Influence in 2018, Key Indicators and Opportunity within MSA Safety Incorporated, Curis, American States Water, AAC, eHealth, and Vista Gold -- New Research Emphasizes Economic Growth |
| 5/22/18 | 16:44 ET | PR Newswire | River Oaks Implements EarlySense Technology To Enhance Patient Safety During Detox |
| 6/5/18 | 16:01 ET | PR Newswire | AAC Holdings to Present at William Blair 2018 Growth Conference |
| 6/8/18 | 17:24 ET | Reuters News | BRIEF-AAC Holdings Files For Mixed Shelf Of Up To $150 Million - SEC Fiing |
| 6/13/18 | 13:51 ET | Dow Jones Institutional News | *S&PGR Affirms AAC Holdings Ratings, Outlook Remains Positive |
| 6/14/18 | 10:18 ET | PR Newswire | AAC Holdings Announces S&P Global Has Affirmed its Credit Rating and Positive Outlook on Improved Business Fundamentals |

**EXHIBIT 2**

# AAC Holdings, Inc.
## Factiva Headlines [1]
### 3/8/17 – 4/16/19

| Date | Time | Publisher | Headline |
|------|------|-----------|----------|
| 6/14/18 | 10:19 ET | Dow Jones Institutional News | Press Release: AAC Holdings Announces S&P Global Has Affirmed its Credit Rating and Positive Outlook on Improved Business Fundamentals |
| 7/22/18 | 3:10 ET | Dow Jones Institutional News | DJ AAC Holdings Inc, Inst Holders, 2Q 2018 (AAC) |
| 7/26/18 | 19:01 ET | Dow Jones Institutional News | Press Release: AAC Holdings Schedules Second Quarter 2018 Earnings Release and Conference Call |
| 7/26/18 | 19:01 ET | PR Newswire | AAC Holdings Schedules Second Quarter 2018 Earnings Release and Conference Call |
| 8/1/18 | 16:34 ET | PR Newswire | AAC Holdings, Inc. Reports Second Quarter 2018 Results |
| 8/1/18 | 16:34 ET | Dow Jones Institutional News | Press Release: AAC Holdings, Inc. Reports Second Quarter 2018 Results |
| 8/1/18 | 17:22 ET | Reuters News | BRIEF-AAC Holdings Posts Q2 Adjusted Earnings Per Share $0.09 |
| 8/2/18 | | CQ FD Disclosure | Q2 2018 AAC Holdings Inc Earnings Call - Final |
| 8/3/18 | 22:35 ET | Dow Jones Institutional News | AAC Holdings' CEO Michael Cartwright on Q2 2018 Results -- Earnings Call Transcript >AAC |
| 9/5/18 | 9:17 ET | PR Newswire | AAC's New Campaign Unveils 5 Misconceptions about Recovery |
| 9/5/18 | 16:10 ET | PR Newswire | American Addiction Centers Names Stephen Ebbett Chief Digital & Marketing Officer |
| 9/5/18 | 16:10 ET | Dow Jones Institutional News | Press Release: American Addiction Centers Names Stephen Ebbett Chief Digital & Marketing Officer |
| 9/5/18 | 16:17 ET | Dow Jones Institutional News | AAC Holdings Files 8K - Director, Officer or Compensation Filing >AAC |
| 10/3/18 | 17:16 ET | PR Newswire | American Addiction Centers Praises Federal Legislation to Combat Opioid Epidemic |

EXHIBIT 2

# AAC Holdings, Inc.
## Factiva Headlines [1]
## 3/8/17 – 4/16/19

| Date | Time | Publisher | Headline |
|------|------|-----------|----------|
| 10/3/18 | 17:16 ET | Dow Jones Institutional News | Press Release: American Addiction Centers Praises Federal Legislation to Combat Opioid Epidemic |
| 10/16/18 | 8:17 ET | Dow Jones Institutional News | AAC Holdings Is Maintained at Outperform by Raymond James |
| 10/22/18 | 3:34 ET | Dow Jones Institutional News | DJ AAC Holdings Inc, Inst Holders, 3Q 2018 (AAC) |
| 10/30/18 | 19:54 ET | PR Newswire | AAC Holdings Schedules Third Quarter 2018 Earnings Release and Conference Call |
| 10/30/18 | 19:54 ET | Dow Jones Institutional News | Press Release: AAC Holdings Schedules Third Quarter 2018 Earnings Release and Conference Call |
| 11/1/18 | 11:55 ET | PR Newswire | American Addiction Centers Names New Leadership for California Market |
| 11/6/18 | 7:01 ET | PR Newswire | AAC Holdings, Inc. Reports Third Quarter 2018 Results |
| 11/6/18 | 7:01 ET | Dow Jones Institutional News | Press Release: AAC Holdings, Inc. Reports Third Quarter 2018 Results |
| 11/6/18 | 7:13 ET | Reuters News | BRIEF-AAC Holdings Q3 Loss Per Share $0.47 |
| 11/6/18 | 13:47 ET | Dow Jones Institutional News | AAC Holdings Down After 3Q Headwinds -- Market Mover |
| 11/6/18 | | CQ FD Disclosure | Q3 2018 AAC Holdings Inc Earnings Call - Final |
| 11/7/18 | 6:23 ET | Dow Jones Institutional News | AAC Holdings Cut to Neutral From Overweight by Cantor Fitzgerald |
| 11/8/18 | 5:40 ET | Dow Jones Institutional News | N American Morning Briefing: Stocks to Open Lower After Postelection Gains |
| 11/8/18 | 13:28 ET | PR Newswire | American Addiction Centers Provides Free Treatment to Veterans |
| 11/9/18 | 11:25 ET | Dow Jones Institutional News | *S&PGR Revises AAC Holdings Otlk To Neg From Pos, Rtgs Affirmed |
| 11/9/18 | 13:40 ET | Dow Jones Institutional News | AAC Holdings Inc. CEO Michael Cartwright on Q3 2018 Results -- Earnings Call Transcript >AAC |

EXHIBIT 2

# AAC Holdings, Inc.
# Factiva Headlines [1]
## 3/8/17 – 4/16/19

| Date | Time | Publisher | Headline |
|---|---|---|---|
| 11/14/18 | 14:44 ET | Dow Jones Institutional News | Moody's Downgrades Aac Holdings' Cfr To Caa2; Outlook Negative |
| 11/16/18 | 7:40 ET | PR Newswire | American Addiction Centers Releases 10 Tips to Stay Sober During the Holidays |
| 12/7/18 | 6:01 ET | PR Newswire | AAC Holdings Announces Comprehensive Plan to Drive Operational Efficiency and Long-Term Value Creation; $15 Million Cost Reduction Program Implemented |
| 12/7/18 | 6:01 ET | Dow Jones Institutional News | Press Release: AAC Holdings Announces Comprehensive Plan to Drive Operational Efficiency and Long-Term Value Creation; $15 Million Cost Reduction Program Implemented |
| 12/7/18 | 6:14 ET | Reuters News | BRIEF-AAC Holdings - $15 Million Cost Reduction Program Implemented |
| 12/20/18 | 11:15 ET | PR Newswire | AAC & Young People In Recovery Partner To Ensure Those Struggling with Addiction Can Research Treatment Options Online |
| 1/4/19 | 16:16 ET | Dow Jones Institutional News | Blame the Bankers for Bad Corporate Behavior -- Barrons.com |
| 1/5/19 | 6:00 ET | Dow Jones Institutional News | Blame the Bankers for Bad Corporate Behavior A New Kind of Activist |
| 1/5/19 | 6:00 ET | Dow Jones Institutional News | A New Kind of Activist -- Barron's |
| 1/7/19 | | Barron's | Blame the Bankers for Bad Corporate Behavior A New Kind of Activist |
| 1/17/19 | 8:41 ET | PR Newswire | American Addiction Centers Releases Five Tips to Beat the Winter Blues & Stay Sober |
| 1/22/19 | 3:45 ET | Dow Jones Institutional News | AAC Holdings Inc, Inst Holders, 4Q 2018 (AAC) |
| 2/4/19 | 14:22 ET | PR Newswire | American Addiction Centers' New Docuseries Unveils The Realities of Recovery |

EXHIBIT 2

# AAC Holdings, Inc.
## Factiva Headlines [1]
### 3/8/17 – 4/16/19

| Date | Time | Publisher | Headline |
|------|------|-----------|----------|
| 3/1/19 | 17:57 ET | PR Newswire | AAC Holdings Schedules Fourth Quarter and Full Year 2018 Earnings Release and Conference Call |
| 3/1/19 | 17:57 ET | Dow Jones Institutional News | Press Release: AAC Holdings Schedules Fourth Quarter and Full Year 2018 Earnings Release and Conference Call |
| 3/6/19 | 17:03 ET | Dow Jones Institutional News | AAC Holdings Files 8K - Director, Officer or Compensation Filing >AAC |
| 3/13/19 | 5:30 ET | PR Newswire | AAC Holdings, Inc. Reports Fourth Quarter and Full Year 2018 Operational Highlights and Other Recent Developments; Postpones Conference Call |
| 3/13/19 | 5:30 ET | Dow Jones Institutional News | Press Release: AAC Holdings, Inc. Reports Fourth Quarter and Full Year 2018 Operational Highlights and Other Recent Developments; Postpones Conference Call |
| 3/13/19 | 6:06 ET | Dow Jones Institutional News | AAC Holdings Files 8K - Director, Officer or Compensation Filing >AAC |
| 3/13/19 | 5:45 ET | Reuters News | BRIEF-AAC Holdings Reports Q4 Operational Highlights, Postpones Conference Call |
| 3/15/19 | 13:56 ET | Dow Jones Institutional News | *S&PGR Downgrades AAC Holdings Inc. To 'CCC'; Outlook Negative |
| 3/29/19 | 17:54 ET | Reuters News | BRIEF-AAC Holdings Reports Adjustments To Previous Financials |
| 4/9/19 | 17:22 ET | PR Newswire | AAC Holdings, Inc. Receives NYSE Continued Listing Standard Notice |
| 4/9/19 | 17:22 ET | Dow Jones Institutional News | Press Release: AAC Holdings, Inc. Receives NYSE Continued Listing Standard Notice |
| 4/15/19 | 6:00 ET | PR Newswire | AAC Holdings Announces Updated Timing for its Fourth Quarter and Full Year 2018 Earnings Release and Conference Call |

**EXHIBIT 2**

# AAC Holdings, Inc.
## Factiva Headlines [1]
### 3/8/17 – 4/16/19

| Date | Time | Publisher | Headline |
|------|------|-----------|----------|
| 4/15/19 | 6:00 ET | Dow Jones Institutional News | Press Release: AAC Holdings Announces Updated Timing for its Fourth Quarter and Full Year 2018 Earnings Release and Conference Call |
| 4/15/19 | 6:17 ET | Reuters News | BRIEF-Aac Holdings Plans To Issue Q4 Results On April 16, 2019 |
| 4/16/19 | 6:00 ET | PR Newswire | AAC Holdings, Inc. Reports Fourth Quarter and Full Year 2018 Results and Provides Guidance for 2019 |
| 4/16/19 | 6:00 ET | Dow Jones Institutional News | Press Release: AAC Holdings, Inc. Reports Fourth Quarter and Full Year 2018 Results and Provides Guidance for 2019 |
| 4/16/19 | 8:34 ET | Reuters News | AAC Holdings Inc: Losses of 85 cents announced for fourth quarter |
| 4/16/19 | 12:42 ET | Dow Jones Institutional News | AAC Holdings Fall 12% After Earnings Results >AAC |
| 4/16/19 | 12:57 ET | PR Newswire | Dr. Mark Calarco Named CEO of Addiction Labs of America |
| 4/16/19 | 13:27 ET | Dow Jones Institutional News | AAC Holdings' CEO Michael Cartwright on Q4 2018 Results -- Earnings Call Transcript >AAC |
| 4/16/19 | | CQ FD Disclosure | Q4 2018 AAC Holdings Inc Earnings Call - Final |

Source: *Factiva*
Note:

[1] Excludes public press articles whose titles indicate the content relates to AAC's stock price movements on the relevant date and equity research articles that do not list AAC among the covered equities in the article's title.

EXHIBIT 3

# AAC Holdings, Inc.
# Impact of Financial Statement Restatement on Net Income
## 2015 – 3Q 2018 [1]

*(in millions)*

| Reporting Period | Initially Reported [A] | Restatement Adjustment (Preliminary) [B] | Restatement Adjustment [C] | Restated (Preliminary) [A] + [B] = [D] | Restated [A] + [C] = [E] |
|---|---|---|---|---|---|
| FY 2015 | $8.3 | -$24.7 | -$23.8 | -$16.4 | -$15.4 |
| FY 2016 | -$5.7 | -$13.5 | -$20.6 | -$19.2 | -$26.4 |
| FY 2017 | -$25.1 | $14.3 | $7.7 | -$10.8 | -$17.4 |
| 1Q 2017 | -$1.6 | – | $0.9 | – | -$0.8 |
| 2Q 2017 | -$2.9 | – | $3.1 | – | $0.2 |
| 3Q 2017 | -$0.4 | – | $1.1 | – | $0.7 |
| 4Q 2017 | -$20.2 [2] | – | $2.7 | – | -$17.5 |
| 1Q–3Q 2018 | -$20.3 | $11.8 | -$8.0 | -$8.5 | -$28.3 |
| 1Q 2018 | -$2.1 | – | $1.3 | – | -$0.8 |
| 2Q 2018 | -$5.0 | – | $1.4 | – | -$3.6 |
| 3Q 2018 | -$13.2 | – | -$10.7 | – | -$23.8 |

Source:  AAC, SEC Form 8-K, filed February 22, 2018; AAC, SEC Form 10-K, filed February 23, 2018; AAC, SEC Form 10-Q, filed May 9, 2018; AAC, SEC Form 10-Q, filed November 6, 2018; AAC, SEC Form 10-Q, filed August 3, 2018; AAC, SEC Form 8-K, filed March 29, 2019; AAC, SEC Form 10-K, filed April 15, 2019

Note:

[1]  Restated net income figures are reported annually for 2015–2016 and quarterly for 1Q 2017–3Q 2018.  Preliminary restated net income figures are reported annually for 2015–2017 and for the 9 months ended September 30th for 2018.  The preliminary restated net income figure for 2015 includes the estimated impact for periods prior to 2015.

[2]  Net income is incorrectly reported as positive $20.2 million in AAC's Form 10-K, filed February 23, 2018.  In AAC's earnings press release issued the previous day, net income is correctly reported as negative $20.2 million.

EXHIBIT 4

# AAC Holdings, Inc.
# Residual Returns on Regulatory Filing and Press Release Dates [1]
# 11/6/18 – 4/16/19

| Filing Date | Impact Date | Description | Residual Return [2] |
|---|---|---|---|
| 11/6/18 | 11/6/18 | AAC reports 3Q 2018 results and files its 3Q 2018 Form 10-Q | -58.9% * |
| 3/13/19 | 3/13/19 | AAC reports 4Q 2018 and FY 2018 operational highlights, announces it will delay the filing of its FY 2018 Form 10-K, and postpones conference call | -2.5% |
| 3/19/19 | 3/20/19 | AAC files a Form NT 10-K after market close on 3/19/19 disclosing it would be unable to timely file its FY 2018 Form 10-K because it was conducting an analysis of its previous estimates of accounts receivables | -1.4% |
| 3/29/19 | 4/1/19 | AAC reports preliminary estimated adjustments to previous financials | 13.2% * |
| 4/9/19 | 4/10/19 | AAC receives a standard notice of delisting from the NYSE as a result of AAC's delay in filing its FY 2018 Form 10-K | 2.5% |
| 4/15/19 | 4/15/19 | AAC files its FY 2018 Form 10-K, which includes its 4Q 2018 and FY 2018 financial results and final restatement impact to previous financials, and announces updated timing for its 4Q 2018 and FY 2018 earnings release and conference call | 1.3% |
| 4/16/19 | 4/16/19 | AAC reports 4Q 2018 and FY 2018 results and provides guidance for FY 2019 | -15.2% * |

Source: *Bloomberg*; *CRSP*; *Eikon*; Expert Report of W. Scott Dalrymple, CFA, dated July 6, 2021 and Production Materials; Amended Complaint; AAC, SEC Form 10-Q, filed November 6, 2018; AAC, SEC Form 8-K, March 13, 2019; AAC, SEC Form NT 10-K, filed March 19, 2019; AAC, SEC Form 8-K, filed March 29, 2019; AAC, SEC Form 8-K, April 9, 2019; AAC, SEC Form 10-K, filed April 15, 2019; AAC, SEC Form 8-K, April 16, 2019

Note:

[1] Event study model extends Mr. Dalrymple's model through 4/16/19. To estimate his model, Mr. Dalrymple uses indicator variables for dates on which AAC released press releases containing "quarterly/annual financial results or issued revised guidance" (Dalrymple Report, ¶¶ 57, 63). Using this approach, two additional indicator variables for November 6, 2018 and March 13, 2019 are added to his set of chosen indicator variables when estimating his model for the period after the end of the Proposed Class Period.

[2] Residual returns are reported as log returns. A "*" indicates significance on the 5% level. Statistical significance is determined using the root mean square error, following Mr. Dalrymple's methodology. In my own event study model, I instead use the standard error of the forecast to determine statistical significance.