# Exhibit F

UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF TENNESSEE

NASHVILLE DIVISION

| | |
|---|---|
| INDIANA PUBLIC RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) |
| Plaintiff, | ) ) ) Civil Action No. |
| vs. | ) 3:19-cv-00407 ) |
| MICHAEL T. CARTWRIGHT, KIRK R. MANZ and ANDREW W. McWILLIAMS, | ) ) ) ) |
| Defendants. | ) |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

VIDEOTAPED ORAL DEPOSITION OF

W. SCOTT DALRYMPLE

FRIDAY, SEPTEMBER 2, 2021

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

On the 2nd day of September, 2021, at 9:53 a.m., the videotaped oral deposition of the above-named witness was taken at the instance of the Defendants, before Michelle L. Munroe, Certified Shorthand Reporter in and for the State of Texas, at The Stoneleigh Hotel, 2927 Maple Avenue, Dallas, Texas, pursuant to Notice and the agreement hereinafter set forth.

Job no. 4753920

Pages 1 - 70

Page 1

APPEARANCES

FOR THE PLAINTIFF:
Mr. Christopher M. Wood, Esq.
ROBBINS GELLER RUDMAN & DOWD LLP
414 Union Street
Suite 900
Nashville, Tennessee 37219
615.244.2203 telephone
cwood@rgrdlaw.com

FOR THE DEFENDANTS:
Ms. Lisa Bugni, Esq.
Ms. Jessica P. Corley, Esq.
KING & SPALDING LLP
50 California Street
Suite 3300
San Francisco, California 94111
415.381.1234 telephone
lbugni@kslaw.com

ALSO PRESENT:
Phil Hall, Video Technician

Page 2

I N D E X

WITNESS                                          PAGE

W. SCOTT DALRYMPLE

    Examination by Ms. Bugni.................. 4

DEPOSITION EXHIBITS              IDENTIFIED

Exhibit 12      July 6, 2021 expert report...... 4

Exhibit 13      Amended Complaint............... 61

Page 3

PROCEEDINGS

THE VIDEOGRAPHER: Today is Thursday September 2, 2021. The time is 9:53 a.m. We are on the record.

Would the court reporter please swear in the witness.

SCOTT DALRYMPLE, having been first duly sworn, testified as follows:

EXAMINATION

BY MS. BUGNI:

Q. Please state your name for the record.

A. William Scott Dalrymple.

Q. Mr. Dalrymple, I have handed you what has been marked as Exhibit 12. If you would please take a look and let me know what the document is.

(Exhibit 12 marked.)

A. This appears to be my expert report in this matter.

Q. Okay. And that's your signature on page 24?

A. It is.

Q. And does Exhibit 12 accurately reflect your opinion on whether the market for AAC Holdings stock was efficient for the period of March 8th, 2017, through November 5, 2018?

Page 4

A. It does.

Q. Does Exhibit 12 accurately reflect your opinion on whether damages can be calculated on a class-wide basis in this case?

A. It does.

Q. Before we get started, is there anything that you would like to edit or change in Exhibit 1 -- Exhibit 12? Excuse me.

A. No.

Q. What do you consider yourself to be an expert in?

A. Well, generally speaking, and I say this in my report, finance, economics, valuation, securities markets, as well as other areas of expertise involving finance and economics such as antitrust. That's not an exhaustive list, just off the top of my head.

Q. When were you retained for this case?

A. I don't remember exactly. It would have been in the spring of 2021.

Q. Who retained you?

A. Mr. Wood, Robbins Geller. Mr. Wood contacted me.

Q. Has Mr. Wood been your primary contact at Robbins Geller?

Page 5

2 (Pages 2 - 5)

A. Yes.

Q. Do you have an engagement agreement with Robbins Geller?

A. Yes.

Q. Approximately how many hours did you spend through the date of your report, which is Exhibit 12?

A. I haven't added it up. I don't -- I would just have to look at the invoices. I don't know.

Q. What did you do to prepare for your deposition?

A. I read my report. I reviewed the complaint. I reviewed the order on the motion to dismiss. I reviewed my reliance materials. I had a brief discussion with Mr. Wood. I reviewed a previous transcript in another case. That's all I can think of.

Q. What case did you review a transcript from?

A. It was from Acadia Healthcare case.

Q. When did you speak to Mr. Wood to prepare for your deposition?

A. Yesterday.

Q. And how long was that conversation?

A. Probably an hour to an hour and a half.

Page 6

Q. Was it in-person or over the phone?

A. It was via Zoom.

Q. Are there individuals other than you who worked on your report?

A. I had individuals who assisted me with the report and the analysis at my firm, yes.

Q. How many individuals?

A. Probably four to six all together.

Q. And who are those four to six individuals?

A. It would have been a person Ted Barlow B-a-r-l-o-w; Jody Bland, B-l-a-n-d; Justin Peden; Sean Kemsley; and one of my assistants, Joanne Wooldridge.

Q. Anyone else?

A. Possibly. That's just what comes to mind.

Q. And of those five individuals who had -- who spent the most time out of the five on this case?

A. Well, I -- as far as everyone, I might have spent the most time. Are you asking with respect to those five who spent the most?

Q. Yes, sir.

A. Okay. In terms of hours, I would just have to look. My expectation would be Sean or Ted, but I would just have to look.

Page 7

Q. And what are Mr. Kemsley's qualifications?

A. He is -- he has an undergraduate degree in economics, econometrics or maybe mathematics, I just don't remember, from BYU. And I don't -- I don't recall what else he has done.

Q. And how long have you worked with Mr. Kemsley?

A. He has been with our firm probably a year and a half roughly.

Q. What are Mr. Barlow's qualifications?

A. I believe he has two degrees, one of which might be business. I don't recall. Business or economics from -- I don't remember if he went to Chicago for undergraduate or graduate. I would just have to go look.

Q. How long have you worked with Mr. Barlow?

A. Probably a little over five years.

Q. What was Mr. Barlow's role in the preparation of your report?

A. He would have assisted in the research and perhaps some of the drafting of the background, general project management, just overseeing timing and overseeing the analyses.

Q. What was Mr. Kemsley's role in the preparation of your report?

Page 8

A. He would have done more of the data analysis. He would have constructed the code around the -- for instance, the event study and the other data analysis in the report.

Q. Is your payment contingent on the results of this case?

A. No.

Q. Do you stand to receive any bonus or additional payment based on the results achieved?

A. No.

Q. How many times has Robbins Geller retained you?

A. In total, maybe half a dozen times. I was retained by Robbins Geller on a series of individual cases, but I mentally think of that as one case even though they were five courts.

Q. And so when you say --

A. I would have to go look.

Q. When you say six times, is that including the conglomerate of cases as just one or are there -- are you including that as five of the six?

A. I'm including that as one and I can think of maybe -- maybe four others come to mind.

Q. Did plaintiff or plaintiff's counsel provide you any facts or data that you considered in

Page 9

3 (Pages 6 - 9)

Veritext Legal Solutions
866-299-5127

forming your opinions in this case? 10:01:31

A. Plaintiff's counsel provided the 10:01:36 complaint, the order on the motion to dismiss, and I 10:01:43 believe at least some of the analyst reports and 10:01:51 media reports that I refer to. I don't think they 10:01:55 provided anything else. 10:02:02

Q. Did plaintiff or plaintiff's counsel 10:02:04 provide you any assumptions that you relied on in 10:02:06 forming your opinions in this case? 10:02:10

A. Any assumptions? 10:02:12

Q. Yes, sir. 10:02:13

A. No. 10:02:16

Q. What was the first thing you did after 10:02:21 being retained in this case? 10:02:23

MR. WOOD: Objection to form. 10:02:27

A. Well, I don't recall exactly what the 10:02:28 order of events were. I received the complaint and 10:02:40 the motion to dismiss and I took a look at the case. 10:02:45 And then at some point after that I was -- I would 10:02:49 have been formally retained, and then I don't recall 10:02:52 precisely what the first thing I did was after that. 10:02:55

Q. In general, what are the steps that you 10:02:58 took in this case after you were retained? 10:03:01

MR. WOOD: Objection; form. 10:03:05

A. Well, I would have -- I or the staff 10:03:06

Page 10

working under my direction would have been looking 10:03:17 at -- after I had read the complaint, read the order 10:03:21 on the motion to dismiss, taken a look at the -- at 10:03:26 the background of the company and the stock, and 10:03:33 once we had an idea of exactly what the scope was, 10:03:41 we would begin the analysis. 10:03:47

Q. And what does the analysis entail? What 10:03:51 steps are involved in that? 10:03:53

A. Well, it's everything that I have set 10:03:55 forth in my report. 10:03:59

Q. Anything that's not in your report? 10:04:01

A. Any analysis? 10:04:05

Q. Yes, sir. 10:04:07

A. Well, all the -- all the analysis in 10:04:09 support of this opinion is in this report. 10:04:13

Q. What is your understanding of what this 10:04:17 case is about? 10:04:19

A. Well, I lay it out in Section 5 when I 10:04:22 talk about the background. 5(D) I discuss the 10:04:30 allegations. Generally I understand it's a 10:04:38 securities class action. 10:04:42

Q. Who are the defendants? 10:04:47

A. Michael Cartwright, Kirk Manz and Andrew 10:04:51 McWilliams. 10:04:59

Q. What is your understanding of what 10:04:59

Page 11

information plaintiff claims defendants allegedly 10:05:01 misrepresented or failed to disclose at the start of 10:05:06 the alleged class period? 10:05:08

A. Well, my understanding of the allegations 10:05:15 is summarized here in 5(D), but I would have to go 10:05:17 back to the complaint and look at it to recall 10:05:24 exactly what my understanding is. But my 10:05:30 understanding is what's set forth in the complaint. 10:05:32

Q. If you would please -- I think you're 10:05:37 already there -- page 4 of your report, paragraph 10:05:40 18. And if you want to review it and then let me 10:05:42 know when you're ready. 10:05:45

A. (Reviewed document.) Okay. 10:05:55

Q. Is it your understanding that plaintiff 10:05:56 alleges certain disclosures that corrected 10:06:05 defendants alleged misrepresentations? 10:06:02

A. Yes, that's what I -- that's what I say 10:06:13 here, that the plaintiffs have identified certain 10:06:17 dates on which information became available that 10:06:22 corrected defendants' alleged misrepresentations and 10:06:26 omissions or otherwise revealed the extent of the 10:06:28 risk concealed by the defendants' alleged scheme. 10:06:31 Yeah, right here in paragraph 18. 10:06:35

Q. And then in the following paragraph, 10:06:37 paragraph 19, you identify a November 6, 2018, press 10:06:38

Page 12

release, correct? 10:06:42

A. Yes. 10:06:44

Q. Is that one of the disclosures that 10:06:45 allegedly corrected defendants' alleged 10:06:47 misrepresentations? 10:06:50

A. My understanding is that that -- the 10:06:55 November 6 announcement is one of the -- those 10:06:59 corrective disclosures. I believe there was also an 10:07:06 earnings call on that day and so I don't recall the 10:07:10 information contained in the press release versus 10:07:14 the earnings call or anything else that would have 10:07:17 been released that day. 10:07:21

Q. And then in paragraphs 22 and 23 of your 10:07:23 report you identify an April 16, 2019, press release 10:07:26 and earnings call, correct? 10:07:31

A. Yes. Paragraph 22 and then in 23 I refer 10:07:41 to the earnings call. 10:07:46

Q. Are the April 16, 2019, press release and 10:07:48 earnings call disclosures an alleged corrective 10:07:53 disclosure in the case? 10:07:57

A. Well, my understanding is those -- is 10:08:04 April 16th is one of the dates that plaintiffs have 10:08:09 identified that I'm referring to previously in 10:08:11 paragraph 18. 10:08:15

Q. Other than the November 6, 2018, 10:08:18

Page 13

4 (Pages 10 - 13)

disclosures and the April 16, 2019, disclosures, are you aware of any other disclosures that allegedly corrected defendants' alleged misrepresentations?

A. At this time I'm not aware of anything other than what has been alleged in the complaint. And my understanding is the complaint refers to these two disclosures, but I would have to go review the complaint just to confirm that.

Q. But sitting here today, you are not aware of any disclosures other than the November 6, 2018, disclosures and the April 16, 2019, disclosures that allegedly corrected defendants' alleged misrepresentations?

A. Yeah. Sitting here today, I'm not aware of any -- anything else that allegedly corrected the misstatements.

Q. If you would please turn to Appendix A of your report, it is page -- it's kind of -- it's page 29 of the --

A. Yes.

Q. Appendix A of Exhibit 12 lists your prior testimony and publications, correct?

A. Yes.

Q. For what time period does the testimony that is listed in Appendix A cover?

Page 14

A. This appears to be everything. There does not appear to be a limitation on the time period.

Q. With respect to the publications that are listed, are those all of the publications or is there a limitation by time period for the ones that are listed?

A. Certainly within the last 10 years this would be everything. I can't say that this is absolutely everything going all the way back to -- through my professional career but certainly the last 10 years and beyond, I believe.

Q. Are you aware of any publications that you made that are not listed in Appendix A?

A. No, nothing comes to mind.

Q. Which of the cases that are listed in Appendix A were class action cases alleging violations of securities laws?

A. Do you mean with respect to testimony or with respect to --

Q. We'll start with testimony.

A. So if I start with testimony, the first one under deposition, the Acadia Healthcare case, that was a class action. Sorry, you said class action, right?

Q. I said class action alleging violations of

Page 15

the securities laws.

A. Yeah, that was class action alleging violation of securities laws. The fourth one, Nikki Bollinger Gray versus Core -- Corrections Corporation of America. The Royal Park engagements which start maybe two-thirds of the way down on that first page, each of those were class actions alleging securities law -- well, I'm sorry. I would have to go back and look. They were securities cases. I -- I can't remember specifically what the alleged violation was. It might have been securities law but they were securities cases.
Let's see, just class actions, right?

Q. Yes, sir.

A. On testimony, I believe that is it. And then there are some others in the partial list of cases which starts on page 32 of this document.

Q. In the partial list of cases that starts on page 32, which ones of those were class actions alleging violations of the securities laws?

A. The first one provided expert and rebuttal opinions on share price inflation and aggregate damages on behalf of a former Australian electronics retail chain. That was a class action involving securities violations. I say securities violations.

Page 16

I use that term generally. I think it was the Corporation's Act in Australia, but it was generally similar to a 10B5 case.
The fourth one I -- I actually don't recall if that was -- it was a class action, but I do not recall if it was securities or if it was breach of contract.
The -- maybe the seventh one was a securities case although it was evaluating class action opt-out, so sorry, that -- it was opt-outs involved in a class action involved in the securities -- related to securities violation.
The ninth one was another case in Australia involving a securities class action in violation of securities laws in Australia.
I'm on the -- I'm on page 33 now. Sorry it's taking me a while. I'm just having to read each of these.

Q. Take your time.

A. The fifth one was a securities class action case, as was the sixth, as was the seventh. And then I think the tenth one was a securities class action. The eleventh was a securities class action. The twelfth was a securities class action.
The -- yeah, off the -- just going through

Page 17

5 (Pages 14 - 17)

Veritext Legal Solutions
866-299-5127

Q. this and it's -- this is -- this is a partial list, not an exhaustive list. Those are the ones that come to mind. I can't tell you that I have gotten every one of them.

Q. Understood. And in the ones that you identified both from testimony and then from your partial list of cases as securities class actions, how many times have you been retained by the defendant in those cases?

A. Do you mind if I count?

Q. Go ahead.

A. Sorry. I'm going to start numbering these instead of bulleting them.

I count eight, but I'm not sure if that's -- I count eight of the ones I just listed but that was a quick count.

Q. And in how many of those cases were you retained by Robbins Geller?

MR. WOOD: Objection to form.

A. Of the ones I just listed?

Q. Yes, sir.

A. Sorry, your previous question was how many times were -- was I retained on behalf of defendant. Okay.

So Robbins Geller, I was retained in the Acadia Healthcare case, the Corrections Corporation of America case and then the five Royal Park cases listed here.

Q. Any others?

A. Not that I recall. There might -- I may have been retained in a consulting role in another case. I'm sorry, but nothing -- nothing listed here, no.

Q. Has any judge, arbitrator or other decision-maker ever rejected any of your expert opinions?

A. I once had a report that was -- that I prepared on behalf of defendants that a judge did not let in because the defendants had not given the plaintiffs proper notice that expert discovery would be extended. So my report and the other reports in that case were never admitted into the case.

Q. Any other times?

A. Not to my knowledge.

Q. If you'd please turn to Appendix B of your report.

A. Okay.

Q. Appendix B lists the documents that you considered in this case, correct?

MR. WOOD: Objection to form.

A. Yes, it says information considered.

Q. Is this list complete?

A. Yes, I believe it is.

Q. In the materials considered, you list a number of analyst reports; is that right?

A. That's correct.

Q. Did you review all of these analyst reports?

A. I or someone working under my direction would have at least reviewed them to some extent. I did not review all of these in significant detail. I reviewed certain ones in more detail than others.

Q. How did you obtain the analyst reports?

A. Well, do you mind if I flip to my report?

Q. Sure.

A. I might have a footnote. Yeah, it looks like they were accessed through Thompson Reuters. I recall that we received analyst reports that some of those came from counsel and some of those we retrieved from Refinitiv, which is -- which is Thompson Reuters' database.

Q. One of the corrective disclosures in the case that is alleged was dated April 16, 2019, correct?

A. That's my recollection.

Q. You did not review any analyst reports on or around April 16, 2019, correct?

A. I do not believe I did. I don't -- I'm sorry, I'm just flipping back over. Yeah, not for the purpose of my analysis here. The last report I reviewed was November 2018.

Q. What was the date of the last report you reviewed?

A. I'm looking at page 39. Line 63 says, November 6, 2018.

Q. Why didn't you review any analyst reports dated after November 6, 2018?

MR. WOOD: Objection to form.

A. Well, because I was analyzing the class period through November 5, 2018.

Q. You have a section in Appendix B that is entitled Media Reports.

Do you see that?

A. I do.

Q. Is the list of media reports here complete?

A. I believe it is.

Q. And these media reports are listed in chronological order, correct?

A. I believe they are.

Q. The last media report you reviewed is dated November 6, 2018, correct?

A. Yes.

Q. So you did not review any media reports on AAC dated after November 6, 2018, correct?

A. Not for the purposes of my analysis here, no.

Q. You did not review a press release on AAC entitled AAC Holdings, Inc., reports fourth quarter and full year 2018 operating highlights and other recent developments, postpones conference call that is dated March 13, 2019, correct?

A. Well, I think I might have. I think that when we're referring to media reports, I was just referring to what's listed in this section of Appendix B.

I do believe I might have reviewed at least a press release. But if I did, I would have noted it either in Appendix B or in a footnote when I am describing -- when I -- when I discuss that date in the background section.

Q. Sure. And feel free to look through your report and let me know where it is that you referenced a March 13, 2019, AAC press release.

A. Let's see, so I'm looking at public filings which is on -- I'm on page 42 in Appendix B. Oh, I'm sorry, that's April 16, 2019. Number 41. I'm not sure that I -- I'm not sure that I did review that. I would just -- yeah, I don't think I did then.

Q. If it's not referenced in your report, you agree that it is not something that you reviewed for your analysis?

A. Yes, unless I referenced it here. Unless there was an oversight between the footnotes and what's referenced here, I would not have reviewed it for the purpose of this opinion.

Q. The next section in Appendix B is public filings, AAC Holdings, Inc., correct?

A. Yes.

Q. Is this list complete?

A. To my knowledge, it's a complete list of the public filings I reviewed in support of this opinion.

Q. And you reviewed only two public filings from AAC Holdings that were dated in 2019, correct?

A. It appears so, yes, two 8Ks in 2019.

Q. And those are 8Ks that are dated April 16, 2019, and November 4, 2019, correct?

A. That's correct.

Q. So you did not review AAC Holdings Form 8K dated March 29, 2019, correct?

A. Yeah, I don't -- I don't believe I did. It's not listed here.

Q. You did not review AAC Holdings Form 10K dated April 15, 2019, correct?

A. Yeah, not -- not in forming my opinions here, no.

Q. You did not review AAC Holdings Form 8K dated March 13, 2019, correct?

A. Not in forming my opinions here.

Q. Did you ask for any information that you were not provided?

A. Did I ask who? Sorry, did I ask --

Q. Did you ask plaintiff or plaintiff's counsel for any information that you were not provided?

A. No.

Q. Did you ask your team members for any information that they were unable to find?

A. No.

Q. Please turn to page 9 of your report.

A. All right.

Q. I'm sorry, page 6, paragraph 25. And if you want to review the paragraph and then let me know when you're ready.

A. (Reviewed document.) Okay.

Q. What is the fraud on the market presumption of reliance that you reference there?

A. Well, that's really a legal concept. I can only provide you with what my understanding of it is.

Q. Please go ahead.

A. Which is that investors are able to satisfy the reliance requirement of the information available in the market through relying on the price of a publicly traded security.

Q. You have concluded in this report that AAC traded in a semi-strong form efficient market during the period of March 8, 2017, through November 5, 2018, correct?

A. That's correct.

Q. And the semi-strong form of market efficiency means that all publicly available information is reflected in the price of AAC's stock, correct?

MR. WOOD: Objection to form.

A. Yeah. I say it in paragraph 27. I think you -- 27(b) it is that all publicly available information is reflected in the price of the traded

Veritext Legal Solutions
866-299-5127

asset, yes. 10:32:13

Q. Given that AAC traded in a semi-strong 10:32:14 form efficient market, its stock price should not 10:32:18 react to information that had already been made 10:32:22 publicly available to the market through filings 10:32:24 that AAC made with the Securities & Exchange 10:32:27 Commission, correct? 10:32:30

MR. WOOD: Objection; form. 10:32:32

A. Well, that's a -- that's a very general 10:32:34 statement. It just depends on how previously -- I 10:32:38 think what you're suggesting is that the share price 10:32:47 should not react to filings previously made through 10:32:52 the SEC publicly available, if I understand your 10:32:58 question correctly. 10:33:01

However, a stock price can react as a -- 10:33:05 can react to information that was previously 10:33:10 disclosed because stock prices continue to interact 10:33:12 with that information and other information. 10:33:16

So it's hard to answer that question in 10:33:19 the abstract without knowing specifically what the 10:33:22 hypothetical is. 10:33:26

Q. What other information would you need to 10:33:28 know to answer the question? 10:33:30

A. Well, I believe your question was that a 10:33:34 stock -- that a stock price cannot react to 10:33:40

previously disclosed information. But information 10:33:43 that was previously disclosed can be evaluated, for 10:33:48 instance, in the context of other new information 10:33:54 that becomes available. And so together that forms 10:33:57 the basis of a stock price reaction, some of which 10:34:02 could be explained by information previously known, 10:34:09 some of which could be explained by new information. 10:34:11

So it was just a general -- I think your 10:34:13 question was very general and I'm just trying to -- 10:34:16 it's not possible to -- it's not possible to say in 10:34:27 an unqualified way that once information becomes 10:34:39 available, that the share price stops reacting. It 10:34:43 depends on how that information interacts with other 10:34:47 new information. 10:34:50

Q. Assume for me there is no other new 10:34:50 information. With that assumption and given that 10:34:53 AAC traded in a semi-strong form efficient market, 10:34:58 its stock price should not react to information that 10:35:02 has already been made publicly available to the 10:35:04 market through filings AAC made with the Securities 10:35:07 & Exchange Commission, correct? 10:35:10

MR. WOOD: Objection to form. 10:35:12

A. So are you -- are you asking me to assume 10:35:14 that information is made available and that there is 10:35:16 no other information that becomes available that 10:35:21

would interact with that information? 10:35:25

Q. Yes, sir. 10:35:26

A. Generally speaking, in a semi-strong form 10:35:33 efficient market, once information becomes 10:35:35 available, the share price will react to that 10:35:37 information. 10:35:40

Q. In a semi-strong form efficient market for 10:35:49 AAC, should the stock price start reacting on the 10:35:55 day the information is made available? 10:36:00

MR. WOOD: Objection; form. 10:36:03

A. Well, it depends on how the information is 10:36:03 made available. It depends on, for instance, when 10:36:12 the information becomes available, through what 10:36:15 channels it becomes available. 10:36:18

It often does begin to react on the day 10:36:24 that the information becomes available, but again, 10:36:29 it just depends on the circumstances. 10:36:31

Q. If information about AAC is made available 10:36:36 through filings that AAC makes with the Securities 10:36:39 and Exchange Commission, would you expect AAC's 10:36:45 stock to start reacting on that day? 10:36:48

MR. WOOD: Objection; form. 10:36:50

A. Well, it would depend on what time the 10:36:54 filings were made and when that was made known to 10:37:03 the public. 10:37:06

Q. If information about AAC is made available 10:37:07 through filings that AAC makes with the Securities & 10:37:10 Exchange Commission before the market opens, would 10:37:15 you expect the stock to start reacting on that same 10:37:17 day? 10:37:20

MR. WOOD: Objection; form. 10:37:21

A. Generally speaking, if the information is 10:37:22 available to market participants and if it's -- if 10:37:31 it's new and it's value relevant to the stock. 10:37:33

Q. One of the tests that you performed to 10:37:39 determine whether AAC's stock traded in an efficient 10:37:41 market was whether there is a cause-and-effect 10:37:45 relationship between events and stock price 10:37:47 movements, correct? 10:37:51

A. Yes. 10:37:52

Q. And feel free to turn to that section in 10:37:54 your report. 10:37:56

A. I'm assuming you are referring to -- 10:37:57

Q. It starts on page 13. 10:38:00

A. Yes. Cammer Factor 5, yeah. 10:38:04

Q. The events you tested for Cammer Factor 5 10:38:05 were a subset of days on which AAC released 10:38:12 value-relevant information through press releases, 10:38:16 correct? 10:38:19

A. Well, the days that I tested were earnings 10:38:21

Veritext Legal Solutions
866 299 5127

dates. And those were days that on an ex ante basis one would expect to have a higher concentration of new, value-relevant information.

I think your question was did I test days on which AAC released new and value-relevant information. That's not quite what I did. I tested days on which you would expect to have a higher frequency of new and value-relevant information.

Q. And so the release days that you use throughout your report is in reference to AAC's earnings releases; is that right?

A. I believe that's right. There -- there may have been -- I'm sorry, let me just review my report. I'm on -- I'm looking at paragraph 57. Release days to be days on which AAC issued quarterly or annual financial results or issued revised guidance. So it would be one of those two criteria.

Q. To analyze the extent to which AAC's stock price responded to information released on the release days, you used an event study, correct?

A. Would you mind repeating that?

MS. BUGNI: Could you read it back, please.

(Record read.)

Page 30

A. Yeah, the event study is one of the techniques I used in this analysis.

Q. What other analysis did you use to test the cause-and-effect relationship?

A. Well, the results of the event study are then tested using a -- I believe a chi-squared and Fisher's exact test. Those are the two procedures which are separate and apart from the event study.

Q. What is an event study?

A. Well, I explain it in my report. But generally speaking, it's a -- it's a regression analysis that is -- it is used to examine in this case share price movements and reaction to a specific event.

Q. When you say "regression analysis," what do you mean by that?

A. Well, a regression analysis is -- I'm sorry, let me find it in my report. It essentially is a statistical analysis that -- here in paragraph 60, examines the nature and the form of the relationship between two or more variables.

So in a regression analysis, you would have a dependent variable that you are attempting to explain. And you have an independent variable or independent variables that you use to attempt to

Page 31

explain the movements of the dependent variable.

Q. And what was the dependent variable in this case?

A. The dependent variable was AAC's share price returns.

Q. And which variables were you trying to exclude the effect of?

A. Sorry. Are you asking me what my independent variables?

Q. Yes, sir. What were your independent variables?

A. Okay. The independent variables were -- I believe I used two indices. Let me just look to my report to make sure I -- at paragraph 63, I used -- I applied the Russell Microcap Total Return Index and the Dow Jones U.S. Select Health Care Providers Total Return Index. And in addition, I use dummy variables to control for the impact of the release days that are within the estimation window.

Q. How did you select the Russell Microcap Total Return Index?

A. It is a -- I would have to look at my reliance materials to see if AAC was a constituent. But it was the market index that most closely reflected the market cap of the stock.

Page 32

Q. And if AAC was included in that, would you exclude AAC before using the index?

A. Yes, although it would be immaterial.

Q. Why would it be immaterial?

A. Because it's a very large index from a market cap perspective.

Q. Do you recall whether you did exclude AAC?

A. I recall that I did.

Q. How did you select the Dow Jones U.S. Select Health Care Providers Total Return Index as an independent variable?

A. That is a relatively broad and widely used index of health care providers. And it -- I selected it because it was most closely associated with the industry in which AAC operates.

Q. Was AAC included in that index?

A. I would have to look. I don't recall that it was, but I would just have to look. And if it was I would have excluded it -- or sorry, more specifically, removed it.

Q. Do you know if there are any other behavioral healthcare providers included in that index?

A. I would just -- I would have to look at the index constituents.

Page 33

9 (Pages 30 - 33)

Q. And in determining the independent variable, do you consider it to be a difference that matters whether a health care company is general health care or behavioral health care? 10:45:06 10:45:09 10:45:12 10:45:14

A. Do I think it matters whether the company in question is general or behavioral? I don't -- I would just have to look at a specific index and see what the constituents are of the general index versus a behavioral index to see. 10:45:19 10:45:25 10:45:38 10:45:43 10:45:48

Generally speaking, these control for general industry movements so it would just depend on index. 10:45:51 10:45:53 10:45:58

Q. Do you recall doing that here? 10:46:00

A. I recall looking at alternative indices that are in my reliance materials, but I don't -- I don't say which ones here, but I believe they're in the reliance materials. 10:46:03 10:46:10 10:46:17 10:46:19

Q. What are the indicator or dummy variables that you used as independent variables? 10:46:23 10:46:26

A. A dummy variable takes on a value of one or zero. In this case, the dummy variable takes on the value of one on the day -- if it occurs on an earnings day that I identify as a release day. Otherwise, it takes on a value of zero. 10:46:30 10:46:36 10:46:41 10:46:48 10:46:53

Q. Going to Exhibit 1 of your report which is 10:47:03

Page 34

towards the end. It's the second-to-last page. 10:47:05

What is Exhibit 1? 10:47:21

A. It is a summary of the release days and abnormal returns associated with those. 10:47:25 10:47:29

THE REPORTER: Can you speak up please. 10:47:29 10:47:29

A. Sorry. Sure. Yeah. A summary of the release days and abnormal returns associated with those release days. 10:47:33 10:47:34 10:47:37

Q. The first release day that you have listed in Exhibit 1 is a press release that was issued on May 3, 2017, after market close, correct? 10:47:40 10:47:42 10:47:47

A. Yes. 10:47:52

Q. You measured the abnormal return on May 4th, 2017, the next day, correct? 10:47:53 10:47:57

A. Yes. 10:48:02

Q. Why did you measure the abnormal return on May 4th, 2017? 10:48:03 10:48:06

A. Because of the timing of that release would have been reflected in the next day if it was released after the market close. 10:48:08 10:48:16 10:48:19

Q. And then the remaining releases, except for one, are all releases that were issued after market close and you looked at the abnormal return on the next trading day, correct? 10:48:22 10:48:27 10:48:31 10:48:36

Page 35

A. Correct. 10:48:40

Q. And why did you select that window to measure the abnormal return for those days? 10:48:42 10:48:45

A. Well, it's the same reason for -- if the press release was after the market close, I would have expected the reaction on the next day. 10:48:49 10:48:55 10:48:57

Q. There was one release that you looked at that was issued before the market opened on March 1, 2018, correct? 10:49:01 10:49:03 10:49:09

A. Yes, I see that. 10:49:12

Q. And for -- to measure the abnormal return for that release, you looked at the reaction on the same day, correct? 10:49:14 10:49:16 10:49:20

A. Yes. 10:49:24

Q. Why did you measure the abnormal return on the same day as the release was issued? 10:49:25 10:49:28

A. Because my understanding was that release was made before the market opened, so I would have expected the reaction on the same day after the market opened, or at least the reaction to begin that day. 10:49:32 10:49:35 10:49:38 10:49:41 10:49:49

Q. Would you expect the reaction to begin within minutes of the release being issued? 10:49:49 10:49:52

MR. WOOD: Objection to form. 10:49:56

A. Well, that -- it just depends. How a -- 10:49:58

Page 36

how a stock reacts within a day is going to depend on what the -- what information is being released, how complex that information is, how that information interacts with other information that's available in the market. So I would just have to know more about what the circumstances are. 10:50:07 10:50:13 10:50:18 10:50:19 10:50:21 10:50:29

Q. For filings that AAC makes with the Securities & Exchange Commission, would you expect the release to begin on the same day -- excuse me -- within minutes of the filing? 10:50:32 10:50:35 10:50:38 10:50:43

MR. WOOD: Objection; form. 10:50:45

A. Generally speaking, obviously the information becomes available within minutes. But, again, the extent to which that is observable in the interday share price is going to depend on the nature of that information and how it interacts with previous expectations. 10:50:47 10:50:59 10:51:02 10:51:09 10:51:12 10:51:15

It would -- you would expect that information to start to be incorporated into the share price within minutes. However, whether that is observable and consistent with the movement of the share price throughout the remainder of the day is just going to depend on how that information is reacting with other expectations and information in the market. 10:51:17 10:51:20 10:51:24 10:51:29 10:51:34 10:51:37 10:51:42 10:51:44

Page 37

10 (Pages 34 - 37)

Q. On two of the release days in Exhibit 1, you found that there was no statistically significant abnormal stock price return, correct?

A. That's correct.

Q. And on both of those days there was a stock price reaction, correct?

MR. WOOD: Objection to form.

A. When you say "reaction," are you -- are you just asking if the stock price changed from one day to the next?

Q. Yes, sir.

A. There was a change in the stock price, but it was -- the reaction was not statistically significant.

Q. And for those two days, do you agree that since the reaction was not statistically significant, it cannot be distinguished from zero?

MR. WOOD: Objection to form.

A. Well, from a statistical perspective, that test, when you ask if something is statistically significant, it is testing that against zero statistically.

I wouldn't say that that means that the reaction cannot be distinguished from zero by some other means. But from a statistical perspective,

that test suggests that the model is unable to distinguish that from a zero return.

Does that answer your question?

Q. Yes, sir.

MS. BUGNI: I'm about to get into a new area. Do you need a break, comfort break or you would like to keep going?

THE WITNESS: Why don't we take a break if that works for you.

MS. BUGNI: That's fine.

THE VIDEOGRAPHER: We're off the record at 10:54 a.m.

(Recess 10:54 a.m. to 11:05 a.m.)

THE VIDEOGRAPHER: Back on the record at 11:05 a.m.

Q. Please turn to paragraph 34 of your report on page 9. I'm going to actually give you a series of paragraphs and they all use the language "supports an inference."

Feel free to look at them and then let me know when you're ready, but that's the language that I'm focusing on. So it's paragraph 34, paragraph 53 and paragraph 86.

A. (Reviewed document.) All right.

Q. In each of those paragraphs you use the

phrase "supports an inference," correct?

A. I believe that's right.

Q. What do you mean by "supports an inference"?

A. Generally that it supports a finding that the stock traded in an efficient market.

Q. Why do you use supports an inference as opposed to a definitive statement that it means that there is an efficient market or something along those lines?

MR. WOOD: Objection; form.

A. Well, I suppose I could have written it a bit more actively. But in this analysis, I'm going through each of these factors and looking at the factors so I'm not taking one factor in isolation to draw a conclusion.

I'm looking at the findings of that factor in the context of the rest of the analysis. So that's why I don't have an absolute conclusion at the end of each of these analyses.

Q. So as an economist, you are using evidence to support a conclusion; is that fair?

A. Yeah, I think I'm -- I believe that's fair. I'm looking at evidence associated with each of these factors and using that evidence to draw a

conclusion that AAC stock traded in a semi-strong form efficient market.

Q. In paragraph 71 that starts at the bottom of page 17 --

A. Yes.

Q. -- you use the phrase there that it "directly supports a conclusion."

Do you see that?

A. I do.

Q. Why do you use that phrase there?

A. Well, when we're talking about Cammer Factor 5, what we're testing is the cause-and-effect relationship between the release of what we would anticipate is new, value-relevant information and the stock price.

So Cammer Factor 5 is in a way a direct test of whether the stock is reflecting new, value-relevant information which is the essence of the semi-strong form version of the efficient market hypothesis.

Q. One of the tests that you ran to evaluate market efficiency is the auto correlation test that's on page 19 of your report, correct?

A. Yes.

Q. What form of market efficiency does auto

11 (Pages 38 - 41)

Q. You use the Augmented Dickey Fuller test to test for auto correlation, correct?

A. The Augmented Dickey Fuller test is a test for a unit root. It's a different test than the one that is used for auto correlation.

Q. What is the Augmented Dickey Fuller test?

A. It tests for what's known as stationarity. So in a -- when we think about stock price returns, those -- in general, we would expect those to be a stationary series; in other words, that they tend to revert towards, for instance, zero.

Whereas, if you were to look at a price series, a price series is not generally expected to be a stationary series. It is expected to incorporate each new innovation.

And what the Dickey Fuller test does is it tests to see if over time the -- at least the way I have applied it here -- that the returns do not have a unit root and that the price series does have a unit root, which is what we would expect in normal markets when the stock price is not predictable for past returns.

Q. So you're using two different metrics that you're looking at the stock price series and then the stock price returns; is that fair?

Q. correlation test?

A. That would generally test for a violation of the weak form of market efficiency.

Q. Auto correlation assesses whether lagged price returns are predictors of future price returns, correct?

A. Generally speaking, it regresses the price return on one day on the price return on the previous day.

Q. And if future stock prices can be predicted by using past price returns, then the stock price returns exhibit auto correlation, correct?

A. When you say can be predicted, I'm not -- would you mind reading that back? I'm just not sure.

(Record read.)

A. Well, auto correlation, if it were possible to systematically predict stock price returns based on return history, auto correlation would be one way to test for that. That is a pattern that would emerge in the situation that you describe or probably would emerge. It's one pattern that would be likely to emerge. I'm not entirely sure that's the way you asked the question, though.

Page 42

A. Yeah. In footnote 105, I think I say it more specifically. It evaluates the presence of a unit root in a time-series. So the null hypothesis being tested is that a unit root exists. In this case, the test suggests the presence of unit root in AAC's stock price series and rejects the premise of a unit root in AAC's stock price returns.

Q. When you say the null hypothesis being tested is that a unit root exists, is that exists in returns or price?

A. Well, both. The way the test is constructed is the null hypothesis is set up to either reject or fail to reject a unit root.

Q. In both returns and price?

A. I believe that's correct. I'd want to check my reliance materials, but yes.

Q. And so did you test both price and returns?

A. Yes.

Q. Is it possible for stock prices to exhibit a unit root but the returns to be auto correlated?

A. I would have to think about that. That's a -- that's a fairly technical question that I would have to put more thought into.

Generally speaking, when we're looking at

Page 45

Q. Fair enough. I'm not an economist.

If auto correlation is present, it implies that the market for the stock is not efficient, correct?

A. Not necessarily.

Q. Why not?

A. Well, because it depends on your specification, for instance. When you are testing for auto correlation, you have to implement that test in certain ways. You implement it over certain time frames. You test at certain levels of significance.

If there were auto correlation present, it might be something to look into, but it would have to be considered in the wider context of the analysis. Specifically, it -- one might observe auto correlation for a certain period or sub period. And if you are testing any significance level of 5 percent, on average you will see a random observation of auto correlation on average 5 percent of the time.

That's not indicative of -- that's not indicative that the stock does not trade in an efficient market. It would just be something else to look into.

Page 43

12 (Pages 42 - 45)

Veritext Legal Solutions
866 299 5127

a stock price series that is nonstationary, the returns are typically stationary; in other words, they would not have a unit root. Whether I can eliminate that possibility entirely as you asked, I would have to think about.

Q. Why does testing for a unit root in prices and finding one indicate that the shares were traded in an efficient market?

A. Well, I think as I alluded to earlier, this individual finding in and of itself does not necessarily indicate whether the share is traded in an efficient market. It's more in this case a bit of a cross-check to understand whether there is anything else to examine that may be -- that may not be picked up in the other factors.

Q. And the results of the test you ran for AAC did not indicate that there was a reason to check on other things; is that correct?

A. These tests indicated that there was not evidence that AAC was violating the weak form of market efficiency.

Q. Turning to your opinion on damages, which starts on page 22.

A. All right.

Q. I'm going to ask you about paragraph 91.

So if you would like to read that and then let me know when you're ready.

A. (Reviewed document.) Okay.

Q. In paragraph 91 you write, Given that AAC's shares trade in a semi-strong form efficient market, the share price return -- share price reactions to new, value-relevant information appropriately reflect -- reflected the effects of such events on the share price. Correct?

A. I believe you read that correctly.

Q. Does the market for AAC's shares have to be semi-strong form efficient for the share price reactions to new, value-relevant information to appropriately reflect the effects of such events on the share price?

A. Does it have to be? I don't know that it has to be. It -- it would depend on -- well, I think it would depend on what the event in question is and how that is being measured.

So it would just -- I think your question was whether that is a necessary condition for a stock price to reflect all new and value-relevant information. I believe the answer to that is no, because you -- there are security prices that may not trade at all; but when they do, their prices

reflect all of the value-relevant information.

Q. In paragraph 91 you begin the first sentence with, Given that AAC's shares traded in a semi-strong form efficient market, correct?

A. Yes.

Q. Is that a necessary piece for the rest of the sentence?

MR. WOOD: Objection; form.

A. So the rest of the sentence being the share price reactions to new, value-relevant information appropriately reflected the effects of such events on the share price.

There are other -- there might be other ways to test that. It's just in this context that's what I found with respect to AAC.

Q. What are the other ways to test it?

A. Well, I think the -- what I just testified to earlier, for instance, would be a situation in which there is a security or an asset that does not trade; but in the event that asset is bought or sold, there would be a way to determine whether the price of that asset is reflective of new, value-relevant information specifically by examining other standard tools and valuation techniques that could be used to corroborate that.

Q. But you found that that was not necessary to determine damages in this case, correct?

MR. WOOD: Objection to form.

A. That's -- that's not correct. I haven't found what's necessary to determine damages.

Q. Do you reference in your opinion on measuring damages any other tests that could be used other than the one that depends on AAC shares being traded in a semi-strong form efficient market?

A. Yes, I -- I'm looking -- sorry, just bear with me one minute.

Paragraph 92, for instance, I refer to practitioners routinely measure the value of expected earnings using income and market approaches which may be used to quantify the impact of changes and expectations and perceived risk associated with a business earnings stream. These techniques may be used to measure the share price impact of alleged misrepresentations directly or to corroborate the observed share price impact of a curative event, as well as to quantify the impact of any confounding information that may have coincided with a curative event.

Q. Is what you reference in paragraph 92 in relation to disentangling the effects of a curative

13 (Pages 46 - 49)

event that has both fraud- and non-fraud-related disclosures?

A. Well, I think I say that those techniques can be used to measure misrepresentation directly or to disentangle what I refer to here as confounding information, which I think you were asking about.

Q. In looking at the measure of damages, the model to be used in this case, did you find that the techniques referenced in paragraph 92 would be necessary?

A. Did you say looking at damages?

Q. In looking at the model for measuring damages.

A. Well, I have not constructed a model that measures damages. I have not determined the extent to which these techniques would be applied in that model.

Q. In paragraph 90 of your report you write that estimating share price inflation often begins by analyzing the impact of curative events, correct?

A. Yes.

Q. And if you are using an event study to determine the impact of curative events, does that depend on the market for the stock being semi-strong form efficient?

Page 50

A. It depends on exactly how we apply the event study. Generally speaking, when we apply event studies, we apply them to -- and the way that I have done here, which is a context of the market model, and the market model leverages semi-strong form efficiency to predict returns.

That's not necessarily the only way that an event study can be applied, but that would be -- that would be one way to apply it.

Q. Have you ever used an event study to determine the impact of curative events for a stock that did not trade in a semi-strong form efficient market?

A. I don't -- I don't know. Event study is a very broad term. It just -- it refers to the -- it refers to the study of the impact of a particular event. And I've studied the impact of events on securities that trade in efficient markets and that securities that I would imagine probably do not.

I don't know that I have ever used the specific regression techniques that I apply here in that context. But, again, the event study is -- covers a wide -- in my view, a variety of analyses. So I would just have to think about that.

Q. Sitting here today, can you think of any

Page 51

instance when you have used regression techniques to determine the impact of a curative event for a stock that did not trade in a semi-strong form efficient market?

A. Yeah, I can think of examples of when I have used regression to do that.

Q. How many examples can you think of?

A. It's difficult to say. You know, every case is different. The regression techniques that I'm thinking of were just applied in a different context so I -- it's just hard to say. I use regression a lot.

Q. Have you used regression to determine the impact of a curative event for a stock that did not trade in a semi-strong form efficient market in a class action case?

A. I cannot think of any times when -- I'm sorry. Was your question about regression analysis or was it about event studies?

Q. Regression.

A. Regression analysis can be applied to a wide variety of things. It can be applied to securities prices. It can be applied to measure internal financial metrics. So it's -- it's hard for me to say -- to limit that.

Page 52

But with respect to securities class actions, I don't recall a securities class action in which I measured damages on a security that was not efficient using -- using regression, but I might have.

Regression is just a very, very broad category in a statistical model so I just don't recall off the top of my head.

Q. In looking at measuring damages and your reference to a curative event, the two curative events in this case we discussed earlier, those were the disclosures on November 6, 2018, and April 16, 2019, correct?

A. That's -- that's what I understand.

Q. Your opinion on market efficiency for AAC's common stock is limited to the period of March 8, 2017, through November 5, 2018, correct?

A. Yes. My opinion is that the market for the stock was semi-strong form efficient from March 8, 2017, to November 5, 2018.

Q. When you reference that AAC's shares traded in a semi-strong form efficient market in paragraph 91, how do you know that the market for AAC's stock was semi-strong form efficient on the dates of the two alleged curative events which

Page 53

14 (Pages 50 - 53)

Veritext Legal Solutions

866 299 5127

occurred outside the time period of March 8, 2017, through November 5, 2018?

A. Well, I haven't formed an opinion on that period, as I just said. And in implementing a damages calculation, that might be a step that I would take in order to apply an event study in order to measure inflation. And, you know, as I state here, the event study, broadly speaking, the market model specifically is something that can be applied to use -- to measure inflation along with many other valuation tools and techniques.

So one of the -- one of the analyses that may be necessary in order to apply those models might be to look at the market following the curative event to ensure that the event study or market model used to make the prediction is a -- is a good indicator of what share price inflation might have been.

Q. But you did not do that analysis here?

A. I did not analyze the efficiency of the market after November 5th. However, that was not an analysis that I needed to do in order to form my opinion on damages.

Q. But it is an analysis that would need to be done to determine whether a market model could be

Page 54

used as an indicator of what share price inflation might have been?

A. Possibly if we were measuring share price inflation from a market model using an event study framework, one thing we would want to look to is the prices after the event to ensure that those prices reflect the new information corresponding to the disclosure.

Q. And that is not an analysis that you have done here, correct?

A. I have not -- I have not -- no, I have not looked at the efficiency of the market after November 5th, 2018, in this report.

Q. Do you have any opinions on the efficiency of the market for AAC's stock after November 5, 2018?

A. Well, again, my -- my opinions are set forth in my report and my report is -- covers the period through November 5th, 2018.

Q. So sitting here today, you do not have any opinions on the efficiency of the market for AAC's stock after November 5, 2018?

A. Yeah, again, nothing that I have -- that I have written here in my report. Yeah, I have not formed an opinion on that.

Page 55

Q. In forming the opinions that are set forth in paragraphs 89 through 95 of your report, did you consider the content of the alleged misrepresentations and the content of the alleged corrective disclosures?

A. Well, I had an understanding of the misrepresentations and the corrective disclosures, if that's what you're asking.

Q. In forming the opinions set forth in paragraphs 89 through 95 of your report, does part of that analysis depend on the consideration of the contents of the alleged misrepresentations and the contents of the alleged corrective disclosures?

A. Well, it considers it and it -- what I have written here in paragraphs 89 to 95 could be applied in the context of the misrepresentations and corrective disclosures here, but it's not limited specifically to the misrepresentations and disclosures in this case.

These tools and techniques can be applied to a wide variety of cases, both inside and outside the context of litigation. These are standard valuation tools and techniques.

Q. Could these tools be applied if the alleged misrepresentations were a mismatch to the

Page 56

alleged corrective disclosures?

A. What do you mean -- what do you mean by that? I don't understand the question.

Q. Could these tools be applied if the alleged corrective disclosures don't, in fact, correct the alleged misrepresentations?

MR. WOOD: Objection to form.

A. Certain of them could. I would just have to understand more about what you mean by that.

Q. In forming the opinions set forth in paragraphs 89 through 95, did you do that analysis to determine whether the alleged corrective disclosures, in fact, corrected the alleged misrepresentations?

A. Well, no, that wasn't necessary. Because I think under your hypothetical, you're suggesting that the corrective disclosures did not correct the alleged misrepresentations in which case that might give rise to the need to apply different tools and techniques in order to measure the impact of the misrepresentations on the share price.

Q. So I wasn't asking a hypothetical. I was asking what you did in the case so let me re-ask.

In forming the opinions set forth in paragraphs 89 through 95, did you do an analysis to

Page 57

15 (Pages 54 - 57)

866 299 5127

determine whether the alleged corrective disclosures, in fact, corrected the alleged misrepresentations?

A. Well, generally, I have not done an analysis of the corrective disclosures or what they corrected.

Q. In forming the opinions in paragraphs 89 through 95 of your report, did you do an analysis to account for the fact that there are two distinct sets of allegations which are the restatement claim and the marketing claim?

MR. WOOD: Objection; form.

A. Well, I have an understanding that those allegations are part of what has been alleged here. I have not formed an opinion as to what the impact of those two categories are, but that was not necessary for my opinions here in paragraphs 89 to 95.

Q. In forming the opinions in paragraphs 89 through 95 of your report, did you consider how you would separate the impact of the Google algorithm change and distinguish that from information that revealed to the market the alleged marketing fraud?

MR. WOOD: Objection; form.

A. I generally address that in the context of

Page 58

89 to 95. So, for instance, paragraph 92 I refer to tools and techniques that can be used to disaggregate information corresponding to -- which could correspond to a corrective disclosure or it could correspond to a misrepresentation.

Again, these are general valuation techniques that can be applied to value any -- any of the claims specifically or in aggregate.

Q. In forming your opinions, did you do an actual analysis to determine whether any of those techniques could be used to distinguish the impact of a Google algorithm change from information that revealed to the market the alleged marketing fraud?

MR. WOOD: Objection to form.

A. Well, I didn't do an analysis to determine that the tools can be used. The tools can be used because they are standard valuation and economic tools that are routinely used. But I think what you're suggesting is -- I haven't actually done the analysis.

Q. In forming the opinions in paragraphs 89 through 95 of your report, did you do an analysis to determine whether the tools mentioned could be used to disaggregate confounding information in the November 6, 2018, press release?

Page 59

MR. WOOD: Objection; form.

A. Well, you're going back to the phrase "did I do an analysis to determine." But again, these are standard economic and valuation tools that can be applied in this context and many other contexts.

So I'm not sure if you're asking whether I actually did the analysis and applied the tools, which I have not done that analysis. I have not attempted to quantify the impact of the alleged misrepresentations, but I -- I have an understanding of what the misrepresentations and corrective disclosures are. And I have an opinion that standard economic and valuation tools and techniques can be applied to measure those.

Q. In forming the opinions set forth in paragraphs 89 through 95 of your report, did you do an analysis to determine whether the techniques you mentioned could be used to disaggregate the confounding information in the April 16, 2019, press release?

MR. WOOD: Objection to form.

A. Is that the same question you just asked but --

Q. But as applied to the April 16, 2019, press release.

Page 60

A. Okay. And I think my answer is similar. These are standard economic and valuation tools that can be applied in any context, including with respect to the allegations related to that date.

Q. Have you done the actual analysis?

MR. WOOD: Objection to form.

A. I have not done the actual analysis.

Q. In coming up with your opinions that are in paragraphs 89 through 95 of your report, did you do any separate analysis as to plaintiff's scheme allegations?

MR. WOOD: Objection to form.

A. I have an understanding that there are allegations of a scheme in this case. As I testified earlier, I have not analyzed the impact of the allegations on the share price at this stage with respect to the scheme or any of the allegations.

(Exhibit 13 marked.)

Q. I have handed you what has been marked as Exhibit 13, which is the amended complaint in this case. If you want to take a minute to browse through it, just let me know when you're ready.

A. (Reviewed document.) Yeah, it's a fairly large complaint. I believe this is the document

Page 61

16 (Pages 58 - 61)

listed in my report, but I couldn't tell you for sure.

Q. What is the class period that's alleged in paragraph 1 of the complaint?

A. March -- let's see, sorry. Between March 8, 2017, and April 15, 2019, inclusive.

Q. Why didn't you use that as the class period for your analysis on market efficiency?

A. Well, I was asked to look at the period through November 5th.

Q. Do you have an understanding of why the class period alleged in the complaint is different from the class period you were asked to look at?

A. I don't know if I have a specific understanding. You know, I'm not -- I'm not the person that actually instructs me to perform an analysis so I don't know specifically. You would have to ask the people that instructed me to do the analysis.

Q. You said you don't know specifically.

Do you have a general understanding of why the class period alleged is different from the class period you were asked to look at?

MR. WOOD: I'm going to object to the form and instruct the witness not to reveal

Page 62

privileged conversations with counsel.

A. Yeah, I don't know how to answer that other than to tell you that I was instructed to look at the class period through November 5th.

Q. You don't have any other information on that?

MR. WOOD: Same objection and instruction.

A. Nothing I can speak to.

Q. Were you asked at the outset of your engagement to look at the period ending November 5, 2018, or did that instruction come in the middle of your analysis?

MR. WOOD: I'm going to object to the form and instruct the witness not to reveal privileged conversations with counsel.

A. I don't know how to answer that then.

MS. BUGNI: So one of the things we're allowed to inquire about is the assumptions he was given under the Federal Rules and this is an assumption he was given. I'm just asking when he was given it.

MR. WOOD: I disagree. I don't think it's an assumption. I think it's what he was asked to do. And I think what he was asked do is set forth

Page 63

in his report. So I think you're -- I think you're crossing the line into privileged discussions. And I think what he was asked to opine on is very clear and set forth in his report.

MS. BUGNI: It's also facts and data that were given to him which is another area of inquiry we're allowed to go into.

MR. WOOD: Now, I don't think it is. I don't think it's facts and data. I think you're -- I think it's different. I think it's -- you're asking a different question so I think I'm going to stand by my instruction.

MS. BUGNI: Okay. Fair enough. We can take that up at an appropriate time.

MR. WOOD: Okay.

Q. Nowhere in your report do you express an opinion as to price impact, correct?

A. Yeah, I think my opinions are pretty clear. I do not -- when you say price impact, I'm assuming you're referring to the impact of the alleged -- the statements, omissions and schemes on the price of the security.

Q. Yes, sir.

A. I have not quantified that.

Q. Have you performed any analysis of price

Page 64

impacts in this case?

A. Not at this time, no.

MS. BUGNI: That is all the questions I have for you, subject to whether plaintiff's counsel has questions.

MR. WOOD: I have no questions.

MS. BUGNI: Thank you for your time.

THE VIDEOGRAPHER: We're off the record at 11:51 a.m.

(Deposition concluded at 11:50 a.m.)

Page 65

17 (Pages 62 - 65)

THE STATE OF _____

COUNTY OF _____

Subscribed and sworn to before me by the said witness, W. SCOTT DALRYMPLE, on this the _____ day of _____, 2021.

_____
Notary Public in and for the
State of _____
County of _____
My commission expires: _____

_____
(Signature of the Witness)

Page 66

---

STATE OF TEXAS   )
COUNTY OF DALLAS )
   I, Michelle L. Munroe, Certified Shorthand Reporter in and for the State of Texas, certify that the foregoing deposition of W. SCOTT DALRYMPLE was reported stenographically by me at the time and place indicated, said witness having been placed under oath by me, and that the deposition is a true record of the testimony given by the witness;
   That the amount of time used by each party at the deposition is as follows:
   Ms. Bugni   -   1 hour, 47 minutes

   I further certify that I am neither counsel for nor related to any party in this cause and am not financially interested in its outcome.
   Given under my hand on this the 3rd day of September, 2021.

*Michelle L Munroe*
Michelle L. Munroe, CSR No. 6011
Commission expires 12-31-22
Firm Registration #571
VERITEXT LEGAL SOLUTIONS
300 Throckmorton Street, Suite 1600
Fort Worth, Texas  76102
817.336.3042  telephone

Page 67

---

Mr. Christopher M. Wood, Esq.

cwood@rgrdlaw.com

September 3, 2021

RE: INDIANA PUBLIC RETIREMENT SYSTEM vs. MICHAEL T. CARTWRIGHT

9/2/2021, W. SCOTT DALRYMPLE, JOB NO. 4753920

The above-referenced transcript has been completed by Veritext Legal Solutions and review of the transcript is being handled as follows:

__ Per CA State Code (CCP 2025.520 (a)-(e)) - Contact Veritext to schedule a time to review the original transcript at a Veritext office.

__ Per CA State Code (CCP 2025.520 (a)-(e)) - Locked .PDF Transcript - The witness should review the transcript and make any necessary corrections on the errata pages included below, notating the page and line number of the corrections. The witness should then sign and date the errata and penalty of perjury pages and return the completed pages to all appearing counsel within the period of time determined at the deposition or provided by the Code of Civil Procedure.

__ Waiving the CA Code of Civil Procedure per Stipulation of Counsel - Original transcript to be released for signature as determined at the deposition.

__ Signature Waived - Reading & Signature was waived at the time of the deposition.

Page 68

---

_x_ Federal R&S Requested (FRCP 30(e)(1)(B)) - Locked .PDF Transcript - The witness should review the transcript and make any necessary corrections on the errata pages included below, notating the page and line number of the corrections. The witness should then sign and date the errata and penalty of perjury pages and return the completed pages to all appearing counsel within the period of time determined at the deposition or provided by the Federal Rules.

__ Federal R&S Not Requested - Reading & Signature was not requested before the completion of the deposition.

Page 69

18 (Pages 66 - 69)

Case 3:19-cv-00407   Document 84-6   Filed 09/07/21   Page 19 of 19 PageID #: 1987