# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| INDIANA PUBLIC RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated, | ) ) ) ) | |
| Plaintiff, | ) ) | Civil Action No. 3:19-cv-00407 |
| vs. | ) ) | |
| MICHAEL T. CARTWRIGHT, KIRK R. MANZ AND ANDREW W. MCWILLIAMS, | ) ) ) | |
| Defendants. | ) ) | |

---

# EXPERT REBUTTAL REPORT OF
## W. SCOTT DALRYMPLE, CFA
## JUNE 13, 2022

---

# TABLE OF CONTENTS

**Page**

I. Introduction and Summary of Opinions ............................................................................ 1

II. Overview of the Zurek Report ....................................................................................... 2

III. Analysis of the Zurek Report ....................................................................................... 4

    A.      Dr. Zurek's opinion that the Restatement Claim did not impact AAC's stock price is unsupported by his analysis and ignores the economics of the claim .............................. 5

         1)      Dr. Zurek does not analyze the impact of alleged misstatements corresponding to the Restatement Claim on AAC's share price ................................................... 5

         2)      Dr. Zurek ignores evidence that the Restatement Claim did impact AAC's share price ....................................................................................... 7

         3)      Dr. Zurek's examination of purported corrective disclosures related to the Restatement Claim is unreliable and incomplete ............................... 13

         4)      The dates Dr. Zurek examines are not indicative of price impact during the Class Period .................................................................................. 16

    B.      Dr. Zurek's opinion that my damages methodology cannot measure damages consistent with Plaintiff's theories of liability is incorrect ..................................................... 18

         1)      Standard economic and valuation techniques can be applied to isolate inflation attributable to the claims at issue ........................................................ 19

         2)      Standard economic and valuation techniques can be applied to estimate inflation on each day of the Class Period and account for any relevant changes in inflation over time ....................................................................................... 23

IV. Further Work ............................................................................................................ 26


Case 3:19-cv-00407    Document 99-2    Filed 06/13/22    Page 2 of 40 PageID #: 2074



7250 Dallas Parkway
Suite 200
Plano, Texas 75024
+1.972.377.0300

1000 Louisiana Street
Suite 1150
Houston, Texas 77002
+1.713.457.3125

405 Lexington Avenue
Floor 9
New York, New York 10174
+1.212.364.1926

Re: Indiana Public Retirement System, Individually and on Behalf of All Others Similarly Situated ("Plaintiff")
v. Michael T. Cartwright, Kirk R. Manz and Andrew W. McWilliams (collectively, "Defendants")

### I.    Introduction and Summary of Opinions

1.    I previously submitted a report in this matter dated July 6, 2021 (the "Dalrymple Report") in which I reached the following conclusions:[1]

    a.    Shares of AAC traded during the Class Period in a semi-strong-form efficient market in which new information was reflected in the share price.

    b.    In a semi-strong efficient market, one may apply an event study in conjunction with other generally accepted methods to estimate the share price inflation, if any, that was attributable to, or was maintained by, Defendants' alleged scheme and/or misrepresentations and omissions throughout the Class Period.[2]  The share price inflation may be used, along with other widely accepted financial and economic methods, to arrive at damages for every member of the proposed class using a common technique that is grounded in Plaintiff's theory of liability.

2.    On September 7, 2021, Paul Zurek, Ph.D., issued an expert report in this matter (the "Zurek Report").  Dr. Zurek expresses no disagreement with my opinion that AAC common stock traded in a market that was semi-strong-form efficient during the Class Period, nor does he express any disagreement with the analyses I conducted in reaching that opinion.  Instead, Dr. Zurek offers two primary opinions in his report: (1) that allegations related to the Restatement Claim "did not have price impact on AAC's stock price during the Proposed Class Period;"[3] and (2) that I fail to "propose a damages methodology capable of measuring damages consistently with Lead Plaintiff's theory of liability."[4]

3.    Dr. Zurek's first opinion is drawn from erroneous conclusions based on his mis-specified examination of AAC's share price reaction to what he purports to be corrective information about the Restatement Claim, including a day on which AAC released information that misreported the impact of the

---

[1]  Defined terms in this report have the same meanings as used in the Dalrymple Report unless otherwise noted.

[2]  References to misrepresentations and misstatements in this report may refer generally to Plaintiff's allegations, including omissions and Defendants' alleged scheme.  My assessment of the impact of certain information on AAC's share price is not dependent on findings as to which of these or other legal definitions would apply to the information allegedly withheld or misstated.

[3]  Zurek Report, ¶ 9.  I understand that Plaintiff disputes Dr. Zurek's bifurcation of the allegations into separate claims related to a Restatement Claim and a Marketing Claim.  For ease of reference in responding to his opinions, I adopt this terminology but do not express an opinion on this issue.

[4]  Zurek Report, ¶ 12.



restatement to investors and did not correct previous misstatements. At the same time, Dr. Zurek fails to examine the impact of the alleged misstatements on AAC's share price at the time the misstatements were made during the Class Period, despite evidence that the alleged misstatements would have had a direct impact on the value of AAC's equity. As a result, Dr. Zurek's opinion that the Restatement Claim did not have an impact on AAC's share price is unreliable and irreconcilable to valuation principles.

4. Dr. Zurek's second opinion is based on mischaracterizations of my opinions. The methodology I set forth in the Dalrymple Report is based on standard techniques used in securities analysis and valuation, including economic and valuation techniques that may be applied to isolate and apportion the share price decline attributable to a corrective event when confounding information may be present or, more generally, to estimate the impact of specific information regardless of whether such information applies to only certain elements of a claim. The methodology I propose can easily accommodate findings and assumptions regarding whether and how inflation may have varied over the Class Period. I have used these same techniques to measure inflation and estimate the impact of allegedly concealed information throughout the relevant periods in numerous cases.

5. None of the issues or purported critiques of my damages methodology that Dr. Zurek raises affect my opinions in this matter, as set forth in the Dalrymple Report.

6. My credentials and qualifications are set forth in the Dalrymple Report. My current curriculum vitae is attached to this report as **Supplemental Appendix A**. A list of additional materials I have considered in my work for this matter as of the date of this report is contained in **Supplemental Appendix B**, as well as in the citations in the footnotes to the text in this report.

7. I will review, evaluate, and analyze additional data, facts, or information as they become available. I reserve the right to amend or supplement my opinions based upon further information learned, produced, or provided to me. The analyses and opinions described herein may, therefore, change based upon additional information that becomes available or other developments that occur.

## II. Overview of the Zurek Report

8. Dr. Zurek characterizes Plaintiff's claims as follows: "(a) 'Restatement Claim': 'Defendants made false and misleading statements about AAC's accounts receivable, leading to false financial statements that were ultimately revealed to investors through AAC's Restatement of its financial results for fiscal years 2016 and 2017 and the first three quarters [of] 2018;'"[5] "(b) 'Marketing Claim': 'Defendants engaged in a fraudulent and deceptive sales and marketing scheme and made false and misleading statements related to AAC's sales and marketing practices that were revealed to investors as the industry

---

[5] Zurek Report, ¶ 14, quoting Memorandum Opinion, Apr. 8, 2021, p. 2.



and Congress began to investigate and cast light upon such deceptive practices.'" [6]   On this basis, Dr. Zurek offers two opinions:

    a.    "*First*, from an economic standpoint, the Restatement Claim did not have price impact on AAC's stock price during the Proposed Class Period."[7]

    b.    "*Second*, Mr. Dalrymple does not propose a damages methodology capable of measuring damages consistently with Lead Plaintiff's theory of liability."[8]

9.    Dr. Zurek's first opinion, that the Restatement Claim did not impact AAC's stock price, is based on his examination of three purported corrective disclosure dates:

    a.    March 29, 2019: "…after market hours, [] the Company announced that it would restate its financials and provided preliminary estimates of the impact.  AAC's residual stock price return on April 1, 2019, (the first trading day after the information was released) was positive 13.2%, which is statistically significant at the 1% level."[9]

    b.    April 15, 2019: "…AAC publicly filed its Form 10-K for FY 2018 prior to market hours…This filing included the final impact of the restatement on AAC's financials. AAC's residual stock price return was positive 1.3% on that day, which is not statistically significant at conventional levels of significance."[10]

    c.    April 16, 2019: "…AAC issued a press release discussing, among other topics, its financial results and held a conference call…my review of this information shows that no new information regarding the restatement was disclosed…"[11]

10.    In support of his second opinion, that I do not propose a damages methodology capable of measuring damages consistent with Lead Plaintiff's theory of liability, Dr. Zurek asserts:

In particular, Mr. Dalrymple does not address (beyond mere generalities regarding 'widely accepted valuation and economic techniques') how he would account for (1) the mismatch between the contents of the alleged misrepresentations and the alleged corrective disclosures for the Marketing Claim, which means that price declines associated with the latter cannot be assumed to be a measure of inflation during the Proposed Class Period as Mr. Dalrymple is effectively assuming; (2) confounding information on November 6, 2018 (for the Marketing Claim), and on April 15 and 16, 2019, (for the Marketing and Restatement Claims); and (3) the lack of statistical significance of AAC's residual stock

---

[6]    Zurek Report, ¶ 14, quoting Memorandum Opinion, Apr. 8, 2021, pp. 2-3.
[7]    Zurek Report, ¶ 9.  Emphasis in original.
[8]    Zurek Report, ¶ 12.  Emphasis in original.
[9]    Zurek Report, ¶ 9.
[10]    Zurek Report, ¶ 10.
[11]    Zurek Report, ¶ 11.



price return on April 15, 2019, and the fact that information regarding the Restatement Claim was already disclosed previously in March 2019.[12]

11. Therefore, according to Dr. Zurek, "Mr. Dalrymple has failed to show that damages can be calculated on a class-wide basis in this litigation in a manner consistent with Lead Plaintiff's theory of liability for both the Marketing and Restatement Claims."[13]

### III. Analysis of the Zurek Report

12. The Zurek Report does not challenge my finding that AAC's stock traded in a market that was semi-strong form efficient during the Class Period, nor does it raise any critiques of the analyses I set forth in support of this conclusion, including my event study.[14]

13. With respect to his opinion regarding the impact of allegedly withheld information on AAC's share price, Dr. Zurek's opinions are limited to what he purports to be the Restatement Claim. He offers no opinion as to whether the Marketing Claim or Defendants' alleged scheme impacted AAC's share price. In particular, Dr. Zurek does not dispute that share price reactions following the alleged corrective disclosures on November 6, 2018 and April 16, 2019 are indicative of the Marketing Claim's price impact. In addition, Dr. Zurek does not examine other dates that may also be indicative of the Marketing Claim's price impact, including AAC's share price reaction to analyst reports on October 16, 2018 discussing the potential impact of changes to search engine algorithms that allegedly undermined AAC's ability to sustain its allegedly fraudulent and deceptive marketing practices and scheme.[15]

14. Dr. Zurek also does not directly dispute my opinion that damages in this case can be computed on a class-wide basis using widely accepted techniques to estimate the "difference between: (a) share price inflation associated with shares purchased at the time they were purchased; and, (b) share price inflation associated with shares sold at the time they were sold after one or more curative events."[16] Indeed, he does not even contend that damages in this matter cannot be computed on a class-wide basis;[17] rather, his critique is limited to assertions that I have not provided "proof" that inflation and damages can be computed.[18]

---

[12]   Zurek Report, ¶ 12.
[13]   Zurek Report, ¶ 13.
[14]   Zurek Report, ¶ 4.
[15]   William Blair, "Although Difficult to Define, Google Algorithm Change May Affect Near-Term Admission Growth, EBITDA Performance," Oct. 16, 2018; Raymond James, "Blame the Google - Lowering Estimates and Price Target on Lower Census Assumptions," Oct. 16, 2018. It is my understanding that Plaintiff contends that information contained in these reports is partially corrective of the alleged misrepresentations.
[16]   Dalrymple Report, ¶ 94.
[17]   *See, e.g.,* Zurek Dep., Jun. 1, 2022 ("Zurek Dep."), 114:20-115:8; 130:7-17; 133:8-18.
[18]   Zurek Report, ¶ 61.



15.     As set forth in the remainder of this report, both of Dr. Zurek's opinions rest on a series of erroneous and unfounded assertions, incomplete analysis, and flawed reasoning.  As a result, Dr. Zurek demonstrates neither a lack of price impact nor any reason that the methodology I propose could not be applied to compute damages on a class-wide basis.

**A.     Dr. Zurek's opinion that the Restatement Claim did not impact AAC's stock price is unsupported by his analysis and ignores the economics of the claim**

16.     According to Dr. Zurek, March 29 and April 15, 2019 are the only dates that "contained new value relevant information about the restatement."[19]  He points to a statistically significant and positive abnormal return following the March 29, 2019 disclosure as evidence that "AAC's stock price did not decline in response to the disclosure of new information about the Restatement Claim."[20]  Similarly, Dr. Zurek identifies a lack of a statistically significant abnormal return following the April 15, 2019 disclosure as "economic evidence that AAC's disclosure of the restatement did not impact its stock price."[21]  Finally, even though he acknowledges that AAC's share price reaction on April 16, 2019 was negative and statistically significant and that "there was discussion of the restatement" on this day, he asserts that "none of it represented new value-relevant information to which the market would react if it were efficient."[22]

17.     Dr. Zurek fails to examine the economics underlying Plaintiff's allegations and, instead, presents a flawed analysis in which he evaluates price movements only on what he contends to be the corrective disclosure dates associated with the Restatement Claim, but which do not actually reflect the impact of the withheld information on AAC's share price.  This leads Dr. Zurek to conclude, improperly, that AAC's share price would have been unaffected if the company had reported lower accounts receivables balances and higher cumulative net losses during the Class Period.

**1)  Dr. Zurek does not analyze the impact of alleged misstatements corresponding to the Restatement Claim on AAC's share price**

18.     Dr. Zurek acknowledges that the Restatement Claim relates to Defendants' alleged "'false and misleading statements about AAC's accounts receivable, leading to false financial statements that were ultimately revealed to investors through AAC's Restatement of its financial results for fiscal years 2016 and 2017 and the first three quarters [of] 2018.'"[23]  Thus, he appears to understand that AAC's alleged Restatement Claim misstatements occurred on each earnings release date (in addition to other dates)

---

19     Zurek Report, ¶ 47.
20     Zurek Report, ¶ 48.
21     Zurek Report, ¶ 50.
22     Zurek Report, ¶ 51.
23     Zurek Report, ¶ 14a, quoting Memorandum Opinion, Apr. 8, 2021, p. 2.



during the Class Period.[24]  Dr. Zurek also acknowledges that the price impact of misstatements on a share price can be measured at the time the misstatements are made or at the time the truth is revealed:

> In some circumstances, the price impact of information can be measured using the observed increase in the stock price at the time an alleged misrepresentation is made, assuming one can isolate the price movement that is specific to the alleged misstatement (i.e., one can account for any confounding information). In other circumstances, a price decline upon the revelation of the alleged truth can represent the price impact of information, again assuming that one can isolate the price movement specific to that revelation.[25]

19.     Thus, in order to support his assertion that the Restatement Claim did not affect AAC's share price, Dr. Zurek would have needed to demonstrate (in addition to other findings) that the alleged misstatements: 1) did not cause AAC's share price to increase, or decline by less than it otherwise would have, on the dates of the misrepresentations; and 2) did not cause AAC's share price to decline when the relevant truth was revealed.  Yet Dr. Zurek does not examine even a single date in the Class Period on which the misrepresentations allegedly occurred.  Instead, he chooses to examine only dates on which he contends the misrepresentations were corrected:

> In the present case, the existence of inflation associated with the Restatement Claim (i.e., whether or not there was price impact) can best be analyzed by examining the observed price movement in AAC's stock price when information about the restatement was made available to the market, including the information Lead Plaintiff alleges was corrective.[26]

20.     Dr. Zurek's approach is unscientific and unsupportable.  In order to support his conclusion that the alleged misstatements did not have an impact on AAC's share price, Dr. Zurek would need to examine both the alleged misstatement dates and the corrective disclosure dates (in conjunction with other evidence) in order to show a lack of price impact.

21.     When asked at deposition why he did not consider the alleged misstatement dates, Dr. Zurek contended that limiting his analysis to purported corrective disclosure dates is "the best, most direct and most appropriate…approach" and, in his view, "a sufficient condition for establishing as an economic matter that there was no price impact."[27]  This is wrong.  While examining inflation on the subset of days that Dr.

---

[24]   Consolidated Complaint, § V.B.
[25]   Zurek Report, ¶ 58.
[26]   Zurek Report, ¶ 36.  Emphasis added.
[27]   Zurek Dep., 38:22-39:18.  Emphasis added.



Zurek considers may be *necessary* to demonstrating a lack of price impact, it is not "*sufficient*," as he claims.[28] His reasoning is flawed as a matter of simple logic.

22.    As set forth in the Dalrymple Report, AAC's share price reactions corresponding to four of its earnings dates during the Class Period, each of which included alleged misstatements, were positive and statistically significant (at five percent).[29] Despite acknowledging that "the price impact of information can be measured using the observed increase in the stock price at the time an alleged misrepresentation is made," Dr. Zurek does not even investigate the extent to which the alleged misstatements might have caused AAC's share price to increase;[30] as a result, for instance, Dr. Zurek effectively *assumes* that AAC's stock would have experienced the *same positive and significant abnormal returns* throughout 2017 even if it had disclosed accounts receivable balances that were *lower by more than $30 million*.[31] Similarly, on the other misstatement dates during the Class Period, Dr. Zurek fails to investigate whether the alleged misstatements prevented AAC's share price from declining by less than it otherwise would have (had the correct information been reported).

23.    Notwithstanding his claim that price impact is "best" analyzed at the time the truth is revealed, I unaware of any economic reasoning that would support Dr. Zurek's one-sided approach. Even setting aside the numerous other flaws underlying his analysis, Dr. Zurek's opinion that the Restatement Claim did not affect AAC's share price is fatally flawed and unreliable since he does not even examine the dates in the Class Period on which the alleged misstatements were made.[32]

### 2)    Dr. Zurek ignores evidence that the Restatement Claim did impact AAC's share price

24.    The impact of the Restatement Claim on AAC's financial statements would have been to substantially reduce the company's accounts receivable balances while significantly increasing the magnitude of its net losses. By failing to examine the effects of these adjustments at the time the alleged

---

[28]    I note that Dr. Zurek also explained that his decision to ignore misstatement dates in his price impact analysis avoided "additional steps" of identifying confounding information. Zurek Dep., 47:10-48:19.

    Q.    You [assess price impact] more directly by – by doing what the quote in your report refers to as an indirect analysis?

    A.    In this case -- in this case, yes. Because <u>doing it directly on these days of – of the misstatements would require a number of additional steps</u> that are just not necessary, given that it's one of the relatively rare instances where I don't think there's a mismatch. And I think when the information ultimately does come out, it is a direct metric of what the market -- how the market would have reacted to an earlier disclosure. Zurek Dep., 48:9-19. Emphasis added.

    While ignoring the alleged misstatement dates may have avoided "additional steps," this is not an economic justification for failing to perform the analysis.

[29]    Plaintiff's allegations that the alleged misstatements caused the stock price to be inflated during the Class Period do not require the share price to increase in response to misstatements, since it is possible that the misstatements maintained AAC's share price by maintaining previous expectations. Thus, while a lack of price increase (or attenuated price decrease) may be *necessary* to infer a lack of price impact, it is *not sufficient* to demonstrate a lack of price impact.

[30]    Zurek Report, ¶ 58.

[31]    Dalrymple Report, Exhibit 1; *infra* Table 1.

[32]    Furthermore, as I explain below, the dates Dr. Zurek examines are not representative of the price impact of the alleged misstatements during the Class Period. *See infra* §§ III(A)(3) and III(A)(4).



misstatements were made, Dr. Zurek ignores evidence that these adjustments would have had a direct impact on AAC's share price during the Class Period.

### (a) Accounts Receivable

25. According to Dr. Zurek, even though AAC overstated its accounts receivable balances during the Class Period, the company's share price would have been unaffected if the company had not made these misstatements. Such a conclusion is incompatible with economic and valuation principles and defies common sense. The magnitude by which AAC overstated its accounts receivable balance throughout the Class Period is evidence of the Restatement Claim's price impact, which Dr. Zurek ignores.

26. As Dr. Zurek stated in this report, "[a]n important feature of securities that are traded in efficient markets is that security prices equal the sum of discounted expected future cash flows based on the market's assessment of publicly available information."[33] Dr. Zurek also acknowledged at his deposition that accounts receivable are current assets;[34] current assets are those assets that the company expects to convert into cash within a year.[35] Therefore, a reduction in reported accounts receivable (all else equal) indicates that the company has fewer assets that it expects to convert into cash within the year. Dr. Zurek inexplicably fails to account for this basic relationship between the cash that AAC could have been expected to collect and the company's share price, which is direct evidence of the Restatement Claim's price impact.

27. AAC's accounts receivable overstatement was not immaterial. As set forth in **Table 1**, the Restatement Claim relates to misstatements that resulted in AAC's account receivable balance being overstated by up to almost 90% during the reporting periods at issue during the Class Period.

**Table 1.    AAC Accounts Receivable Restatement (Millions)[36]**

|  | Q4-16 | Q1-17 | Q2-17 | Q3-17 | Q4-17 | Q1-18 | Q2-18 | Q3-18 |
|---|---|---|---|---|---|---|---|---|
| Previously Reported | $87.3 | $94.1 | $96.5 | $92.5 | $94.1 | $99.6 | $97.4 | $94.6 |
| **Adjustment** | (41.3) | (39.1) | (35.9) | (33.6) | (30.4) | (27.6) | (26.3) | (34.7) |
| Restated | $46.0 | $55.0 | $60.6 | $58.9 | $63.7 | $72.0 | $71.1 | $59.9 |
| *Overstatement Pct.* | *89.8%* | *71.1%* | *59.2%* | *57.0%* | *47.7%* | *38.3%* | *37.0%* | *57.9%* |

---

[33] Zurek Report, ¶ 25, citing Brealey, Myers, and Allen (2014), p. 328 ("[I]n an efficient market it is not possible to find expected returns greater (or less) than the risk-adjusted opportunity cost of capital. This implies that every security trades at its fundamental value, based on future cash flows…and the opportunity cost of capital.")

[34] Zurek Dep., 52:20-24.

[35] *See, e.g.,* "Current Assets," *CFA Program Glossary,* https://www.cfainstitute.org/en/programs/cfa/curriculum/glossary#q=Current%20 assets.

[36] AAC Holdings, Inc. Form 10-K for period ending Dec. 31, 2018, p. F-11, F-43 – F-48.

 **bva**group®

28.     To put the accounts receivable overstatement in perspective, AAC's total market capitalization was less than $175 million at the time that the Q1-17 results were reported.[37]  During the Class Period, accounts receivable represented the majority of AAC's current assets.[38]  From a valuation perspective, the accounts receivable overstatement directly overstated the company's net worth to shareholders.  In other words, writing down the accounts receivable balance during the Class Period would have indicated to shareholders that the company's expected cash collections over the next year would be tens of millions of dollars lower.  To suggest that AAC's share price would have been the same irrespective of whether the company reported, for instance, an accounts receivable balance of $94 million or $55 million is wholly unsupportable.[39]

29.     Dr. Zurek attempts to re-frame the issue by suggesting that AAC's accounts receivable overstatements would somehow have had an indeterminate effect on the share price at the time of the misstatements:

> …the restatement resulted in changes that decreased net income (relative to originally reported figures) in some periods but increased it in others; it had no effect on reported operating cash flows.  Furthermore, to the extent that the restatement negatively affected accounts receivable, revenue, and net income in some periods, it positively affected cash collection metrics, such as days sales outstanding ("DSO").  Therefore, given that reported operating cash flows were not affected, net income increased in some periods and decreased in others, and cash collection metrics were affected as well, the overall effect of the restatement on the market's assessment of expected future cash flows, which would affect AAC's stock price and therefore inflation, cannot be immediately determined based on the nature of the restatement itself. However, the market's assessment of the effect can be determined by examining AAC's stock price movement when information about the restatement was disclosed.[40]

30.     Dr. Zurek's suggestion that market participants may have viewed a reduction in AAC's accounts receivable balance (on the order of tens of millions of dollars) as *potentially positive* because it mechanically improved the company's cash collection metrics (DSO) defies logic and common sense.  Investors would have understood that the reason for the reduction in DSO is not because AAC had improved the rate at which it collected receivables; rather, it would be because there were *significantly fewer receivables to collect* and, therefore, *less expected cash available to shareholders*.

31.     In his deposition, Dr. Zurek continued to confuse the issue, suggesting that there is some level of "complexity" in assessing whether the share price would have been negatively affected if AAC had reported a lower accounts receivable balance:

---

[37]  AAC reported it had 24,071,969 shares outstanding as of April 28, 2017.  AAC Form 10-Q, Mar. 31, 2017.  AAC's closing share price on April 28, 2017 was $7.16.

[38]  AAC Form 10-K for period ending Dec. 31, 2018, p. F-11 and F-43 – F-48.

[39]  Dr. Zurek confirmed at his deposition that he did not analyze the valuation impact of any "specific number" reported on AAC's balance sheet.  Zurek Dep., 76:9-22.

[40]  Zurek Report, ¶ 36.



Q. So generally speaking, wouldn't you expect the company with, say, $100 million dollar of accounts receivable as current assets to have more expected cash flows than a company with no accounts receivable in their current assets, all other things being equal?

A. <u>No. I -- I think it really depends on historical trends</u> and -- and what you see happening with accounts receivable over time. You can look at various collection metrics, such as the sales outstanding, which measures on average how long it takes to collect revenue.

And -- and so it -- it's not as simple as that. And that's why -- but I'm not saying it doesn't matter. I'm just saying it's -- there's complexity there, and the best way to cut through that complexity is to see how the market reacted when the information was ultimately revealed.

Q. What's the complexity? It seems -- it seems simple to me that if there's -- if a company has more assets that it's expecting to collect in the near future, then, everything else being the same, that's a good thing.

A. Well, not necessarily. Because the market can be discounting those based on the historical collection metrics; right? You can have a set of circumstances where accounts receivables is growing over time, and <u>the market may be discounting some of that</u>.[41]

32. While it is possible that market participants' perception of "historical trends" may have affected the *degree* of price impact (though Dr. Zurek does not support this speculation or explain why such an investigation would be "complex"), there is no economic basis to conclude that AAC's significant accounts receivable overstatement did not affect the company's share price *at all*.[42]

33. Similarly, Dr. Zurek's claim in his report that "the overall effect of the restatement on the market's assessment of expected future cash flows…cannot be immediately determined based on the nature of the restatement itself" is misplaced.[43] Even if investors would have understood that AAC had generated the same level of historical operating cash flow in the counterfactual, they also would have understood the reason for this was that receivables were uncollectable, as opposed to slower to collect.[44] While Dr. Zurek may contend that investors placed a discount on AAC's reported accounts receivable balance, he presents no evidence that such a discount would approach the actual misstatement of more than $26 million to $41 million.[45]

---

[41] Zurek Dep., 53:13-54:16. Emphasis added; objection omitted.

[42] Accounts receivable balances are reported net of allowances for losses from uncollectible receivables, which are both probable and reasonably estimable. *See, e.g.,* Elaine Henry and Thomas R. Robinson, "Understanding Balance Sheets," 2022 CFA Program, Level I, Reading 18, 2019, p. 10. Thus, properly reported, net balances of accounts receivable should not have significant uncertainty as to collection and would not need to be "discounted" as Dr. Zurek speculates.

[43] Zurek Report, ¶ 36.

[44] Indeed, Dr. Zurek's observation that "[a]nalysts commented on AAC's DSO" (Zurek Report, footnote 49) only underscores the evidence that market participants viewed AAC's inflated accounts receivable balance as an operational issue, not as an indication that the company's accounts receivable were significantly overstated (as turned out to be the case).

[45] *See* **Table 1**. As a corollary, if two companies are expected to generate the same expected earnings and are otherwise identical except that Company A has $100 million more in cash than Company B, then the equity value of Company A would be higher than that of Company B (all else equal). *See, for instance,* Shannon P. Pratt, *Valuing a Business: The Analysis and Appraisal of Closely Held Companies* (5th ed. 2008), pp. 88-89.

 bvagroup®

### (b) Earnings

34. Dr. Zurek also contends that "net income increased in some periods and decreased in others."[46] He concludes that "given that reported operating cash flows were not affected, net income increased in some periods and decreased in others, and cash collection metrics were affected as well, the overall effect of the restatement on the market's assessment of expected future cash flows, which would affect AAC's stock price and therefore inflation, cannot be immediately determined based on the nature of the restatement itself."[47] Notably, Dr. Zurek refers to inflation in AAC's share price (*i.e.,* the *degree* to which the Restatement Claim affected AAC's share price), but not whether the Restatement Claim did or did not have an impact on AAC's share price (*i.e.,* the *existence* of price impact).

35. As previously discussed, Dr. Zurek's observations that "operating cash flows were not affected" and "cash collection metrics were affected" are inapt and ignore the relationship between accounts receivable and AAC's equity value.[48] Similarly, his suggestion that "net income increas[ing] in some periods and decreas[ing] in others" would somehow render the overall impact of the Restatement Claim ambiguous is also unsupportable.[49] The cumulative impact of AAC's restatements on net income was negative throughout the Class Period.[50] As AAC reported when it restated its financial statements:

> The adjustments resulted in an estimated increase to net income of approximately $7.7 million for the year ended December 31, 2017. The adjustments also resulted in an estimated decrease of net income of approximately $20.6 million for the year ended December 31, 2016. Periods prior to 2016 were also impacted as a result of the adjustments, resulting in an estimated cumulative effect adjustment of approximately $23.8 million, recorded as a reduction to stockholders' equity on the balance sheet as of January 1, 2016. The adjustments did not affect the previously reported cash flows from operating activities.[51]

36. Thus, as shown in **Table 2**, for the three year period from 2016 to 2018 (which corresponds to the alleged misstatements corresponding to the Restatement Claim), AAC reported that it had earned approximately $20.9 million *less*, a nearly 60 percent increase from the total of its previously reported (misstated) net losses during the Class Period.[52]

---

[46]  Zurek Report, ¶ 36.

[47]  Zurek Report, ¶ 36.

[48]  Zurek Report, ¶ 36. Dr. Zurek seems to imply that investors' expectations of future cash flows to equity would have been unaffected by the Restatement Claim because "operating cash flows were not affected." This reasoning is flawed, as investors do not look exclusively to operating cash flow while ignoring indications of a company's ability to generate earnings (as measured by net income and other measurements of earnings) and convert assets to cash (as measured by accounts receivable in addition to other elements of a company's financial statements).

[49]  Zurek Report, ¶ 36.

[50]  I note that Dr. Zurek presents this same information in Exhibit 3 of the Zurek Report yet fails to recognize that the cumulative impact of the adjustments on net income was always negative.

[51]  AAC Form 10-K for period ending Dec. 31, 2018, p. 3.

[52]  *See* **Table 2**. This excludes any effect of the $23.8 million decrease to previously reported net income attributable to periods prior to 2016.



**Table 2. AAC Cumulative Net Income/(Loss) from 2016 to 2018 (Millions)[53]**

| | FY-16 | Q1-17 | Q2-17 | Q3-17 | Q4-17 | Q1-18 | Q2-18 | Q3-18 |
|---|---|---|---|---|---|---|---|---|
| *Net Income/(Loss)* | | | | | | | | |
| Previously Reported | ($0.6) | ($0.6) | ($1.9) | $0.8 | ($18.8) | ($0.2) | ($3.0) | ($11.5) |
| Adjustment | (20.6) | 0.9 | 3.1 | 1.1 | 2.7 | 1.3 | 1.4 | (10.7) |
| Restated | ($21.2) | $0.3 | $1.1 | $1.8 | ($16.1) | $1.1 | ($1.6) | ($22.2) |
| | | | | | | | | |
| *Cumulative Net Loss* | | | | | | | | |
| Previously Reported | ($0.6) | ($1.2) | ($3.1) | ($2.3) | ($21.2) | ($21.4) | ($24.4) | ($35.9) |
| **Cumulative Adjustment** | **(20.6)** | **(19.8)** | **(16.7)** | **(15.6)** | **(12.9)** | **(11.7)** | **(10.3)** | **(20.9)** |
| Restated | ($21.2) | ($20.9) | ($19.8) | ($18.0) | ($34.1) | ($33.0) | ($34.6) | ($56.8) |
| ***Percent Increase in Net Loss over Previously Reported Net Loss*** | | | | | | | | ***58.4%*** |

37.  The implausibility of Dr. Zurek's opinion is clear from the beginning of the Class Period. In the counterfactual, AAC would have reported a net loss in FY 2016 of $0.93 per share instead of a net loss of only $0.03 per share.[54] Yet according to Dr. Zurek, the Restatement Claim had no price impact, such that AAC's share price would have been the same, regardless of whether the company reported a loss $0.93 per share or $0.03 per share. Such a conclusion collapses under even a basic level of economic scrutiny.

38.  Dr. Zurek's suggestion that the Restatement Claim relates to timing issues, or that it somehow indicates that the company may have been overly conservative by understating net income in select periods, ignores the context of the alleged fraud in which AAC unequivocally overstated earnings for the periods reported during the Class Period.[55] While net income in certain periods may have been higher in isolation, the cumulative impact on net income was always negative.[56] From the perspective of investors forming expectations about future earnings based on current and historical performance reported during the Class Period, it is difficult to imagine a scenario in which AAC's perceived ability to generate earnings would have been the same in the counterfactual on every day of the Class Period.[57] Dr. Zurek's suggestion

---

[53]  AAC Holdings, Inc. Form 10-K for period ending Dec. 31, 2018, p. F-10 – F-11, F-37 - F-42.

[54]  Based on AAC's restated net loss of $21.2 million and previously reported net loss of $0.6 million divided by 22.7 million weighted-average common shares outstanding. *See* AAC Form 10-K for period ending Dec. 31, 2016, p. 30.

[55]  I note that Defendants presented similar assertions in their Motion to Dismiss. ("The Restatement was not entirely negative – it resulted in increases to net income for fiscal year 2017 and the first two quarters of 2018. The fact that the Restatement resulted in increases to net income for certain periods demonstrates that there was no fraud here. No executive would intentionally understate net income." *See* Memorandum of Law in Support of Defendants' Motion to Dismiss Plaintiff's Amended Complaint, Feb. 12, 2020, p. 1.

[56]  Although the restatement had the effect of increasing reported net income in 2017 by $7.7 million and in the first two quarters of 2018 by $2.7 million, these effects are more than offset by substantial reductions in net income reported in 2016 (decrease of $20.6 million) and prior periods (decrease of $23.8 million), and in the third quarter of 2018 (decrease of $10.7 million). *See* **Table 2**.

[57]  For instance, at the beginning of the Class Period, AAC's net income for the previous year would have been more than $20 million lower.



that one cannot assess price impact on the alleged misstatement dates because investors might have reacted mechanically to each quarter's lower or higher net income (while ignoring AAC's overall diminished ability to generate earnings) is unfounded and at odds with the economics underlying the allegations.

39.    The reduction in AAC's earnings associated with the Restatement Claim is further evidence of price impact, which Dr. Zurek ignores.  While he contends that determining the *degree* of share price inflation at the time of each alleged misstatements involves "complexity," Dr. Zurek presents no economic basis for concluding there was *no price impact* from the alleged misstatements at the time they were made. In the semi-strong form efficient market in which AAC's stock traded, which Dr. Zurek does not dispute, a reduction in the company's perceived ability to generate earnings would be expected to reduce its share price.  Dr. Zurek's opinion that the Restatement Claim did not affect AAC's share price during the Class Period is irreconcilable to this basic economic principle.

### 3)    Dr. Zurek's examination of purported corrective disclosures related to the Restatement Claim is unreliable and incomplete

40.    Rather than examining the price impact at the time of the alleged misstatements, Dr. Zurek limits his analysis to AAC's share price reaction on three days that occurred after the end of the Class Period, when investors would have understood many of the problems AAC allegedly concealed during the Class Period. [58]  Moreover, in the case of March 29, 2019, AAC did <u>not</u> even disclose that the restatement would have a negative impact on AAC's net income after 2016.

41.    The restatement adjustments that AAC estimated on March 29, 2019 were significantly more positive than the adjustments that the company actually made on April 15, 2019.  In its 8-K dated March 29, 2019, the company predicted that the restatement would have a *positive* impact on net income of approximately $12.6 million for the three year period from 2016 to 2018:

> The adjustments will result in <u>estimated increases to net income of approximately $11.8 million and $14.3 million, for the nine months ended September 30, 2018 and the year ended December 31, 2017, respectively</u>. The adjustments will also result in an <u>estimated decrease of net income of approximately $13.5 million for the year ended December 31, 2016</u>. Periods prior to 2016 will also be impacted as a result of the adjustments, which will result in an estimated cumulative effect adjustment of approximately $24.7 million, recorded as a reduction to stockholders' equity on the balance sheet as of January 1, 2016. The adjustments will not affect the previously reported net operating cash flows.[59]

---

[58]    As I discuss in § III(A)(4), AAC's financial condition deteriorated significantly between the Class Period and the purported corrective disclosures that Dr. Zurek examines.  More generally, as discussed in §§ III(A)(1) and III(A)(2), the question is not simply whether AAC's share price reaction to those disclosures was negative, but whether the evidence indicates that AAC's share price would have been lower if investors had understood the company's true financial performance during the Class Period.

[59]    AAC Form 8-K, Mar. 29, 2019.  Emphasis added.



42.      Instead, on April 15, 2019, AAC reported a net income adjustment of *negative* $20.9 million for this same period.  As a result, AAC's actual restatement adjustments on April 15, 2019 increased net loss adjustments by $33.5 million relative to what the company had estimated on March 29, 2019, as summarized in the following table:

**Table 3.      AAC Estimated versus Actual Net Income Restatement from 2016 to 2018 (Millions)** [60]

|  | FY 2016 | FY 2017 | Q1-Q3 2018 | Total |
|---|---|---|---|---|
| Estimated Net Income Adjustment (March 29, 2019) | ($13.5) | $14.3 | $11.8 | $12.6 |
| Actual Net Income Adjustment (April 15, 2019) | (20.6) | 7.7 | (8.0) | (20.9) |
| **Actual to Estimated Variance** | **($7.1)** | **($6.6)** | **($19.8)** | **($33.5)** |

43.      While the significant gap between AAC's estimated and actual restatement is apparent in Exhibit 3 of the Zurek Report, Dr. Zurek does not address it, even though March 29 and April 15, 2019 are the only two dates on which he contends that AAC made corrective disclosures related to the Restatement Claim.  Instead, he is satisfied with the superficial observation that AAC's abnormal return was positive and significant in response to the incorrect (and unduly positive) restatement estimate on March 29, 2019:

> AAC's residual return on April 1, 2019, was positive 13.2%, and statistically significant at the 1% level.   Since <u>I identified no confounding information (i.e., company-specific information that was not about the restatement</u>) released after market hours on March 29, 2019, through end of market hours on April 1, 2019, I conclude that AAC's stock price did not decline in response to the disclosure of new information about the Restatement Claim.[61]

44.      Dr. Zurek's conclusion that there was no confounding information associated with the March 29, 2019 disclosure is wrong.  The information the company released to the market was incorrect, not corrective.  Thus, AAC's share price reaction was "confounded" by the error in AAC's prediction about the impact of the restatement, which turned out to be significant.

45.      Having erroneously concluded that AAC's share price reaction to the March 29, 2019 disclosure is probative of the Restatement Claim's price impact, Dr. Zurek fails to consider the likelihood that the share price reaction he observes on April 1, 2019 was in response to AAC's incorrect (and unduly positive) estimate of the restatement adjustments, not the corrective information about the Restatement Claim.  At his deposition, Dr. Zurek conceded that a company's announcement of a positive net income restatement could have a positive impact on its share price, yet offered no explanation for why he examined AAC's share price reaction on a day when the information about the Restatement Claim was misreported as having

---

[60]      AAC Form 10-K for period ending Dec. 31, 2018; AAC Form 8-K, Mar. 29, 2019.
[61]      Zurek Report, ¶ 48.



a positive (rather than negative) effect on net income.[62]  As a matter of economics and common sense, Dr. Zurek's examination of AAC's share price reaction following the non-corrective disclosure on March 29, 2019 cannot support his opinion of no price impact during the Class Period.

46.    By the time AAC released the actual restatement on April 15, 2019, Dr. Zurek simply assumes that investors would have fully understood the impact of the economics underlying the restatement on the company's performance going forward.[63]  Without commentary or context from the company, which was provided the next day, Dr. Zurek has no basis to assume that investors understood the extent to which AAC's restated financial results were indicative of future performance.

47.    Dr. Zurek does not address this, nor does he attempt to disaggregate the impact of the Restatement Claim from the other information in AAC's 10-K released on April 15, 2019.  Instead, he summarily concludes that "AAC's reported financial results were below analyst expectations" and "[t]herefore, this other information is not effectively confounding (i.e., it is not information that could lead me to erroneously conclude that information about the Restatement Claim did not cause AAC's stock price to decline)."[64]  Such a superficial observation cannot support Dr. Zurek's conclusion that the abnormal return on April 15, 2019 is indicative of the Restatement Claim's impact on AAC's share price.

48.    Relatedly, Dr. Zurek misconstrues the share price reaction to the alleged corrective disclosure on April 16, 2019, concluding that the information does not contain new value-relevant information about the Restatement Claim.  While AAC may not have released additional restated financial information on that day, Dr. Zurek does not consider the likelihood that the impact of AAC's reduced guidance on that day would have been mitigated if AAC had disclosed the correct financial results during the Class Period.  In particular, the guidance released on April 16, 2019 would have confirmed that the company's ability to generate earnings going forward was substantially lower, an expectation that investors may have been able to form during the Class Period if the correct financial information had been disclosed.[65]

49.    Even if Dr. Zurek were able to show that the alleged corrective disclosure on April 16, 2019 did not reveal additional information about the Restatement Claim, which he does not, such a finding would be insufficient to support his conclusions since he cannot demonstrate that the Restatement Claim did not affect AAC's share price during the Class Period.[66]  Setting aside his failure to examine the alleged

---

[62]    Zurek Dep., 86:1-87:7.

[63]    Zurek Report, ¶ 49.  Dr. Zurek's characterization of the disclosure on April 15, 2019 as containing "additional information regarding the restatement" is misleading to the extent that the March 29, 2019 disclosure indicated that the restatement would have a positive, rather than a negative, impact on net income.

[64]    Zurek Report, ¶ 49.

[65]    Dr. Zurek also does not analyze the two-day window from April 15 to April 16, 2019, during which AAC experienced a cumulative abnormal return of approximately 13 percent, which is significant at the five percent level.

[66]    *See supra*, §§ III(A)(1) and III(A)(2).



misstatement dates or any other dates within the Class Period, the dates that Dr. Zurek does examine do not support his conclusion that the Restatement Claim did not have an impact on AAC's share price.

### 4) The dates Dr. Zurek examines are not indicative of price impact during the Class Period

50. In his report, Dr. Zurek attempts to support his assessment of the Restatement Claim's price impact during the Class Period based solely on AAC's share price reactions in April 2019, stating:

> It may not always be possible to determine price impact at an earlier time by looking at the price reaction when corrective information is revealed if there is a change in circumstances or a mismatch between the information revealed and a hypothetical earlier disclosure (See Section VII.A for more detailed discussion). However, based on my review of the circumstances in the present matter, there is no reason to conclude that this would apply here.[67]

51. In reality, AAC's circumstances changed dramatically between the Class Period (when the stock traded between $5 and $13 per share) and the dates that Dr. Zurek tests in April 2019 (when the stock traded at around $2 per share). AAC's share price deterioration between the end of the Class Period and April 2019 suggests that market participants were increasingly pessimistic about the company's prospects, such that one cannot simply assume, as Dr. Zurek does, that inferences drawn from share price reactions in April 2019 are indicative of share price inflation during the Class Period.[68]

52. By the time AAC provided its initial (and incorrect) estimate of the impact of the Restatement Claim on March 29, 2019, the company had already delayed its 10-K filing (which it had historically released in February), finally disclosing on March 19, 2019 that:[69]

> AAC Holdings, Inc. (the "Company") has determined that it is not able to file its Annual Report on Form 10-K for the fiscal year ended December 31, 2018 (the "Form 10-K") by the prescribed due date without unreasonable effort or expense. <u>The Company is conducting an analysis of its estimates of accounts receivable, including its client-related diagnostic services accounts receivable.</u> The Company expects to file the Form 10-K within the extension period of 15 calendar days as provided under Rule 12b-25 under the Securities Exchange Act of 1934, as amended.[70]

53. Thus, by April 2019, market participants may already have had reason to suspect that AAC's prior reporting of its accounts receivable was inaccurate, such that abnormal returns on the dates that Dr. Zurek tests would have only partially reflected the impact of the Restatement Claim after AAC's financial

---

[67] Zurek Report, fn 46.

[68] For instance, Dr. Zurek does not dispute Plaintiffs' allegations that the share price during the Class Period was inflated due to false and misleading statements related to the Marketing Claim and that corrective information released on November 6, 2018 corresponded with a decline in AAC's share price of approximately 44 percent.

[69] AAC filed its Form 10-K for the year ended December 31, 2017 on February 23, 2018.

[70] AAC Form 12b-25, Mar. 19, 2019. Emphasis added.



condition had already deteriorated significantly relative to the Class Period.[71]  Indeed, the deterioration in AAC's financial condition was apparent in the company's March 13, 2019 8-K, in which AAC provided certain operating and balance sheet metrics for Q4 2018.  In addition, AAC announced multiple indications of financial distress, stating that it had:

    a. "enacted a series of cost savings initiatives during the fourth quarter for 2018 and into the first quarter of 2019 which is expected to result in over $30 million of annualized cost savings." [72]

    b. "commenced a process to explore strategic alternatives to generate additional value from its real estate portfolio consisting of treatment centers located across the United States."[73]

    c. entered into a $30 million credit facility ($23 million after fees, costs, and other expenses) bearing an interest rate of LIBOR plus 11 percent.[74]

    d. "postponed its conference call scheduled for March 13, 2019 as the Company requires additional time to complete the consolidated financial statements for the year ended December 31, 2018."[75]

54.  Dr. Zurek conceded at his deposition that he had not considered these developments, nor had he considered the fact that S&P downgraded AAC's credit rating in March 2019.[76]  More generally, Dr. Zurek has presented no analysis in support of his assumption that there was not a "change of circumstances" with regard to AAC's financial condition.[77]

55.  Clearly, by the time that AAC released its restated financial information, investors were aware of other information that indicated that the company was potentially in a dire financial condition, such that the actual restated financial information cannot be assumed to have the same impact on expectations as it would have if it had become known during the Class Period.  As a result, Dr. Zurek's analysis of share price reactions to AAC's disclosures in March and April 2019 are not indicative of inflation in the share price during the Class Period, when AAC's financial condition was more stable.

---

[71]  Dr. Zurek also ignores that AAC's share price fell by nearly 30 percent in March 2019 alone, from $2.55 on February 28, 2019 to $1.84 on March 29, 2019.

[72]  AAC Form 8-K, Mar. 13, 2019, Ex. 99.1.

[73]  AAC Form 8-K, Mar. 13, 2019, Ex. 99.1.

[74]  AAC Form 8-K, Mar. 13, 2019.

[75]  AAC Form 8-K, Mar. 13, 2019, Ex. 99.1.

[76]  Zurek Dep., 58:10-65:6.

[77]  Zurek Report, fn 46.  Dr. Zurek suggests that he understands "[my] opinion…to be that one can measure inflation [associated with the Restatement Claim] by looking at the price decline when corrective information comes to light."  *See* Zurek Dep., 64:6-65:6.  As is clear from my report and testimony in this matter, I have not estimated share price inflation and therefore have not selected a specific technique, or set of techniques, by which to measure it.



**B. Dr. Zurek's opinion that my damages methodology cannot measure damages consistent with Plaintiff's theories of liability is incorrect**

56. In the Dalrymple Report, I explain how damages can be measured for every member of the proposed class using a common technique that is grounded in Plaintiff's theory of liability.[78] While Dr. Zurek does not contend that damages in this matter cannot be computed on a class-wide basis, he contends that I "do[] not propose a damages methodology capable of measuring damages consistently with Lead Plaintiff's theory of liability."[79]

57. Although he acknowledges that class-wide damages may be computed "based on market prices (the actual price and a hypothetical market price that would have prevailed in the absence of the alleged fraud),"[80] Dr. Zurek asserts that I have not provided certain details about the techniques underlying the methodology I set forth in the Dalrymple Report. These details relate to what Dr. Zurek purports to be:

    a. "the mismatch between the contents of the alleged misrepresentations and the alleged corrective disclosures for the Marketing Claim, which means that price declines associated with the latter cannot be assumed to be a measure of inflation during the Proposed Class Period;"[81]

    b. "confounding information on November 6, 2018 (for the Marketing Claim), and on April 15 and 16, 2019, (for the Marketing and Restatement Claims);"[82]

    c. "the lack of statistical significance of AAC's residual stock price return on April 15, 2019, and the fact that information regarding the Restatement Claim was already disclosed previously in March 2019."[83]

58. Each of the purported issues Dr. Zurek raises center around potential limitations of the event study technique when it comes to isolating the impact of corrective information at the time of the corrective disclosures and measuring inflation during the Class Period.[84] But as I explain in the Dalrymple Report, "[t]o the extent that there are issues complicating the quantification of artificial inflation at the time of a curative event, standard financial analysis and valuation tools can be applied to measure inflation and damages in accordance with Plaintiff's theory of liability."[85]

---

[78] Dalrymple Report, ¶¶ 89-95.
[79] Zurek Report, ¶ 12.
[80] Zurek Report, ¶ 56.
[81] Zurek Report, ¶ 52.
[82] Zurek Report, ¶ 52.
[83] Zurek Report, ¶ 52.
[84] Each of the purported issues Dr. Zurek raises refers to the measurement of share price inflation by reference to abnormal returns at the times of the corrective disclosures, which I measure using an event study. In his deposition, Dr. Zurek recalled (incorrectly) that my proposed methodology was limited to the application of an event study. *See* Zurek Dep., 40:14-19.
[85] Dalrymple Report, ¶ 92.



59.    While Dr. Zurek appears to take issue with what he describes as the general nature of my opinion that "inflation in AAC's common stock, if any, can be measured using widely accepted valuation and economic techniques,"[86] he does not actually dispute this conclusion.[87]  Nor does he contend that the valuation impact of the information that Plaintiff alleges should have been known cannot be ascertained.  Instead, Dr. Zurek asserts that "proposing to use inflation and only saying that it 'can be measured using widely accepted valuation and economic techniques' is not an economic methodology or proof that damages (or inflation) can in fact be computed."[88]

60.    While he does not explain what his standard of "proof" might be, the specific techniques appropriate for addressing the sort of details he raises in his report relate to a fully constructed damages *model* (which I have not been asked to prepare at this stage) rather than a methodology (which I describe in the Dalrymple Report).[89]  Dr. Zurek ignores this distinction and fails to reconcile his opinion to the fact that experts routinely address the details he raises in the context of securities litigations and valuations when addressing loss causation and calculating damages, as I have done in multiple cases.  Furthermore, Dr. Zurek does not explain why it would be appropriate to select a specific technique before the relevant fact discovery is complete and other inputs relevant to the calculation of damages are made available.

### 1) Standard economic and valuation techniques can be applied to isolate inflation attributable to the claims at issue

61.    Many of the purported issues Dr. Zurek raises relate to his unfounded speculation that my methodology could not isolate the share price impact of corrective information at the time the corrective information was made available to market participants.  Dr. Zurek discusses what he purports to be a "mismatch" between the alleged misrepresentations and the corrective disclosures, suggesting that one could not infer inflation during the Class Period by reference to the share price reaction following the corrective disclosures.[90]  He also contends that the presence of confounding information (with respect to the Marketing Claim) and the lack of a statistically significant share price reaction (with respect to the Restatement Claim) would somehow fall outside the boundaries of the methodology I set forth in the Dalrymple Report.[91]

---

[86]    Dalrymple Report, ¶ 90.

[87]    Zurek Report, ¶ 52; Zurek Dep., 113:18-114:5.

[88]    Zurek Report, ¶ 61.

[89]    Dr. Zurek speculates that "it is possible that, under certain circumstances, no reliable methodology exists to appropriately calculate inflation or damages in a manner that is consistent with the relevant theory of liability" (Zurek Report, ¶ 55), though he provides no reasoning as to why such circumstances would apply to this case.  These and similar statements in the Zurek Report suggest that Dr. Zurek's standard of proof for what would constitute a "reliable methodology" is nothing short of a fully constructed damages model that he deems to be reliable, which I have not been asked to prepare at this time.  While Dr. Zurek contends there is "no 'off-the-shelf' methodology" (Zurek Report, ¶ 55), this does not mean the same widely used economic, financial, and valuation techniques that are routinely applied in securities and other litigations cannot be applied in this case.

[90]    Zurek Report, ¶¶ 63-68.

[91]    Zurek Report, ¶¶ 69-74.  I address these issues in the Dalrymple Report (¶¶ 90-93).



62.     Dr. Zurek's assertions are incorrect and predicated on the flawed premise that one must rely solely on an event study, without reference to other techniques and evidence, in order to measure inflation.[92]  But there is no basis for assuming, as Dr. Zurek does, that inflation must be measured solely by reference to AAC's share price reactions to corrective information.  Dr. Zurek mischaracterizes my methodology as being subject to such a limitation by ignoring other techniques I discuss in the Dalrymple Report and how such techniques (event studies in addition to other widely accepted valuation techniques) could be used to assess the inflation arising from the allegations in this case.

63.     The information Defendants allegedly concealed during the Class Period would have enabled market participants to revise their expectations about AAC's performance and, thereby (according to Plaintiff's theory) reduced the price at which AAC's shares traded during the Class Period consistent with economic principles and fundamental financial and valuation mechanisms underlying security prices in efficient capital markets.  Nowhere in the Zurek report does Dr. Zurek reconcile his opinions to these conditions, which are present in this matter and other securities litigation cases in which experts routinely compute share price inflation.

64.     In finance and economics, the concept of value is inextricably linked to expectations of future performance.  At any time, the value of an interest in a security, asset, contract, or other holding is the sum of all future economic benefits expected at that time, discounted to the present to reflect the time value of money and risk (*i.e.,* uncertainty) associated with those benefits.[93]  Hence, throughout the Class Period, the value of AAC's stock was a function of investors' expectations of future performance, such that the company's share price would have increased or decreased in response to changes in those expectations.[94]

65.     Grounded in the standard economic definition of value is the concept that "at any point in time an individual security has an intrinsic value (or in the terms of the economist, an equilibrium price) which depends on the earning potential of the security."[95]  A standard technique for estimating the value of a security is the income approach, which directly measures the present discounted value of future cash flows to shareholders.  Under the income approach, value today equals future cash flows discounted at the

---

[92]  This same flawed reasoning is also fatal to Dr. Zurek's price impact opinion, *i.e.,* Dr. Zurek truncates his analysis based on what he (incorrectly) finds to be the share price reactions associated with the Restatement Claim without further investigation (*supra* § III(A)).  The same types of analyses that Dr. Zurek ignores when assessing price impact, as previously discussed, may be applied to estimate inflation associated with the Restatement Claim, which Dr. Zurek erroneously suggests could not be measured based on the methodology I set forth in the Dalrymple Report.  *See* Zurek Report, ¶ 75.

[93]  Shannon P. Pratt, *Valuing a Business: The Analysis and Appraisal of Closely Held Companies* (5th ed. 2008), pp. 175-176.

[94]  As Dr. Zurek stated in this report, "[a]n important feature of securities that are traded in efficient markets is that security prices equal the sum of discounted expected future cash flows based on the market's assessment of publicly available information." Zurek Report, ¶ 25, citing Brealey, Myers, and Allen (2014), p. 328 ("[I]n an efficient market it is not possible to find expected returns greater (or less) than the risk-adjusted opportunity cost of capital. This implies that every security trades at its fundamental value, based on future cash flows…and the opportunity cost of capital.").

[95]  Eugene Fama, "Random Walks in Stock Market Prices," *Financial Analysts Journal*, Jan.-Feb. 1995, p. 75.  *See also for instance,* CFA Program Glossary, https://www.cfainstitute.org/en/programs/cfa/curriculum/glossary; John Campbell, et al., *The Econometrics of Financial Markets* (1997), pp. 20-25; Shannon P. Pratt, *Valuing a Business: The Analysis and Appraisal of Closely Held Companies* (5th ed. 2008), p. 44.



opportunity cost of capital, which reflects the risk associated with those cash flows.[96]  From the perspective of a shareholder in a publicly traded company, the value of each share is that share's pro rata claims to cash flows generated by the company in which the shares are held.

66.     A common application of the income approach is the discounted cash flow (<u>DCF</u>) analysis.[97] DCF models arrive at the present value of a stream of cash flows (either positive or negative) by discounting periodic expected cash flows ($CF_t$) at the relevant opportunity cost (r):[98]

$$Present\ Value\ CF = \sum_{t=0}^{n} \frac{CF_t}{(1 + r)^t}$$

67.     The economics underlying the income approach are reflected in another commonly used valuation technique known as the market approach.  An application of the market approach applies a multiple to a measure of expected income, such as net income.  For instance:[99]

$$Equity\ Value\ = Net\ Income\ * \frac{P}{E}\ Multiple$$

68.     Under the market approach, the multiple reflects expectations of growth and risk (discounted to reflect the time value of money) associated with the applicable measurement of earnings.[100]  In the above equation, the price-to-earnings ("<u>PE</u>") multiple reflects the expected risk and growth of future earnings, as measured by net income.  Like the income method, the market approach is grounded in the fundamental expectations of the firm's future economic performance; however, market approaches may rely on current or historical measures of earnings as a proxy for expected future earnings.

69.     Following the release of new information, market participants adjust their expectations of future cash flows.  Therefore, a firm's value at any time is a function of the available information on which expectations of a firm's future earnings (from which investors derive future cash flows) are based.  By applying standard valuation techniques, it is possible to trace the effect of each element of a counterfactual disclosure on value based on the extent to which the adjustment would have affected expectations of the company's ability to generate future cash flows to investors (if at all).

70.     Not only is it possible to apply such techniques to estimate share price inflation, but I have actually done so in other cases involving allegations of share price inflation arising from multiple misrepresentations.  In a recent matter in this Court involving shareholder claims against Corrections Corporation of America ("<u>CCA</u>"), the allegations at issue involved two distinct corrective disclosures that

---

[96]    Shannon P. Pratt, *Valuing a Business: The Analysis and Appraisal of Closely Held Companies* (5th ed. 2008), p. 175.

[97]    I refer to the income and market approaches in the Dalrymple Report.  Dalrymple Report ¶ 92.

[98]    *See* Shannon P. Pratt, *Valuing a Business: The Analysis and Appraisal of Closely Held Companies* (5th ed. 2008), p. 516.

[99]    Shannon P. Pratt, *Valuing a Business: The Analysis and Appraisal of Closely Held Companies* (5th ed. 2008), pp. 265-266.

[100]    Shannon P. Pratt, *Valuing a Business: The Analysis and Appraisal of Closely Held Companies* (5th ed. 2008), pp. 292-293.



affected different facilities with different expected future cash flows.[101]  Additionally, the risk and growth expectations associated with these facilities' cash flows would have been different in the counterfactual world (in which the plaintiff alleged the company should have made certain disclosures about risk) than they were in the actual world (in which the company allegedly concealed risks).[102]  By applying standard economic and valuation techniques, including the income and market approaches, I separated the impact of the concealed information from confounding information (the materialization of disclosed risks that also became known at the same time as the corrective information) in order to estimate inflation in CCA's share price under the plaintiff's theory of liability.  As I explained in my expert report in that matter, my inflation estimates allowed for the allegations associated with each corrective disclosure to be considered jointly or individually, depending on whether the trier-of-fact found that the risks associated with the different facilities had been concealed.

71.      Similarly, in a case involving shareholder allegations of misrepresentations regarding the financial position and performance of an Australian retailer, Dick Smith Holdings ("DSH"), I computed share price inflation associated with multiple alleged misrepresentations that affected DSH's reported net assets (including receivables, allowances for doubtful debts, and other working capital accounts), earnings, and pro forma results.[103]  The alleged misrepresentations and corresponding corrective events occurred through multiple disclosures over more than 18 months.  Again, I applied standard economic and valuation techniques to remove the impact of confounding information at the time of the alleged corrective disclosures and to estimate inflation directly for each of the alleged misrepresentations.[104]  The resulting inflation estimates I computed in that matter could be assessed for any combination of counterfactual disclosures that the finder-of-fact determined should have been made as well as inflation associated with all misrepresentations jointly.

72.      While no two cases are the same, the set of tools and techniques that I have applied in these and other cases are available here.  I have seen nothing that would distinguish this case from any other exercise (inside and outside the context of litigation) in which the impact of specific information is assessed through standard economic, financial, and valuation techniques.  The economic impact of Plaintiff's allegations is that investors would have revised their expectations earlier than they did if the allegedly

---

[101]  *Grae v. Corrections Corporation of America*, U.S. District Court, Middle District of Tennessee, No. 3:16-cv-02267.

[102]  Dr. Zurek claims that "the allegedly concealed risk associated with AAC relying on a deceptive marketing strategy is mismatched from the alleged corrective disclosure that this risk had materialized in 'declining sales calls and [AAC's] inability to use its deceptive marketing strategies'" and that I "do[] not demonstrate that AAC's stock price reaction to the alleged materialization of this risk can be used to measure inflation earlier, before this risk had materialized."  Zurek Report, ¶ 68.  Notwithstanding Dr. Zurek's failure to demonstrate the merits supporting his characterization of this purported "mismatch," this issue was present in the CCA matter.  As I demonstrated in that case, standard economic and valuation techniques can be used to isolate the materialization of allegedly concealed risks from the materialization of known risks.

[103]  *Dick Smith Representative Proceedings*, Supreme Court of New South Wales, No. 2018/52431.

[104]  In this case, I also isolated the impact of certain information related to historical performance from other information that also affected expectations of future performance.



Case 3:19-cv-00407    Document 99-2    Filed 06/13/22    Page 24 of 40 PageID #: 2096

concealed information had been known. This concept maps to any combination of what Dr. Zurek characterizes as the Marketing Claim, the Restatement Claim, and confounding information.

### 2) Standard economic and valuation techniques can be applied to estimate inflation on each day of the Class Period and account for any relevant changes in inflation over time

73. The purported issues Dr. Zurek raises also relate to what he speculates would be complexities arising from the difference in inflation over time, including differences in inflation at the time the corrective information became available and at other times during the Class Period. According to Dr. Zurek, "the mismatch" means that price declines associated with the corrective disclosures cannot be used as a measure of inflation associated with the misrepresentations.[105] He also claims the "allegedly concealed risk associated with AAC relying on a deceptive marketing strategy is mismatched from the alleged corrective disclosure that this risk had materialized in 'declining sales calls and [AAC's] inability to use its deceptive marketing strategies'."[106]

74. As previously discussed, Dr. Zurek's purported critiques are based on a mischaracterization of my methodology as limited to the application of an event study approach.[107] For instance, he claims that I have "presented no analysis to demonstrate that [my] 'methodology' to purportedly calculate damages based on observed price movements following alleged corrective disclosures can be used to measure inflation given this mismatch" (which he purports to exist between the alleged misrepresentations and alleged corrective disclosures).[108] But as previously discussed, Dr. Zurek's critiques rest on his flawed assertion that my measurement of inflation would be based exclusively on the measurement of AAC's abnormal returns following the release of corrective information, without reference to any of the standard and widely used techniques that one could apply in order to measure inflation based on the prevailing

---

[105] Zurek Report, ¶ 52.

[106] Zurek Report, ¶ 68.

[107] For instance, Dr. Zurek states:

There is, therefore, no close correspondence between the contents of the information allegedly withheld from the market (existence of a fraudulent and deceptive marketing scheme and related false and misleading statements) and the information actually revealed even if the alleged fraud ultimately caused investor losses by being responsible for the allegedly disappointing financial results. While Lead Plaintiff appears to allege that the two are causally related, even if that were true, it does not mean that the market's reaction to the alleged corrective disclosure is a reasonable approximation of the market's hypothetical reaction to an earlier truthful disclosure, which is a necessary condition for one to calculate inflation using the price decline following the alleged corrective disclosure. In fact, there are a number of reasons to conclude that the price reaction following the alleged corrective disclosures would not be the same as inflation earlier during the Proposed Class Period. Zurek Report, ¶ 65, emphasis added.

The methodology I propose does not contemplate an inflation measurement based exclusively on the share price reaction to the alleged corrective disclosures, as is clear from the Dalrymple Report. Dr. Zurek's attempts to suggest otherwise are based on nothing more than mischaracterizations of my methodology.

[108] Zurek Report, ¶ 63.



economic conditions during the Class Period and the information that would have been known on each day.[109]

75.    Dr. Zurek refers to dates during the Class Period in which he speculates that changes in business conditions may have interacted with the corrective information.  Following this reasoning, he contends that, for instance, I "do[] not provide any analysis that the effects of a future algorithm change in August 2018, and its specific implications for AAC, would have been known to the market as of the beginning of the Proposed Class Period."[110]  Again, Dr. Zurek ignores the availability of standard economic and valuation techniques that I discuss in the Dalrymple Report, which could be used (if appropriate) to estimate changing levels of inflation over time.  For instance, one may develop scaling factors based on the extent to which allegedly withheld information would have affected expectations at different times, accounting for any "portion of the impact on AAC that would not have been known upon a hypothetical earlier disclosure" and other "business developments," if appropriate.[111]

76.    Indeed, the Zurek Report provides an example of how scaling factors may be used in a case involving "[a] company knows that there is a 30% probability it will lose a major customer, yet conceals this risk (i.e., the market believes there is a 0% probability)."[112]  While Dr. Zurek's example may be overly simplistic (for instance, in the CCA matter, my isolation of allegedly concealed risks from risks that would have been known in the counterfactual was based on detailed economic and valuation analyses), it actually illustrates how the complexities about which he speculates could be addressed.  At his deposition, Dr. Zurek conceded that his opinion is not that such issues would prevent the calculation of class-wide damages, only that I "ha[ve] not described that is possible or that [I am] capable of doing it."[113]

77.    Regardless of which specific techniques may be appropriate, it is possible to ascertain the share price inflation that existed for each day in the Class Period.  The extent to which share price inflation would have existed in AAC's shares on any given day is a function of the cumulative impact of information

---

[109]   The source of Dr. Zurek's understanding that "there is a mismatch between the contents of the alleged misrepresentations regarding the Marketing Claim and the alleged corrective disclosures on November 6, 2018, and April 16, 2019" (Zurek Report, ¶ 63) is unclear.  It appears to be based, at least in part, on his observation that "AAC did not disclose that it engaged in deceptive marketing on either alleged corrective disclosure date (or as far as I am aware, subsequently to the alleged corrective disclosures)."  Zurek Report, ¶ 65.  Dr. Zurek's reasoning is flawed and inapt.  Even if AAC did not state that its marketing practices were deceptive, the allegations (*inter alia*) are that investors learned that the company's ability to generate earnings was impaired, information and risks that Plaintiff allege was improperly concealed before the corrective disclosures.  Whether AAC or Defendants characterized the company's conduct as deceptive at the time the information became known (or at a later time) is beside the point.  Such a fact pattern is not unique to this case and does not complicate the estimation of inflation and damages.

[110]   Zurek Report, ¶ 72.  Dr. Zurek also states that "analysts reported their estimates of the impact on AAC of the change in Google's algorithm as early as October 2018, prior to the first alleged corrective disclosure."  Zurek Report, ¶ 73.  It is my understanding that Plaintiff contends that information contained in these reports was partially corrective.  Regardless, my methodology could account for changes in inflation associated with these analyst reports using the same techniques discussed in the Dalrymple Report and herein (including the use of scaling factors, if appropriate).

[111]   Zurek Report, ¶¶ 72-73.

[112]   Zurek Report, ¶¶ 67.

[113]   Zurek Dep., 118:2-10.



allegedly withheld as of that day.  The range of economic and financial techniques that can be used to isolate the impact of specific claims or confounding information can be applied, if appropriate, to quantify the impact of different information that would have become available to market participants over time. These techniques, if relevant, can also account for changes in economic conditions that may have affected how the alleged misrepresentations interacted with expectations over time.  For instance, in both the CCA and DSH matters, I used the fundamental valuation techniques described above in conjunction with my event study results to scale inflation over multiple disclosures throughout the Class Period.

      a. In the CCA matter, I applied fundamental valuation analysis to adjust my inflation estimates during the Class Period to account for a partial corrective disclosure, which related to one facility, prior to the revelation of information about the other facilities.  I also applied a scaling factor to my inflation estimates during the period before CCA converted to a real estate investment trust, in order to account for the differences in the tax structure between the two types of entities.[114]

      b. In the DSH matter, I estimated inflation directly using a fundamental value approach to measure the impact of each counterfactual disclosure, which corresponded to multiple releases during the relevant period, such that the cumulative inflation estimate increased along with the cumulative impact of the allegedly withheld information, which I determined would have varied based on the nature of the counterfactual disclosures and changes in market participants' assessment of business risks over the relevant period.  I also estimated inflation using a back-casting approach in which I developed scaling factors (based on my fundamental value approach) in order to account for the increasing cumulative impact of the allegedly withheld information.

78. The specific facts and circumstances of each case dictate the specifics of my approach; however, in neither of those two cases did my methodology, which is consistent with the methodology set forth in the Dalrymple Report, require or result in constant inflation during the Class Period.[115]

79. I understand further that the analysis of facts and determinations as to specific applications within my proposed damages framework are typically performed when addressing loss causation and calculating damages, relying upon a relevant factual record that is complete, or at least materially so, with regard to such aspects of the case.  It is both typical and appropriate that I would describe the specific facts and assumptions used in my damages model in detail once I have considered that factual record.  But it

---

[114] I also removed from my inflation estimates the impact of risks that I determined would have been known (as opposed to concealed) and which materialized as a result of the corrective disclosures.

[115] Dr. Zurek's suggestion that my methodology requires the impact of the alleged misrepresentations to be the same as the impact of the alleged corrective disclosures presupposes that inflation would be constant during the Class Period.  But Dr. Zurek has no basis for assuming that I would apply such a constraint in this case, nor have I done so in other cases.



would be premature to settle on a specific technique before the relevant fact discovery is complete and other inputs relevant to the calculation of damages are made available to me in this matter.

80. Dr. Zurek's assertions that my damages methodology could not account for changes in inflation over time has no basis in my opinions and is based entirely on a mischaracterization of my opinions.

### IV. Further Work

81. My analysis is ongoing, and I reserve the right to supplement my opinions as additional information is made available to me.

W. Scott Dalrymple, CFA
BVA Group
Partner

Case 3:19-cv-00407    Document 99-2    Filed 06/13/22    Page 28 of 40 PageID #: 2100




**Supplemental Appendix A**

## SCOTT DALRYMPLE, CFA

PARTNER

| | |
|---|---|
| Direct | +1.214.619.4960 |
| Mobile | +1.214.842.0078 |
| Email | sdalrymple@bvagroup.com |

Scott Dalrymple is an economist specializing in quantitative valuation, econometrics, statistics, securities analysis, antitrust, financial markets, and intellectual property.

Mr. Dalrymple has led numerous consulting, commercial litigation, and restructuring engagements on behalf of multinational companies, investors, financial institutions, and government agencies in the U.S., Europe, and Australia. He has testified in federal and state court and has advised clients in areas including:

- Application of economic, statistical, and quantitative methods used in business interruption matters, securities analysis, financial forecasting, valuation, and antitrust analyses;

- Construction of event studies, market efficiency tests, and other financial econometric models to assess share price artificiality associated with alleged misrepresentations and non-disclosures;

- Quantification of multibillion-dollar claims related to the securitization of residential mortgage-backed assets;

- Estimation of price artificiality arising from alleged manipulations in crude oil futures and options markets through monopolization of cash forward contracts;

- Valuation of residual interests in mortgage-backed securitizations based on loan-level econometric models and simulations;

- Analysis of reasonable royalty and lost profits damages arising from patent infringement claims;

- Development of economic and financial forecast models for purposes of capital restructurings, evaluating investment opportunities, and managing working capital; and

- Design of sampling procedures and statistical inferences drawn from samples used in fraud investigations, product evaluations, accounting reviews, and class certification analyses.

Mr. Dalrymple holds a Master of Science in Economics with a concentration in Industrial Organization from the London School of Economics and Political Science and a Bachelor of Business Administration in Finance and Business Honors from the University of Texas at Austin. He has presented to chapters of the American Bar Association, the Licensing Executives Society, and other organizations on topics including patent infringement damages, quantitative analysis, and macroeconomic trends. Mr. Dalrymple also contributed to the AICPA Practice Aid on Intellectual Property Infringement Damages and has been published in Law360. He is a member of the CFA Society of Dallas–Fort Worth.

Prior to joining BVA, Mr. Dalrymple was with AlixPartners and was an economist in the London office of a global economics consulting firm. Mr. Dalrymple began his career at PricewaterhouseCoopers and also worked in corporate finance and transaction advisory roles for a publicly-traded technology company.

**bva**group®

Valuation.
Disputes.
Advisory.

| 7250 Dallas Parkway | 1000 Louisiana Street | 405 Lexington Avenue |
|---|---|---|
| Suite 200 | Suite 6925 | Floor 9 |
| Plano, Texas 75024 | Houston, Texas 77002 | New York, New York 10174 |
| +1.972.377.0300 | +1.713.457.3125 | +1.212.364.1926 |

## TESTIMONY AND PUBLICATIONS

**DEPOSITION:**

*Robert Strougo, Individually and on behalf of All Others Similarly Situated v. Tivity Health, Inc., et al.*
Civil Action No. 3:20-cv-00165
United States District Court, Middle District of Tennessee, Nashville Division

*Indiana Public Retirement System v. Michael T. Cartwright, et al.*
Civil Action No. 3:19-cv-00407
United States District Court, Middle District of Tennessee, Nashville Division

*St. Clair County Employees' Retirement System, Individually and on Behalf of All Others Similarly Situated v. Acadia Healthcare Company, Inc. et al.*
Civil Action No. 3:18-cv-00988
United States District Court, Middle District of Tennessee, Nashville Division

*Highfields Capital I LP, et al. v. SeaWorld Entertainment, Inc., et al.*
Civil Action No. 3:18-cv-01276
United States District Court, Southern District of California, San Diego

*Farmland Partners Inc., v. Rota Fortunae a/k/a David Quinton Mathews, QKM, L.L.C., et al.*
Civil Action No. 1:18-cv-02351
United States District Court, District of Colorado

*Nikki Bollinger Grae, individually and on Behalf of All Others Similarly Situated, v. Corrections Corporation of America, et al.*
Civil Action No. 3:16-cv-02267
United States District Court, Middle District of Tennessee

*Leaf Trading Cards, LLC v. The Upper Deck Company*
Civil Action No. 3:17-CV-03200-N
United States District Court, Northern District of Texas, Dallas Division

*Samsung Electronics America, Inc., v. All Pro Distributing, Inc., et al.*
Civil Action No. 3:15-CV-04108-D
United States District Court, Northern District of Texas, Dallas Division

*Royal Park Investments SA/NV, Individually and on Behalf of All Others Similarly Situated v. The Bank of New York Mellon, as Trustee*
Cause No. 14-CV-6502
United States District Court, Southern District of New York



PARTNER

*Royal Park Investments SA/NV, Individually and on Behalf of All Others Similarly Situated v. HSBC Bank USA, National Association, as Trustee*
Cause No. 14-CV-08175
United States District Court, Southern District of New York

*Avaya Inc., v. Interactive Intelligence, Inc.*
Cause No. 01-16-0004-7193
AAA Commercial Arbitration

*Royal Park Investments SA/NV, Individually and on Behalf of All Others Similarly Situated v. Wells Fargo Bank, N.A., as Trustee*
Cause No. 14-CV-9764
United States District Court, Southern District of New York

*Royal Park Investments SA/NV, Individually and on Behalf of All Others Similarly Situated v. U.S. Bank National Association, as Trustee*
Cause No. 14-CV-2590
United States District Court, Southern District of New York

*Galt Strategies, LLC v. Critter Control, Inc., Kevin Clark, ABCN Services Corp., et al.*
Cause No. DC-15-05281
162nd Judicial District Court, Dallas County, Texas

*Royal Park Investments SA/NV, Individually and on Behalf of All Others Similarly Situated v. Deutsche Bank National Trust Company, as Trustee*
Cause No. 14-CV-4394
United States District Court, Southern District of New York

*Maxus Healthcare Partners, LLC ("Maxus"), v. Texas RHH, LLC d/b/a Renew Home Health, et al.*
Cause No. 017-275219-14
17th Judicial District Court, Tarrant County, Texas

*GTG Holdings, Inc. v. Amvensys Capital Group, LLC, ACG Telecom, LLC, and Z. Edward Lateef*
Case No. 3:13-cv-03107-M
United States District Court, Northern District of Texas, Dallas Division

*In The Matter of the Marriage of Jessica L. Jones and David E. Jones and in the Interest of David E. Jones, Jr., Jackson H. Jones and William A. Jones, Children*
Case No. D-1-FM-13-001139
250th Judicial District Court, Travis County, Texas

bvagroup® | Valuation. Disputes. Advisory.

PARTNER

**TRIAL AND HEARING:**

*James JN-Marie, Individually and on behalf of all others similarly situated, v. Spartan Concrete Products, LLC and Heavy Materials, LLC*
Civil Action No. ST-2017-CV-486
Superior Court of the Virgin Islands, Division of St. Thomas & St. John

*Robert Strougo, Individually and on behalf of All Others Similarly Situated v. Tivity Health, Inc., et al.*
Civil Action No. 3:20-cv-00165
United States District Court, Middle District of Tennessee, Nashville Division

*Shirley Jones, Individually and on Behalf of Her IRAs, et al., v. WFG Investments, Inc., WFG Advisors, LP, Wilson H. Williams, and David W. Williams*
Case No. 16-03743
Financial Industry Regulatory Authority

*Smith Walker v. E\*Trade Securities LLC and E\*Trade Clearing LLC*
Case No. 16-03022
Financial Industry Regulatory Authority

*Avaya Inc., v. Interactive Intelligence, Inc.*
Cause No. 01-16-0004-7193
AAA Commercial Arbitration

*Maxus Healthcare Partners, LLC ("Maxus"), v. Texas RHH, LLC d/b/a Renew Home Health, et al.*
Cause No. 017-275219-14
17th Judicial District Court, Tarrant County, Texas

*Galt Strategies, LLC v. Critter Control, Inc., Kevin Clark, ABCN Services Corp., et al.*
Cause No. DC-15-05281
162nd Judicial District Court, Dallas County, Texas

*Edward Kennard Andrew and Mark L. Hepworth v. Southwest Securities, Inc.*
Case No. 14-02566
Financial Industry Regulatory Authority

*In the Matter of the Marriage of Jessica L. Jones and David E. Jones and in the Interest of David E. Jones, Jr., Jackson H. Jones and William A. Jones, Children*
Case No. D-1-FM-13-001139
250th Judicial District Court, Travis County, Texas

CONFIDENTIAL | DO NOT DISTRIBUTE WITHOUT CONSENT

PARTNER

**PRESENTATIONS AND PUBLICATIONS:**

Co-Author (with Jody Bland and Todd Goldwasser), "The SEC's Modernized Marketing Rule and Performance Measurement Issues for Investment Advisers," *Securities Regulation Law Journal*, Vol. 49 No. 3, Fall 2021.

Co-Author (with Joseph R. Mason and Jody Bland), "Collateralized Loan Obligations: Overview and Challenges," *BVA Group*, May 14, 2020.

Co-Author (with Robert Manz and Emily Chiu), "COVID-19 Business Interruption Claims: Causation May be Key," *BVA Group*, April 24, 2020.

Co-Author (with Joseph R. Mason and Jeffrey D. Balcombe), "Financial Supervision and Regulation in the US: Dodd-Frank Reform," *European Parliament*, December 2018.

Contributing Author, Hitchner, James R., *Financial Valuation: Applications and Models*, Fourth Edition, April 2017.

*Series N and Super Priority Preferred: The Unintended Consequences of Increasing Complexity in Today's Capital Markets*, Houston Bar Association Securities Litigation and Arbitration Section, April 11, 2017.

Co-Author, "Don't Shoot the Methodology: Use and (Mostly) Misuse of the Nash Bargaining Solution," *Law360*, March 2014.

*Economic Factors That Influence Royalties: Application of Game Theory*, LES Seattle Chapter Presentation, November 14, 2013.

*Bargaining Power in Licensing Negotiations*, LES San Diego Chapter Presentation, March 12, 2013.

*Bargaining Theory in Reasonable Royalty Calculations,* ABA Webinar, December 14, 2012.

Contributing Author, "Calculating Intellectual Property Infringement Damages," AICPA Practice Aid 06-1, 2012.

**AFFILIATIONS:**

The Economic Club of Washington D.C., panelist judge for the Philip M. Dearborn and Vernon E. Jordan fellowships for graduate students pursuing doctoral degrees in the fields of economics, finance, and business, 2014 to 2020.

CFA Institute and CFA Society of Dallas–Fort Worth.

CONFIDENTIAL | DO NOT DISTRIBUTE WITHOUT CONSENT

PARTNER

## PARTIAL LIST OF CASES

Mr. Dalrymple has been involved with the following types of cases in a consulting and/or testifying capacity:

### VALUATION AND SECURITIES ANALYSIS

- Provided expert and rebuttal opinions on share price inflation and aggregate damages on behalf of a former Australian electronics retail chain.

- Provided expert testimony on damages and losses on behalf of a broker/dealer arising from a series of private placement investments and offerings.

- Quantified the impact of trustees' alleged failures to repurchase loans on behalf of a residential mortgage backed securitization (RMBS) investor.

- Developed a class-wide damage model arising from suitability claims against an investment bank.

- Provided expert testimony in support of class certification on behalf of residential mortgage backed securitization (RMBS) holders.

- Analyzed market efficiency in support of fairness and solvency opinions related to shares of publicly traded companies in the energy sector.

- Prepared event studies and damages analyses based on various share matching (LIFO, FIFO, offsets) and account consolidation conventions on behalf of security holders evaluating class action opt outs.

- Analyzed trading activity and valuations of restricted and unrestricted shares associated with an alleged pump-and-dump scheme following a reverse merger.

- Provided expert opinions and rebuttal of opposing expert analysis regarding share price inflation damages on behalf of an Australian industrial conglomerate involved in a shareholder class action lawsuit.

- Served as a testifying expert in an arbitration matter involving the liquidation of margin positions.

- Provided economic and statistical analysis of loan collateral characteristics, performance, and alleged misrepresentations associated with residential and commercial mortgage-backed securities on behalf of multinational financial institutions and investors.

- Developed econometric models to establish relationships between crude oil futures and options prices and numerous industrial, financial, and macroeconomic variables in a securities class action lawsuit.

- Provided expert testimony on the valuation of a healthcare services company.

- Served as a consulting expert for government agencies in negotiations of multibillion-dollar settlements involving the origination, sale, and securitization of residential mortgages.

- Negotiated the value of residual interests in Canadian mortgage-backed securities on behalf of the bankrupt sponsor based on econometric models and Monte Carlo simulations used to predict future cash flows from individual mortgages.



bvagroup®  Valuation. Disputes. Advisory.

7250 Dallas Parkway
Suite 200
Plano, Texas 75024
+1.972.377.0300

1000 Louisiana Street
Suite 6925
Houston, Texas 77002
+1.713.457.3125

405 Lexington Avenue
Floor 9
New York, New York 10174
+1.212.364.1926

PARTNER

- Provided expert opinions the solvency of a debtor subsidiary in the telecom industry facing fraudulent transfer allegations.

- Analyzed the economic merits of civil penalties assessed by the U.S. SEC related to the sale of restricted stock.

- Assessed the appropriateness of certain private equity investments related to the investment policy statement of a family limited partnership.

- Evaluated the economic merits of breach of fiduciary duty claims related to options trading strategies in a jointly-held investment account.

- Quantified share price inflation damages on behalf of an Australian contracting and development company involved in a shareholder class action lawsuit.

- Evaluated share price inflation allegations against an Australian real estate investment trust and quantified damages based on multiple share purchase matching approaches and detailed trading data in a shareholder class action lawsuit.

- Analyzed plaintiff and defendant shareholder damages models related to claims against an Australian commodities company in a shareholder class action lawsuit.

- Investigated quantitative methods used to value the structured credit portfolios of a global investment and insurance company.

- Advised a major U.S. bank on the write-down of its structured finance portfolio.

- Quantified share price inflation and corresponding damages based on allegations against an Australian gaming corporation in a shareholder class action lawsuit.

- Analyzed the effects of management representations on a U.S. technology firm's share price in a shareholder class action lawsuit.

- Examined the impact of accounting scandal revelations on the share price of a U.S. media firm in a shareholder class action lawsuit.

- Constructed a Monte Carlo simulation to estimate the value of performance-based incentives in the UK media industry.

## ANTITRUST AND REGULATION

- Provided expert testimony on relevant market definitions, market power, and vertical restraints of competition on behalf of a manufacturer in a case involving allegations of market foreclosure.

- Quantified damages on behalf of a plaintiff class alleging overcharges on purchases of accessory items.

- Provided expert opinions in support of class certification in a case involving alleged overcharges of building materials.

- Quantified the impact of price artificiality associated with alleged market manipulations in crude oil futures and options markets.

- Assessed the impact of monopolization claims on prices in the European automobile parts market.

CONFIDENTIAL | DO NOT DISTRIBUTE WITHOUT CONSENT

 Valuation. Disputes. Advisory.

7250 Dallas Parkway
Suite 200
Plano, Texas 75024
+1.972.377.0300

1000 Louisiana Street
Suite 6925
Houston, Texas 77002
+1.713.457.3125

405 Lexington Avenue
Floor 9
New York, New York 10174
+1.212.364.1926

Case 3.19-cv-00407    Document 99-2    Filed 06/13/22    Page 35 of 40 PageID #: 2107

- Evaluated monopolization claims in the market for remanufactured printer cartridges.

- Analyzed the price impact of alleged false advertising claims in the market for fruit juices.

- Assisted a European competition authority in a review of its financial services sector based on event studies used to estimate the effect of firm entry on lending rates.

- Examined the impact of competition policies on the personal banking sector in a national European market based on quantitative analysis of current account activity associated with major banks.

- Analyzed the impact of a UK pharmaceutical firm's alleged predatory pricing behavior on sales of its primary competitor.

- Quantified the impact of regulatory and commercial changes on a portfolio of media and gambling rights in the UK.

- Developed an industrial analysis framework used to evaluate competitive drivers across several manufacturing sectors for purposes of valuing a European manufacturing firm.

## INTELLECTUAL PROPERTY

- Provided testimony rebutting an opposing expert's lost profits calculations arising from claims of intellectual property infringement, trade secret misappropriations, tortious interference and other allegations.

- Led the analysis of reasonable royalty damages on behalf of more than 150 defendants alleged to infringe a single patent covering widely-used website features related to geographic location services.

- Provided expert testimony regarding the economics of contractual royalty calculations on behalf of a U.S. communications company.

- Served as a testifying expert on behalf of a consulting firm seeking damages arising from alleged misappropriations of trade secrets.

- Assessed the merits of trade secret misappropriation claims against a global energy services company.

- Evaluated reasonable royalty claims associated with alleged U.S. patent infringements related to numerous technologies, including:

  o Telephony and cellular network;

  o Network architecture;

  o Hardware and software technology;

  o Digital media;

  o Remote access technologies;

  o Power converter architectures;

  o E-commerce;

  o Garments and apparel;

  o Automotive parts;

  o Food processing;

CONFIDENTIAL | DO NOT DISTRIBUTE WITHOUT CONSENT



7250 Dallas Parkway
Suite 200
Plano, Texas 75024
+1.972.377.0300

1000 Louisiana Street
Suite 6925
Houston, Texas 77002
+1.713.457.3125

405 Lexington Avenue
Floor 9
New York, New York 10174
+1.212.364.1926

Case 3:19-cv-00407   Document 99-2   Filed 06/13/22   Page 36 of 40 PageID #: 2108

- o  Methods for check payment processing;

- o  Geographic location services; and

- o  Oil and gas exploration.

- Advised patent holders on strategic opportunities and licensing strategy for purposes of monetizing patent portfolios in the network technology and electronic storage industries.

- Computed lost profits, unjust enrichment, and reasonable royalty damages arising from theft of trade secrets claims brought by a specialized provider of electronic components against former employees.

- Assessed damages associated with contingency fee agreements between a law firm and former client arising from the settlement of a patent litigation lawsuit.

- Analyzed lost profits damages arising from patent infringement claims covering a wide range of network, software, and industrial applications.

- Composed a series of intellectual property valuations submitted to European tax authorities on behalf of a global steel manufacturer.

- Assessed the economic merits of an injunction claims against a major provider of rail track inspection services.

- Evaluated price erosion claims on behalf of defendants accused of patent infringement in industrial applications.

- Assessed damages arising from trade secret claims involving tens of millions of transactions in the freight industry.

- Evaluated damages arising from trademark infringement claims against companies in the financial services, technology, and automotive industries.

## COMMERCIAL LITIGATION AND INVESTIGATIONS

- Designed sampling procedures and advised on statistical inferences drawn from samples used in numerous fraud investigations, accounting reviews, and class certification analyses.

- Provided expert opinions based on statistical and econometric models used to evaluate employee allegations of discrimination under U.S. Title VII.

- Led the sampling, investigation, and extrapolation of results from transaction data retrieved from various accounting systems for purposes of identifying unreported IT costs in a breach of contract dispute involving a major U.S. hospital network.

- Provided expert opinions on lost wages associated with an alleged wrongful termination of a public services officer.

- Assessed damages associated with contingency fee agreements between a law firm and former client arising from the settlement of a patent litigation lawsuit.

- Constructed a series of econometric and financial models used to evaluate breach of contract claims in the freight and shipping industry based on the analysis of tens of millions of individual shipping records.

- Quantified the effects of a U.S. publicity scandal on Japanese sales of celebrity-sponsored products based on a quantitative analysis of sales data, controlling for numerous macroeconomic factors.

- Analyzed the forgone acquisition value of a UK retailer due to an alleged breach of fiduciary duty.

CONFIDENTIAL | DO NOT DISTRIBUTE WITHOUT CONSENT



bvagroup®  Valuation. Disputes. Advisory.

7250 Dallas Parkway
Suite 200
Plano, Texas 75024
+1.972.377.0300

1000 Louisiana Street
Suite 6925
Houston, Texas 77002
+1.713.457.3125

405 Lexington Avenue
Floor 9
New York, New York 10174
+1.212.364.1926

PARTNER

## TURNAROUND AND RESTRUCTURING

- Assisted a regional hospital in preparing for Chapter 11 proceedings.

- Implemented a weekly cash projection process and advised on working capital strategies that enabled a U.S. manufacturer to operate within its asset-based facility.

- Managed the implementation of financial models and weekly cash management processes on behalf of a U.S. metals distributor.

- Developed a series of integrated financial models that enabled a public U.S. technology firm to evaluate restructuring opportunities and secure long-term and short-term funding.

- Implemented a short-term cash management tool and monthly strategic model for a private equity portfolio company

- Developed cash forecast and liquidation models on behalf of creditors of a U.S. metal fabricator.

- Assisted a U.S. hospital operator in developing financial plans used to secure additional funding.

- Estimated the impact of an audit firm's alleged misrepresentations on the unsecured claims against a U.S. company's bankrupt estate.

- Quantified the value of life insurance and executive benefit claims against a U.S. bankruptcy estate based on various actuarial assumptions.

- Advised on the reliability of a U.S. distributor's financial model and business plan based on a series of financial and statistical tests.

- Negotiated the settlement of numerous claims on behalf of a U.S. bankruptcy estate.

- Managed bankruptcy proceedings on behalf of a regional U.S. electronics chain.

## BUSINESS ADVISORY AND CORPORATE FINANCE

- Designed econometric models to measure revenue impacts of product placements for a global consumer product company.

- Advised a U.S. freight company on the design and implementation of financial and economic forecasting tools.

- Designed sampling procedures to optimize new sporting goods product tests given limited access to college-level athletes.

- Identified demand drivers for an equipment manufacturer based on econometric analyses of distribution channels and inventory levels.

- Developed a comprehensive IT framework that enabled a U.S. manufacturer to project short-term borrowing requirements in a consolidated database/ERP system.

- Designed weekly cash management and monthly financial reporting tools for multiple private equity portfolio companies in the marketing and broadcast industries.

CONFIDENTIAL | DO NOT DISTRIBUTE WITHOUT CONSENT



7250 Dallas Parkway
Suite 200
Plano, Texas 75024
+1.972.377.0300

1000 Louisiana Street
Suite 6925
Houston, Texas 77002
+1.713.457.3125

405 Lexington Avenue
Floor 9
New York, New York 10174
+1.212.364.1926

PARTNER

- Managed numerous projects for a public U.S. technology firm, including: product pricing and bundling analysis, development of operational metrics, and the redesign of the commission structure.

- Designed and implemented automation tools used in numerous business planning and reporting applications for clients in the retail, shipping, and manufacturing sectors.

- Advised a commercial real estate client on the sale of a major U.S. shopping mall.

bvagroup®  Valuation. Disputes. Advisory.

7250 Dallas Parkway
Suite 200
Plano, Texas 75024
+1.972.377.0300

1000 Louisiana Street
Suite 6925
Houston, Texas 77002
+1.713.457.3125

405 Lexington Avenue
Floor 9
New York, New York 10174
+1.212.364.1926

Case 3:19-cv-00407 Document 99-2 Filed 06/13/22 Page 39 of 40 PageID #: 2111

# Indiana Public Retirement System, et al. v. Michael T. Cartwright, et al.
## Supplemental Appendix B - Information Considered

**Court Documents:**
  (1) Memorandum of Law in Support of Defendants' Motion to Dismiss Plaintiff's Amended Complaint, Feb. 12, 2020

**Expert Reports:**
  (1) Expert Report fo W. Scott Dalrymple, Jul. 6, 2021
  (2) Rebuttal Report of Paul Zurek and supporting material, Sept. 7, 2021

**Depositions:**
  (1) Deposition of Paul Zurek, Jun. 1, 2022

**Public Filings - AAC Holdings, Inc.:**
  (1) Form 10-K Dec. 31, 2016
  (2) Form 10-Q, Mar. 31, 2017
  (3) Form 8-K Mar. 13, 2019
  (4) Form 12b-25 Mar. 19, 2019
  (5) Form 8-K Mar. 29, 2019

**Articles and Books:**
  (1) Eugene Fama, "Random Walks in Stock Market Prices," *Financial Analysts Journal*, Jan.-Feb. 1995
  (2) Elaine Henry and Thomas R. Robinson, "Understanding Balance Sheets," *2022 CFA Program, Level I, Reading 18*, 2019

**Case Law and Related Documents:**
  (1) *Grae v. Corrections Corporation of America*, U.S. District Court, Middle District of Tennessee, No. 3:16-cv-02267
  (2) *Dick Smith Representative Proceedings*, Supreme Court of New South Wales, No. 2018/52431

**Other:**
  (1) CFA Program Glossary