| | |
|---|---|
| INDIANA PUBLIC RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br>                       Plaintiff,<br><br>    vs.<br><br>MICHAEL T. CARTWRIGHT, KIRK R. MANZ and ANDREW W. McWILLIAMS,<br><br>                 Defendants. | Civil Action No. 3:19-cv-00407<br><br><u>CLASS ACTION</u><br><br>Judge Eli J. Richardson<br>Magistrate Judge Alistair E. Newbern<br><br>LEAD PLAINTIFF'S REPLY IN SUPPORT OF MOTION FOR CLASS CERTIFICATION |

**[UNDER SEAL]**

- 1 -

**TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ...................................................................................................1

II.    ARGUMENT.........................................................................................................2

       A.     Defendants Have Failed to Prove a Lack of Price Impact ......................2

              1.     Defendants' Concession of Price Impact for the Marketing Claim
                     Dooms All of Their Price Impact Contentions ...........................................2

              2.     Defendants Cannot Prove a Lack of Price Impact for the
                     Restatement Claim.......................................................................................3

                     a.     Defendants Fail to Establish a Lack of Front-End Price
                            Impact ................................................................................................3

                     b.     Defendants Fail to Establish a Lack of Back-End Price
                            Impact ................................................................................................5

       B.     Plaintiff Is Entitled to the *Affiliated Ute* Presumption.............................7

       C.     Common Questions Predominate as to the "Marketing Claim" ..............9

       D.     Common Questions Predominate as to the Alleged Scheme................11

       E.     Damages Are Calculable on a Class-Wide Basis, and Class-Wide
              Questions Regarding Damages Support Certification ..........................14

              1.     Plaintiff's Proposed Methodology for Calculating §10(b) Damages
                     Plainly Satisfies *Comcast*..........................................................................14

              2.     Mr. Dalrymple Was Not Required to Create a Damages Model ...............16

              3.     Mr. Dalrymple's Methodology Can Measure Inflation Associated
                     with Defendants' Marketing Scheme...........................................................16

              4.     Dalrymple's Methodology Can Measure Inflation Associated with
                     Defendant's False Financial Statements .....................................................19

              5.     Mr. Dalrymple's Methodology Can Measure Inflation Associated
                     with Defendants' Scheme ...........................................................................20

III.   CONCLUSION...................................................................................................20

4871-9889-7701.v1

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Anschutz Corp. v. Merrill Lynch & Co. Inc.*,
   785 F. Supp. 2d 799 (N.D. Cal. 2011) ................................................................9

*Aranaz v. Catalyst Pharm. Partners Inc.*,
   302 F.R.D. 657 (S.D. Fla. 2014) ........................................................................2

*Baker v. SeaWorld Ent., Inc.*,
   2017 WL 5885542 (S.D. Cal. Nov. 29, 2017) ..............................................9, 11

*Burges v. BancorpSouth, Inc.*,
   2017 WL 2772122 (M.D. Tenn. June 26, 2017)..........................................5, 7, 8

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
   310 F.R.D. 69 (S.D.N.Y. 2015) ..........................................................................6

*City of Cape Coral Mun. Firefighters' Ret. Plan v.*
   *Emergent Biosolutions, Inc., HQ*,
   322 F. Supp. 3d 676 (D. Md. 2018) .....................................................................2

*Comcast. Weiner v. Tivity Health, Inc.*,
   334 F.R.D. 123 (M.D. Tenn. 2020) ............................................................ *passim*

*Cosby v. KPMG, LLP*,
   2020 WL 3548379 (E.D. Tenn. June 29, 2020)......................................7, 9, 11, 18

*Cosby v. KPMG, LLP*,
   2021 WL 1828114 (E.D. Tenn. May 7, 2021)......................................................2

*Desai v. Deutsche Bank Sec. Ltd.*,
   573 F.3d 931 (9th Cir. 2009) ...............................................................................9

*Dodona I, LLC v. Goldman, Sachs & Co.*,
   296 F.R.D. 261 (S.D.N.Y. 2014) ........................................................................8

*Dougherty v. Esperion Therapeutics, Inc.*,
   2020 WL 6793326 (E.D. Mich. Nov. 19, 2020)..............................................16, 19

*Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*,
   ___ U.S. ___, 141 S. Ct. 1951 (2021).............................................................2, 4

4871-9889-7701.v1

*Grae v. Corr. Corp. of Am.*,
   330 F.R.D. 481 (M.D. Tenn. 2019) ................................................................................. *passim*

*Halliburton Co. v. Erica P. John Fund, Inc.*,
   573 U.S. 258 (2014).............................................................................................................2

*Hatamian v. Advanced Micro Devices, Inc.*,
   2016 WL 1042502 (N.D. Cal. Mar. 16, 2016)...................................................................17

*Haw. Ironworkers Annuity Tr. Fund v. Cole*,
   296 F.R.D. 549 (N.D. Ohio 2013) ....................................................................................14

*In re BancorpSouth, Inc.*,
   2017 WL 4125647 (6th Cir. Sept. 18, 2017) ......................................................................4

*In re Barclays Liquidity Cross & High Frequency Trading Litig.*,
   390 F. Supp. 3d 432 (S.D.N.Y. 2019)..................................................................................9

*In re BofI Holding, Inc. Sec. Litig.*,
   2021 WL 3742924 (S.D. Cal. Aug. 24, 2021) ...................................................................17

*In re FirstEnergy Corp.*,
   2022 WL 681320 (S.D. Ohio Mar. 7, 2022).........................................................7, 13, 14, 15

*In re Teva Sec. Litig.*,
   2021 WL 872156 (D. Conn. Mar. 9, 2021) ........................................................................15

*In re VHS of Mich., Inc.*,
   601 F. App'x 342 (6th Cir. 2015) ......................................................................................15

*In re Volkswagen "Clean Diesel" Mktg.,*
   *Sales Pracs., & Prod. Liab. Litig.*,
   2017 WL 3058563 (N.D. Cal. July 19, 2017)......................................................................9

*In re Xcelera.com Sec. Litig.*,
   430 F.3d 503 (1st Cir. 2005)................................................................................................6

*Joseph v. Wiles*,
   223 F.3d 1155 (10th Cir. 2000),
   *abrogated by Cal. Pub. Emps.' Ret. Sys. v.*
   *ANZ Sec., Inc.*,
   __ U.S. __, 137 S. Ct. 2042 (2017)...................................................................................8, 9

4871-9889-7701.v1

*Junge v. Geron Corp.*,
2022 WL 1002446 (N.D. Cal. Apr. 2, 2022) ...........................................................................15

*Kasper v. AAC Holdings, Inc.*,
2017 WL 3008510 (M.D. Tenn. July 14, 2017) .......................................................................7

*Loritz v. Exide Techs.*,
2015 WL 6790247 (C.D. Cal. July 21, 2015)...........................................................................8

*Ludlow v. BP, P.L.C.*,
800 F.3d 674 (5th Cir. 2015) .................................................................................10, 11, 17, 18

*Norfolk Cnty. Ret. Sys. v. Cmty. Health Sys., Inc.*,
332 F.R.D. 556 (M.D. Tenn. 2019) .........................................................................................7

*Pirnik v. Fiat Chrysler Autos., N.V.*,
327 F.R.D. 38 (S.D.N.Y. 2018) ...............................................................................................6

*Plymouth Cnty. Ret. Sys. v. Patterson Cos., Inc.*,
2020 WL 5757695 (D. Minn. Sept. 28, 2020) .......................................................................19

*Ret. Sys. of Miss. v. TreeHouse Foods, Inc.*,
2020 WL 919249 (N.D. Ill. Feb. 26, 2020) ...........................................................................19

*Ret. Sys. v. Prudential Fin., Inc.*,
2015 WL 5097883 (D.N.J. Aug. 31, 2015) .............................................................................6

*Ret. Sys. v. S. Co.*,
332 F.R.D. 370 (N.D. Ga. 2019).................................................................................2, 4, 6, 16

*Rooney v. EZCORP, Inc.*,
330 F.R.D. 439 (W.D. Tex. 2019) ...........................................................................................5

*Schwab v. E\*TRADE Fin. Corp.*,
285 F. Supp. 3d 745 (S.D.N.Y. 2018),
*aff'd*, 752 F. App'x 56 (2d Cir. 2018).....................................................................................8

*Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*,
552 U.S. 148 (2008)..........................................................................................................13, 14

*Strougo v. Barclays PLC*,
312 F.R.D. 307 (S.D.N.Y. 2016) .............................................................................................8

*Strougo v. Tivity Health, Inc.*,
2022 WL 2037966 (M.D. Tenn. June 7, 2022)............................................................2, 3, 4, 13

*Thiemann v. OHSL Fin. Corp.*,
2001 WL 34142349 (S.D. Ohio Sept. 14, 2001) ...................................................................7

*Thorpe v. Walter Inv. Mgmt., Corp.*,
2016 WL 4006661 (S.D. Fla. Mar. 16, 2016)........................................................................16

*United States v. Bonds*,
12 F.3d 540 (6th Cir. 1993) .....................................................................................................4

*W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*,
2016 WL 4138613 (E.D. Penn. Aug. 4, 2016) ........................................................................6

*W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*,
325 F.R.D. 280 (D. Minn. 2018)..............................................................................................9

*Waggoner v. Barclays PLC*,
875 F.3d 79 (2d Cir. 2017)..............................................................................................8, 9, 15

*Willis v. Big Lots, Inc.*,
242 F. Supp. 3d 634 (S.D. Ohio 2017) ....................................................................................4

*Wilson v. LSB Indus., Inc.*,
2018 WL 3913115 (S.D.N.Y. Aug. 13, 2018)......................................................................16

4871-9889-7701.v1

## I.    INTRODUCTION

Defendants do not dispute most class certification prerequisites.  The disputes they do raise are meritless.[1]

Defendants concede price impact as to the so-called "Marketing Claim."  That fact alone defeats their price impact contentions entirely.    While Defendants try to rebut the *Basic* presumption as to the so-called "Restatement Claim," they fail to show a lack of price impact here as well.[2]    Their expert failed even to examine whether Defendants' misrepresentations and omissions impacted the price of AAC stock when they were made.  This failure is independently fatal to their attempted rebuttal.  If that were not enough, Defendants' expert also tries to use a disclosure that misstated the impact of the restatement to show that Defendants' fraud did not impact the stock price, even though the price dropped significantly after the actual restatement was revealed.  This argument also fails.

Defendants    contend    *Affiliated    Ute*    is    inapplicable    to    a    case    involving    both misrepresentations and omissions without addressing controlling case law in this Circuit holding to the contrary.  Much less do Defendants actually address the extent to which Plaintiff's claims turn on omissions.

Defendants next try to use an idiosyncratic out-of-Circuit damages theory to contend damages cannot be calculated on a class-wide basis whenever harm results from materialization of an undisclosed risk.  That contention is contradicted not only by several cases in this District and others but also by Defendants' own expert.  Class members were harmed because they bought

---

[1]    Capitalized terms not otherwise defined herein have the same meaning as set forth in ECF 77. Unless otherwise noted, emphasis is added and citations are omitted throughout, and all "¶_" and "¶¶_" references are to the Complaint.

[2]    While Defendants' statements and omissions did address two categories of information, Plaintiff does not agree that the "Marketing Claim" and "Restatement Claim" are separate claims.

4871-9889-7701.v1

shares at inflated prices, and that inflation was removed when the undisclosed risks created by AAC's deceptive practices materialized. The resulting harm is necessarily calculable on a class-wide basis. The remainder of Defendants' damages contentions are uniformly rejected by courts in this District and beyond and should be rejected here as well.

## II. ARGUMENT

### A. Defendants Have Failed to Prove a Lack of Price Impact

Having conceded market efficiency, "defendant[s] bear[] the burden of persuasion to prove a lack of price impact." *Goldman Sachs Grp., Inc. v. Ark. Tchr. Ret. Sys.*, ___ U.S. ___, 141 S. Ct. 1951, 1963 (2021); *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 284 (2014) ("It is incumbent upon the Defendant to show the absence of price impact"). This is a "daunting task," *Aranaz v. Catalyst Pharm. Partners Inc.*, 302 F.R.D. 657, 673 (S.D. Fla. 2014) – one requiring Defendants to prove the fraud-related information caused "***no price impact whatsoever***." *City of Cape Coral Mun. Firefighters' Ret. Plan v. Emergent Biosolutions, Inc., HQ*, 322 F. Supp. 3d 676, 687 (D. Md. 2018); *Cosby v. KPMG, LLP*, 2021 WL 1828114, at \*5 (E.D. Tenn. May 7, 2021).

#### 1. Defendants' Concession of Price Impact for the Marketing Claim Dooms All of Their Price Impact Contentions

Defendants do not dispute price impact for the marketing claim. Zurek Rpt., ¶¶9-13. This concession dooms Defendants' price impact contentions entirely because they necessarily cannot meet their burden to show a ***complete*** lack of price impact. *E.g.*, *Strougo v. Tivity Health, Inc.*, 2022 WL 2037966, at \*7 (M.D. Tenn. June 7, 2022) ("To sever the link in this case, [defendants] must show a complete lack of price impact."). This should end the price impact inquiry entirely. *Id.* at \*9 (declining to find an absence of price impact with respect to the "Nutrisystem" claim where defendant "[had] not attempted to dispute price impact" of the "Goodwill" claim); *Monroe Cnty. Emps.' Ret. Sys. v. S. Co.*, 332 F.R.D. 370, 395 (N.D. Ga. 2019) ("concession dooms

- 2 -

Defendants' attempt to rebut the presumption of reliance because the inquiry is whether Defendants have proven a complete lack of price impact during the Class Period"); *Grae v. Corr. Corp. of Am.*, 330 F.R.D. 481, 500 n.8 (M.D. Tenn. 2019). The Court need go no further.

### 2. Defendants Cannot Prove a Lack of Price Impact for the Restatement Claim

Because Defendants have failed to demonstrate a lack of price impact for the so-called marketing claim, the Court need not reach Defendants' price impact arguments regarding the so-called restatement claim. *Supra* §II.A.1. Even if the Court were to examine price impact with respect to the so-called restatement claim, Defendants still cannot prove a lack of price impact.

### a. Defendants Fail to Establish a Lack of Front-End Price Impact

To defeat class certification, Defendants "must show a complete lack of price impact." *Strougo*, 2022 WL 2037966, at *7. While Defendants argue "there is no price impact for the Restatement Claim," they do not even try to show a lack of price impact at the time the misstatements were made. Although Dr. Zurek acknowledges that "[i]n some circumstances, the price impact of information can be measured using the observed increase in the stock price" (Zurek Rpt., ¶58), he nonetheless admits he "did not look at days in which financial statements were . . . issued." Zurek Tr. 32:24-33:1.[3] By ignoring front-end price impact as to the Restatement Claim, Defendants have failed to meet their burden.

Defendants do not dispute AAC's stock price increased by statistically significant amounts on May 3, 2017 (7.9%), August 2, 2017 (19.3%), November 1, 2017 (28.3%), and February 21, 2018 (7.7%), after the release of AAC's financial results, each of which contained false statements.

---

[3] Deposition Transcript of Paul Zurek, dated June 1, 2022 ("Zurek Tr."), attached as Exhibit A to the Declaration of Christopher M. Wood in Support of Lead Plaintiff's Reply in Support for Class Certification ("Wood Decl."), filed concurrently herewith.

Dalrymple Rpt.; ¶¶94, 96, 107.[4]  But Dr. Zurek does not analyze these dates.  Zurek Tr. 33:2-7.

By failing to examine the misstatement dates, Dr. Zurek ignores affirmative evidence of front-end

price impact.  Rebuttal, §III.A.2.  For example, AAC's misstatements resulted in overstatements

of its accounts receivable by up to almost 90% or $41.3 million during the Class Period.  *Id.*, ¶27.

Yet Dr. Zurek fails to consider the magnitude of the overstatements, maintaining instead that

AAC's share price would have remained unchanged if AAC had accurately disclosed its

receivables.  *Id.*, ¶28.

Dr. Zurek's belief that he did not need to test the misstatement dates is irreconcilable with

controlling case law and demonstrates his opinions are unreliable.[5]  Rebuttal, ¶¶18-23.  "[P]rice

impact may be demonstrated ***either*** at the time that the alleged misrepresentations were made, ***or***

at the time of their correction."  *In re BancorpSouth, Inc.*, 2017 WL 4125647, at \*1 (6th Cir.

Sept. 18, 2017).  By failing even to consider whether price impact existed "at the time that the

alleged misrepresentations were made," *id.*, Dr. Zurek cannot "'in fact' 'seve[r] the link' between

a misrepresentation and the price paid by the plaintiff."  *Goldman Sachs*, 141 S. Ct. at 1962;

*Strougo*, 2022 WL 2037966, at \*7.  Defendants have failed to rebut the presumption of reliance.

---

[4]  With respect to the other alleged misstatements, Dr. Zurek "fails to investigate whether the alleged misstatements prevented AAC's share price from declining by less than it otherwise would have."  Expert Rebuttal Report of W. Scott Dalrymple ("Rebuttal"), ¶22 (Ex. B to the Wood Decl.).  While not all alleged misstatements were followed by statistically significant increases in AAC's stock price, this does not preclude a finding of price impact.  *Monroe*, 332 F.R.D. at 394 (collecting cases).  Having failed to conduct ***any*** analysis of these misstatements, Defendants' price impact arguments fail.  *Willis v. Big Lots, Inc.*, 242 F. Supp. 3d 634, 657 (S.D. Ohio 2017).
[5]  For expert testimony to be admissible, "there must be a 'fit' between the inquiry in the case and the testimony, and expert testimony that does not relate to any issue in the case is not relevant and therefore not helpful."  *United States v. Bonds*, 12 F.3d 540, 555 (6th Cir. 1993).

- 4 -

### b. Defendants Fail to Establish a Lack of Back-End Price Impact

The Complaint alleges the truth regarding the restatement claim was revealed, in part, over a two-day period. ¶¶132-137. On April 15, 2019, AAC disclosed its restated financial results, revealing, among other things, that the restatement resulted in: (1) "an estimated decrease of net income of approximately $20.6 million for the year ended December 31, 2016"; and (2) "an estimated cumulative effect adjustment of approximately $23.8 million, recorded as a reduction to stockholders' equity on the balance sheet as of January 1, 2016." ¶132. On April 16, 2019, AAC issued a press release further detailing AAC's restatement, as well as providing revised revenue and EPS estimates for FY19. *Id.*, ¶134. As a result, AAC's stock price declined by more than 13% over a two-day period (*i.e.*, April 15-16, 2019), a statistically significant amount. Rebuttal, ¶48 n.65. This price decline is affirmative evidence of price impact. *Burges v. BancorpSouth, Inc.*, 2017 WL 2772122, at *10 (M.D. Tenn. June 26, 2017) (decline of more than 8% over two-day period following corrective disclosure was evidence of price impact).

Defendants do not dispute the price reaction following these disclosures was negative and statistically significant. Rebuttal, ¶22. Instead, Defendants argue there is no price impact for the Restatement Claim because there was no statistically significant price decline on April 15, 2019. Defendants' Opposition to Plaintiff's Motion for Class Certification (ECF 83) ("Opp.") at 10. However, as Mr. Dalrymple explains, this does not demonstrate a lack of price impact because Dr. Zurek has not shown that the April 15, 2019 disclosures contained no "new value-relevant information about the Restatement Claim." Rebuttal, ¶¶46-49. In any case, "the absence of a statistically significant price adjustment on [April 15, 2019] does not show the stock price was unaffected by the misrepresentation." *Rooney v. EZCORP, Inc.*, 330 F.R.D. 439, 450 (W.D. Tex. 2019). In other words, "the existence of non-statistically-significant stock price declines does not

- 5 -

prove the absence of price impact."  *Monroe*, 332 F.R.D. at 393; *City of Sterling Heights Gen. Emps.' Ret. Sys. v. Prudential Fin., Inc.*, 2015 WL 5097883, at *12 n.8 (D.N.J. Aug. 31, 2015); *W. Palm Beach Police Pension Fund v. DFC Glob. Corp.*, 2016 WL 4138613, at *46 (E.D. Penn. Aug. 4, 2016); *Pirnik v. Fiat Chrysler Autos.*, *N.V.*, 327 F.R.D. 38, 46 (S.D.N.Y. 2018); *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 95 (S.D.N.Y. 2015).

Further, the use of a two-day event window is appropriate.  "[T]he Supreme Court has expressly refused to 'adopt any particular theory of how quickly and completely publicly available information is reflected in market price.'" *Monroe*, 332 F.R.D. at 391.  Multi-day windows are routinely used in securities fraud cases. *See, e.g*., A. Craig MacKinlay, Event Studies in Economics and Finance, J. Econ. Literature, March 1997, at 14-15 ("In practice, the period of interest is often expanded to multiple days, including at least the day of the announcement and the day after the announcement."); David I. Tabak & Frederick C. Dunbar, *Performing the Basic Event Study*, Litigation Services Handbook: The Role of the Financial Expert §19.2 (Roman L. Weil et al. eds., 3d ed. 2001) ("In securities fraud cases, many experts have adopted the convention of looking at one-day, two-day, or five-day periods following an announcement.").

Defendants' argument that "use of a two-day window is contrary to Plaintiff's conclusion of market efficiency" (Opp. at 11) is wrong.  *Barclays PLC*, 310 F.R.D. at 96 (finding efficiency "[b]ecause it is standard for experts to utilize an event window including both the day of the event and the day following an event"); *In re Xcelera.com Sec. Litig.*, 430 F.3d 503, 513 n.11 (1st Cir. 2005) (rejecting argument that two-day event event window is inconsistent with efficient market).

Defendants also argue there is no price impact because AAC's stock price did not decline after AAC preliminarily estimated its restated financials on March 29, 2019.  Opp. at 9-10. However, Defendants ignore that the March 29, 2019 disclosure falsely informed investors the

- 6 -

restatement revealed net income had been **understated** by a cumulative $12.6 million in 2016 to 2018 when, in fact, it had been **overstated** by $20.9 million, as AAC ultimately disclosed on April 15, 2019.  Rebuttal, ¶¶41-45.  Because this disclosure did not reveal the truth, the reaction is irrelevant.  *Kasper v. AAC Holdings, Inc.*, 2017 WL 3008510, at *13 (M.D. Tenn. July 14, 2017) (prior disclosure did not rebut presumption because it "was not curative").

### B.      Plaintiff Is Entitled to the *Affiliated Ute* Presumption

 "Where plaintiffs' claims are based on a combination of omissions and misstatements, courts have acknowledged the applicability of the *Affiliated Ute* presumption as to the element of reliance with regard to alleged omissions."  *Burges*, 2017 WL 2772122, at *10.  In such cases, "reliance [may] be presumed" under **both** "the fraud-on-the-market and *Affiliated Ute* presumptions."  *Id.* at *11.[6]

This case is about both omissions and misstatements.  Plaintiff alleges Defendants "fail[ed] to disclose" or "conceal[ed]" many pieces of material information.[7]  Plaintiff's marketing-related allegations concern the concealment of AAC's deceptive marketing strategies.  While Defendants made statements about their purportedly "'best-in-class'" sales and marketing practices, the case does not turn on whether those statements were technically true.  Even if AAC's marketing practices gave them a short-term advantage, they were deceptive and unsustainable and ultimately

---

[6]     *See also Cosby v. KPMG, LLP*, 2020 WL 3548379, at *26 (E.D. Tenn. June 29, 2020); *Norfolk Cnty. Ret. Sys. v. Cmty. Health Sys., Inc.*, 332 F.R.D. 556, 572-73 (M.D. Tenn. 2019) ("the putative class is entitled to a presumption of reliance under *Basic's* fraud-on-the-market theory and *Affiliated Ute's* omission doctrine"); *Thiemann v. OHSL Fin. Corp.*, 2001 WL 34142349, at *5 (S.D. Ohio Sept. 14, 2001) (common questions predominated under *Basic*'s fraud-on-the-market theory and *Affiliated Ute*'s omissions doctrine); *In re FirstEnergy Corp.*, 2022 WL 681320, at *26 (S.D. Ohio Mar. 7, 2022) (finding reliance adequately pled based on both "*Basic* and *Affiliated Ute* presumptions").

[7]     *E.g.*, ¶¶6, 19, 58-59, 113(c), 117, 144-145.

4871-9889-7701.v1

"'decimated' AAC's business."[8] The rationale of *Affiliated Ute* is fully applicable –how could investors prove they relied on the absence of facts of which they were unaware?

Citing no cases from this Circuit, Defendants argue Plaintiff is not entitled to the *Affiliated Ute* presumption because Plaintiff's claims supposedly "center[] on allegations of affirmative misrepresentations." Opp. at 12. To the extent Defendants' cases hold courts can apply **only** the *Basic* presumption **or** the *Affiliated Ute* presumption, they contradict Sixth Circuit precedent.

Even under the Defendants' standard, the existence of "affirmative misrepresentations" does not "preclude [Plaintiff] from relying on the *Affiliated Ute* presumption." *Dodona I, LLC v. Goldman, Sachs & Co.*, 296 F.R.D. 261, 269-70 (S.D.N.Y. 2014) (cited in *Burges*). Rather, those cases hold "[t]he *Affiliated Ute* presumption applies to cases 'involving primarily a failure to disclose,' which is not the same as cases involving exclusively a failure to disclose." *Id*. at 269; *see also Strougo v. Barclays PLC*, 312 F.R.D. 307, 319 (S.D.N.Y. 2016).

Here, this case is "primarily" focused on the concealed facts – like the extent to which AAC's business relied on deceptive marketing – rather than the literal truth or falsity of Defendants' statements; *Affiliated Ute* thus applies even under Defendants' standard.

Defendants' cases, in addition to being from other Circuits, are inapt. *Waggoner v. Barclays PLC*, 875 F.3d 79, 96 (2d Cir. 2017), involved alleged "omissions" that were "simply the inverse of the Plaintiffs' misrepresentation allegation[s]." *Id.*[9] Because Plaintiff's claim is more

---

[8]    ECF 62 at 31 (citing ¶¶33-49, 67-83).

[9]    *See also Joseph v. Wiles*, 223 F.3d 1155, 1163 (10th Cir. 2000) (defendant allegedly "'omitted to disclose that its financial statements had been falsified'"), *abrogated by Cal. Pub. Emps.' Ret. Sys. v. ANZ Sec., Inc.*, __ U.S. __, 137 S. Ct. 2042 (2017); *Schwab v. E\*TRADE Fin. Corp.*, 285 F. Supp. 3d 745, 753 (S.D.N.Y. 2018) (discussing "failure to disclose the alleged falsity of a representation"), *aff'd*, 752 F. App'x 56 (2d Cir. 2018); *Loritz v. Exide Techs.*, 2015 WL 6790247, at \*21 (C.D. Cal. July 21, 2015) (plaintiffs alleged "numerous affirmatively misleading statements," whereas the omissions were simply undisclosed facts that proved the affirmative statements false).

- 8 -

about omissions than affirmative misrepresentations and is not an attempt to allege "misstatements whose only omission is the truth that the statement misrepresents" (*id.*), *Affiliated Ute* applies.

*Affiliated Ute* also applies because of the scheme claims. As in *W. Va. Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 325 F.R.D. 280, 288 (D. Minn. 2018), the "thrust of the scheme liability claim is omissions, not affirmative statements." The core of the scheme is Defendants' **concealed** deceptive conduct. Therefore, "Plaintiff[] can benefit from the *Affiliated Ute* presumption." *Medtronic*, 325 F.R.D. at 288-90.

Defendants' authority is inapposite. *Joseph*, 223 F.3d at 1163, did not involve scheme liability. *Desai v. Deutsche Bank Sec. Ltd.*, 573 F.3d 931, 941 (9th Cir. 2009), insisted on a "distinction, for purposes of the *Affiliated Ute* presumption, between omission claims, on the one hand, and misrepresentation and manipulation claims, on the other," which is inconsistent with Sixth Circuit authority. *Supra* §II.C.1. Even courts in the Ninth Circuit have declined to rely on *Desai* in cases where "Plaintiff has not alleged a market manipulation scheme. The distinction . . . in *Desai* is therefore not relevant." *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, 2017 WL 3058563, at *15 (N.D. Cal. July 19, 2017). Courts outside the Ninth Circuit have declined to rely on *Desai* at all. *In re Barclays Liquidity Cross & High Frequency Trading Litig.*, 390 F. Supp. 3d 432, 448 (S.D.N.Y. 2019) (collecting cases).[10]

### C. Common Questions Predominate as to the "Marketing Claim"

There is no bar to certifying a class based on a "materialization of the risk" theory of harm. *Grae*, 330 F.R.D. at 496 n.5, 497; *Cosby*, 2020 WL 3548379, at *27-*28; *Baker v. SeaWorld Ent., Inc.*, 2017 WL 5885542, at *14 (S.D. Cal. Nov. 29, 2017). Defendants' contention to the contrary (Opp. §III) relies on a distortion of a single out-of-circuit case.

---

[10]  *Anschutz Corp. v. Merrill Lynch & Co. Inc.*, 785 F. Supp. 2d 799, 818 (N.D. Cal. 2011), relies solely on *Joseph* and *Desai* and is distinguishable for the same reasons.

- 9 -

In *Grae*, Judge Trauger addressed class certification in a securities fraud case where the plaintiff "argued that price impact was established . . . via a 'materialization of the risk' theory," *i.e.*, "a situation where a party's fraud is revealed, not by an express disclosure of the truth, but by a fraudulently concealed risk's coming to fruition." *Grae*, 330 F.R.D. at 496 n.5, 497. Specifically noting "[t]he Sixth Circuit has recognized that materialization of risk is a viable theory of loss causation in a securities fraud case," the Court found defendant had failed to prove the absence of price impact and granted certification. *Id.* at 499-500.

Misconstruing the fact-specific opinion in *Ludlow v. BP, P.L.C.*, 800 F.3d 674 (5th Cir. 2015), Defendants claim a "materialization of the risk theory . . . requires losses to be calculated in different ways for different types of investors, depending on their individual level of risk tolerance." Opp. at 13-14. Not so. The unique "damages theory" advanced in *Ludlow* "hinge[d] on a determination that each plaintiff would not have bought BP stock at all were it not for the alleged misrepresentations – a determination not derivable as a common question, but rather one requiring individualized inquiry." *Ludlow*, 800 F.3d at 690; *see also id.* at 691 ("[W]here the economic loss depends on the posture of the plaintiff vis-à-vis risk tolerance, that loss causation, and thus damage, cannot be presumed nor can it be found class-wide."). Plaintiff here does not claim it would not have bought AAC stock ***at all*** were it not for the misrepresentations. Rather:

> [u]nder plaintiff's liability theory, Defendants' scheme and misrepresentations and omissions of material facts caused AAC common stock to trade at artificially inflated prices between at least March 8, 2017 and November 5, 2018 by inducing artificial inflation in the price of AAC common stock and maintaining existing artificial inflation. According to Plaintiff, individual shareholders were harmed to the extent they experienced losses arising from such artificial inflation.

Dalrymple Rpt., ¶¶89-¶94.

In short, Plaintiff and the Class are pursuing a standard theory of reliance, including that the price of AAC's stock was inflated by the concealment of a risk that later materialized, which

- 10 -

concealment made the stock seem more valuable than it was.  This theory is easily capable of class-wide resolution.  *Grae*, 330 F.R.D. at 496 n.5, 497; *Baker*, 2017 WL 5885542, at *14 (distinguishing *Ludlow* where "[p]laintiffs clearly assert an 'out-of-pocket' damages methodology," certification of which the *Ludlow* court upheld as to one subclass).  Ironically, Defendants' own expert explains how this methodology works, giving the example of a company that conceals "a 30% probability it will lose a major customer," which loss would cause a $10 million drop in the company's value.  Zurek Rpt., ¶67.  As Dr. Zurek explains, "the hypothetical price in the absence of the alleged concealed risk would have been lower than the actual price by $3 million, which is 30% of $10 million."  *Id.*  That inflation is the (class-wide) source of damages in the hypothetical and, similarly, here.

Where a plaintiff "rel[ies] on the out-of-pocket methodology as prescribed in the statute – that is, the artificial inflation per share at the time of purchase less the artificial inflation at the time of the sale" to show damages, "reliance on the *Ludlow* decision [is] unpersuasive," there is no need for an individualized inquiry regarding risk tolerance.  *Cosby*, 2020 WL 3548379, at *27-*28.

### D.  Common Questions Predominate as to the Alleged Scheme

The Complaint alleges Defendants engaged in a scheme to defraud.  *E.g.*, ¶¶24-62; ECF 62 at 7-8 (Plaintiff "accus[es] Defendants (at several places in the Amended Complaint) of perpetrating a scheme . . . by, among other things, 'employing devices, schemes and artifices to defraud.'"); ECF 56 at 4 ("Plaintiff 'alleges that the defendants' entire business model, beyond any misstatements or omissions, [wa]s deceptive.'").

For example, the Complaint alleges Defendants improperly booked revenue associated with services for which "AAC had received partial payment from an insurance company but continued to pursue collections for remaining amounts AAC claimed it was owed."  ¶58.  AAC was ultimately forced to write off substantial portions of this revenue when the cash associated

- 11 -

therewith never materialized, yet it concealed from investors a related SEC subpoena for over seven months. ¶¶125, 144-145. The Complaint further alleges Defendants inflated AAC's revenue by failing to timely write off revenue Defendants were aware AAC was never going to receive, and AAC was compelled to restate its financial statement as a result. ¶¶50-62.

The Complaint also alleges AAC's marketing practices were deceptive. *E.g.*, ¶¶26-49. A substantial portion of AAC's revenue was generated through websites with generic-sounding URLs, such as rehabs.com and recovery.org, which appeared to provide informational resources about drug abuse and drug treatment but which in reality were owned and operated by AAC and designed to drive patients to AAC facilities. ¶¶30-33. When people seeking help called the toll-free phone number displayed on the websites, they were connected with an AAC sales representative who was paid on a commission basis to enroll patients in AAC's facilities. *Id.* These types of deceptive practices became unsustainable as a result of media attention, congressional investigations, and efforts to stamp out such practices by search engines like Google. ¶¶33-49. These efforts to curtail predatory operators from taking advantage of individuals seeking treatment took a profound toll on AAC, which had fueled its growth with deception and lost tens of millions of dollars in revenue when its tactics were thwarted. *Id.*

Despite having chosen not to even seek dismissal of Plaintiff's scheme claims, Defendants now contend Plaintiff cannot show predominance as to such claims. These contentions fail. As explained above, Plaintiff is entitled to the presumption of reliance as to the scheme claims under *Affiliated Ute*. §II.C. Even if *Affiliated Ute* did not apply to the scheme claims, *Basic* would.

Defendants do not separately challenge price impact as to Plaintiff's scheme allegations.[11] Rather, Defendants contend the *Basic* presumption is unavailable for other reasons.

First, Defendants contend Plaintiff's scheme claims are not "sufficiently distinct" from the so-called marketing and restatement claims. Opp. at 15-16. There is no requirement scheme allegations be distinct from alleged misstatements, and Defendants' authority to the contrary predates *SEC v. Lorenzo*, where the Supreme Court expressly rejected such an approach. *Strougo*, 2022 WL 2037966, at *10 ("[M]any . . . post-*Lorenzo* courts have found that scheme claim liability can be based upon misrepresentations or omissions and not just deceptive acts. . . . [Defendants] offer[] no compelling explanation as to why this Court should not join the growing trend."); *FirstEnergy*, 2022 WL 681320, at *7 n.16 ("[s]cheme liability may rest in part on the same statements or omissions that trigger misstatement liability, or it may embrace separate statements or conduct").[12]

Second, *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148 (2008), does not remotely stand for the proposition that *Basic* is unavailable because the alleged scheme was never "disclosed to the market." Opp. at 16. In *Stoneridge*, the question before the Court was whether

---

[11]  Regardless, the evidence of price impact is overwhelming. With respect to AAC's improper partial payment revenue recognition practices, individuals within AAC's own accounting department exchanged text messages regarding the Company's "***so many frivolous [journal entries]***," stating "these numbers are ***total bullshit***" and recognizing "***our stock is up, and it's totally arti[ficial] . . . my question is at what point do you think it will blow up***." Wood Decl., Ex. C at 549-50, 589, 594. Defendants' broad-ranging fraudulent practices did "blow up," in part simultaneously, including on November 6, 2018, when Defendants disclosed "a 'change in estimate of the collectability' of those accounts receivable was necessary," and the risks concealed by Defendants' marketing scheme in part materialized, causing AAC's stock price to decline more than 44%. ¶¶7, 58, 72, 130-131. Evidence of price impact with respect to the so-called restatement allegations is described *supra* at §II.A.2.b.

[12]  Even if this were not the case, the Complaint alleges conduct that goes beyond solely making misstatements. *E.g.*, ¶¶30-32, 46, 57-58, 144-145, 149-150. Defendants' contention that "Plaintiff fails to assert a single distinct act in furtherance of that scheme" therefore fails. Opp. at 15.

- 13 -

§10(b)'s private right of action extended to "aiding and abetting a §10(b) violation." 552 U.S. at 148. The portion of the opinion quoted by Defendants concerned whether Plaintiff relied on deceptive acts by ***third parties*** that were not issuers of the securities in question, owed "no duty to disclose" to the Plaintiff, and were in no way responsible for Charter's (the issuer) decision to misrepresent the transactions in question to Charter's shareholders. *Id.* at 159. Contrary to Defendants' contentions, the Supreme Court rejected scheme liability in *Stoneridge* because the "petitioner did not in fact rely upon [the third parties'] own deceptive conduct" – which the Court found to be too attenuated – not because Charter was successful (for a time) in preventing its fraudulent scheme from being revealed. *Id.* at 159-60.

Courts have rejected the interpretation of *Stoneridge* advanced by Defendants here, noting the "illogical import of Defendants' stance [that Defendants] could be liable for securities fraud only if it willingly put its fraud into broad daylight." *FirstEnergy*, 2022 WL 681320, at *27 (distinguishing *Haw. Ironworkers Annuity Tr. Fund v. Cole*, 296 F.R.D. 549 (N.D. Ohio 2013)).

### E. Damages Are Calculable on a Class-Wide Basis, and Class-Wide Questions Regarding Damages Support Certification

#### 1. Plaintiff's Proposed Methodology for Calculating §10(b) Damages Plainly Satisfies *Comcast*

*Comcast* requires a plaintiff present a methodology showing class-wide damages can be measured in a manner consistent with its theory of liability. *Id.* at 30.

In *Comcast*, the plaintiffs alleged four distinct theories of antitrust liability. *Id*. at 31. However, in granting class certification, the district court found only one theory was capable of class-wide proof. *Id.* As evidence damages could be calculated on a class-wide basis, however, the plaintiffs presented a methodology that "did not isolate damages resulting from any one theory of antitrust impact," instead calculating damages collectively. *Id.* at 32. The Supreme Court found

- 14 -

the proposed methodology did not demonstrate damages could be measured on a class-wide basis because it "identifie[d] damages that [were] not the result of the wrong." *Id.* at 37.

Since *Comcast*, courts have clarified it only "applies where multiple theories of liability exist, those theories create separable anticompetitive effects, and the combined effects can result in aggregated damages." *In re VHS of Mich., Inc.*, 601 F. App'x 342, 344 (6th Cir. 2015). To comply with *Comcast*, a damages model need only measure the harm underlying plaintiff's theory of liability. *Waggoner*, 875 F.3d at 106.

Here, Mr. Dalrymple's proposed methodology plainly satisfies these standards. First, unlike in *Comcast*, Plaintiff here is proceeding under a single theory of liability under §10(b). Plaintiff alleges Defendants engaged in a fraudulent scheme and made material misstatements and omissions throughout the Class Period that artificially inflated the price of AAC's stock, causing Class members to suffer damages when the truth was revealed and inflation was removed from the stock. *See* ¶128. Courts routinely find plaintiffs proceeding under similar theories of liability do not implicate the aggregation concerns present in *Comcast*. *E.g.*, *Junge v. Geron Corp.*, 2022 WL 1002446, at *6 (N.D. Cal. Apr. 2, 2022); *In re Teva Sec. Litig.*, 2021 WL 872156, at *42 (D. Conn. Mar. 9, 2021).

Further, Mr. Dalrymple's proposed methodology directly measures the harm underlying Plaintiff's lone theory of liability. Mr. Dalrymple explains he would measure the inflation in AAC's common stock resulting from Defendants' alleged misconduct. Dalrymple Rpt., ¶¶ 89-91. Mr. Dalrymple further explains, to the extent any issues complicate the quantification of inflation based on the curative events, the share price impact of the alleged misstatements and commissions could be measured "in accordance with Plaintiff's theory of liability." *Id.*, ¶92.

- 15 -

Having proposed a common methodology that would only measure those damages resulting from Plaintiff's lone theory of liability, Plaintiff has satisfied *Comcast*. *Weiner v. Tivity Health, Inc.*, 334 F.R.D. 123, 137 (M.D. Tenn. 2020) (Mr. Dalrymple's methodology satisfied *Comcast* where his "proposed measure for damages [was] . . . directly linked with [Plaintiff's] underlying theory of classwide liability"); *Dougherty v. Esperion Therapeutics, Inc.*, 2020 WL 6793326, at *6 (E.D. Mich. Nov. 19, 2020).

### 2. Mr. Dalrymple Was Not Required to Create a Damages Model

While Defendants do not dispute damages can be calculated on a class-wide basis, they nonetheless criticize Mr. Dalrymple's damages methodology by claiming it is "not a methodology" and Mr. Dalrymple was required to create a damages model to satisfy *Comcast*. Opp. at 17-18. These criticisms are routinely rejected by courts. *Monroe*, 332 F.R.D. at 399 (finding proposed methodology complied with *Comcast* even though expert "ha[d] not yet specified which valuation tools . . . he [would] ultimately use"); *Wilson v. LSB Indus., Inc.*, 2018 WL 3913115, at *17 (S.D.N.Y. Aug. 13, 2018) (rejecting argument expert was required to specify "valuation tools" because "such specificity is not required at this stage"); *Thorpe v. Walter Inv. Mgmt., Corp.*, 2016 WL 4006661, at *16 (S.D. Fla. Mar. 16, 2016) ("'nothing in *Comcast* requires an expert to perform his analyses at the class certification stage'").

All that is required for class certification is to show class-wide damages are capable of measurement "using a common methodology . . . even though certain of the inputs to that model are not yet ascertainable." *Monroe*, 332 F.R.D. at 399. Mr. Dalrymple detailed how he would calculate class-wide damages. Dalrymple Rpt., ¶¶89-95. Nothing more is required at this stage.

### 3. Mr. Dalrymple's Methodology Can Measure Inflation Associated with Defendants' Marketing Scheme

Defendants' contentions regarding the marketing claim are wrong.

- 16 -

First, Defendants assert Mr. Dalrymple's methodology is inadequate because it "fails to account for the mismatch between the contents of the alleged misrepresentation and the alleged corrective disclosures." Opp. at 18-19. However, Defendants' argument is "nothing more than an attack on loss causation" – it is not only premature at this stage but also irrelevant to the issue of predominance. *Hatamian v. Advanced Micro Devices, Inc.*, 2016 WL 1042502, at *9 (N.D. Cal. Mar. 16, 2016) (rejecting argument there was "misalignment between certain misrepresentations and later corrective disclosures" as improper merits challenge); *In re BofI Holding, Inc. Sec. Litig.*, 2021 WL 3742924, at *7 (S.D. Cal. Aug. 24, 2021) (finding issue of whether there is "some 'fit' between the [alleged corrective disclosure] and Defendants' earlier misrepresentations" as "irrelevant to the predominance inquiry underlying *Comcast*"). Indeed, even *Ludlow*, on which Defendants heavily rely, rejected this argument. 800 F.3d at 688 ("the tightness of that fit is a question common to the class, for which *Amgen* did not require proof at the certification stage").

Defendants' argument is also wrong because Mr. Dalrymple has not stated inflation must be measured solely by reference to AAC's share price declines. Dalrymple Rpt., ¶92; Rebuttal, ¶¶62-69. Rather, as he makes clear, his proposed methodology may also be used "to measure the share price impact of alleged misrepresentations directly." Dalrymple Rpt., ¶92.

Second, Defendants' contention that Mr. Dalrymple cannot isolate damages related to Plaintiff's materialization of the risk theory is misplaced. Opp. at 20-21. Mr. Dalrymple makes clear standard financial analysis and valuation techniques "may be used to quantify the impact of changes in expectations and perceived risk associated with a business or earning stream." Dalrymple Rpt., ¶92. Mr. Dalrymple conducted this very analysis in *Grae v. Corr. Corp. of Am.*, 330 F.R.D. 481 (M.D. Tenn. 2019), to measure inflation. Rebuttal, ¶¶70, 72. There, using the same techniques, Mr. Dalrymple "separated the impact of the concealed information from

- 17 -

confounding information (the materialization of disclosed risks that also became known at the same time as the corrective information) in order to estimate inflation in CCA's share price under the plaintiffs' theory." Rebuttal, ¶70. At summary judgment, Judge Trauger denied defendants' *Daubert* motion, finding he appropriately "acknowledge[d] and address[ed] [the] challenge" of "separat[ing] the damages caused by the concealed risk from the loss of value that would have accompanied the relevant adverse event, even if the pre-event risk had not been concealed." *Grae*, 2021 WL 1100431, at *10 (denying motion to exclude Mr. Dalrymple's opinion).

Defendants' reliance on *Ludlow* is also unavailing. As noted above, at issue there was a damages theory that "hinge[d] on a determination that each plaintiff would not have bought BP stock at all were it not for the alleged misrepresentations." *Ludlow*, 800 F.3d at 690. Here, Plaintiff is not proceeding under the damage theory at issue in *Ludlow* but under a standard out-of-pocket damages methodology routinely used to measure §10(b) damages. Dalrymple Rpt., ¶¶89, 94; *Weiner*, 334 F.R.D. at 137. Therefore, Mr. Dalrymple has not assumed putative Class members would not have purchased AAC stock but for the alleged misrepresentation, nor does the damages methodology proposed here require him to make any such assumption. For this reason, courts have rejected this exact argument. *Cosby*, 2020 WL 3548379, at *28 (finding defendants' "reliance on the *Ludlow* decision unpersuasive" where plaintiffs relied on an out-of-pocket methodology). Indeed, even the *Ludlow* court recognized this distinction, noting that a hypothetical plaintiff who would have purchased at a lower price if the risk were disclosed "would be entitled to damages based on the inflated price she paid." 800 F.3d at 690.

Third, Defendants argue Mr. Dalrymple fails to propose a methodology accounting for the "factors incorporated in AAC's 2019 guidance." Opp. at 22-23. Defendants' argument, however, is not germane to predominance. Instead, their "criticisms go to the accuracy of the damages

model and loss causation, but do not prevent class certification because all of these alleged obstacles for accurate calculation of the damages are the same if there is one plaintiff or one million plaintiffs." *Plymouth Cnty. Ret. Sys. v. Patterson Cos., Inc.*, 2020 WL 5757695, at \*15 (D. Minn. Sept. 28, 2020). Indeed, as the ability to disaggregate is itself a question common to the class, this argument supports predominance. *See, e.g.*, *Dougherty*, 2020 WL 6793326, at \*7 ("the extent to which damages would need to be disaggregated is an issue common to all class members."); *Pub. Emps.' Ret. Sys. of Miss. v. TreeHouse Foods, Inc.*, 2020 WL 919249, at \*9 (N.D. Ill. Feb. 26, 2020) ("all the putative class members' claims will live or die by their ability to disaggregate potentially confounding news, making the question 'common' to all of the members"). Defendants' arguments are, therefore, improper at this stage and, if anything, raise another common question to be answered on a class-wide basis.[13]

### 4. Dalrymple's Methodology Can Measure Inflation Associated with Defendant's False Financial Statements

Based upon Dr. Zurek's admittedly one-sided price impact analysis, Defendants claim Mr. Dalrymple has not proposed a methodology for measuring inflation related to the so-called "Restatement Claim." Opp. at 23. Specifically, Defendants argue that because the price of AAC stock did not decline when news regarding the restatement was released, Mr. Dalrymple has not shown his methodology is capable of measuring inflation based on the corrective disclosure dates. Opp. at 23-24. However, Defendants' contention there is no back-end price impact for the restatement claim is incorrect for the reasons set forth above. *Supra* §II.A.2.b.

---

[13] Beyond the impropriety of this argument, it is also wrong. Indeed, Mr. Dalrymple explains that his proposed methodology is capable of "quantify[ing] the impact of any confounding information that may have coincided with a curative event," including information AAC disclosed on April 16, 2019 concerning its guidance revisions. Dalrymple Rpt., ¶92; Rebuttal, ¶¶74-79.

- 19 -

Defendants' argument separately fails because Mr. Dalrymple's methodology expressly provides how inflation associated with Defendants' false financial statements would be measured. Dalrymple Rpt., ¶¶92-94. Mr. Dalrymple explains that where there are "issues complicating the quantification of artificial inflation at the time of a curative event," his methodology "may be used to measure the share price impact of alleged misrepresentations directly." *Id.*, ¶92. For example, by measuring the front-end price impact: "share price inflation can be estimated for any day in the Class Period." *Id.*, ¶93. Defendants' contention is thus baseless.

### 5. Mr. Dalrymple's Methodology Can Measure Inflation Associated with Defendants' Scheme

Misreading the Complaint, Defendants contend Mr. Dalrymple's methodology does not apply to Plaintiff's scheme allegations because "the truth regarding Defendants' scheme was [not] revealed to the market." Opp. at 24-25. However, as set forth above, the circumstances concealed by Defendants' scheme were revealed to the market. *Supra* §II.D. In any event, Mr. Dalrymple makes clear that the terms "misrepresentations," "omissions," and "scheme" are legal definitions that have no bearing on the applicability of his proposed methodology: "[m]y assessment of the impact of certain information on AAC's share price is not dependent on findings as to which of these or other legal definitions would apply to the information allegedly withheld or misstated." Rebuttal, ¶1 n.2. As such, Defendants' argument is inapposite.

## III. CONCLUSION

The Motion should be granted.

4871-9889-7701.v1

DATED: June 13, 2022

Respectfully submitted,

ROBBINS GELLER RUDMAN
  & DOWD LLP
CHRISTOPHER M. WOOD, #032977
CHRISTOPHER H. LYONS, #034853


      s/ Christopher M. Wood
     CHRISTOPHER M. WOOD

414 Union Street, Suite 900
Nashville, TN  37219
Telephone:  615/244-2203
615/252-3798 (fax)
cwood@rgrdlaw.com
clyons@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
DARREN J. ROBBINS
FRANCISCO J. MEJIA
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)
darrenr@rgrdlaw.com
fmejia@rgrdlaw.com

Lead Counsel for Indiana Public Retirement
System

BARRETT JOHNSTON MARTIN
  & GARRISON, LLC
JERRY E. MARTIN, #20193
Bank of America Plaza
414 Union Street, Suite 900
Nashville, TN  37219
Telephone:  615/244-2202
615/252-3798 (fax)
jmartin@barrettjohnston.com

Local Counsel

- 21 -

<u>CERTIFICATE OF SERVICE</u>

I hereby certify under penalty of perjury that on June 13, 2022, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses on the attached Electronic Mail Notice List, and I hereby certify that I caused the mailing of the foregoing via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

s/ Christopher M. Wood
CHRISTOPHER M. WOOD

ROBBINS GELLER RUDMAN
   & DOWD LLP
414 Union Street, Suite 900
Nashville, TN  37219
Telephone:  615/244-2203
615/252-3798 (fax)


Email:  cwood@rgrdlaw.com

# Mailing Information for a Case 3:19-cv-00407 Caudle v. AAC Holdings, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Lohr Alexandria Beck**
  lohr.beck@kslaw.com

- **Paul Kent Bramlett**
  pknashlaw@aol.com

- **Robert P. Bramlett**
  robert@bramlettlawoffices.com

- **Lisa R. Bugni**
  lbugni@kslaw.com

- **Jessica Perry Corley**
  jpcorley@kslaw.com

- **Patrick V. Dahlstrom**
  pdahlstrom@pomlaw.com

- **Logan R. Hobson**
  lhobson@kslaw.com

- **J. Alexander Hood , II**
  ahood@pomlaw.com

- **Jeremy A. Lieberman**
  jalieberman@pomlaw.com,disaacson@pomlaw.com,lpvega@pomlaw.com

- **Jonathan Lindenfeld**
  jlindenfeld@pomlaw.com

- **Christopher Hamp Lyons**
  clyons@rgrdlaw.com,e_file_sd@rgrdlaw.com,clyons@ecf.courtdrive.com

- **Jerry E. Martin**
  jmartin@barrettjohnston.com,jkarsten@barrettjohnston.com,ealexander@barrettjohnston.com,elusnak@barrettjohnston.com,jmartin@rgrdlaw.com

- **Francisco J. Mejia**
  fmejia@rgrdlaw.com

- **W. Travis Parham**
  travis.parham@wallerlaw.com,TAPDocketingClerk-Nash@wallerlaw.com,shelli.dimarco@wallerlaw.com

- **Christopher M. Wood**
  cwood@rgrdlaw.com,agonzales@ecf.courtdrive.com,CWood@ecf.courtdrive.com,agonzales@rgrdlaw.coom,e_file_sd@rgrdlaw.com,CReis@ecf.courtdrive.com,creis(

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)