# EXHIBIT 1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

INDIANA PUBLIC RETIREMENT SYSTEM,
Individually and on Behalf of All Others
Similarly Situated,

Plaintiff,

v.

MICHAEL T. CARTWRIGHT, KIRK R. MANZ,
and ANDREW W. MCWILLIAMS,

Defendants.

Civil Action No. 3:19-cv-00407

SUR-REBUTTAL REPORT OF PAUL ZUREK, PH.D.

July 11, 2022

# Table of Contents

I.     Qualifications and Assignment ......................................................................................... 1

II.    Summary of Opinions ...................................................................................................... 1

III.    Plaintiff's and Mr. Dalrymple's Criticisms of My Restatement Claim Price Impact Opinion Are Unfounded and Wrong ............................................................................... 2

    A.    As an Economic Matter, the Restatement Claim Can Be Analyzed Separately from the Marketing Claim ................................................................................. 3

    B.    Mr. Dalrymple's Criticisms of My Price Impact Opinion Are Unfounded ....... 4

        1.    Front-End Price Impact of the Alleged Misrepresentations ................. 5

        2.    Back-End Price Impact ...................................................................... 10

    C.    AAC's Stock Price Movement on April 16, 2019 Does Not Demonstrate Price Impact of Restatement Claim ......................................................................... 11

## I.  Qualifications and Assignment

1. My qualifications and prior testimony are listed in the Rebuttal Report of Paul Zurek, Ph.D., dated September 7, 2021 ("Zurek Report").  My current CV and list of prior testimony are included as **Appendix A**.

2. I have been asked by counsel for Defendants to review and respond to the opinions in the Expert Rebuttal Report of W. Scott Dalrymple, CFA[1] and assertions in Lead Plaintiff's Reply in Support of Motion for Class Certification,[2] specifically concerning Plaintiff's and Mr. Dalrymple's critiques of my opinions regarding price impact of the Restatement Claim.[3]

3. A list of materials that I have considered in forming my opinions in addition to those in the Zurek Report is included as **Appendix B**.

## II.  Summary of Opinions

4. Overall, the criticisms of my price impact analysis in the Class Certification Reply and Dalrymple Rebuttal are unfounded and do not change the opinions in the Zurek Report.

5. First, while I understand that this is ultimately a legal question for the Court to resolve, as an economic matter, the two claims in this matter (the Marketing Claim and the Restatement Claim) are in fact distinguishable and can be analyzed separately as they concern alleged fraud regarding two distinguishable drivers of value for AAC.  In fact, Plaintiff's allegation that the alleged corrective disclosure on November 6, 2018 only concerned the Marketing Claim implies that if one uses declines on the alleged corrective disclosure dates as measures of dissipation of inflation as proposed by Mr. Dalrymple, inflation would be different for the two claims.

6. Second, while Mr. Dalrymple contends that my analysis does not support my conclusion that the Restatement Claim did not have impact on AAC's stock price during the

---

[1] Expert Rebuttal Report of W. Scott Dalrymple, CFA, dated June 13, 2022 ("Dalrymple Rebuttal").

[2] Lead Plaintiff's Reply in Support of Motion for Class Certification, *Indiana Public Retirement System, Individually, et al. v. Michael T. Cartwright, Kirk R. Manz and Andrew W. McWilliams*, filed June 13, 2022 ("Class Certification Reply," and "Plaintiff").

[3] Cornerstone Research staff, working under my direction, have assisted me in the preparation of this report. Cornerstone Research is being compensated for my work as an expert in this matter at an hourly rate of $850. The compensation is not contingent on the opinions that I reach or the outcome of this litigation.  My opinions are based on information available to me as of the date of this report, and I reserve the right to revise or supplement my opinions should additional information or facts become available or to respond to any additional opinions offered by Mr. Dalrymple.

Proposed Class Period,[4] this is incorrect, and the analysis presented in the Zurek Report in fact supports my opinion and demonstrates that there was no price impact. As I explained in the Zurek Report, under the particular circumstances of this matter, the best evidence of price impact as an economic matter is the reaction of AAC's stock price, or lack thereof, to the release of the totality of information disclosed about the Restatement Claim across all dates that I analyzed.

7.      Third, Mr. Dalrymple's assertion that the statistically significant price movement on April 16, 2019 demonstrates price impact of the Restatement Claim is wholly unsupported and contrary to Plaintiff's assertion of market efficiency. As demonstrated in the Zurek Report, AAC's stock price did not decline on April 15, 2019 when the final restatement figures became public. In fact, AAC's residual stock return on April 15, 2019 was positive and not statistically significant at conventional levels of significance. If the information contained in the restatement was value-relevant and negative and the market for AAC's stock was efficient, as Mr. Dalrymple contends and Plaintiff asserts, AAC's stock price should have at the very minimum begun to decline on April 15, 2019. It did not, which is fully consistent with no price reaction to the disclosure of the final restatement figures in an efficient market and fully consistent with a finding of no price impact.

### III.     Plaintiff's and Mr. Dalrymple's Criticisms of My Restatement Claim Price Impact Opinion Are Unfounded and Wrong

8.      In the Class Certification Reply and Dalrymple Rebuttal, Plaintiff and Mr. Dalrymple level three unfounded and incorrect criticisms of my analysis of price impact of the Restatement Claim:

      a.   That my analysis is insufficient to demonstrate lack of price impact because it only analyzes price impact of the Restatement Claim and not of the Marketing Claim.[5]

---

[4] I understand that Plaintiff is seeking to certify a class of "[a]ll persons who purchased or otherwise acquired the common stock of [AAC] between March 8, 2017 and November 5, 2018, inclusive," (the "Proposed Class Period") excluding AAC, the Defendants, members of Defendants' immediate families, and entities controlled by Defendants." See Memorandum of Law in Support of Lead Plaintiff's Motion for Class Certification, *Indiana Public Retirement System, Individually and on Behalf of All Others Similarly Situated vs. Michael T. Cartwright, Kirk R. Manz, and Andrew W. McWilliams*, filed July 6, 2021, p. 1; Zurek Report, ¶ 5.

[5] See, e.g., Class Certification Reply, pp. 1–3 (emphasis removed). ("Defendants do not dispute price impact for the marketing claim. Zurek Rpt., ¶¶9-13. This concession dooms Defendants' price impact contentions entirely because they necessarily cannot meet their burden to show a complete lack of price impact.") See also, Dalrymple Rebuttal, ¶ 13.

b. That my analysis is insufficient to demonstrate lack of price impact with respect to the Restatement Claim because I only analyze back-end price impact and not front-end price impact, and that my back-end price impact analysis incorrectly focuses only on March 29, 2019.[6]

c. That my analysis fails to show no price impact with respect to the Restatement Claim because there was a statistically significant price movement on April 16, 2019.[7]

9. In the sections that follow, I address each of these criticisms, show that each is unfounded, and discuss the reasons why my opinions remain unchanged from those outlined in the Zurek Report.

### A. As an Economic Matter, the Restatement Claim Can Be Analyzed Separately from the Marketing Claim

10. In its Class Certification Reply, Plaintiff contends that "Defendants do not dispute price impact for the marketing claim [and this] concession dooms Defendants' price impact contentions entirely because they necessarily cannot meet their burden to show a ***complete*** lack of price impact."[8] While I understand that this is ultimately a legal question for the Court to resolve, as an economic matter, the two claims in this matter are in fact distinguishable and can be analyzed separately as they concern alleged fraud regarding two *distinguishable* drivers of value for AAC.

11. First, the Marketing Claim concerns information allegedly withheld about AAC's ability to generate and grow *future* revenue by attracting new clients to its facilities. Plaintiff alleges that AAC's marketing practices designed to generate such future revenue were unsustainable.[9]

---

[6] See, e.g., Dalrymple Rebuttal, ¶¶ 3, 19, 40; Class Certification Reply, pp. 3–7.
[7] See, e.g., Dalrymple Rebuttal, ¶¶ 48–49; Class Certification Reply, pp. 5–6.
[8] Class Certification Reply, p. 2 (emphasis in original).
[9] See, e.g., Consolidated Complaint for Violations of the Securities Exchange Act of 1934, *David Brown Caudle, Individually and on Behalf of All Others Similarly Situated v. AAC Holdings, Inc., Michael T. Cartwright, Kirk R. Manz and Andrew W. McWilliams*, filed November 4, 2019 ("Amended Complaint"), ¶¶ 26–27 ("AAC relied heavily on its sales and marketing efforts to grow revenue."); Memorandum Opinion, *Indiana Public Retirement System, et al. v. AAC Holdings, Inc., et al.*, filed April 8, 2021 ("MTD Opinion"), p. 20 ("Plaintiffs also allege that Defendants made false and misleading statements regarding AAC's marketing practices, touting AAC's 'best-in-class sales and marketing engine' with its 'competitive advantage' to investors...Plaintiffs contend that efforts by the industry and others to curtail such predatory and unscrupulous tactics took a profound financial toll on AAC, which relied heavily on deceptive methods to fuel its growth. These curtailing efforts began to reveal to the market AAC's deceptive practices and resulted in AAC revenue decline of tens of millions of dollars.").

Page 3

Case 3:19-cv-00407   Document 109-1   Filed 07/20/22   Page 6 of 43 PageID #: 2283

12. Second, the Restatement Claim concerns claims that revenues recognized based on services to *current or past* clients (*i.e.*, not *future* clients) were ultimately misreported under GAAP thereby withholding from the market information about the likelihood that these revenues would ultimately translate into cash flows (cash receipts) due to concerns about collectability.[10]

13. Third, consistent with the above, Plaintiff's Amended Complaint has separate sections describing alleged "False and Misleading Statements Regarding AAC's Marketing Practices"[11] and alleged "False and Misleading Statements About AAC's Financial Results and Accounting Practices."[12]

14. Finally, on November 6, 2018, Plaintiff only identifies allegedly corrective information it appears to associate with the Marketing Claim.[13] This implies that if one uses declines on the alleged corrective disclosure dates as measures of dissipation of inflation, as Mr. Dalrymple proposed doing in his expert report, inflation would be different for the two claims. This is further consistent with the two claims being distinguishable and amenable to separate analysis.

### B. Mr. Dalrymple's Criticisms of My Price Impact Opinion Are Unfounded

15. Mr. Dalrymple contends that my analysis does not support my conclusion that the Restatement Claim did not have impact on AAC's stock price during the Proposed Class Period. This is incorrect. The analysis presented in the Zurek Report supports my opinion and demonstrates that there was no price impact.

16. Specifically, Mr. Dalrymple asserts that I do not demonstrate price impact because I did not "analyze the impact of alleged misstatements corresponding to the Restatement

---

[10] See, e.g., Amended Complaint, ¶¶ 51–52, 57 ("As AAC's restated financial statements revealed, by failing to timely write off revenue that defendants were aware AAC was never going to receive, Defendants caused AAC to report its financial condition and operating performance as being much stronger than it actually was."); MTD Opinion, pp. 2, 19–20 ("Defendants made false and misleading statements about AAC's accounts receivable, leading to false financial statements that were ultimately revealed to investors through AAC's Restatement of its financial results for fiscal years 2016 and 2017 and the first three quarters [of] 2018.").

[11] Amended Complaint, V.A.

[12] Amended Complaint, V.B.

[13] See, e.g., Amended Complaint, ¶¶ 129–131. See also, Zurek Report, ¶ 16 ("Lead Plaintiff's description of the alleged corrective disclosure [on November 6, 2019] in its discussion of loss causation (quoted above) only mentions information that Lead Plaintiff appears to associate in its Amended Complaint with being corrective of the Marketing Claim. It contains no mention of provision for doubtful accounts, accounts receivable, or of the subsequent restatement.").

Claim,"[14] that I ignore "evidence that the Restatement Claim did impact AAC's share price,"[15] and that my analysis of back-end price impact is "unreliable and incomplete"[16] and "not indicative of price impact during the Class Period."[17]  As I explained in the Zurek Report, under the particular circumstances of this matter, the best evidence of price impact as an economic matter is the reaction of AAC's stock price, or lack thereof, to the release of the totality of information disclosed about the Restatement Claim across all dates that I analyzed.[18]  Further, as explained in the following sub-sections, Mr. Dalrymple's contentions are unfounded and do not change my opinions.

### 1.  Front-End Price Impact of the Alleged Misrepresentations

17.  Mr. Dalrymple contends that "[i]n order to support his conclusion that the alleged misstatements did not have an impact on AAC's share price, Dr. Zurek would need to examine both the alleged misstatement dates and the corrective disclosure dates (in conjunction with other evidence) in order to show a lack of price impact."[19]  This contention is unsupported.

18.  First, as discussed in the following sub-section, Mr. Dalrymple cannot dispute my finding that AAC's residual return was not statistically significant and negative on any of the days when new information regarding the Restatement Claim was released to the market in 2019, including when the final restatement figures were released prior to the start of trading on April 15, 2019.[20]  This finding holds regardless of whether one uses my or Mr. Dalrymple's event study.[21]

19.  Second, while I am not expressing a legal opinion or concluding in any way how the Court in this case should rule regarding the required burden of proof to demonstrate lack of price impact, I understand that when analyzing price impact, at least some courts have in the past examined only the dates of alleged corrective disclosures.  For example, I understand

---

[14] Dalrymple Rebuttal, p. 5.
[15] Dalrymple Rebuttal, p. 7.
[16] Dalrymple Rebuttal, p. 13.
[17] Dalrymple Rebuttal, p. 16.
[18] See, e.g., Zurek Report, ¶ 36.
[19] Dalrymple Rebuttal, ¶ 20 (emphasis in original).
[20] See Zurek Report, Exhibit 4.
[21] See Zurek Report, footnotes 67–68, 71.

that the Court in *The Erica P. John Fund Inc., et al. v. Halliburton Company, et al.* stated (on remand) that:

> Fraud on the market securities litigation typically focuses on a price change at the time of a corrective disclosure. Fox, *supra* p. 8, at 441. If a particular disclosure causes the stock price to decline at the time of disclosure, then the misrepresentation must have made the price higher than it would have otherwise been without the misrepresentation. *Id*. Measuring price change at the time of the corrective disclosure, rather than at the time of the corresponding misrepresentation, allows for the fact that many alleged misrepresentations conceal a truth. *Id*. Thus, the misrepresentation will not have changed the share price at the time it was made. *Id*.[22]

> To show that a corrective disclosure had a negative impact on a company's share price, courts generally require a party's expert to testify based on an event study that meets the 95% confidence standard, which means "one can reject with 95% confidence the null hypothesis that the corrective disclosure had no impact on price." *Id*. at 442 n. 17.[23]

Therefore, in contending that "[w]hile examining inflation on the subset of days that Dr. Zurek considers may be *necessary* to demonstrating a lack of price impact, it is not '*sufficient*,'"[24] Mr. Dalrymple appears to be inconsistent with the logic outlined by the Court above.

20.    Mr. Dalrymple's contentions are further inconsistent with economic logic and the circumstances of this case specifically.  The gist of Mr. Dalrymple's criticism of my analysis appears to be that "[t]he impact of the Restatement Claim on AAC's financial statements would have been to substantially reduce the company's accounts receivable balances while significantly increasing the magnitude of its net losses."[25]  But, contrary to his assertion, this is what my analysis of the market's reaction to the release of information about the restatement ultimately measures because the restatement did reveal to the market, among other things, that accounts receivable were substantially reduced.

21.    In particular, the market first learned on April 15, 2019 that AAC's historical accounts receivable were lower than previously reported.[26]  For example, AAC reported on

---

[22] *Erica P. John Fund, Inc. v. Halliburton Co.*, 309 F.R.D. 251, 262 (N.D. Tex. 2015) ("2015 Halliburton Opinion").
[23] 2015 Halliburton Opinion.
[24] Dalrymple Rebuttal, ¶ 21 (emphasis in original).
[25] Dalrymple Rebuttal, ¶ 24.
[26] See, e.g., AAC, SEC Form 10-K, filed April 15, 2019, pp. F-11, F-43–F-48.

November 6, 2018 that accounts receivable as of September 30, 2018 were $94.6 million, whereas in its 2018 Form 10-K filed April 15, 2019, AAC reported restated accounts receivable as of September 30, 2018 of $59.8 million, a 37% decline to the previously reported figure.[27] Yet, AAC's stock price did not decline on that day on a residual basis—it increased (although the increase was not statistically significant).[28] Mr. Dalrymple does not explain, and it is not logical to assert, that the absence of any price decline on April 15, 2019 is consistent with a hypothetical price decline earlier had this information been released during the Proposed Class Period.

22. The only explanation offered by Mr. Dalrymple is that AAC's circumstances changed over the Proposed Class Period and into 2019,[29] but this is not as clear as Mr. Dalrymple portrays it to be. AAC was rated *below* investment grade both during the Proposed Class Period and after. While the Company's credit rating was downgraded after the end of the Proposed Class Period,[30] Mr. Dalrymple does not demonstrate why the Company's circumstances were changed so fundamentally as to negate the lack of any discernible negative market reaction to the restatement. In fact, a rating agency (Moody's Investors Service) discussed collectability of reported accounts receivable during the Proposed Class Period:

> AAC's accounts receivable have increased substantially as the company has experienced increasing payor delays, including increased requests for documentation from insurers. While accounts receivables trends appear to be improving, it has not yet translated into improvement in free cash flow.[31]

23. As mentioned, regardless of whether circumstances changed, Mr. Dalrymple offers no basis for his contention that a complete lack of price reaction in March 2019 and April 2019 in response to information about the actual restatement is consistent with there being any

---

[27] AAC, SEC Form 8-K, Ex. 99.1, filed November 6, 2018, p. 7; AAC, SEC Form 10-K, filed April 15, 2019, p. F-43. Accounts receivable was $47.9 million as of December 31, 2018, an approximately 49% decline to the figures previously reported for September 30, 2018.

[28] AAC's residual stock price return on April 15, 2019 was positive 1.3% and not statistically significant at the 5% level of significance using Mr. Dalrymple's event study. Zurek Report, ¶ 50.

[29] Dalrymple Rebuttal, ¶ 51 ("In reality, AAC's circumstances changed dramatically between the Class Period (when the stock traded between $5 and $13 per share) and the dates that Dr. Zurek tests in April 2019 (when the stock traded at around $2 per share). AAC's share price deterioration between the end of the Class Period and April 2019 suggests that market participants were increasingly pessimistic about the company's prospects, such that one cannot simply assume, as Dr. Zurek does, that inferences drawn from share price reactions in April 2019 are indicative of share price inflation during the Class Period.").

[30] *Eikon*.

[31] "AAC Holdings, Inc., Update to key credit considerations," Moody's Investors Service, September 18, 2018, p. 5.

hypothetical price impact earlier during the Proposed Class Period at the time of the alleged misrepresentations.

24. In addition to his assertion that the impact of the restatement on the size of accounts receivable implies price impact (which it does not, given that the market did not react when it learned from the restatement that accounts receivable was 37% lower as of September 2018), Mr. Dalrymple's contentions about restated earnings are equally unpersuasive. Based on Mr. Dalrymple's own Table 2 (and also shown in Figure 1 below and Exhibit 3 to the Zurek Report), the impact of the restatement on net income during the Proposed Class Period was to increase net income in every quarter subject to the restatement except during 3Q 2018, and, for 3Q 2018, the earnings were not reported by AAC until the very last day of the Proposed Class Period, and therefore could only have affected the stock price after the Proposed Class Period ended, if at all.[32] Instead, Mr. Dalrymple resorts to a confusing calculation of cumulative losses, starting with 2016, to misleadingly contend that the impact on AAC's reported income was large.[33]

**Figure 1: Originally Reported and Restated Net Income for Quarters during the Proposed Class Period (*in millions*)**

| Reporting Period | Initially Reported | Restatement Adjustment | Restated |
|---|---|---|---|
| 1Q 2017 | -$1.6 | $0.9 | -$0.8 |
| 2Q 2017 | -$2.9 | $3.1 | $0.2 |
| 3Q 2017 | -$0.4 | $1.1 | $0.7 |
| 4Q 2017 | -$20.2 | $2.7 | -$17.5 |
| 1Q 2018 | -$2.1 | $1.3 | -$0.8 |
| 2Q 2018 | -$5.0 | $1.4 | -$3.6 |
| 3Q 2018 | -$13.2 | -$10.7 | -$23.8 |

25. Indeed, there is economic intuition for why the Restatement Claim would not have had price impact. First, an efficient market values companies based on expected future cash flows.[34] Accounts receivable, current assets, provisions for doubtful accounts, revenue, and earnings affect valuation only to the extent that they are informative about a company's expected future cash flows. While the impact of the restatement on AAC's earnings was

---

[32] Dalrymple Rebuttal, Table 2; Zurek Report, Exhibit 3.
[33] Dalrymple Rebuttal, Table 2.
[34] See, e.g., Zurek Report, Section V.A, footnote 78.

negative before the Proposed Class Period and at the very end of the Proposed Class Period (the 3Q 2018 results announced on November 6, 2018), the impact on earnings for the majority of the Proposed Class Period was positive and AAC's reported cash flow was not affected by the restatement in any period.[35]

26.     In addition, Mr. Dalrymple's focus on the change in the level of accounts receivable to conclude that the restatement would have had price impact is overly simplistic.  His conclusion assumes that the market assumed 100% collectability of accounts receivable, without support and contrary to market commentary.  There is evidence that securities analysts were concerned about collectability of accounts receivable both before and during the Proposed Class Period.  In fact, analysts focused on a metric of collectability, DSO, as I discussed in the Zurek Report.[36]  Several examples of analyst reports mentioning DSO are provided below, and **Exhibit 1** includes numerous additional examples:

- Days' sales outstanding (DSO) increased in the quarter to 95 days, as compared with 88 days last quarter and 96 days at year-end 2015. This remains a **hot-button topic among investors, given the company's large out-of-network revenue stream, so we believe the uptick could garner some negative attention**.[37]  (William Blair, August 4, 2016)

- Our **biggest concern, by far, is the spike in DSOs to 116 days**. This metric, which was 9 days above our forecast, **set a new record** and compares to 88 days a year ago and increased by 6 days from year end.… The damage of high DSOs to Cash Flow from Operations was evident – the company generated only $4.4M of CFFO in the quarter. We expect to learn more about this topic on the earnings call tomorrow. **In short, it's not panic time, but it's our opinion that the stock will likely not work until DSOs begin to decline**.[38] (Raymond James, May 4, 2017)

- **Days sales outstanding (DSOs), which are a hot-button issue on the stock**, also dropped 10 days year-over-year (and five days sequentially) to 101 days in the fourth quarter.[39]  (William Blair, February 21, 2018)

---

[35] See, e.g., Zurek Report, Exhibit 3; AAC, SEC Form 10-K, filed April 15, 2019, pp. 3, F-49–F-54.
[36] See, e.g., Zurek Report, ¶ 36.
[37] "Modest Sales Upside, EBITDA in Line; Sales Guidance Up Modestly and EBITDA Reiterated," William Blair, August 4, 2016 (emphasis added).
[38] "Decent Income Statement, but Those DSOs…" Raymond James, May 4, 2017 (emphasis in original).
[39] "Solid End to the Year, Good 2018 Outlook; Research Study Shows Favorable Outcomes at AAC Facilities," William Blair, February 21, 2018 (emphasis added).

Analysts' discussion of DSO is consistent with the market assigning a discount to the reported accounts receivable to account for concerns about collectability, which is in turn consistent with the lack of price impact when the amount of accounts receivable was ultimately reduced as publicly revealed in the restatement disclosed on April 15, 2019.

27. The above is fully consistent with my opinions in the Zurek Report, including that "whether or not there was price impact...can best be analyzed by examining the observed price movement in AAC's stock price when information about the restatement was made available to the market."[40]

28. Finally, to the extent Mr. Dalrymple's proposed damages methodology purports to compute damages based on price declines on the dates of alleged corrective disclosures,[41] that methodology would imply that there was no price impact of misrepresentations associated with the Restatement Claim earlier during the Proposed Class Period. This is because a damages methodology that measures inflation during the Proposed Class Period using back-end price declines in this case implies that there was no inflation for the Restatement Claim, and therefore no price impact.

### 2. Back-End Price Impact

29. In addition to asserting that I did not examine all relevant dates to determine there was no price impact on the front-end, Mr. Dalrymple asserts that I did not examine all relevant dates on the back-end. As I explained in the Zurek Report, the best evidence of price impact as an economic matter under the circumstances is the reaction of AAC's stock price, or lack thereof, to the release of the totality of information disclosed about the Restatement Claim across *all* dates that I analyzed.[42] Plaintiff and Mr. Dalrymple misleadingly focus on my analysis of March 29, 2019, but I did in fact analyze all the dates on which relevant information was disclosed and found that there was no price impact.[43]

30. In particular, in addition to March 29, 2019, I also analyzed:[44]

---

[40] Zurek Report, ¶ 36.
[41] This is what the Dalrymple Report implies, but which Mr. Dalrymple is now attempting to de-emphasize, presumably in light of my findings that there were no such price declines associated with the Restatement Claim. See Expert Report of W. Scott Dalrymple, CFA, dated July 6, 2021 ("Dalrymple Report"), ¶¶ 90–92; Dalrymple Rebuttal, ¶¶ 61–72.
[42] Zurek Report, ¶ 36.
[43] Furthermore, while I understand that loss causation is an issue to be considered at the merits stage, I note that a further implication of the lack of back-end price impact is that there would be no loss causation with respect to the Restatement Claim, and therefore no damages associated with that claim.
[44] See, e.g., Zurek Report, Exhibit 4.

a. March 13, 2019, the day on which AAC reported 4Q 2018 and FY 2018 operational highlights and announced that it would delay the filing of its FY 2018 Form 10-K and postpone its conference call.

b. March 20, 2019, the first trading day after AAC disclosed it would be unable to timely file is FY 2018 Form 10-K because it was conducting an analysis of its previous estimates of accounts receivable.

c. April 15, 2019, the day AAC filed its FY 2018 Form 10-K which included its restated financials and announced updated timing for its earnings release and conference call. Importantly, this disclosure included the declines in reported accounts receivable that Mr. Dalrymple includes in Table 1 of the Dalrymple Rebuttal. Mr. Dalrymple asserts that the fact that accounts receivable differed substantially between originally reported and restated figures is evidence of earlier price impact.

31. None of these three dates are associated with statistically significant price declines, and Mr. Dalrymple does not dispute this. Therefore, there was no price impact associated with the Restatement Claim for the reasons described in the prior section and in the Zurek Report.

**C.      AAC's Stock Price Movement on April 16, 2019 Does Not Demonstrate Price Impact of Restatement Claim**

32. In his rebuttal report, Mr. Dalrymple states:

> While AAC may not have released additional restated financial information on that day, Dr. Zurek does not consider the likelihood that the impact of AAC's reduced guidance on that day would have been mitigated if AAC had disclosed the correct financial results during the Class Period. In particular, the guidance released on April 16, 2019 would have confirmed that the company's ability to generate earnings going forward was substantially lower, an expectation that investors may have been able to form during the Class Period if the correct financial information had been disclosed.[45]

Mr. Dalrymple's contention that the statistically significant price movement on April 16, 2019 demonstrates price impact of the Restatement Claim is wholly unsupported and contrary to Plaintiff's assertion of market efficiency for the reasons outlined below.

---

[45] Dalrymple Rebuttal, ¶ 48.

33.     First, the entirety of information about the Restatement Claim was made public before the market opened on April 15, 2019 when AAC filed its Form 10-K for FY 2018 at 6:10 AM ET.[46]  The filing of AAC's 10-K was mentioned in a *Bloomberg* news alert prior to the market open.[47]  If the Restatement Claim had an impact on AAC's stock price, it would be expected that AAC's stock price would have declined when the final restatement was announced, and that is the time (and not on April 16, 2019) at which the restatement "would have confirmed that the company's ability to generate earnings going forward was substantially lower."[48]  However, as demonstrated in the Zurek Report, AAC's stock price did not decline on April 15, 2019.  In fact, AAC's residual return on April 15, 2019 was positive and not statistically significant at conventional levels of significance.[49]  This is not disputed by Mr. Dalrymple.

34.     Second, even if one accepts Plaintiff and Mr. Dalrymple's assertion that the Restatement Claim was responsible for at least part of the observed price decline on April 16, 2019, then this would indicate that the market for AAC's stock was not efficient.[50]  As discussed in the Zurek Report, the academic literature is clear that information is incorporated rapidly into a security's price in an efficient market and that a market is semi-strong-form efficient when *all information* that is publicly available is reflected in the price of that security.[51]  The lack of a negative and statistically significant price reaction for AAC's stock on April 15, 2019 is contrary to Plaintiff's assertion of market efficiency if that reaction instead took place on April 16, 2019.

35.     Third, Plaintiff contends in its Class Certification Reply that "the use of a two-day event window" over both April 15, 2019 and April 16, 2019 to evaluate the price impact of the entirety of information about the Restatement Claim "is appropriate."[52]  However, given the timing of information released about AAC's restatement and AAC's stock price movements, a two-day event window cannot be used to establish price impact of the

---

[46] The SEC accepted AAC's Form 10-K for the year ended December 31, 2018 at 6:10:59 AM ET on April 15, 2019.  See https://www.sec.gov/Archives/edgar/data/0001606180/000156459019011552/0001564590-19-011552-index.htm.

[47] *Bloomberg*.

[48] Dalrymple Rebuttal, ¶ 48.

[49] AAC's residual return was positive 1.3% on April 15, 2019.  See, e.g., Zurek Report, ¶ 10, Exhibit 4.

[50] I understand that Plaintiff is seeking to establish efficiency in order to be afforded the presumption of reliance and in order to be able to calculate damages in the manner in which Mr. Dalrymple proposed in his report.  See Zurek Report, ¶ 29.

[51] See Zurek Report, ¶¶ 25–26, footnotes 31, 33–34.

[52] Class Certification Reply, p. 6.

Restatement Claim as a matter of financial economics.  The information that there was an impending restatement was public for over two weeks by the time AAC filed its 10-K for FY 2018 on April 15, 2019 because AAC announced that it would restate its financial statements and that it expected to report a material weakness in its internal controls after market hours on March 29, 2019.[53]  Further, as noted above, the restatement itself was released as part of a 10-K filing by the Company before market hours on April 15, 2019 and was further highlighted by a *Bloomberg* alert before market hours.

36.     As a matter of economics, there should be no dispute that even if the market's reaction to the release of the information contained in the April 15, 2019 restatement for whatever reason look longer than one day, such a reaction should have begun quickly upon the information becoming public, in the morning of April 15, 2019.  This means that the information about the Restatement Claim released as part of the filing of the Form 10-K for FY 2018 should have been (at least partially if for whatever reason not fully) reflected in AAC's stock price on April 15, 2019.  In fact, Mr. Dalrymple himself admitted that if information about AAC was made available through SEC filings before market open, he would expect AAC's stock to start reacting on the same trading day:

> Q. If information about AAC is made available through filings that AAC makes with the Securities & Exchange Commission before the market opens, would you expect the stock to start reacting on that same day?
>
> A. Generally speaking, if the information is available to market participants and if it's -- if it's new and it's value relevant to the stock.[54]

37.     However, AAC's residual return on April 15, 2019 was positive and not statistically significant, demonstrating either lack of price impact (lack of value relevance) or lack of

---

[53] See Zurek Report, ¶ 40.  The March 29, 2019 press release stated, "On March 29, 2019, AAC Holdings, Inc. (the 'Company'), the Audit Committee (the 'Audit Committee') of the Company's Board of Directors and executive management, in consultation with the Company's independent registered public accounting firm, BDO USA, LLP ('BDO'), determined that adjustments to certain of its previously issued financial statements audited by BDO and unaudited quarterly financial statements reviewed by BDO are necessary.  The adjustments relate to estimates of accounts receivable, , [*sic*] provision for doubtful accounts and revenue for the relevant periods described below. … the Company expects to report a material weakness in the Company's internal controls over financial reporting, and, therefore, conclude that internal controls over financial reporting as of December 31, 2018 are not effective.  Although the assessment is not yet complete, management expects to recommend to the Audit Committee certain remedial actions."  See AAC, SEC Form 8-K, filed March 29, 2019.  The SEC accepted this Form 8-K at 17:30:32 PM ET on March 29, 2019.  https://www.sec.gov/Archives/edgar/data/0001606180/000119312519092953/0001193125-19-092953-index.htm.
[54] Videotaped Oral Deposition of W. Scott Dalrymple, Thursday, September 2, 2021, 29:1–9.

market efficiency (due to lack of any discernible price reaction), regardless of whether it could be argued that a two-day window may be appropriate in some circumstances. This is because, as discussed above, the academic literature is clear that in an efficient market, security prices begin to incorporate new information rapidly. In other words, the lack of a price reaction for a full trading day is inconsistent with market efficiency even if one were to argue that the entire reaction would have taken longer than one trading day. Therefore, if the restatement was value-relevant and the market for AAC's stock was efficient, as Mr. Dalrymple and Plaintiff allege, AAC's stock price should have at least started to decline on April 15, 2019. It did not, which is fully consistent with no price reaction to the disclosure of the final restatement figures. Given this, as a matter of economics, there is no dispute that the market for AAC's stock was either not efficient, or the release with the final restatement figures did not have price impact.

38.    Finally, Mr. Dalrymple states:

> Without commentary or context from the company, which was provided the next day, Dr. Zurek has no basis to assume that investors understood the extent to which AAC's restated financial results were indicative of future performance.[55]

His assertion that the market needed additional context from AAC that was allegedly provided on April 16, 2019, is without support. As discussed in the Zurek Report, there was no new, value-relevant information about the Restatement Claim revealed on that day. In fact, I discussed every piece of information related to the restatement that became public on that day and none of it contained new, value-relevant information. No "context" was provided by the Company on April 16, 2019, with the "new" information limited to two sentences not included in the April 15, 2019 Form 10-K filing, none of which contained new, value-relevant information as an economic matter.[56]

---

[55] Dalrymple Rebuttal, ¶ 46.

[56] See Zurek Report, ¶ 45 ("Finally, on April 16, 2019, before market hours, AAC issued a press release that included mention of the restatement and also included its reported financial results for FY 2018. The pre-market press release on April 16, 2019, did not disclose new information about the restatement. It repeated the disclosure AAC made on April 15, 2019, essentially word-for-word with the exception of two additional sentences that were part of the press release. The first sentence ('The restatements do not implicate misconduct with respect to the Company, its management or its employees') was previously included in the March 29, 2019, disclosure. The second sentence ('All comparisons to prior period results contained in this release are presented on an as restated basis') does not include new value-relevant information as an economic matter."). See also, AAC, SEC Form 8-K, filed March 29, 2019; AAC, SEC Form 10-K, filed April 15, 2019, p. 3; AAC, SEC Form 8-K, filed April 16, 2019, pp. 2, 4.

39.   In sum, Mr. Dalrymple's opinions in the Dalrymple Rebuttal do not change my conclusions in the Zurek Report, including my opinion that the Restatement Claim did not have price impact on AAC's stock price during the Proposed Class Period.

Executed this 11th day of July, 2022

_____

Paul Zurek, Ph.D.

## PAUL ZUREK, Ph.D.
### Vice President

**Cornerstone Research**
Two Embarcadero Center, 20th Floor • San Francisco, CA 94111
415.229.8225 • mobile 917.434.7602
pzurek@cornerstone.com

## ACADEMIC BACKGROUND

2002 – 2008   **The Wharton School, University of Pennsylvania**   Philadelphia, Pennsylvania
*Ph.D. and M.A. in Finance*
Research interests include valuation, asset pricing, financial econometrics and financial institutions risk management.

1998 – 2002   **The Wharton School, University of Pennsylvania**   Philadelphia, Pennsylvania
*B.S. in Economics, Minor in Mathematics, Summa Cum Laude*

## PROFESSIONAL EXPERIENCE

7/08 – Present   **Cornerstone Research, Inc.**   New York and San Francisco
*Vice President*
Ten years of experience conducting financial and economic analysis for financial institution and other corporate and individual clients in complex litigation, including securities, valuation, appraisal, market structure, market manipulation, hedge funds, PE and investment management, international arbitration, financial fraud, risk management, and government investigations. Design and oversee development of quantitative analysis models. Provide testimony and presentation of findings to regulators and arbitration panels.

6/10 – 03/11   **United Poles Federal Credit Union**   Perth Amboy, New Jersey
*Director and ALCO Committee Member*
Member of the Board of Directors. Advised on issues of strategy and risk.

9/02 – 12/07   **Kimberton International Associates – The Banking Group**   Kimberton, Pennsylvania
*Senior Consultant*
Designed executive education programs for banking and financial services. Taught seminars on financial institutions risk management, macroeconomics, banking, and general business management. Worked with clients in the United States, Europe and Latin America.

5/01 – 8/01   **Credit Suisse First Boston**   San Francisco, California
*Mergers & Acquisitions Summer Analyst*
Assisted in transactions during both preparatory and due-diligence stages. Performed financial statement, precedent transaction and comparable company analysis. Updated league tables and analyzed revenue, market share and headcount trends in the Technology M&A Group.

**TEACHING EXPERIENCE**

| | |
|---|---|
| Wharton / Ping An Bank Executive Education Program *Taught global economics and credit risk modeling in Beijing, China.* | 2015 |
| Wharton China Asset Management Company Executive Development Program *Taught global financial markets and market microstructure.* | 2011 |
| Risk Management Association and Wharton Advanced Risk Management Program *Instructor (2007–2009) and Academic Co-Director (2009)* | 2007 – 2009 |
| Wharton Hana Financial Hana Leaders Academy Global Course *Instructor in Risk Management* | 2008 |
| Merrill Lynch Investment Banking Institute *Teaching Assistant* | 2006, 2007 |
| Investment Management, Derivative Securities, International Banking, Venture Capital, Corporate Finance, Macroeconomics, Microeconomics *Teaching Assistant* | 2002 – 2008 |

**RESEARCH AND PUBLICATIONS**

"Momentum and Long-Run Risks," Working Paper, *The Wharton School*, November 2007.

"Essays on Asset Pricing," Doctoral Dissertation, *The University of Pennsylvania*, 2008.

The Guide to Damages in International Arbitration. Chapter 16: Market Approach or Comparables (with José Alberro), 1st Edition, November 2016, 2nd Edition, December 2017, 3rd Edition, November 2018.

Commodities: Markets, Performance, Strategies. Chapter 14: Commodity Mutual Funds (with Gustavo Camilo and Janko Cizel), Oxford University Press 2018.

"Collateralized loan obligations in the age of COVID-19" (with Yan Cao and Manuel Vasconcelos), Thomson Reuters Westlaw Expert Analysis, June 22, 2020.

**HONORS AND AWARDS**

| | |
|---|---|
| Outstanding Doctoral Student Paper Award at the Southern Finance Association Annual Meeting, Western Finance Association Doctoral Student Travel Grant | 2008 |
| Weiss Center for International Financial Research Summer Fellowship | 2007 |
| Dean's Fellowship for Distinguished Merit | 2002 |
| Class of 1939 Fellowship | 2002 |

Case 3:19-cv-00407    Document 109-1    Filed 07/20/22    Page 20 of 43 PageID #: 2297

**INVITED AND CONFERENCE PRESENTATIONS, SPEAKING ENGAGEMENTS**

| | |
|---|---|
| "The Rise of Special Purpose Acquisition Companies (SPACs): How to Minimize Securities Litigation Risks" webcast, The Knowledge Group | 2021 |
| "Trends and Updates on Class Action Litigation: Hot Buttons During the COVID-19 Crisis," webcast, The Knowledge Group | 2020 |
| "Discussion: Loss Causation in a Bear Market: The Economists' Perspective," Chicago Bar Association Securities Law Committee | 2020 |
| "The Evolving Securities Litigation Landscape:  Recent Trends and Updates You Need to Know," webcast, The Knowledge Group | 2020 |
| "Effective Use of Statistical Evidence in Class Action Litigation: Practical Guide in 2019," webcast, The Knowledge Group | 2019 |
| "Securities Litigation in 2019:  Winning Tips and Strategies," webcast, The Knowledge Group | 2019 |
| "Proving and Determining Damages in International Arbitration: Methods, Trends and Best Practices," webcast, The Knowledge Group | 2019 |
| Cambridge Forums Forum on Securities Litigation, panel speaker. | 2019 |
| Western Finance Association Annual Meeting, Southern Finance Association Annual Meeting, Drexel University, Ohio State University, University of Iowa, University of Minnesota, University of Notre Dame, Virginia Polytechnic Institute and State University | 2008 |
| The Wharton School | 2007 |

**CONFERENCE PARTICIPATION**

| | |
|---|---|
| Wharton Rodney L. White Center for Financial Research Conference on Financial Decisions and Asset Markets[*] | 2019 |
| American Finance Association Annual Meeting | 2008, 2009, 2011 – 2020 |
| Western Finance Association Annual Meeting[*] | 2008, 2016 – 2018 |
| NYU Five Star Conference in Finance | 2012 |
| Wharton FIC and Oliver Wyman's Risk Roundtable | 2003, 2011 |
| Southern Finance Association Annual Meeting[*], Mid-Atlantic Research Conference in Finance[*] | 2008 |
| Mid-Atlantic Research Conference in Finance[*], Wharton FIC and Oliver Wyman's Risk Roundtable | 2007 |
| NBER's Asset Pricing Program Meeting | 2006 |
| The Philadelphia Fed Policy Forum | 2003 |
| NSF/NBER Time Series Conference | 2002 |

* Paper Discussant or Presenter

**OTHER ACTIVITIES**

Refereed for the Journal of Economic Dynamics and Control and Finance Research Letters.  Fellow at the Wharton Financial Institutions Center.

**TESTIMONY AND EXPERT REPORTS**

In the Matter of Deutsche Bank Securities, Inc. (SEC administrative proceeding 3-17730), presentation to the SEC and NY AG, June 2015.

Pattelli v. Lending Club Corporation, arbitration testimony, January 2016.

In Re: Volkswagen "Clean Diesel" Marketing, Sales Practices, and Products Liability Litigation (MDL No. 2672 CRB (JSC)), expert declaration, August 2016.

Confidential expert reports submitted to the SEC regarding execution quality in FX markets, September 2016 and October 2016.

B.K. et al v. Gregory McKay (2:15-cv-00185), expert report, December 2017.

MidCoast Council and Division CCMF Ltd. v. Fitch Ratings, Inc., Federal Court of Australia, New South Wales (NSD995 of 2014), expert reports, June 2018 and February 2019, expert conclave and joint expert report, June 2019.

In Re: RH Securities Litigation (4:17-cv-00554), expert report, August 2018, deposition, September 2018.

Public Employees' Retirement System of Mississippi v. Treehouse Foods, Inc. et al (1:16-cv-10632), expert report, October 2018, deposition, April 2019.

Aaron Booth and Cody Tucker on behalf of themselves and all others similarly situated v. Galveston County, Texas, et al. (3:18-cv-104), two expert declarations and deposition, January 2019.

Brian C. Schartz, On Behalf of Himself and All Others Similarly Situated and Derivatively on Behalf of Nominal Defendant The Female Health Company v. O.B. Parrish, et al. (2016CH14488 and 2016CH13815, Circuit Court of Cook Country, Illinois, County Department, Chancery Division), expert report, February 2019, deposition, March 2019.

In Re: Spectrum Pharmaceuticals, Inc. Securities Litigation (2:16-cv-02279), expert report, March 2019.

Trevor Mild, Individually and on Behalf of All Others Similarly Situated v. PPG Industries, Inc., Michael H. McGarry, Vincent J. Morales, and Mark C. Kelly (2:18-cv-04231), expert report and deposition, April 2019.

In Re:  Novo Nordisk Securities Litigation (3:17-cv-00209), expert report, June 2019, deposition July 2019.

Christakis Vrakas et al v. United States Steel Corporation et al (2:17-cv-00579), expert report and deposition, June 2019.

Margaret Tinsley, et al. v. Michael Faust, et al. (2:15-cv-00185), expert reports, October and November 2019, deposition, January 2020.

In re Health Insurance Innovations Securities Litigation (8:17-cv-02186), expert report, January 2020, deposition, February 2020.

Frederic Haghebaert, Individually and On Behalf of All Others Similarly Situated v. Tandy Leather Factory, Inc., Janet Carr, Tina L. Castillo, and Shannon L. Greene (4:19-cv-01000), expert declaration, February 2020.

Matt Karinski v. Stamps.com, Inc. et al. (2:19-cv-01828), expert report, August 2020, deposition, October 2020.

Matt Wolther, individually and on behalf of all others similarly situated v. Shubham Maheshwari et al. (18CV329690, Superior Court of the State of California, County of Santa Clara), expert report, February 2021.

Cambridge Retirement System, Individually and On Behalf of All Others Similarly Situated v. Amneal Pharmaceuticals, Inc. et al (SOM-L-1701-19, Superior Court of New Jersey, Law Division, Somerset County), expert report, March 2021.

Indiana Public Retirement System, Individually and on Behalf of All Others Similarly Situated v. Michael T. Cartwright, Kirk R. Manz, and Andrew W. McWilliams (3:19-cv-00407), expert report, September 2021, deposition June 2022.

Shela Camenisch and Dale Dean; Luna Baron; and Eva King, Individually and as Trustee of the Eva M. King Trust, individually and on behalf of all others similarly situated v. Umpqua Bank (3:20-cv-5905-RS), expert report, March 2022, deposition, April 2022.

# Additional Materials Considered

**Analyst Reports**

- "Solid End to First Year as a Public Company; Development Pipeline Looks Robust," William Blair, February 24, 2015

- "Strong Quarter as Company Firing on All Cylinders, But California Charges May Dampen Enthusiasm," William Blair, July 29, 2015

- "Another Solid Quarter; De Novo Outlook Remains Solid, Guidance Increased," William Blair, October 28, 2015

- "Continue to See Weakness as a Buying Opportunity," Avondale Partners, October 28, 2015

- "Reiterates Guidance; Estimates/Price Target Lowered," Raymond James, January 27, 2016

- "Highlights From Recent Travels With Management," William Blair, January 28, 2016

- "Fourth Quarter Largely In Line; 2016 Guidance Calls for Another Year of Solid Growth," William Blair, February 23, 2016

- "Strong Execution Continues; Near-term Catalysts Could Lead to Upside," Avondale Partners, February 23, 2016

- "Reiterate $27 PT on in-line 2016 Guidance; 79% Est. ADC Ramp by 2017," Raymond James, February 24, 2016

- "Remain Buyers as Headwinds Abate & Execution Continues; Initiating '17 Est.," Avondale Partners, May 5, 2016

- "Strong Start to the Year as Novel Bed Additions Drive Growth; Guidance Reiterated," William Blair, May 5, 2016

- "Modest Sales Upside, EBITDA in Line; Sales Guidance Up Modestly and EBITDA Reiterated," William Blair, August 4, 2016

- "Remain Buyers as We Expect Growth Trends to Improve," Avondale Partners, August 5, 2016

- "Upgrade to Strong Buy on Valuation and Upside to Street Estimates," Raymond James, August 15, 2016

- "Key Operating Metrics Remain Strong, but Lab Pricing Pressure Crimps Results, Outlook," William Blair, November 3, 2016

- "Still Believe Value Exists Long-Term; Maintain Buy," Avondale Partners, November 4, 2016

- "First Look at In-Line Fourth-Quarter Results and 2017 Outlook," William Blair, February 28, 2017

- "Expect Trends to Improve in 2017; Remain Buyers at Current Levels," Avondale Partners, March 1, 2017

- "Maintaining $9 Price Target and Estimates Post 4Q," Mizuho, March 1, 2017

## Expert Reports

- Expert Rebuttal Report of W. Scott Dalrymple, CFA, dated June 13, 2022

## Legal Pleadings and Filings

- *Erica P. John Fund, Inc. v. Halliburton Co.*, 309 F.R.D. 251 (N.D. Tex. 2015)

- Lead Plaintiff's Reply in Support of Motion for Class Certification, *Indiana Public Retirement System, Individually, et al. v. Michael T. Cartwright, Kirk R. Manz and Andrew W. McWilliams*, filed June 13, 2022

## Company Filings

- AAC Holdings, Inc., 3Q 2015 Earnings Call Transcript, October 28, 2015

- AAC Holdings, Inc., 4Q 2015 Earnings Call Transcript, February 23, 2016

- AAC Holdings, Inc., 1Q 2016 Earnings Call Transcript, May 5, 2016

- AAC Holdings, Inc., 2Q 2016 Earnings Call Transcript, August 4, 2016

- AAC Holdings, Inc., 3Q 2016 Earnings Call Transcript, November 3, 2016

- AAC Holdings, Inc., 4Q 2016 Earnings Call Transcript, February 28, 2017

- AAC Holdings, Inc., Investor Presentation, March 8, 2017

- AAC Holdings, Inc., 16th Annual Needham Healthcare Conference Transcript, April 4, 2017

- AAC Holdings, Inc., 1Q 2017 Earnings Call Transcript, May 4, 2017

- AAC Holdings, Inc., Investor Presentation, May 23, 2017

- AAC Holdings, Inc., 2Q 2017 Earnings Call Transcript, August 3, 2017

- AAC Holdings, Inc., M&A Call Transcript, September 13, 2017

- AAC Holdings, Inc., M&A Presentation, September 13, 2017

- AAC Holdings, Inc., 3Q 2017 Earnings Call Transcript, November 2, 2017

- AAC Holdings, Inc., Investor Presentation, November 15, 2017

- AAC Holdings, Inc., 4Q 2017 Earnings Call Transcript, February 22, 2018

- AAC Holdings, Inc., Investor Presentation, March 28, 2018

- AAC Holdings, Inc., 1Q 2018 Earnings Call Transcript, May 3, 2018

- AAC Holdings, Inc., 2Q 2018 Earnings Call Transcript, August 2, 2018

- AAC Holdings, Inc., SEC Form 8-K, Ex. 99.1, filed November 6, 2018

**Other**

- "AAC Holdings, Inc., Update to key credit considerations," Moody's Investors Service, September 18, 2018

**Websites**

- SEC Edgar, "AAC Holdings Inc., SEC Form 8-K Filing Detail," accessed July 8, 2022, https://www.sec.gov/Archives/edgar/data/0001606180/000119312519092953/0001193125-19-092953-index.htm

- SEC Edgar, "AAC Holdings Inc., SEC Form 10-K Filing Detail," accessed July 8, 2022, https://www.sec.gov/Archives/edgar/data/0001606180/000156459019011552/0001564590-19-011552-index.htm

**EXHIBIT 1**

# AAC Holdings, Inc.
## Select Company and Analyst Commentary on Collectability and DSO
2/24/15 – 11/8/18

| | Date | Source | Quote |
|---|---|---|---|
| 1. | 2/24/15 | William Blair | Regarding the balance sheet and cash flow generation, days' sales outstanding (DSO) looked solid in the quarter, declining from an estimated 81 days last year to 71 days as of December 31, 2014. This afforded strong cash collections and drove 2014 cash from operations to $8.0 million, versus $3.4 million in 2013. |
| 2. | 7/29/15 | William Blair | Regarding the balance sheet, days sales outstanding (DSO) looked relatively stable in the quarter, declining from an estimated 82 days last year to 80 days as of June 30, 2015. |
| 3. | 10/28/15 | Avondale Partners | Clearly, overhangs still continue to weigh on the stock, but we believe AAC has a solid pipeline ahead with continued room for revenue growth and margin improvement. Near-term, a myopic look at increases in DSO's and doubtful accounts (limited to 3Q), lab reimbursement, and ADR may be causing some investors to stay on the sidelines. … Doubtful Accounts and DSO Increases Likely to Self-Correct. DSOs increased +34.7% YoY, much of which can be attributed to acquired AR at Oxford. The increase in the provision for doubtful accounts is associated with the DSO treatment and not as a result of a material change in payor mix. Increased DSOs impacted margins by about 150 bps, but the negative impact should abate going forward. |
| 4. | 10/28/15 | William Blair | Regarding the balance sheet, days sales outstanding (DSO) increased in the quarter, rising from an estimated 80 days last quarter to 93 days as of September 30, 2015, which could be a nit to pick given the otherwise strong financial performance. |
| 5. | 10/28/15 | 3Q 2015 Earnings Call | Acquired accounts receivables accounted for an increase of seven days of our DSOs compared to normal operations. |
| 6. | 10/28/15 | 3Q 2015 Earnings Call | Q: And then final one and I will hop off, just the bad debt ticked up a little bit sequentially. Is there anything in particular there, or is that lab related? Any color you can offer us there? <br><br> A: I think that's predominantly directly related to the increase to the DSOs. Again, let me clarify its provision for doubtful accounts which is directly impacted by aging and so we saw an uptick in DSOs related to the acquisition of the AR. We had some slower collections in the quarter related to some transition on the lab billing side. But our expectation is to make improvements of that in the fourth quarter. |

EXHIBIT 1

# AAC Holdings, Inc.
## Select Company and Analyst Commentary on Collectability and DSO
2/24/15 – 11/8/18

| | Date | Source | Quote |
|---|---|---|---|
| 7. | 10/28/15 | 3Q 2015 Earnings Call | Q: [O]n the DSOs, I think you mentioned -- I didn't catch the number but a lot of the sequential uptick is just due to acquisitions.  So number one, can you give me what the impact was sequentially on that?  And then number two, do you think that can normalize into Q4 or early Q1 where we might see that DSO level come back down?<br><br>A: I think you will continue to see it move up and down as we do acquisitions, when we bring on places like Oxford, when we bring on different in-network contracts.  You are going to see it go up and down. … On the DSOs, part of the -- seven days of the increase were specifically related to AR that was acquired as part of the acquisition, so that's part of the uptick in addition to what Michael just outlined. |
| 8. | 10/28/15 | 3Q 2015 Earnings Call | Q: [I]f you go more in network I assume those are lower DSOs, so that would have a diluted impact on DSOs, if you will?<br><br>A: Long-term, [in-network DSOs] will be lower DSOs but short-term they may raise your DSOs a little bit as you are transferring over that company.  When you take it over and you start working with that insurance company, it may take a little bit to get your new entity into the system.  And so it may actually raise DSOs temporarily and then it will definitely bring them down because you definitely get lower DSOs on in-network versus out-of-network. |
| 9. | 1/27/16 | Raymond James | Other model metrics of note:  We assume by 4Q16 that DSOs will decline to 80 and that bad debt expense falls back to historical levels (~8% of revenue) by 4Q16. |
| 10. | 1/27/16 | Raymond James | Company-Specific Risks for AAC Holdings, Inc. … Reimbursement and Collectability ... The company is an out-of-network provider, which may impact its ability to collect full reimbursement in some situations.  As a result, the company's revenues may come under pressure should payors implement greater restrictions, including but not limited to:  disregarding the assignment of payment from clients to out-of-network providers (i.e., sending payments directly to clients instead of the company), capping out-of-network client benefits, and waiving out-of-pocket payments. |

EXHIBIT 1

# AAC Holdings, Inc.
## Select Company and Analyst Commentary on Collectability and DSO
2/24/15 – 11/8/18

| | Date | Source | Quote |
|---|---|---|---|
| 11. | 1/28/16 | William Blair | Days Sales Outstanding (DSOs).  AAC's DSO levels also have become a hot-button topic among investors, as third-quarter DSOs rose to 93 days, versus 80 days in the prior quarter.  Management highlighted that DSOs rose again in the fourth quarter, but were up only 3 days, to 96 days sales outstanding.  Equally important, management indicated that DSOs had dropped back to 89 by December 2015 and that it anticipates DSOs will normalize (in the low-to mid-80 day level) by mid-2016.  In explaining the DSO jump, management discussed M&A transactions, the conversion to the ICD-10 coding mandate, and conversion of its lab billing software as reasons for the temporary uptick in DSOs.  Moreover, management highlighted that its trailing-12-months' cash deposits to net revenue have remained very strong—at between 99% and 101% each quarter over the last two years (so cash collections appear robust).  While we expect bears to continue to focus on this issue, until resolved, we believe the cash collection data is compelling and note that year-end DSOs at 89 show a favorable trend. |
| 12. | 2/23/16 | Avondale Partners | Doubtful Accounts and DSO Increases.  DSOs increased +35.2% YoY, due to a number of reasons such as, ICD-10, Acquired A/R, and conversion to lab billing software.  The increase was not as a result of a material change in payor mix.  DSOs have started to decline meaningfully (89 and 85 in December 2015 and January 2016 respectively), and we expect that this metric will continue to abate in 2016. |
| 13. | 2/23/16 | William Blair | Looking at DSOs, the company experienced a modest sequential uptick to 96 days sales outstanding, up from 93 days in the third quarter.  While investors may continue to focus on this uptick, DSOs dropped to 89 in the month of December and 85 days in January, and should continue to trend down to more normalized levels (80 to 90 days) by second quarter 2016 (as ICD-10 related billing issues dissipate, acquired accounts receivable are no longer a drag, and the company completes the migration to new lab billing software). Moreover, management highlighted that trailing-12-months' cash collections to net revenue remained at roughly 100% in the quarter (indicating that collection experience remains in line with recognized net revenues). |
| 14. | 2/23/16 | 4Q 2015 Earnings Call | Days sales outstanding were 96 days for the fourth quarter compared with 71 days a year ago and 93 days in the third quarter.  As disclosed in our preannouncement last month, we experienced a drag in the fourth quarter due to the ICD-10 implementation, new facility start-up, acquired AR and delays resulting from the conversion to a new billing platform for our laboratory.  That being said, December and January were the 2 best collection months we've experienced to date.  DSOs were 89 and 85 days, respectively, in those 2 months. |

**EXHIBIT 1**

# AAC Holdings, Inc.
## Select Company and Analyst Commentary on Collectability and DSO
2/24/15 – 11/8/18

| | Date | Source | Quote |
|---|---|---|---|
| 15. | 2/23/16 | 4Q 2015 Earnings Call | Q: As we think about DSOs this year, how do you -- where do you think they step down to and then stabilize?  And how -- I know it's a process, but when do you – what do you think they'll be running?  What are you thinking about back half of the year?<br><br>A: It's been – we've consistently seen in the past where we would think it to be kind of in that 80- to 90-day range.  Obviously, we had some good gains in December and January.  So our goal is to try to get that closer to 80 by the end of the year. |
| 16. | 2/24/16 | Raymond James | Call highlights:  (1) Management expects DSO's to drop to 80 by the end of 2016, with a 80-90 DSO run-rate range. |
| 17. | 5/5/16 | Avondale Partners | DSO Improvement.  DSOs were 88 for 1Q, down significantly from 96 as cash collections improved.  AAC expects DSOs to waiver in the 80-90 day range given its out of network characteristics.  DSOs will see timing shifts, especially around de novo's and acquisitions. |
| 18. | 5/5/16 | William Blair | As mentioned earlier, the company experienced a sequential decline in days' sales outstanding (DSO), down from 96 days in the fourth quarter 2015 to 88 days in the current period.  Despite management's reassurances that DSO would trend down in the first quarter of 2016, this remained a hot-button topic among investors, so we view the solid DSO decline (and positive cash flow from operations this quarter) as a favorable data point. |
| 19. | 5/5/16 | 1Q 2016 Earnings Call | Days sales outstanding decreased 8 days in the first quarter.  DSOs were 88 days for Q1, down from 96 days from Q4 of 2015.  The decrease in DSOs was primarily the result of strong cash collections during the quarter. |
| 20. | 5/5/16 | 1Q 2016 Earnings Call | Q: Kirk, maybe if you could give us an update on DSOs.  I know that they improved sequentially, good cash collections there.  But I think I saw in a presentation that maybe January was tracking at around 85 days.  So just curious what the uptick was maybe for the quarter.  And as you bring on acquisitions and transfer ownership and open Laguna Beach, for example, should we expect to see DSOs increase in the second half, just given all that moving -- that movement?<br><br>A: We made great gains.  In the first quarter, we had record collections, and it was a strong quarter for us.  There were specific reasons that we articulated in prior calls related to fourth quarter increasing in 2015 related to a couple of different elements regarding acquisition AR -- acquisition-related AR, ICD-10 and some conversion billing software that we implemented internally.  And we see that we're kind of on the back end of that.  Historically, we've always felt kind of DSOs in that 80- to 90-day range is kind of where we'd like to be.  And we're there now, so we feel good about our collections efforts at this point. |

EXHIBIT 1

# AAC Holdings, Inc.
## Select Company and Analyst Commentary on Collectability and DSO
2/24/15 – 11/8/18

| | Date | Source | Quote |
|---|---|---|---|
| 21. | 5/5/16 | 1Q 2016 Earnings Call | We've said since day 1 when we went public that we're an out-of-network provider. 80 to 90 days for DSOs was very normal. Occasionally it could uptick when we do acquisitions. If we were doing government sector contracts, or we were doing Medicare, you would see those DSOs in a different format. And I think many times, we get compared to organizations where 50% to 70% of their business is government-funded business, and they have lower DSOs. We've said very clearly that 80 to 90 is a very appropriate range for out-of-network providers, and I think you'll see that with any other out-of-network providers that are in the marketplace. So you're going to see a little bit of movement, but we feel very strongly about our cash collections and the progress that we've been making. |
| 22. | 8/4/16 | William Blair | Days' sales outstanding (DSO) increased in the quarter to 95 days, as compared with 88 days last quarter and 96 days at year-end 2015. This remains a hot-button topic among investors, given the company's large out-of-network revenue stream, so we believe the uptick could garner some negative attention—although we acknowledge that recent facility openings and M&A activity could add some volatility to this metric going forward. |
| 23. | 8/4/16 | 2Q 2016 Earnings Call | DSOs were 95 days for the second quarter compared with 80 days a year ago and 88 days in the first quarter. The year-over-year increase in days was related to acquisitions in de novo projects. Off note, our provisions for doubtful accounts decreased to 6.9% of revenue, down from 7.8% from the prior-year period. And we had strong cash collections in the second quarter. |
| 24. | 8/4/16 | 2Q 2016 Earnings Call | Q: And then last one, just on the DSOs. I know you talked some of the acquisitions and the de novo opening. Should we think about that kind of staying at this somewhat elevated level in the Q3, as we digest or might we see the DSO start to tick back down again to the high 80s, low 90s?<br><br>A: If you look at our legacy residential facilities, they are sitting at about 84 days compared to our 95 DSOs over the whole company. So as those acquisitions kind of get fully integrated, as those de novo operate, we would expect that to come, to start to trend downward. |
| 25. | 8/4/16 | 2Q 2016 Earnings Call | Q: So just a follow-up on the DSO. So the sequential uptick was mainly due to acquisitions, is that what we should assume?<br><br>A: Most of [the sequential uptick in DSO] is due to the acquisitions as well as just the de novo projects that we have, that we've brought online as well. |

EXHIBIT 1

# AAC Holdings, Inc.
## Select Company and Analyst Commentary on Collectability and DSO
2/24/15 – 11/8/18

| | Date | Source | Quote |
|---|---|---|---|
| 26. | 8/5/16 | Avondale Partners | DSO Affected by Growth. DSOs were 95 for 2Q (vs. 80 LY) mainly due to recent acquisitions and de novo projects. These facilities still need some work before they can reach legacy levels, which were actually 84 days in 2Q. We should also expect DSO to decrease going forward as the mix shifts to include more INN clients. |
| 27. | 8/15/16 | Raymond James | Company-Specific Risks for AAC Holdings, Inc. ... Reimbursement and Collectability ... The company is an out-of-network provider, which may impact its ability to collect full reimbursement in some situations. As a result, the company's revenues may come under pressure should payors implement greater restrictions, including but not limited to: disregarding the assignment of payment from clients to out-of-network providers (i.e., sending payments directly to clients instead of the company), capping out-of-network client benefits, and waiving out-of-pocket payments. |
| 28. | 11/3/16 | William Blair | Days' sales outstanding (DSO) increased in the quarter to 105, compared with 95 last quarter and 93 during the year-ago period. As highlighted last quarter, we believe the bulk of this uptick relates to recently acquired assets, as the company's legacy operations have averaged mid- to high-80 DSO (management indicated legacy facilities had DSO of 81, versus 84 in the prior quarter); still, we will look to the call for more guidance on this topic, as it will remain an area of investor attention and since we anticipated a modest downtick in DSO during the period. |
| 29. | 11/3/16 | 3Q 2016 Earnings Call | DSOs were 105 days for the second quarter compared with 93 days a year ago and 95 days in the second quarter. DSOs at legacy facilities were 81 days, down from 84 days in the second quarter. The increase in DSOs was related to acquired AR, de novo projects and slower lab collections. Our provision for doubtful accounts was $4.8 million or 6.8% of revenue, down from $5.4 million or 9.4% from the prior year period. |
| 30. | 11/4/16 | Avondale Partners | The current picture of increasing DSOs, lower sequential margins and CFOPS, and lower lab revenue is spooking investors, but we still see a path to at least 15% EBITDA growth in 2017 and expect results to improve . … AAC reported further deterioration in DSOs, which increased to 105 in 3Q versus 93 LY. Recent acquisitions and de novo projects continue to impact this metric; however, in 3Q, the company also reported slower collections on lab. It appears that payors are seeking additional documentation for lab reimbursement, which is causing a bit more paperwork and additional time to collect. Overall, new facilities still need work before they can reach legacy levels, which actually saw a sequential improvement in DSO to 81 days in 3Q versus 84 in the previous quarter. Overtime, we would expect DSOs at legacy facilities to decline as the penetration of in network beds continues, which offsets the longer collection period for out of network facilities. |

EXHIBIT 1

# AAC Holdings, Inc.
## Select Company and Analyst Commentary on Collectability and DSO
### 2/24/15 – 11/8/18

| | Date | Source | Quote |
|---|---|---|---|
| 31. | 2/28/17 | William Blair | Days' sales outstanding (DSO) continue to be a focus on the company's balance sheet, in our view, as DSO rose to 111, compared with 105 last quarter and 96 during the year-ago period. While management has highlighted M&A and de novo developments as culprits in recent quarters, we also believe laboratory billings are modestly elevating the DSO profile of the organization (which management also has acknowledged in prior earnings calls). Still, we will look to the call for more guidance on this topic, as it will remain a key area of investor attention. |
| 32. | 2/28/17 | 4Q 2016 Earnings Call | DSOs were 111 days for the fourth quarter compared with 96 days from the prior year period. Our DSOs continued to be impacted by increased documentation requests, by commercial payers prior to payment and slower collections related to laboratory services. Our provision for doubtful accounts was $6.3 million or 8.7% of revenue compared to 8.9% from the prior year period. Our cash deposits to net revenue was 100.9% for the trailing 12 months ended December 31. We had $4 million of cash at quarter-end with outstanding debt inclusive of our senior credit facility in Deerfield's convertible notes of $189 million. |
| 33. | 2/28/17 | 4Q 2016 Earnings Call | Q: So -- I just want to go back to the DSOs. Andrew, I think, you said that the collection rates haven't changed. Can you give us some data on the collection rates when it comes to lab reimbursements?

A: Yes. When we've taking a look back at the historical collection rates on our lab, over, specifically now that we've seen this uptick in the DSOs, we haven't seen a dramatic change in the -- our collection success rate in that.

Q: And is that -- okay. Do you have data behind that, how it's trending or no, actual collection numbers?

A: I mean, obviously, in booking -- when recording our revenue and allowance for doubtful accounts, we take a look at the historical collection trends, write-offs, et cetera, over the lab. And the correlation between the increase in the DSOs due to additional documentation requests from the payers and our collection success rate, there isn't one. Those aren't in correlation together. As we have seen our DSOs go up, we haven't seen our collection rates go down. |

EXHIBIT 1

# AAC Holdings, Inc.
## Select Company and Analyst Commentary on Collectability and DSO
### 2/24/15 – 11/8/18

| | Date | Source | Quote |
|---|---|---|---|
| 34. | 2/28/17 | 4Q 2016 Earnings Call | Q: So let's start with the DSOs, if we could.  I was just wondering, in your presentation, you had given us the breakout before in the third quarter.  So I just wanted to know, what are the legacy DSOs?  What's going on with acquisitions in de novo?  Or maybe, just any additional color you can give us on the 111 days from your presentation.<br><br>A: The DSOs continue to be impacted consistent with prior quarters by our labs.  Again, the primary reason for that is the request of additional documentation prior to payment.  We're not seeing any increase in -- or decrease in collections as a result of that.  It's just taking longer to get paid on those claims.<br><br>Q: And so I remember that you were going to be a little proactive with your payers and getting them the documentation upfront.  Are you still doing that?  And then you also mentioned, I think, that payers are just looking for more documentation -- is that just lab or is that also for your regular business?<br><br>A: On the lab front, Paula, we are putting systems in place and sending the chart many times with the claim and that will expedite it a little bit.  It hasn't really sped it up for the fourth quarter.  You didn't really see that material improvement.  It was pretty flat quarter-over-quarter from the lab DSOs, and that's really the driver for it being up in the first place.  Overall, in 2016, across the board, I think, all the insurance providers are asking for more documentation.  They're looking at levels of care.  We're not really seeing that impact your day-to-day at your facility, but they certainly are -- in terms of the DSOs, but you're certainly are seeing more and more looking at charts and treating operations like a Medicare or Medicaid facility from the commercial insurance payers. |
| 35. | 2/28/17 | 4Q 2016 Earnings Call | Q: And just on the subjects of cash flow in 2017, what's a good number for cash flow from operations?  And what's your DSO assumption for '17 for the total business?<br><br>A: Earlier, we talked about free cash flow of about $20 million for 2017.  That assumes -- that's inclusive of scheduled debt payments, obviously, interest, maintenance CapEx of roughly about 3% of revenue.  And then we're scheduling DSOs to come down in 2017, obviously, based on our initiatives and working with the payers.  However, that's not going to be a very quick process.  I mean, we can get that down to about 100 down from where we're at, but it's not going to be -- it's not like we're going to be substantially below 90 as an out-of-network provider. |

EXHIBIT 1

# AAC Holdings, Inc.
## Select Company and Analyst Commentary on Collectability and DSO
### 2/24/15 – 11/8/18

| | Date | Source | Quote |
|---|---|---|---|
| 36. | 3/1/17 | Avondale Partners | While DSOs continued to increase, it does not appear that AAC is seeing any adverse impacts to its collections currently. … However, DSOs of 111 in 4Q increased vs. 105 in 3Q'16 and up from 96 LY as payors request additional documentation.  It is important to note that while DSOs are lengthening, the collections are not seeing an adverse impact. … DSO Continues to Increase.  In 4Q, AAC reported DSOs of 111 days (vs. 96 LY and 105 in 3Q'16) due to increased documentation requests by commercial payors and slower collections on the lab business.  While AAC is working on putting systems in place to facilitate documentation requests, it is still in early stages and thus far it has not sped up the process.  According to Management, the increased documentation has not led to a decline in collections or changes in the amount of collections currently, which we believe is positive.  However, we do continue to watch DSOs closely for signs of stabilization. |
| 37. | 3/1/17 | Mizuho | Increasing DSO concerning.  DSO increased to 111 compared with 105 days in 3Q:16 and 96 for 4Q:15 due to increased documentation requests by commercial payors and slower collections related to laboratory services.  While AAC noted that the collection rate is unchanged and this is solely a timing issue, we find the trend concerning.  The company expects DSO to stabilize to around 100 by the end of 2017. ... Conclusion.  Operating results were good, but weakness in the lab business and worsening DSO bears watching. |
| 38. | 3/8/17 | Investor Presentation | Facility DSO's have remained under 90 days … Payor requests for clinical documentation (physician orders and test results) have extended lab collection days … Collections … While Days Sales Outstanding (DSOs) have fluctuated quarter over quarter, trailing Twelve Months Cash Deposits to Net Revenue (revenue less allowance for doubtful accounts) has remained consistent and deposits have continued to increase. |
| 39. | 4/4/17 | 16th Annual Needham Healthcare Conference | So DSOs have been a topic that has been discussed out there regarding our DSOs which increased from 90 days to 111 days by the fourth quarter.  And, effectively, the drive and increase of the DSOs comes from the lab side of our business. … there was a lot of, I think, scrutiny within the lab business and rightly so. … There was fraud and abuse from a few providers in the lab space and, if you are a payer and you want to eliminate fraud and abuse, the best way to do it is through adding -- requiring basically clinical documentation. … The challenge is with that is that what it has done is it has slowed the time which we do get paid.  And so if you can think, a typical payer, we submit a claim, they wait; they then submit a clinical documentation request, we then get the documentation, we then send it to them.  They then send back another request saying now you showed us the doctor's orders, show us the test results.  And long story short is that you have an elongation of the payment period on the lab side, which has impacted our DSOs. |

**EXHIBIT 1**

# AAC Holdings, Inc.
## Select Company and Analyst Commentary on Collectability and DSO
2/24/15 – 11/8/18

| | Date | Source | Quote |
|---|---|---|---|
| 40. | 5/3/17 | William Blair | Days' sales outstanding (DSO) continue to be a focus on the company's balance sheet, in our view, as DSO rose to 116, compared with 111 days last quarter. While management has highlighted M&A and de novo developments as culprits in recent quarters, we also believe laboratory billings are modestly elevating the DSO profile of the organization (which management also has acknowledged in prior earnings calls). Still, we will look to the call for more guidance on this topic, as it will remain a key area of investor attention. |
| 41. | 5/4/17 | Raymond James | Decent Income Statement, but Those DSOs … Our biggest concern, by far, is the spike in DSOs to 116 days. This metric, which was 9 days above our forecast, set a new record and compares to 88 days a year ago and increased by 6 days from year end … The damage of high DSOs to Cash Flow from Operations was evident – the company generated only $4.4M of CFFO in the quarter. We expect to learn more about this topic on the earnings call tomorrow. In short, it's not panic time, but it's our opinion that the stock will likely not work until DSOs begin to decline. |
| 42. | 5/4/17 | 1Q 2017 Earnings Call | Day sales outstanding, DSOs, were 116 days for the first quarter of 2017, up 5 days from Q4 of 2016. Of the 5-day increase from the fourth quarter, 4 days were related to Lab collections, of which we were impacted by 43 days in the quarter that we were temporarily unable to bill for services due to technical issues with our clearinghouse and with internal conversion to new lab billing codes for 2017. These technical issues were resolved in March, and we have seen a 6% improvement in average daily collections in April compared to Q1. Provision for doubtful accounts was 9% of total revenues for the first quarter of 2017 compared with 8% of total revenues for the prior year period. Our reserves increased due to slower collections. |
| 43. | 5/4/17 | 1Q 2017 Earnings Call | Q: Okay. And then the provision for doubtful accounts, that always seem to trend up a little bit in Q1. Does that have anything to do with seasonality with deductibles, with consumer driven health plans in higher deductibles et cetera, or is that just random noise in the system?<br><br>A: The provision for doubtful accounts trended up as our aging went up as well. So as DSOs go up, you would generally expect the provision for doubtful accounts as a percentage of revenue to also increase, and that's exactly what happened during of quarter. |

**EXHIBIT 1**

# AAC Holdings, Inc.
## Select Company and Analyst Commentary on Collectability and DSO
### 2/24/15 – 11/8/18

| | Date | Source | Quote |
|---|---|---|---|
| 44. | 5/4/17 | 1Q 2017 Earnings Call | Q: I appreciate the color on the billing issues you saw that have since been resolved.  But any feel for where we might see DSOs settle in the second quarter?  And then kind of a target for year-end as I know that remains a focused topic for a lot of people.<br><br>A: Obviously, it's the top priority of management. And we had some technical challenges in Q1 that we were able to resolve.  We continue to see some documentation requests obviously in the lab that we would expect to continue, however, we're bringing on additional billing resources and focusing our IT efforts on helping us reduce turnaround times with the payers.  So we've got a lot kind of at work here.  We expect DSOs will come down in subsequent quarters.  And our target is how fast can we get to 100 DSOs.<br><br>Q: So the document requests, is that something you can just add initially or do you actually have to submit the bill and then wait for them to ask for more clinical documentation?  So can you preemptively do that, or is that too difficult?<br><br>A: … you get the document request.  You send in the bill.  Not all insurance companies are requiring a document request.  So if you just clog the system with every single insurance payer out there with documents, I think it would be another problem.  So it really is -- once you get a records request then you assemble the record, and sometimes it's a couple pages, sometimes they want the entire record.  So if it was as simple as us putting together the treatment plan or discharge summary and sending that on that's one thing.  But some places actually are now requiring 5 days post discharge, send the entire document.  Which could be several hundred pages.  So we're seeing it all over the board with the insurance companies.  But I do feel like the processes we're putting in place are alleviating some of that.  I definitely think that in Q2 we'll see the DSOs trend back down maybe to 111, 112, and like Kirk said, get to 100 by the end of the year. |
| 45. | 5/23/17 | Investor Presentation | DSO's increased, collections were stable … Payors are requesting more documentation before processing lab claims, significantly extending payment times … AAC plans to anticipate documentation requests and submit as much information with the initial claim … Increase in documentation requests prior to payment in OON facilities (primary at Desert Hope and Green House) … AAC working to streamline submission of medical records … Majority of AAC's out-of-network residential facilities and lab also switched clearinghouses from Q3'16 to Q1'17, which had a temporary negative impact on DSOs. |

**EXHIBIT 1**

# AAC Holdings, Inc.
## Select Company and Analyst Commentary on Collectability and DSO
2/24/15 – 11/8/18

| | Date | Source | Quote |
|---|---|---|---|
| 46. | 5/23/17 | Investor Presentation | 2017 DSO update … 1Q 2017 DSOs of 116 days represented a five day increase from 4Q 2016 … Largely driven by one-time technical issues related to lab collections … Temporarily unable to bill for services for 20 days due to technical issues with clearing house … Internal conversion to new lab billing codes for 2017 caused another 23 day delay … These issues were resolved in March 2017 … Collections in April have improved 6% compared to Q1 2017 … Management expects DSOs to trend down to ~111 days in Q2 2017 and to ~100 days by 4Q 2017. |
| 47. | 8/2/17 | William Blair | Days' sales outstanding (DSO) continue to be a key investor focus, in our view, so it was good to see DSOs fall to 113 days in the quarter—compared with 116 days last quarter.  While management has highlighted M&A and de novo developments as culprits in recent quarters, we also believe laboratory billings were modestly elevating the DSO profile of the organization (which management also acknowledged in prior earnings calls).  Management had anticipated DSOs would fall by at least four days in the current period (by rectifying a lab billing issue that impacted the first quarter 2017 collections performance) so we will look for further color on this topic as well. |
| 48. | 8/3/17 | 2Q 2017 Earnings Call | We did see an increase in our provision for doubtful accounts to 12%.  The increase in the provision for doubtful accounts is the result of increases in the aging of our accounts receivable.  Days sales outstanding, DSOs, have been a major focus for us.  We talked about his impact on the DSOs being primarily driven by payers requiring extensive documentation on laboratory claims, and we discussed some technical reasons related to billing that caused a 5-day increase in Q1.  For the second quarter, we were able to reduce DSOs to 113 days, down 3 days from Q1.  Collections improved by 11% in the second quarter, and our trailing 12 months deposit ratios to our net revenue was 100%. |

EXHIBIT 1

# AAC Holdings, Inc.
## Select Company and Analyst Commentary on Collectability and DSO
### 2/24/15 – 11/8/18

| | Date | Source | Quote |
|---|---|---|---|
| 49. | 8/3/17 | 2Q 2017 Earnings Call | Q: So where I cut off was the 100-day DSO, is that still a target? ... Is that still your expectation by the end of the year?<br><br>A: Well, yes, certainly, we think we can get down to 100 days [for DSO]. We'd love to be able to do it by the end of the year. We hope maybe by the first half of next year. We had great collection improvement in Q2, 11% improvement and so certainly that would be our target.<br><br>Q: So I know in the first quarter you had a glitch in getting the bills out, that I assume that got fixed. But if you pull that effect out, it doesn't look like it's getting much better in terms of what -- them actually turning the bills around and paying you, is that fair?<br><br>A: … that kind of glitch that we had in the first quarter, that was resolved as we said -- and you know at the time of our last call. And overall, we had great collections for the quarter. We had 11% improvement in the collections in the quarter. The one thing with the lab revenue going down pretty dramatically this quarter, that had an offsetting impact to our DSOs. It had nothing to do with collections. Collections even for the lab actually improved by 25% this quarter. So great quarter, collections both at all of our facilities and at the lab. But just the ratio calculation of lab revenue going down by more than the collections went up had an offsetting impact to the DSOs. Otherwise, the DSOs would have come down a little bit more dramatically. If you kind of hold that lab revenue constant quarter-over-quarter, our DSOs would have been closer to 106 days.<br><br>Q: ... I thought that the lab DSOs were the issue, so I would think that less lab revenue would mean lower DSOs, so I must be missing something as usual?<br><br>A: So if the revenue came down by more than your collections improved during the quarter, all things being equal you're going to have an increase in DSOs. If you take your AR and divide it by your revenue divided by the number of days and that revenue comes down more than the collections got. |
| 50. | 8/3/17 | 2Q 2017 Earnings Call | We're starting to see that the market wants to derisk the lab conversation, wants to derisk the DSO and the debt conversation. We feel like that we've achieved that. |

EXHIBIT 1

# AAC Holdings, Inc.
## Select Company and Analyst Commentary on Collectability and DSO
2/24/15 – 11/8/18

| | Date | Source | Quote |
|---|---|---|---|
| 51. | 8/9/17 | Cantor Fitzgerald | We also see upside potential for AAC as management addresses its high accounts receivable balances. Days of sales outstanding (DSO) has grown from 96 days in 3Q16, to 110 days in 4Q16, and 116 days in 1Q17, due to increased documentation requests by commercial payors and slower lab collections driven by a technical issue with their clearing house which was resolved in March 2017. Prior to the lab business, DSO was in the 80-90 day range. Management targets 100 days by the end of 2017 and we expect a continued decrease in DSO as the government becomes a larger percentage of the payor mix. … In our projections of AAC's future cash flows, we made assumptions that EBITDA margins would be moderately depressed from historical levels due to AAC focusing on diversifying their payor mix and targeting the lower margin in-network patients. We also assumed that AAC's DSO metric would drop to 100 days by the end of 2017 and to 85 days by 2018 which would reduce AAC's current assets thereby affecting net working capital. |
| 52. | 9/13/17 | M&A Presentation | AdCare acquisition rationale … Lowers DSOs (AdCare DSO's were 32 days for their fiscal year ending 9/30/16). |
| 53. | 9/13/17 | M&A Call | With this acquisition, we will enter both Medicare and Medicaid payer markets and will leverage AdCare's 30 years of experience in the governmental payer space. AdCare's Medicare inpatient hospital rates are comparable to our commercial insurance rates, and we will benefit from AdCare's much lower DSOs, which average 32 to 35 days. |
| 54. | 11/1/17 | William Blair | DSOs were 106 days in the period, compared with 113 days in the second quarter 2017. While management has highlighted M&A and de novo developments as culprits in recent quarters, we also believe laboratory billings were modestly elevating the DSO profile of the organization (which management also acknowledged in prior earnings calls). Overall, we view the DSO decline favorably, as this has been a hot-button issue among investors over the last year; we will look for additional clarity on the various components driving DSO changes (e.g., lab billing, core operations, acquisitions and de novos) on the earnings call. |
| 55. | 11/1/17 | Cantor Fitzgerald | AAC continues to make progress with its receivables, reflecting improved collections (and more in-network business) and less diagnostic testing. DSO were 106 days in 3Q17, vs. 113 in 2Q17 and 105 in 3Q16. |
| 56. | 11/2/17 | Cantor Fitzgerald | We are fine-tuning our estimates and reiterating our $14 price target and Overweight rating on AAC. With a strong showing in 3Q17, reflecting better volumes, higher revenue per visit and improved collections, margins are growing and DSO are coming down. … Improved collections boost metrics. The company continues to make progress with its receivables, reporting record cash collections during 3Q17 of $75 million, representing an 11% increase from the 2Q17 level. AAC cut DSO to 106 days, a 10-day improvement from 1Q17, driving average daily revenue up 48% and average revenue per visit up 33%. |

EXHIBIT 1

# AAC Holdings, Inc.
## Select Company and Analyst Commentary on Collectability and DSO
2/24/15 – 11/8/18

| | Date | Source | Quote |
|---|---|---|---|
| 57. | 11/2/17 | 3Q 2017 Earnings Call | Most importantly, we materially improved collections in Q3. And I'm happy to report that we had a record collections quarter in Q3, with $75 million in collections, up $7.3 million or 11% from Q2. DSOs have now dropped to 106 days, a 10-day improvement since Q1. |
| 58. | 11/2/17 | 3Q 2017 Earnings Call | Q: Okay. And then final question and then I'll hop off. Just on DSOs, obviously very good collection process, nice to see that going down. Anymore thoughts on where we might see that settle at year-end? Or into 2018?<br><br>A: Yes, consistent with -- well, first off I'd like to say that we're very pleased with the collections that we had in the third quarter. Collections improved $7.5 million or 11% in the quarter. We've got a 7-day improvement in DSOs this quarter and a 10-day improvement since Q1. Consistent with what we said last quarter, where we said we believed that we can get the DSOs to -- closer to 100, in the first half of '18, we still feel very good about that. And very pleased where collections are at quarter-to-date, this quarter as well. |
| 59. | 11/3/17 | Raymond James | Call highlights ... DSOs have improved by 10 days since the March quarter (3Q: 106 days), with record collections in 3Q ($75M, +11% q/q); management expects DSOs to reach ~100 days in 1H18. |
| 60. | 11/15/17 | Investor Presentation | Recent developments and company updates … Financing … Cash flows materially improving- DSO's down 10 days in 2017; cash from ops $14 million YTD. |
| 61. | 11/15/17 | Investor Presentation | Collections … 3Q 2017 DSOs of 106 days represented a ten day decrease from 1Q 2017 … Lab receivables continue to pressure DSO's … Management expects DSOs to trend down to ~100 days in 2018 … 3Q 2017 cash collections increased 23% from Q1 '17. |
| 62. | 2/21/18 | William Blair | Days sales outstanding (DSOs), which are a hot-button issue on the stock, also dropped 10 days year-over-year (and five days sequentially) to 101 days in the fourth quarter. … adjusted revenue (adjusting for an accounting change, which requires the provision for doubtful accounts to be reported as a direct reduction to sales in 2018 and beyond). |
| 63. | 2/21/18 | Cantor Fitzgerald | Collections continued to improve, with 4Q17 DSO dropping to 101 days from 106 in 3Q17 and 111 days in 4Q16. |
| 64. | 2/22/18 | Cantor Fitzgerald | The company has also improved its cash collections by 15%, reducing DSO to 101 days from 106 in 3Q17 and 111 in 4Q16. DSO continues to be a focus for the company as it is part of its strategy to accelerate operational efficiency. We believe this gives the company greater financial flexibility. |
| 65. | 2/22/18 | 4Q 2017 Earnings Call | A few highlights. First, our continued focus on bringing DSOs down is paying off. DSOs came down to 101 days in the fourth quarter, an improvement of 10 days from the prior year and 5 days sequentially from third quarter. |

EXHIBIT 1

# AAC Holdings, Inc.
## Select Company and Analyst Commentary on Collectability and DSO
2/24/15 – 11/8/18

| | Date | Source | Quote |
|---|---|---|---|
| 66. | 2/22/18 | 4Q 2017 Earnings Call | DSOs continue to improve, and we were 101 days for the fourth quarter 2017, down sequentially from 106 days in the third quarter and 111 days in the prior year period. … Total cash collections for the year ended 2017 is compared with the prior year increased by 15%. Focusing on DSOs continues to be a priority for us as part of our strategy to accelerate operational efficiency and discipline. Going forward, we expect improvements in DSOs to be incremental on the quarter rather than significant downtick we experienced in this quarter. |
| 67. | 3/28/18 | Investor Presentation | Financial highlights … Delivered solid 2017 performance … Adjusted EBITDA increased 20%; DSO's decreased by 10 days from Q4 '16 to 101 days at Q4 '17. |
| 68. | 3/28/18 | Investor Presentation | 2018 Roadmap … Continued Improvements in Operations … Continuing to focus on the financial discipline required to improve key operating metrics including collections and DSOs. |
| 69. | 3/28/18 | Investor Presentation | Collections … Q4 2017 DSOs of 101 days represented a ten day decrease from Q4 2016 … Management expects DSOs to trend down to ~100 days in 2018 (Less than 100 days with AdCare) … 2017 cash collections increased 15% from 2016. |
| 70. | 5/2/18 | Cantor Fitzgerald | DSO continued to trend down to less than 100 days compared to 101 days in 4Q17 and 116 days in 1Q17, suggesting continued improvements in collections and operational efficiency. |
| 71. | 5/3/18 | Cantor Fitzgerald | The company's 1Q18 upside was driven by higher volumes and rates, which got a boost from AdCare's higher outpatient revenue per case. DSO continues to improve, to 95 days in 1Q18, after adjusting for the new revenue accounting standard and one month of AdCare, which closed 3/1/18. … The company has also improved its cash collections, reducing DSO to 95 days from 101 in 4Q17. DSO continues to be a focus for the company as it is part of its strategy to accelerate operational efficiency. We believe this gives the company greater financial flexibility. |
| 72. | 5/3/18 | 1Q 2018 Earnings Call | We're also pleased with continuing operational efficiencies in the first quarter as DSOs continue to trend down reflecting our continued commitment in this area. |
| 73. | 5/3/18 | 1Q 2018 Earnings Call | As Michael mentioned earlier, DSOs continue to improve and were 95 days during the first quarter after adjusting for the adoption of the new revenue recognition accounted standard and adjusting for only having AdCare for one month during the quarter. This represents a 7-day sequential improvement from the fourth quarter of 2017, and a 20-day improvement on a year-over-year basis. Total cash collections increased sequentially from the fourth quarter and grew -- and increased 25% on a year-over-year basis. We continue to remain on track to deliver the outlook we previously guided to for 2018. |
| 74. | 5/13/18 | Cantor Fitzgerald | All of this complements 1Q18 improvements attributable to AdCare that helped raise volumes and average rates and internal efforts that have pushed down DSO. |

EXHIBIT 1

# AAC Holdings, Inc.
## Select Company and Analyst Commentary on Collectability and DSO
2/24/15 – 11/8/18

| | Date | Source | Quote |
|---|---|---|---|
| 75. | 8/2/18 | 2Q 2018 Earnings Call | Operations during the second quarter remained strong with a 27% increase in revenue and continued improvements in both cash collections and DSOs. |
| 76. | 8/2/18 | 2Q 2018 Earnings Call | We continue to see positive trends in billing and cash collections with DSOs at 89 days for the second quarter of 2018, representing a 24-day improvement year-over-year and a 12-day improvement year-to-date. |
| 77. | 11/6/18 | 3Q 2018 Earnings Call | Q: And then my last question comes down to the DSOs.  What were your DSOs in the quarter?<br><br>A: DSOs for the quarter approximated at about 100 days for the quarter.  Cash collections were down this quarter sequentially from last quarter; however, that was due to some very specific items such as we talked about one of the synergies we had was the conversion of AdCare Rhode Island's billing from a third party to our own with an e-billing conversion.  There's a temporary decline in your cash collections, and there were a couple of other pretty discrete items as well.  We are seeing cash collections improve over the average for Q3 and Q4. |
| 78. | 11/8/18 | Raymond James | Call Highlights … DSOs increased in 3Q18 to ~100 days, which was related to bringing AdCare's billing in house – already seeing improvements in 4Q. |
| 79. | 11/8/18 | Raymond James | Company-Specific Risks for AAC Holdings, Inc. ... Reimbursement and Collectability ... The company is an out-of-network provider, which may impact its ability to collect full reimbursement in some situations.  As a result, the company's revenues may come under pressure should payors implement greater restrictions, including but not limited to:  disregarding the assignment of payment from clients to out-of-network providers (i.e., sending payments directly to clients instead of the company), capping out-of-network client benefits, and waiving out-of-pocket payments. |

Source:  AAC Conference Call Transcripts and Presentations; Various Analyst Reports