# EXHIBIT 2

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **INDIANA PUBLIC RETIREMENT SYSTEM,** Individually and on Behalf of All Others Similarly Situated, | ) ) ) | |
| | ) | |
| **Plaintiff,** | ) ) | **Civil Action No. 3:19-cv-00407** |
| **vs.** | ) ) | |
| **MICHAEL T. CARTWRIGHT, KIRK R. MANZ AND ANDREW W. MCWILLIAMS,** | ) ) ) | |
| **Defendants.** | ) ) | |

---

**REPLY REPORT OF**
**W. SCOTT DALRYMPLE, CFA**
**JULY 25, 2022**

---

**bva**group® | Valuation. Disputes. Advisory.

# TABLE OF CONTENTS

**Page**

I. Introduction and Summary of Opinions...........................................................................................1

II. Analysis of the Zurek Rebuttal Report ..........................................................................................2

    A. Dr. Zurek's opinion that the Restatement and Marketing Claims can be analyzed separately as an economic matter does not support his price impact opinion ..................................................................................................................2

    B. Dr. Zurek's additional explanations for relying on the same incomplete and flawed analysis of the Restatement Claim's price impact do not remedy the shortcomings of his opinions..............................................................................................4

        1) Dr. Zurek's incomplete analysis does not and cannot show a lack of price impact.........................................................................................................4

        2) Dr. Zurek's failure to examine front-end price impact is fatal to his opinions......................................................................................................6

        3) Dr. Zurek's analysis of back-end price impact is flawed and incomplete..................................................................................................9

    C. Dr. Zurek's assertions about AAC's share price movement on April 16, 2019 are based on mischaracterizations of my opinions and flawed reasoning ......................10

III. Further Work ...............................................................................................................................12


Case 3:19-cv-00407    Document 112-2    Filed 07/25/22    Page 3 of 15 PageID #: 2352



| 7250 Dallas Parkway | 1000 Louisiana Street | 405 Lexington Avenue |
| Suite 200 | Suite 1150 | Floor 9 |
| Plano, Texas 75024 | Houston, Texas 77002 | New York, New York 10174 |
| +1.972.377.0300 | +1.713.457.3125 | +1.212.364.1926 |

Re: Indiana Public Retirement System, Individually and on Behalf of All Others Similarly Situated ("Plaintiff") v. Michael T. Cartwright, Kirk R. Manz and Andrew W. McWilliams (collectively, "Defendants")

## I. Introduction and Summary of Opinions

1. I have been retained on behalf of Plaintiff in the above-styled case. On July 6, 2021, I issued an expert report in this matter ("Dalrymple Report") in which I set forth my opinions that shares of AAC traded during the Class Period in a semi-strong-form efficient market and that damages may be computed on a class-wide basis for every member of the proposed class using a common technique that is grounded in Plaintiff's theory of liability. On June 13, 2022, I issued another expert report ("Dalrymple Rebuttal Report"), in which I addressed opinions offered by Dr. Paul Zurek in his expert report dated September 7, 2021 ("Zurek Report") in which Dr. Zurek opined that alleged misrepresentations related to Plaintiff's Restatement Claim had no impact on AAC's stock price.[1] As I explained in the Dalrymple Rebuttal Report, it is my opinion that Dr. Zurek fails to show a lack of price impact and, in addition, ignores evidence that the alleged misrepresentations affected AAC's stock price during the Class Period.[2]

2. On July 11, 2022, Dr. Zurek issued a rebuttal report ("Zurek Rebuttal Report") in which he offers certain opinions in response to the opinions set forth in the Dalrymple Rebuttal Report. I have been asked by counsel for Plaintiff to respond to Dr. Zurek's opinions in the Zurek Rebuttal Report.

3. As set forth herein, it is my opinion that Dr. Zurek's opinions in the Zurek Rebuttal Report suffer from similar defects as his opinions in the Zurek Report. The additional points Dr. Zurek raises reveal further flaws in his reasoning and additional shortcomings in his review and presentation of the evidence. In summary, my opinion that Dr. Zurek fails to show a lack of price impact is unchanged.

4. My credentials and qualifications are set forth in the Dalrymple Report and Dalrymple Rebuttal Report. In addition to the materials identified in the Dalrymple Report and Dalrymple Rebuttal Report, I have reviewed the Zurek Rebuttal Report along with the materials cited therein and in this report.[3] I also have reviewed Defendants' [Proposed] Sur-Reply in Opposition to Plaintiff's Motion for Class Certification dated July 11, 2022 and Lead Plaintiff's Reply in Support of Motion for Class Certification dated June 13, 2022.

---

[1] Defined terms in this report have the same meanings as used in the Dalrymple Report and Dalrymple Rebuttal Report unless otherwise noted.

[2] References herein to "misstatement(s)" and "misrepresentation(s)" refer to the fraud and fraudulent scheme alleged by Plaintiff, which includes misrepresentations, omissions, and a course of conduct that operated as a fraud or deceit on purchasers of AAC shares during the Class Period.

[3] Use of the first person "I" in my report refers either to me or to those working under my direct supervision.



5. I will review, evaluate, and analyze additional data, facts, or information as they become available. I reserve the right to amend or supplement my opinions based upon further information learned, produced, or provided to me. The analyses and opinions described herein may, therefore, change based upon additional information that becomes available or other developments that occur.

## II. Analysis of the Zurek Rebuttal Report

6. In the Zurek Rebuttal Report, Dr. Zurek claims that "Plaintiff and Mr. Dalrymple level three unfounded and incorrect criticisms of my analysis of price impact of the Restatement Claim."[4]

    a. Dr. Zurek's analysis does not show lack of price impact because it only analyzes the Restatement Claim and not the Marketing Claim.

    b. Dr. Zurek's analysis of the Restatement Claim does not show lack of price impact because it is limited to back-end price impact and focuses only on March 29, 2019.

    c. Dr. Zurek's analysis improperly ignores the statistically significant price movement on April 16, 2019.

7. As an initial matter, I note that Dr. Zurek does not address all of the critiques of his price impact opinion that I set forth in the Dalrymple Rebuttal Report, instead mostly rehashing the arguments made in the Zurek Report.[5] It is still my opinion that Dr. Zurek's opinions fail for each of the reasons I discuss in the Dalrymple Rebuttal Report, regardless of whether he attempts to address my critiques.

8. As I discuss in the remainder of this report, the opinions Dr. Zurek presents in the Zurek Rebuttal Report suffer from erroneous reasoning, contain mischaracterizations of my opinions, and fail to address the significant evidence that the alleged misrepresentations affected AAC's share price during the Class Period.

## A. Dr. Zurek's opinion that the Restatement and Marketing Claims can be analyzed separately as an economic matter does not support his price impact opinion

9. Dr. Zurek suggests that "the Marketing Claim concerns information allegedly withheld about AAC's ability to generate and grow *future* revenue by attracting new clients to its facilities,"[6] while, "the Restatement Claim concerns claims that revenues recognized based on services to *current or past* clients (*i.e.*, not *future* clients) were ultimately misreported under GAAP."[7] Thus, according to Dr. Zurek, the

---

4    Zurek Rebuttal Report, ¶ 8.

5    For instance, Dr. Zurek does not address my critiques of his analysis of the March 29, 2019 disclosure (Dalrymple Rebuttal Report, ¶¶ 40-45) and ignores much of the evidence I present in relation to AAC's change in circumstances between the Class Period and March/April 2019 (Dalrymple Rebuttal Report, ¶¶ 50-55).

6    Zurek Rebuttal Report, ¶ 11.

7    Zurek Rebuttal Report, ¶ 12.



distinction between the two claims turns on whether changes in investors' expectations were driven by "future revenue from new clients" versus revenue from "current or past clients (*i.e.*, not future clients)."

10. Dr. Zurek's parsing of the claims between "new" and "current or past" clients appears to be based on nothing more than his own say-so and is inconsistent with my understanding of Plaintiff's claims in this matter. Even accepting Dr. Zurek's misinterpretation of Plaintiff's claims, he fails to recognize the overlap between the Restatement and Marketing Claims under his own definition. Under Plaintiff's theory, information withheld about AAC's ability to grow revenue from *future* clients (*i.e.,* Dr. Zurek's characterization of the Marketing Claim) would have been concealed by AAC's overstated financial performance under the Restatement Claim. Moreover, nowhere in his opinions does Dr. Zurek attempt to distinguish between the "future" and "current or past" clients that he contends distinguish the claims from one another. Nor does Dr. Zurek recognize that the same expectations stemming from allegedly fraudulent revenue growth from "future" clients earlier in the Class Period would also have been concealed via overstated (uncollectable) accounts receivables later in the Class Period, by which point those "future" clients would have become "current or past" clients.

11. Dr. Zurek also claims that "Plaintiff's Amended Complaint has separate sections describing alleged 'False and Misleading Statements Regarding AAC's Marketing Practices' and alleged 'False and Misleading Statements About AAC's Financial Results and Accounting Practices.'"[8] He makes further assertions about the structure of the Complaint, contending that "Plaintiff only identifies allegedly corrective information it appears to associate with the Marketing Claim" with respect to AAC's November 6, 2018 disclosure.[9] Yet these are not economic opinions; they are observations about how the Plaintiff has organized the pleadings, which fall outside the purview of economics. Moreover, Dr. Zurek fails to recognize that the Complaint does address aspects of the November 6, 2018 disclosure that I understand relate to AAC's alleged improper revenue recognition practices and a related subpoena from the SEC:

> Because AAC was ignoring its own historical collection experience and failing to properly reserve for or write off accounts receivable that had aged well beyond 360 days, it significantly overstated its accounts receivable during the Class Period. In March 2018, <u>AAC received an SEC subpoena seeking information about accounts receivable where AAC had received partial payment from an insurance company</u> but continued to pursue collections for remaining amounts AAC claimed it was owed. <u>Cartwright and McWilliams concealed AAC's receipt of that subpoena from the market until November 6, 2018</u>. In the third quarter of 2018, the audit committee conducted a review of AAC's accounting for those specific receivables and stated that a "change in estimate of the collectability" of those accounts receivable was necessary. <u>As disclosed on November 6, 2018, that change in estimate resulted in a $6 million revenue reduction and an increase in AAC's net loss of about $5.7 million</u> for the three and nine months, respectively, ended September 30, 2018. Defendants Cartwright and McWilliams, however, continued to conceal that this was just the tip of the iceberg.[10]

---

8    Zurek Rebuttal Report, ¶ 13.
9    Zurek Rebuttal Report, ¶ 14.
10   Consolidated Complaint, ¶ 58. Emphasis added.



12.    Dr. Zurek does not explain how this allegedly concealed information, which Plaintiff contends was revealed on November 6, 2018, reconciles to his assertion that "Plaintiff only identifies allegedly corrective information it appears to associate with the Marketing Claim" on this date.[11]  Nor does he attempt to disaggregate the impact of this information on AAC's share price, even though he does not dispute that AAC's share price reaction on November 6, 2018 was negative and statistically significant.  While I do not express an opinion about the legal distinction between the claims, Dr. Zurek's assertions about the structure of the Complaint and the claims it asserts further undermine his flawed conclusion that the Restatement Claim had no price impact.

13.    I do not disagree that the claims may be analyzed separately, if appropriate, from an economic perspective.  But Dr. Zurek has not made such a separation based on Plaintiff's theory of liability or even in a way that is consistent with his own misinterpretation of the claims.  Therefore, he is unable to support his assertion that he has examined the price impact of the Restatement Claim in isolation of the Marketing Claim, as he purports to have done in support of his price impact opinion.

**B.    Dr. Zurek's additional explanations for relying on the same incomplete and flawed analysis of the Restatement Claim's price impact do not remedy the shortcomings of his opinions**

14.    Dr. Zurek repeatedly claims that my criticisms of his price impact opinion are unfounded.[12]  In the Dalrymple Rebuttal Report, however, I provide a detailed explanation and "foundation" for my critiques.[13]  That Dr. Zurek is unable to address these criticisms or reconcile them to his opinions does not mean they are unfounded.  On the contrary, in my opinion, the criticisms I set forth in the Dalrymple Rebuttal Report are not only valid but fatal to Dr. Zurek's conclusions.  The additional arguments Dr. Zurek presents in the Zurek Rebuttal Report only highlight the problems with his price impact opinion.

**1)    Dr. Zurek's incomplete analysis does not and cannot show a lack of price impact**

15.    Instead of addressing the arguments in the Dalrymple Rebuttal Report regarding the defects of his price impact analysis, Dr. Zurek doubles down on his illogical argument that he is able to show a lack of price impact by limiting his analysis to what he subjectively views to be "the best evidence of price impact" rather than considering all evidence of price impact:

> As I explained in the Zurek Report, under the particular circumstances of this matter, the best evidence of price impact as an economic matter is the reaction of AAC's stock price, or lack thereof, to the release of the totality of information disclosed about the Restatement Claim across all dates that I analyzed.[14]

---

[11]    Zurek Rebuttal Report, ¶ 14.
[12]    Zurek Rebuttal Report, ¶¶ 4, 8, 9, and 16.
[13]    Dalrymple Rebuttal Report, ¶¶ 12-55.
[14]    Zurek Rebuttal Report, ¶ 16.  Emphasis added.

 **bva**group®

16.     In order to show that there is no price impact from the Restatement Claim, as Dr. Zurek purports to have done, he would have needed to perform a comprehensive investigation of the Restatement Claim's impact on AAC's share price *throughout* the Class Period.  Instead, he limits the scope of his analysis to what he decides, *ex ante* and without basis, to be "the best evidence of price impact" based solely on AAC's share price reactions on select dates *after* the Class Period.[15]  Limiting the scope of his analysis in this way means that Dr. Zurek is unable to reasonably conclude, regardless of his findings, that there is a lack of price impact.  Absence of evidence, based on an incomplete analysis, is not evidence of absence.

17.     In the Zurek Rebuttal Report, Dr. Zurek attempts to rely on case law as justification for limiting the scope of his analysis.  While I express no legal opinion with regard to the case he cites and its applicability (or lack thereof) to this matter, I note that the first sentence of the ruling he quotes states, "[f]raud on the market securities litigation *typically* focuses on a price change at the time of a corrective disclosure."[16]  He goes on to assert that this ruling "appears to be inconsistent with" my assertion that his limited analysis is necessary but not sufficient.[17]

18.     Again, without offering a legal opinion, I note that the language of the ruling does not seem to support Dr. Zurek's sweeping conclusion.  Something that is "typical" does not always happen and a "typical focus" on corrective disclosures in many cases does not mean that all other evidence of price impact can be ignored in this case.  Therefore, my opinion that Dr. Zurek's limited analysis is insufficient to show a lack of price impact (even aside from the errors in his analysis discussed below and in the Dalrymple Rebuttal Report) is unchanged.

19.     It is also important to note that, while Dr. Zurek suggests that I have offered opinions regarding whether measuring front-end or back-end price impact is more appropriate in this matter, I have in fact offered no such opinions.  Dr. Zurek's allegation that I am "attempting to de-emphasize" the computation of damages "based on price declines on the dates of alleged corrective disclosures" reads content into the Dalrymple Report and the Dalrymple Rebuttal Report that simply is not there.[18]  I have not estimated share price inflation and any attempt by Dr. Zurek to suggest otherwise is a misrepresentation of my opinions.[19] My opinion regarding price impact is simply that Dr. Zurek's analysis does not, and in fact *cannot*, show a lack of price impact.

---

[15]     Zurek Rebuttal Report, ¶¶ 6, 16, 29.

[16]     Zurek Rebuttal Report, ¶ 19, citing *Erica P. John Fund Inc., et al. v. Halliburton Co.*, 309 F.R.D. 251 (N.D. Tex. 2015).  Emphasis added.

[17]     Zurek Rebuttal Report, ¶ 19.

[18]     Zurek Rebuttal Report, note 41 and ¶ 28.

[19]     Dr. Zurek's assertion is also irrelevant to, and unsupportive of, his price impact opinion.



**2) Dr. Zurek's failure to examine front-end price impact is fatal to his opinions**

20. Dr. Zurek's claim that he does not need to look at front-end price impact because he does not think it is "the best" evidence of price impact is inapt because, as I explain in the Dalrymple Report, there is significant evidence that the misrepresentations would have caused front-end price impact. Dr. Zurek attempts to dismiss this evidence by suggesting that this "conclusion assumes that the market assumed 100% collectability of accounts receivable."[20]

21. Dr. Zurek is wrong. This particular critique rests on the assumption that market participants viewed the incremental accounts receivable to be *greater than 0%*, not 100%. Dr. Zurek's affirmative opinion that there was *no price impact*, on the other hand, rests on the assumption that market participants expected *0% of incremental accounts receivable to be collectible*. Yet Dr. Zurek presents no basis for making this assumption.[21]

22. Dr. Zurek attempts to shore up his assertions by pointing to analyst commentary, claiming that "[a]nalysts' discussion of DSO is consistent with the market assigning a discount to the reported accounts receivable to account for concerns about collectability."[22] Here, Dr. Zurek confuses the length of time it takes to collect receivables with whether they are collectible at all; DSO measures the former, not the latter. For instance, the analyst commentary Dr. Zurek presents in Exhibit 1 of the Zurek Rebuttal Report refers to issues like "documentation requests by commercial payors" and "laboratory billings" as the reason for AAC's elevated DSO.[23] Nowhere does Dr. Zurek present evidence that analysts' concerns over DSO levels caused them to question whether the receivables were collectible.

23. Even accepting Dr. Zurek's speculation that analysts "assign[ed] a discount to the reported accounts receivable to account for concerns about collectability" (which he fails to support by reference to commentary or valuation models), I have seen no evidence that analysts would have applied the appropriate discount.[24] AAC's estimates of the portion of its accounts receivable that were uncollectible following the restatement are orders of magnitude greater than its original estimates. As set forth in the following table, AAC originally reported that about *24 to 38 percent* of its accounts receivable balances were uncollectible; in its restated financial statements, AAC reported that approximately *56 to 60 percent* of the same accounts receivable balances were uncollectible, which is *1.5 to 2.5 times greater* than what the company reported at the time the alleged misstatements were made.

---

[20] Zurek Rebuttal Report, ¶ 26.

[21] Moreover, Dr. Zurek does not consider the likelihood that the restatement adjustments would have been informative as to expectations of AAC's future revenue at the time they were made. Customer accounts receivable are part of a company's revenue cycle, such that write-downs of accounts receivable represent recognized revenue that ultimately will not be collected.

[22] Zurek Rebuttal Report, ¶ 26.

[23] Zurek Rebuttal Report, Exhibit 1, quoting Cantor Fitzgerald (August 9, 2017) and William Blair (November 1, 2017).

[24] Zurek Rebuttal Report, ¶ 26.



**Table 1. AAC's Estimate of Uncollectible Accounts (Millions)[25]**

|  | Q4-16 | Q1-17 | Q2-17 | Q3-17 | Q4-17 |
|---|---|---|---|---|---|
| *As Reported* | | | | | |
| Accounts receivable, gross | $115.5 | $128.2 | $137.8 | $141.3 | $152.2 |
| Allowance for doubtful accounts | (28.1) | (34.0) | (41.3) | (48.7) | (58.1) |
| Accounts receivable, net | $87.3 | $94.1 | $96.5 | $92.5 | $94.1 |
| ***Estimated uncollectible pct.*** | ***24.4%*** | ***26.5%*** | ***30.0%*** | ***34.5%*** | ***38.2%*** |
| | | | | | |
| *As Restated* | | | | | |
| Accounts receivable, gross | $115.5 | $128.2 | $137.8 | $141.3 | $152.2 |
| Allowance for doubtful accounts | (69.5) | (73.2) | (77.2) | (82.4) | (88.5) |
| Accounts receivable, net | $46.0 | $55.0 | $60.6 | $58.9 | $63.7 |
| ***Estimated uncollectible pct.*** | ***60.1%*** | ***57.1%*** | ***56.0%*** | ***58.3%*** | ***58.1%*** |
| | | | | | |
| ***Increase in uncollectible estimate*** | ***2.5x*** | ***2.2x*** | ***1.9x*** | ***1.7x*** | ***1.5x*** |

24.    As I explained in the Dalrymple Rebuttal Report, accounts receivable (like other current assets) are assets that are expected to be converted to cash within a year and therefore can have a significant impact on near-term cash flow expectations; thus, "a reduction in reported accounts receivable (all else equal) indicates that the company has fewer assets that it expects to convert into cash within the year."[26] As Dr. Zurek acknowledges, a reduction in expected future cash flow would correspond to a reduction in value. [27] Yet Dr. Zurek is unable to reconcile his opinions to this basic financial principle—in the counterfactual, AAC would have had fewer receivables that it expected to collect and, therefore, would have reported an equity value that was materially lower than what it reported at the time the misstatements were made. As I explain in the Dalrymple Rebuttal Report:

> From a valuation perspective, the accounts receivable overstatement directly overstated the company's net worth to shareholders. In other words, writing down the accounts receivable balance during the Class Period would have indicated to shareholders that the company's expected cash collections over the next year would be tens of millions of dollars lower. To suggest that AAC's share price would have been the same irrespective of whether the company reported, for instance, an accounts receivable balance of $94 million or $55 million is wholly unsupportable.[28]

---

[25]    AAC Holdings, Inc. Form 10-K for period ending Dec. 31, 2018, pp. F-11, F-15. AAC Holdings, Inc. Form 10-K for period ending Dec. 31, 2017, pp. F-4, F-10. AAC Holdings, Inc. Form 10-K for period ending Dec. 31, 2016, pp. F-3, F-12. Differences due to rounding.

[26]    Dalrymple Rebuttal Report, ¶ 26.

[27]    In the Zurek Rebuttal Report, Dr. Zurek acknowledges that "[a]ccounts receivable, current assets, provisions for doubtful accounts, revenue and earnings affect valuation only to the extent that they are informative about a company's expected future cash flows." Zurek Rebuttal Report, ¶ 25.

[28]    Dalrymple Rebuttal Report, ¶ 28.



25.     As Dr. Zurek confirmed at his deposition, he did not analyze the valuation impact of any "specific number" reported on AAC's balance sheet, yet he inexplicably asserts that the very misstatements that he neglected to examine had no price impact at the time they were made.[29]  For instance, even a cursory review of the per share valuation impact of the misstatements reveals that Dr. Zurek's position is untenable.

**Table 2.  AAC Accounts Receivable Restatement**[30]

|  | Q4-16 | Q1-17 | Q2-17 | Q3-17 | Q4-17 | Q1-18 | Q2-18 | Q3-18 |
|---|---|---|---|---|---|---|---|---|
| Adjustment (millions) | $(41.3) | $(39.1) | $(35.9) | $(33.6) | $(30.4) | $(27.6) | $(26.3) | $(34.7) |
| Shares Outstanding (millions) | 23.7 | 23.7 | 24.1 | 24.1 | 24.0 | 23.9 | 24.6 | 24.6 |
| **Adjustment ($/Share)** | $(1.74) | $(1.65) | $(1.49) | $(1.40) | $(1.27) | $(1.15) | $(1.07) | $(1.41) |

26.     A valuation impact of this magnitude (*e.g.,* relative to a share price $5 to $13 during the Class Period) cannot be explained away by speculating that market participants "assign[ed] a discount to the reported accounts receivable to account for concerns about collectability," as Dr. Zurek attempts to do.[31]

27.     The Zurek Rebuttal Report also leans on the same flawed assertions in the Zurek Report that the impact of the restatement on AAC's earnings was not necessarily negative, which I address in the Dalrymple Rebuttal Report.[32]  Dr. Zurek now contends that "the impact of the restatement on net income during the Proposed Class Period was to increase net income in every quarter subject to the restatement except during 3Q 2018, and, for 3Q 2018, the earnings were not reported by AAC until the very last day of the Proposed Class Period, and therefore could only have affected the stock price after the Proposed Class Period."[33]  In making this assertion, Dr. Zurek omits the negative $20.6 million impact of the restatement on FY 2016 net income, even though the alleged misstatements regarding AAC's FY 2016 results were made during the Class Period.[34]  As I explain in the Dalrymple Rebuttal Report:

---

[29]     Zurek Dep., 76:9-22.

[30]     AAC Holdings, Inc. Form 10-K for period ending Dec. 31, 2018, p. F-11, F-43 – F-48.  Differences due to rounding.

[31]     Zurek Rebuttal Report, ¶ 26.  I also note that the same analysts that Dr. Zurek cites in his report routinely report AAC's book value and book value per share, a metric that would have been directly and significantly overstated by the alleged misstatements, as summarized in Table 2.  *See, e.g.,* Raymond James, "Upgrade to Outperform with $14 Price Target," November 3, 2017; William Blair, "Strong Execution Drives Solid Start to the Year; AdCare Acquisition Further Diversifies Business, Lowers Risk Profile," May 2, 2018.  Dr. Zurek makes no attempt to examine how a reduction in this measurement would have affected these analysts' views of the company.

[32]     Dalrymple Rebuttal Report, ¶¶ 34-39.

[33]     Zurek Rebuttal Report, ¶ 24.

[34]     Dr. Zurek states that I "misleadingly contend that the impact on AAC's reported income was large" (Zurek Rebuttal Report, ¶ 24) and presents AAC's restated net income beginning in Q1 2017.  He appears to be unaware that the first alleged misstatement date corresponded to AAC's 2016 Form 10-K for period ending December 31, 2016, which reported results for FY 2016 that were overstated by $20.6 million.  *See, e.g.,* Consolidated Complaint, ¶ 64 AAC Holdings, Inc.; Dalrymple Rebuttal Report, Table 2. AAC presented restated quarterly financial statements for 2017 and 2018 and restated annual financial statements for FY 2016 in its 10-K for the period ending December 31, 2018.

Dr. Zurek's suggestion that the Restatement Claim relates to timing issues, or that it somehow indicates that the company may have been overly conservative by understating net income in select periods, ignores the context of the alleged fraud in which AAC unequivocally overstated earnings for the periods reported during the Class Period. While net income in certain periods may have been higher in isolation, the cumulative impact on net income was always negative. From the perspective of investors forming expectations about future earnings based on current and historical performance reported during the Class Period, it is difficult to imagine a scenario in which AAC's perceived ability to generate earnings would have been the same in the counterfactual on every day of the Class Period. Dr. Zurek's suggestion that one cannot assess price impact on the alleged misstatement dates because investors might have reacted mechanically to each quarter's lower or higher net income (while ignoring AAC's overall diminished ability to generate earnings) is unfounded and at odds with the economics underlying the allegations.[35]

28. Dr. Zurek does not directly dispute the evidence that the overall impact of the Restatement Claim would have been to reduce investors' perceptions of AAC's ability to generate earnings and future cash flows at the time the misstatements were made. Instead, he relies on superficial and misleading attempts to rationalize his decision to assess only back-end price impact, but which neither support his approach nor demonstrate a lack of front-end price impact.

### 3) Dr. Zurek's analysis of back-end price impact is flawed and incomplete

29. According to Dr. Zurek, "the market first learned on April 15, 2019 that AAC's historical accounts receivable were lower than previously reported," but "AAC's stock price did not decline on that day on a residual basis."[36] As I discuss in the Dalrymple Rebuttal Report, the lack of a statistically significant share price decline on that day is not sufficient to support Dr. Zurek's finding of no price impact in relation to the Restatement Claim.[37] In the Zurek Rebuttal Report, Dr. Zurek claims that "the only explanation" I provide for why a statistically insignificant abnormal return on April 15, 2019 would be consistent with price impact during the Class Period "is that AAC's circumstances changed over the Proposed Class Period and into 2019, but this is not as clear as Mr. Dalrymple portrays it to be."[38]

30. In support of this assertion, Dr. Zurek contends that AAC's credit rating was below investment grade both during and after the Class Period.[39] This argument is inapt. Whether or not AAC's debt was

---

[35] Dalrymple Rebuttal Report, ¶ 38.

[36] Zurek Rebuttal Report, ¶ 21.

[37] Dalrymple Rebuttal Report, ¶¶ 40-49.

[38] Zurek Rebuttal Report, ¶ 22. I note that Dr. Zurek mischaracterizes my opinions, claiming that the change in AAC's circumstances is the only reason I provide for why "the absence of any price decline on April 15, 2019" may be "consistent with a hypothetical price decline earlier had this information been released during the Proposed Class Period." Zurek Rebuttal Report, ¶ 21. He then asserts that I "offer[] no basis for [my] contention that a complete lack of price reaction in March 2019 and April 2019 in response to information about the actual restatement is consistent with there being any hypothetical price impact earlier during the Proposed Class Period at the time of the alleged misrepresentations." Zurek Rebuttal Report, ¶ 23. While it is unclear whether Dr. Zurek believes I have offered only a single explanation or no explanation, I clearly explain in the Dalrymple Rebuttal Report why Dr. Zurek's examination of share price reactions following disclosures in March and April 2019 does not support his opinion of no price impact during the Class Period, based on sound economic reasoning that is grounded in the evidence of the case. Dalrymple Rebuttal Report, ¶¶ 40-55.

[39] Zurek Rebuttal Report, ¶ 22.



below investment grade during the Class Period does not mean that the company's financial condition did not continue to deteriorate, nor does it even suggest that AAC's credit position had not deteriorated significantly by the time Dr. Zurek examines back-end price impact (after the company's debt had been downgraded even further).[40] More generally, Dr. Zurek does not address other evidence I present in the Dalrymple Rebuttal Report, which clearly shows that AAC's circumstances changed dramatically between the Class Period (when AAC's stock traded between $5 and $13 per share) and the dates on which Dr. Zurek purports to have found a lack of back-end price impact (after AAC's market capitalization had collapsed and its stock traded at around $2 per share).[41]

31. Dr. Zurek also attempts to prop up his back-end price impact analysis by claiming that he "also analyzed" AAC's share price reactions on March 13, 2019 ("the day on which AAC reported 4Q 2018 and FY 2018 operational highlights and announced that it would delay the filing of its FY 2018 Form 10-K and postpone its conference call") and March 20, 2019 ("the first trading day after AAC disclosed it would be unable to timely file is FY 2018 Form 10-K because it was conducting an analysis of its previous estimates of accounts receivable").[42] The extent of Dr. Zurek's "analysis" appears to be his observation that these dates did not correspond to statistically significant price declines.[43] Again, as previously discussed, AAC's circumstances changed dramatically between the Class Period and the dates that Dr. Zurek tests for back-end price impact. Claiming to have "analyzed" two additional dates, while still failing to reconcile AAC's circumstances in March and April 2019 to the dates on which the alleged misstatements were made, does nothing to support Dr. Zurek's reliance on share price reactions in March and April 2019 to infer a lack of price impact associated with the Restatement Claim.

**C. Dr. Zurek's assertions about AAC's share price movement on April 16, 2019 are based on mischaracterizations of my opinions and flawed reasoning**

32. According to Dr. Zurek, my purported "contention that the statistically significant price movement on April 16, 2019 demonstrates price impact of the Restatement Claim is wholly unsupported and contrary to Plaintiff's assertion of market efficiency."[44] Dr. Zurek then repeats his assertions from the Zurek Report in support of his flawed premise that "AAC's residual return on April 15, 2019 …demonstrate[es] either lack of price impact (lack of value relevance) or lack of market efficiency (due to lack of any discernible price reaction)."[45]

---

[40] Under Dr. Zurek's binary framework (investment grade versus non-investment grade), there would be no reason for ratings agencies to downgrade debt that fell below investment grade.

[41] Dalrymple Rebuttal Report, ¶¶ 50-55.

[42] Zurek Rebuttal Report, ¶ 30. Dr. Zurek initially claimed, "there were three days on which information about the restatement was disclosed: March 29, 2019, April 15, 2019, and April 16, 2019." Zurek Report, ¶ 47. I address Dr. Zurek's assertions about each of these dates in the Dalrymple Rebuttal Report (¶¶ 40-55).

[43] Zurek Rebuttal Report, ¶ 31.

[44] Zurek Rebuttal Report, ¶ 32.

[45] Zurek Rebuttal Report, ¶ 37.



33.    As an initial matter, I have not offered the opinion that AAC's "statistically significant price movement on April 16, 2019 demonstrates price impact of the Restatement Claim."[46]  This is a blatant mischaracterization of my opinions, and even the excerpts from the Dalrymple Rebuttal Report that Dr. Zurek presents make it clear that this is not an opinion I have offered.[47]

34.    As I explain in the Dalrymple Rebuttal Report, it is improper for Dr. Zurek to truncate his analysis on April 15, 2018, before market participants would have had context around the implications of the Restatement Claim (whether explicit or implicit) to re-assess expectations.  That is not to say that the abnormal return on April 16, 2019 necessarily demonstrates price impact in and of itself, as Dr. Zurek erroneously suggests is my opinion.  But in order for Dr. Zurek to *prove* a *lack of price impact*, he would need to be able to explain why the reaction on this day could not be attributed, *at all*, to the previous mis-statements about AAC's financial performance.  By failing to properly examine AAC's share price decline on April 16, 2019, he is not able to do so.

35.    In the Zurek Rebuttal Report, Dr. Zurek erroneously claims to have "discussed every piece of information related to the restatement that became public on [April 16, 2019] and none of it contained new, value-relevant information."[48]  Contrary to this assertion, Dr. Zurek did not discuss the William Blair analyst report released on April 16, 2019.[49]  In reference to its forecast, William Blair noted that "management did not provide restated 2017 results to account for novel ASC 606 accounting," and that "[t]he company is hosting an earnings conference call Tuesday morning…and we will finalize our forecasts following the call."[50]  Even if the company provided no additional insight into the restatement itself on April 16, 2019, as Dr. Zurek contends, market participants would have been unaware that further information was not forthcoming until after the press release and earnings call that morning.  It is possible that such context, or lack thereof, was particularly significant in light of AAC's previous filing delays and prior releases about the restatement, including its 8-K on March 29, 2019 in which the company released information about the restatement that turned out to be highly inaccurate.[51]  It was only on April 16, 2019 that market participants could have confirmed that no further information would be released and that the restated financial

---

[46]    Zurek Rebuttal Report, ¶ 32.

[47]    Zurek Rebuttal Report, ¶ 32, quoting the Dalrymple Rebuttal Report, ¶ 48: "While AAC may not have released additional restated financial information on that day, Dr. Zurek does not consider the *likelihood* that the impact of AAC's reduced guidance on that day would have been mitigated if AAC had disclosed the correct financial results during the Class Period.  In particular, the guidance released on April 16, 2019 would have confirmed that the company's ability to generate earnings going forward was substantially lower, an expectation that investors *may* have been able to form during the Class Period if the correct financial information had been disclosed."  Emphasis added.

[48]    Zurek Rebuttal Report, ¶ 38.

[49]    William Blair, "First Take on Fourth-Quarter Results; Continued Census Weakness Affects Quarterly Performance, Improvements in Early 2019," April 16, 2019.  This report refers to AAC's close price of $2.14 on April 15, 2019 and an upcoming call at 9am Central on Tuesday, which suggests that the report was released around the beginning of the day on April 16, 2019.

[50]    William Blair, "First Take on Fourth-Quarter Results; Continued Census Weakness Affects Quarterly Performance, Improvements in Early 2019," April 16, 2019, pp. 2-4.

[51]    *See, e.g.,* Dalrymple Rebuttal Report, ¶¶ 40-42.  In addition, Raymond James noted that "management's restatement of prior periods related to changes in revenue recognition did not include adjusted EBITDA or adjusted EPS, which we will update once available."  Raymond James, "2019 Guide Light, but AAC on the Path to Recovery," April 17, 2019, p. 1.  But prior to April 16, 2019, Raymond James would not have known that AAC would not provide this information and that the restatement's impact on adjusted EBITDA and adjusted EPS would not be disclosed.

statements, in conjunction with other information released by the company, represented the complete set of available information from which one could form expectations.  Dr. Zurek fails to consider this.

36.     In the Zurek Rebuttal Report, Dr. Zurek attempts to justify ignoring the abnormal return on April 16, 2019 by asserting that "even if one accepts Plaintiff and Mr. Dalrymple's assertion that the Restatement Claim was responsible for at least part of the observed price decline on April 16, 2019, then this would indicate that the market for AAC's stock was not efficient."[52]  But these two things are not mutually exclusive as Dr. Zurek contends.  For instance, as is the case here, analysts often provide commentary and revise forecasts based on new information in the days following its release, which can affect investors' expectations and, therefore, the price of a stock.  This does not mean that the market is inefficient;[53] rather, it could be indicative of information that may be complex and/or incomplete, and which may need time to be fully incorporated into market participants' expectations.

37.     Furthermore, even if these two things were mutually exclusive, which they are not, I have not assessed whether the market for AAC shares was efficient in April 2019 and neither has Dr. Zurek.  By relying on an event study to measure AAC's abnormal return in the period *after* the Class Period (for which I did not assess market efficiency), Dr. Zurek simply *assumes* market efficiency.  Indeed, his arguments regarding back-end price impact are wholly reliant on the assumption that AAC's shares trade in an efficient market after the Class Period.  If Dr. Zurek contends that AAC's shares did not trade in an efficient market *after* the Class Period, then he cannot show a lack of back-end price impact.  Regardless, this has no bearing on my opinion that AAC's shares traded in an efficient market *during* the Class Period.

### III.   Further Work

38.     My analysis is ongoing, and I reserve the right to supplement my opinions as additional information is made available to me.

_W. Scott Dalrymple (signature)_

W. Scott Dalrymple, CFA
BVA Group
Partner

---

[52]     Zurek Rebuttal Report, ¶ 34. Citation omitted.
[53]     In order to support such a conclusion, Dr. Zurek would need to present a comprehensive examination of AAC's market efficiency, similar to the one I present in relation to the Class Period in the Dalrymple Report, which he has not done.

