IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

INDIANA PUBLIC REQUIREMENT ) 
SYSTEM, )
Individually and on Behalf of All Others )
Similarly Situated )     NO. 3:19-cv-00407
  )     JUDGE RICHARDSON
     Plaintiff, )
  )
v. )
  )
AAC HOLDINGS, et al., )
  
     Defendants.


## <u>MEMORANDUM OPINION AND ORDER</u>

Pending before the Court is Plaintiff's motion for class certification. (Doc. No. 76). Defendants filed a response (Doc. No. 83) and Plaintiff filed a reply (Doc. No. 100). Defendants requested permission to file a sur-reply on the grounds that Plaintiff raised issues in its reply for the first time. (Doc. No. 106). The Court granted Defendants' request (Doc. No. 108) and Defendants filed a sur-reply (Doc. No. 109). For the reasons stated herein, Plaintiff's motion for class certification is granted in part and denied in part.[1]

The facts set forth below alleged in the amended complaint[2] and are discussed to provide context for Plaintiff's motion for class certification.

---

[1] The Court notes that Plaintiff filed a "Notice of Supplemental Authority in Support of Lead Plaintiff's Motion for Class Certification" (Doc. No. 121, "Notice") without leave to do so. Defendants responded to the Notice, arguing that the Court should disregard the Notice as unauthorized briefing. (Doc. No. 122). The Court agrees with Defendants that the Notice at Doc. No. 121 is an unauthorized brief. The Court did not consider the brief in the resolution of the motion, and Plaintiff is cautioned to seek leave to file supplemental briefing in the future.

[2] As discussed further below, although there is some confusion among lower courts on how to treat facts contained in the complaint on a motion for class certification, the Court finds the approach by the Sixth

The proposed class in this purported class action consists of investors who purchased common stock of AAC Holdings, Inc. ("AAC" or "the Company") between March 8, 2017 and November, 5 2018. (Doc. No. 77 at 7)[3]. AAC is a healthcare company primarily operating in the field of addiction treatment, providing addiction treatment centers and sober living services. (Doc. No. 45 at 4).[4] As explained in part in the Court's opinion (Doc. No. 62, "motion-to-dismiss opinion) denying Defendants' motion to dismiss (Doc. No. 52) the amended complaint, Plaintiff[5] brings a Restatement Claim and a Marketing Claim against Defendants under Section 10(b) of the Securities and Exchange Act and Rule 10b-5 promulgated thereunder. Plaintiff's Restatement Claim asserts that Defendants made false and misleading statements about AAC's accounts receivable, leading to false financial statements that were ultimately revealed to investors through AAC's Restatement of its financial results[6] for fiscal years 2016 and 2017 and the first three

---

Circuit to be that a court should take facts contained in the complaint as true only insofar as they are undisputed on a motion for class certification. Therefore, the Court does not treat the facts contained in the amended complaint as true unless it can reasonably ascertain that they are undisputed by Defendants.

[3] The Court notes that as to the proposed class period, there is inconsistency between the amended complaint (Doc. No. 45 at 4) and the motion for class certification (Doc. No. 77 at 7). The amended complaint states that the class period is between March 8, 2017 and April 15, 2019, whereas the motion for class certification states that the class period is between March 8, 2017 and November 5, 2018. The Court adopts the latter version for purposes of analysis, as it apparently represents Plaintiff's most recent view as to the appropriate class period and is, if anything, more favorable to Defendants than the former version because it is narrower.

[4] When citing to a page in a document filed by one of the parties, the Court endeavors to cite to the page number ("Page ___ of __") added by the Clerk's Office as part of the pagination process associated with Electronic Case Filing if such page number differs from the page number originally provided by the author/filer of the document.

[5] All references herein to "Plaintiff" are to Indiana Public Requirement System ("INPRS") as the class representative and lead plaintiff, which it has been appointed without opposition from David Brown Caudle, who originally filed this suit. (Doc. No. 37).

[6] "Restatement" as set forth in Defendants' 2018 Form 10-K filed with the Securities and Exchange Commission ("SEC").

quarters of 2018. (Doc. No. 62 at 2–3). Plaintiff's Marketing Claim alleges that Defendants engaged in a fraudulent and deceptive sales and marketing scheme and made false and misleading statements related to AAC's sales and marketing practices that were revealed to investors as the industry and Congress began to investigate and cast light upon such deceptive practices. (*Id.*).

Plaintiff also brings Scheme Claims against Defendants pursuant to § 10(b).[7] (Doc. No. 45 at 10). Specifically, Plaintiff alleges that Defendants participated in a scheme and wrongful course of conduct that operated as a fraud or deceit on purchasers of AAC common stock. (*Id.*). Plaintiff's Scheme Claims are predicated on the same conduct underlying Plaintiff's Restatement and Marketing Claims. (*Id.* at 1, 5).[8]

### 1. Marketing Claim

Plaintiff alleges two primary misleading marketing behaviors on the part of AAC. AAC acquired Referral Solutions Group, LLC ("RSG") in July 2015, whose primary business involved operating over 100 websites with uniform resource locators ("URLs") such as "rehabs.com" and "recovery.com." (*Id.* at 12). Plaintiff contends that contrary to how they were advertised, these websites did not merely provide "informational resources" about drug abuse and treatment, but instead were "thinly veiled lead generation mechanisms" that used search engine optimization ("SEO") techniques to increase the sites' visibility. (*Id.*). The sites also purposely charged rehab

---

[7] These claims were not discussed much in the Court's motion-to-dismiss opinion, because Defendants did not move to dismiss them.

[8] The Court notes that there is a discrepancy between how the parties refer to scheme liability in this case. Defendants refer to a single "scheme claim" (Doc. No. 83 at 2), whereas Plaintiff refers to multiple "scheme claims" (Doc. No. 100 at 19). The Court acknowledges that Plaintiff has not been clear about the exact contours of the scheme liability it envisions in this case. However, the Court finds it more accurate to refer to multiple scheme claims—one based on Defendants' conduct related to the allegedly deceptive marketing practices and one based on Defendants' conduct related to the alleged overstatement of its accounts receivable and restatement of financial statements. In other words, Plaintiff has one Scheme Claim predicated on Defendants' alleged deceptive marketing practices and one Scheme Claim predicated on Defendants' alleged unlawful conduct connected to its overstatement of its accounts receivable.

providers for advertisement space or for when visitors clicked on the advertisements to then reach the rehab providers' websites. (*Id.*). As for the second allegedly misleading marketing behavior, Plaintiff accuses AAC of paying their representatives who provided individuals with information about addiction and treatment options a commission based on individuals' enrollment in AAC's facilities (*Id.*). These representatives were also supposedly "subject to minimum admissions goals." (*Id.*).

Central to Plaintiff's Marketing Claim are several allegedly materially false and misleading statements and omissions made by Defendants. On May 23, 2017, Defendants Michael Cartwright, the former Chief Executive Officer ("CEO") of AAC and Chairman of the AAC Board of Directors, and Kirk Manz, AAC's former Chief Financial Officer ("CFO"), spoke at the UBS Global Healthcare Conference in New York. (*Id.* at 26). The slide deck presented by Defendants referred to AAC's "sales and marketing engine" as "best in class" and stated that AAC's "marketing knowledge and infrastructure" provided AAC with a "significant competitive advantage." (*Id.* at 26–27).

Beginning in late 2017, the United States House of Representative Committee on Energy and Commerce, Subcommittee on Oversight and Investigations began holding hearings on the deceptive and fraudulent marketing practices in the addiction treatment industry. (*Id.* at 14). Among the public discussion of misleading marketing practices in the addiction treatment industry, in January 2018, Google expanded a nation-wide ban on selling advertisements for addiction-treatment related search terms to a global ban. (*Id.* at 17).

On February 22, 2018, Defendants Cartwright and Andrew McWilliams, AAC's former Chief Accounting Officer, hosted a conference call to discuss AAC's financial results. (*Id.* at 27). When asked about AAC's marketing efforts, Cartwright said: ". . . I think the team that we have

focused on digital marketing is incredible. The talent is really exceptional. And I think the ideas that they come up with on a quarterly basis amaze me . . . ." (*Id.* at 27). The following day, AAC filed with the Securities and Exchange Commission ("SEC") its Form 10-K for Fiscal Year ("FY") 2017, in which AAC stated that the "national sales and marketing program provides [AAC] with a competitive advantage compared to treatment facilities that primarily target local geographic areas and use fewer marketing channels to attract clients." (*Id.* at 28).

In a similar set of comments during a May 3, 2018 conference call, Defendant Cartwright stated, in response to a question regarding the marketing engine:

> One thing I'm most impressed about is the people we have in sales and marketing. We have the right people. So it's not really a people issue because we have extremely talented people in our call center as well as on the outside BD team as well as in the digital marketing space . . . .

(*Id.* at 33).

On July 25, 2018, Congress called Defendant Cartwright to testify, and during the testimony he was questioned directly about AAC's marketing practices. During his testimony, Cartwright stated that AAC "make[s] sure that [AAC's] website visitors know who they are contacting" and that AAC makes "clear that users know which treatment centers are going to answer the numbers they call." (*Id.* at 64).

On August 1, 2018, ahead of AAC's release of its 2Q18[9] financial results, AAC issued a press release in which Defendant Cartwright stated, "We are pleased with the progress we have made this year as we continue to execute to plan and make strides in transforming our sales and marketing team, including opening a new admissions center and bringing on new leadership . . . ." (*Id.* at 33).

---

[9] "2Q18" refers to the second fiscal quarter of 2018, *i.e.,* the quarter ending June 30, 2018. The Court will use the same form of abbreviation when referring to others fiscal quarters, each ending either on March 31, June 30, September 30, or December 31 of the referenced year.

Later that month, Google also released an update to its broad core algorithm, which could have impacted "where a given website appear[ed] in the hierarchy of Google's search results." (*Id.* at 18). The update came to be known as the "Your Money or Your Life" update, and allegedly prioritized content that demonstrated "expertise, authoritativeness, and trustworthiness." (*Id.* at 18–19). With the new update in place, websites with more trustworthy content were supposedly ranked higher in search results than less reputable websites. (*Id.* at 19).

On November 6, 2018, AAC filed with the SEC its 3Q18 Form 10-Q, in which AAC warned that Google's changes to its algorithms may impact the number of calls to AAC's admissions center and "decrease in interactions with potential clients and a lowering of [AAC's] census." (*Id.* at 31). In a conference call that day, Defendant Cartwright remarked that "Google launched changes to its algorithm that impacted the search engine optimization ["SEO"] of [AAC's] health care and medical-related websites." (*Id.* at 36). Cartwright attributed the downturn in calls to AAC's call centers from July to September to the SEO changes. (*Id.*). After the conference call, AAC common stock purportedly declined "more than 44%" from close of $5.31 on November 5, 2018 to "close of $2.96 on November 6, 2018." (*Id.* at 55).

**2. Restatement Claim**

Plaintiff's Restatement Claim relies on the theory that AAC was forced to restate its financial results after it improperly calculated its accounts receivable. (*Id.* at 19). According to Plaintiff, AAC designated debts owed to the Company that were unlikely to be collectable as "doubtful accounts" or "bad debt" on its financial statements. (*Id.* at 20). AAC allegedly treated a "large portion of its revenues as collectible" based on industry data when AAC was in possession of historical data that indicated that the revenue actually should have been designated as doubtful accounts or otherwise uncollectible, thus knowingly inflating its accounts receivable. (*Id.* at 22–

23). Beginning with AAC's 2016 Form 10-K, the amended complaint provides in detail a series of disclosures and statements made by AAC in which AAC allegedly misrepresented its accounts receivable and the information on which it was basing the calculations for its accounts receivable. (*Id.* at 37–46).

In March 2018, the SEC subpoenaed AAC, seeking information regarding accounts receivable where AAC had received partial payment from an insurance company but had supposedly continued to pursue collections for remaining accounts AAC claimed it was owed. (*Id.* at 23). In the third quarter of 2018, AAC's audit committee reviewed AAC's accounting practices for the receivables that were the subject of the subpoena and found that a change in the "estimate of the collectability" of the accounts receivable was necessary. (*Id.*).

Several months later, on November 6, 2018, AAC issued a release incorporating the information from AAC's 3Q18 results, *i.e.*, that the change in estimate resulted in a $6 million revenue reduction and an increase in AAC's net loss of approximately $4.8 million. (*Id.* at 23–24). Both the release on November 6 and AAC's 3Q18 Form 10-Q detailed how AAC's change in its accounting systems resulted in a reduction in revenue. (*Id.* at 53). The release and 3Q18 Form 10-Q also disclosed that AAC's accounting had been subject to a SEC subpoena (*Id.* at 53–54). As excerpted from the amended complaint, the release states in part:

> During the three months ended September 30, 2018 and effective as of July 1, 2018, we made a change to our accounting estimate of the collectability of accounts receivable, specifically relating to accounts where we have received a partial payment from a commercial insurance company and we are continuing to pursue additional collections for the balance that we estimate remains outstanding ("partial payment accounts receivable"). Based on the limited number of claims that were closed through our historical appeals process, information with respect to the ultimate resolution of the appeals of these partial payment accounts receivable has been limited. As a result, initial assumptions of the ultimate collectability rates for partial payment accounts receivable were primarily based on industry and other data. During 2018, to enhance our own collection processes, we began using a third-party vendor to pursue collections on these partial payment accounts receivable. As

of September 30, 2018, we are using this vendor exclusively for collection of the partial payment accounts receivable. As a result of utilizing the third-party vendor, the number of partial payment claims closed through the appeals process has increased allowing us to rely on our own collection history and additional information obtained from the third party vendor to estimate ultimate collectability. This recent information indicated that our current assumptions were different from our historical assumptions. We used this additional information to further refine our procedures to more precisely estimate the collectability of partial payment accounts receivable. This change in estimate resulted in a reduction in revenue of approximately $6.0 million, an increase in net loss of approximately $4.8 million, or $0.20 loss per basic and diluted share for the three and nine months ended September 30, 2018. We determined this change in assumptions and estimation procedures of the collectability of partial payment accounts receivable is a change in accounting estimate in accordance with Accounting Standards Codification ("ASC") 250-10 "Accounting Changes and Error Corrections."

(*Id.* at 53). The revenues were allegedly well below Wall Street analyst expectations. (*Id.* at 55). Plaintiff contends that the combination of the lower-than expected revenues and disappointing call volumes caused AAC common stock to decline "more than 44%" from close of $5.31 on November 5, 2018 to "close of $2.96 on November 6, 2018." (*Id.* at 55). Plaintiff further alleges that the reductions in revenue were not due to modest changes in accounting, as purported by AAC in its release and SEC filing, but instead was the result of reckless disregard of facts known by Defendants for years. (*Id.* at 54).

The following year, on March 29, 2019, AAC filed its Form 8-K with the SEC. (*Id.* at 24). The Form 8-K revealed that AAC expected to report a material weakness in the Company's internal controls over financial reporting as of December 31, 2018. (*Id.*). The Form 8-K went on to explain that the "Company expects to file the Form 10-K, including the restated Financial Statement, but no later than April 2, 2019. . ." (Doc. No. 84-2). Importantly, the Form 8-K also contained several estimated adjustments that the Company expected to be contained in the "restated Financial Statement":

The adjustments will result in estimated increases to net income of approximately $11.8 million and $14.3 million, for the nine months ended September 30, 2018

and the year ended December 31, 2017, respectively. The adjustments will also result in an estimated decrease of net income of approximately $13.5 million for the year ended December 31, 2016. Periods prior to 2016 will also be impacted as a result of the adjustments, which will result in an estimated cumulative effect adjustment of approximately $24.7 million, recorded as a reduction to stockholders' equity on the balance sheet as of January 1, 2016. The adjustments will not affect the previously reported net operating cash flows. The Company is diligently working to complete its review of the restated financial statements, and, therefore, the estimated adjustments described in the immediately preceding sentences are preliminary in nature.

(*Id.*). A few weeks later, on April 15, 2019, AAC filed with the SEC its 2018 Form 10-K ("the Restatement"), in which it disclosed that it had restated its historical financial results.[10] (Doc. No. 45 at 55–56). The Restatement explained that "[t]he adjustments relate to estimates of accounts receivable, provision for doubtful accounts and revenue for the relevant periods described below, as well as the related income tax effects." (*Id.* at 56). The Restatement goes on to say that subsequent to December 31, 2018, AAC "became aware of historical cash collection trends by customer that existed at the time of the issuance of the historical financial statements," the Company's prior "oversight" (*i.e.*, not recognizing) of which led to "the adjustments being considered correction of an error under" GAAP. (*Id.* at 56). The corrections resulted in the following adjustments: 1) "an estimated increase to net income of approximately $7.7 million for the year ended December 31, 2017,"; 2) "an estimated decrease of net income of approximately $20.6 million for the year ended December 31, 2016"; and 3) "an estimated cumulative effect adjustment of approximately $23.8 million recorded as a reduction to stockholders' equity on the balance sheet as of January 1, 2016." (*Id.* at 56).

The following day (April 16, 2019), AAC released additional financial figures for 4Q18, all of which allegedly fell below the estimates that Defendants had led the market to expect. (*Id.*

---

[10] As discussed further below, however, the estimated adjustments for the restated financials contained in the March 29, 2019 Form 8-K differed significantly from those contained in the April 15, 2019 Form 10-K.

at 57). The release also included details regarding the Restatement, explaining that the "adjustments related to estimates of accounts receivable, provision of doubtful accounts, and revenue for the relevant periods . . . ." (*Id.* at 57–58). That day, AAC's common stock price fell over 18%, closing at $1.74 per share. (*Id.* at 58).

LEGAL STANDARD

The principal purpose of class actions is to achieve efficiency and economy of litigation, with respect to both the parties and the courts. *Gen. Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 159 (1982). As an exception to the usual rule that litigation is conducted by and on behalf of individually named parties, "[c]lass relief is 'peculiarly appropriate' when the 'issues involved are common to the class as a whole' and when they 'turn on questions of law applicable in the same manner to each member of the class.'" *Id.* at 155 (quoting *Califano v. Yamasaki*, 442 U.S. 682, 701 (1979)). District courts have broad discretion in deciding whether to certify a class but must exercise that discretion within the framework of Rule 23. *See Coleman v. Gen. Motors Acceptance Corp.*, 296 F.3d 443, 446 (6th Cir. 2002). However, "when in doubt as to whether to certify a class action, the district court should err in favor of allowing a class." *Rankin v. Rots,* 220 F.R.D. 511, 517 (E.D. Mich. 2004) (citing *Eisenberg v. Gagnon*, 766 F.2d 770, 785 (3d Cir. 1985)).

A class action will be certified only if, after rigorous analysis, the court is satisfied that the prerequisites of Fed. R. Civ. P. 23(a) have been met and that the action falls within one of the categories prescribed in Fed. R. Civ. P. 23(b). *Bridging Cmtys. Inc. v. Top Flite Fin. Inc.*, 843 F.3d 1119, 1124 (6th Cir. 2016). A party seeking to maintain a class action must be prepared to show that Rule 23(a)'s numerosity, commonality, typicality, and adequacy of representation requirements have been met. *Comcast v. Behrend*, 569 U.S. 27, 33 (2013). In addition, the party must satisfy, through evidentiary proof, at least one of Rule 23(b)'s provisions. *Id.* at 34. Where,

as here, Plaintiff relies on Rule 23(b)(3) in particular, the court can certify a Rule 23(a)-compliant class if the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy. The matters pertinent to these findings include: (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action. Fed. R. Civ. P. 23(b)(3).

In determining whether a plaintiff has met his or her burden, a court cannot rely merely on the designation of action as a class action in the pleadings. *See In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir. 1996). Instead, before certifying a class, a district court must conduct a "rigorous analysis" of the prerequisites of Rule 23 of the Federal Rules of Civil Procedure. *Id.* at 161. As touched on above, in evaluating whether class certification is appropriate, "it may be necessary for the court to probe behind the pleadings,"[11] as the issues concerning whether it is appropriate to certify a class are often "enmeshed" within the legal and factual considerations raised by the litigation. *Gen. Tel. Co. of the Southwest*, 457 U.S. at 160; *see also In re Am. Med. Sys.*, 75 F.3d at 1079. It follows that the Court may rely on affidavits or declarations submitted in support of the Class Certification Motion. *See, e.g., Steward v. Janek*, 315 F.R.D. 472, 477 (W.D.

---

[11] The Sixth Circuit, citing the Seventh Circuit, recently offered examples of when it is necessary to probe behind the pleadings to determine whether the requirements of Rule 23 have been satisfied. "What if a plaintiff alleges that the class consists of 10,000 members, but a defendant claims it includes 10?" *Doster v. Kendall*, 54 F.4th 398, 432 (6th Cir. 2022) (citing *Szabo v. Bridgeport Machs., Inc.*, 249 F.3d 672, 676 (7th Cir. 2001) (Easterbrook, J.)). "The plaintiff must offer proof." *See id.* And when a plaintiff relies on a fraud-on-the-market theory, it "must prove (not [merely] plead) most of the elements of this factual theory to satisfy Rule 23(b)(3)." *Id.*

Tex. 2016) (declining to exclude declarations submitted in support of motion to certify class); *Clay v. CytoSport, Inc.*, No. 3:15-CV-00165-L-AGS, 2017 WL 10592138, (S.D. Cal. Apr. 6, 2017). *Cf. Frazier v. PJ Iowa, L.C.*, 337 F. Supp. 3d 848, 865 (S.D. Iowa 2018) ("Signed declarations or affidavits provide appropriate support for motions to conditionally certify a class" (involving a proposed collective action under the Fair Labor Standards Act)). Likewise, the Court can consider deposition testimony. *See*, *e.g.*, *Crutchfield v. Sewerage & Water Bd. of New Orleans*, No. CIV.A. 13-4801, 2015 WL 3917657, at *5 (E.D. La. June 25, 2015) (declining to strike plaintiffs' deposition testimony submitted in support of motion for class certification even though unpersuasive and self-serving at best), *aff'd and remanded*, 829 F.3d 370 (5th Cir. 2016).

The certification stage, however, is not the appropriate time for the Court to "engage in free-ranging merits inquiries[.]" *Amgen, Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013). "Merits questions may be considered to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Id.* It is clear that over the years, many courts (including this one and others in this Circuit) have stated that the court generally must accept as true the allegations (at least those related to the merits) contained in the plaintiff's complaint. *See, e.g.*, *Porcell v. Lincoln Wood Prod., Inc.*, 713 F. Supp. 2d 1305, 1309 (D.N.M. 2010); *Moreno–Espinosa v. J & J Ag Prods., Inc.*, 247 F.R.D. 686, 691 (S.D. Fla. 2007) (citing *Heffner v. Blue Cross and Blue Shield of Ala., Inc.*, 443 F.3d 1330, 1337 (11th Cir. 2006)); *Rankin*, 220 F.R.D. at 517; *Edwards v. McCormick*, 196 F.R.D. 487, 490 (S.D. Ohio 2000). But such statements have not accurately reflected the law in the Sixth Circuit as it has existed for more than a decade. As the Sixth Circuit explained in 2012, allegations in the complaint (including allegations related to the merits and not directly to class certification) should not be accepted as true *unless they are undisputed*:

"Rule 23 does not set forth a mere pleading standard. A party seeking class certification must affirmatively demonstrate his compliance with the Rule." *Wal–Mart* [*Stores, Inc. v. Dukes,* 131 S. Ct. 2541, 2551 (2011). "[A]ctual, not presumed, conformance with Rule 23(a) remains ... indispensable," *Gen. Tel. Co. of Sw. v. Falcon,* 457 U.S. 147, 160, 102 S. Ct. 2364, 72 L.Ed.2d 740 (1982), and must be checked through "rigorous analysis," *Wal–Mart,* 131 S. Ct. at 2551 (quoting *Falcon,* 457 U.S. at 161, 102 S. Ct. 2364). Some circuits expressly bar district courts from presuming that the plaintiffs' allegations in the complaint are "true for purposes of the class motion ... without resolving factual and legal issues that strongly influence the wisdom of class treatment." *Szabo v. Bridgeport Machs., Inc.,* 249 F.3d 672, 675 (7th Cir.), *cert. denied,* 534 U.S. 951, 122 S. Ct. 348, 151 L.Ed.2d 263 (2001) (internal quotation marks omitted); *see also Elizabeth M. v. Montenez,* 458 F.3d 779, 783 (8th Cir. 2006); *Miles v. Merrill Lynch & Co. (In re Initial Pub. Offerings Sec. Litig.),* 471 F.3d 24, 41 (2d Cir. 2006). That approach follows from *Falcon,* and *Wal–Mart* has cemented its propriety. Nevertheless it does not apply in all circumstances; it is not always " 'necessary ... to probe behind the pleadings before coming to rest on the certification question,' " *Wal–Mart,* 131 S. Ct. at 2551 (quoting *Falcon,* 457 U.S. at 160, 102 S. Ct. 2364), because sometimes there may be no disputed "factual and legal issues" that "*strongly influence the wisdom of class treatment,*" *Szabo,* 249 F.3d at 675.

*Gooch v. Life Invs. Ins. Co. of Am.*, 672 F.3d 402, 417 (6th Cir. 2012). Explaining the rationale for

not accepting the allegations of the complaint as true for purposes of class certification, the Seventh

Circuit wrote in *Szabo*:

The proposition that a district judge must accept all of the complaint's allegations when deciding whether to certify a class cannot be found in Rule 23 and has nothing to recommend it. The reason why judges accept a complaint's factual allegations when ruling on motions to dismiss under Rule 12(b)(6) is that a motion to dismiss tests the legal sufficiency of a pleading. Its *factual* sufficiency will be tested later— by a motion for summary judgment under Rule 56, and if necessary by trial. By contrast, an order certifying a class usually is the district judge's last word on the subject; there is no later test of the decision's factual premises (and, if the case is settled, there could not be such an examination even if the district judge viewed the certification as provisional). Before deciding whether to allow a case to proceed as a class action, therefore, a judge should make whatever factual and legal inquiries are necessary under Rule 23. This would be plain enough if, for example, the plaintiff alleged that the class had 10,000 members, making it too numerous to allow joinder, see Rule 23(a)(1), while the defendant insisted that the class contained only 10 members. A judge would not and could not accept the plaintiff's assertion as conclusive; instead the judge would receive evidence (if only by affidavit) and resolve the disputes before deciding whether to certify the class. What is true of disputes under Rule 23(a)(1) is equally true of disputes under Rule

23(b)(3).

. . .

Questions such as these require the exercise of judgment and the application of sound discretion; they differ in kind from legal rulings under Rule 12(b)(6). And if some of the considerations under Rule 23(b)(3), such as "the difficulties likely to be encountered in the management of a class action", overlap the merits—as they do in this case, where it is not possible to evaluate impending difficulties without making a choice of law, and not possible to make a sound choice of law without deciding whether Bridgeport authorized or ratified the dealers' representations— then the judge must make a preliminary inquiry into the merits.

Courts make similar inquiries routinely under Rule 12(b)(1) and 12(b)(2) before deciding whether they possess jurisdiction over the subject matter of the case and the persons of the defendants, the location of the proper venue, application of *forum non conveniens*, and other preliminary issues. Often personal jurisdiction is closely linked to the nature, and merit, of the claim being asserted, see, e.g., *Sheet Metal Workers' National Pension Fund v. Elite Erectors, Inc.*, 212 F.3d 1031 (7th Cir.2000), but this does not mean that the judge will just take the plaintiff's word about what happened. Nor will the court accept the plaintiff's say-so when deciding how much could be recovered (and thus whether the amount in controversy for diversity jurisdiction is present), even though the maximum recovery depends strongly on the merits. See, e.g., *Pratt Central Park Limited Partnership v. Dames & Moore, Inc.*, 60 F.3d 350 (7th Cir.1995). When jurisdiction or venue depends on contested facts—even facts closely linked to the merits of the claim—the district judge is free to hold a hearing and resolve the dispute before allowing the case to proceed. A motion under Rule 12(b)(6) is unique in requiring the district judge to accept the plaintiff's allegations; we see no reason to extend that approach to Rule 23, when it does not govern even the other motions authorized by Rule 12(b).
. . .

Plaintiffs cannot tie the judge's hands by making allegations relevant to both the merits and class certification. . . .

Certifying classes on the basis of incontestable allegations in the complaint moves the court's discretion to the plaintiff's attorneys—who may use it in ways injurious to other class members, as well as ways injurious to defendants. Both the absent class members and defendants are entitled to the protection of independent judicial review of the plaintiff's allegations.

*Szabo*, 249 F.3d 672,675–77 (7th Cir. 2001). So under Szabo, allegations in the complaint—even if related primarily to the merits (and indirectly to class certification)—are not

to be taken as true for purposes of class certification. As *Gooch* indicates, *Szabo's* approach is now the Sixth Circuit's approach, although the Sixth Circuit is careful to note in effect that there is no need to probe behind the pleadings to the extent that those factual allegations are undisputed . *See Gooch*, 672 F.3d at 417; *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 537 (6th Cir. 2012) ("*Dukes* [*i.e.*, *Walmart*] verified that the district court should not merely presume that the plaintiffs' allegations in the complaint are true for the purposes of class motion without resolving factual and legal issues [unless there are no undisputed relevant factual or legal issues]." (citing *See Gooch*, 672 F.3d at 417)).

So to the extent that relevant allegations in the pleadings are not undisputed, a court must probe behind the pleadings, and therefore must rely on information outside of the complaint to support any decision to certify a class. This rule squares with the principle that courts, although directed to refrain from engaging directly in analyses on the merits at the class certification stage, must conduct a rigorous analysis as to the fulfillment of the Rule 23 requirements.

Therefore, "if there are material factual disputes, the court must receive evidence and resolve the disputes before deciding whether to certify the class." *Priddy v. Health Care Serv. Corp.*, 870 F.3d 657, 660 (7th Cir. 2017) (citation, alterations, and internal quotation marks omitted). As indicated in multiple places above, the factual issues related to resolution of the Rule 23 inquiry may, to an extent, overlap with issues related to the merits, but the court is to resolve only the Rule 23 issues, and not the merits issues. *See, e.g.*, *In re Sanofi-Aventis Sec. Litig.*, 293 F.R.D. 449, 453 (S.D.N.Y. 2013) (citing *Wal–Mart Stores v. Dukes*, 564 U.S. 338 (2011) and *Amgen*). In deciding whether Rule 23's requirements for certification have been met, a district court may draw reasonable inferences from the facts before it. *Rankin*,220 F.R.D. at 517 (citing *Senter v. Gen. Motors Corp.*, 532 F.2d 511, 520 (6th Cir.1976)).

<u>DISCUSSION</u>

1. <u>Federal Rule of Civil Procedure 23(a)</u>

As suggested above, Federal Rule of Civil Procedure 23(a) provides in pertinent part that a plaintiff (or multiple plaintiffs) may sue in a representative capacity on behalf of members of a class only if: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative [plaintiff(s)] will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). Even if the parties do not dispute issues relating to the requirements of Rule 23(a), the district court must nonetheless conduct a "rigorous analysis" of such requirements. *See In re Tivity Health*, No. 22-0502, 2022 WL 17243323, at *1 (6th Cir. Nov. 21, 2022). Therefore, although the parties here do not dispute that the requirements of numerosity, commonality, typicality, and adequacy are met with respect to the proposed class, the Court nevertheless engages below in an independent analysis of the requirements and finds them satisfied here.

### A. Numerosity

Class certification requires that the proposed class be so numerous that joinder of all members is impracticable. Fed. R. Civ. P. 23(a)(1) "While there is no strict numerical test, 'substantial' numbers usually satisfy the numerosity requirement." *In re Polyurethane Foam Antitrust Litig.*, 314 F.R.D. 226, 237 (N.D. Ohio 2014) (quoting *Daffin v. Ford Motor Co.*, 458 F.3d 549, 552 (6th Cir. 2006)) (internal quotation marks omitted). "Numerosity is generally assumed to have been met in class action suits involving nationally traded securities." *In re Direct Gen. Corp. Sec. Litig.*, Case No. 3:05-0077, 2006 WL 2265472, at * 2 (M.D. Tenn. Aug. 8, 2006) (citing *Ballan v. Upjohn Co.*, 159 F.R.D. 473, 479 (W.D. Mich. 1994)). Plaintiff states that although the exact number of persons who acquired AAC stock during the proposed Class Period

is unknown, it estimates based on the stock's average weekly trading volume that "many thousands of individual investors owned AAC common stock during the Class Period." (Doc. No. 77 at 12–13). Therefore, Plaintiff has established the numerosity required by Rule 23(a)(1).

## B. Commonality

Class certification requires the existence of questions of law or fact common to the class. Fed. R. Civ. P. 23(a)(2). To satisfy this requirement of commonality, Plaintiff must show that class members have suffered the same injury. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 349-50 (2011). "Their claims must depend upon a common contention of such a nature that it is capable of class-wide resolution, which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.* at 350. What matters to class certification is not the *raising of common questions*, but the capacity of a class-wide proceeding to *generate common answers* apt to drive the resolution of the litigation. *Id.* The mere fact that after the common questions as to the defendant's liability have been resolved, questions peculiar to each individual member of the class remain does not mean that a class action is impermissible. *See Young*, 693 F.3d at 543 (6th Cir. 2012) (holding that presence of questions peculiar to each individual member of the class was no bar when liability arose from a single course of conduct).

Plaintiff identifies several common questions of law and fact among the proposed class. According to Plaintiff, common questions include, for example whether: "Defendants were engaged in a scheme to defraud and/or made materially false or misleading statements or omissions to investors regarding AAC's sales and marketing programs"; "Defendants were engaged in a scheme to defraud and/or made materially false or misleading statements or omissions to investors regarding AAC's financial results"; and Defendants' misrepresentations caused the putative Class

to suffer damages." (Doc. No. 77 at 13). Most importantly, Plaintiff alleges that the class members all suffered the same injury—that they purchased AAC common stock during the class period at an inflated price and have as a result suffered a loss. Therefore, Plaintiff has established the commonality required by Rule 23(a)(2).

## C. Typicality

"Rule 23(a)(3) requires proof that plaintiffs' claims are typical of the class members' claims." *Young*, 693 F.3d at 542. "This requirement insures [sic] that the representative's interests are aligned with the interests of the represented class members so that, by pursuing their own interests, the class representatives also advocate the interests of the class members." *Weiner v. Tivity Health, Inc.*, 334 F.R.D. 123, 128 (M.D. Tenn. 2020) (citation omitted). "[A] plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members and if his claims are based on the same legal theory." *Grae v. Corr. Corp. of Am.*, 330 F.R.D. 481, 501 (M.D. Tenn. 2019) (citing *In re Am. Med. Sys., Inc.*, 75 F.3d at 1082). Plaintiff submits that its claims are typical of the proposed class because they arise out of the same alleged course of conduct—that Defendants artificially inflated AAC's share prices by engaging in a scheme to defraud and misrepresenting its financial results and deceptive marketing practices. (Doc. No. 77 at 14). Plaintiff asserts that it and the putative class have suffered from losses from the same course of conduct and share identical interests in holding Defendants accountable and maximizing the recovery of the Class. (*Id.*). Therefore, Plaintiff has established the typicality required by Rule 23(a)(3).

## D. Adequacy

Class certification also requires that the "representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to

represent." *Weiner*, 334 F.R.D. at 128 (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997)). "There are two criteria for determining whether the representation of the class will be adequate: 1) The representative must have common interests with unnamed members of the class, and 2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel." *See Senter v. General Motors Corp.*, 532 F.2d 511, 524–525 (6th Cir. 1976).

Here, the proposed class representative (a status sometimes referred to as the "named plaintiff") is Indiana Public Retirement System ("INPRS"), a large U.S.-based pension fund. (Doc. No. 77 at 10). INPRS purchased "or otherwise acquired" more than 136,000 shares of AAC common stock during the proposed class period and allegedly suffered approximately $1 million in losses. (*Id.* at 10 (citing Doc. No. 78-1 at 3 (Decl. Jeffrey Gill)). INPRS further states that it has expended significant time and effort prosecuting this case on behalf of the proposed class through lead counsel, Robbins Geller Rudman & Dowd LLP ("Robbins Geller"). (*Id.* at 10). Because INPRS purchased AAC common shares during the class period and are alleged to have suffered losses as a result, the Court finds that it has common interests with the unnamed members of the class. Further, INPRS has shown that it will vigorously prosecute the interests of the class through counsel that is patently qualified. Therefore, Plaintiff has established the adequacy required by Rule 23(a)(4).

## 2. **Federal Rule of Civil Procedure 23(b)(3)**

"In securities class action cases, the crucial requirement for class certification will usually be the predominance requirement of Rule 23(b)(3)." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 276 (2014). Plaintiff relies on Rule 23(b)(3), which allows for certification of a Rule 23(a)-compliant class if the court finds that the questions of law or fact common to class members

predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

"The 'predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Tyson Foods, Inc. v. Bouaphakeo*, 136 S.Ct. 1036, 1045 (2016) (quoting *Amchem Prod., Inc.*, 521 U.S. at 623). "This calls upon courts to give careful scrutiny to the relation between common and individual questions in a case." *Id*. The predominance inquiry asks whether the common, aggregation-enabling issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues. *Id*.; *Thompson v. Allianz Life Ins. Co. of N. Amer.*, 330 F.R.D. 219, 225 (D. Minn. 2019). Plaintiff asserts that the common questions of law and fact described above with regard to commonality, predominate over individual questions in this case.

Specifically, Plaintiff seeks to establish the predominance of the element of reliance under § 10(b) and Rule 10b-5 promulgated thereunder[12] via application of the so-called *Basic* presumption (otherwise known as the "fraud-on-the-market theory"), or, in the alternative, application of the so-called *Affiliated Ute* presumption. "The predominance requirement is typically met in securities fraud class actions by plaintiffs' invocation of one of two presumptions developed by the Supreme Court that obviate the need to prove reliance on an individual basis." *Strougo v. Barclays PLC*, 312 F.R.D. 307, 312 (S.D.N.Y. 2016), *aff'd but criticized on other grounds sub nom. Waggoner v. Barclays PLC*, 875 F.3d 79 (2d Cir. 2017).

As the Second Circuit has explained:

---

[12] As noted in greater detailed in the Court's opinion regarding Defendant's motion to dismiss (Doc. No. 62), Rule10b-5 is promulgated under Section 10(b) of the Securities and Exchange Act, and both prohibit fraudulent, material misrepresentations or omission in connection with the sale or purchase of security. *Grae v. Corrections Corp. of Am.*, No. 3:16-cv-2267, 2017 WL 6442145, at * 13 (M.D. Tenn. Dec. 18, 2017).

[A] plaintiff may also seek to take advantage of two presumptions of reliance established by the Supreme Court.

The first—the *Affiliated Ute* presumption—allows the element of reliance to be presumed in cases involving primarily omissions, rather than affirmative misstatements, because proving reliance in such cases is, in many situations, virtually impossible. *Wilson v. Comtech Telecomms. Corp.*, 648 F.2d 88, 93 (2d Cir. 1981); *see also Affiliated Ute*, 406 U.S. at 153–54, 92 S.Ct. 1456.

The second—the *Basic* presumption—permits reliance to be presumed in cases based on misrepresentations if the plaintiff satisfies certain requirements.

*Waggoner*, 875 F.3d at 93.

As discussed below, the Court finds that Plaintiff is entitled to the *Basic* presumption for its Restatement Claim, and its Scheme Claim to the extent that based on the Defendants' alleged deceptive conduct in connection with the Restatement. In other words, Plaintiff has established predominance as to these two claims. As to Plaintiff's Marketing Claim, the Court finds that Plaintiff has failed to provide a damages model that comports with the materialization-of-the-risk theory of loss causation and therefore cannot establish predominance as to this claim. As additionally discussed below, the Court also finds that Plaintiff cannot proceed on its Scheme Claim to the extent that it is based on Defendants' allegedly deceptive marketing practices, for the same reasons that it cannot proceed on its Marketing Claim—Plaintiff cannot establish predominance.

**A. Predominance**

As noted, Plaintiff requests application of the *Basic* presumption to its Marketing, Restatement, and Scheme Claims. In the alternative, Plaintiff argues that *Affiliated Ute* presumption applies. Defendants challenge Plaintiff's request for the *Basic* presumption only with

respect to its Restatement and Scheme Claims. Defendants also raise a host of arguments alleging that Plaintiff has failed to provide sufficient damages models to warrant class certification.

As discussed below, the Court finds that Plaintiff is entitled to the *Basic* presumption for its Restatement Claim and its Scheme Claim that is based on Defendants' alleged overstatement of its accounts receivable and improper calculation of accounts receivable. However, the Court finds that Plaintiff's damages model for its Marketing Claim fails the requirements set out under *Comcast* and therefore cannot be certified, and for the same reasons, its Scheme Claim based on Defendants' alleged deceptive marketing practices cannot be certified.

i.    *The Basic Presumption (the fraud-on-the-market theory)*

"Whether common questions of law or fact predominate in a securities fraud action often turns on the element of reliance." *See Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804 (2011). "Reliance by the plaintiff upon the defendant's deceptive acts is an essential element of the § 10(b) private cause of action." *See id.* at 810 (internal quotation marks omitted). "This is because proof of reliance ensures that there is a proper 'connection between a defendant's misrepresentation and a plaintiff's injury.'" *See id.* at 810 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224 (1988)). In *Basic*, the Court recognized that "[r]equiring proof of individualized reliance from each member of the proposed plaintiff class effectively would have prevented respondents from proceeding with a class action, since individual issues then would have overwhelmed the common ones." *See Basic*, 483 U.S. at 240. To alleviate those concerns, the Court in *Basic* permitted "plaintiffs to invoke a rebuttable presumption of reliance based on what is known as the 'fraud-on-the-market' theory." *See Erica P. John Fund*, 563 U.S. at 811. The theory holds that "the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations." *See id.* (internal quotations omitted).

"Based on this theory, a plaintiff must make the following showings to demonstrate that the presumption of reliance applies in a given case: (1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed." *See Halliburton Co.*,573 U.S. at 268 .

As to Plaintiff's Restatement Claim, Defendants seek not to refute the application of the *Basic* presumption, but rather to *rebut* the presumption by proving lack of price impact. In other words, Defendants attempt to show that the alleged misrepresentations regarding AAC's accounts receivable did not affect AAC's stock price.[13] With regard to Plaintiff's Scheme Claim based on its overstatement of its accounts receivable, Defendants argue that the *Basic* presumption is inapplicable because Plaintiff has failed to show that the scheme was publicly known. Defendants do not dispute the applicability of the *Basic* presumption to Plaintiff's Marketing Claim.[14]

1) Restatement Claim

The *Basic* presumption is not conclusive, because it is rebuttable. Defendants can rebut the presumption through "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or [their] decision to trade at a fair market price…. ." *See id.* at 269. When a defendant seeks to rebut the presumption, "[t]he district court's

---

[13] Therefore, as to Plaintiff's Restatement Claim, Defendants do not dispute that Plaintiff has met the requirements for the application of the *Basic* presumption, and the Court agrees that these requirements have been met. That is, the Court agrees that the alleged misrepresentations were publicly known, that AAC stock traded on an efficient market, and that Plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed. As to the requirement of materiality, the Court agrees with Plaintiff that it need not satisfy this requirement as the class certification stage. *See Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 276 (2014).

[14] As indicated above, the only disputed requirement for the *Basic* presumption as to Plaintiff's Scheme Claims is the public knowledge requirement. As with the Restatement Claim, the Court is satisfied that the remaining requirements for application of the *Basic* presumption to Plaintiff's Scheme Claims are met. However, as discussed below, the Court finds that Plaintiff has failed to establish predominance as to its Scheme Claim based on Defendants' deceptive marketing practices.

task is simply to assess all the evidence of price impact [on the given security]—direct and indirect—and determine whether it is more likely than not that the alleged misrepresentations had a price impact." *See Goldman Sachs Group, Inc. v. Arkansas Teacher Retirement System*, 141 S. Ct. 1951, 1963 (2021). And "price impact may be demonstrated either at the time that the alleged misrepresentations were made, or at the time of their correction." *See In re BancorpSouth Inc.*, No. 17-0508, 2017 WL 4125647, at *1 (6th Cir. 2017).

Defendants do not dispute that the requirements for the *Basic* presumption for Plaintiff's Restatement Claim are met. Instead, Defendants attempt to rebut the *Basic* presumption by showing that it was more likely than not that the Restatement did not affect AAC's stock price— *i.e.* that there was no price impact. Plaintiff contends that Defendants' evidence is insufficient to establish lack of price impact.[15]

It is worth taking a moment to make clear what the Court is *not* doing in determining whether Defendants have proven lack of price impact. Much has been written about the relationship between price impact, causation, and materiality with respect to the *Basic* presumption, and the Court does not find it necessary to repeat in full what several other courts have already observed. In addressing this particularly convoluted area of the law, Judge Trauger explained that:

> At the heart of this confusing area of the case law is the fact that all three concepts addressed—loss causation, materiality, and price impact—are, in essence, slightly different takes on the same fundamental question: Did a statement matter? As a result, evidence relevant to each issue is likely also to be relevant to the others. Evidence of price impact is relevant to materiality, because evidence that a statement affected a stock's price confirms that a reasonable investor would have

---

[15] Plaintiff further argues in order to properly rebut the *Basic* presumption, Defendants must establish lack of price impact as to *all* claims for which Plaintiff seeks application of the presumption. Because the Court finds that Defendants have failed to establish lack of price impact, and therefore failed to rebut the *Basic* presumption as to the Restatement Claim, the Court need not address this argument.

cared about the statement. Evidence of loss causation is relevant to price impact, because, if the plaintiff is to succeed, the price impact must be what caused the loss—the two become one and the same. And evidence of materiality is likely to be relevant to both price impact and loss causation, because, as the Court observed in *Halliburton II*, materiality, when used in the context of the *Basic* presumption, is itself merely a piece of indirect evidence offered to establish that a statement can be assumed to have affected a stock price. 573 U.S. at 278, 134 S.Ct. 2398. Taking a piece of evidence and placing it in any of the three boxes, to the exclusion of the others, would be an artificial and logically questionable exercise.

*See Grae*, 330 F.R.D. 481 at 498. Despite lower courts' acknowledgment that evidence of loss causation will often be relevant to price impact, the Supreme Court has cautioned that "loss causation is a familiar and distinct concept in securities law; it is not price impact." *See Halliburton Co.*, 563 U.S. at 814. "Price impact is the consideration of 'whether the alleged misrepresentations affected the market price in the first place.'" *See Willis v. Big Lots, Inc.*, 242 F. Supp. 3d 634 (S.D. Ohio 2017) (quoting *Halliburton Co.*, 563 U.S. at 814). "Loss causation, on the other hand, is the showing 'that the defendant's deceptive conduct caused [the plaintiffs] claimed economic loss.'" *See id.* (quoting *Halliburton Co.*, 563 U.S. at 807) (alteration original).

The Court perceives that these statements may seem difficult to reconcile.[16] However, the Court understands these statements to mean that in a particular case, a defendant's conduct could affect the price of stock held by a plaintiff (*i.e.*, impact the stock price) but not be the cause of a

---

[16] Indeed, the undersigned has previously observed that in the law, and in the vernacular, there are many different words for the core idea of "to cause," *e.g.,* "to effect," "to prompt," "to result in," and "to trigger." But it seems to the undersigned that these words and phrases all refer to the same concept, which is along the lines of "to be responsible for something happening." There likewise are many different words and phrases for the core idea of "to affect," *e.g.,* "to impact," "to shape" and "to influence." But it seems to the undersigned that these words and phrases all refer to the same concept, which is along the lines of "to be responsible for something changing to at least some degree," *i.e.,* "to cause some sort of change in something to at least some degree." The two concepts here are similar. This contributes to the difficulty of distinguishing between the concepts of price impact and loss causation. Indeed, when a defendant seeks to show that an alleged misrepresentation did not "impact" the price of a stock, what else is that defendant attempting to do other than trying to show that the misrepresentation did not *cause* the price of the stock to change from what it otherwise would have been? And what is the Court then doing in determining that a defendant successfully demonstrated lack of price impact if not saying that defendant has broken the causal chain? However, the Court must work within the parameters of the law as it exists at the given time, no matter how detached from reason it may be.

plaintiff's economic loss. For example, suppose that it has recently come to light that executives at Company A were engaging in an insider trading scheme, and that after news of the scheme broke, Company A's publicly traded stock declined in value. In an effort to subdue angry investors and intensive media scrutiny, the Board of Directors announced that Company A would institute a share buyback for investors who bought shares during the time period of the insider trading scheme above a particular inflated share price for the same amount the investor paid for the shares. A bullish investor declines the offer, thinking he can do better trading the shares on the stock market. He fails, takes a large loss on the shares, and files suit against Company A. In this instance, while the investor-plaintiff may be able to show price impact—that the insider trading scheme affected Company A's stock price—his behavior will likely stymy his ability to show loss causation. When presented with an offer to mitigate his losses, he chose to take his chances in the stock market and lost. In this sense, a court may find that the investor-plaintiff's loss was not necessarily caused by Company A's misconduct but by the plaintiff's decision to forego the share buyback opportunity. Therefore, while price impact and loss causation are related, they are conceptually distinct.    Indeed, loss causation remains an issue to be decided at the merits stage.

Defendants seek to prove lack of price impact by showing that the Restatement (AAC's 2018 Form 10-K filed on April 15, 2019) did not affect AAC's stock price on the grounds that: 1) the stock-price change identified by Plaintiff did not occur until April 16, 2019, thus requiring the improper use of a two-day event window to assess price impact; and 2) even if the Court were to consider the change in AAC's stock price on April 16, 2019, the change could not have been a result of the information disclosed in the Restatement because the disclosure did not contain any information that was new vis-à-vis the information that was disclosed on March 29, 2019 in AAC's Form 8-K. (Doc. No. 83 at 13–15). The Court addresses each argument in turn.

a) Use of a Two-Day Window to Determine Price Impact

The parties agree that on April 15, 2019, AAC filed the Restatement (the Company's 2018 Form 10-K) with the SEC, in which it admitted to errors in its previously stated accounts receivable. (Doc. No. 45 at 56). The parties also agree that on the following day, April 16, 2019, Defendants Cartwright and McWilliams hosted a conference call during which they discussed the details of the Restatement. (Doc. No. 45 at 58, Doc. No. 83 at 16). Further, Defendants do not dispute that on April 16, AAC common stock fell over 18%. (Doc. No. 83 at 15).

Defendants argue that the Court must use a one-day window to assess price impact, such that any change in stock price that occurred on April 16, 2019 cannot be attributed to the Restatement that was published on April 15, 2019. (Doc. No. 83 at 15–16). Defendants further assert that consideration of AAC's change of stock price on April 16 requires use of a two-day window to determine price impact (*i.e.* two days between the Restatement and the change in stock price), which undermines Plaintiff's argument (which Defendants did not dispute) that AAC stock traded in an efficient market. (*Id.*).[17]

On the other hand, Plaintiff insists that the Court's use of a two-day window to assess Defendants' price-impact argument is proper. The Court agrees. The Supreme Court has not adopted "any particular theory of how quickly and completely publicly information is reflected in market price." *See Basic Inc. v. Levinson*, 485 U.S. 224, 248 n. 28 (1988). Further, courts have regularly accepted the use of two-day windows to assess price impact. *See Monroe County*

---

[17] Defendants also argue that the change in AAC's stock price on April 16, 2019 cannot be attributed to the April 16, 2019 press release because it did not contain information that was new via-a-vis the Form 10-K filed the day prior. However, because the Court finds the use of a two-day window appropriate, and therefore can consider the April 15, 2019 Restatement in assessing price impact, the Court need not address whether the April 16, 2019 press release contained information different compared to that contained in the Form 10-K.

*Employees' Retirement System v. Southern Company*, 332 F.R.D. 370, 390 (N.D. Ga. 2010) ("[T]he [c]ourt declines to limit its consideration of the experts' event study results to one-day event windows only.") (collecting cases); *Pelletier v. Endo International PLC*, 338 F.R.D. 446 (E.D. Pa. 2021) ("There is no per se rule against considering a two-day window period in assessing whether a disclosure had a price impact . . . ."); *St. Clair County Employees' Retirement System v. Acadia Healthcare Company, Inc.*, No. 3-18-cv-00988, 2022 WL 4598044 (M.D. Tenn. Sept. 30, 2022) (rejecting argument that change in stock price occurring the day after disclosure was not relevant to price-impact analysis). Furthermore, at least one court has remarked that [w]hile most public information *should* be absorbed into an efficient market quickly, the related price impact may occur more slowly where clarifying or contextualizing information is disclosed later." *See Pelletier*, 338 F.R.D. 446 at 486 (emphasis original). As discussed below, Defendants insist that the initial estimates of the adjustments were first introduced in the March 29, 2019 Form 8-K and Defendants' expert agrees that the final impact was clarified in the Restatement filed on April 15, 2019. (Doc. No. 83 at 14–15). Therefore, given that the market reacts more slowly to clarifying information than to new information, the price impact from the clarifying information contained in the April 15 Restatement is particularly apt to be assessed under a two-day window. Therefore, the Court finds that use of a two-day window is appropriate to determine whether Defendants have shown lack of price impact.[18] As a result, in assessing price impact, the Court may consider AAC's stock price movement on April 16, 2019, the day following public disclosure of the Restatement.

---

[18] The Court notes that Defendants also seek to prove lack of price impact by showing that there was non-statistically significant stock price movement (less than 5%) on the day of the corrective disclosure, April 15, 2019. (Doc. No. 83 at 15). The Court need not consider this argument because it has determined that a two-day window is appropriate, and therefore it can consider AAC's stock price movement on April 16, 2019 as evidence of price impact. However, even if the Court had adopted a one-day window, the Court notes that there is disagreement among the courts as to whether non-statistically significant stock price movement can evidence lack of price impact. *Compare Monroe County*, 332 F.R.D. at 393 ("Non-

b)  Whether the Information in the Restatement Was Previously Disclosed

Defendants also argue that any change in AAC stock price on April 16, 2019, cannot be attributed to the disclosure in the Restatement because AAC's Form 8-K filed on March 29, 2019 already disclosed "the nature and causes of the restatement," providing "estimated adjustments to net income for FY 2016, FY 2017, and the first three quarters for 2018." (Doc. No. 83 at 14–15). According to Defendants' expert, Dr. Paul Zurek, when the market opened on April 1, 2019, AAC's residual return was positive 13.2%. (Doc. No. 84-1 at 22).  It is notable that neither Defendants nor Defendants' expert go so far as to suggest that the March 29, 2019 disclosure included identical information to the April 15, 2019 disclsoure; even Dr. Zurek characterizes the March 29, 2019 disclosure as "preliminary estimates" and the April 15 disclosure as revealing the "full extent of the impact … ." (Doc. No. 84-1 at 15). And this is for good reason.

As pointed out by Plaintiff, there are important differences between the March 29, 2019 Form 8-K and the Restatement that could explain why AAC's stock price would not react similarly to both disclosures. Plaintiff argues that the Form 8-K misstated key figures: "Defendants ignore that the March 29, 2019 disclosure falsely informed investors the restatement revealed net income had been *understated* by a cumulative $12.6 million in 2016 to 2018 when in fact it had been *overstated* by $20.9 million, as AAC ultimately disclosed on April 15, 2019."[19] (Doc. No. 100 at 12–13) (alteration original).

---

significance means indeterminate with respect to finding the cause of a stock price movement; it does not mean that there was no decline or that the decline was necessarily caused by factors other than the corrective disclosure.") *with Willis v. Big Lots, Inc.*, 242 F. Supp. 3d 634, 656 (S.D. Ohio 2017) (explaining that lack of price impact can be demonstrated by "showing that the alleged corrective disclosure did not cause the stock price to decrease (what Defendants refer to as 'back-end price impact.")).

[19] The Court assumes that by "restatement," Plaintiff refers here to expected adjustments to estimates of accounts receivables referenced in the Form 8-K: Plaintiffs could not logically be referring to the "Restatement" as defined herein, because that was released weeks after March 29, 20019 (on April 15, 2019).

AAC's Form 8-K stated that AAC had determined that certain adjustments to "estimates of accounts receivable" would be necessary. It further explained that the adjustments will result in "estimated increases to net income of approximately $11.8 million and $14.3 million, for the nine months ended September 30, 2018 and year ended December 31, 2017, respectively." (Doc. No. 84-2 at 3). As for decreases, the Form 8-K stated that the adjustments will result in an "estimated decrease of net income of approximately $13.5 million for the year ended December 31, 2016. Periods prior to 2016 will also be impacted…[with an] estimated cumulative effect adjustment of approximately $24.7 million, recorded as a reduction to stockholders' equity on the balance sheet as of January 1, 2016." (*Id.*).

Compare this information with that contained in the Restatement filed on April 15, 2019. The Restatement stated that the "adjustments resulted in an estimated increase to net income of approximately $7.7 million for the year ended in December 31, 2017." (Doc. No. 84-3 at 5). Dr. Dalrymple also opined that based on the Restatement, the actual net income for Q1–Q3 of 2018 was a decrease of $8 million, rather than an increase of $11.8 million (Doc. No. 99-2 at 16). The Restatement goes on to state that "[t]he adjustments also resulted in an estimated decrease in net income of approximately $20.6 million for the year ended December 31, 2016. (Doc. No. 84-3 at 5). Periods prior to 2016 were also impacted as a result of the adjustments, resulting in an estimated cumulative effect adjustment of approximately $23.8 million, recorded as a reduction to stockholders' equity on the balance sheet as of January 1, 2016." (*Id.*)..

To summarize, the Form 8-K estimated $6.6 million more in net income for the year ending December 31, 2017 than was reported in the Restatement and estimated $19.8 million more in net income for the year ending December 31, 2018 than reported in the Restatement. (Doc. No. 99-2 at 16). Furthermore, for the year ending December 31, 2016, the Form 8-K estimated a decrease

in net income that was $7.1 million less than the decrease in net income reported in the Restatement. (*Id.*). True, as to the cumulative reduction to stockholders' equity on the balance sheet as of January 1, 2016, the estimate on the Form 8-K was greater (by $900,000) than later was reported in the Restatement.

When considering the substantial changes in the figures collectively, however, the Court is not satisfied that the market was adequately apprised on March 29, 2019 (via the Form 8-K) of the information that was later disclosed in the Restatement. The Court therefore rejects Defendants' argument that the change in AAC's stock price on April 16, 2019 cannot be attributed to the Restatement because the information was already released in the Form 8-K.

In summary, Defendants have failed to rebut *Basic* presumption by a preponderance of the evidence by showing lack of price impact, because they have not shown a lack of price impact. Therefore, Plaintiff, having met the requirements of the *Basic* presumption, need not show individualized proof of reliance on the alleged misrepresentations with respect to its Restatement Claim.

2) Scheme Claims

Defendants argue that Plaintiff's Scheme Claims fail to establish the predominance requirement under Rule 23(b). Rule 10b-5(a) makes it unlawful for "any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange" "(a) [t]o employ any device, scheme, or artifice to defraud." 17 C.F.R. § 240.10b-5(a). "Violations of subsections [10b-5](a). . . are often called 'scheme liability.'" *See S.E.C v. Familant*, 910 F. Supp. 2d 83, 93 (D.D.C. 2012). "To state a primary liability claim under Rules 10b-5(a) or (c), a plaintiff must allege a device, scheme or artifice to defraud, or an act, practice or course of business which would operate as a fraud, in addition to alleging the standard elements of a § 10(b) and Rule 10b-5 violation: (1) scienter; (2)

connection with the purchase or sale of securities; (3) reliance; (4) economic loss; and (5) loss causation." *See New York City Employees' Retirement System v. Berry*, 616 F. Supp. 2d 987, 996 (N.D. Cal. 2009).[20]

While the Sixth Circuit has had few occasions in which to discuss scheme liability, several other courts have noted that "'scheme liability' is viable only if Rule 10b-5(b) cannot fully cover the deceptive acts—that is, the 'scheme' must include deceptions beyond misrepresentations and omissions." *See Familant*, 910 F. Supp. 2d at 94.[21] Furthermore, "[s]cheme liability may rest in part on the same statements or omissions that trigger misstatement liability, or it may embrace separate statements or conduct." *In re Firstenergy Corp.*, Nos. 2-20-cv-3785 & 2-20-cv-4287, 2022 WL 681320, at *7 (S.D. Ohio Mar. 7, 2022).

Defendants argue in the first instance that Plaintiff's Scheme Claims fail because they overlap entirely with Plaintiff's Restatement and Marketing Claims, thereby sharing these claims' alleged fatal defects. Plaintiff does not dispute that its Scheme claims rely on Defendants' conduct underlying both the Restatement Claim and the Marketing Claim. (Doc. No. 100 at 17–18).

To the extent that Plaintiff alleges a scheme in connection with Defendants' marketing practices, this claim fails because Plaintiff cannot establish predominance as to the Marketing Claim. As discussed in detail below, the Court finds that Plaintiff has failed to provide a sufficient

---

[20] Remarkably, Plaintiff does not identify with specificity the subpart(s) of Section 10(b) or Rule 10b-5 under which it brings its Marketing or Restatement Claims. In its memorandum opinion on Defendants' motion to dismiss (Doc. No 62), however, the Court construed Plaintiff's Marketing and Restatement Claims as brought pursuant to 17 C.F.R. § 240.10b-5(b).

[21] 17 C.F.R. § 240. 10b-5(b) states that "[i]t shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange," "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."

damages model under *Comcast* to support its use of the materialization-of-the-risk loss causation theory in furtherance of its Marketing Claim. Because its Marketing Claim uses no other theory of loss causation and provides no alternative damages model, any scheme liability claim predicated on Defendants' deceptive marketing practices would presumably rely on the materialization-of-the-risk theory and the presently associated damages model, and thus cannot proceed due to lack of predominance.

Turning now to scheme liability as it relates to Defendants' conduct regarding the Restatement. Plaintiff alleges that Defendants "engaged in a scheme to defraud," (impliedly a scheme to defraud investors). (Doc. No. 100 at 17).[22] Plaintiff contends that it is entitled to the *Basic* presumption for its Scheme Claim; Defendants disagree—relying on *Stoneridge Inv. Partners, LLC v. Sci-Atlanta*, 552 U.S. 148 (2008), they argue that the presumption is inapplicable because the scheme was never publicly known during the relevant time, meaning (according to Defendants) that the market would have never reacted to Defendants' deceptive conduct and investors would not have relied in turn on the price of AAC stock that reflected the fact and the consequences of that deception.[23] (Doc. No. 83 at 21). Plaintiff does not dispute that the scheme

---

[22] The Court admits that Plaintiff does not provide a particularly clear basis for its scheme liability claim. The Court is persuaded by the finding of *Familant* and some circuit courts that Section 10b-5(a) requires a showing of deception beyond misrepresentations and omissions. However, Defendants did not challenge Plaintiff's Scheme Claim in its motion to dismiss, and the Court must refrain from making a decision on the merits at the class certification stage.

[23] The Court acknowledges that Plaintiff puts forth an argument in support of *Affiliated Ute* presumption for its Scheme Claim. However, Plaintiff's briefs go only so far as providing the Court a basis to consider application of the *Affiliated Ute* presumption to its Scheme Claim insofar as the Scheme Claim relies on Defendants' deceptive marketing practices. (Doc. No. 77 at 24 ("Defendants engaged in a scheme to defraud investors by, *inter alia*, utilizing various deceptive sales and marketing practices. Accordingly, *Affiliated Ute's* presumption of reliance also applies.")); (Doc. No. 100 (discussing only Defendants' marketing practices as the conduct forming a basis for *Affiliated Ute* presumption for Plaintiff's Scheme Claim)). Indeed, after reviewing Plaintiff's briefs, the Court concludes that Plaintiff does not provide the Court with any argument in favor of applying the *Affiliated Ute* presumption to Plaintiff's Scheme Claim predicated on Defendants' conduct related to the Restatement. Because the Court finds that Plaintiff does not provide

was not publicly known, but instead argues that its Scheme Claim nonetheless is entitled to the *Basic* presumption.

Several courts have written at length on whether and (if so) to what extent the deceptive conduct underlying a scheme, or the product of a scheme, must be known to the public in order for the *Basic* presumption to apply. In doing so, most courts wrestle with the Court's decision in *Stoneridge.* In *Stoneridge*, investors accused Charter Communications Inc. ("Charter") of issuing misleading financial statements, which affected Charter's stock price. *See id.* at 152–153. As part of the class action, the investors sought to impose scheme liability under § 10(b). *See id.* at 152. As part of the alleged scheme, respondents (suppliers of Charter), supplied Charter with digital cable converter boxes, which Charter then furnished to customers. *See id.* at 154. Charter would overpay respondents for the boxes, and respondents would return the overpayment through purchasing advertising from Charter. *See id.* Charter would then "record the advertising purchases as revenue and capitalize its purchase of the [] boxes." *See id.* This scheme ultimately allowed Charter to "fool its auditor into approving a financial statement showing it met projected revenue and operating cashflow numbers." *See id.*

It is an understatement to say that *Stoneridge* has created confusion among the lower courts. Several lower courts, including the two quoted immediately hereafter,[24] read *Stoneridge* as providing a detailed discussion of how a plaintiff can fulfill the requirements of *Basic* presumption in particular when seeking to impose scheme liability. *See Hawaii Ironworkers Annuity Trust Fund v. Cole*, 296 F.R.D. 549, 555 (N.D. Ohio 2013) ("The decision in *Stoneridge* thus stands for the

_____

the Court with a basis on which to apply *Affiliated Ute* to its Scheme Claim predicated on Defendants' conduct related to the Restatement, the Court will address only whether Plaintiff is entitled to the *Basic* presumption on its Scheme Claim predicated on Defendants' conduct related to the Restatement.
[24] The Court realizes that the selected quotes themselves do not make entirely clear that this is how the two respective courts read *Stoneridge*, but it is clear that this is in fact how they read *Stoneridge*.

proposition that, to invoke the fraud-on-the-market in a scheme liability case, a plaintiff must establish that a defendant's deceptive conduct was publicly disclosed."); *WM High Yield Fund v. O'Hanlon*, 964 F. Supp. 2d 368, 389 (E.D. Penn. 2013) ("To impose this scheme liability on [the defendant], it must be shown that the [p]laintiff [] knew about or relied on deceptive conduct by [the defendant] that was publicly disclosed at the time they purchased or sold DVI's securities.") (citing *Stoneridge*, 552 U.S. at 166–167).

The undersigned, however, finds that *Stoneridge* says very little about what a plaintiff must show in order to be entitled to the *Basic* presumption for scheme liability under Rule 10b-5(a). The Court in *Stoneridge* begins its analysis by observing (in its Section "A") that "[r]eliance by the plaintiff upon the defendant's deceptive acts is an essential element of the § 10(b) private cause of action." *See Stoneridge*, 522 U.S. at 159. It goes on to explain that two rebuttable presumptions potentially can apply to the element of reliance—the *Affiliated Ute* presumption and the *Basic* presumption (also known as the "fraud-on-the-market doctrine"). *See id.* The Court then states that "[n]either presumption applies" in this case. *See id.* As to the applicability of the *Basic* presumption, the Court explains: "No member of the investing public had knowledge, either actual or presumed, of respondents' deceptive acts during the relevant times. Petitioner, as a result, cannot show reliance upon any of respondents' actions except in an indirect chain that we find too remote for liability." *See id.*

After finding that neither presumption supporting reliance applies, the Court then moves on to discuss (in its Section "B") causation, which is a concept related to but distinct from reliance. *See id.* at 160. The Court explains that "reliance is tied to causation, leading to the inquiry whether respondents' acts were immediate or remote to the injury." *See id.* The analysis that ensues relates to the question of whether liability can be imposed against respondents given the lack of a direct

chain of causation between their actions and the disclosed financial statements; which the Court admits overlaps with the question of reliance.

The undersigned's reading of *Stoneridge* is bolstered by an observation made in the dissent. Justice Stevens, writing for the dissenters, explains that "[t]he Court is right that a fraud-on-the-market presumption coupled with its view on causation would not support petitioner's view of reliance. . .." *See id.* at 171 (Steven J., dissenting). He then asserts that the Court (*i.e.*, the majority in *Stoneridge*) "has it backwards when it *first* addresses the fraud-on-the-market presumption, rather than the causation required." *See id.* Thus, although Justice Stevens expresses a view contrary to the majority, he in fact acknowledges that the majority first addresses *Basic* and then moves on to discuss causation, leaving behind the question of whether *Basic* presumption applies.

While the undersigned admits that *Stoneridge* is at times not a model of clarity, as perhaps evidenced by the confusion in its application by the lower courts, the undersigned is satisfied that the bulk of *Stoneridge*'s discussion contained in Section B of the opinion relates to a defendant's liability under §Rule 10b-5(a) in a broad sense, one that goes beyond merely what is required specifically for a plaintiff to be entitled to the application of the *Basic* presumption for a scheme claim under Rule10b-5(a). The Court quite clearly had done away with its discussion of the *Basic* presumption once it found that "[n]either presumption applie[d] here," referring to *Basic* and *Affiliated Ute*. *See id.* at 159. Indeed, after that point, the Court did not even mention *Basic* a single time except to note (in what the undersigned believes was actually an unnecessary reference that has caused much of the above-referenced confusion) once that the petitioner contended that it actually could show a causal link sufficient "to apply *Basic*'s presumption of reliance to respondent's acts." *Id.* at 160.

Therefore, as to the application of the *Basic* presumption when a plaintiff seeks to impose scheme liability, *Stoneridge* at most instructs that the *Basic* presumption does not apply to a scheme claim under § 10(b) when "[n]o member of the investing public ha[s] knowledge, either actual or presumed, of [defendants'] deceptive acts during the relevant times," and that reliance on defendants' actions "except in an indirect chain" is "too remote for liability." *See id.*

So the undersigned concludes that *Stoneridge* generally has relatively little (less than many courts believe) to say about the applicability of the *Basic* presumption. And with respect to the instant case in particular, the undersigned notes that *Stoneridge* appears to have especially little to offer, given differences between the two cases. In *Stoneridge*, the Court determined whether the petitioner had sufficiently demonstrated reliance or causation to impose scheme liability on an individual or entity who did not issue or directly cause the issuance of the financial statement. The respondents in *Stoneridge*: (a) were not the company (or individuals associated with the company) whose financial statements were underlying the litigation; (b) did not give the direction to the auditor to issue those financial statements; and (c) did not provide the improper information to the auditor to allow the creation and issuance of those financial statements. True, the respondents were participants in the alleged scheme—cogs in the machine—but the crux of the case was the causal chasm between respondents' actions in the alleged scheme and the information the petitioner then relied on, *i.e.* the financial statements.

The same is not true for the alleged scheme in this case. Unlike respondents in *Stoneridge* (the defendants in the district court), Defendants in this case are both the participants in the alleged scheme and parties allegedly responsible for the issuance of the financial statements that were inaccurate (and had to be corrected via the Restatement). Therefore, the Court finds that the relevant analysis in *Stoneridge* for purposes of this case involves only answering whether the

investing public "had knowledge, either actual or presumed, of respondents' deceptive acts during the relevant times," *id.*, which closely tracks a necessary inquiry for the application of the *Basic* presumption anyway. *See Halliburton*, 573 U.S. at 268 (identifying the first element of *Basic* presumption as "(1) that the alleged misrepresentations were publicly known").

Admittedly, when applying *Basic* to scheme liability, the question is raised of what exactly must be publicly known with respect to *the alleged scheme*. With respect to Rule 10b-5(b) misrepresentation claims (such as those involved in *Halliburton*), the question of what must be publicly disclosed is straightforward—the *misrepresentation* must have been publicly disclosed, at which point the market would have reacted to the misrepresentation, and the investing public is then presumed to have relied on the stock price as representative of the information available to the public at the time of the applicable investor's stock purchase. Scheme claims under Rule 10b-5(a) present a more difficult question as to what must be publicly known. Some courts have interpreted *Stoneridge* as requiring that the existence of *the scheme itself* be publicly known. *See Hawaii Ironworkers Annuity Trust Fund*, 296 F.R.D. at555 ("The decision in *Stoneridge* thus stands for the proposition that, to invoke the fraud-on-the-market in a scheme liability case, a plaintiff must establish that a defendant's deceptive conduct was publicly disclosed."). Though the Court in *Stoneridge* found that the petitioner was unentitled to the *Basic* presumption because no member of the investing public had knowledge of the respondents' "deceptive acts," this Court is not persuaded that "deceptive acts" should be read so narrowly as to refer exclusively to "the scheme" (however it might be defined) itself. In other words, contrary to the finding of the court in *Hawaii Ironworkers*, when the Court in *Stoneridge* found that no member of the investing public had knowledge of the respondents' "deceptive acts"—and therefore petitioner could not show reliance——it was *not* holding that the fact the acts *were deceptive* must be publicly known in

order to fulfill the public knowledge requirement of the *Basic* presumption. This makes sense because, naturally, "for [a] scheme to succeed, it ha[s] to be concealed from the shareholders; otherwise, it would [] unravel[]." *In re Firstenergy Corp.*, Nos. 2-20-cv-3785 & 2-20-cv-4287, 2022 WL 681320, at *27 (S.D. Ohio Mar. 7, 2022).

Therefore, even after *Stoneridge*, the question remains as to *what* must be publicly known for the application of the *Basic* presumption to a scheme claim under § 10(b). The court in *Firstenergy* noted that the proper "inquiry [with respect to this question] is whether Defendants presented a deceptive public-facing 'cover' that would be reflected in share prices and relied on by investors." *See In re Firstenergy Corp.*, 2022 WL 681320, at *27; *West Virginia Pipe Trades Health & Welfare Fund v. Medtronic, Inc.*, 57 F. Supp. 3d 950 (D. Minn. 2014) (permitting plaintiff to rely on published clinical studies as the publicly disclosed evidence of defendant's deceptive conduct). Requiring for the application of the *Basic* presumption, that the (concealed) deceptive conduct has a public-facing cover makes sense. "When a scheme has no public-facing cover, and there is no information for the market to digest, *then* it fairly can be said that the scheme fails to engender any reliance by investors." *See Firstenergy Corp.*, 2022 WL 681320, at *27.

In *In re Galena Biopharma, Inc. Securities Litigation*, 117 F. Supp. 3d 1145, 1156 (D. Or. 2015), the plaintiffs alleged that members of Galena's Board of Directors and executive officers engaged in a fraudulent scheme to increase the price of Galena stock so that they could sell their personally owned Galena stock at an artificially high price. *See id. at 1156.* As part of the alleged scheme, Galena's management and directors allegedly worked with two investor relation firms, DreamTeam and Lidingo, [to] [] place misleading articles on investor websites touting Galena." *See id.* at 1158. The court found that, despite the defendants' argument to the contrary, the reliance required for plaintiffs' scheme-liability claim was satisfied. *See id.* at 1197. Unlike in *Stoneridge*,

where the respondent-vendors "played no role in preparing or disseminating Charter's financial statements," the investor relation firms, together with other defendants, were alleged to have "hired authors to draft articles and other promotional materials . . . designed to tout Galena, inflate Galena's stock price, or call attention to other aspects of the alleged promotional scheme." *See id.* at 1198. The court also noted that Galena's Chief Executive Officer, Mark Ahn, and Vice President of Marketing & Communications, Remy Bernada, "hired the promotional firms," thereby causing the articles to be published and "caused public statements to be published in certain publicly-filed documents." *See id.* at 1199.

The court in *Galena* therefore found that the causation issues that plagued petitioners before the Court in *Stoneridge* were absent with respect to the plaintiffs, who were misled by the puffed-up articles and blog posts. Furthermore, though the court did not address the issue directly, the court treated the publicly disclosed promotional materials associated with the scheme as sufficient to establish the public-knowledge requirement for the *Basic* presumption purposes. Therefore, the court in *Galena Biopharma* found that the public cover of the defendants' scheme, namely the unlawfully published articles and statements, were sufficient to show reliance to support the application of the *Basic* presumption.

The reasoning of *Galena* is instructive here. Plaintiff requests the application of the *Basic* presumption to its claim of Scheme liability, relying on Defendants' alleged deceptive conduct relating to the Restatement. As discussed above, Plaintiff's theory is that AAC engaged in a several years-long scheme in which it overstated its accounts receivable by designating debts owed to AAC as collectable despite historical data indicating to the contrary. (Doc. No. 45 at 22–24). In the amended complaint, Plaintiff provides several examples of publicly-filed statements made by AAC in which AAC discloses allegedly overstated accounts receivables and makes allegedly false

statements that the accounts receivable were calculated using historical information regarding AAC's ability to collect debts. (*Id.* at 37–46). For example, Plaintiff provides an excerpt of AAC's 2016 Form 10-K in which AAC states that: "In evaluating the collectability of accounts receivable and evaluating the adequacy of our allowance for doubtful accounts, management considers a number of factors, including historical experience. . . ." (*Id.* at 39).

Plaintiff also provides an excerpt of AAC's 1Q17 Form 10-Q, which provides a similar statement regarding accounts receivable: "Our expected realization is determined by management after taking into account the type of services provided *and the historical collections received from the commercial payors*, on a per facility basis, compared to the gross client charges billed." (Doc. No. 45 at 41) (emphasis added). Plaintiff alleges that statements referring to reliance on historical collection data to calculate AAC's accounts receivable was repeated in several financial statements over the span of several years. (*Id.* at 41).

Just as the court in *Galena* presumed that the plaintiffs relied on the published articles touting Galena and therefore did not require plaintiffs to prove public knowledge of the fact that the defendants' conduct was deceptive (*i.e.*, prove public knowledge of the *deceptive nature* of the defendant's acts), the Court here is content to presume that Plaintiff, as an investor in AAC stock, relied on AAC's public statements regarding its accounts receivables made as part of its alleged scheme; therefore, the Court will not require that Plaintiff prove public knowledge of the deceptive nature of Defendants' acts. Therefore, it is reasonable to presume that the market reacted to the repeated public disclosures regarding AAC's supposed reliance on historical information regarding collectable debt, and that investors, such as Plaintiff, in turn relied on the price of AAC stock as reflective of such publicly available information.

Therefore, the Court finds that the public knowledge requirement for the purposes of *Basic* presumption is met, and that Plaintiff can be said to have relied on public-facing cover of the scheme alleged. Plaintiff is therefore entitled to the *Basic* presumption for its Scheme Claim predicated on Defendants' alleged overstatement of its accounts receivables and misrepresentation of how those accounts receivables were calculated.

ii.  *Damages*

"[C]ourts must conduct a 'rigorous analysis' to ensure at the class-certification stage that 'any model supporting a plaintiff's damages case [is] consistent with its liability case,' i.e., that the model 'measure[s] only those damages attributable to that theory' of liability." *See Rikos v. Procter & Gamble Co.*, 799 F.3d 497, 523 (6th Cir. 2015) (quoting *Comcast*, 569 U.S. 33–34)). Nonetheless, at this stage in the litigation, "the plaintiffs are not required to prove damages by calculating specific damages figures for each member of the class, but rather they must show that a reliable method is available to prove damages on a class–wide basis." *See In Processed Egg Products Antitrust Litigation*, 312 F.R.D. 171, 202 (E.D. Penn. 2015) (internal quotation marks omitted). "That is, Plaintiffs must show that there is a reliable means for measuring damages with reasonable accuracy in the aggregate." *See id.* Defendants challenge Plaintiff's damages models for each of its claims. The Court addresses each of Defendants' arguments in turn below.

1)  Marketing Claim (and Materialization-of-the-Risk Theory)

Plaintiff pursues its Marketing Claim using a materialization-of-the-risk theory of loss causation. As one circuit has put it, this "theory allows liability on a securities fraud claim even if the decline in a security's price is not caused by the market's reaction to a corrective disclosure revealing precisely the facts concealed by the fraud, as they existed at the time of the defendant's misstatements. Under the theory, the plaintiff may prove loss causation by showing, instead, that

the materialization of a fraudulently concealed risk caused the price inflation induced by the concealment of that risk to dissipate." *See Hubbard v. BankAtlantic Bancorp, Inc.*, 688 F.3d 713, 726 (11th Cir. 2012). "Under the materialization of the risk theory, a misstatement or omission is the proximate cause of an investment loss if the risk that caused the loss was within the zone of risk concealed by the misrepresentations and omissions alleged by a disappointed investor." *See In re Envision Healthcare Corporation Securities Litigation*, No. 3-17-cv-01112, 2019 WL 6168254, at *24 (M.D. Tenn. Nov. 19, 2019). In other words, "the plaintiff must show that it was the very facts about which the defendant lied which caused its injuries." *See Nuveen Mun. High Income Opportunity Fund. v. City of Alameda, Cal.*, 730 F.3d 1111, 1120 (9th Cir. 2013). In resolving Defendants' motion to dismiss, the Court found that the amended complaint adequately pled loss causation as to its Marketing Claim under the materialization-of-the risk theory: "In other words, having considered the relationship between the risks allegedly concealed (AAC's deceptive marketing strategies) and the risks that subsequently materialized (AAC's declining sales calls and its inability to use its deceptive marketing strategies), and drawing all reasonable inferences in Plaintiffs' favor, the Court concludes Plaintiffs have plausibly alleged loss causation." (Doc. No. 62 at 23).

Defendants argue that the materialization-of-the-risk theory prevents Plaintiff from establishing predominance with respect to its Marketing Claim because the theory requires "losses to be calculated in different ways for different types of investors." (Doc. No. 83 at 18). Defendants rely on *Ludlow v. BP, P.L.C.* 800 F.3d 674, 690 (5th Cir. 2015), for this proposition.[25] *Ludlow*

---

[25] The Court notes that *Ludlow* raised a second issue with plaintiff's materialization-of-the-risk theory, one that was not raised by Defendants in this case. Namely, the court suggested that the plaintiff's materialization-of-the-risk theory is incompatible with its request for the *Basic* presumption. *See id.* at 691. In the court's view, under *Basic*, reliance can be presumed when "(a) all information in an efficient market is priced into a security and (b) investors typically make investment decisions based upon *price and price*

involved the events related to the 2010 Deepwater Horizon oil spill. *See id.* at 687. In *Ludlow*, the plaintiffs had two damages theories—the Post-Spill damages theory and the Pre-Spill damages theory. *See id.* at 689. The Post-Spill damages theory implicated the out-of-pocket theory, alleging that the stock was higher than it would have been because of the misrepresentation, and the damage is the "difference between the 'true' price and the 'paid' price." *See id.*

By contrast, the Pre-Spill damages theory implicated the plaintiffs' materialization-of-the-risk theory. Indeed, it hinged on the idea that "BP [British Petroleum] allegedly misstated the efficacy of its safety procedures, creating an impression that the risk of a catastrophic failure was lower than it actually was." *See id.* at 690. The misstatements resulted in investors being "defrauded into taking a greater risk than disclosed, taking away plaintiffs' opportunity to decide whether to divest in light of the heightened risk." *See id.* (internal quotation marks omitted).

The court in *Ludlow* envisioned two groups of plaintiffs who would be included in the Pre-Spill damages set:one group that would have never bought BP stock absent the misrepresentations and a second group (with a higher risk tolerance) that would have bought the stock even if the truth had not been concealed via such misrepresentations. *See id.* The court concluded that each plaintiff in the second group would experience a windfall if awarded "full materialization-of-the-risk damages," and thus instead would be entitled to damages "based on the inflated price *she* paid." *Id.* (emphasis added). The court could not find that predominance was established. The court explained that the plaintiff's expert's model did not provide "any mechanism for separating these

---

*alone*." *See id.* The materialization-of-the-risk theory, however, presumes that investors are making a decision based on perceived *risk*, rather than price, thus undercutting "one of the rationales for the *Basic* presumption of reliance." *See id.* at 691. The parties do not raise this particular issue, and the Court need not reach because as below, the Court finds that Plaintiff's Marketing Claim fails under *Comcast*.

two classes of plaintiffs" and therefore could not provide "an adequate measure of class-wide damages under *Comcast*."[26] *See id.* at 690.

Defendants argue that Plaintiff's reliance on the materialization-of-the-risk theory presents the same issue as the Pre-Spill damages model in *Ludlow*. Defendants posit that like investors in *Ludlow*, some AAC investors with a high risk tolerance would have purchased AAC stock even if risks associated with AAC's marketing practices had never been concealed. (Doc. No. 83 at 19–20). Because these investors would unfairly benefit from damages awarded to investors with lower risk tolerances who would not have purchased AAC stock had they known of the risk, according to Defendants, Plaintiff cannot establish predominance as required under Rule 23(b).

Plaintiff attempts to distinguish *Ludlow* by arguing that it (Plaintiff) relies on the out-of-pocket damages model widely accepted in Section 10(b) cases. (Doc. No. 100 at 16–17); *see In re Under Armour Securities Litigation*, No. RDB-17-0388, 2022 WL 4545286, at *16 (D. Md. Sept. 29, 2022) ("Several courts have sanctioned the use of similar 'out-of-pocket' methodologies in analogous securities fraud cases."). This model looks to the artificial inflation per share at the time of purchase less the artificial inflation as the time of the sale. (Doc. No. 100 at 16–17).

---

[26] In *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), the Court considered whether the district court properly certified a class action of more than 2 million current and former Comcast subscribers alleging that Comcast Corporation and its subsidiaries engaged in anti-competitive conduct under the anti-trust laws of the United States. In its analysis, the Court explained that damages models for a class action must make "establish that damages are susceptible of measurement across the entire class for the purposes of Rule 23(b)." *See id.* at 35. The Court found that the class action had been improperly certified because respondents' damages model fell "far short of establishing that damages are capable of measurement on a class wide basis." *See id.* at 34. Respondent therefore could not establish predominance because "[q]uestions of individual damage calculations will inevitably overwhelm questions common to the class." *See id.*

While the court in *Ludlow* speaks generally of predominance at the outset its decision, it does not return explicitly to that concept in its determination that the damages model fails provide a class-wide basis for calculating damages. Nevertheless, its reliance on *Comcast* indicates that the court was in substance finding that the plaintiff had failed to establish predominance.

Though not raised by either party, *Mulderrig v. Amyris, Inc.* confronted a set of circumstances strikingly similar to those before the Court here. 340 F.R.D. 575 (N.D. Cal. 2021). In *Mulderrig*, the defendants (relying on the court's reasoning in *Ludlow*) argued that the plaintiffs could not proceed under a materialization-of-the-risk theory because so doing requires "an individualized assessment of whether a class member would have bought stock at all (or at a lower price) had the risk been accurately disclosed." *See id.* at 590. The plaintiffs, however, planned to proceed under an out-of-pocket damages model in conjunction with their materialization-of-the-risk theory. *See id.* While defendants framed the issue as to whether the plaintiff could fulfill predominance because materialization-of-the-risk theory allegedly could not account for a diverse set of investors, the court latched onto a different issue related to predominance.

*Comcast* requires district courts to ensure that "a model purporting to serve as evidence of damages in [a] class action [] measure[s] only those damages attributable to [the plaintiffs'] theory." *See Comcast v. Behrend*, 569 U.S. 27, 35 (2013). "If the model does not even attempt to do that, it cannot possibly establish that damages are susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *See id.* In other words, the plaintiff will not be able to prove predominance. Although "[c]alculations need not be exact . . . any model supporting a plaintiff's damages case must be consistent with its liability case . . . ." *See id.*

The court in *Mulderrig* found that the plaintiffs' expert did not "explain how the proposed [out-of-pocket] model calculate[d] damages based on the materialization-of-the-risk theory. *See Mulderrig*, 340 F.R.D. at 590. Indeed, neither one of her expert reports identifi[ed] the materialized risk that plaintiffs allege, much less explain[ed] how such risk would be factored into the damages model." *See id.* The court therefore concluded that the proposed damages model did not "attribute

damages to a materialization of the risk theory," and that therefore class certification must be denied as to that theory. *See id.*[27]

      *Mulderrig* is instructive here. As noted, Defendants argue that Plaintiff's Marketing Claim "requires individualized inquiries into each individual class member's risk tolerance" and that therefore Plaintiff cannot establish predominance as required under Rule 23(b)(3). (Doc. No. 83 at 18–19). Similar to the plaintiff in *Mulderrig*, Plaintiff responds by asserting that in connection with its Marketing Claim, it is pursuing a materialization-of-the-risk liability theory and an out-of-pocket damages methodology. (Doc. No. 100 at 16–17). Quoting from its expert report, Plaintiff explains:

> [u]nder [P]laintiff's liability theory, Defendants' scheme and misrepresentations and omissions of material facts caused AAC common stock to trade at artificially inflated prices between at least March 8, 2017 and November 5, 2018 by inducing artificial inflation in the price of AAC common stock and maintaining existing artificial inflation. According to Plaintiff, individual shareholders were harmed to the extent they experienced losses arising from such artificial inflation.

(Doc. No. 100 at 16 (quoting Doc. No. 78-2 at 25)). Plaintiff's expert report, however, goes onto to explain:

> The inflation in AAC's common stock, if any, can be measured using widely accepted valuation and economic techniques. Estimating share price inflation often begins by analyzing the impact of the curative events. When previously withheld information was disclosed to the market, artificial price inflation is removed from AAC's stock price. Curative events therefore indicate the extent to which the share

---

[27] The Court acknowledges that the court in *Junge v. Geron Corporation*, 2022 WL 1002446 (N.D. Cal. Apr. 2, 2022), disagreed with the characterization of *Mulderrig*'s materialization-of-the-risk theory. While *Mulderrig* assumed that the materialization-of-the-risk theory was a theory of liability for the purposes of being subject to analysis under *Comcast*, *Junge* conceptualized the theory as merely one of a form of loss causation, which does not "contravene *Comcast* or defeat predominance under Rule 23(b)." *See Junge*, 2022 WL 1002446, at *8. The Court agrees that the materialization-of-the-risk theory is a theory of loss causation rather than one of liability (to the extent those two concepts can be neatly separated). However, the Court does not agree with *Junge* that a party's reliance on the materialization-of-the-risk theory does not implicate questions of damages under *Comcast* or predominance under Rule 23(b). Indeed, *Junge* is certainly an outlier in this regard, as several courts have grappled with how to reconcile the materialization-of-the-risk theory with *Comcast* while still conceptualizing it as a theory of loss causation. Moreover, *Junge* appears largely inapplicable to the questions facing this Court because in that case, the plaintiffs had not "confirmed nor denied whether they [would] use materialization of the risk as a basis for seeking damages." *See id.* at *8.

> price had been inflated by alleged material misrepresentations or omissions and, as a result, may be used to estimate share price inflation in semi-strong form efficient markets"

(Doc. No. 78-2 at 26). Plaintiff's expert report as to calculation of damages appears to omit any consideration of how to factor in the risk on which Plaintiff bases its materialization-of-the-risk theory. Indeed, in his consideration of how to calculate damages, Dr. Dalrymple appears to be referencing corrective disclosures rather than risk. For example, Plaintiff states that it will calculate damages for its materialization of the risk theory using a technique in which it examines the extent to which AAC stock price was artificially inflated during the class period. (Doc. No. 100 at 16). Yet, Dr. Dalrymple explains that estimating "price inflation often begins by analyzing the impact of the *curative events*. When *previous withheld information was disclosed to the market*, artificial inflation is removed from AAC's stock price." (Doc. No. 78-2 at 25) (emphasis added). In his references to "curative events" and previously withheld information being "disclosed to the market," it appears that Dr. Dalrymple is referring to corrective disclosures rather than a materialization of a risk. (*Id.*). A corrective disclosure *cures* a prior misleading or incorrect statement and it includes information previously withheld from the market, but a materialized risk is not curative in the same way that a corrective disclosure is curative; a materialized risk (once revealed) may "cure" inflation in stock price by potentially removing the inflation, but it does not correct prior incorrect information. Further, a company in some circumstances might "disclose" a materialized risk, but in general, a materialized risk is revealed not by being "disclosed" but rather by materializing. Moreover, just as the court in *Mulderrig* observed with respect to the plaintiff's expert in that case, Dr. Dalrymple has provided no explanation as to how the risk of AAC's deceptive marketing claims will be factored into Plaintiff's damages model—that is, how Dr. Dalrymple expects to show that the risk affected AAC's stock price at the time the risk was concealed or after it materialized (revealed).

Although Plaintiff does not have to provide a detailed damages model at this stage of the litigation, it must show that their model is "consistent with its liability case" and that its damages are "attributable to that theory of liability." *See Comcast*, 569 U.S. at 35. Plaintiff has failed to do so here with respect to its materialization-of-the-risk theory. Therefore, class certification with respect to its Marketing Claim is denied because Plaintiff has failed to establish predominance with respect to this claim.

2) <u>Restatement Claim</u>

Defendants argue that Dr. Dalrymple has failed to adequately provide a damages model for Plaintiff's Restatement Claim. The Court disagrees. As discussed above, Plaintiff's damages model is based on the "measure of inflation in AAC's common stock resulting from Defendants' alleged misconduct." (Doc. No. 100 at 21). In his expert report, Dr. Dalrymple offers that such inflation can be measured "using widely accepted valuation and economic techniques." (Doc. No. 78-2 at 26). In his view, the "curative events" indicate the "extent to which the share price had been inflated by material misrepresentations." (*See id.*). As discussed directly above, Dr. Dalrymple's explanation as to his method for calculating damages seems clearly geared toward a corrective disclosure theory of loss causation. Because Plaintiff's Restatement Claim is based on a corrective disclosure theory of loss causation, rather than a materialization-of-the risk theory, the Court finds Plaintiff to have presented its damages model as to its Restatement Claim in sufficient detail for class certification.

Defendants contend that Dr. Dalrymple has not conducted a "price impact analysis," and was not aware of disclosures other than the November 6, 2018 (a press release reporting AAC's third quarter 2018 financial results) disclosure and the April 16, 2019 disclosure (the press release following the Restatement). (Doc. No. 83 at 28–29). As noted above, at the class certification

stage, a plaintiff is not required to provide an entire damages analysis. *See Thorpe v. Walter Investment Management Corp.*, No. 1-14-cv-20880, 2016 WL 4006661, at *16 (S.D. Fla. Mar. 16, 2016). Further, given the Court's, and Dr. Dalrymple's conclusion in his rebuttal report, that the March 29, 2019, disclosure contained materially different information from the April 15, 2019 disclosure, the Court is not persuaded that consideration of the March 29 disclosure is fatal to a damages model for the Restatement Claim. (Doc. No. 99-2 at 15). Therefore, with respect to its Restatement Claim, Plaintiff has provided a damages model sufficient for class certification.

   3)  Scheme Claim

       Defendants challenge the suitability of Plaintiff's damages model for its Scheme Claim. (Doc. No. 83 at 29). Specifically, Defendants allege that "without a 'curative' disclosure for the alleged scheme to calculate damages, Mr. Dalrymple's model does not apply." (*Id.* at 29). Plaintiff responds by referring to a portion of Mr. Dalrymple's report in which he specifically explains that "[r]eferences to misrepresentations and misstatements in this report may refer generally to Plaintiff's allegations, including omissions and Defendants' alleged scheme. My assessment of the impact of certain information on AAC's share price is not dependent on findings as to which of these or other legal definitions would apply to the information allegedly withheld or misstated." (Doc. No. 99-2 at 3). Therefore, merely because Mr. Dalrymple omitted a separate damages model by which to calculate damages for Plaintiff's Scheme Claim, that does not mean that his expert report does not account for such a model. And to the extent that a curative disclosure is discussed in reference to misrepresentations and misstatements, Mr. Dalrymple's statement therefore also explains that the curative disclosure could apply to damages calculation used for Plaintiff's Scheme claim.

Further, the Court does not agree that there is no 'curative' disclosure as to Plaintiff's Scheme Claim. To the extent that Plaintiff's Scheme Claim relies on Defendants' alleged deceptive conduct related to the Restatement (and the Court believes it does), then the Restatement would likely qualify as the curative disclosure. Therefore, the Court sees no reason why the damages model used by Mr. Dalrymple for the Restatement Claim would not suffice also for Plaintiff's Scheme Claim. Plaintiff has therefore provided a sufficient damages model for its Scheme Claim predicated on its accounts receivables and misrepresentation of how those accounts receivables were calculated.

**B. <u>Superiority</u>**

Rule 23(b)'s superiority requirement provides the following four factors for courts to consider:

(A) the class members' interests in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already begun or against class members;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3). The superiority requirement is fulfilled here. "Numerous courts have found the class action device to be a superior method of proceeding in a securities law fraud case." *Davis v. Avco Corp.*, 371 F. Supp. 782, 792 (N.D. Ohio 1974) (collecting cases). Defendants' alleged securities fraud caused economic injury to a large number of geographically dispersed investors, making the cost of pursuing individual claims impracticable and inefficient. The alternatives to a class action are not superior. The Court, therefore, finds (without objection from Defendants) that Plaintiff has satisfied the requirements under Rule 23(b)(3).

## C. **Class Counsel**

"When one applicant seeks appointment as class counsel, the court may appoint that applicant only if the applicant is adequate under [Federal Rule of Civil Procedure] 23(g)(1) and (4)." Fed. R. Civ. P. 23(g)(2). Rule 23(g)(1) requires the Court, in appointing class counsel, to consider:

> (i) the work counsel has done in identifying or investigating potential claims in the action; (ii) counsel's experience in handling class actions, other complex litigation, and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law; and (iv) the resources that counsel will commit to representing the class.

Fed. R. Civ. P. 23(g)(1)(A). Rule 23(g)(1) also lists other matters the Court may consider and actions the Court may take in appointing Class Counsel. Fed. R. Civ. P. 23(g)(1)(B)-(E). Rule 23(g)(4) requires Class Counsel to "fairly and adequately represent the interests of the class."

In this case, Robbins Geller has done significant work in identifying and investigating the potential claims in the action. (Doc. No. 77 at 10). Robbins Geller has extensive experience and knowledge with securities class actions, to say the least. (*Id.*). The Court has no reason to believe that Robbins Geller will be unable to commit the resources necessary to represent the class. Therefore, because the Court finds Robbins Geller clearly satisfies the requirements of Rule 23(g), it will appoint Robbins Geller as Class Counsel.

## CONCLUSION

For the reasons stated herein, Plaintiff's motion for class certification (Doc. No. 76) is GRANTED in part and DENIED in part, as set forth more specifically immediately below.

Pursuant to Fed. R. Civ. P. 23(c)(1)(B), the Court hereby CERTIFIES, respectively, the following CLASS and CLAIMS:

> All persons who purchased or otherwise acquired the common stock of AAC Holdings, Inc. ("AAC" or the "Company") between March 8, 2017 and November 5, 2018, inclusive (the "Class Period"). Excluded from the Class are AAC, Michael

T. Cartwright, Kirk R. Manz, Andrew McWilliams and members of their respective immediate families, any entity of which any of them has a controlling interest and the legal representatives, heirs, predecessors, successors or assigns of any of them (collectively, the "Excluded Parties").

Plaintiff's Restatement Claim, and Plaintiff's Scheme Claim based on Defendants' alleged unlawful conduct connected to its overstatement of its accounts receivable as described above.

However, consistent with the Court's specification of the claims as to which certification has been granted, the motion is DENIED to the extent that Plaintiff seeks certification as to its Marketing Claim and Scheme Claim predicated on Defendants' deceptive marketing practices.

Also, pursuant to Fed. R. Civ. P. 23(c)(1)(B), the Court APPOINTS Indiana Public Requirement System as class representative and Robbins Geller as class counsel.

IT IS SO ORDERED.

*Eli Richardson*
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE