UNITED STATES DISTRICT COURT

MIDDLE DISTRICT OF TENNESSEE

NASHVILLE DIVISION

| | |
|---|---|
| INDIANA PUBLIC RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>vs.<br><br>MICHAEL T. CARTWRIGHT, KIRK R. MANZ and ANDREW W. McWILLIAMS,<br><br>Defendants. | Civil Action No. 3:19-cv-00407<br><br>CLASS ACTION<br><br>Judge Eli J. Richardson<br>Magistrate Judge Alistair E. Newbern<br><br>MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION (I) FOR RECONSIDERATION OF THE COURT'S MEMORANDUM ORDER AND OPINION GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR CLASS CERTIFICATION; AND (II) TO STAY DEADLINES CONCERNING CLASS NOTICE |

## TABLE OF CONTENTS

Page

I. INTRODUCTION .......... 1

II. LEGAL STANDARD .......... 3

III. ARGUMENT .......... 4

A. The Order Patently Misunderstood Plaintiff's Expert Testimony .......... 4

1. Dalrymple's References to Corrective Disclosures Were Not Intended to Exclude Materialization of Risk .......... 5

2. Dalrymple Described a Damage Model Consistent with Plaintiff's Theory of Liability for Its Marketing Claim .......... 6

B. Harm and Injustice Would Result if Reconsideration Were Denied .......... 14

IV. CONCLUSION .......... 14

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Andren v. Alere, Inc.*,
2018 WL 1920179 (S.D. Cal. Apr. 24, 2018) ... 4

*Bond v. Clover Health Invs. Corp.*,
587 F. Supp. 3d 641 (M.D. Tenn. 2022) ... 6

*Comcast v. Behrend*,
569 U.S. 27 (2013) ... 4, 6

*Coopers & Lybrand v. Livesay*,
437 U.S. 463 (1978) ... 3

*Cosby v. KPMG, LLP*,
2020 WL 3548379 (E.D. Tenn. June 29, 2020),
*report and recommendation adopted sub nom.*
2021 WL 1828114 (E.D. Tenn. May 7, 2021) ... 11, 12

*Eisenberg v. Gagnon*,
766 F.2d 770 (3d Cir. 1985) ... 14

*Grae v. Corr. Corp. of Am.*,
No. 3:16-CV-02267 (M.D. Tenn.) ... *passim*

*Grae v. Corr. Corp. of Am.*,
2021 WL 1100431 (M.D. Tenn. Mar. 17, 2021) ... 2, 9, 10

*Grae v. Corr. Corp. of Am.*,
2021 WL 1100799 (M.D. Tenn. Mar. 23, 2021) ... 8, 9

*Grae v. Corr. Corp. of Am.*,
329 F.R.D. 570 (M.D. Tenn. 2019),
*on reconsideration*,
330 F.R.D. 481 (M.D. Tenn. 2019) ... 8, 13

*Grae v. Corr. Corp. of Am.*,
330 F.R.D. 481 (M.D. Tenn. 2019) ... 3, 8, 14

*Grant v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*,
2017 WL 1153927 (M.D. Tenn. Mar. 27, 2017) ... 4

*In Def. of Animals v. Nat'l Insts. of Health*,
543 F. Supp. 3d 70 (D.D.C. 2008) .......... 3

*In re BP p.l.c. Sec. Litig.*,
2014 WL 2112823 (S.D. Tex. May 20, 2014),
*aff'd sub nom.*
*Ludlow v. BP, P.L.C.*,
800 F.3d 674 (5th Cir. 2015) .......... 11

*In re BP p.l.c. Sec. Litig.*,
2016 WL 3090779 (S.D. Tex. May 31, 2016) .......... 12

*Jaynes v. United States*,
69 Fed. Cl. 450 (2006) .......... 4

*Kerns v. Caterpillar Inc.*,
144 F. Supp. 3d 963 (M.D. Tenn. 2015) .......... 3

*Louisville/Jefferson Cty. Metro. Gov't v. Hotels.com, L.P.*,
590 F.3d 381 (6th Cir. 2009) .......... 3

*Ludlow v. BP, P.L.C.*,
800 F.3d 674 (5th Cir. 2015) .......... 9, 11, 12

*Mulderrig v. Amyris, Inc.*,
340 F.R.D. 575 (N.D. Cal. 2021) .......... 11, 13

*Rankin v. Rots*,
220 F.R.D. 511 (E.D. Mich. 2004) .......... 14

*Ratcliffe v. Food Lion, LLC*,
2019 WL 6242302 (M.D. Tenn. Nov. 20, 2019) .......... 3, 5, 14

*Said v. Nat'l R.R. Passenger Corp.*,
390 F. Supp. 3d 46 (D.D.C. 2019) .......... 3, 14

*Strougo v. Tivity Health, Inc.*,
606 F. Supp. 3d 753 (M.D. Tenn. 2022),
*vacated and remanded on other grounds by*
*In re Tivity Health, Inc.*,
2022 WL 17243323 (6th Cir. Nov. 21, 2022) .......... 9

*Willis v. Big Lots, Inc.*,
242 F. Supp. 3d 634 (S.D. Ohio 2017) .......... 6

**Page**

**STATUTES, RULES AND REGULATIONS**

Federal Rules of Civil Procedure
Rule 23 .... 4
Rule 23(c)(1)(C) .... 4
Rule 54(b) .... 3

## I. INTRODUCTION

On February 24, 2023, the Court issued a Memorandum Opinion and Order (ECF 138) (the "Order") granting in part and denying in part Lead Plaintiff's Motion for Class Certification (ECF 76). The Order certified "Plaintiff's Restatement Claim, and Plaintiff's Scheme Claim based on Defendants' alleged unlawful conduct connected to its overstatement of its accounts receivable." Order at 52-53. The Order denied certification "to the extent that Plaintiff seeks certification as to its Marketing Claim and Scheme Claim predicated on Defendants' deceptive marketing practices above." *Id.* Plaintiff respectfully submits that the Order "patently misunderstood" Plaintiff's expert evidence as to the so-called "Marketing Claim." Plaintiff respectfully requests that the Court reconsider the Order and certify the Class *in toto*.

Plaintiff alleges the risks concealed by Defendants' marketing scheme in part materialized on November 6, 2018, when Defendants disclosed "that the Company had failed to meet its revenue, earnings per share, and EBITDA targets, and reduced the fiscal year 2018 ('FY18') guidance Cartwright had previously reassured investors AAC was on track to meet. AAC's disastrous results were the direct result of AAC's inability to continue its deceptive marketing practices and financial manipulations" and contributed to a more than 44% decline in AAC's stock price. ¶7; *see also* ¶¶58, 72, 130-131; *see* ECF 62 at 20, 22-24.[1]

In moving to certify the Class, Plaintiff and its expert, W. Scott Dalrymple, established that a reliable method is available to prove damages on a class-wide basis consistent with this liability theory. Although the Order construed Dalrymple's references to "corrective disclosures" as excluding a materialization-of-risk theory, Dalrymple intended that term to be ***inclusive*** of the

---

[1] All "¶_" and "¶¶_" references are to the Consolidated Complaint for Violations of the Securities Exchange Act of 1934 (ECF 45) ("Complaint").

materialization-of-risk theory put forward by Plaintiff.[2] That understanding is consistent with how that term has been used by ***Defendants' own expert*** and at least one judge of this Court.

More importantly, Dalrymple did not "omit any consideration of how to factor in the risk on which Plaintiff bases its materialization-of-the-risk." Order at 48. Both Dalrymple and Plaintiff specifically pointed to another case in this District, *Grae v. Corr. Corp. of Am.*, No. 3:16-CV-02267 (M.D. Tenn.), where Dalrymple constructed the exact damage model the Order said he failed to explain. There, Judge Trauger expressly found that Dalrymple addressed the challenge of "separat[ing] the damages caused by the concealed risk from the loss of value that would have accompanied the relevant adverse event, even if the pre-event risk had not been concealed." *Grae v. Corr. Corp. of Am.*, 2021 WL 1100431, at *10 (M.D. Tenn. Mar. 17, 2021) ("*Grae III*").[3] Plaintiff explained that the same analysis could be done here. Reply at 9-11.

Plaintiff further submits that harm and injustice would result if the Court declines to reconsider the Order as the Class would be precluded from pursuing valuable claims against Defendants with respect to a substantial portion of the alleged misconduct.

For all of these reasons, and as explained below, Plaintiff respectfully requests that the Court reconsider the Order and certify the class as defined in Plaintiff's Memorandum of Law in Support of Its Motion for Class Certification. ECF 77 at 1. Plaintiff further requests that the Court vacate the

---

[2] *E.g.*, Order at 48 ("Dr. Dalrymple appears to be referencing corrective disclosures rather than risk") (citing Expert Report of W. Scott Dalrymple, CFA, July 6, 2021 (ECF 78-2) (the "Opening Report")); *id.* ("it appears that Dr. Dalrymple is referring to corrective disclosures rather than a materialization of a risk") (quoting the Opening Report at 25).

[3] Lead Plaintiff's Reply in Support of Motion for Class Certification (ECF 100) ("Reply") at 9-11, 17-18; Expert Rebuttal Report of W. Scott Dalrymple, CFA, June 13, 2022 (ECF 99-2) (the "Rebuttal Report"), ¶¶70 n.101, 72. The "Opening Report" and "Rebuttal Report" are collectively referred to as the "Reports." All citations are omitted and emphases added unless otherwise indicated.

deadlines concerning notice to the Class set forth in the Court's March 2, 2023 Order (ECF 140) until such time as this Motion is resolved.

## II. LEGAL STANDARD

This Court has set forth the legal standard applicable to motions for reconsideration on multiple occasions. For instance, in vacating a prior order denying class certification and conditionally certifying a class in *Ratcliffe v. Food Lion, LLC*, this Court held:

> Fed. R. Civ. P. 54(b) . . . provides that any order that adjudicates fewer than all claims or the rights and liabilities of fewer than all parties "may be revised at any time before the entry of judgment adjudicating all the claims and all the parties' rights and liabilities." Fed. R. Civ. P. 54(b). District courts may afford such relief from interlocutory orders as justice requires. *Grae v. Corr. Corp. of Am.*, 330 F.R.D. 481, 490 (M.D. Tenn. 2019) [("*Grae II*")]. Courts traditionally will find justification for reconsidering interlocutory orders when there is (1) an intervening change of controlling law, (2) new evidence available, or (3) a need to correct clear error or prevent manifest injustice. *Id.* (*citing Louisville/Jefferson Cty. Metro. Gov't v. Hotels.com, L.P.*, 590 F.3d 381, 389 (6th Cir. 2009)). This standard vests significant discretion in district courts. *Kerns v. Caterpillar Inc.*, 144 F. Supp. 3d 963, 967 (M.D. Tenn. 2015). . . .
>
> In determining whether justice requires reversal of a prior interlocutory order, courts assess circumstances such as whether the court patently misunderstood the parties, whether the court made a decision beyond the adversarial issues presented, whether the court made an error in failing to consider controlling decisions or data, and whether a controlling or significant change in the law has occurred. *Said v. Nat'l R.R. Passenger Corp.*, 390 F. Supp. 3d 46, 50 (D.D.C. 2019). The Court must determine, within its discretion, "whether reconsideration is necessary under the relevant circumstances." *In Def. of Animals v. Nat'l Insts. of Health*, 543 F. Supp. 3d 70, 75 (D.D.C. 2008). The burden is on the moving party to show that reconsideration is appropriate and that harm or injustice would result if reconsideration were denied. *Said*, 390 F. Supp. 3d at 50. Motions for reconsideration are not vehicles for either reasserting arguments previously raised and rejected by the court or presenting arguments that should have been raised previously with the court. *Id.* at 50-51.

2019 WL 6242302, at *1 (M.D. Tenn. Nov. 20, 2019).

Separately, Federal Rule of Civil Procedure ("Rule") 23(c)(1)(C) provides: "An order that grants or denies class certification may be altered or amended before final judgment." Considering "a district court's order denying or granting class status is inherently tentative" (*Coopers & Lybrand*

*v. Livesay*, 437 U.S. 463, 469 n.11 (1978)), courts have held that traditional standards for reconsideration do not apply to a court's ability to alter or amend a class certification decision under Rule 23(c)(1)(C). *E.g.*, *Jaynes v. United States*, 69 Fed. Cl. 450, 453 (2006); *Andren v. Alere, Inc.*, 2018 WL 1920179, at *2 (S.D. Cal. Apr. 24, 2018) ("Because the Court has discretion to modify an order on class certification prior to judgment, the Court considers Plaintiffs' motion under Rule 23 and not under the parameters of a motion for reconsideration.").

In any case, "[i]t is within the sole discretion of the court to determine if a prior ruling should be reconsidered, and the Sixth Circuit has declined to impose any conditions or limitations upon a court's power to review a prior ruling." *Grant v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 2017 WL 1153927, at * 2 (M.D. Tenn. Mar. 27, 2017).

Plaintiff respectfully submits that reconsideration is warranted under each of the standards set forth above.

## III. ARGUMENT

### A. The Order Patently Misunderstood Plaintiff's Expert Testimony

As the Court held, *Comcast v. Behrend*, 569 U.S. 27 (2013) requires that Plaintiff put forth a damage model "'consistent with its liability case.'" Order at 42.

> [A]t this stage in the litigation, "the plaintiffs are not required to prove damages by calculating specific damages figures for each member of the class, but rather they must show that a reliable method is available to prove damages on a class-wide basis." . . . "That is, Plaintiffs must show that there is a reliable means for measuring damages with reasonable accuracy in the aggregate."

*Id.*

With respect to the Marketing Claim, the Order held that Plaintiff had "failed to provide a damages model that comports with the materialization-of-the-risk theory of loss causation and

therefore cannot establish predominance as to this claim." *Id.* at 21.[4] In explaining the basis for this conclusion, the Order reasoned: (i) "it ***appears*** that Dr. Dalrymple is referring to corrective disclosures rather than a materialization of a risk;" and (ii) "Plaintiff's expert report as to calculation of damages ***appears*** to omit any consideration of how to factor in the risk on which Plaintiff bases its materialization-of-the-risk theory." *Id.* at 48.

Plaintiff respectfully submits that it clearly demonstrated a reliable method was available to prove damages on a class-wide basis consistent with its liability case, and that the Order's conclusion to the contrary "patently misunderstood" Plaintiff's evidence, is erroneous, and "injustice would result if reconsideration were denied." *Ratcliffe*, 2019 WL 6242302, at *1.

**1. Dalrymple's References to Corrective Disclosures Were Not Intended to Exclude Materialization of Risk**

The Order faults Dalrymple for "referencing corrective disclosures rather than risk" and held that "it ***appears*** that Dr. Dalrymple is referring to corrective disclosures rather than a materialization of a risk." Order at 48 (citing the Opening Report at 25). Plaintiff respectively submits that the Order's interpretation of Dalrymple's references to "curative events" and "corrective disclosures" is inconsistent with the substance of Dalrymple's opinions set forth in his Reports, which specifically address how his proposed damage model is consistent with "a materialization of [a] risk" theory of damages. *See, e.g.*, Rebuttal Report, ¶¶70, 70 n.102, 77, 77 n.114.

Dalrymple's references to a "corrective disclosure," or "curative events," were intended to be inclusive, not exclusive, of the numerous ways a plaintiff can prove loss causation and damages, including through a materialization of the concealed risk theory. Indeed, while courts in different districts have defined the term "corrective disclosure" in different ways, Dalrymple's use of the term

4 The Court also held: "Plaintiff cannot proceed on its Scheme Claim to the extent that it is based on Defendants' allegedly deceptive marketing practices, for the same reasons that it cannot proceed on its Marketing Claim." *Id.*

"corrective disclosure" is ***entirely consistent*** with how Judge Trauger discussed "corrective disclosures" in *Bond v. Clover Health Invs. Corp*., mere months before Dalrymple's Rebuttal Report was submitted:

> ***The event revealing the truth is typically referred to as a "corrective disclosure."*** *Willis v. Big Lots, Inc.*, 242 F. Supp. 3d 634, 656-57 (S.D. Ohio 2017). Sometimes a corrective disclosure is actually a disclosure in the traditional sense – that is, a statement by the defendant admitting to the truth. Other times, the corrective "disclosure" comes from a third party's uncovering the truth and informing the market. ***And, in some cases, it is, in essence, the passage of time itself that does the disclosing, when the truth comes to light, not through any person's statement, but through the real-world materialization of a risk that had been concealed***. *See Ohio Pub. Employees Ret. Sys.*, 830 F.3d at 385 (discussing "materialization of risk" corrective disclosures).

587 F. Supp. 3d 641, 679-80 (M.D. Tenn. 2022). Further, Dalrymple's use of the term "corrective disclosure" to include a materialization-of-risk theory is also consistent with how ***Defendants' own expert understood and used the term in the rebuttal report to which Dalrymple was responding***. Rebuttal Report of Paul Zurek, Ph.D., Sept. 7, 2021 (ECF 84-1), ¶66 (noting that "***the alleged corrective disclosure was a materialization of risk***").

To the extent the Order construed Dalrymple's usage of the term "corrective disclosure" as implying a damage model that would not include a materialization-of-the-risk theory, Plaintiff regrets the confusion and respectfully submits that this was in error. Indeed, as described below, the substance of Dalrymple's Reports makes clear that his damage model is fully consistent with Plaintiff's materialization-of-the-risk theory and that a reliable method is available to prove damages on a class-wide basis. *See Comcast*, 569 U.S. at 35.

#### 2. Dalrymple Described a Damage Model Consistent with Plaintiff's Theory of Liability for Its Marketing Claim

The Order notes that "Plaintiff's expert report as to calculation of damages ***appears*** to omit any consideration of how to factor in the risk on which Plaintiff bases its materialization-of-the-risk." Order at 48. The Order further explained: "Dalrymple has provided no explanation as to how

the risk of AAC's deceptive marketing claims will be factored into Plaintiff's damages model – that is, how Dr. Dalrymple expects to show that the risk affected AAC's stock price at the time the risk was concealed or after it materialized (revealed)." *Id.*

Defendants' expert posed this same criticism. In his response to the Opening Report, Zurek states:

> The fact that the alleged corrective disclosure was a materialization of risk further shows the mismatch in the content of the alleged corrective disclosures and the alleged fraud. This is because an earlier disclosure of a risk is not the same as a subsequent materialization, and the two would generally be associated with different price reactions.

ECF 84-1, ¶66. Zurek offered the following example as to why he believes Dalrymple's model is inadequate:

> A company knows that there is a 30% probability it will lose a major customer, yet conceals this risk (*i.e.*, the market believes there is a 0% probability). The company loses the customer and its stock price declines. The stock price decline when the company loses the customer represents the reaction to the certainty (100% probability) of losing the customer, while the allegedly concealed risk is that there was a 30% probability of losing the customer. Since a stock price decline in response to a 100% probability of loss would be larger than in response to a 30% probability of that same loss, the stock price decline to the former (the "back-end price drop" as described in Goldman) is not a measure of "front-end inflation" due to the allegedly concealed risk. To illustrate this, suppose the "back-end price drop" were $10 million. Had the company revealed the 30% probability that it would lose a major customer before this risk had materialized with 100% probability, the hypothetical price in the absence of the alleged concealed risk would have been lower than the actual price by $3 million, which is 30% of $10 million. Using the price drop of $10 million to measure inflation would overstate it by $7 million.

*Id.*, ¶67.

Judge Trauger noted this exact issue in *Grae v. Corr. Corp. of Am.*:

> The "materialization of risk" theory of demonstrating loss causation flows from the common sense assumption that concealed risks are sometimes revealed by events, not admissions. For example, if a company makes a fortune selling what it claims to be unbreakable widgets, its value will go down if it admits that the widgets are, in fact, breakable – but its value will also go down if it keeps silent but the widgets just start breaking and the public finds out about it. In either hypothetical, the value of the company has decreased because the public has learned the same

> truth. In either hypothetical, an unsuspecting shareholder would have been harmed by the same lie. To claim that only the hypothetical involving an admission represents an instance of loss causation by fraud would make little sense. The same reasoning applies in the price impact context. What matters is demonstrating a negative price impact from the public's learning the truth, not necessarily how the public learned the truth.
>
> Of course, when the truth is revealed by a risk's coming to fruition, rather than merely by the disclosure of the risk itself, it may be difficult to separate the damage to a company's value done by the revelation from the damage done by the event. After all, even when the public is fully apprised of the possibility of some calamitous event, the value of an affected company should still be expected to go down if the event actually occurs, because, at that point, the relevant harm went from being a possibility to a certainty. Accordingly, when an event constitutes both a harm in and of itself and the revelation of a concealed truth, the value of the company may suffer from both. As long as some part of the price impact can be attributed to the revelation, however, it is corroborative of a fraud on the market.

329 F.R.D. 570, 579 (M.D. Tenn. 2019) ("*Grae I*"), *on reconsideration*, *Grae II*, 330 F.R.D. 481 (M.D. Tenn. 2019). *Grae* is of particular significance here, and Plaintiff respectfully submits that Dalrymple's discussion of *Grae* in his Rebuttal Report includes exactly the analysis the Court mistakenly held was missing.

*Grae* was a securities fraud class action brought against CoreCivic, Inc. and certain of its executives alleging that defendants misrepresented the risks associated with the renewal of contracts with its largest customer, the U.S. Bureau of Prisons ("BOP"). *Grae v. Corr. Corp. of Am.*, 2021 WL 1100799, at *1 (M.D. Tenn. Mar. 23, 2021) ("*Grae IV*").[5] While the *Grae* defendants had claimed (amongst numerous other alleged misrepresentations) that CoreCivic's "'renewal rate on existing contracts remains high as a result of . . . the quality of our operations[,]'" plaintiff alleged that CoreCivic in fact operated poor quality prisons. *Grae IV*, 2021 WL 1100799, at *10. Plaintiff further alleged defendants knew but failed to disclose that there was a substantial likelihood the BOP

[5] Dalrymple refers to *Grae* as "CCA." *E.g.*, Rebuttal Report, ¶70. CoreCivic changed its name from Corrections Corporation of America (CCA) to CoreCivic, Inc., shortly after the litigation commenced.

would decline to renew a number of lucrative contracts with CoreCivic because of the poor quality of CoreCivic's operations. *Id.* These risks materialized on August 18, 2016, when Deputy Attorney General Sally Q. Yates issued a memorandum entitled "Reducing our Use of Private Prisons" (the "Yates Memo"), where she directed that the BOP decline to renew contracts with private prisons, including CoreCivic, in part because "'time ha[d] shown that they compare poorly to our own [BOP] facilities.'" *Id*. at *8 (alteration in original). Proceeding on a materialization-of-the-risk theory, like here, plaintiff alleged that this disclosure was a "real-world realization of the risk that a company's executives concealed or denied." *Id.* at *22.

As Plaintiff and Dalrymple note, Dalrymple was plaintiff's expert in *Grae* and created a damage model he intended to present at trial.[6] *See Grae III*, 2021 WL 1100431, at *10; Rebuttal Report, ¶70; Reply at 17-18. In doing so, Dalrymple presented a damages model that accounted for the precise issue identified by Zurek, this Court, Judge Trauger in *Grae I*, and indeed Judge Ellison after the *Ludlow* remand – how "the risk of [CCA's deceptive quality claims was] factored into Plaintiff's damages model." *See* Order at 48. Indeed, after the *Grae* defendants claimed Dalrymple had failed to do so and moved to exclude Dalrymple's testimony, Judge Trauger rejected their contentions, holding:

> The calculation of damages in a case based on the realization of a concealed risk is an inherently difficult task, because one must separate the damages caused by the concealed risk from the loss of value that would have accompanied the relevant adverse event, even if the pre-event risk had not been concealed. ***Dalrymple, however, acknowledges and addresses this challenge, reaching what he characterizes as a "conservative" estimate of the loss attributable to fraud***.

[6] To be clear, *Grae* did not require that this model be created at class certification. Rather, it was submitted in connection with plaintiff's expert disclosures regarding damages prior to trial. Indeed, at class certification, "the question is not whether he has already made the damages calculation, but whether an appropriate methodology exists for making the calculations." *Strougo v. Tivity Health, Inc.*, 606 F. Supp. 3d 753, 767 (M.D. Tenn. 2022), *vacated and remanded on other grounds by In re Tivity Health, Inc.*, 2022 WL 17243323 (6th Cir. Nov. 21, 2022).

*Grae III*, 2021 WL 1100431, at *10.

Here, Dalrymple explained in his Rebuttal Report (and Plaintiff explained in its Reply) that the "risk of AAC's deceptive marketing claims will be factored into Plaintiff's damages model" (Order at 48) in the same way Dalrymple did in *Grae III*.[7] Specifically, in responding to criticisms in the Zurek Report, Dalrymple explained:

> Dr. Zurek claims that "the allegedly concealed risk associated with AAC relying on a deceptive marketing strategy is mismatched from the alleged corrective disclosure that this risk had materialized in 'declining sales calls and [AAC's] inability to use its deceptive marketing strategies'" and that I "do[] not demonstrate that AAC's stock price reaction to the alleged materialization of this risk can be used to measure inflation earlier, before this risk had materialized." Zurek Report, ¶68. Notwithstanding Dr. Zurek's failure to demonstrate the merits supporting his characterization of this purported "mismatch," this issue was present in the CCA matter. ***As I demonstrated in that case, standard economic and valuation techniques can be used to isolate the materialization of allegedly concealed risks from the materialization of known risks***.

Rebuttal Report, ¶70 n.102. Dalrymple also explained how he had done exactly the same analysis in *Grae*:

> In a recent matter in this Court involving shareholder claims against Corrections Corporation of America ("CCA"), the allegations at issue involved two distinct corrective disclosures that affected different facilities with different expected future cash flows. Additionally, ***the risk and growth expectations associated with these facilities' cash flows would have been different in the counterfactual world (in which the plaintiff alleged the company should have made certain disclosures about risk) than they were in the actual world (in which the company allegedly concealed risks)***. By applying standard economic and valuation techniques, including the income and market approaches, I separated the impact of the concealed information from confounding information (***the materialization of disclosed risks that also became known at the same time as the corrective information***) in order to estimate inflation in CCA's share price under the plaintiff's theory of liability. As I explained in my expert report in that matter, ***my inflation estimates allowed for the allegations associated with each corrective disclosure to be considered jointly or individually, depending on whether the trier-of-fact found that the risks associated with the different facilities had been concealed***.

[7] Rebuttal Report, ¶70 n.102; Reply at 17-18.

*Id.*, ¶70.[8] Plaintiff explained this in its Reply. Reply at 17-18.

For these reasons, neither *Ludlow v. BP, P.L.C.*, 800 F.3d 674 (5th Cir. 2015), nor *Mulderrig v. Amyris, Inc.*, 340 F.R.D. 575 (N.D. Cal. 2021), the two cases the Court cited in support of its conclusion that Plaintiff had not established damages could be calculated on a class-wide basis with respect to the Marketing Claim, justifies denying certification of the Marketing Claim. In fact, these decisions illustrate precisely why the Marketing Claim should be certified.

As Plaintiff set forth in its Reply, *Ludlow*'s discussion of pre-spill damages is inapposite because Plaintiff is not relying on a consequential damages theory, but rather, as the Court recognized, an "out-of-pocket damages model widely accepted in Section 10(b) cases." Order at 45; Reply at 10-11.[9]

---

8 *See also* Rebuttal Report, ¶76 ("Indeed, the Zurek Report provides an example of how scaling factors may be used in a case involving '[a] company knows that there is a 30% probability it will lose a major customer, yet conceals this risk (*i.e.*, the market believes there is a 0% probability).' While Dr. Zurek's example may be overly simplistic (for instance, in the CCA [*Grae*] matter, my isolation of allegedly concealed risks from risks that would have been known in the counterfactual was based on detailed economic and valuation analyses), it actually illustrates how the complexities about which he speculates could be addressed. At his deposition, Dr. Zurek conceded that his opinion is not that such issues would prevent the calculation of class-wide damages, only that I 'ha[ve] not described that is possible or that [I am] capable of doing it.'").

9 In a footnote, the Court noted that *Ludlow* "raised a second issue with plaintiff's materialization-of-the-risk theory [namely] that the plaintiff's materialization-of-the-risk theory is incompatible with its request for the *Basic* presumption." Order at 43 n.25. ***Critically***, it was not a materialization-of-the-risk theory ***in general*** that *Ludlow* suggested was incompatible with *Basic*. Rather, as the District Court order *Ludlow* affirmed makes clear, it was "***Plaintiffs' articulation of consequential damages***" that was "antithetical to the 'fraud-on-the-market' theory which enables the classwide resolution of their claims." *In re BP p.l.c. Sec. Litig.*, 2014 WL 2112823, at *12 (S.D. Tex. May 20, 2014), *aff'd sub nom. Ludlow v. BP, P.L.C.*, 800 F.3d 674 (5th Cir. 2015). In fact, the District Court noted plaintiffs "***expressly eschew*** that their recovery should be limited to the market price distortion." *Id.* at *11. Here, Plaintiff has ***never*** suggested it is seeking consequential damages. ¶¶138, 154-155; *Cosby v. KPMG, LLP*, 2020 WL 3548379, at *28 (E.D. Tenn. June 29, 2020), *report and recommendation adopted sub nom.* 2021 WL 1828114 (E.D. Tenn. May 7, 2021) (distinguishing *Ludlow* and holding that "[p]laintiffs are not seeking consequential damages. Instead, Plaintiffs rely on the out-of-pocket methodology as prescribed in the statute – that is, the artificial inflation per share at the time of purchase less the artificial inflation at the time of the sale.").

In fact, Dalrymple's discussion in his Rebuttal Report of how a damages model would account for Plaintiff's materialization-of-the-risk theory is entirely consistent with what Judge Ellison, following remand in *Ludlow*, described in *In re BP p.l.c. Sec. Litig.*, 2016 WL 3090779 (S.D. Tex. May 31, 2016). There, the court noted: "'[W]hen the corrective event is the materialization of an understated risk, the stock price movement on the date of correction (*i.e.*, on the date that the risk materialized) will not equate to inflation on the date of purchase unless the probability of the risk materializing was 100 percent.'" *Id.* at *33.[10] In other words, "to factor in the risk on which Plaintiff bases its materialization-of-the-risk" (Order at 48), assuming that the probability of the risk materializing was ***not*** 100%, a damages model should exclude damages associated with stock price declines that would have occurred even had the risks been fully disclosed.[11]

This is exactly what Dalrymple successfully did in *Grae*, and it is exactly what Plaintiff established could be done in this case. Rebuttal Report, ¶¶70, n.102, 76; Reply at 17-18.[12]

---

[10] In *BP*, the probability of the risk materializing was ***not*** 100% (plaintiffs only claimed it was "highly likely"), yet plaintiff's expert claimed as damages "100% of the stock price movement on the date of correction." *Id*. Having "warned Plaintiffs of this very problem in its class certification memorandum and order," the court found plaintiffs' measure of damages unreliable. *Id.*

[11] Judge Trauger makes an analogous point in *Grae*: "[E]ven when the public is fully apprised of the possibility of some calamitous event, the value of an affected company should still be expected to go down if the event actually occurs, because, at that point, the relevant harm went from being a possibility to a certainty." *Grae I*, 329 F.R.D. at 579.

[12] Specifically, in *Grae*, although Dalrymple calculated that the abnormal return associated with the public disclosure of the Yates Memo was $8.06 per share, he did ***not*** opine 100% of this abnormal return was recoverable damages. Expert Report of W. Scott Dalrymple, CFA, Aug. 7, 2020, *Grae v. Corr. Corp. of Am.*, No. 3:16CV02267 (M.D. Tenn. Jan. 22, 2021), ECF 401-31. Rather, Dalrymple dedicated over 12 pages of his expert report to explaining how he valued inflation assuming Plaintiff would prove ***not*** that CCA was ***certain*** to lose its BOP business but rather that CCA was ***likely*** to lose such business. *Id*. at Appendix D. As a result, of the $8.06 per share abnormal return associated with the public disclosure of the Yates Memo, Dalrymple excluded $1.44 per share from his per-share damages figure, which represented the decline associated with, as the *Grae* court put it,

*Mulderrig*, which, as the Order noted, was "not raised by either party," is also inapposite. Order at 46. There, the court found plaintiff's damages model inadequate because neither of plaintiff's expert reports "identifies the materialized risk that plaintiffs allege, much less explains how such risk would be factored into the damages model." *Mulderrig*, 340 F.R.D. at 590. In contrast, Dalrymple does both. First, Dalrymple identifies the materialized risk that plaintiffs allege:

> Between March 8, 2017 and April 15, 2019, Plaintiff alleges that Defendants engaged in a scheme to defraud and made misrepresentations in public statements, financial releases and conference calls regarding . . . ***risks associated with AAC's sales and marketing operations***.
>
> * * *
>
> I understand Plaintiff has identified certain dates on which information became available to market participants that corrected Defendants' alleged misrepresentations and omissions, or otherwise ***revealed the extent of the risks concealed by Defendants' alleged scheme***.

Opening Report, ¶¶17-18 (citing Complaint, ¶¶128-138, which alleges in part that "the circumstances concealed by defendants' prior misrepresentations and omissions began to come out," in part as a result of AAC's disappointing 3Q18 financial results caused by the Google algorithm update); *id.*, ¶¶19-20; Rebuttal Report , ¶74 n.109 (Dalrymple discussing his understanding of the materialized risk associated with the marketing claim: "the allegations (*inter alia*) are that investors learned that the company's ability to generate earnings was impaired, information and risks that Plaintiff allege was improperly concealed before the corrective disclosures").

Second, as set forth above, Dalrymple does explain how the alleged risk can be factored into the damages model.

In sum, Plaintiff respectfully submits that the Order misunderstood Dalrymple's Reports. Plaintiff respectfully submits that Dalrymple's proposed damages model is consistent with Plaintiff's

---

"the event," rather than the undisclosed "possibility of [the] calamitous event." *Id.*; *Grae I*, 329 F.R.D. at 579.

theory of liability and that Plaintiff has established there is a "'reliable means for measuring damages with reasonable accuracy in the aggregate.'" Order at 42.

### B. Harm and Injustice Would Result if Reconsideration Were Denied

Finally, Plaintiff respectfully submits that harm and injustice will result if the Court declines to reconsider the Order. *Ratcliffe*, 2019 WL 6242302 at *1 (citing *Said*, 390 F. Supp. 3d at 50). Simply put, without certification of the Marketing Claim, class members lack any realistic opportunity to recover damages associated with this claim.[13] Particularly with respect to reconsideration of class certification orders and "whether [the Court should] give its earlier decision a second look," the Court should consider that it is "the rights of [absent class members, not just the Plaintiff, that] are at stake." *Grae II*, 330 F.R.D. at 491-92 (reconsidering denial of class certification and certifying class).

As the Court noted in its Order, "'when in doubt as to whether to certify a class action, the district court should err in favor of allowing a class.'" Order at 10 (citing *Rankin v. Rots,* 220 F.R.D. 511, 517 (E.D. Mich. 2004) (citing *Eisenberg v. Gagnon*, 766 F.2d 770, 785 (3d Cir. 1985))). Any doubt about whether to reconsider the Order militates in favor of reconsideration, which will allow the Class to have its claims, as well as its damages model, adjudicated on their merits.

## IV. CONCLUSION

For the foregoing reasons, Plaintiff respectfully submits that the Court should reconsider the Order and amend the Class and Claims to include the Marketing Claim and Scheme Claim predicated on Defendants' marketing practices. Plaintiff further requests that the Court vacate the

---

[13] This is because, as explained in Plaintiff's Memorandum of Law in Support of Its Motion for Class Certification, "[m]ost Class members' interests in individually prosecuting separate actions is minimal as the trouble and expense of doing so would be prohibitive when weighed against the potential recoveries." ECF 77 at 18.

deadlines concerning notice to the Class set forth in the Court's March 2, 2023 Order (ECF 140) until such time as this Motion is resolved.

DATED: March 10, 2023

Respectfully submitted,

ROBBINS GELLER RUDMAN
& DOWD LLP
CHRISTOPHER M. WOOD, #032977
CHRISTOPHER H. LYONS, #034853
HENRY S. BATOR, #040431

s/ Christopher M. Wood
CHRISTOPHER M. WOOD

414 Union Street, Suite 900
Nashville, TN 37219
Telephone: 615/244-2203
615/252-3798 (fax)
cwood@rgrdlaw.com
clyons@rgrdlaw.com
hbator@rgrdlaw.com

ROBBINS GELLER RUDMAN
& DOWD LLP
DARREN J. ROBBINS
CHRISTOPHER D. STEWART
FRANCISCO J. MEJIA
JACK ABBEY GEPHART
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
darrenr@rgrdlaw.com
cstewart@rgrdlaw.com
fmejia@rgrdlaw.com
jgephart@rgrdlaw.com

Lead Counsel for Indiana Public Retirement System

BARRETT JOHNSTON MARTIN
& GARRISON, LLC
JERRY E. MARTIN, #20193
Bank of America Plaza
414 Union Street, Suite 900
Nashville, TN 37219
Telephone: 615/244-2202
615/252-3798 (fax)
jmartin@barrettjohnston.com

Local Counsel

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on March 10, 2023, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the email addresses on the attached Electronic Mail Notice List.

s/ Christopher M. Wood
CHRISTOPHER M. WOOD

ROBBINS GELLER RUDMAN
& DOWD LLP
414 Union Street, Suite 900
Nashville, TN 37219
Telephone: 615/244-2203
615/252-3798 (fax)

Email: cwood@rgrdlaw.com

# Mailing Information for a Case 3:19-cv-00407 Caudle v. AAC Holdings, Inc. et al

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Henry Scattergood Bator**
  hbator@rgrdlaw.com
- **Lohr Alexandria Beck**
  lohr.beck@kslaw.com
- **Paul Kent Bramlett**
  pknashlaw@aol.com
- **Robert P. Bramlett**
  robert@bramlettlawoffices.com
- **Lisa R. Bugni**
  lbugni@kslaw.com
- **Jessica Perry Corley**
  jpcorley@kslaw.com
- **Patrick V. Dahlstrom**
  pdahlstrom@pomlaw.com
- **Jack A. Gephart**
  jgephart@rgrdlaw.com
- **Logan R. Hobson**
  lhobson@kslaw.com
- **J. Alexander Hood , II**
  ahood@pomlaw.com
- **Brandon R. Keel**
  bkeel@kslaw.com
- **Jeremy A. Lieberman**
  jalieberman@pomlaw.com,disaacson@pomlaw.com,lpvega@pomlaw.com
- **Jonathan Lindenfeld**
  jlindenfeld@pomlaw.com
- **Christopher Hamp Lyons**
  clyons@rgrdlaw.com,e_file_sd@rgrdlaw.com,clyons@ecf.courtdrive.com
- **Jerry E. Martin**
  jmartin@barrettjohnston.com,jkarsten@barrettjohnston.com,elusnak@barrettjohnston.com,jmartin@rgrdlaw.com
- **Francisco J. Mejia**
  fmejia@rgrdlaw.com
- **W. Travis Parham**
  travis.parham@hklaw.com,shelli.dimarco@hklaw.com,pat.grace@hklaw.com
- **Ronni D. Solomon**
  rsolomon@kslaw.com
- **Christopher Stewart**
  cstewart@rgrdlaw.com
- **Christopher M. Wood**
  cwood@rgrdlaw.com,agonzales@ecf.courtdrive.com,CWood@ecf.courtdrive.com,agonzales@rgrdlaw.coom,e_file_sd@rgrdlaw.com,CReis@ecf.courtdrive.com,creis(

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)