# Exhibit A

# EXHIBIT 5

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

IN RE AMYRIS, INC. SECURITIES
LITIGATION

Case No. 4:19-cv-01765-YGR

## REBUTTAL REPORT OF CYNTHIA L. JONES, CFA

# Table of Contents

I.     Introduction ................................................................................................................ 1

II.    Summary of Assertions in Defendants' Opposition ............................................... 1

III.   Defendants Cannot Show Lack of Price Impact .................................................... 2

IV.    Defendants Make Premature Demands on the Proposed Damages Methodology ............... 3

     A.    Confounding Information Does Not Preclude A Common Formula for Ascribing Damages on a Class-Wide Basis ............................................................. 5

     B.    The Proposed Damages Model Supports Plaintiffs' Theory of the "Materialization of Undisclosed Risks" ...................................................... 11

V.     Conclusion ............................................................................................................... 13

I, Cynthia L. Jones, do hereby declare and state as follows:

## I.    <u>Introduction</u>

1.    I am a Senior Manager with DLA, LLC ("DLA") in its Forensics, Valuation and Litigation Services Group.  I previously submitted a Declaration and Expert Report dated July 29, 2021 in support of Plaintiffs' Motion for Class Certification ("Jones Report").  The Jones Report set forth my opinions that:  a) Amyris common stock traded in an efficient market during the period March 15, 2018 through March 19, 2019 (the "Class Period"); and b) that a common damage methodology could be applied to compensate purchasers of Amyris common stock on a class-wide basis, assuming Defendants are found liable for alleged violations of the Securities Exchange Act of 1934 ("Exchange Act").  My analyses and conclusions were examined during my deposition in this matter which took place on September 14, 2021.

2.    I have reviewed Defendants' Opposition to Plaintiffs' Motion for Class Certification ("Opposition") and have been asked by Plaintiffs' counsel to respond to Defendants' claims regarding the price impact of alleged misleading information, and challenges to my opinion regarding a common damage methodology.  Defendants do not challenge my opinion regarding market efficiency.

## II.    <u>Summary of Assertions in Defendants' Opposition</u>

3.    Defendants claim that despite the clear showing that Amyris common stock traded in an efficient market during the Class Period, the presumption of reliance is rebutted based on Mr. Jansen's purported "unrelated concerns."[1]  However, Defendants do not even try to demonstrate a lack of *price* impact, which is necessary for them to rebut the presumption of reliance as it applies to the Class.

---

[1] Opposition, p.19.

1

4.      Defendants also claim that Plaintiffs have failed to propose a method for measuring class-wide damages consistent with their theory of liability.  Further, they specify that the "proposed model does not attempt to identify or account for non-fraud factors" that may have impacted the price of the stock.[2]  I strongly disagree that there is any impediment in the present case that would prevent damages from being calculated using the well accepted "out-of-pocket" measure, compensating harmed investors on a class-wide basis using a common formula.

### III.      Defendants Cannot Show Lack of Price Impact

5.      As set forth in the Jones Report, Amyris common stock traded in an efficient market during the Class Period.  Defendants do not dispute this.  Thus, there is a presumption that the Class relied on the alleged misrepresentations because the alleged misrepresentations were reflected in the market prices, causing the prices to be artificially inflated when the investors purchased stock during the Class Period.[3]

6.      However, even when it is demonstrated that the stock traded in an efficient market, it is my understanding that Defendants can rebut the presumption of reliance that applies to the Class if they can prove that the "alleged misrepresentation did not actually affect the market price of the stock."[4]  Here though, Defendants do not even attempt to argue that the alleged misrepresentations had no impact on the price of Amyris stock.

7.      Instead, Defendants use Mr. Jansen's social media posts to argue that he did not rely on the integrity of the stock price but instead based his purchases on "unrelated concerns," which they do not specify.[5]  Based on this, Defendants argue that they have rebutted the presumption of

---

[2] Opposition, pps. 20-22.
[3] Basic Inc. v. Levinson, 485 U.S. 224, 249 (1988).
[4] Halliburton Co. v. Erica P. John Fund, Inc., 134 S. Ct. 2398 (2014).
[5] Opposition, pps.19-20.

2

reliance as to "the entire Class."[6]  I disagree.  Any individual investor's rationale for purchasing or selling stock does not disrupt the presumption that Amyris's stock traded in an efficient market and the price reflect all available information.  Therefore, individual motivations cannot rebut the presumption of reliance *as to the entire Class*.  To rebut the presumption of reliance as to the Class, it is my understanding that Defendants would need to demonstrate a lack of *price impact*, which they do not even attempt to do.

## IV.   Defendants Make Premature Demands on the Proposed Damages Methodology

8.      Defendants are unable to demonstrate a lack of price impact following either of the two alleged partial disclosure dates – November 13, 2018 or March 19, 2019[7] – so instead they assert that the proposed damage methodology set forth in the Jones Report has not demonstrated that damages can be calculated on a class-wide basis using a methodology that is consistent with the alleged fraud.  I disagree.

9.      As I set out in my report, class-wide damages for this case can be calculated using a broadly accepted methodology, known as an "out-of-pocket" loss calculation, based on the amount of artificial inflation in the price of the stock, which resulted directly from the dissemination of allegedly false and misleading information during the Class Period.[8]  The standard "out-of-pocket" formula for compensating harmed investors is to calculate the difference between the actual price paid for a security and the price the investor would have paid in the absence of the alleged misrepresentations.  That difference is known as the inflation per share in the price of the stock.  However, purchasing at an inflated price does not necessarily give rise to recoverable damages,

---

[6] Opposition, p.20.

[7] Each of the alleged corrective disclosures came after the close of trading and impacted the price of Amyris's stock on the following day.

[8] Jones Report at ¶¶ 83-85.

3

because the investor must hold the stock through the date of a corrective disclosure or event, when the inflation has dissipated, resulting in damages.  As I set out in the Jones Report, the level of inflation in the price of Amyris common stock can be calculated using the results of an Event Study, along with company-specific information that is relevant to the allegations in the instant case.  The amount of artificial inflation in the price of the stock can be determined on a daily basis, using the historical pricing data.  Once the amount of artificial inflation is determined, it can be applied to class members' actual purchase and sale activity, and individual losses can be calculated using a single common formula (an inflation matrix), consistent with Plaintiff's theory of liability.  This represents a common damages methodology that can be applied on a class-wide basis.

10.     Ignoring that the damages methodology I propose is well established, generally accepted, and successfully utilized in essentially every securities class action, Defendants claim that this methodology is insufficient.

11.     Defendants' criticisms entirely relate to problems they speculate could occur when deriving the precise calculation of damages for the class.  However, it is my understanding that the precise calculation of damages will be determined at the merits stage, through the experts' loss causation reports and testimony. Because this is the class certification stage, I have only been asked to propose a damages methodology that can be applied to this case on a class-wide basis and have not been engaged to present the ultimate damages calculation.  Thus, Defendants' challenges to the methodology I have proposed are premature.  Nevertheless, as I set forth below, the issues raised by Defendants can be accounted for using the approach I propose.

12.     Importantly, Defendants do not dispute that once the precise amount of inflation is calculated, damages can be applied on a class-wide basis.  Instead, they assert that there are issues that *hypothetically could* preclude a calculation for determining the amount by which Amyris stock price was allegedly inflated, specifically:

4

a.  The possibility that confounding information contributed to Amyris's price decline following corrective disclosures[9]; and

b.  The concept that the quantum of inflation may be greater or less depending on the economic significance of the alleged fraud over the course of the Class Period.[10]

13.  I will address both of those issues and demonstrate that case-specific facts and circumstances, as they relate to the alleged fraud, are easily dealt with through the generally accepted valuation methodology I have proposed.  In truth, the issues raised by Defendants are issues that are present in virtually every 10b-5 damages analysis.

**A.   Confounding Information Does Not Preclude A Common Formula for Ascribing Damages on a Class-Wide Basis**

14.  Defendants claim that the proposed damages methodology is inadequate because it does not account for *potential* non-fraud related (confounding) information that *may have* contributed to the price decline.  These arguments are baseless.

15.  As I clearly testified, the damages model *would* necessarily account for potential non-fraud related price impact.

> Q:  Is it your opinion that the amount of artificial inflation during the class period can be measured based solely on the residual decreases in the stock price when corrective information, if any, entered the market on November 13, 2018 and March 19, 2019?
>
> A:  That is the basis, that is the first step, for calculating artificial inflation, with the caveat that those amounts ***may require adjustment depending on, for example, the – whether or not there was additional confounding information that may have entered the market, impacting the price on those corrective disclosure dates***, and what a trier of fact might find was the level of liability at that point – at certain points in time during the class period. So that is the basis. But that is not the ultimate, necessarily.[11] [emphasis added]

---

[9] Opposition, pps.20-22.
[10] Id., pps.22-25.
[11] Jones deposition transcript at 101:18 – 102:12.

5

> In some cases, non-fraud related information enters the market on the same day as corrective disclosures, contributing to the price decline. This is referred to as "confounding information." Event studies, in combination with fundamental valuation methods, may be applied to isolate only the fraud-related price impact, and to quantify the appropriate amount of inflation .

16.     Furthermore, the Jones Report describes how the damages model would accommodate potential non-fraud related information which may have contributed to the price decline.[12]     Specifically, the Jones Report explains that event studies, in combination with fundamental valuation analyses, are applied "to isolate only the fraud-related price impact, and to quantify the appropriate amount of inflation."[13]  Such fundamental valuation analyses include, for example, a sum-of-the-parts analysis which determines the contribution of different factors to changes in earnings and earnings estimates.

17.     In my opinion, based on my experience as well as my analysis of the alleged misstatements, the corrective disclosures, and the price declines, there is nothing unusual about this case that would prevent an expert from using the proposed methodology to factor potentially confounding information into a damages model aligning it entirely with Plaintiffs' theory of liability. In truth, the potential for confounding information is quite common in securities litigation.  In my experience, it is something that occurs frequently when deriving damages models pursuant to 10b-5 allegations, and it is easily dealt with using the standard valuation techniques applicable to my proposed methodology.

18.     Defendants seem to insist that I should have performed a definitive damages analysis and calculation.  It is my understanding that at this stage of the litigation a specific damages model - one that identifies and quantifies every potentially confounding factor - is *not* required. In my opinion it would be imprudent and not beneficial to the Class or the court to do so, as discovery is

---

[12] Jones Report at ¶89.
[13] Id.

6

ongoing, and the damage model would not be fully informed. Determining what portion of the price decline, if any, that is due to confounding information would require a detailed loss causation analysis which depends on information learned through discovery.   However, this does not undermine that *damages can be applied on a class-wide basis using a common methodology*.

19.     And here, Defendants' insistence that corrective disclosures contained confounding information is questionable and premature.  They have not proffered any expert analysis showing that there were specific confounding factors which caused a measurable portion of the price declines on November 14, 2018 or March 20, 2019, nor have they shown support through economic evidence.

<u>The November 13, 2018 Alleged Corrective Disclosure</u>

20.     As set forth in the in the Jones Report,[14] following Amyris's release of Q3 2018 earnings, which were well below Company guidance and analysts' expectations, Amyris's shares declined by 29.8%, from a closing price of $5.90 per share on November 13 to $4.14 per share on November 14, 2018 on volume of more than 6.6 million shares.   In contrast, the NASDAQ Biotechnology Index declined by less than 2% that day.



---

[14] Id. ¶s 78-80.

7

21.     The market was particularly surprised by the sharp miss because in its earnings teleconference with investors following the release of Q2 2018 results, just three months earlier, management assured the investment community that the Company was on track to produce annual revenue of $185 million to $195 million for fiscal year 2018.[15]  Through the first nine months of the year, the Company reported revenue of just $62.7 million.  During the earnings teleconference on November 13, the Company lowered its revenue guidance to $170 million for the year.  Amyris attributed the shortfall in Q3 2018 revenue to $15 million in Vitamin E royalties that did not materialize.

22.     Defendants do not challenge that the stock price decline was significant, but rather claim that unforeseen volatility in Vitamin E prices contributed to the decline.[16]   Defendants' assertion on this point is speculative and appears to conflict with Defendants' own statements to the market.

23.     Although I have not yet been asked to provide an estimate of the per share damages, I believe it is worth addressing Defendants' claim that the announcement of volatility in the Vitamin E market contributed to the decline in the price of Amyris stock on November 14, 2018.  As I explained in the Jones Report, one would expect stock prices to respond to new or unexpected, relevant information as it enters the market.[17]  Yet, the presence of volatility in the market for Vitamin E during the Class Period was already known to Amyris and to the market prior to November 13, 2018.

24.     During the teleconference with the investment community held by Amyris on August 6, 2018, Mr. Melo discussed the volatility in Vitamin E prices and specifically described the Vitamin

---

[15] Earnings Call Transcript, August 6, 2018, 22:36.
[16] Opposition, p.22.
[17] Jones Report at ¶84.

8

E market as "*a very volatile market*" while reassuring that "we have been very effective at predicting the [Vitamin E] market prices to date."[18]  Despite the known volatility in the Vitamin E market, Mr. Melo said he "felt very confident" about the second half of the year, he made no adjustment to revenue guidance of $185-195 million, and he continued to project $10-$15 million in royalty revenues.[19]

25.    Defendants' unsupported suggestion that repetitive information about Vitamin E contributed to the price decline on November 14, 2018 is contrary to the very foundation of price impact analysis.  However, even if Defendants' assertion turns out to be valid, the proposed methodology specifically allows for adjustments, as necessary, to address confounding information.

The March 19, 2019 Alleged Corrective Disclosure

26.    Defendants further argue that the March 19, 2019 corrective disclosure did not mention anything about royalty revenues, "suggesting that any number of other factors," may have caused the stock price decline that followed.[20]  They do not, however, point to any particular information that *might have* impacted the stock price, nor do they argue a lack of price impact.

27.    As I testified in my deposition, the price decline that followed Amyris's March 19, 2019 disclosure that it would be late in filing its Form 10-K for the fiscal year ended December 31, 2018, contained specific information directly related to Plaintiffs' allegations, including:

a) The fact that the Company had *not* remediated its material weakness in financial controls despite repeated assurances that the Company was taking actions to do so; and

b) That the Company warned it may have *further deficiencies* to report, thereby putting the market on notice of potential restatements of revenue and net income.[21]

---

[18] Amyris Q2 2018 earnings teleconference.
[19] Id.
[20] Opposition, p.22.
[21] Amyris SEC Form NT 10-K, March 19, 2019.

9

28.     Contributing to the price decline that day was the timing of the late filing notice, as it came on the heels of a disappointing Q4 and full year 2018 earnings announcement.  Further, the Company had $90 million in convertible debt maturing in Q2 2019 which -- despite Defendants' assurances during the Class Period -- the market had expressed concerns about, and the absence of audited financial statements could be an impediment to refinancing.

29.     As of 10:00 am on March 20, 2019, Amyris's share price was already declining, as reported by Dow Jones Newswire.[22]  By the end of the trading day on March 20, 2019, AMRS shares had declined by 20.1%, on trading volume of 6.5 million shares.  In contrast, the NASDAQ Biotechnology Index declined by less than 1% that day.



30.     Here again, Defendants do not challenge that the stock price decline was significant, and their claim of potential cofounding information appears to be a red herring.  Nevertheless, if the evidence demonstrates that confounding information contributed to the price decline, the damages methodology I have proposed can account for it on a class-wide basis.

---

[22] Jones Report at ¶82.

10

**B.** **The Proposed Damages Model Supports Plaintiffs' Theory of the "Materialization of Undisclosed Risks"**

31.     Defendants argue that the proposed damages methodology cannot support Plaintiffs' theories, including their materialization of the risk theory.[23]   They either fundamentally misunderstand my proposed methodology or mischaracterize it.

32.     Defendants assert that I have proffered a damages model that would include the "*entire* drop in Amyris's stock price" following the November 13, 2018 alleged corrective disclosures as the measure of inflation per share.[24]   This is simply not true.  Defendants ignore important portions of my report and my testimony.  My report specifically explains that the proposed method would use historical stock price data and the well accepted Event Study methodology to "isolate that portion of the price impact that can be attributed to the fraudulent information."[25]  My report then explains how this method is used to create an inflation ribbon that can be adjusted during the Class Period to reflect, among other things, how "the amount of artificial inflation may increase or decrease depending upon the economic significance of the fraudulent information throughout the Class Period."[26] Similarly, when I was asked at my deposition whether it was my opinion that damages would be calculated solely based on the stock price decline when corrective information entered the market, I responded that the residual price decline was only the "first step" in measuring damages, and that other factors including:  a) potentially confounding information that may have contributed to the price decline, and b) the level of liability at different points in time during the Class Period, would also be factored into the damages model.[27]

---

[23] Opposition, pps.22-25.
[24] Id. p. 22.
[25] Jones Report, ¶88.
[26] Id.
[27] Jones deposition transcript 101:25-102:12.

11

33.     It is therefore clear from both my report and my deposition testimony, that Defendants are wrong to assert that the proposed methodology "purports to allocate as 'artificial inflation' the full stock price decline after the November 13, 2018 disclosure, subject only to unnamed 'confounding information.'"[28]   Defendants' entire argument on this point is simply incorrect.

34.     At this stage, while counsel is still conducting merits discovery, an expert cannot reliably establish the precise dollar amounts by which the alleged false or misleading statements inflated the value of the stock.  Nor is an expert required to do so.[29]  But it is not the specific dollar amount of inflation this is important for class certification.  What matters is that the damages model can accommodate case-specific evidence that may necessitate adjustments to the inflation per share during the Class Period.  At this class certification stage, it is simply too early (1) to assert that the evidence will show something different from what Plaintiffs allege, or (2) to attempt to specify how these details would impact Plaintiffs' proposed damages methodology without actually knowing what the evidence will show.

35.     Regardless, Defendants' speculation -- and it is speculation since merits discovery is ongoing -- misses the point because the issue of non-constant inflation throughout the Class Period is quite common in securities litigation and is one that can be accommodated through the methodology I propose.  For example, once the merits of the case have been fully vetted, *if* it is shown that the economic significance of the undisclosed risks was less at the beginning of the Class Period than at the time of the corrective disclosure, the inflation per share for all Class members would necessarily be less at the beginning of the Class Period.  Calculating individual damages from

---

[28] Opposition, p.24.
[29] See, *e.g.*: In re Scotts EZ Seed Litig., 304 F.R.D. 397, 414 (S.D.N.Y. 2015): "nothing in Comcast requires an expert to perform his analyses at the class certification stage."

12

this would then just be a matter of mechanically applying these daily levels of inflation to the actual trading activity of each Class member.  This method utilizes scientific principles and generally-accepted valuation techniques, and this method is used in virtually every securities class action.

36.     The proposed damages methodology would in no way result in individualized damages for Class members. To assist the court in understanding how the methodology I propose applies on a class-wide basis, I have attached as Exhibit No. 1 at p. 12-14, a plan of allocation that was used in the Biovail securities class action to calculate damages for all class members.  As you can see, the inflation per share was not constant throughout the class period, yet damages were successfully allocated to investors on a class-wide basis.[30]

37.     Because fact discovery is ongoing, a comprehensive loss causation analysis cannot be performed with specificity at this time.  However, determining the inflation per share can be achieved through a common and well accepted methodology, consistent with Plaintiffs' theory, and applied on a class-wide basis.

### V.     Conclusion

38.     The event studies that I performed and detailed in the Jones Report clearly show that Amyris's stock traded in an efficient market during the Class Period.  This is not in dispute. Defendants cannot rebut the resulting presumption of reliance as it applies to the Class upon their characterization of one individual's trading motivations.

39.     The event studies that I performed and detailed in the Jones Report also clearly show that Amyris's stock price declined by a significant amount following each of the alleged corrective disclosure dates.  This too is not in dispute.  Defendants suggest that there may be confounding information impacting the price on November 14, 2018 and March 20, 2019.  They do not, however,

---

[30] Biovail Sec. Lit., 03-CV-8917 (GEL)(SDNY).

13

put forth any evidence, statistical or otherwise, to demonstrate that Vitamin E price volatility, or factors unrelated to the SEC late filing notice, caused a portion of the price decline. However, should a timely review of the evidence reveal that to be the case, the damages methodology as proposed will account for the impact of confounding information. Defendants' insistence on a damage model now, that can only be specified following a full examination of the evidence, is premature and speculative. Finally, there is nothing unusual about the allegations here, nor Amyris's stock price behavior, that gives me any pause in opining that "out-of-pocket" damages can be calculated on a class-wide basis, consistent with Plaintiffs' theory of liability.

Respectfully submitted,

Cynthia L. Jones, CFA
October 27, 2021

14

EXHIBIT NO. 1

## NOTICE OF PENDENCY OF CLASS ACTION AND PROPOSED SETTLEMENT, MOTION FOR ATTORNEYS' FEES AND SETTLEMENT FAIRNESS HEARING

This Notice relates to the following actions:

- *In re Biovail Corporation Securities Litigation*, Master File No. 03-CV-8917 (GEL) in the United States District Court for the Southern District of New York ("U.S. Action").

- *Canadian Commercial Workers Industry Pension Plan against Biovail Corporation, Eugene N. Melnyk, Brian H. Crombie, John R. Miszuk and Kenneth G. Howling*, Court File No. 48172 CP in the Ontario Superior Court of Justice ("Canadian Action").

**If you purchased Biovail Corporation ("Biovail") common stock on the New York Stock Exchange or other U.S. stock exchanges or the Toronto Stock Exchange or other Canadian stock exchanges during the period from February 7, 2003, through and including March 2, 2004, then you may be entitled to a payment from a proposed class action settlement.**

*This Notice is being sent to you pursuant to court orders.  This is not a solicitation from a lawyer.[1]*

## THE U.S. ACTION

- The Settlement of the U.S. Action will provide a $138 million cash settlement fund for the benefit of the Class described herein (*see* response to question 5 below defining the "Class" and "Class Members") who bought shares of Biovail Corporation common stock during the period from February 7, 2003, through and including March 2, 2004 on stock exchanges in the United States or Canada.  All dollar amounts referenced herein are in U.S. dollars.

- In addition, Biovail will adopt the corporate governance provisions posted on the Internet at www.BiovailSecuritiesLitigationSettlement.com.

- The Settlement resolves a lawsuit over whether Biovail and the other Defendants in this action misled investors about a new drug that Biovail launched during the Class Period, Cardizem LA, as well as about Biovail's financial condition during the Class Period.

- Your legal rights are affected whether you act or do not act.  Read this Notice carefully.

| YOUR LEGAL RIGHTS AND OPTIONS IN THIS SETTLEMENT: | |
|---|---|
| **SUBMIT A CLAIM FORM BY SEPTEMBER 8, 2008** | The only way to get a payment from the Settlement. |
| **EXCLUDE YOURSELF (Opt-out of the Class) BY JULY 8, 2008** | Get no payment.  This is the only option that allows you ever to be part of any other lawsuit against Biovail and the other Released Parties about the Settled Claims as those terms are defined in the response to question 12 below. |
| **OBJECT BY JULY 8, 2008** | Write to the Court about why you do not like the Settlement, the Plan of Allocation, or the application for attorneys' fees and reimbursement of expenses.  *See* responses to questions 18 and 19 below. |
| **GO TO A HEARING ON AUGUST 8, 2008** | Ask to speak in Court about the Settlement, the Plan of Allocation, or the application for attorneys' fees and reimbursement of expenses.  *See* responses to questions 20-22 below. |
| **DO NOTHING** | Get no payment.  Give up rights. |

- These rights and options - and the deadlines to exercise them - are explained in this Notice.

- The Court in charge of this Action still has to decide whether to approve the Settlement, the proposed Plan of Allocation and the application for attorneys' fees and expenses.  Payments will be made if the Court approves the Settlement and after appeals, if any, are resolved.  Please be patient.

---

[1]  Si vous avez acheté des actions ordinaires de Biovail Corporation ("Biovail") sur la bourse des valeurs de New York (NYSE) ou d'autres bourses des valeurs aux Etats-Unis, ou sur la bourse de Toronto (TSX) ou d'autres bourses des valeurs canadiennes pendant la période commençant le 7 février 2003 et terminant le 2 mars 2004 (inclusivement), vous pourriez avoir droit á un paiement d'un règlement proposé d'un recours collectif.

*Vous recevez cet avis suite à l'ordre de la cour.  Cet avis n'est pas une sollicitation d'un avocat.*

Si vous souhaitez obtenir une version française de cet avis ou du Formulaire de Réclamation, vous pourriez télécharger les documents de www.BiovailSecuritiesLitigationSettlement.com, ou vous pourriez appeler le 1-877-465-5582 pour demander qu'ils vous soient expédiés.

Page 1

## SUMMARY NOTICE

Statement of Plaintiff Recovery

Pursuant to the Settlement described herein, a Settlement Amount consisting of **$138 million in cash** has been deposited in an interest bearing Escrow Account for the benefit of the Class.  Lead Plaintiffs estimate that there were approximately 217.6 million shares of Biovail common stock traded on the relevant stock exchanges during the Class Period which may have been damaged.  Lead Plaintiffs estimate that the average recovery per damaged share of Biovail common stock purchased during the Class Period under the Settlement is $0.63 per damaged share[2] before deduction of Court-awarded attorneys' fees and expenses and the costs of administration.  A Class Member's actual recovery will be determined in accordance with the Plan of Allocation set forth on pages 12-14 below, if the Court approves the plan.  The Court may modify the proposed Plan of Allocation or adopt a different plan, without further notice to the Class.

Statement of Potential Outcome of Case

The parties disagree on both liability and damages and do not agree on the average amount of damages per share that would be recoverable if plaintiffs were to have prevailed on each claim alleged.  The issues on which the parties disagree include (a) the appropriate economic model for determining the amount by which Biovail's common stock was allegedly artificially inflated (if at all) during the Class Period; (b) the amount by which Biovail's common stock was allegedly artificially inflated (if at all) during the Class Period; (c) the effect of various market forces influencing the trading price of Biovail's common stock at various times during the Class Period; (d) the extent to which external factors, such as general market and industry conditions, influenced the trading price of Biovail's common stock at various times during the Class Period; (e) the extent to which the various matters that Plaintiffs alleged were materially false or misleading influenced (if at all) the trading price of Biovail's common stock at various times during the Class Period; (f) the extent to which the various allegedly adverse material facts that Plaintiffs alleged were omitted influenced (if at all) the trading price of Biovail's common stock at various times during the Class Period; and (g) whether the statements made or facts allegedly omitted were material or otherwise actionable under the federal securities laws.  The Defendants deny that they are liable to the Lead Plaintiffs or the other members of the Class and deny that Plaintiffs or the other members of the Class have suffered any damages.

Statement of Attorneys' Fees and Costs Sought

Plaintiffs' Co-Lead Counsel are moving the Court to award attorneys' fees not to exceed 16.1% of the Gross Settlement Fund, and for reimbursement of expenses incurred in connection with the prosecution of this Action in an amount not to exceed $3.5 million, plus interest on such expenses at the same rate as earned by the Gross Settlement Fund.  The requested fees and expenses would amount to an average of approximately $0.12 per damaged share in total for fees and expenses.  Application will also be made for reimbursement to the Lead Plaintiffs and the other proposed Class representative for an amount not to exceed $65,000 for reimbursement of their reasonable costs and expenses (including lost wages) directly relating to their representation of the Class. Plaintiffs' Counsel have expended considerable time and effort in the prosecution of this litigation on a contingent fee basis, and have advanced the expenses of the litigation, in the expectation that if they were successful in obtaining a recovery for the Class they would be paid from such recovery.  In this type of litigation, it is customary for counsel to be awarded a percentage of the common fund recovery as their attorneys' fees.

Further Information

Further information regarding the U.S. Action and this Notice may be obtained by contacting Plaintiffs' Co-Lead Counsel:  Steven B. Singer, Esq., Bernstein Litowitz Berger & Grossmann LLP, 1285 Avenue of the Americas, New York, NY 10019, Telephone (212) 554-1400, or Sanford P. Dumain, Esq., Milberg LLP, One Penn Plaza, New York, NY 10119-0165, Telephone (212) 594-5300.

Reasons for the Settlement

For the Plaintiffs, the principal reason for the Settlement is the benefit to be provided to the Class now.  This benefit must be considered in light of all the risks that Plaintiffs would face to succeed in proving liability and a larger amount of damages at a trial.  Even if Plaintiffs were successful at trial, there would be further risks on appeal.  The $138 million in cash recovered now must be compared to the risks that no recovery, and importantly no *larger* recovery, might be achieved after a contested trial and likely appeals, possibly years into the future.

For the Defendants, who deny all allegations of wrongdoing or liability whatsoever, the principal reason for the Settlement is to eliminate the expense, risks, and uncertain outcome of the litigation.

**[END OF COVER PAGE]**

---

[2] An allegedly damaged share might have been traded more than once during the Class Period, and the indicated average recovery would be the total for all purchasers of that share.

Page 2

## WHAT THIS NOTICE CONTAINS
### Table of Contents

**Page**

THE U.S. ACTION ........................................................................................................................... 1
SUMMARY NOTICE ....................................................................................................................... 2
    Statement of Plaintiff Recovery ................................................................................................ 2
    Statement of Potential Outcome of Case ................................................................................. 2
    Statement of Attorneys' Fees and Costs Sought ..................................................................... 2
    Further Information .................................................................................................................... 2
    Reasons for the Settlement ...................................................................................................... 2
BASIC INFORMATION .................................................................................................................... 4
    1.  Why did I get this notice package? ................................................................................. 4
    2.  What is this lawsuit about? .............................................................................................. 4
    3.  Why is this a class action? .............................................................................................. 4
    4.  Why is there a settlement? ............................................................................................. 5
WHO IS IN THE SETTLEMENT ...................................................................................................... 6
    5.  How do I know if I am part of the Settlement? ................................................................ 6
    6.  Are there exceptions to being included? ......................................................................... 6
    7.  What if I am still not sure if I am included? ...................................................................... 6
THE SETTLEMENT BENEFITS — WHAT YOU GET ..................................................................... 6
    8.  What does the Settlement provide? ................................................................................ 6
    9.  How much will my payment be? ....................................................................................... 6
HOW YOU GET A PAYMENT — SUBMITTING A PROOF OF CLAIM FORM ............................... 7
    10.  How can I get a payment? ............................................................................................... 7
    11.  When would I get my payment? ....................................................................................... 7
    12.  What am I giving up to get a payment or stay in the Class? ........................................... 7
EXCLUDING YOURSELF ("OPTING OUT") FROM THE SETTLEMENT ........................................ 8
    13.  How do I get out of the proposed Settlement? ............................................................... 8
    14.  If I do not exclude myself, can I sue the Defendants and the other
        Released Parties for the same thing later? ..................................................................... 8
    15.  If I exclude myself, can I get money from the proposed Settlement? ............................. 8
THE LAWYERS REPRESENTING YOU .......................................................................................... 9
    16.  Do I have a lawyer in this case? ..................................................................................... 9
    17.  How will the lawyers and Class Representatives be paid? ............................................. 9
OBJECTING TO THE SETTLEMENT, PLAN OF ALLOCATION AND APPLICATION FOR ATTORNEYS' FEES
AND REIMBURSEMENT OF LITIGATION EXPENSES ................................................................... 9
    18.  How do I tell the Court that I do not like the Settlement, the proposed Plan of Allocation,
        and/or the application
        for attorneys' fees and reimbursement of litigation expenses? ...................................... 9
    19.  What is the difference between objecting and excluding? ............................................ 10
THE COURT'S SETTLEMENT FAIRNESS HEARING ................................................................... 10
    20.  When and where will the Court decide whether to approve the proposed Settlement? ... 10
    21.  Do I have to come to the Settlement Fairness Hearing? ............................................... 11
    22.  May I speak at the Settlement Fairness Hearing? ........................................................ 11
IF YOU DO NOTHING .................................................................................................................... 11
    23.  What happens if I do nothing at all? .............................................................................. 11
GETTING MORE INFORMATION .................................................................................................. 11
    24.  Are there more details about the proposed Settlement? .............................................. 11
    25.  How do I get more information? ..................................................................................... 11
PLAN OF ALLOCATION OF NET SETTLEMENT FUND AMONG CLASS MEMBERS ................. 12
THE CANADIAN ACTION .............................................................................................................. 14
SPECIAL NOTICE TO SECURITIES BROKERS AND OTHER NOMINEES ................................ 15

## BASIC INFORMATION

### 1. Why did I get this notice package?

You or someone in your family may have purchased Biovail common stock during the period from February 7, 2003, through and including March 2, 2004. Such purchasers may be members of the Class (as defined below) in this Action and are generally referred to herein as "Class Members" and are collectively referred to as the "Class."

The Court directed that this Notice be sent to Class Members because they have a right to know about a proposed settlement of a class action lawsuit, and about all of their options, before the Court decides whether to approve the Settlement. If the Court approves the Settlement, after any objections and appeals that might be taken are resolved, an administrator appointed by the Court will make the payments that the Settlement allows.

This package explains the lawsuit, the Settlement, Class Members' legal rights, what benefits are available, who is eligible for them, and how to get them.

The Court in charge of the case is the United States District Court for the Southern District of New York, and the case is known as *In re Biovail Corporation Securities Litigation*, Master File No. 03-CV-8917 (GEL). This case was originally assigned to United States District Judge Richard Owen but it was reassigned to United States District Judge Gerard E. Lynch. The people who are leading the action on behalf of the Class, Ontario Teachers' Pension Plan Board and Local 282 Welfare Trust Fund, are called the Lead Plaintiffs, and the company and the persons they sued, Biovail Corporation, Eugene N. Melnyk, Brian H. Crombie, John R. Miszuk, Kenneth Howling, and Rolf Reininghaus, are called the Defendants.

### 2. What is this lawsuit about?

Biovail is a Canadian pharmaceutical company engaged in the development, manufacturing, marketing, licensing, and distribution of pharmaceutical products for the treatment of chronic medical conditions. At the start of the Class Period, the key element of Biovail's business strategy was the application of its delivery technology to drugs developed by other pharmaceutical companies. Biovail reformulated existing drugs to make them easier to administer to patients. Beginning in 2002, Biovail began to attempt to change its business model by focusing its efforts on developing its own drugs. The first drug that Biovail self-developed and self-launched was Cardizem LA ("CLA"), a drug used for the treatment of hypertension.

On June 18, 2004, Lead Plaintiffs filed a Consolidated Amended Class Action Complaint, which was followed by the filing on August 25, 2006 of the Consolidated Second Amended Class Action Complaint (the "Complaint"). The Complaint generally asserts, among other things, that Defendants violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder (i) by issuing a series of allegedly false and misleading statements concerning the efficacy of and demand for CLA, as well as the purported success of the launch of the drug, and by concealing manufacturing problems which negatively impacted sales of CLA; and (ii) by issuing a series of allegedly false and misleading statements concerning Biovail's financial results which were impacted by alleged accounting improprieties in violation of Generally Accepted Accounting Principles. The Complaint generally alleges that, as a result of Defendants' dissemination of the allegedly false and misleading statements during the Class Period, the market price of Biovail's common stock was artificially inflated, thereby causing damage to Class Members. The Complaint also alleges that during the Class Period insider trading in violation of the securities laws occurred.

The Defendants deny all allegations of misconduct contained in the Complaint and deny having engaged in any wrongdoing whatsoever.

### 3. Why is this a class action?

In a class action, one or more people called class representatives sue on behalf of people who have similar claims. All these people are a class or class members. Bringing a case, such as this one, as a class action allows adjudication of many similar claims of persons and entities that might be economically too small to bring in individual actions. One court resolves the issues for all class members, except for those who exclude themselves from the class.

## 4. Why is there a settlement?

These consolidated actions were commenced in late 2003, and Lead Plaintiffs filed the Consolidated Amended Class Action Complaint in the summer of 2004. Defendants moved to dismiss that complaint on September 28, 2004. Their motion was denied by the Court by order entered December 22, 2004 (the "December 2004 Order"). On August 25, 2006, Plaintiffs filed the Consolidated Second Amended Class Action Complaint (the "Complaint"), which contains a number of additional allegations of wrongdoing and which added another individual defendant. All Defendants answered the Complaint on October 20, 2006.

Discovery commenced shortly after the Court issued its December 2004 Order. In response to Plaintiffs' discovery requests, Defendants produced many millions of pages of documents, and several non-parties also produced documents. Additionally, Plaintiffs took the testimony of approximately fifteen fact witnesses.

Lead Plaintiffs moved for class certification on February 28, 2006, and after extensive briefing by both parties, the Court heard oral argument on the motion on March 23, 2007. The Court had not yet ruled on Lead Plaintiffs' motion for class certification when the parties entered into an agreement to settle this Action.

In the fall of 2005, the parties engaged in a mediation before a former federal district court judge, but were unable to reach an agreement to resolve the Action. In December 2007, with the benefit of the further development of the Action and the extensive discovery conducted since the earlier mediation, and with the assistance of a second highly experienced mediator, Lead Plaintiffs, by their counsel, conducted discussions and arm's-length negotiations with counsel for Defendants with a view to settling the issues in dispute and achieving the best relief possible consistent with the interests of the Class. When the parties agreed to settle this Action, fact discovery, which was ongoing, was scheduled to be completed February 29, 2008, followed by expert discovery, which was to be completed by April 25, 2008.

At the time that the agreement to settle this Action was reached, Lead Plaintiffs had a clear understanding of the strengths and weaknesses of the case and the risks they would face in proceeding to trial. At trial, it is the plaintiffs' burden to establish every element of each of the claims they asserted against the defendants. One of the elements that plaintiffs have to establish in an action for violation of Section 10(b) of the Exchange Act is called loss causation. Another element that plaintiffs would have to establish is that defendants acted with the requisite level of intent to mislead investors, known as *scienter.* While Lead Plaintiffs believe that they could have met their burdens with respect to both of these elements, they also recognize that the law with respect to loss causation and *scienter* has been evolving and the risks to plaintiffs in satisfying these burdens have been becoming greater. Defendants had arguments that could find appeal with a jury. Lead Plaintiffs also recognized that, even if they prevailed at the trial level, the appeal that Defendants would have taken was potentially a more serious risk to the ultimate outcome of the case. Additionally, as noted above, given that the amount of damages sustained by the Class would be seriously disputed, there was the real possibility of no recovery after trial or a recovery that did not exceed the amount of the Settlement but which would still be in jeopardy on appeal. Finally, even if a jury verdict were ultimately sustained on appeal, it could take years before the Action was finally resolved.

Additionally, as noted above, at the time that the agreement to settle was reached, the Court had not yet ruled on Lead Plaintiffs' motion for Class Certification. It was clear that if Lead Plaintiffs prevailed on that motion, Defendants would seek leave to appeal that ruling. If the Court of Appeals heard that appeal, it would significantly delay the resolution of the Action.

The Court has not decided in favor of Plaintiffs or Defendants. Instead, both sides agreed to a settlement. That way, they avoid the risks and cost of a trial and subsequent appeals. Additionally, settlement of the Action assures that persons affected by the alleged fraud can get compensation. The Class Representatives and their attorneys think the Settlement is fair, reasonable and adequate and in the best interests of all Class Members.

## WHO IS IN THE SETTLEMENT

To see if you will get money from this Settlement, you first have to decide if you are a Class Member.

### 5. How do I know if I am part of the Settlement?

The Court directed, for the purposes of the proposed Settlement, that everyone, except the persons and entities identified in response to question 6 below, who fits this description is a Class Member: *all persons and entities who purchased the common stock of Biovail on the New York Stock Exchange or other U.S. stock exchanges or the Toronto Stock Exchange or other Canadian stock exchanges during the period from February 7, 2003*, through and including March 2, 2004.

### 6. Are there exceptions to being included?

Excluded from the Class are Biovail, its subsidiaries, affiliates, predecessor and successor entities; Ernst & Young LLP [U.S. and Canada] and any of their affiliates, subsidiaries, and predecessor and successor entities; Ernst & Young LLP [U.S. and Canada] partners and partners of any of their affiliates, subsidiaries, and predecessor and successor entities; individual defendants Eugene N. Melnyk, Brian H. Crombie, John R. Miszuk, Kenneth Howling and Rolf Reininghaus; members of their immediate families; any entity in which any defendant has a controlling interest; any person who was an officer or director of Biovail during the Class Period; and the legal representatives, heirs, successors or assigns of any of the foregoing excluded persons or entities.

If one of your mutual funds purchased shares of Biovail common stock on a relevant stock exchange during the Class Period, that alone does not make you a Class Member. You are a Class Member only if *you directly purchased shares of Biovail common stock on the New York Stock Exchange or other U.S. stock exchanges or the Toronto Stock Exchange or other Canadian stock exchanges during the period from February 7, 2003, through and including March 2, 2004.* Check your investment records or contact your broker to see if you purchased Biovail common stock on a relevant exchange during the Class Period.

If you **sold** Biovail common stock during the Class Period, that alone does not make you a Class Member. You are a Class Member only if you **purchased** shares of Biovail common stock on the New York Stock Exchange or other U.S. stock exchanges or the Toronto Stock Exchange or other Canadian stock exchanges during the period from February 7, 2003, through and including March 2, 2004.

### 7. What if I am still not sure if I am included?

If you are still not sure whether you are included, you can ask for free help. You can call 1-877-465-5582 or visit www.BiovailSecuritiesLitigationSettlement.com for more information. Or you can fill out and return the Proof of Claim form described in question 10, to see if you qualify.

## THE SETTLEMENT BENEFITS — WHAT YOU GET

### 8. What does the Settlement provide?

In exchange for the Settlement and dismissal of the Action, Biovail and the Individual Defendants have agreed to create a $138 million cash fund, which is earning interest, to be divided, after payment of fees and expenses as awarded by the Court, among all Class Members who submit valid Proof of Claim forms.

Biovail has also agreed to enact certain corporate governance changes posted on the Internet at www.BiovailSecuritiesLitigationSettlement.com.

### 9. How much will my payment be?

Your share of the Net Settlement Fund (*i.e.*, the Settlement Amount plus accrued interest less Court-awarded fees and expenses and less Taxes) will depend on the total Recognized Claims represented by the valid Proof of Claim forms that Class Members send in, how many shares of Biovail common stock you bought, how much you paid for them, and when you bought and whether or when you sold them, and if so, for how much you sold them.

You can calculate your Recognized Claim in accordance with the formula shown below in the Plan of Allocation. It is unlikely that you will get a payment for all of your Recognized Claim. After all Class Members have sent in their Proof of Claim forms, the payment you get will be a part of the Net Settlement Fund equal to your Recognized Claim divided by the total of everyone's Recognized Claims. *See* the Plan of Allocation beginning on page 12 for more information on how your Recognized Claim will be determined.

## HOW YOU GET A PAYMENT — SUBMITTING A PROOF OF CLAIM FORM

**10. How can I get a payment?**

To qualify for a payment, you must send in a Proof of Claim form. A Proof of Claim form is being circulated with this Notice. You may also get a Proof of Claim form, either in English or French, on the Internet at www.BiovailSecuritiesLitigationSettlement.com. Read the instructions carefully, fill out the Proof of Claim form, include all the documents the form asks for, sign it, and mail it postmarked not later than **September 8, 2008**.

**11. When would I get my payment?**

The Court will hold a hearing on **August 8, 2008**, to decide whether to approve the Settlement. If the Court approves the Settlement, there may be appeals. It is always uncertain whether these appeals can be resolved, and resolving them can take time, perhaps more than a year. It also takes time for all the Proofs of Claim to be processed. Please be patient.

**12. What am I giving up to get a payment or stay in the Class?**

Unless you validly request exclusion, you are staying in the Class, and that means that, upon the "Effective Date," you will release all "Settled Claims" (as defined below) against the "Released Parties" (as defined below).

"Settled Claims" means any and all claims, debts, demands, rights or causes of action or liabilities whatsoever (including, but not limited to, any claims for damages, interest, attorneys' fees, expert or consulting fees, and any other costs, expenses or liability whatsoever), whether based on federal, state, local, statutory or common law or any other law, rule or regulation, whether fixed or contingent, accrued or un-accrued, liquidated or un-liquidated, at law or in equity, matured or un-matured, whether class or individual in nature, including both known claims and Unknown Claims (as defined below), (i) that have been asserted in this Action by the Class Members or any of them against any of the Released Parties, or (ii) that could have been asserted in any forum by the Class Members or any of them on behalf of the Class against any of the Released Parties which arise out of, are related to, or are based upon the allegations, transactions, facts, matters or occurrences, representations or omissions involved, set forth, or referred to in the Complaint and which relate to the purchase, sale or ownership of Biovail securities during the Class Period.

"Released Parties" means Biovail and the Individual Defendants, their past or present subsidiaries, parents, successors and predecessors, officers, directors, agents, employees, attorneys, insurers, advisors, and investment advisors, and any person, firm, trust, corporation, officer, director or other individual or entity in which any Defendant has a controlling interest or which is related to or affiliated with any of the Defendants, and the legal representatives, heirs, successors in interest or assigns of any of the Defendants.

"Unknown Claims" means any and all Settled Claims which any Lead Plaintiff or other Class Member does not know or suspect to exist in his, her or its favor at the time of the release of the Released Parties, and any Settled Defendants' Claims which any Defendant does not know or suspect to exist in his or its favor, which if known by him or it might have affected his or its decision(s) with respect to the Settlement. With respect to any and all Settled Claims and Settled Defendants' Claims, the parties stipulate and agree that upon the Effective Date, the Lead Plaintiffs and the Defendants shall expressly waive, and each other Class Member shall be deemed to have waived, and by operation of the Judgment shall have expressly waived, any and all provisions, rights and benefits conferred by any law of any state or territory of the United States, or principle of common law, which is similar, comparable, or equivalent to Cal. Civ. Code § 1542, which provides:

> A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.

Page 7

Lead Plaintiffs and Defendants acknowledge, and all other Class Members by operation of law shall be deemed to have acknowledged, that the inclusion of "Unknown Claims" in the definition of Settled Claims and Settled Defendants' Claims was separately bargained for and was a key element of the Settlement.

Upon the Effective Date of this Settlement, all Class Members on behalf of themselves, their heirs, executors, administrators, predecessors, successors and assigns, shall, with respect to each and every Settled Claim, release and forever discharge, and shall forever be enjoined from prosecuting, any Settled Claims against any of the Released Parties.

The "Effective Date" will occur when an Order entered by the Court approving the Settlement becomes final and not subject to appeal.

If you remain a member of the Class, all of the Court's orders will apply to you and legally bind you.

## EXCLUDING YOURSELF ("OPTING OUT") FROM THE SETTLEMENT

If you do not want a payment from this Settlement, but you want to keep any right you may have to sue or continue to sue the Defendants and the other Released Parties, on your own, about the Settled Claims, then you must take steps to get out of the Class. This is called excluding yourself from -- or "opting out" of -- the Class. Defendants may withdraw from and terminate the Settlement if persons and entities who would otherwise be Class Members, and who purchased in excess of a certain amount of Biovail common stock, opt out of the Class.

### 13. How do I get out of the proposed Settlement?

To opt out of the Class, you must send a signed letter by mail stating that you "request exclusion from the Class in *In re Biovail Corporation Securities Litigation*, Master File No. 03-CV-8917 (GEL)." Your letter should include the date(s), price(s), and number(s) of shares of all your purchases and sales of Biovail common stock during the Class Period. In addition, be sure to include your name, address, telephone number, and your signature. You must mail your exclusion request by first class mail postmarked no later than **July 8, 2008** to:

*In re Biovail Corporation Securities Litigation*
Exclusions
c/o Complete Claim Solutions, LLC, Claims Administrator
P.O. Box 24640
West Palm Beach, FL 33416

You cannot exclude yourself by telephone or by e-mail. If you ask to be excluded, you will not get any Settlement payment, and you cannot object to the Settlement, the Plan of Allocation or the application for attorneys' fees and reimbursement of expenses. You will not be legally bound by anything that happens in this lawsuit, and you may be able to sue (or continue to sue) the Defendants and the other Released Parties in the future.

A request for exclusion from the Class in this Action shall also be deemed a request for exclusion from the class in the Canadian Action which is discussed on page 14 below.

### 14. If I do not exclude myself, can I sue the Defendants and the other Released Parties for the same thing later?

No. Unless you exclude yourself, you give up any rights to sue the Defendants and the other Released Parties for any and all Settled Claims. If you have a pending lawsuit against any of the Defendants or any of the other Released Parties, speak to your lawyer in that case immediately. You must exclude yourself from the Class to continue your own lawsuit. Remember, the exclusion deadline is **July 8, 2008**.

### 15. If I exclude myself, can I get money from the proposed Settlement?

No. If you exclude yourself, do not send in a Proof of Claim form to ask for any money. But you may exercise any right you may have to sue, continue to sue, or be part of a different lawsuit against the Defendants and the other Released Parties.

## THE LAWYERS REPRESENTING YOU

### 16.  Do I have a lawyer in this case?

The Court ordered that the law firms of Bernstein Litowitz Berger & Grossmann LLP, 1285 Avenue of the Americas, New York, NY 10019, Telephone (212) 554-1400 and Milberg LLP,[3] One Penn Plaza, New York, NY  10119-0165, Telephone (212) 594-5300 will represent all Class Members.  These lawyers are called Class Counsel or Plaintiffs' Co-Lead Counsel.  You will not be separately charged for these lawyers.  The Court will determine the amount of fees and expenses to be paid to Class Counsel.  All fees and expenses awarded by the Court will be paid from the Gross Settlement Fund.  Class Members may, but are not required to, hire their own lawyers at their own expense.

### 17.  How will the lawyers and Class Representatives be paid?

Plaintiffs' Co-Lead Counsel are moving the Court to award attorneys' fees from the Gross Settlement Fund in an amount not to exceed 16.1% of the Gross Settlement Fund and, for reimbursement of their expenses in an amount not to exceed $3.5 million, plus interest on such expenses at the same rate as earned by the Gross Settlement Fund.

Plaintiffs' Co-Lead Counsel are also moving the Court to award a payment of up to $65,000 to Lead Plaintiffs and the other proposed Class representative, for their reasonable costs and expenses (including lost wages) directly relating to their representation of the Class.

Plaintiffs' Co-Lead Counsel, without further notice to the Class, will subsequently apply to the Court for payment of the Claims Administrator's fees and expenses incurred in connection with giving notice, administering the Settlement and distributing the Settlement proceeds to the members of the Class.

## OBJECTING TO THE SETTLEMENT, PLAN OF ALLOCATION AND APPLICATION
## FOR ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES

If you are a Class Member, you can tell the Court that you do not agree with the Settlement, or some part of it, the proposed Plan of Allocation, and/or the application for attorneys' fees and reimbursement of litigation expenses.

### 18.  How do I tell the Court that I do not like the Settlement, the proposed Plan of Allocation, and/or the application for attorneys' fees and reimbursement of litigation expenses?

If you are a Class Member, you can object to the Settlement, or any of its terms, to the proposed Plan of Allocation and/or to the application by Plaintiffs' Co-Lead Counsel for an award of fees and expenses.  You may write to the Court setting out your objection.  You may give reasons why you think the Court should not approve any or all of the Settlement terms or arrangements, the proposed Plan of Allocation, and/or the application for attorneys' fees or expenses.  The Court will consider your views if you file a proper objection within the deadline identified, and according to the following procedures.

To object to the Settlement, the proposed Plan of Allocation, and/or the application for attorneys' fees and expenses, you must send a signed letter stating that you object to the Settlement, the proposed Plan of Allocation, and/or the application for attorneys' fees and expenses in *In re Biovail Corporation Securities Litigation*, Master File No. 03-CV-8917 (GEL).  Be sure to include your name, address, telephone number, and your signature, identify the date(s), price(s), and number(s) of shares of all purchases and sales of Biovail common stock you made during the Class Period (February 7, 2003 through and including March 2, 2004), and state the reasons why you object to the Settlement, the proposed Plan of Allocation, and/or the application for attorneys' fees and expenses.  Your objection must be filed with the Court and served on all of the following counsel on or before **July 8, 2008**:

---

[3] Milberg LLP was formerly known as Milberg Weiss Bershad & Schulman LLP.  On May 18, 2006 in the United States District Court for the Central District of California (Los Angeles), Milberg Weiss Bershad & Schulman LLP and two of its partners, David J. Bershad and Steven G. Schulman, and others, were named as defendants in an indictment.  On September 20, 2007, a superseding indictment was filed which added Melvyn I. Weiss as a named defendant. The indictments alleged that, in certain cases identified in the indictments, portions of attorneys' fees awarded to the firm were improperly shared with certain plaintiffs.  Milberg LLP has pleaded not guilty.  The three partners named in the indictments have left the firm and have agreed to plead guilty to a charge of conspiracy.  The indictments do not refer to this action, and make no allegations of any impropriety in the conduct of this action.

| **COURT** | **PLAINTIFFS' CO-LEAD COUNSEL** | **DEFENDANTS' COUNSEL** |
|---|---|---|
| Clerk of the Court | Steven B. Singer, Esq. | Martin F. Cunniff, Esq. |
| United States District Court for the | Bernstein Litowitz | Howrey LLP |
| Southern District of New York | Berger & Grossmann LLP | 1299 Pennsylvania Avenue, N.W. |
| 500 Pearl Street | 1285 Avenue of the Americas | Washington, D.C. 20004 |
| New York, NY 10007 | New York, NY 10019 | and |
| | and | T. Barry Kingham, Esq. |
| | Sanford P. Dumain, Esq. | Curtis, Mallet-Prevost, |
| | Milberg LLP | Colt & Mosle LLP |
| | One Penn Plaza | 101 Park Avenue |
| | New York, NY 10119-0165 | New York, NY 10178 |

You do not need to go to the Settlement Fairness Hearing to have your written objection considered by the Court. At the Settlement Fairness Hearing, any Class Member who has not previously submitted a request for exclusion from the Class and who has complied with the procedures set out in this response 18 and response to question 22 below for filing with the Court and providing to counsel for Plaintiffs and Defendants a statement of an intention to appear at the Settlement Fairness Hearing may also appear and be heard, to the extent allowed by the Court, to state any objection to the Settlement, the Plan of Allocation or Plaintiffs' Co-Lead Counsel's application for an award of attorneys' fees and reimbursement of expenses. Any such objector may appear in person or arrange, at that objector's expense, for a lawyer to represent the objector at the Hearing.

Any Class Member who does not object to the Settlement, the proposed Plan of Allocation, and/or the application for an award of attorneys' fees and reimbursement of litigation expenses in the manner prescribed above shall be deemed to have waived such objection and shall forever be foreclosed from making any objection to the fairness, adequacy or reasonableness of the Settlement, the Judgment to be entered approving the Settlement, the proposed Plan of Allocation or the application for an award of attorneys' fees and reimbursement of expenses.

### 19. What is the difference between objecting and excluding?

Objecting is simply telling the Court that you do not like something about the Settlement, the proposed Plan of Allocation or the application for attorneys' fees and reimbursement of expenses. You can object only if you stay in the Class. Excluding yourself is telling the Court that you do not want to be part of the Class. If you exclude yourself, you have no basis to object because the case no longer affects you.

## THE COURT'S SETTLEMENT FAIRNESS HEARING

The Court will hold a hearing to decide whether to approve the Settlement, the proposed Plan of Allocation and the application for attorneys' fees and reimbursement of expenses. You may attend and you may ask to speak, but you do not have to.

### 20. When and where will the Court decide whether to approve the proposed Settlement?

The Court will hold a Settlement Fairness Hearing at **11:00 a.m.** on **Friday, August 8, 2008**, in Courtroom 6B at the United States District Court for the Southern District of New York, 500 Pearl Street, New York, New York 10007. At this hearing the Court will consider whether the Settlement is fair, reasonable and adequate. At the Settlement Fairness Hearing, the Court also will consider the proposed Plan of Allocation for the proceeds of the Settlement and the application of Plaintiffs' Co-Lead Counsel for attorneys' fees and reimbursement of expenses. The Court will take into consideration any written objections filed in accordance with the instructions at question 18. The Court also may listen to people who have properly indicated, within the deadline identified above, an intention to speak at the hearing; but decisions regarding the conduct of the hearing will be made by the Court. *See* question 22 for more information about speaking at the hearing. At or after the hearing, the Court will decide whether to approve the Settlement. If the Court approves the Settlement, it will then consider whether or not to approve the proposed Plan of Allocation and the fee and expense application. Please be aware that the Court may adopt a plan of allocation that differs from the plan set forth herein without further notice to the Class. It is not known how long these decisions will take.

You should be aware that the Court may change the date and time of the Settlement Fairness Hearing. Thus, if you want to come to the hearing, you should check with Plaintiffs' Co-Lead Counsel before going to the Court to be sure that the date and/or time has not changed.

**21. Do I have to come to the Settlement Fairness Hearing?**

No. Plaintiffs' Co-Lead Counsel will answer questions the Court may have. However, you are welcome to come at your own expense. If you send an objection, you do not have to come to Court to talk about it. As long as you served and filed your written objection in accordance with the directions set forth in the response to question 18 above, the Court will consider it. You may also pay your own lawyer to attend, but it is not necessary. Class Members do not need to appear at any hearing or take any other action to indicate their approval.

**22. May I speak at the Settlement Fairness Hearing?**

If you object to the Settlement, the proposed Plan of Allocation, and/or the application for an award of attorneys' fees and expenses, you may ask the Court for permission to speak at the Settlement Fairness Hearing. To do so, you must include with your objection (*see* question 18 above) a statement stating that it is your "Notice of Intention to Appear in *In re Biovail Corporation Securities Litigation*, Master File No. 03-CV-8917 (GEL)." Persons who intend to object to the Settlement, the Plan of Allocation, and/or counsel's application for an award of attorneys' fees and expenses and desire to present evidence at the Settlement Fairness Hearing must include in their written objections the identity of any witnesses they may call to testify and exhibits they intend to introduce into evidence at the Settlement Fairness Hearing. You cannot speak at the Settlement Fairness Hearing if you excluded yourself from the Class or if you have not provided written notice of your intention to speak at the Settlement Fairness Hearing by the deadline identified, and in accordance with the procedures described in the responses to questions 18 and 20 above and in this response.

## IF YOU DO NOTHING

**23. What happens if I do nothing at all?**

If you do nothing, you will get no money from this Settlement and you will be precluded from starting a lawsuit, continuing with a lawsuit, or being part of any other lawsuit against any of the Defendants and any of the other Released Parties about the Settled Claims in this case, ever again. To share in the Net Settlement Fund you must submit a Proof of Claim form (*see* question 10). To start, continue or be a part of any other lawsuit against any of the Defendants and/or any of the other Released Parties about the Settled Claims in this case you must exclude yourself from the Class in accordance with the procedures set forth in this Notice (*see* question 13).

## GETTING MORE INFORMATION

**24. Are there more details about the proposed Settlement?**

This Notice summarizes the proposed Settlement. More details are in a Stipulation and Agreement of Settlement dated April 4, 2008 (the "Stipulation"). You can get a copy of the Stipulation by writing to Steven B. Singer, Esq., Bernstein Litowitz Berger & Grossmann LLP, 1285 Avenue of the Americas, New York, NY 10019, or Sanford P. Dumain, Esq., Milberg LLP, One Penn Plaza, New York, NY 10119-0165, or by visiting www.blbglaw.com or www.milberg.com.

You also can contact the Claims Administrator at 1-877-465-5582 toll free; write to *In re Biovail Corporation Securities Litigation Settlement*, c/o Complete Claim Solutions, LLC, P.O. Box 24640, West Palm Beach, FL 33416; or visit the website at www.BiovailSecuritiesLitigationSettlement.com, where you will find answers to common questions about the Settlement, a Proof of Claim form, plus other information to help you determine whether you are a Class Member and whether you are eligible for a payment.

**25. How do I get more information?**

For even more detailed information concerning the matters involved in this Action, reference is made to the pleadings, to the Stipulation, to the Orders entered by the Court and to the other papers filed in the Action, which may be inspected at the Office of the Clerk of the Court, United States District Court, 500 Pearl Street, New York, NY 10007 during regular business hours.

## PLAN OF ALLOCATION OF NET SETTLEMENT FUND AMONG CLASS MEMBERS

The $138 million cash Settlement Amount and the interest earned thereon shall be the Gross Settlement Fund. The Gross Settlement Fund, less all Taxes, approved costs, fees and expenses (the "Net Settlement Fund") shall be distributed to members of the Class who submit acceptable Proofs of Claim ("Authorized Claimants").

The Claims Administrator shall determine each Authorized Claimant's *pro rata* share of the Net Settlement Fund based upon each Authorized Claimant's "Recognized Claim." The Recognized Claim formula is not intended to be an estimate of the amount of what a Class Member might have been able to recover after a trial; nor is it an estimate of the amount that will be paid to Authorized Claimants pursuant to the Settlement. The Recognized Claim formula is the basis upon which the Net Settlement Fund will be proportionately allocated to the Authorized Claimants.

An Authorized Claimant's "Recognized Claim" will be calculated for purposes of the Settlement as follows:

1. For shares of common stock purchased between February 7, 2003 and October 2, 2003, and:

    A. sold between February 7, 2003 and October 2, 2003, the Recognized Claim shall be zero.

    B. sold between October 3, 2003 and October 7, 2003, the Recognized Claim shall be the lesser of:
       (1) $2.87 per share; or
       (2) the difference between the purchase price per share and the sales price per share for each share sold.

    C. sold between October 8, 2003 and October 13, 2003, the Recognized Claim shall be the least of:
       (1) $6.47 per share; or
       (2) $2.87 + the difference between $29.05 and sales price per share; or
       (3) the difference between the purchase price per share and the sales price per share for each share sold.

    D. sold between October 14, 2003 and October 29, 2003, the Recognized Claim shall be the lesser of:
       (1) $2.87 per share; or
       (2) the difference between the purchase price per share and the sales price per share for each share sold.

    E. sold between October 30, 2003 and November 20, 2003, the Recognized Claim shall be the lesser of:
       (1) $3.75 per share; or
       (2) the difference between the purchase price per share and the sales price per share for each share sold.

    F. sold between November 21, 2003 and March 2, 2004, the Recognized Claim shall be the lesser of:
       (1) $7.83 per share; or
       (2) the difference between the purchase price per share and the sales price per share for each share sold.

    G. retained at the end of trading on March 2, 2004, the Recognized Claim shall be the lesser of:
       (1) $8.27 per share; or
       (2) the difference between the purchase price per share and $18.60.[4]

2. For shares of common stock purchased between October 3, 2003 and October 7, 2003, and:

    A. sold between October 3, 2003 and October 7, 2003, the Recognized Claim shall be zero.

    B. sold between October 8, 2003 and October 13, 2003, the Recognized Claim shall be the least of:
       (1) $3.61 per share; or
       (2) the difference between $29.05 and sales price per share; or
       (3) the difference between the purchase price per share and the sales price per share for each share sold.

    C. sold between October 14, 2003 and October 29, 2003, the Recognized Claim shall be zero.

    D. sold between October 30, 2003 and November 20, 2003, the Recognized Claim shall be the lesser of:
       (1) $0.88 per share; or
       (2) the difference between the purchase price per share and the sales price per share for each share sold.

---

[4] The March 3, 2004 closing price ($ US) of Biovail common stock.

E. sold between November 21, 2003 and March 2, 2004, the Recognized Claim shall be the lesser of:
   (1) $4.96 per share; or
   (2) the difference between the purchase price per share and the sales price per share for each share sold.

F. retained at the end of trading on March 2, 2004, the Recognized Claim shall be the lesser of:
   (1) $5.40 per share; or
   (2) the difference between the purchase price per share and $18.60.

3. For shares of common stock purchased between October 8, 2003 and October 29, 2003, and:

   A. sold between October 8, 2003 and October 29, 2003, the Recognized Claim shall be zero.

   B. sold between October 30, 2003 and November 20, 2003, the Recognized Claim shall be the lesser of:
      (1) $0.88 per share; or
      (2) the difference between the purchase price per share and the sales price per share for each share sold.

   C. sold between November 21, 2003 and March 2, 2004, the Recognized Claim shall be the lesser of:
      (1) $4.96 per share; or
      (2) the difference between the purchase price per share and the sales price per share for each share sold.

   D. retained at the end of trading on March 2, 2004, the Recognized Claim shall be the lesser of:
      (1) $5.40 per share; or
      (2) the difference between the purchase price per share and $18.60.

4. For shares of common stock purchased between October 30, 2003 and November 20, 2003, and:

   A. sold between October 30, 2003 and November 20, 2003, the Recognized Claim shall be zero.

   B. sold between November 21, 2003 and March 2, 2004, the Recognized Claim shall be the lesser of:
      (1) $4.08 per share; or
      (2) the difference between the purchase price per share and the sales price per share for each share sold.

   C. retained at the end of trading on March 2, 2004, the Recognized Claim shall be the lesser of:
      (1) $4.52 per share; or
      (2) the difference between the purchase price per share and $18.60.

5. For shares of common stock purchased between November 21, 2003 and March 2, 2004, and:

   A. sold between November 21, 2003 and March 2, 2004, the Recognized Claim shall be zero.

   B. retained at the end of trading on March 2, 2004, the Recognized Claim shall be the lesser of:
      (1) $0.44 per share; or
      (2) the difference between the purchase price per share and $18.60.

In the event a Class Member has more than one purchase or sale of Biovail common stock, all purchases and sales shall be matched on a First In First Out ("FIFO") basis, Class Period sales will be matched first against any Biovail shares held at the beginning of the Class Period and then against purchases in chronological order, beginning with the earliest purchase made during the Class Period. A purchase or sale of Biovail common stock shall be deemed to have occurred on the "contract" or "trade" date as opposed to the "settlement" or "payment" date. The receipt or grant by gift, devise or operation of law of Biovail common stock during the Class Period shall not be deemed a purchase or sale of Biovail common stock for the calculation of an Authorized Claimant's Recognized Claim nor shall it be deemed an assignment of any claim relating to the purchase of such Biovail shares unless specifically provided in the instrument of gift or assignment and the original purchase occurred during the Class Period. The receipt of Biovail common stock during the Class Period in exchange for securities of any other corporation or entity shall not be deemed a purchase or sale of Biovail common stock.

To the extent a Claimant had a gain from his, her or its overall transactions in Biovail common stock during the Class Period, the value of the Recognized Claim will be zero. Such Claimants will in any event be bound by the Settlement. To the extent that a Claimant suffered an overall loss on his, her or its overall transactions in Biovail common stock during the Class Period, but that loss was less than the Recognized Claim calculated above, then the Recognized Claim shall be limited to the amount of the actual loss.

Page 13

For purposes of determining whether a Claimant had a gain from his, her or its overall transactions in Biovail common stock during the Class Period or suffered a loss, the Claims Administrator shall: (i) total the amount paid for all Biovail common stock purchased during the Class Period by the Claimant (the "Total Purchase Amount"); (ii) match any sales of Biovail common stock during the Class Period first against the Claimant's opening position in the stock (the proceeds of those sales will not be considered for purposes of calculating gains or losses); (iii) total the amount received for sales of the remaining shares of Biovail common stock sold during the Class Period (the "Sales Proceeds"); and (iv) ascribe an $18.60 per share holding value for the number of shares of Biovail common stock purchased during the Class Period and still held at the end of the Class Period ("Holding Value"). The difference between the Total Purchase Amount ((i) above) and the sum of the Sales Proceeds and the Holding Value ((iii) plus (iv) above) will be deemed a Claimant's gain or loss on his, her or its overall transactions in Biovail common stock during the Class Period.

Each Authorized Claimant shall be allocated a *pro rata* share of the Net Settlement Fund based on his, her or its Recognized Claim as compared to the total Recognized Claims of all Authorized Claimants. A payment to an Authorized Claimant of less than $10 in total will not be included in the calculation and will not be distributed.

Class Members who do not submit acceptable Proofs of Claim will not share in the Settlement proceeds. Class Members who do not either submit a request for exclusion or submit an acceptable Proof of Claim will nevertheless be bound by the Settlement and the Judgment of the Court dismissing this Action.

Distributions will be made to Authorized Claimants after all claims have been processed and after the Court has finally approved the Settlement. If any funds remain in the Net Settlement Fund by reason of un-cashed distributions or otherwise, then, after the Claims Administrator has made reasonable and diligent efforts to have Class Members who are entitled to participate in the distribution of the Net Settlement Fund cash their distributions, any balance remaining in the Net Settlement Fund one (1) year after the initial distribution of such funds shall be re-distributed to Class Members who have cashed their initial distributions and who would receive at least $10.00 from such re-distribution, after payment of any unpaid costs or fees incurred in administering the Net Settlement Fund for such re-distribution. If after six months after such re-distribution any funds shall remain in the Net Settlement Fund, then such balance shall be contributed to non-sectarian, not-for-profit, 501(c)(3) organization(s) designated by Plaintiffs' Co-Lead Counsel after notice to the Court and subject to direction, if any, by the Court.

Plaintiffs, Defendants, their respective counsel, and all other Released Parties shall have no responsibility for or liability whatsoever for the investment or distribution of the Settlement Amount, the Net Settlement Fund, the Plan of Allocation or the determination, administration, calculation, or payment of any Proof of Claim or non-performance of the Claims Administrator, the payment or withholding of Taxes owed by the Gross Settlement Fund or any losses incurred in connection therewith.

## THE CANADIAN ACTION

On September 21, 2005, a separate securities class action styled *Canadian Commercial Workers Industry Pension Plan against Biovail Corporation, Eugene N. Melnyk, Brian H. Crombie, John R. Miszuk and Kenneth G. Howling,* Court File No. 48172 CP (the "Canadian Action"), was commenced in Canada in the Ontario Superior Court of Justice (the "Canadian Court"). The Canadian Action alleges violations of Canadian law based on essentially the same facts and circumstances as those cited in the Complaint in the U.S. Action. The Canadian Action was brought on behalf of essentially the same class represented in the U.S. Action, i.e., all persons who purchased Biovail's common stock between February 7, 2003 and March 2, 2004, other than the defendants named in the Canadian Action. Plaintiff in the Canadian Action and its counsel have determined to ask the Canadian Court to approve the settlement of the Canadian Action based on the consideration obtained in settlement of the U.S. Action. The Canadian Court will hold a fairness hearing to determine whether to approve the settlement of the Canadian Action on September 15, 2008, at 10:00 a.m.

The decision of the Canadian Court with respect to approval of the settlement of the Canadian Action does not affect the settlement of the U.S. Action or the determinations of the Court in the U.S. Action. Settlement of the U.S. Action is not conditioned on the decisions of the Canadian Court or approval of the settlement of the Canadian Action. Additionally, there will be no distribution of funds through the Canadian Action. The only Proof of Claim form that will be distributed is the claim form in the U.S. Action.

Canadian Class Counsel have had input into the notice and administration procedures which will govern the Settlement, and were involved in negotiating the provisions of the corporate governance reforms. Canadian Class Counsel will be compensated for their services by the Defendants in an amount to be approved by the Canadian Court, and not out of the Settlement Fund.

As described earlier, a request for exclusion from the U.S. proceedings will also serve to exclude a Class Member from the Canadian Action. Similarly, any objection made concerning the Settlement will be provided to the Canadian Court. A specific objection concerning the Canadian settlement may be provided to Canadian Class Counsel.

If you would like additional information regarding the Canadian Action, please contact: Charles M. Wright or A. Dimitri Lascaris at Siskinds LLP, 680 Waterloo Street, London, ON N6A 3V8, Tel: (519) 672-2121, or Michael D. Wright at Cavalluzzo Hayes Shilton McIntyre & Cornish LLP, 474 Bathurst Street, Suite 300, Toronto, ON M5T 2S6.

### SPECIAL NOTICE TO SECURITIES BROKERS AND OTHER NOMINEES

If you purchased common stock of Biovail on the New York Stock Exchange or any other U.S. stock exchange or the Toronto Stock Exchange or any other Canadian stock exchange during the period from February 7, 2003, through and including March 2, 2004 for the beneficial interest of a person or organization other than yourself, the Court has directed that, WITHIN SEVEN (7) DAYS OF YOUR RECEIPT OF THIS NOTICE, you either (a) provide to the Claims Administrator the name and last known address of each person or organization for whom or which you purchased Biovail common stock on any such exchanges during such time period or (b) request additional copies of this Notice and the Proof of Claim form, which will be provided to you free of charge, and within seven (7) days of receipt of such copies mail the Notice and Proof of Claim form directly to the beneficial owners of that Biovail common stock. If you choose to follow alternative procedure (b), the Court has directed that, upon such mailing, you send a statement to the Claims Administrator confirming that the mailing was made as directed. You are entitled to reimbursement from the Gross Settlement Fund of your reasonable expenses actually incurred in connection with the foregoing, including reimbursement of postage expense and the cost of ascertaining the names and addresses of beneficial owners. Those expenses will be paid upon request and submission of appropriate supporting documentation. All communications concerning the foregoing should be addressed to the Claims Administrator:

In re Biovail Securities Litigation
c/o Complete Claim Solutions, LLC
Claims Administrator
P.O. Box 24640
West Palm Beach, FL  33416
1-877-465-5582

Dated:  New York, New York
     May 9, 2008                                       By Court Order