UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION


INDIANA PUBLIC RETIREMENT       )
SYSTEM                          )
                                )          Case No. 3:19-cv-00407
vs                              )
                                )
MICHAEL T. CARTWRIGHT,          )
et al.                          )

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -


BEFORE THE HONORABLE

ELI J. RICHARDSON, DISTRICT JUDGE

TRANSCRIPT OF PROCEEDINGS

October 18, 2023


- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

Patricia A. Jennings, RMR, CRR
Official Court Reporter
719 Church Street, Suite 2300
Nashville, TN 37203
patty_jennings@tnmd.uscourts.gov

APPEARANCES:

For the Plaintiffs:        Christopher M. Wood
Robbins Geller Rudman & Dowd LLP
200 31st Avenue N
Nashville, TN  37203

Ellen Gusikoff Stewart
Robbins Geller Rudman & Dowd LLP
655 W Broadway
Suite 1900
San Diego, CA  92101

Jerry E. Martin
Barrett Johnston Martin
 & Garrison LLC
200 31st Avenue N
Nashville, TN  37203

For the Defendants:        Brandon R. Keel
King & Spalding LLP
1180 Peachtree Street NE
Suite 1600
Atlanta, GA  30309-3521

The above-styled cause came to be heard on October 18, 2023, at 3:00 p.m., before the Honorable Eli J. Richardson, District Judge, when the following proceedings were had, to-wit:

THE COURT: All right. We are here this afternoon in a case that in the past sort of had a different case name. In its current iteration, where we are now in terms of the parties, it's Indiana Public Retirement System versus Cartwright, et al., and the case number is 3:19-cv-407.

We're here for a hearing on the motion for final approval of the settlement of this class action, sometimes called a fairness hearing.

In the lead-up to the hearing, there have been a variety of different filings, mostly, as would be expected, by the plaintiffs. On the defendants' side, they did file the required CAFA, C-A-F-A, notice. But we have a variety of documents from the plaintiff's side in support of the approval of the final settlement, which appears to be unopposed both generally, which is no surprise, but as far as I know on any of the particulars, but we'll talk about all these things.

If counsel could make their appearances, please.

MR. WOOD: Good afternoon, Your Honor. Christopher Wood, Robbins Geller, on behalf of the plaintiff.

THE COURT: Afternoon, Mr. Wood.

MR. WOOD: Good afternoon.

MR. MARTIN: Good afternoon, Your Honor. Jerry Martin of Barrett Johnston on behalf of the plaintiff.

THE COURT: Afternoon, Mr. Martin.

MS. STEWART: Good afternoon, Your Honor. Ellen Gusikoff Stewart also of Robbins Geller firm.

THE COURT: Afternoon, Ms. Stewart.

MR. KEEL: Good afternoon, Your Honor. Brandon Keel of King & Spalding on behalf of the defendants.

THE COURT: Afternoon, Mr. Keel.

MR. KEEL: Good afternoon, Your Honor.

THE COURT: All right. Counsel, so by way of background, I would note that both in Mr. Wood's declaration, and otherwise, the parties have set forth a good, sort of, procedural recounting of where this case has been. And in short, there was certification -- class certification, which was opposed. There was certification really on one of the two main theories or claims of the plaintiffs, not on the other one. There was a motion for reconsideration for the Court's decision that denied certification in that one respect. Parties notified the Court of a settlement being reached while that motion was pending. Thereafter, a motion for preliminary approval of the class action settlement was given.

There are provisions made for notice to be given. That was approved by the Court in an order dated July the 6th of this year. In the lead-up into today's hearing, as I say, there are numerous filings made, and the Court has reviewed them all and thinks it has a pretty good sense of where things stand, but I did want to ask Mr. Wood if he wanted to make some remarks in further support of the settlement of this class action speaking to the fairness, reasonableness and adequacy of the proposed resolution for the class and whatever he might want to say in terms of the award of attorney's fees and the award to the lead plaintiff.

MR. WOOD: Thank you, Your Honor. Christopher Wood on behalf of the plaintiff and the class. As Your Honor mentioned, we did submit voluminous briefing, which I hope was comprehensive and it covered the relevant factors that the Court needs to consider. I would just note -- want to make a few comments in support of the settlement.

As the Court noted, it's the Court's job on final approval to determine whether the settlement is fair, reasonable and adequate, and I would respectfully submit, Your Honor, that there is overwhelming and, in fact, uncontroverted proof in the record that the $3.75 million cash recovery that we achieved in this case, as well as all of the terms of the proposed settlement, including the plan of allocation and the requested fees and expenses and the

awards to lead plaintiff, are, indeed, fair, reasonable and adequate. Your Honor is entitled to rely on the opinion of experienced counsel in reaching that determination. And I and my team firmly believe that this result is fair, reasonable and adequate, as I set forth in my declaration, and in the best interest of the class.

The plaintiff, Your Honor, Indiana Public Retirement System, is one of the largest pension funds in the country. It currently has over $40 billion in assets under management and has overseen this case and been involved in all aspects of the case. It's approved the settlement and the attorney's fees, and it believes the settlement is fair, reasonable and adequate. You're also entitled to rely on its judgment, Your Honor.

The settlement process was overseen by a nationally-renowned mediator who oversaw settlement discussions and had an intimate knowledge of the issues in the case. The settlement was indisputably reached at arm's length with the mediator's assistance, which also supports approval.

And perhaps most importantly, Your Honor, the reaction of the class provides, I think, the most conclusive evidence that the settlement is fair, reasonable and adequate and should be approved.

Your Honor, as Mr. Murray says in his most recent

declaration, the settlement administrator sent out over 11,000 claim packages to potential class members and nominees. Information about this case was posted on the web, published in the Wall Street Journal, sent over the business wire, transmitted through the DTC system pursuant to the Court's notice order, and in response, Your Honor, not a single objection has been received by anyone as to any aspect of the settlement, whatsoever, the fees, the expenses, nothing. And so Your Honor is entitled to rely on that as well.

I would respectfully submit, Your Honor, that the record overwhelmingly demonstrates the fairness, the reasonableness and adequacy of all aspects of the settlement, including the fees and expenses requested, and I'd ask that the Court grant final approval.

I'm certainly happy to answer any questions the Court has. As I say, we tried to be comprehensive in our brief, and I don't want to just stand up here and repeat myself.

THE COURT: Sure. Sure. And you were comprehensive. I appreciate that. Just a few things I wanted to ask about. One is, fair to say, you know, unlike some securities fraud class actions, we are in a situation here with the lead plaintiff that is an institution -- institutional investor, especially sophisticated, and

therefore maybe gets added -- there was added weight for the view not just of plaintiff's counsel, which is certainly very experienced and has a track record of great success, but the weight of the plaintiff in this case maybe is entitled to more weight than you would see in some securities fraud class actions.  Is that fair to say?

MR. WOOD:  I think so, Your Honor.  I'll tell you, I've had a number of cases with individuals who have suffered very small losses who are incredibly passionate and adequate leaders of these types of cases, but the Indiana fund is one of the top 100 largest pension funds in the country.  We gave you a declaration from Mr. Gill, who was involved and oversaw this case.  He's general counsel of the fund.  Mr. Gill has been a practicing attorney for over 30 years, served in the state of Louisiana both as a -- I'm sorry, Louisiana -- of Indiana, both as a prosecutor, as well as the head of numerous state agencies, and he was personally involved in overseeing this case.  And I do think the sophistication of the lead plaintiff here adds to the conclusion this is a fair, reasonable and adequate settlement.

THE COURT:  And there is no additional information beyond what we had a couple days ago, no one purporting to raise a late objection or purporting to be a late opt-out; is that right?

MR. WOOD:  There is absolutely nothing.  In fact,

there are no opt-outs, whatsoever, which is actually surprising. You normally at least see somebody scribble something on a piece paper that says "I don't like this. Please opt me out." None of that. Absolutely nothing.

THE COURT: Do you happen to have knowledge about how many claims have been filed so far, understanding that the claims period has not expired?

MR. WOOD: I don't know the exact number, Your Honor. There's five weeks left in the process. What typically happens in this case and the reason that we selected Gilardi for the claims administrator here -- well, we selected them because they're very experienced in doing this work. They have a database of folks, including large institutional investors, who are set up to file these claims electronically. The vast majority of claims in these cases these days are filed electronically. And the folks that are filing those claims are doing so pursuant to a process. They have the deadline in mind. And what we typically see is in the last week or two, 90 percent -- 80, 90 percent of the claims are filed. They're looking at the deadline. They're doing all their work. They're hitting send. And you have hundreds of thousands or tens of thousands of claims submitted at once.

So I don't think right now the claims rate from what I understand is particularly high, but we wouldn't

expect it to be. In these cases in general, particularly more recently with electronic filing, you know, we see claims rates of well over 70 percent of eligible shares and folks submit claims, and I have no reason to believe this case will be any different.

THE COURT: Based on what you know, understanding you're not the claims administrator, but based on what you know, would it be fair to say there have been enough claims filed that it looks normal in the sense that there's no reason to believe that there was any deficiency in the notice provision? Is that fair to say?

MR. WOOD: Absolutely. And I say that primarily because I know pretty well how Gilardi works, and I know how these processes work. And as I said, the vast majority of the claims are done electronically, and they have these systems in place where they send these notices out to these large institutions, and the institutions process the information on behalf of the folks that own the stock and then it comes back in. And so we haven't seen anything from Gilardi that suggests -- first of all, the notice plan was complied with entirely.

THE COURT: Yeah. Yeah. And there is evidence in the record of that, yeah.

MR. WOOD: Yeah. And there's been nothing from Gilardi to suggest that there were any defects in that or

that the claims rate here is going to be any different --

THE COURT: Right.

MR. WOOD: -- from the normal case.

THE COURT: All right. Thank you. Now, I'm not going to call out the people in the gallery, instead I'll ask you about them. Do you know who they are such that we don't have any objectors like, you know, that are in the gallery?

MR. WOOD: They are --

THE COURT: Purported objectors, yeah.

MR. WOOD: They are my colleagues. I don't believe they're going to object.

THE COURT: Yeah. Yeah. I suspect they won't, yeah. So for the record we don't have anyone here purporting to have any opposition.

Now, I wanted to ask, is there anyone here that is going to go to the National -- ABA's National Institute on Class Actions, next couple days? Anyone happen to be going?

MR. WOOD: Not currently, Your Honor.

THE COURT: If not, you know, it's starting -- it's starting tomorrow. The ABA's National Institute on Class Actions is going on Friday, and as it turns out, I'm going to be on a panel. And the only reason I say that is to explain my perhaps unusual interest in this topic, which is incentive awards, where those are headed, what's required, is the Eleventh Circuit's pooh-poohing of incentive or service

awards, depending on how you want to call them -- is that going anywhere? What might be the overlap between the provisions that you're relying on specific, right, to the PLSRA -- if I got the acronym right. I think I have the letters in the right order. But anyhow. So all these issues are something to be sort of discussed and I've had to focus on them not only in a recent class action in this case, but also in preparing for this panel.

So that explains the special interest here, which is to say, you asked for an award that to me I think given the best view of the law, if a judge is really going to follow it -- there may be some follow-up questions -- it's such a small percentage, right, of the total, and yet if you look at courts -- and I think a proper analysis in particular cases depending on who it is that's seeking the award, there could be a problem with an award, or it's not justifiable under the statute, so maybe you have to alternatively look at the -- you know, the nonstatutory basis of an incentive award and so forth.

In this case, though, when you have the service award that would go to an institutional investor, it's maybe easier because it's -- it's much easier to package what's being asked for as really expenses, was what the statute talks about. Right? Not awards. It's sort of reimbursement of sort of reasonable costs and expenses. And the theory

here it seems to me looking at the declaration is basically when sort of, you know, salaried employees are spending their time working on their employer's business to successfully prosecute that class action, that's sort of like an out-of-pocket, you know, expense. It's a salary expense to work on this project. Is that kind of the theory?

MR. WOOD: Your Honor, it's time that they could have been spending working on other fund business instead of this. So I think Your Honor is exactly right. And the award amount, you know, $11,350, it's not particularly high. They did not get into this case for the award.

If you'll recall from the lead plaintiff declaration, they lost a million dollars in AAC stock. They're not doing this for the award. And I think the rates that you saw in there are incredibly modest. As I said, you know, Mr. Gill's rate was $150 an hour. He has over 30 years of experience doing this work. And Mr. Stetsil, $100 an hour, he has almost 20 years of experience as -- he's currently the Director of Public Equities for the fund. He's a CFA charter holder, incredibly experienced, you know, and gave up his time to sit and be deposed by the defendants and go through all their documents all for the benefit of the class. This is all time he could have been spending devoting to fund business. And I think that under those circumstances it's reasonable, especially when, you know, I respectfully

submit it's a fairly modest award.

Those rates, the 150 and 100, were approved with respect to the same fund two years ago by a judge in the Central District of California in the Stamps.com case. I think Your Honor approved a $300 an hour rate in the CHS case a few years ago, when they were asking for over $100,000. I think it's fair that the fund be awarded that for their service here.

THE COURT: Yeah, I don't disagree. And I would note it's an easier case here, unlike I had one recently where the service award requested for a lead plaintiff was substantially in excess of the losses they were claiming, and, you know, then -- you know, then it's especially important for the Court not to be a rubber stamp on the award just because it seemed so small compared to the overall settlement. But here I agree with your remarks as supporting the service award here.

All right. Let me see whether I had anything else. Oh, one thing I did want to ask about was the notion on the -- standby one moment. Regarding the expenses. You have a particular figure of 624,000 and change, so to speak.

Is that a final figure, where you're not going to be like, "Oh, yeah, we need to add on travel for this or that"? I mean, that's what you would want in the order?

MR. WOOD: That is what we want in the order.

I'll tell you, for example, my colleagues who came here from San Diego today, it's all costs that we eat. I said in my declaration we excluded, I think, $50,000 from that number just to try to bring it down as low as -- as low as we could. All of the document hosting costs were excluded, costs for investigators. These are out-of-pocket costs we excluded. Legal research we excluded. We really tried to -- well, we took Your Honor's order to heart and tried to get the number down.

THE COURT: Yeah. And, you know, like -- and, you know, my interest in that is just sort of to make sure that when there's a high amount of expenses, it's kind of easy to assume that's going to be really -- the great bulk of it will be the expert witness expenses, which in a case like this makes sense. In other cases, it's, you know -- you know, it would be less clear why the expense would be so high. Here, there are a variety of functions for the expert witness.

Would it be fair to say that one of them was to develop an appropriate plan of allocation, that was some of the expert witness work?

MR. WOOD: That's right, Your Honor. I would say that the plan of allocation was really built on the report that the expert would have submitted at summary judgment and trial had we gotten there. So that was already in process and had been in process and had also, in part, been in

process because there were a lot of discussions during the mediation about the appropriate amount of damages and how to calculate that. So there was a huge process that was involved with that over a long period so that by the time it came to the plan of allocation, we weren't starting over. We were really trying to use the best information that we had to divide the pot in a way that was consistent with what we would have tried to prove at trial.

THE COURT: Yeah. Yeah. So, you know, the initial work was not geared towards the precise function of the plan of allocation, but once the job switches to developing an appropriate plan of allocation, you can use the work that was done previously.

MR. WOOD: Yeah. That's right, Your Honor. And there was more work done at that point.

THE COURT: Yeah. And regarding the plan of allocation, which you've asked me to approve, it seems to me that it's taking kind of the fact that different investors are buying at different times, different investors within the class, and the general idea is that someone has come up with what they think the expert to do to be an appropriate -- sort of an appropriate reflection of what the inflation of the shares based on, you know, information that was in the mix, but shouldn't have been or wasn't in the mix, but should have been, what the inflation was in the share value versus when

they -- when they bought versus when they sold.

MR. WOOD: That's right.

THE COURT: Yeah. And that's really the plan of allocation, and this is the expert's best -- you know, best shot at approximating that. Fair to say?

MR. WOOD: That's fair to say, Your Honor. And we did set forth in the notice and in our papers. In addition to that, we included in there basically a haircut for the marketing claim because Your Honor declined to certify it. We asked Your Honor to change your mind, and then we settled the case. But we wanted to recognize that, that there's some uncertainty there. So we came up with our best number for that, and we gave it a haircut just to try to be fair in light of the procedural posture of the case at the time of settlement.

THE COURT: It's certainly appropriate. I wanted to ask you finally about the requested attorney's fees. There are a couple of things -- maybe several things that I think are interesting. One is, yeah, I agree with you, 17 percent on a sort of common fund settlement, that's not an overly big ask, perfectly reasonable.

The next thing I wanted to note was, like, this wasn't a subject of negotiation at all with the defense side; right?

MR. WOOD: No.

THE COURT: No. It's another reason why you'd say, look, collusion had nothing to do with this, particularly when sort of the issue of attorney's fees is never broached with the other side; right?

MR. WOOD: It's never broached. And if you -- I believe in the stipulation of settlement it says they take no position, but it's never broached at all.

THE COURT: Yeah. Final thing. I thought you took sort of an interesting position here, which is like not really -- not really attempting to persuade the Court that the award is justified by the lodestar. And, you know, I take it sort of the view -- you know, your view is, look, we don't have to -- the notion that the percentage of fund method is what applies here and our percentage is reasonable under the circumstances, we don't even have to get into lodestar, and there's no reason why we need to justify it.

Is that kind of where you're coming from?

MR. WOOD: That's right, Your Honor. I mean, we have case law to support that, too, right.

THE COURT: Yeah.

MR. WOOD: There's case law in the Sixth Circuit that says that a lodestar crosscheck is entirely optional and not required.

THE COURT: Yeah.

MR. WOOD: And it is our view that the percentage

is the appropriate way of looking at it because you're trying to replicate the market. And if you're replicating the market in a case that's not a class action, it's not a percentage, but with a lodestar crosscheck, people do cases on -- contingency cases on a percentage basis.

And so Your Honor is exactly right. You know, we included in my declaration the number of hours that we spent on certain things because I think that that is arguably required under the local rules, but I don't believe it's necessary for the Court to do a lodestar crosscheck.

THE COURT: Yeah. Yeah. And, you know, I think -- I think that that's right. I thought the information you sort of put in there was fine, but you're allowed to say, look, we're not really -- you know, we're not going to undertake this big explanation about why it's justified because, you know, if you're, let's say, the Vanderbilt scholar Brian Fitzpatrick, you're definitely thinking, well, are you going to hold it against counsel that they took less hours to achieve the same approach? What sense does that make? I think there's some wisdom to that.

I do want to note in this particular case, where the common fund percentage claim is 17 percent, I'm not worried about a lodestar check in any event. I think the -- you know, the information we have that would go towards a lodestar is fine, but not concerned about it because the rate

is reasonable.

All right. Thank you, Mr. Wood. I think that's all I have for you right now.

MR. WOOD: Thank you, Your Honor.

THE COURT: All right. Yes, sir. All right. So, you know -- and I think when we sort of consider the defense side of the house, Mr. Keel, the first thing I just wanted to ask you about -- and I do want to preface this by saying from my perspective, you know, no response you give is going to be taken as a sign that you're a huge fan of the settlement, or you love the result, or you love that your clients are paying it, anything like that. And I know that actually can be sensitive for defense counsel when they're asked to speak in what could be taken as sort of support for settlement payment.

Are you able to comment on how the fact that AAC declared bankruptcy and was dismissed -- and if your answer is, you know, "I don't really think I can, why don't you ask Mr. Wood," that's fine -- but how that particular piece of this does not impair the fairness, reasonableness or adequacy of the Court's settlement? Do you see what I'm asking?

MR. KEEL: I think so, Your Honor. Do you mind if I --

THE COURT: Yes, sir.

MR. KEEL: So correct me if I have this wrong,

Your Honor, but I take it the question is to what extent, if any, does having AAC dismissed of this because of the bankruptcy impact the fairness, adequacy or reasonableness of the settlement?

THE COURT: Yeah. Yeah.

MR. KEEL: And I would say that I don't believe it affects the reasonableness, fairness or adequacy of the settlement role. This was a claim against the individual defendants, you know, for breach of the securities laws, and they were the ones who were alleged to have violated the laws. Plaintiffs continued to pursue those claims with the same vigor and the same effort that they would have with or without AAC as part of this case. And having AAC part of the case or not I don't think impacted the scope of the damages plaintiffs were seeking or our valuation of the merits, or lack thereof, of the case or the value of the settlement.

So, in my opinion, having AAC out of the case because of its bankruptcy did not impact the fairness, reasonableness or the adequacy of the settlement at all.

THE COURT: All right. Thank you for that, Mr. Keel. The other thing I wanted to ask you about is this -- and, again, not asking you to sort of affirmatively make any representations about the correctness of what plaintiff's counsel is saying, but I would be interested. Have you seen anything in the moving papers or hear anything

from Mr. Wood today that makes you think "That doesn't sound right, Judge, and you ought to know something, you ought to know where I'm coming from on this"? Anything like that?

MR. KEEL: Nothing like that, Your Honor. I think -- you know, we obviously agreed to the settlement because we think it's fair, we think it's reasonable, we think it's adequate, and the fact that the notice program was complied with, the extent of the notice that went out, and there are zero objections from the class and no request for exclusion -- which I agree with Mr. Wood is pretty rare, you at least see some of those -- I think all that echoes and supports finding that the settlement is fair, reasonable and adequate.

THE COURT: All right. Thank you, Mr. Keel. Appreciate that.

MR. KEEL: Thank you, Your Honor.

THE COURT: All right. Okay. So I'm going to talk about the applicable standards, and then we'll talk about the proposed orders here, you know, the particularities of the orders. And the Court wants to note that the plaintiffs have it right when they note that in the Sixth Circuit we kind of look at a couple of different standards for fairness, reasonableness and adequacy of a settlement. One is the -- sort of the more recent standards promulgated Rule 23(e)(2), and then there are also the

somewhat overlapping and preexisting Sixth Circuit standards. Before we get to that, though, there's always the question, well, the Court's preliminary finding about certification preliminarily certifying the class for at least, you know, one of plaintiff's claims on that piece of it, is there any reason to come out differently at this stage, has anything changed.

And neither counsel has asserted that anything has change. I think it's fair to say plaintiffs have sort of represented nothing has. I see nothing that would change the analysis that I had before. So the prior certification decision is reaffirmed, and the Court will proceed accordingly.

We do have, you know, the same certified class, which was certified with respect to really has been the portion of the complaint beyond the marketing claim. So we can consider it sort of the restatement claims. And that certification decision is affirmed and made final because I do think that the key things, which are, of course, typicality -- for example, there's typicality, adequacy, numerosity and commonality. What the Court said before I think still holds.

There's also this notion of ascertainability. There's also something I'm going to talk about in Chicago on Friday, which sometimes presents an interesting question.

Here, ascertainability is not an issue either.

And then finally, in terms of predominance, the Court continues to find that predominance does exist and that class action resolution of the claims is superior to alternative methods.

Then, having said that, we look at, you know, with that class thus certified, what about the fairness and reasonableness and adequacy of the proposed settlement? I would note that if we look at Rule 23(e)(2), we look at the following:

First, the class representatives and class counsel have adequately represented the class. Here, you know, we've had discussions already about the sophistication of the class representatives and the work that the representative -- that the employees of the representative, the retirement system, put into this. In terms of class counsel, it's clear they did a lot of work, worked hard on these claims in a variety of contexts: Discovery, mediation, class certification, successfully opposing a motion to dismiss, doing the work on the complaints. All of those things suggest adequacy as required under Rule 23(e)(2).

Regarding the next 23(e)(2) factor, the proposal being negotiated at arm's length, that's clearly the case as a result of work with a mediator and clearly was two sides that were not seeing these things the same and were certainly

proceeding in all respects at arm's length.

Then we look at the adequacy of relief to the class, taking into account the costs, risks and delay of trial and appeal. All those things very substantial as laid out in appropriately considerable detail in the plaintiff's moving papers. You know, in this kind of case in particular, even maybe more than some class actions, the costs, risks and potential delay are just enormous, and it's the kind of thing that justifies, you know, plaintiff's counsel reasonably together with their client, the lead plaintiff, agreeing to settle for, you know, substantially less than the full amount they would claim at trial.

The effectiveness of any proposed method of distributing relief to the class, including the method of processing class member claims. This was a matter of great intentionality on the plaintiff's part, and the way of allocating the net settlement fund here certainly appears effective. The method of distributing it even down to the provision for, well, if your claim is less than $10, you know, we're not going to write a check for $10. But in all respects, it looked like an effective method to the Court to distribute relief to the class.

Next factor is the terms of any proposed award of attorney's fees. And the terms there -- and I've commented on this already -- there's a lot of work done by class

counsel. They took this on a contingency. The percentage requested is sort of nowhere near too high at 17 percent. The result does justify a substantial award because this is a -- you know, this is tough litigation to obtain a settlement.

And then any agreement required to be identified under Rule 23(e)(3). And, you know, the settlement agreement here, which, you know, is referred to as the stipulation of settlement, it's got a lot of different terms. The Court has reviewed it multiple times. There's nothing in there that would suggest that there's a problem with the adequacy of relief to the class or any other provision in there.

And then the Court needs to look at whether the proposal treats class members equitably relative to each other. And this is where the notion of having a supportable plan of allocation occurs. And the one here, it was pretty mathematical and factual in its method, and sort of the notion of the game being rigged in favor of this plaintiff or that plaintiff, you know, the retirement system versus, you know, the little guy investor, I'm not seeing a risk of that. And I think that the distribution methods, as I discussed, were appropriate and that is the key to saying that the proposal treats class members fair relatively to each other and equitably relative to each other.

Sixth Circuit factors overlap, and as I tick

through them, I think that will be clear enough. We look, number one, at the risk of fraud or collusion. No risk here in terms of -- you know, the main risk, it seems to me, is that the lead plaintiff or class counsel agrees to sell the class as a whole short in return for something favorable for the lead plaintiff or an unjustifiably favorable award for plaintiff's counsel. There's no sign of that.

Number two, the complexity, expense and likely duration of the litigation. All of those are very high. We're talking about high complexity expense and likely duration, especially considering the possibility of appeal. So that supports the adequacy of the settlement.

The amount of discovery engaged in by the parties. There was certainly in this case the quantification involved here. And, you know, this was one of these cases where, if you look at what happened here, this was not exactly settled on the front end of this case. And to the contrary, there was a substantial amount of work in discovery involved here. And that is laid out, for example, at Docket No. 177, page 14, the completion of fact discovery, including reviewing and analyzing more than 430,000 pages of documentary evidence and the taking and defending of 22 fact depositions. So there was a lot of discovery to inform class counsel.

Regarding likelihood of success on the merits, the

novice may wonder, well, which way would that even cut.  The answer, as I see it, is the higher the likelihood of success on the merits, the less justifiable it is to settle for amounts substantially below what the plaintiffs believe they could claim at trial.  Here, I think there's an appropriate balance between, you know, what was obtained, talking about 3.75 million as a gross settlement figure, and the likelihood of success on the merits because there were a lot of obstacles to success on the merits.  That's just the nature of these kinds of claims.  And that goes to liability, you know, as well as the likelihood of success in obtaining the desired, from the plaintiff's perspective, damages.

The opinions of class counsel and class representatives.  We've already discussed how that supports approval.

The reaction of absent class members.  The Sixth Circuit is right to make a specific emphasis on this in a way that Rule 23(e)(2) does not.  That's an extremely strong factor in this case in favor of the settlement, particularly where you have sophisticated investors.  There are going to be a lot of sophisticated class members.  And where no one's complaining in any way, shape or form about the settlement, that's a very good sign of the adequacy of the settlement.

And then, finally, the public interest.  A big

part of that is resolving these disputes so that, you know, the resources that would go to this case -- and, you know, I can say already to this point there have been a lot of resources from this Court that went on the written motions in this case -- public interest is certainly in favor of, where the parties agree to do so, and there's no reason not to, to allow the settlement to occur because it saves resources and also contributes to really a resolution of disputes in our society, which is always important.

So all the factors support acceptance of this proposed settlement.

Now, we touched, you know, a couple of times already on the attorney's fees issue, and I already explained why the award of a service fee from my perspective is reasonable. If we look at the Sixth Circuit factors regarding attorney's fees, the Court looks at the value of the benefit rendered to the plaintiff class. And I think, you know, the -- in raw figures, you know, the figure sounds pretty good, right, 3.75 million. And then, you're -- you know, you're also thinking, though, that, well, maybe it's not great to the maximum amount that plaintiffs would have obtained at trial, but that is very speculative and something in the future, and I think that the value of the benefit rendered to the plaintiff class in terms of it being certain and being available now is very substantial.

The value of the services on an hourly basis. And here's where -- because it's sort of a Sixth Circuit factor, we do need to know something about the amount of hours worked. And, you know, given where counsel lays out the work that was done and provides information about some of the hours, this is certainly a factor to be considered. I do think that in this particular case the Court is certainly -- particularly in a case like this, where the fee arrangement, not surprisingly, was contingency, the Court finds that there's no issue with the value of the services on an hourly basis.

The next factor is whether the services were undertaken on a contingent fee basis. That obviously helps support a higher award because plaintiffs had a risk of no -- plaintiff's counsel had a risk of no recovery despite lots of work.

Finally, society's stake in rewarding attorneys -- I say next to finally. Society's stake in rewarding attorneys who produce such benefits in order to maintain an incentive to others. You know, obviously, we don't want to overincentivize folks to bring claims that aren't meritorious, but we do want to incentivize attorneys, you know, pursuant to the congressional -- really the congressional design of essentially having private parties helping for securities laws, and we do want to incentivize

that.  You know, I think a much smaller reward than what's being requested is the kind of thing that may provide an insufficient incentive, and I think the incentive here is certainly reasonable.

Finally -- I keep saying finally.  This is still next to finally.  The complexity of the litigation.  We've talked about the complexity of these kinds of cases, not least this one.

And finally, the professional skill and standing of counsel involved on both sides.  You know, it's not my practice to comment on counsel that appear in front of me, except to comment on their experience.  I don't comment on their quality as such, but I think it suffices to say that, you know, the -- and there were multiple firms involved, but we can say that the lead firms, you know, I think have a history and counsel themselves have experience and demonstrated results that speak for themselves.

So I think that there's no issue with the Sixth Circuit factors supporting the award of attorney's fees that's requested.  So the Court is going to approve the plan of allocation.

It's going to approve the settlement.  It's going to approve the award of attorney's fees and the service fees.

So that kind of gets us down really to one more issue, which is the text of the proposed orders themselves.

And if we look at this, I want to start out with the order awarding attorney's fees and expenses. And, you know, when I look at this, it looks like, Mr. Wood, there's really nothing that the Court needs to fill in. And, you know, I scrutinize these things. A lot of times we'll come to the final hearing and there are various different blanks that need to be filled or language that needs to be changed, you know, because things are in flux or maybe it could just be a typo or, you know, counsel kicked the can down the road for filling in the blanks. In this one, I didn't see anything that needed to be changed or filled in. I think it's -- I think it's appropriate as is.

Do you see anything that would need to be changed?

MR. WOOD: We're good, Your Honor.

THE COURT: Okay. All right. How about you? What do you think, Mr. Keel? Do you see anything in there?

MR. KEEL: No, Your Honor.

THE COURT: All right. Then the next one is the proposed final judgment and order of dismissal with prejudice. And that one, in looking at it, I'm thinking that this is probably another one where I don't think I saw anything that needed to be changed.

Does that sound right to you, Mr. Wood?

MR. WOOD: Yes, Your Honor.

THE COURT: Okay. Mr. Keel, would you agree?

MR. KEEL: Yes, Your Honor.

THE COURT: And, finally, there was the order regarding the plan of allocation. Anyone see anything that needed to be changed there?

MR. WOOD: No, Your Honor.

THE COURT: No? Mr. Keel?

MR. KEEL: No, Your Honor.

THE COURT: All right. Then it seems to me like there is no reason not to enter the orders as proposed, and the Court will do accordingly forthwith.

All right. From my perspective, I think that that is all that we need to do here this afternoon.

Mr. Wood, anything further that you perceive?

MR. WOOD: Nothing, Your Honor. I appreciate your time and attention you took on this case.

THE COURT: Yes, sir. I have a San Diegan in the room. I would invite the San Diegans to say hello to each other afterwards if they're inclined to do so. It's good to have folks in from SoCal.

Mr. Keel, anything from you?

MR. KEEL: Nothing further, Your Honor. Thank you very much.

THE COURT: All right. Thank you for being here today. Appreciate you answering the Court's questions in really a direct and helpful manner. And we'll get those

orders issued.  Thanks, folks.  We stand in recess.

(Proceedings concluded at 3:50 p.m.)

REPORTER'S CERTIFICATE

I, Patricia A. Jennings, Official Court Reporter for the United States District Court for the Middle District of Tennessee, with offices at Nashville, do hereby certify:

That I reported on the Stenograph machine the proceedings held in open court on October 18, 2023, in the matter of DAVID BROWN CAUDLE, et al. vs. AAC HOLDINGS, INC., et al., Case No. 3:19-cv-00407; that said proceedings in connection with the hearing were reduced to typewritten form by me; and that the foregoing transcript (pages 1 through 34) is a true and accurate record of said proceedings.

This the 21st day of November, 2023.

/s/ Patricia A. Jennings
Patricia A. Jennings, RMR, CRR
Official Court Reporter